## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| NATURAL PRODUCTS GROUP, LLC, et al.,[1] | Case No. 10-_____ (       ) |
| Debtors. | Jointly Administered |

### DEBTORS' MOTION FOR AUTHORITY TO PAY CERTAIN PREPETITION CLAIMS OF VENDORS AND SERVICE PROVIDERS IN THE ORDINARY COURSE OF BUSINESS

Natural Products Group, LLC ("NPG") and its affiliated debtors and debtors in possession (collectively, the "Debtors") file this motion pursuant to 11 U.S.C. §§ 105(a) and 363(b) and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for authority to pay the liquidated, non-contingent, and undisputed prepetition claims of vendors and service providers (the "Prepetition Vendor Claims") in the ordinary course of business under the terms and conditions set forth herein (the "Motion"). In support of the Motion, the Debtors submit the Affidavit of Mark I. Lehman in Support of First Day Motions and Applications (the "Lehman Affidavit"), filed contemporaneously herewith and incorporated herein by reference, and respectfully represent as follows:

### Background

#### A.      The Bankruptcy Cases

1.      On January 27, 2010 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C.

---

[1]      The debtors and debtors in possession in these cases are Natural Products Group, LLC (Fed. EIN 86-1119470); Arbonne Intermediate Holdco, Inc. (Fed. EIN 87-0735363); Levlad Intermediate Holdco, Inc. (Fed. EIN 87-0735367); Arbonne International, LLC (Fed. EIN 33-0762250); Levlad, LLC (Fed. EIN 95-2973496); Arbonne Institute of Research and Development, LLC (Fed. EIN 33-0762250); Arbonne International Holdings, Inc. (Fed. EIN 20-5585671); and Arbonne International Distribution, Inc. (Fed. EIN 20-5585608).

§§ 101, et seq. (the "Bankruptcy Code"). The Debtors continue to operate their respective businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.    No creditors' committee has been appointed in these cases by the Office of the United States Trustee. No trustee or examiner has been requested or appointed in any of the Debtors' chapter 11 cases.

### B.    Overview of Business Operations

3.    NPG, together with its Debtor and non-Debtor affiliates (collectively, the "Company"), are leaders in the manufacture and distribution of personal care products. The Company operates primarily through Debtors Arbonne International, LLC ("Arbonne") and Levlad, LLC ("Levlad"). Arbonne is headquartered in Irvine, California and, either directly or through a subsidiary, has additional leased facilities located in Greenwood, Indiana; Dallas, Texas; Toronto, Ontario, Canada; Calgary, Alberta, Canada; New South Wales, Australia; Northampton, United Kingdom; and Munich, Germany. Levlad is headquartered in Chatsworth, California and has several other leased facilities in that area.[2]

4.    **NPG**. In 2004, the predecessor to Harvest Partners, L.P. ("Harvest"), a leading New York-based private equity investment firm specializing in management buyouts and growth financings of middle-market companies, formed NPG as a special purpose entity to complete the acquisitions of Arbonne and Levlad. Harvest, through its subsidiary Harvest Partners IV, L.P., along with other investors, provided approximately $93 million for the acquisitions. NPG serves as the ultimate parent of the Company.

---

[2]    An organizational chart illustrating the structure of the Company as of the Petition Date is included in the Lehman Affidavit.

5. **Arbonne**. Arbonne was founded in Switzerland in 1975 with the goal of developing skin care products based on natural, botanical principles, and it relocated its headquarters and primary operations to the United States in 1980. Arbonne now sells its own branded line of hundreds of botanically based personal care, cosmetic and wellness products, including skin care, body and hair care, cosmetics, aromatherapy, and nutritional products. Arbonne's products are botanically based, pH correct, dermatologist tested, hypoallergenic, and never tested on animals. Arbonne markets most of its products as part of a comprehensive personal care, cosmetic, health and wellness regimen designed for combined and repeated use.

6. Whereas traditional marketing moves products from the manufacturer to wholesalers, warehousers, shippers, advertisers, and retailers before ever reaching the consumer, Arbonne markets its products in the United States, Canada, the United Kingdom, and Australia through a direct sales network of Arbonne Independent Consultants ("AICs"). AICs are independent contractors and may be individuals or registered business entities. They are not employees of the Company. The AICs purchase Arbonne products from the Company at published discounted prices to then market and sell the products to consumers. Arbonne's marketing relies on developing and keeping trusted relationships with its consumers and the AICs. Consequently, Arbonne is focused on maintaining the quality of its products and services at a level that it believes exceeds that of standard retail brands.

7. AICs are eligible to earn commissions and incentives based on their retail volume and the retail volume of other AICs that they have directly or indirectly sponsored, also known as their "downline." AICs are compensated in two basic ways: (a) through retail profit on the sale of the Arbonne products that were purchased at a discount and (b) through

3

commissions, overrides, and bonuses paid based on the AICs' product sales volume and the sales volume of their downline.

8.      AICs operating in Canada contract directly with Arbonne's subsidiary, Arbonne International Distribution, Inc. ("AIDI"), which is a Debtor in these cases. AICs operating in the United Kingdom and Australia contract directly with Arbonne's non-Debtor foreign subsidiary, Arbonne Europe Sàrl ("AES"). Certain of Arbonne's other foreign subsidiaries, Arbonne International Canada, Inc. ("AICI"), Arbonne UK Limited ("AUKL"), and Arbonne Australia Pty Ltd. ("AAPL"), provide logistical support and services to the AICs operating in their respective countries, including leasing property, employing personnel and providing marketing and administrative services. Arbonne also established subsidiary Arbonne Germany GmbH in the event the Company decides to begin operations in Germany.

9.      Arbonne Institute of Research and Development, LLC ("AIRD"), also a Debtor in these cases, provides product development services for Arbonne. AIRD is a Delaware limited liability company with a service agreement to use a Swiss laboratory facility at which AIRD coordinates the efforts of master formulators as they research, develop, and finalize Arbonne's exclusive personal care products. The proprietary formulas being developed by AIRD are owned by Arbonne and represent botanically-based products based on cutting-edge technologies and the latest advances in skin care science. Neither Arbonne nor AIRD engage in any sales or other commercial activity in or from Switzerland.

10.      For the last twelve months ending November 30, 2009, Arbonne had revenue of approximately $378 million and EBITDA of approximately $38 million.

11.      **Levlad**. Levlad was founded in 1972 in Venice Beach, California. It was one of the first manufacturers of natural personal care products, with its founders starting off by

4

collecting rainwater and blending it with natural herbs from their herb shop, then selling the mixture as the very first rainwater shampoo. Currently, Levlad manufactures safe, performance driven and natural personal care products, including a line that is certified organic, by combining proven botanical, herbal, and floral treatments with modern ingredients and techniques. Levlad's products include shampoos, conditioners, soaps, bath gels, lotions, deodorants, and toothpastes. Levlad markets these products under the brand names Nature's Gate®, Nature's Gate Organics®, Nature's Gate Advanced Care®, Nature's Gate Organics Natural Results® Acne Care, and Rainwater Organics. Levlad markets these products internationally, including throughout North America at natural food retailers, including Whole Foods, and specialty retailers, including General Nutrition Centers (GNC), and Bed, Bath & Beyond. Levlad's brands hold leading market positions across key product categories.

12. Levlad also provides value-added, turn-key manufacturing and formulation services for private-label customers, including Arbonne. In such capacity, Levlad provides its customers a full range of services, including product creation, manufacturing, filling, product labeling and packaging design, raw material procurement, and collateral marketing development materials. In this capacity, Levlad has long-standing relationships with recognized name brand personal care product companies and specialty retailers – an average tenure of over twelve years for Levlad's top customers.

13. For the last twelve months ending November 30, 2009, Levlad had revenue of approximately $73 million and an EBITDA loss of approximately $6 million.

14. As of the Petition Date, the Company employed approximately 867 employees worldwide. Of that number, approximately 792 are employed by the Debtors and

5

approximately 75 are based with NPG's non-debtor subsidiaries. In addition to the Company's employees, Arbonne utilizes a direct sales network of approximately 750,000 AICs.

### C. Capital and Debt Structure

15. As of November 30, 2009, the Company's consolidated balance sheet reflected total assets of approximately $286 million. Of this amount, approximately $24 million was comprised of cash and cash equivalents, approximately $26 million was comprised of property and equipment, net of depreciation, approximately $42 million was comprised of inventories, and approximately $194 million was comprised of other assets. The Company's consolidated balance sheet also reflected total liabilities of approximately $804 million. As of the Petition Date, the Debtors' books and records reflect that they have approximately $4.3 million in cash on hand.

16. On or about June 19, 2006, Levlad and Arbonne, as borrowers, and Levlad Intermediate Holdco, Inc. ("Levlad HoldCo") and Arbonne Intermediate Holdco, Inc. ("Arbonne HoldCo," and together with Levlad HoldCo, the "HoldCos"), as guarantors, entered into (a) a $410 million First Lien Credit Agreement (the "First Lien Credit Agreement") and (b) a $195 million Second Lien Credit Agreement (the "Second Lien Credit Agreement"), each with Canadian Imperial Bank of Commerce ("CIBC"), as administrative agent and collateral agent, and with other lenders from time to time party thereto. In addition to the guarantees of the HoldCos, the obligations of Levlad and Arbonne under the First Lien Credit Agreement and Second Lien Credit Agreement were guaranteed by Debtor AIRD and were secured by liens on substantially all of the borrowers' and guarantors' assets.

17. The proceeds from the First Lien Credit Agreement and the Second Lien Credit Agreement were used by Arbonne and Levlad to repay approximately $298 million in

6

existing indebtedness that was incurred to finance the 2004 acquisition of Arbonne and Levlad by NPG.

18.     On the same date, the HoldCos, as borrowers, also entered into the HoldCo Credit Agreement, which provided for a $135 million unsecured term loan facility (the "HoldCo Term Loan") with Credit Suisse, as the then administrative agent, and with other lenders from time to time party thereto (the "HoldCo Lenders"). The HoldCo Term Loan bears interest at a rate of 13.5% per annum, which may, at the option of the HoldCos, be payable in kind, capitalized, compounded, and added to the principal.

19.     In March 2007, the Debtors refinanced their existing indebtedness under the First Lien Credit Agreement and Second Lien Credit Agreement. Specifically, on March 8, 2007, Levlad and Arbonne, as borrowers, and the HoldCos, as guarantors, entered into a $600 million Credit Agreement (as amended, supplemented, modified or otherwise in effect from time to time, the "OpCo Credit Agreement," and together with the HoldCo Credit Agreement, the "Prepetition Credit Facilities") with CIBC, as administrative agent and collateral agent, and other lenders from time to time party thereto (the "OpCo Lenders," and together with the HoldCo Lenders, the "Prepetition Lenders"). The OpCo Credit Agreement provides for term loans in the aggregate principal amount of $565 million (the "OpCo Term Loan") and a revolving credit facility of $35 million (the "OpCo Revolver," and together with the OpCo Term Loan and the HoldCo Term Loan, the "Prepetition Loans"), a portion of which may be used for letters of credit. In addition to the guarantees of the HoldCos, the obligations of Levlad and Arbonne under the OpCo Credit Agreement are guaranteed by Debtors AIRD, Arbonne International

7

Holdings, Inc., and AIDI, and are secured by liens on substantially all of the Debtors' assets (the "Prepetition Collateral").[3]

20. On June 12, 2009, the Debtors and the OpCo Lenders signed an amendment to the OpCo Credit Agreement (the "OpCo Credit Agreement Amendment"). At the time, the Debtors were in default on the OpCo Credit Agreement. Specifically, the Debtors had exceeded the permissible combined leverage ratio ("Leverage Ratio"), as set forth by a negative covenant in the OpCo Credit Agreement, and had failed to deliver audited financial statements and certificates signed by a designated representative, stating that the Debtors were not in default (collectively, the "Specified Defaults"). The OpCo Credit Agreement Amendment waived the Specified Defaults and temporarily eliminated the Leverage Ratio requirement but required the Company to generate minimum levels of EBITDA during the period in which the Leverage Ratio requirement was eliminated.

21. As of the Petition Date, the principal amount outstanding under the OpCo Term Loan is approximately $501 million. The principal amount outstanding under the OpCo Revolver is approximately $29 million, and the aggregate amount of outstanding letter of credit obligations is approximately $1.1 million. The total amount outstanding under the HoldCo Term Loan, as of the Petition Date, is approximately $217 million.

**D.    Events Leading to the Commencement of the Chapter 11 Cases**

22. Although the Company had experienced a high rate of revenue growth through 2006 and early 2007, this was driven primarily by unusually higher levels of recruitment for new AICs, which was unsustainable. In 2005 and 2006, on a net basis, the Company added approximately 434,000 and 612,000 AICs, respectively. Because recruitment of AICs tends to

---

[3]    Nothing contained herein shall constitute an admission by the Debtors of the validity, priority, extent or enforceability of the Prepetition Loans or any lien or security interest asserted by the Prepetition Lenders in connection with the Prepetition Collateral.

8

be a leading indicator of later attrition, the historically high numbers of new consultants in those years resulted in attrition exceeding the recruiting levels in subsequent years. In 2007, 2008 and 2009, on a net basis, the Company lost approximately 108,000, 270,000 and 145,000 AICs, respectively. This attrition, combined with the downturn in the economy and the financial crisis later in 2008, caused a reduction in the Company's overall net sales.

23.     The Company responded by implementing several cost saving and revenue producing initiatives, including (a) relocation of most of the Company's customer service and information technology operations to Dallas, Texas, which lowered expenses related to information technology contract labor and customer service temporary help as the Company was able to recruit full time employees at lower salaries, (b) conversion of certain AIC publications to an on-line only format, (c) a reduction in force at certain subsidiaries and reduction of warehouse operations to a single shift, (d) realigning the AIC compensation plan to incentivize early stage AICs interested in building a business, (e) development of targeted marketing and product strategies, and (f) expanding Arbonne's Regional Sales Manager program into underutilized geographic areas. Although the Company experienced some success with these initiatives, such success was unable to reverse the effects of the decrease in AICs combined with the global financial crisis.

24.     Compounding this revenue reduction was the fact that the permitted maximum Leverage Ratio contained in the OpCo Credit Agreement was reduced in the fourth quarter of 2008. The tightening of the covenant requirements coupled with reduced revenue triggered a default under the OpCo Credit Agreement, and resulted in the Debtors' entry into the OpCo Credit Agreement Amendment with the OpCo Lenders. The OpCo Credit Agreement Amendment waived certain defaults and temporarily eliminated the Leverage Ratio requirement

9

but required the Company to generate minimum levels of EBITDA during the period in which the Leverage Ratio requirement was eliminated. Although the Company was able to satisfy the EBITDA requirement for the third quarter of 2009, it became apparent at that time that it would not be able to do so going forward and that the Company's debt exceeded the amount that the Company could reasonably support.

25. Consequently, the Company, with the assistance of its financial and legal advisors, entered into discussions with the OpCo Lenders, HoldCo Lenders and principal stockholders in an attempt to implement a consensual restructuring of the Company's capital structure. Further, during the period of discussions, the Company entered into a forbearance agreement with the OpCo Lenders whereby the OpCo Lenders agreed to forbear from exercising remedies in connection with certain defaults by the Company under the OpCo Credit Agreement. The forbearance agreement has been extended from time to time and the forbearance period is currently extended through February 1, 2010 (subject to certain conditions contained therein).

26. Following these extensive discussions—which, among other things, involved negotiating and finalizing term sheets reflecting the material terms of a proposed restructuring, and entry into plan support agreements with a majority of the OpCo Lenders and the HoldCo Lenders[4]—on January 13, 2010, the Company solicited acceptances of the final form of restructuring proposal (the "Restructuring"), which was set forth in that certain Proposal to Restructure, Disclosure Statement and Solicitation of Acceptances of a Prepackaged Plan of Reorganization (the "Disclosure Statement"), filed concurrently herewith. As set forth in the Disclosure Statement, the Company sought approval of the Restructuring through a consensual transaction outside of bankruptcy with the unanimous support of the Prepetition Lenders (the

---

[4]     A more detailed description of the plan support agreements may be found in the Disclosure Statement, which has been filed concurrently herewith.

WM1A 945828v1 01/27/10

"Out-of-Court Transaction"), or, if such unanimous consent was not obtained, in accordance with the terms of the prepackaged plan of reorganization (the "Plan") attached to the Disclosure Statement, subject to bankruptcy court approval.

27.     As more fully described in the Disclosure Statement, the Plan generally provides for the satisfaction of (a) the OpCo Debt[5] through the (i) reinstatement of an aggregate of $125 million of the existing OpCo Debt under the Reinstated OpCo Term Loan, and (ii) issuance upon the Effective Date of 85% of the New NPG Common Stock (subject to dilution for New NPG Common Stock issuable upon the exercise of the New NPG Warrants or any New NPG Options that may be issued and/or awarded under a new Long Term Management Incentive Plan); and (b) the HoldCo Debt through the issuance of New NPG Warrants, which will entitle the holders thereof to purchase New NPG Common Stock equal to an aggregate of 5% of the New NPG Common Stock (subject to dilution for New NPG Common Stock issuable upon the exercise of any New NPG Options that may be issued and/or awarded under the Long Term Management Incentive Plan). Notably, with the exception of the Prepetition Lenders and the existing holders of equity interests in NPG, all of the Company's creditors and equity holders are unimpaired under and deemed to have accepted the Plan. The existing holder of equity interests in NPG will have their equity cancelled and, therefore, are deemed to have rejected the Plan.

28.     The deadline to vote to accept or reject the proposed Restructuring (whether effectuated through an Out-of-Court Transaction or through the Plan) expired on January 27, 2010 at 12:00 noon (Prevailing Eastern Time). Although the Prepetition Lenders overwhelmingly voted in favor of the Restructuring, the Debtors were unable to consummate the Restructuring through the Out-of-Court Transaction. To prevent the consequences of defaults

---

[5]     All capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Disclosure Statement and Plan, which have been filed concurrently herewith.

under the OpCo Credit Agreement, preserve the Debtors' business as a going-concern, and restructure their debt in accordance with the Plan, the Debtors commenced these cases under chapter 11 of the Bankruptcy Code.

### E.    Unimpaired Claims of Vendors and Service Providers

29.    In the ordinary course of their business, the Debtors rely on certain third-party vendors and service providers to supply goods, materials and services that the Debtors cannot operate without or cannot replace without incurring exorbitant costs (collectively, the "Vendors"). The essential goods and services provided by these Vendors include, among other things, raw materials and components that are critical to the manufacturing process, common carrier, and warehousing and logistics services for the storage and shipment of products, webhosting for selling products and providing AIC training programs online, credit card processing services for the placing of orders by AICs and their clients, and professional and consulting services that are not otherwise subject to fee applications under the Bankruptcy Code or the Plan. The Debtors believe that some of the Vendors may refuse to continue to provide essential goods and services if the Debtors do not promptly pay prepetition amounts outstanding.

30.    The Debtors' inability to maintain their existing relationships with their Vendors could cause production disruptions if such parties cease providing goods and services, even for a short period of time. In many instances, the Vendors represent the sole source providers of such goods or services or are otherwise not replaceable in a timely and cost effective manner. The Debtors, for example, do business with numerous Vendors without the benefit of contracts. Such Vendors are not obligated to honor particular trade terms or to continue to do business with the Debtors going forward.

12

31.     In addition to not being contractually bound to perform, certain of the Debtors' Vendors, such as shippers, for example, may be secured creditors as a result of their ability to assert liens against the Debtors' property.  Additionally, a large percentage of the Debtors' existing payables to Vendors are on account of goods sold to the Debtors in the ordinary course of business within 20 days prior to the Petition Date and, as such, these Vendors may be entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.  The Debtors also rely on numerous foreign Vendors located in Canada for, among other things, maintaining the distribution network of the Debtors.  Given that some of the Vendors are located exclusively outside of the United States, such Vendors may not be subject to the jurisdiction of this Court and may be unwilling to continue to do business with the Debtors absent the timely payment of their Prepetition Vendor Claims.

32.     Given that the Debtors operate in a highly-competitive industry, where supply-chain excellence is critical in maintaining market share, any discontinuity in the provision of the essential goods and services provided by the Vendors could have a severe detrimental impact upon the Debtors' estates, as well as on the timely fulfillment of orders, the quality of products the Debtors manufacture and distribute, the integrity of the Debtors' reputation, and, ultimately, the loyalty of the AICs and their clients.

33.     As of the Petition Date, the Debtors estimate that the aggregate amounts owed to Vendors to be no more than $7.3 million.  Of that total, the Debtors estimate that approximately $500,000 is owed to foreign Vendors.  The Debtors further estimate that approximately $2.85 million of the total amount of Prepetition Vendor Claims may be entitled to priority under section 503(b)(9) of the Bankruptcy Code.

WM1A 945828v1 01/27/10

34. The Debtors' prepackaged Plan was prepared and negotiated in an effort to effectuate a comprehensive reorganization of the Debtors' capital structure, while having as limited an impact on the Debtors' ongoing business operations as possible. To that end, the Plan leaves unimpaired all allowed Priority Claims, Administrative Claims, Unsecured Claims and Secured Claims (as each such term is defined in the Plan) to ensure minimal disruption to the Debtors' business operations as a result of the chapter 11 process. Additionally, the Debtors' prepackaged Plan has been overwhelmingly accepted by those creditors that are impaired and thus authorized to vote under the Plan. Given that the Plan is strongly supported by the Debtors' major creditor constituencies—i.e., the OpCo Lenders and the HoldCo Lenders—the Debtors, consistent with the ultimate goal of preserving their business while effectuating the restructuring, are seeking authority to pay the Prepetition Vendor Claims in the ordinary course of business, which payment the holders of such claims would otherwise be entitled to receive upon consummation of the prepackaged Plan. The Debtors submit that the payment of such Claims in the ordinary course will preserve their enterprise value for all parties in interest and is entirely consistent with the terms of the Plan that has been approved by the Debtors' creditors.

### Jurisdiction

35. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Relief Requested

36. By this Motion, the Debtors seek an order, substantially in the form attached hereto as Exhibit "A", authorizing, but not directing, the Debtors to pay the Prepetition Vendor Claims in the ordinary course of business. Although the Debtors seek authorization to

14

pay the Prepetition Vendor Claims in the ordinary course of business, the Debtors seek at this time the authority to pay no more than $7.3 million in respect of such Claims.

37.     The Debtors believe they are current on their payments to the Vendors, and only wish to maintain such payments throughout the course of their chapter 11 cases. The Debtors propose that they be authorized to pay the Prepetition Vendor Claims in the ordinary course of business subject to the following conditions (the "Claim Payment Conditions"):

(a)     By accepting payment on account of its Prepetition Vendor Claim, the Vendor must continue doing business with the Debtors in the ordinary course according to terms no less favorable to the Debtors than those in place prior to the Petition Date;

(b)     The claimant must waive its right to file or otherwise assert against any or all of the Debtors, their estates, or the Debtors' customers, any claim or lien related to any prepetition amounts allegedly owed to the Vendor by the Debtors at the time of payment of the Prepetition Vendor Claim arising from agreements or other arrangements entered into prior to the Petition Date;

(c)     To the extent the Vendor has already obtained or asserted any such claim or lien, it must take all necessary actions to withdraw such claim or lien; and

(d)     To the extent that a Vendor paid pursuant to any order entered on the Motion refuses to continue doing business with the Debtors in the ordinary course, it must immediately disgorge any payments made on account of its Prepetition Vendor Claims to the Debtors estates.

38.     The Debtors submit that the relief requested herein is essential, appropriate and in the best interests of the Debtors, their creditors and all parties in interest.

## Basis for Relief

39.     The Debtors submit that the payment of the Prepetition Vendor Claims in the ordinary course of business is appropriate pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, as well as the "necessity of payment" doctrine. Section 363 of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in

15

the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under this section, a court may authorize a debtor to pay certain prepetition claims. See, e.g., In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989). To do so, "the debtor must articulate some business justification, other than the mere appeasement of major creditors[.]" Id. As set forth below, the Debtors can easily articulate a sound business justification for payment of the Prepetition Vendor Claims in the ordinary course of business.

### A. Payment of the Prepetition Vendor Claims is Warranted and Necessary to Allow the Debtors to Successfully Operate their Businesses and Preserve the Value of their Estates

40. The Debtors believe that the relief requested in the Motion is warranted, necessary and reasonable under the circumstances. Specifically, the satisfaction of the Prepetition Vendor Claims in the ordinary course of business represents an amount not greater than $7.3 million, the entirety of which would be payable under the terms of the Debtors' prepackaged Plan, which has been overwhelmingly accepted by the Debtors' impaired creditors. By making these payments in the ordinary course, the Debtors will prevent any disruption in their ability to obtain the goods and services necessary to the operation of their respective businesses and, ultimately, the preservation of their existing AIC network and customer base. Additionally, through the Claim Payment Conditions, the Debtors will ensure that they are able to continue to operate their businesses upon favorable trade terms, thus preserving their enterprise value for the benefit of all parties in interest.

41. The payment of Vendors in accordance with the Claim Payment Conditions is appropriate pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, as well as the "necessity of payment" doctrine. Pursuant to section 105(a) of the Bankruptcy Code, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under the doctrine of necessity, a

16

bankruptcy court may exercise its equity powers under section 105(a) to authorize a debtor to pay certain prepetition claims, even though such payment is not explicitly authorized under the Bankruptcy Code. See, e.g., In re Just for Feet, Inc., 242 B.R. 821, 824 (D. Del. 1999) (bankruptcy courts may exercise equity powers to authorize payment of prepetition debt where such payment is necessary to preserve the going concern value of a debtor's business); Ionosphere Clubs, 98 B.R. at 175 (section 105 empowers bankruptcy courts to authorize payment of prepetition debt "when such payment is needed to facilitate the rehabilitation of the debtor").

42.　　Additionally, several courts have authorized payment of prepetition claims pursuant to section 363(b) of the Bankruptcy Code. As noted above, section 363(b)(1) authorizes courts to permit a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1); see also Ionosphere Clubs, 98 B.R. at 175 ("Section 363(b) gives the court broad flexibility in tailoring its orders to meet a wide variety of circumstances."); In re Tropical Sportswear Int'l Corp., 320 B.R. 15, 19-20 (Bankr. M.D. Fla. 2005) (acknowledging that in certain circumstances section 363(b)(1) might authorize payment of prepetition claims if it was shown that such payment would "enable a successful reorganization and make even the disfavored creditors better off"); In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (noting that the preplan satisfaction of prepetition claims may be necessary to satisfy a debtor's fiduciary duties under sections 1106 and 1107 of the Bankruptcy Code).

43.　　As debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are fiduciaries with a "duty to maximize the value of the bankruptcy estate." Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery, 330 F.3d 548, 573 (3d Cir. 2003). "The debtor-in-possession's

17

fiduciary duty to maximize includes the 'duty to protect and conserve property in its possession for the benefit of creditors.'" In re Mushroom Transp. Co., Inc., 382 F.3d 325, 339 (3d Cir. 2004) (citing In re Marvel Entm't Grp., Inc., 140 F.3d 463, 474 (3d Cir. 1998)). Some courts have noted that there are instances in which a debtor can fulfill this fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." CoServ, 273 B.R. at 497. The CoServ court specifically noted that the preplan satisfaction of prepetition claims would be a valid exercise of the debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate . . . ." Id.

44.     Courts have routinely authorized payment of prepetition claims in the context of prepackaged chapter 11 cases in this and other districts. See, e.g., In re Vertis Holdings, Inc., (Case No. 08-11460) (CSS) (Bankr. D. Del. July 22, 2008); In re Hilex Poly Co. LLC, (Case No. 08-10890) (KJC) (Bankr. D. Del. May 7, 2008); In re Holley Performance Prods., Inc., (Case No. 08-10256) (PJW) (Bankr. D. Del. Mar. 5, 2008); In re DJK Residential LLC, (Case No. 08-10375) (JMP) (Bankr. S.D.N.Y. Feb. 5, 2008).[6]

45.     The Debtors' prepackaged Plan contemplates the payment in full of all creditors, other than holders of OpCo Lender Claims and HoldCo Lender Claims (as each such term is defined in the Plan), who have voted overwhelmingly to accept the Plan. Protecting the value of the Debtors' businesses by preventing operational disruptions is among the principal goals of the Debtors' restructuring efforts and the Plan. The relief requested herein preserves the value of the Debtors' estates by (a) ensuring that the Debtors have access to the goods and services that they need to remain stable and (b) enabling the Debtors to maintain good relationships with their Vendors for the benefit of all parties in interest upon the Debtors'

---

[6]     In fact, the Bankruptcy Court for the Southern District of New York has incorporated a motion to pay prepetition claims of creditors whose claims will be paid in full in its prepackaged bankruptcy guidelines for first-day motions. See S.D.N.Y. Admin. Order M-387 § VI.C.16 (amending General Order 203).

18

emergence from chapter 11. The Debtors do not seek authority to pay all Prepetition Vendor Claims immediately, but only to pay in the ordinary course of business undisputed amounts that come due on terms consistent with prepetition practice. Thus, the Debtors submit that the relief is narrowly tailored to facilitate their proposed fast-tracked chapter 11 reorganization process.

46.     The relief sought herein is vital to the Debtors' successful reorganization. The Debtors submit that good relations with their Vendors is essential to the continued operation of their businesses during the pendency of their chapter 11 cases.

47.     Furthermore, if the Vendors agree to continue supplying the Debtors postpetition under current trade terms, as required under the Claim Payment Conditions, the Debtors will avoid unnecessary expenses during these cases. Current trade terms will help the Debtors maintain their liquidity, and will facilitate their ability to sustain operations while reorganizing, while avoiding potential additional costs relating to the shortening of trade terms and/or Vendor requests for the payment of cash on demand or in advance.

48.     In addition, the relief requested herein allows the Debtors to avoid the expense required to analyze each Prepetition Vendor Claim to determine exactly which amounts are subject to potential liens, payable as postpetition administrative expenses, or subject to administrative priority under section 503(b)(9) of the Bankruptcy Code. Finally, paying the Prepetition Vendor Claims in the ordinary course of business minimizes disruption to the Debtors' operations by preventing the initiation of reclamation claims, adversary proceedings and other motions filed by the Vendors seeking payment on their prepetition claims. Because the Debtors' chapter 11 cases are proceeding under a compressed schedule, and because the Prepetition Vendor Claims are unimpaired under the prepackaged Plan, paying such Claims in the ordinary course of business renders a savings to the Debtors both monetarily and

19

operationally by preserving liquidity, and enabling the Debtors to operate smoothly during these cases.

49. The Debtors submit that no parties in interest will be prejudiced by the relief requested herein, as the prepackaged Plan leaves unimpaired all claims other than OpCo Lender Claims and HoldCo Lender Claims. The relief requested herein merely expedites the treatment and distribution that is afforded to the Vendors under the Plan to protect the Debtors' businesses and preserve the value of their estates.

50. For all of the foregoing reasons, the Debtors believe that the relief requested herein is essential and appropriate, and therefore, request that the Court grant the Motion.

**B.     Failure to Authorize Payment of the Prepetition Vendor Claims Within 21 Days After the Petition Date Would Cause Immediate and Irreparable Harm**

51. Pursuant to Bankruptcy Rule 6003, a court may grant a motion authorizing payment of prepetition claims within twenty-one (21) days of the Petition Date if relief is necessary to avoid immediate and irreparable harm. See Fed. R. Bankr. P. 6003. The Debtors would suffer immediate and irreparable harm if the Court denied the relief request herein.

52. The Debtors request a waiver of any stay of the effectiveness of the order approving this Motion. Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).

53. As stated above, the Debtors' businesses are highly dependent on maintaining supply-chain excellence. As such, the preservation of their relationships with their Vendors is at the very heart of their operations and, by extension, their ability to reorganize. There is a very real risk that, absent the relief requested, the Debtors would experience costly

20

delays caused by the refusal of Vendors to continue providing goods and services. Authorizing the relief requested in the Motion will help the Debtors avoid such consequences. The Debtors submit that failure to pay the Prepetition Vendor Claims in the ordinary course of business may force the Debtors to halt orders in process, causing costly delays and irreparably harming the Debtors' relationships with their customers, independent consultants, and Vendors, and ultimately damaging their reputation in the marketplace. These factors together threaten the Debtors' revenue stream during a critical time in their reorganization. Accordingly, the Debtors submit that they have satisfied the requirements of Bankruptcy Rules 6003, ample cause exists to justify a waiver of the fourteen-day stay imposed by Bankruptcy Rule 6004(h), and there is sufficient support for payment of the Prepetition Vendor Claims as proposed herein.

### Reservation of Rights

54.     Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' right to dispute any claim or an approval or assumption of any agreement, contract or lease. Likewise, if this Court grants the relief requested herein, any payment made or credit granted pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

### Notice

55.     Notice of this Motion has been provided to the Office of the United States Trustee for the District of Delaware, counsel to the agents for the Prepetition Lenders, the Debtors' 30 largest unsecured creditors on a consolidated basis (including counsel if known), and all parties requesting notices pursuant to Bankruptcy Rule 2002. The Debtors submit that no other or further notice need be provided.

21

56.     No previous motion for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request entry of an order (i) granting the relief requested herein and (ii) granting the Debtors such other and further relief as the Court deems just and proper.

Dated:  January 27, 2010
        Wilmington, Delaware

FOX ROTHSCHILD LLP

By: _____
    Jeffrey M. Schlerf (No. 3047)
    Eric M. Sutty (No. 4007)
    John H. Strock (No. 4965)
    Citizens Bank Center, Suite 1600
    919 North Market Street
    Wilmington, Delaware 19801
    Telephone: (302) 654-7444

                – and –

    Thomas E Lauria
    Craig H. Averch
    Matthew C. Brown
    WHITE & CASE LLP
    Wachovia Financial Center
    200 South Biscayne Boulevard, 49th Floor
    Miami, Florida 33131
    Telephone: (305) 371-2700
    Facsimile: (305) 358-5744

    Proposed Attorneys for the Debtors
    and Debtors in Possession

WM1A 945828v1 01/27/10

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| NATURAL PRODUCTS GROUP, LLC, et al.,[1] | ) | Case No. 10-_____ (     ) |
|  | ) |  |
|  | ) | Jointly Administered |
| Debtors. | ) |  |
|  | ) | Re: Docket No. ___ |

## ORDER AUTHORIZING DEBTORS TO PAY CERTAIN PREPETITION CLAIMS OF VENDORS AND SERVICE PROVIDERS IN THE ORDINARY COURSE OF BUSINESS

Upon the motion, dated January 27, 2010 (the "Motion"), of Natural Products

Group, LLC and its affiliated debtors and debtors in possession (collectively, the "Debtors"),

pursuant to sections 105(a) and 363(b) of title 11 of the United States Code, 11 U.S.C. §§ 101, et

seq. (the "Bankruptcy Code") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") for authority to pay the Prepetition Vendor Claims[2] in the

ordinary course of business, all as more fully set forth in the Motion; for the reasons set forth in

the Motion, and upon consideration of the Affidavit of Mark I. Lehman in Support of First Day

Motions and Applications, sworn to on the 27th day of January, 2010; and it appearing that the

Debtors will suffer immediate and irreparable harm if the relief requested in the Motion is not

granted; and it appearing that the Court has jurisdiction over this matter; and it appearing that

due notice of the Motion as set forth therein is sufficient under the circumstances, and that no

other or further notice need be provided; and it further appearing that the relief requested in the

---

[1]     The debtors and debtors in possession in these cases are Natural Products Group, LLC (Fed. EIN 86-1119470); Arbonne Intermediate Holdco, Inc. (Fed. EIN 87-0735363); Levlad Intermediate Holdco, Inc. (Fed. EIN 87-0735367); Arbonne International, LLC (Fed. EIN 33-0762250); Levlad, LLC (Fed. EIN 95-2973496); Arbonne Institute of Research and Development, LLC (Fed. EIN 33-0762250); Arbonne International Holdings, Inc. (Fed. EIN 20-5585671); and Arbonne International Distribution, Inc. (Fed. EIN 20-5585608).

[2]     Capitalized terms not otherwise defined in this Order shall have the meaning ascribed to such terms in the Motion.

Motion is in the best interests of the Debtors and their estates and creditors; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is hereby

ORDERED that the Motion is granted; and it is further

ORDERED that the Debtors are authorized, but not directed, to pay the Prepetition Vendor Claims in accordance with the following Claim Payment Conditions set forth in the Motion:

(a)     By accepting payment on account of its Prepetition Vendor Claim, the Vendor must continue doing business with the Debtors in the ordinary course according to terms no less favorable to the Debtors than those in place prior to the Petition Date;

(b)     The claimant must waive its right to file or otherwise assert against any or all of the Debtors, their estates, or the Debtors' customers, any claim or lien related to any prepetition amounts allegedly owed to the Vendor by the Debtors at the time of payment of the Prepetition Vendor Claim arising from agreements or other arrangements entered into prior to the Petition Date;

(c)     To the extent the Vendor has already obtained or asserted any such claim or lien, it must take all necessary actions to withdraw such claim or lien; and

(d)     To the extent that a Vendor paid pursuant to any order entered on the Motion refuses to continue doing business with the Debtors in the ordinary course, the Debtors reserve the right to seek to recover any payments made on account of such Prepetition Vendor Claims as unauthorized postpetition transfers under section 549 of the Bankruptcy Code or other applicable bankruptcy or non-bankruptcy law;

provided, however, that payments to Vendors pursuant to this Order shall not exceed $7.3 million in aggregate, without prejudice to the Debtors' right to seek further relief from the Court increasing the amounts set forth in this decretal paragraph; provided further, however, that the relief granted pursuant to this Order shall not extend beyond this Court's ruling on the

2

confirmation of the Debtors' prepackaged Plan, without prejudice to the Debtors' right to seek further relief from the Court as may be necessary; and it is further

ORDERED that nothing in this Order is intended or shall be construed to constitute relief from the automatic stay pursuant to section 362 of the Bankruptcy Code; and it is further

ORDERED that, notwithstanding the possible applicability of Bankruptcy Rules 6003 and 6004(h) or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry; and it is further

ORDERED that this Court shall, and hereby does, retain jurisdiction with respect to all matters arising from or related to the implementation and interpretation of this Order.

Dated: January ___, 2010
       Wilmington, Delaware


_____
UNITED STATES BANKRUPTCY JUDGE

3