**PROPOSAL TO RESTRUCTURE, DISCLOSURE STATEMENT AND
SOLICITATION OF ACCEPTANCES OF A PREPACKAGED PLAN OF REORGANIZATION**

# Natural Products Group, LLC, *et al.*

> **THE PROPOSAL TO RESTRUCTURE AND SOLICITATION OF ACCEPTANCES OF THE PREPACKAGED PLAN OF REORGANIZATION WILL EXPIRE AT 12:00 NOON, PREVAILING EASTERN TIME, ON JANUARY 27, 2010, UNLESS EXTENDED BY US (SUCH DATE AND TIME, AS THE SAME MAY BE EXTENDED, THE "VOTING DEADLINE"). HOLDERS OF BANK DEBT SHOULD REFER TO THE BALLOT ATTACHED HERETO AS SCHEDULE 4 FOR INSTRUCTIONS ON HOW TO ACCEPT THE TERMS OF THE PROPOSAL TO RESTRUCTURE AND VOTE ON THE PLAN OF REORGANIZATION.**

Natural Products Group, LLC ("NPG") and certain of its direct and indirect subsidiaries (collectively, with all subsidiaries, the "Company") are proposing to restructure their outstanding indebtedness (the "Restructuring") as set forth in this disclosure statement and solicitation of acceptances of a prepackaged plan of reorganization (as it may be supplemented and amended from time to time, collectively the "Disclosure Statement") and the related ballot ("Ballot") for accepting or rejecting the Restructuring proposal. The indicative terms of the Restructuring are set forth in this Disclosure Statement and are summarized below. The Restructuring may be effected as a consensual transaction outside of bankruptcy (the "Out-of-Court Transaction") or as and in accordance with the prepackaged plan of reorganization attached hereto as Schedule 3 (as it may be amended and supplemented from time to time, the "Plan") to be approved in the Chapter 11 Cases (defined and described below).

The proposed Restructuring includes the following key elements.

- *Corporate Restructuring*. On or prior to the closing of the Restructuring (the "Effective Date"), NPG will be converted from a Delaware limited liability company to a Delaware corporation that will serve as the ultimate parent of the Company after the Restructuring ("New NPG"). If the Restructuring is effected through the Plan, this will be implemented through federal bankruptcy law and appropriate filings pursuant to the Delaware General Corporation Law. If the Restructuring is effected through the Out-of-Court Transaction, this conversion will be accomplished through a merger of NPG with a newly-formed Delaware corporation. Additionally, the two current direct subsidiaries of NPG, Arbonne Intermediate Holdco, Inc. ("Arbonne HoldCo") and Levlad Intermediate Holdco, Inc. ("Levlad HoldCo"), will merge with each other, with Arbonne HoldCo surviving the merger (the "Levlad Merger"). We refer to Arbonne HoldCo following the Levlad Merger as "New HoldCo". New NPG will be the sole stockholder of New HoldCo which, in turn, will continue to own directly Arbonne International, LLC ("Arbonne") and Levlad, LLC ("Levlad").

- *OpCo Debt*. All of the outstanding debt under that certain Credit Agreement, dated as of March 8, 2007, by and among Arbonne and Levlad, as borrowers, Arbonne HoldCo and Levlad HoldCo, as guarantors, and the several lenders from time to time party thereto (the "OpCo Lenders"), Canadian Imperial Bank of Commerce as administrative agent and collateral agent (the "OpCo Agent"), CIBC World Markets Corp. and Credit Suisse Securities (USA) LLC as joint lead arrangers and joint bookrunners, Credit Suisse as syndication agent, and Freeport Financial LLC and General Electric Capital Corporation as co-documentation agents, on the other hand, (together with all documents, instruments and agreements executed or entered into in connection therewith, and any amendments thereto, the "OpCo Credit Agreement," and the outstanding indebtedness thereunder, the "OpCo Debt"), would be fully satisfied and restructured as set forth below.

  o An aggregate of $125 million of the existing OpCo Debt would be reinstated as a new term loan by and among Arbonne and Levlad as borrowers, and the existing OpCo Lenders, on the terms set forth on Schedule 2 hereto (the "Reinstated OpCo Term Loan"). Each OpCo Lender would participate on a pro rata basis in the Reinstated OpCo Term Loan.

  o In full satisfaction of the OpCo Debt not reinstated pursuant to the Reinstated OpCo Term Loan, New NPG will issue to each OpCo Lender its pro rata share of 85% of the common stock of New NPG ("New NPG Common Stock") to be issued upon the Effective Date, subject to dilution for (i) New NPG Common Stock issuable upon the exercise of the New NPG Warrants, (ii) New NPG Common

Stock issuable upon the exercise of any New NPG Options that may be issued under the Long Term Management Incentive Plan (up to an additional 7.5% of the New NPG Common Stock, on a fully diluted basis), and (iii) any additional New NPG Common Stock that may be awarded in accordance with the Long Term Management Incentive Plan.

- *HoldCo Debt*. All of the outstanding debt under the HoldCo Credit Agreement, dated as of June 19, 2006, by and among Arbonne HoldCo and Levlad HoldCo, as borrowers, and the several lenders from time to time party thereto (the "HoldCo Lenders"), Wilmington Trust FSB, as successor in interest to Credit Suisse, New York Branch as administrative agent (the "HoldCo Agent"), Credit Suisse Securities (USA) LLC and CIBC World Markets Corp. as joint lead arrangers and joint bookrunners, CIBC World Markets Corp. as syndication agent, and CitiCorp North America, Inc. and UBS Securities LLC, as co-documentation agents (together with all documents, instruments and agreements executed or entered into in connection therewith, and any amendments thereto, the "HoldCo Credit Agreement," and the outstanding indebtedness thereunder, the "HoldCo Debt"), will be fully satisfied as set forth below.

  o New NPG will issue to each HoldCo Lender its pro rata share of warrants (the "New NPG Warrants") that will entitle the holders thereof to purchase New NPG Common Stock equal to an aggregate of 5% of the New NPG Common Stock, subject to dilution for (i) New NPG Common Stock issuable upon the exercise of any New NPG Options that may be issued under the Long Term Management Incentive Plan (up to an additional 7.5% of the New NPG Common Stock, on a fully diluted basis), and (ii) any additional New NPG Common Stock that may be awarded in accordance with the Long Term Management Incentive Plan.

  o The New NPG Warrants will have an aggregate cash exercise price equal to the sum of 100% of the principal amount of the OpCo Debt plus accrued interest thereon as of the closing date of the Restructuring, plus the principal, interest, fees and expenses outstanding under the New Term Loan (defined below) as of the closing date of the Restructuring. The aggregate cash exercise price of the New NPG Warrants will be allocated among all HoldCo Lenders on a pro rata basis

- In connection with the Restructuring, each OpCo Lender will be entitled to participate in providing to Arbonne and Levlad a new senior secured debtor-in-possession facility (in the event of a prepackaged chapter 11 filing) or new term loan (in the event of the Out-of-Court Transaction) in an initial amount of $10 million, which shall be drawn on the effective date of such facility, with the option of the borrowers to borrow up to an additional $10 million at any time prior to June 30, 2010 in one subsequent draw upon the satisfaction of certain conditions. If the Restructuring is effected pursuant to a chapter 11 filing, the debtor-in-possession facility would automatically become a term loan under an exit lending facility on the Effective Date (unless otherwise stated herein, the debtor-in-possession facility, the new term loan, and the term loan under the exit lending facility shall be referred to as the "New Term Loan"). If the Restructuring is effected as an Out-of-Court Transaction, there will be no debtor-in-possession facility because it will be unnecessary. Instead, the New Term Loan would be implemented consensually at the closing of the Restructuring. Except with respect to the debtor-in-possession facility, the New Term Loan will be part of a single facility that will include the New Term Loan and the Reinstated OpCo Term Loan (the "Exit Facility"). In consideration for providing the commitment in respect of the New Term Loan, each lender under the New Term Loan portion of the Exit Facility will receive its pro rata share of 10% of the New NPG Common Stock to be issued on the Effective Date, subject to dilution for (i) New NPG Common Stock issuable upon the exercise of the New NPG Warrants, (ii) New NPG Common Stock issuable upon the exercise of any New NPG Options that may be issued under the Long Term Management Incentive Plan (up to an additional 7.5% of the New NPG Common Stock, on a fully diluted basis), and (iii) any additional New NPG Common Stock that may be awarded in accordance with the Long Term Management Incentive Plan.

We refer to the OpCo Debt and HoldCo Debt to be satisfied through the Restructuring collectively as the "Old Debt." We refer to the OpCo Lenders and the HoldCo Lenders together as the "Prepetition Lenders."

The Company intends to provide copies of the Exit Facility, New NPG Warrants, and the certificate of incorporation and bylaws for New NPG to the Prepetition Lenders at least three (3) days prior to the Voting Deadline. We sometimes refer to the Exit Facility, the New NPG Warrants, the certificate of incorporation and bylaws for New NPG collectively as the "Restructuring Documents".

The Company is seeking the approval of all Prepetition Lenders, but is prepared to pursue the Restructuring even if such unanimous support is not achieved. If each Prepetition Lender does not approve the Restructuring through the Out-of-Court Transaction, or if the Company for any reason determines that it would be more advantageous or expeditious, and there is sufficient support for the Plan, NPG and certain of its subsidiaries and affiliates, including Arbonne HoldCo, Levlad HoldCo, Arbonne and Levlad, intend to commence cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), to consummate the Restructuring through the Plan, as set forth in the section of this Disclosure Statement entitled "The Chapter 11 Plan." To effect the Plan, sufficient holders of OpCo Debt and HoldCo Debt (i.e., holders representing at least 66 2/3% in principal amount and more than 50% in number of those impaired creditors entitled to vote in those classes that actually vote) must vote in favor of the Plan and the other conditions to consummation of the Plan must be satisfied.

Only those parties who actually vote are counted for these purposes, and therefore, it is important that you submit your Ballot so that it is received by the Voting Deadline. If the Company effects the Restructuring through the Chapter 11 Cases, your election to accept the terms of the Restructuring shall constitute (A) a vote in favor of the Out-of-Court-Transaction and the Plan, (B) your agreement to the releases, injunctions and exculpations contained in the Plan and in the Ballot, (C) your agreement to exchange (i) if you are an OpCo Lender, your OpCo Lender Claim for New NPG Common Stock and the Reinstated OpCo Term Loan and (ii) if you are a HoldCo Lender, your HoldCo Lender Claim for the New NPG Warrants, in each case, as set forth in this Disclosure Statement and the Plan, (D) if you are an OpCo Lender, your agreement to be bound by the terms of the Reinstated OpCo Term Loan portion of the Exit Facility and the related ancillary security, collateral and other documents, and (E) your agreement not to sell, assign, transfer, hypothecate or otherwise dispose of, directly or indirectly (a "Transfer"), all or any of your Old Debt (or any option thereon or any right or interest related thereto, including any voting rights associated therewith), unless the transferee agrees in writing to accept and be bound by the terms of the Ballot. If the Company effects the Restructuring through the Out-of-Court Transaction, your election to accept the Restructuring shall constitute the same agreements set forth in this paragraph, except that you will not be agreeing to the Plan, but instead will be agreeing to the Out-of-Court Transaction and the related Restructuring Documents.

**HOLDERS OF OPCO DEBT CONSTITUTING MORE THAN 66 2/3% IN PRINCIPAL AMOUNT AND MORE THAN 50% IN NUMBER OF THE OPCO DEBT HAVE ALREADY EXECUTED AND DELIVERED A PLAN SUPPORT AGREEMENT, DATED DECEMBER 18, 2009, WITH ARBONNE AND LEVLAD (THE "OPCO PLAN SUPPORT AGREEMENT"). ON THE TERMS AND SUBJECT TO THE CONDITIONS CONTAINED IN THE OPCO PLAN SUPPORT AGREEMENT, SUCH OPCO LENDERS HAVE AGREED, AMONG OTHER THINGS, TO TAKE SUCH STEPS AS ARE REASONABLY NECESSARY TO SUPPORT AND ACHIEVE APPROVAL OF THE CONFIRMATION AND CONSUMMATION OF THE RESTRUCTURING, INCLUDING VOTING TO APPROVE THE RESTRUCTURING.**

**HOLDERS OF HOLDCO DEBT CONSTITUTING MORE THAN 66 2/3% IN PRINCIPAL AMOUNT AND MORE THAN 50% IN NUMBER OF THE HOLDCO DEBT HAVE ALREADY EXECUTED AND DELIVERED PLAN SUPPORT AGREEMENTS WITH LEVLAD, ARBONNE, NPG, AND HARVEST PARTNERS IV, L.P. (EACH, A "HOLDCO PLAN SUPPORT AGREEMENT" AND COLLECTIVELY WITH THE OPCO PLAN SUPPORT AGREEMENT, THE "PLAN SUPPORT AGREEMENTS" ). ON THE TERMS AND SUBJECT TO THE CONDITIONS CONTAINED IN THE HOLDCO PLAN SUPPORT AGREEMENTS, SUCH HOLDCO LENDERS HAVE AGREED, AMONG OTHER THINGS, TO TAKE SUCH STEPS AS ARE REASONABLY NECESSARY TO SUPPORT AND ACHIEVE APPROVAL OF THE CONFIRMATION AND CONSUMMATION OF THE RESTRUCTURING, INCLUDING VOTING TO APPROVE THE RESTRUCTURING.**

By accepting the Out-of-Court Transaction or voting to accept or reject the Plan, you are making certain certifications, as contained in the Ballot (including securities laws representations relating to your eligibility to receive the proposed Restructuring consideration), and agreeing to certain provisions contained in the Ballot and/or Plan including exculpation, injunction and release provisions.

**The Company reserves the right to extend the Voting Deadline in its sole and absolute discretion, which may be for any or no reason, and to terminate or withdraw the proposal for the Restructuring or the Plan in any respect, all in accordance with the Plan and the OpCo Plan Support Agreement. Any extension of the**

Voting Deadline will be communicated by the Company to all parties entitled to vote no later than 10:00 a.m., Prevailing Eastern Time, on the next business day following the previously scheduled Voting Deadline.

You should consider the risk factors set forth in the section of this Disclosure Statement entitled "Risk Factors" before you vote to accept or reject the Restructuring.

THIS SOLICITATION OF ACCEPTANCES OF THE RESTRUCTURING IS BEING CONDUCTED (I) TO OBTAIN AGREEMENT FROM PREPETITION LENDERS TO THE OUT-OF-COURT TRANSACTION AND (II), IF SUFFICIENT SUPPORT IS NOT OBTAINED, OR IF THE COMPANY DETERMINES TO PURSUE THE RESTRUCTURING THROUGH THE CHAPTER 11 CASES FOR OTHER REASONS, TO OBTAIN SUFFICIENT ACCEPTANCES OF THE PLAN PRIOR TO THE FILING OF A VOLUNTARY CASE UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. BECAUSE NO CHAPTER 11 CASE HAS YET BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY ANY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(A) OF THE BANKRUPTCY CODE. THE COMPANY HAS NOT AT THIS TIME TAKEN ANY ACTION TO APPROVE A BANKRUPTCY FILING AND, IF THE RESTRUCTURING IS CONSUMMATED THROUGH THE OUT-OF-COURT TRANSACTION, NONE OF NPG OR ITS SUBSIDIARIES WILL COMMENCE A BANKRUPTCY FILING TO CONSUMMATE THE PLAN.

Prior to voting on the Restructuring, holders of Old Debt are encouraged to read and consider carefully this entire Disclosure Statement, including the Plan, and the matters described herein and in the Ballot.

In making a decision in connection with the Out-of-Court Transaction or the Plan, holders of Old Debt must rely on their own examination of the Company and the terms of the Restructuring, the Out-of-Court Transaction, and the Plan, including the merits and risks involved. Holders of Old Debt should not construe the contents of this Disclosure Statement as providing any legal, business, financial or tax advice. Each holder of Old Debt should consult with its own legal, business, financial and tax advisors with respect to any such matters concerning this Disclosure Statement, the Restructuring, the Out-of-Court Transaction, the Plan and the transactions contemplated thereby.

January 13, 2010

## SECURITIES LAW MATTERS

The New NPG Common Stock and the New NPG Warrants to be issued to the Prepetition Lenders as part of the Restructuring (together, the "New Securities") have not been registered under the U.S. Securities Act of 1933, as amended (the "Securities Act"), or the securities laws of any U.S. state or other jurisdiction, and no registration of such securities is contemplated. Any New Securities to be issued in the Restructuring pursuant to an Out-of-Court Transaction are being offered and sold under the private placement exemption provided by Section 4(2) of the Securities Act and similar exemptions under the laws of the states in which the offering will be made. New Securities issued in the Restructuring pursuant to an Out-of-Court Transaction may be offered or sold only to investors that are qualified institutional buyers ("QIBs") (as defined in Rule 144A under the Securities Act) or institutional "accredited investors" (as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act). New Securities issued in the Restructuring pursuant to an Out-of-Court Transaction constitute "restricted securities" and may be transferred only as permitted under the Securities Act and other applicable securities laws, and in accordance with the restrictions described in Article XVII – "Securities Law Matters."

If the Restructuring is effected through the Chapter 11 Cases, the New Securities offered and issued in exchange for Old Debt in accordance with the Plan will be offered and issued in reliance on the exemption from registration specified in section 1145 of the Bankruptcy Code. New Securities issued in accordance with the Plan will be deemed to have been issued in a public offering pursuant to section 1145(c) of the Bankruptcy Code and may be transferred only as permitted under the Securities Act and other applicable securities laws, and in accordance with the restrictions described in Article XVII – "Securities Law Matters."

None of the New Securities to be issued on the Effective Date have been approved or disapproved by the Securities and Exchange Commission or by any state securities commission or similar public, governmental, or regulatory authority, and neither the Securities and Exchange Commission nor any such state authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or upon the merits of the Plan. Any representation to the contrary is a criminal offense. Persons or entities trading in or otherwise purchasing, selling or transferring securities of the Company should evaluate this Disclosure Statement and the Plan in light of the purposes for which they were prepared.

This Disclosure Statement does not constitute an offer to sell or a solicitation of an offer to buy the New Securities in any jurisdiction in which it is unlawful to make such offer or solicitation.

This Disclosure Statement is submitted by the Company on a confidential basis to the holders of Old Debt who are QIBs or "institutional accredited investors" for informational use solely in connection with the consideration of the Out-of-Court Transaction or the Plan. Its use for any other purpose is not authorized. Distribution of this Disclosure Statement to any person other than a holder of Old Debt and any person retained to advise such person with respect to its participation in the Out-of-Court Transaction or the Plan (other than any such distribution by the Company or its advisors) is unauthorized, and until such time, if any, as the Plan is publicly filed with the Bankruptcy Court, any disclosure of any of its contents, without the Company's prior written consent, is prohibited. Each holder of Old Debt, by accepting delivery of this Disclosure Statement, agrees to the foregoing and to make no copies or reproductions of this Disclosure Statement or any documents referred to in this Disclosure Statement in whole or in part (other than publicly available documents).

**<u>For New Hampshire Residents</u>:**

**Neither the fact that a registration statement or an application for a license has been filed under Chapter 421-B of the New Hampshire Revised Statutes Annotated with the State of New Hampshire nor that fact that a security is effectively registered or a person is licensed in the State of New Hampshire constitutes a finding by the secretary of state that any document filed under New Hampshire Revised Statutes Annotated Chapter 421-B is true, complete, and not misleading. Neither any such fact nor the fact that an exemption is available for a security or transaction means that the secretary of state has passed in any way upon the merits or qualifications of, or recommended or given approval to, any person, security or transaction. It is unlawful to make, or cause to be made, to any prospective purchaser, customer, or client any representation inconsistent with the provisions of this paragraph.**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ..................................................................................................................1

II. NOTICE TO HOLDERS OF CLAIMS ................................................................................2

    A.    Voting Procedures and Ballots.................................................................................3

    B.    Voting Deadline .......................................................................................................4

    C.    Solicitation, Voting and Information Agent .............................................................4

    D.    Voting Record Date ..................................................................................................4

    E.    The Ballot..................................................................................................................4

III. SUMMARY OF THE RESTRUCTURING AND TREATMENT UNDER THE PLAN ..........6

    A.    Overview of the Restructuring and Solicitation Process .........................................6

    B.    Summary of the Terms of the Restructuring.............................................................7

    C.    Different Means of Implementation..........................................................................9

    D.    Summary of Restructuring Transactions in Consensual Out-of-Court Transaction.................................................................................................................9

    E.    Conditions to Closing of the Restructuring ...........................................................11

    F.    Summary of the Distributions under the Plan.........................................................11

IV. GENERAL INFORMATION.................................................................................................14

    A.    Overview of the Company ......................................................................................14

    B.    Capital and Debt Structure.....................................................................................19

    C.    Events Leading to the Need for Restructuring.......................................................21

V. SELECTED FINANCIAL INFORMATION .........................................................................22

    A.    Annual Consolidated Financial Information for NPG ...........................................22

    B.    Consolidated Financial Statements for NPG .........................................................22

VI. FINANCIAL PROJECTIONS AND ASSUMPTIONS .........................................................22

    A.    Purpose and Objectives..........................................................................................22

B.     Projected Consolidated Financial Statements ........................................................23

VII. ENTERPRISE VALUE...............................................................................................24

VIII. INTERESTS OF CERTAIN PERSONS IN RESTRUCTURING ..............................25

     A.     Plan Support Agreements ...................................................................................25

     B.     Harvest Management Agreement ........................................................................28

     C.     Employment Agreements.....................................................................................28

IX. EXPLANATION OF CHAPTER 11 .............................................................................30

     A.     Filing Entities......................................................................................................30

     B.     Overview of Chapter 11......................................................................................31

     C.     Plan of Reorganization.......................................................................................32

     D.     The Confirmation Hearing ..................................................................................32

     E.     Confirmation of a Plan .......................................................................................32

X. OVERVIEW OF THE PLAN .........................................................................................33

XI. ANTICIPATED EVENTS DURING THE CHAPTER 11 CASES..................................34

     A.     Timetable ............................................................................................................34

     B.     First Day Pleadings and Orders .........................................................................35

     C.     Representation of the Filing Entities as Debtors in Possession ...........................38

     D.     Filing Entities' Schedules; Bar Date; Claims Objections and Estimated Amount of Claims................................................................................................39

XII. PENDING LITIGATION.............................................................................................40

XIII. THE CHAPTER 11 PLAN ........................................................................................41

     A.     Treatment of Intercompany Claims ...................................................................41

     B.     Classification and Treatment of Claims and Equity Interests................................42

     C.     Means for Implementation of the Plan.................................................................47

     D.     Plan Distribution Provisions ..............................................................................53

     E.     Procedures for Resolving and Treating Contested Claims ...................................56

F.    Conditions Precedent to Confirmation of the Plan and the Occurrence of the Effective Date ....................................................................................57

G.    The Disbursing Agent ...........................................................................59

H.    Treatment of Executory Contracts and Unexpired Leases .....................................60

I.    Retention of Jurisdiction .......................................................................62

J.    Other Material Provisions of the Plan.........................................................64

XIV. RISK FACTORS ..............................................................................................71

A.    General Considerations ...........................................................................71

B.    Certain Considerations with Respect to the Restructuring .....................................71

C.    Certain Considerations with Respect to the Company's Business .........................72

D.    Certain Bankruptcy Considerations .............................................................74

E.    Inherent Uncertainty of Financial Projections .........................................75

F.    Certain Considerations Relating to New NPG Common Stock and New NPG Warrants .................................................................................75

G.    Methods of Solicitation...........................................................................76

H.    Classification and Treatment of Claims and Equity Interests.............................77

I.    Claims Estimations ................................................................................77

XV. PLAN CONFIRMATION AND CONSUMMATION PROCEDURES .............................78

A.    Overview..............................................................................................78

B.    Confirmation of the Plan.........................................................................79

C.    Effect of Confirmation ...........................................................................84

XVI. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES .....................................85

A.    U.S. Federal Income Tax Consequences to the Company....................................86

B.    U.S. Federal Income Tax Consequences to Holders of Old Debt .........................91

C.    Backup Withholding Tax and Information Reporting Requirements...................98

XVII. SECURITIES LAW MATTERS.........................................................................................99

    A.    New Securities Issued in the Out-of-Court Transaction ........................................99

    B.    New Securities Issued in Accordance with the Plan...........................................101

    C.    Additional Restrictions on Transfer....................................................................103

    D.    Representations and Acknowledgements .............................................................103

XVIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
PLAN .................................................................................................................................105

    A.    Liquidation under Chapter 7 of the Bankruptcy Code........................................105

    B.    Alternative Plans of Reorganization ...................................................................105

## SCHEDULES AND EXHIBITS

List of Defined Terms .............................................................................................Schedule 1

Restructuring Term Sheet .......................................................................................Schedule 2

Prepackaged Joint Chapter 11 Plan .......................................................................Schedule 3

Ballot .......................................................................................................................Schedule 4

Consolidated Financial Statements ........................................................................Schedule 5

Liquidation Analysis ...............................................................................................Schedule 6

Projections ...............................................................................................................Schedule 7

# I.

## INTRODUCTION

**All capitalized terms used in this Disclosure Statement and not defined herein shall have the meanings ascribed thereto in the Plan (see Exhibit "A" to the Plan, Glossary of Defined Terms). For ease of reference, all defined terms used in this Disclosure Statement that are not defined in the Plan are listed on Schedule 1 to this Disclosure Statement with reference to the page number where the term is defined. Unless otherwise stated, all references herein to "Schedules" and "Exhibits" are references to schedules and exhibits to this Disclosure Statement and the Plan, respectively.**

This Disclosure Statement and the Schedules hereto, the accompanying Ballots, and the related material are being provided in connection with the Company's solicitation to obtain acceptances of the Restructuring. The Company is soliciting such acceptances and votes from all holders of OpCo Debt and HoldCo Debt as of the Voting Record Date (set forth below). Acceptances and/or votes are not being solicited from holders of any other claims against or interests in the Company because their consent is not necessary to effect the Restructuring through an Out-of-Court Transaction and they are not entitled to vote on the Plan, as explained below. The purpose of this solicitation is to obtain sufficient approvals to enable the Restructuring to occur as an Out-of-Court Transaction and, alternatively, in the absence of such approvals, to obtain sufficient acceptances of a joint prepackaged plan of reorganization prior to the commencement of any Chapter 11 Cases.

THE COMPANY HAS NOT FILED FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, AND THIS DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH OR APPROVED BY THE BANKRUPTCY COURT, THE SECURITIES AND EXCHANGE COMMISSION OR ANY OTHER GOVERNMENTAL OR REGULATORY AGENCY. THIS DISCLOSURE STATEMENT WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL ONLY IF THE COMPANY SEEKS RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AND CONFIRMATION OF THE PLAN.

IN ANTICIPATION OF THE POSSIBLE COMMENCEMENT OF THE CHAPTER 11 CASES TO EFFECT THE RESTRUCTURING, THIS DISCLOSURE STATEMENT DESCRIBES THE PLAN. CLASS 1 – PRIORITY CLAIMS, CLASS 4 – SECURED CLAIMS, CLASS 5 – UNSECURED CLAIMS AND CLASS 7 – OTHER EQUITY INTERESTS ARE UNIMPAIRED UNDER THE PLAN AND ARE THEREFORE DEEMED TO HAVE ACCEPTED THE PLAN. CLASS 6 – NPG EQUITY INTERESTS ARE NOT ENTITLED TO A DISTRIBUTION UNDER THE PLAN AND ARE THEREFORE DEEMED TO HAVE REJECTED THE PLAN. THE COMPANY IS SOLICITING ACCEPTANCES OF THE PLAN FROM CLASS 2 – OPCO LENDER CLAIMS AND CLASS 3 – HOLDCO LENDER CLAIMS.

THE COMPANY BELIEVES THAT THE RESTRUCTURING, EFFECTED THROUGH EITHER THE OUT-OF-COURT TRANSACTION OR THE PLAN, IS IN THE BEST INTERESTS OF AND PROVIDES THE HIGHEST AND MOST EXPEDITIOUS

RECOVERIES TO HOLDERS OF CLAIMS AGAINST THE COMPANY.  ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE RESTRUCTURING THROUGH EITHER THE OUT-OF-COURT TRANSACTION OR THE PLAN ARE URGED TO VOTE IN ITS FAVOR.

## II.

## <u>NOTICE TO HOLDERS OF CLAIMS</u>

The purpose of this Disclosure Statement is two-fold.  First, if the Restructuring is effected through an Out-of-Court Transaction pursuant to the Restructuring Documents, this Disclosure Statement enables you as an OpCo Lender or HoldCo Lender to make an informed decision in exercising your right to accept or reject the Restructuring and enter into the Restructuring Documents and related agreements.  Second, if the Restructuring is effected through the Plan, this Disclosure Statement enables you, as a creditor whose Claim is impaired under the Plan, to make an informed decision in exercising your right to accept or reject the Restructuring and the Plan.  <u>See</u> "Plan Confirmation and Consummation Procedures."

**THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE RESTRUCTURING.  PLEASE READ THIS DOCUMENT WITH CARE.**

**THE SUMMARIES OF THE TERMS OF THE RESTRUCTURING AND THE PLAN, AND THE STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE RESTRUCTURING DOCUMENTS TO BE PROVIDED, THE PLAN AND THE EXHIBITS ANNEXED THERETO, AND TO THE EXHIBITS AND SCHEDULES ANNEXED TO THIS DISCLOSURE STATEMENT.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.  IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF ANY RESTRUCTURING DOCUMENT OR THE PLAN, THE TERMS OF SUCH RESTRUCTURING DOCUMENT OR THE PLAN, AS APPLICABLE, SHALL GOVERN.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF TITLE 11 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (THE "BANKRUPTCY RULES") AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER NON-BANKRUPTCY LAW.**

**AS TO PENDING OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS DISCLOSURE STATEMENT  SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY**

**PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE RESTRUCTURING AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, NEW NPG, NPG, OR ANY OF THEIR RESPECTIVE SUBSIDIARIES AND AFFILIATES.**

ONE OF THE PURPOSES OF THIS SOLICITATION IS TO OBTAIN SUFFICIENT ACCEPTANCES OF THE RESTRUCTURING AND OF THE PLAN PRIOR TO THE COMPANY'S POSSIBLE COMMENCEMENT OF CASES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. AT THIS TIME, NO CHAPTER 11 CASES HAVE BEEN COMMENCED. AS SUCH, THE BANKRUPTCY COURT HAS NOT YET APPROVED THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(A) OF THE BANKRUPTCY CODE. IF THE COMPANY DOES NOT EFFECT THE RESTRUCTURING THROUGH THE OUT-OF-COURT TRANSACTION, AND INSTEAD FILES CHAPTER 11 CASES, THE COMPANY WILL PROMPTLY SEEK AN ORDER (I) APPROVING (A) THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION AND (B) THE SOLICITATION OF VOTES AS HAVING BEEN IN COMPLIANCE WITH SECTION 1126(B) OF THE BANKRUPTCY CODE AND (II) CONFIRMING THE PLAN DESCRIBED HEREIN.

Each Prepetition Lender that is entitled to vote to accept or reject the Restructuring should read this Disclosure Statement, the Restructuring Documents to be provided and the Plan in their entirety before voting. No solicitation of votes to accept or reject the Restructuring and the Plan may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. Except for the Company and certain of the professionals it has retained, no person has been authorized to use or promulgate any information concerning the Company, its businesses, the Restructuring or the Plan other than the information contained in this Disclosure Statement, and if other information is given or made, such information may not be relied upon as having been authorized by the Company. You should not rely on any information relating to the Company, its businesses, the Restructuring or the Plan other than that information contained in this Disclosure Statement and the Schedules and Exhibits hereto.

**DO NOT RETURN ANY OTHER DOCUMENTS WITH YOUR BALLOT.**

A.    **Voting Procedures and Ballots**

The Company has retained AlixPartners, LLP to act as its solicitation, voting and information agent (the "Solicitation Agent") in connection with obtaining approval and acceptance of the Restructuring and the Plan.

After carefully reviewing this Disclosure Statement, including the attached Schedules and Exhibits, please indicate your acceptance or rejection of the Restructuring and the Plan on the Ballot attached hereto as Schedule 4 and return the same by any means, including facsimile, telecopy transmission or electronic mail, as set forth thereon, so that it will be actually received by the Solicitation Agent no later than the Voting Deadline.

**B.     Voting Deadline**

**All Ballots must be actually received by the Solicitation Agent no later than January 27, 2010 at 12:00 noon, Prevailing Eastern Time.**

**C.     Solicitation, Voting and Information Agent**

Questions and requests for assistance or additional copies of this Disclosure Statement or the related Ballot may be directed to the Solicitation Agent.  The contact information for the Solicitation Agent is as follows:

**Natural Products Group, LLC**
**c/o AlixPartners, LLP**
**2101 Cedar Springs Road**
**Suite 1100**
**Dallas, Texas 75201**

**Telephone: (877) 788-2814.**

**For detailed voting instructions and the name, address and phone number of the person you may contact if you have questions regarding the voting procedures, see the Ballot.**

Ballots and all correspondence in connection with the Restructuring and the Plan should be sent or delivered to the Solicitation Agent in accordance with the instructions contained in the Ballot. Any holder that has questions concerning acceptance procedures should contact the Solicitation Agent at the telephone number set forth above.

**D.     Voting Record Date**

The "Voting Record Date" for purposes of determining the holders of Old Debt that are eligible to vote on the Restructuring and/or the Plan is January 12, 2009.

**E.     The Ballot**

There are three different voting choices in connection with the Restructuring, which are outlined in greater detail below. The Ballot was designed to assist holders of Claims to understand the voting process.

OPTION 1.  ACCEPT the Restructuring and vote in favor of the Out-of-Court Transaction and the Plan.

OPTION 2.  REJECT the Restructuring; vote against the Out-of-Court Transaction and the Plan.

OPTION 3.  Take no action; not vote on the Restructuring, the Out-of-Court Transaction or the Plan.

**Holders of Claims that take no action, or fail to take timely action, may nevertheless be bound by the terms of the Plan and have the relevant treatment applied to their Old Debt if the Plan is consummated.**

For the purpose of obtaining sufficient approvals for the Plan, only those parties who actually vote are counted, and therefore, it is important that you submit your Ballot so that it is received by the Voting Deadline. Your election to accept the terms of the Restructuring shall constitute (a) a vote in favor of the Out-of-Court Transaction and the Plan, (b) your agreement to the releases, injunctions and exculpations contained in the Plan and in the Ballot, (c) your agreement to exchange (i) if you are an OpCo Lender, your OpCo Lender Claim for New NPG Common Stock and the Reinstated OpCo Term Loan and (ii) if you are a HoldCo Lender, your HoldCo Lender Claim for the New NPG Warrants, in each case, as set forth in this Disclosure Statement and the Plan, (d) if you are an OpCo Lender, your agreement to be bound by the terms of the Reinstated OpCo Term Loan portion of the Exit Facility and the related ancillary security, collateral and other documents, and (e) your agreement not to Transfer all or any of your Old Debt (or any option thereon or any right or interest related thereto, including any voting rights associated therewith), unless the transferee agrees in writing to accept and be bound by the terms of the Ballot. If the Company effects the Restructuring through the Out-of-Court Transaction, your election to accept the Restructuring shall constitute the same agreements set forth in this paragraph, except that you will not be agreeing to the Plan, but instead will be agreeing to the Out-of-Court Transaction and the related Restructuring Documents.

**ANY HOLDER OF OPCO DEBT THAT HAS EXECUTED THE OPCO PLAN SUPPORT AGREEMENT HAS AGREED, SUBJECT TO THE TERMS AND CONDITIONS OF THE OPCO PLAN SUPPORT AGREEMENT, TO CHOOSE OPTION 1 AND VOTE TO ACCEPT THE RESTRUCTURING AND THE PLAN AND AGREE TO THE RESTRUCTURING DOCUMENTS. ANY HOLDER OF HOLDCO DEBT THAT HAS EXECUTED A HOLDCO PLAN SUPPORT AGREEMENT HAS AGREED, SUBJECT TO THE TERMS AND CONDITIONS OF SUCH HOLDCO PLAN SUPPORT AGREEMENT, TO CHOOSE OPTION 1 AND VOTE TO ACCEPT THE RESTRUCTURING AND THE PLAN AND AGREE TO THE RESTRUCTURING DOCUMENTS.**

**HOLDERS OF OPCO DEBT CONSTITUTING MORE THAN 66 2/3% IN PRINCIPAL AMOUNT AND MORE THAN 50% IN NUMBER OF THE OPCO DEBT HAVE ALREADY EXECUTED AND DELIVERED THE OPCO PLAN SUPPORT AGREEMENT AND ARE EXPECTED TO VOTE TO ACCEPT THE RESTRUCTURING AND THE PLAN AND AGREE TO THE RESTRUCTURING DOCUMENTS.**

**HOLDERS OF HOLDCO DEBT CONSTITUTING MORE THAN 66 2/3% IN PRINCIPAL AMOUNT AND MORE THAN 50% IN NUMBER OF THE HOLDCO DEBT HAVE ALREADY EXECUTED AND DELIVERED A HOLDCO PLAN SUPPORT AGREEMENT AND ARE EXPECTED TO VOTE TO ACCEPT THE RESTRUCTURING AND THE PLAN AND AGREE TO THE RESTRUCTURING DOCUMENTS.**

The Company reserves the right to extend the Voting Deadline in its sole and absolute discretion, which may be for any or no reason, and to terminate or withdraw the proposal for the Restructuring or the Plan in any respect, all in accordance with the Plan and the OpCo Plan Support Agreement. Any extension of the Voting Deadline will be communicated by the Company to all parties entitled to vote no later than 10:00 a.m., Prevailing Eastern Time, on the next business day following the previously scheduled Voting Deadline.

ALL VOTES TO ACCEPT OR REJECT THE RESTRUCTURING AND THE PLAN MUST BE CAST BY USING THE APPROPRIATE BALLOT. VOTES WHICH ARE CAST IN ANY OTHER MANNER WILL NOT BE COUNTED.

**THE COMPANY URGES ALL HOLDERS OF IMPAIRED CLAIMS TO ACCEPT THE RESTRUCTURING AND THE PLAN.**

### III.

### <u>SUMMARY OF THE RESTRUCTURING AND TREATMENT UNDER THE PLAN</u>

*This summary highlights some basic information contained, or incorporated by reference, in this Disclosure Statement to help you understand the Company's business, the Restructuring and the Plan. It does not contain all of the information that is important to you. You should carefully read this Disclosure Statement to understand fully the terms of the Restructuring, as well as the information incorporated by reference herein. You should pay special attention to the information in the section entitled "Risk Factors."*

*Unless stated otherwise, the discussion in this Disclosure Statement of the Company's business includes the business of New NPG and its direct and indirect consolidated subsidiaries. Unless otherwise indicated or the context otherwise requires, "the Company," "we," "us" and "our" refer to NPG and its direct and indirect subsidiaries on a consolidated basis.*

**A.      Overview of the Restructuring and Solicitation Process**

Through consummation of the Restructuring, we intend to reorganize our capital structure, significantly reduce our indebtedness, and improve our liquidity, while providing adequate time to execute our business strategy. On the terms and subject to the conditions described in this Disclosure Statement and the accompanying Ballot, we are proposing the Restructuring through the Out-of-Court Transaction as a means of fully satisfying the Old Debt and, in light of the possibility that we may pursue the Restructuring through the Plan, we are also soliciting acceptances of the Plan.

You may (i) vote to accept the terms of the Restructuring, which shall be a vote in favor of the Out-of-Court Transaction and the Plan, (ii) vote to reject the Restructuring, which shall be a vote against the Out-of-Court Transaction and the Plan, or (iii) take no action with respect to the Restructuring, the Out-of-Court Transaction and the Plan. If you take no action with respect to the Restructuring, the Out-of-Court Transaction and the Plan, you will be deemed to have rejected the Restructuring. This means that all of the Prepetition Lenders will not have accepted the Restructuring and that the conditions to completion of the Out-of-Court Transaction may not

be satisfied. But it will not have any impact on the vote to approve or reject the Plan if the Company pursues the Restructuring through the Plan, and you may nevertheless be bound by the terms of the Plan and have the relevant treatment applied to your Old Debt if the Plan is consummated.

If we effect the Restructuring through the Out-of-Court Transaction in accordance with the Restructuring Documents, the Old Debt will be restructured as described in this Disclosure Statement.

If we do not consummate the Restructuring through the Out-of-Court Transaction, and instead effect the Restructuring under the Plan, all holders of Old Debt will receive the treatment provided in the Plan upon consummation of the Plan (if approved by the Bankruptcy Court).

If we do not receive sufficient votes to effect the Restructuring in the Out-of-Court Transaction and we do not receive sufficient votes to accept the Plan, the Company expects that it will likely be necessary to file for bankruptcy protection without the benefit of an agreed plan of reorganization.

**B.      Summary of the Terms of the Restructuring**

The Restructuring is built around the following key elements:

- NPG will be converted from a Delaware limited liability company to a Delaware corporation referred to herein as "New NPG", and Arbonne HoldCo and Levlad HoldCo will merge with each other with the surviving company referred to herein as "New HoldCo". The Company's businesses will otherwise continue to be operated in substantially their current form whether or not the Company enters chapter 11.

- The OpCo Lenders will receive their respective rights under the Reinstated OpCo Term Loan, which will reinstate an aggregate of $125 million of the existing OpCo Debt. In exchange for the remaining OpCo Debt, each OpCo Lender will receive its pro rata share of 85% of the New NPG Common Stock to be issued upon the Effective Date, subject to dilution for (i) New NPG Common Stock issuable upon the exercise of the New NPG Warrants, (ii) New NPG Common Stock issuable upon the exercise of any New NPG Options that may be issued under the Long Term Management Incentive Plan (up to an additional 7.5% of the New NPG Common Stock on a fully diluted basis), and (iii) any additional New NPG Common Stock that may be awarded in accordance with the Long Term Management Incentive Plan.

- In exchange for the HoldCo Debt, each HoldCo Lender will receive its pro rata share of the New NPG Warrants, which will entitle the holders thereof to purchase New NPG Common Stock

equal to an aggregate of 5% of the New NPG Common Stock, subject to dilution for (i) New NPG Common Stock issuable upon the exercise of any New NPG Options that may be issued under the Long Term Management Incentive Plan (up to an additional 7.5% of the New NPG Common Stock, on a fully diluted basis), and (ii) any additional New NPG Common Stock that may be awarded in accordance with the Long Term Management Incentive Plan. The aggregate cash exercise price of the New NPG Warrants will be equal to the sum of 100% of the principal amount of the OpCo Debt plus accrued interest thereon as of the closing date of the Restructuring, plus the principal, interest, fees and expenses outstanding under the New Term Loan as of the closing date of the Restructuring. The aggregate cash exercise price of the New NPG Warrants will be allocated among all HoldCo Lenders on a pro rata basis.

- The existing equity holders of NPG will have their equity cancelled.

- All other creditors and equity holders will retain all of their legal, equitable and contractual rights in and against the Company under the Restructuring.

- Each OpCo Lender will have the opportunity to participate in providing to Arbonne and Levlad the New Term Loan, which will provide for an initial borrowing in the amount of $10 million, which shall be drawn on the effective date of such facility, with the option of the borrowers to borrow up to an additional $10 million at any time prior to June 30, 2010 in one subsequent draw upon the satisfaction of certain conditions. In consideration of providing the commitment in respect of the New Term Loan, each lender under the New Term Loan will receive its pro rata share of 10% of the New NPG Common Stock to be issued on the Effective Date, subject to dilution for (i) New NPG Common Stock issuable upon the exercise of the New NPG Warrants, (ii) New NPG Common Stock issuable upon the exercise of any New NPG Options that may be issued under the Long Term Management Incentive Plan (up to an additional 7.5% of the New NPG Common Stock, on a fully diluted basis), and (iii) any additional New NPG Common Stock that may be awarded in accordance with the Long Term Management Incentive Plan.

- New NPG will implement a long term management incentive plan (the "Long Term Management Incentive Plan") for the benefit of certain employees of the Company. The Long Term Management Incentive Plan will provide for aggregate awards of 5% of the New NPG Common Stock, on a fully diluted basis, that are issued on

the Effective Date (the "Effective Date Shares"), subject to four year annual vesting and other terms, and the issuance of options to permit holders thereof to acquire up to an additional 7.5% of the New NPG Common Stock, on a fully diluted basis (the "New NPG Options"). In accordance with the Long Term Management Incentive Plan, additional shares of New NPG Common Stock may be issued to the original recipients of the Effective Date Shares to ensure that such Effective Date Shares are not diluted by subsequent issuances of New NPG Common Stock upon exercise of New NPG Options or New NPG Warrants.

**C.      Different Means of Implementation**

If all of the Prepetition Lenders approve the Restructuring, the Company intends to effect the Restructuring through a consensual Out-of-Court Transaction in which: (i) the proposed parties to the Levlad Merger would execute, and deliver to each other, a merger agreement and take such other action as is necessary to complete the Levlad Merger; (ii) NPG and New NPG would enter into a merger agreement pursuant to which New NPG would be the surviving entity of such merger and all of the outstanding equity of NPG would be cancelled; (iii) the proposed parties to the Reinstated OpCo Term Loan and the New Term Loan would execute, and deliver to each other, the Exit Facility and the ancillary security, collateral and other documents related thereto; (iv) the OpCo Debt remaining after satisfaction through the Reinstated OpCo Term Loan would be cancelled in exchange for New NPG Common Stock; and (v) the Holdco Debt would be cancelled in exchange for the New NPG Warrants. The aforementioned Restructuring Documents would contain the specific terms and conditions governing the transactions contemplated thereby.

The Company is seeking the approval of all Prepetition Lenders, but is prepared to pursue the Restructuring even if such unanimous support is not achieved. If each Prepetition Lender does not approve the Restructuring through the Out-of-Court Transaction, or if the Company for any reason determines that it would be more advantageous or expeditious, and there is sufficient support for the Plan, NPG and certain of its subsidiaries (the "Filing Entities"), including Arbonne HoldCo, Levlad HoldCo, Arbonne and Levlad, intend to commence the Chapter 11 Cases to consummate the Restructuring through the Plan, as set forth in the section entitled "The Chapter 11 Plan" herein.

**D.      Summary of Restructuring Transactions in Consensual Out-of-Court Transaction**

The following table sets forth a summary of the Old Debt subject to the Restructuring and indicates the consideration to be received by the Prepetition Lenders pursuant to the Restructuring if it is effected through the Out-of-Court Transaction. The following summary is qualified in its entirety by reference to the Restructuring Documents (which the Company intends to make available to the Prepetition Lenders at least three (3) days prior to the Voting Deadline).

| OLD DEBT | | |
|---|---|---|
| **Old Debt to Be Fully Satisfied** | **Outstanding Amount** | **Consideration Under Out-of-Court Transaction and Plan** |
| OpCo Debt | USD $530.5 million[1] | OpCo Debt is fully satisfied and restructured as follows:<br>• The OpCo Lenders will receive their respective rights under the Reinstated OpCo Term Loan portion of the Exit Facility, which shall reinstate an aggregate of $125 million of the OpCo Debt distributed to the OpCo Lenders on a pro rata basis; and<br>• In exchange for the remaining OpCo Debt, each OpCo Lender will receive its pro rata share of 85% of the New NPG Common Stock to be issued upon the Effective Date, subject to dilution for (i) New NPG Common Stock issuable upon the exercise of the New NPG Warrants, (ii) New NPG Common Stock issuable upon the exercise of any New NPG Options that may be issued under the Long Term Management Incentive Plan (up to an additional 7.5% of the New NPG Common Stock on a fully diluted basis, and (iii) any additional New NPG Common Stock that may be awarded in accordance with the Long Term Management Incentive Plan. |
| HoldCo Debt | USD $215.6 million | HoldCo Debt is fully satisfied as follows:<br>• New NPG will issue to each HoldCo Lender its pro rata portion of the New NPG Warrants, which shall entitle the holders thereof to purchase New NPG Common Stock equal to an aggregate of 5% of the New NPG Common Stock, subject to dilution for (i) New NPG Common Stock issuable upon the exercise of any New NPG Options that may be issued under the Long Term Management Incentive Plan (up to an additional 7.5% of the New NPG Common Stock, on a fully diluted basis), and (ii) any additional New NPG Common Stock that may be awarded in accordance with the Long Term Management Incentive Plan. The aggregate cash exercise price of the New NPG Warrants shall be equal to the sum of 100% of the principal amount of the OpCo Debt plus accrued interest thereon as of the closing date of the Restructuring, plus the principal, interest, fees and expenses outstanding under the New Term Loan as of the closing date of the Restructuring. The aggregate cash exercise price of the New NPG Warrants will be allocated among all HoldCo Lenders on a pro rata basis. |

---

[1] The outstanding amounts referenced in this Article III.D. do not reflect interest, fees, expenses, undrawn Letters of Credit or other charges that may continue to accrue in accordance with the terms of the agreements that govern the respective obligations listed above, or applicable law. Although changes in these amounts will not affect the consideration to be provided to the Prepetition Lenders in connection with the Restructuring, the outstanding amount of any one of the foregoing obligations may change following the date of this Disclosure Statement.

## E. Conditions to Closing of the Restructuring

The Out-of-Court Transaction is conditioned on (unless waived by the Company and the requisite Prepetition Lenders) the approval of all the Prepetition Lenders by the Voting Deadline. Each element of the Out-of-Court Transaction is conditioned on each other element.

The Restructuring contemplated by the Plan requires the approvals of the requisite Prepetition Lenders as described in Article IX.E. – "Explanation of Chapter 11 – Confirmation of a Plan," and the satisfaction of conditions described in Article XIII.F. – "The Chapter 11 Plan – Conditions Precedent to Confirmation of the Plan and the Occurrence of the Effective Date."

## F. Summary of the Distributions under the Plan

If each Prepetition Lender does not approve the Restructuring through the Out-of-Court Transaction, or if the Company for any reason determines that it would be more advantageous or expeditious, and there is sufficient support for the Plan, NPG and certain of its subsidiaries and affiliates intend to file Chapter 11 Cases to consummate the Restructuring through the Plan. The following is a summary of the distributions under the Plan. It is qualified in its entirety by reference to the full text of the Plan and by reference to the Restructuring Term Sheet attached to this Disclosure Statement as Schedule 2. In addition, for a more detailed description of the terms and provisions of the Plan, see "The Chapter 11 Plan" section of this Disclosure Statement.

The claim amounts set forth below are based on information contained in the Company's books and records and reflect what the Company believes to be reasonable estimates of the likely resolution of any contingent, unliquidated and disputed claim amounts, but may differ materially from actual claim amounts that may be filed in the Chapter 11 Cases.

The following chart summarizes the estimated Plan Distributions to each class on the Plan Distribution Date (unless otherwise provided):[2]

| Administrative Claims and Tax Claims[3] | |
|---|---|
| **Classes of Claims** | **Treatment of Classes of Claims** |
| Administrative Claims<br>Estimated Allowed Claims: $7.5 million | Each holder of an Allowed Administrative Claim shall receive (i) the amount of such holder's Allowed Administrative Claim in one Cash payment, or (ii) such other treatment as may be agreed upon in writing by the Filing Entities and such holder; <u>provided</u>, that such treatment shall not provide a return to such holder having a |

---

[2] There can be no assurance that the estimated Claim amounts set forth herein are correct, and the actual amount of Allowed Claims may differ from the estimates. The estimated amounts are subject to certain risks, uncertainties and assumptions. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual amount of Allowed Claims may vary from those estimated herein.

[3] Administrative Claims and Tax Claims are treated in accordance with sections 1129(a)(9)(A) and 1129(a)(9)(C) of the Bankruptcy Code, respectively. Such Claims are not designated as classes of Claims for the purposes of the Plan or for the purposes of sections 1123, 1124, 1125, 1126 or 1129 of the Bankruptcy Code.

| | present value as of the Effective Date in excess of such holder's Allowed Administrative Claim; provided, further, that an Administrative Claim representing a liability incurred in the ordinary course of business of the Filing Entities may be paid at the Filing Entities' election in the ordinary course of business. |
| --- | --- |
| | **Estimated Recovery: 100% of Allowed Claim** |
| Tax Claims<br>Estimated Allowed Claims: $10.9 million | At the election of the Filing Entities, each holder of an Allowed Tax Claim will receive in full satisfaction of such Allowed Tax Claim (a) payments in Cash, in regular installments over a period ending not later that five (5) years after the Petition Date, of a total value, as of the Effective Date, equal to the Allowed amount of such Claim; (b) a lesser amount in one Cash payment as may be agreed upon in writing by such holder; or (c) such other treatment as may be agreed upon in writing by such holder; provided, that such agreed upon treatment may not provide such holder with a return having a present value as of the Effective Date that is greater than the amount of such holder's Allowed Tax Claim or that is less favorable than the treatment provided to the most favored nonpriority Unsecured Claims under the Plan.<br><br>**Estimated Recovery: 100% of Allowed Claim** |

| Claims and Equity Interests | |
| --- | --- |
| **Classes of Claims** | **Treatment of Classes of Claims** |
| Class 1 – Priority Claims<br>Estimated Allowed Claims: $15.4 million<br><br>Unimpaired | Each Allowed Priority Claim against any of the Filing Entities shall be unimpaired under the Plan and, except to the extent that a holder of an Allowed Priority Claim agrees to a different treatment of such Allowed Priority Claim, pursuant to section 1124 of the Bankruptcy Code, all legal, equitable, and contractual rights of each holder of an Allowed Priority Claim in respect of such Claim shall be fully reinstated and retained, and such holder of an Allowed Priority Claim shall be paid in full and in Cash on or as soon as practicable after the latest to occur of (i) the Plan Distribution Date; (ii) the first Business Day after the date that is ten (10) Business Days after the date such Claim becomes an Allowed Priority Claim; and (iii) the date agreed to by the Filing Entities and the holder of the Allowed Priority Claim.<br><br>**Estimated Recovery: 100% of Allowed Claim** |
| Class 2 – OpCo Lender Claims<br>Estimated Allowed Claims: $530.5 million<br><br>Impaired | Each holder of an Allowed OpCo Lender Claim against any of the Filing Entities shall receive, on the Effective Date, its Pro Rata Share of (i) the Reinstated OpCo Term Loan, and (ii) 85% of the New NPG Common Stock issued under the Plan on the Effective Date, subject to dilution for (a) New NPG Common Stock issuable upon the exercise of the New NPG Warrants, (b) New NPG Common Stock issuable upon the exercise of any New NPG Options that may be issued under the Long Term Management Incentive Plan |

| | |
|---|---|
| | (up to an additional 7.5% of the New NPG Common Stock, on a fully diluted basis), and (c) any additional New NPG Common Stock that may be awarded in accordance with the Long Term Management Incentive Plan. The OpCo Lender Claims shall be Allowed, not subject to offset, defense, counterclaim, reduction or credit of any kind whatsoever, in an amount equal to the sum of (i) the aggregate principal amount outstanding under the OpCo Credit Agreement as of the Petition Date, of approximately $530.5 million, plus (ii) accrued and unpaid interest and default interest under the OpCo Credit Agreement through the Petition Date, plus (iii) amounts drawn on the Letters of Credit from the Petition Date through the Effective Date, plus (iv) accrued and unpaid letter of credit fees, administrative fees, and other fees and expenses (including reasonable fees and out-of-pocket expenses of attorneys and advisors incurred by the Prepetition OpCo Agent and the OpCo Lenders) incurred under the OpCo Credit Agreement through the Petition Date. The provisions of the DIP Order containing the Filing Entities' stipulations regarding indebtedness and security interests shall be deemed incorporated by reference in their entirety in the Plan as if fully set forth therein.<br><br>**Estimated Recovery: Undetermined** |
| Class 3 – HoldCo Lender Claims<br>Estimated Allowed Claims: $215.6 million<br><br>Impaired | Each holder of an Allowed HoldCo Lender Claim against any of the Filing Entities shall receive, on the Effective Date, its Pro Rata Share of the New NPG Warrants. The HoldCo Lender Claims shall be Allowed in the aggregate amount of $215.6 million.<br><br>**Estimated Recovery: Undetermined** |
| Class 4 – Secured Claims<br>Estimated Allowed Claims: $0<br><br>Unimpaired | Each Allowed Secured Claim, other than an OpCo Lender Claim, against any of the Filing Entities shall be unimpaired under the Plan, and either (i) all of the legal, equitable, and contractual rights to which such Allowed Secured Claim entitle the holder of such Claim shall be fully reinstated and retained on and after the Effective Date, or (ii) such holder shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for its Allowed Secured Claim, either (w) Cash in the full amount of such Allowed Secured Claim, including any postpetition interest accrued pursuant to section 506(b) of the Bankruptcy Code, (x) the proceeds of the sale or disposition of the collateral securing such Allowed Secured Claim to the extent of the value of the holder's secured interest in such collateral, (y) the collateral securing such Allowed Secured Claim and any interest on such Allowed Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (z) such other distribution as necessary to satisfy the requirements of section 1129 of the Bankruptcy Code.<br><br>**Estimated Recovery: 100% of Allowed Claim** |
| Class 5 – Unsecured Claims<br>Estimated Allowed Claims: $8.7 million | Each Allowed Unsecured Claim against any of the Filing Entities shall be unimpaired under the Plan, and either (i) all of the legal, equitable, and contractual rights to which |

| | |
|---|---|
| Unimpaired | such Allowed Unsecured Claim entitle the holder of such Claim shall be fully reinstated and retained on and after the Effective Date, or (ii) such holder shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for its Allowed Unsecured Claim, Cash in the full amount of such Allowed Unsecured Claim, including any postpetition interest required to be paid thereon under applicable non-bankruptcy law.<br><br>**Estimated Recovery: 100% of Allowed Claim** |
| Class 6 – NPG Equity Interests<br>Estimated Allowed NPG Equity Interests: N/A<br><br>Impaired | On the Effective Date, all Equity Interests in NPG shall be cancelled, and each holder of an Equity Interest in NPG shall not be entitled to any distribution under the Plan. Holders of Equity Interests in NPG shall not be required to surrender their certificates or other instruments evidencing ownership of such Equity Interests.<br><br>**Estimated Recovery: None** |
| Class 7 – Other Equity Interests<br>Estimated Allowed Other Equity Interests: N/A<br><br>Unimpaired | Each Allowed Equity Interest in the Filing Entities, other than in NPG, shall be unimpaired under the Plan, and, pursuant to section 1124 of the Bankruptcy Code, all of the legal, equitable, and contractual rights to which such Equity Interests entitle the holder of such Equity Interests shall be fully reinstated and retained on and after the Effective Date.<br><br>**Estimated Recovery: 100% of Allowed Equity Interest** |

## IV.

## <u>GENERAL INFORMATION</u>

*The Company-specific discussion below briefly describes the Company and its businesses as they exist as of the date of this Disclosure Statement.*

## A.      Overview of the Company

NPG and its direct and indirect subsidiaries are leaders in the manufacture and distribution of personal care products.  The Company operates primarily through Arbonne and Levlad.  Arbonne is headquartered in Irvine, California and, either directly or through a subsidiary, has additional leased facilities located in Greenwood, Indiana; Dallas, Texas; Toronto, Ontario, Canada; Calgary, Alberta, Canada; New South Wales, Australia; Northampton, United Kingdom; and Munich, Germany.  Levlad is headquartered in Chatsworth, California and has several other leased facilities in that area.  The organizational chart below illustrates the structure of the Company as of the date of this Disclosure Statement.



Company Organizational Chart as of
Date of This Disclosure Statement

LEGEND

LLC treated as pass-thru entity for US tax purposes

Corporation for US tax purposes

Foreign entities

Inactive entities

1.    **Our Business Operations**

**NPG.**  In 2004, the predecessor to Harvest Partners, L.P. ("Harvest"), a leading New York-based private equity investment firm specializing in management buyouts and growth financings of middle-market companies, formed NPG as a special purpose entity to complete the acquisitions of Arbonne and Levlad.  Harvest, through its subsidiary Harvest Partners IV, L.P. ("Harvest Partners IV"), along with other investors, provided approximately $93 million for the acquisitions.  NPG serves as the ultimate parent of the Company.

**Arbonne.**  Arbonne was founded in Switzerland in 1975 with the goal of developing skin care products based on natural, botanical principles, and it relocated its headquarters and primary operations to the United States in 1980.  Arbonne now sells its own branded line of hundreds of botanically based personal care, cosmetic and wellness products, including skin care, body and hair care, cosmetics, aromatherapy, and nutritional products.  Arbonne's products are botanically based, pH correct, dermatologist tested, hypoallergenic, and never tested on animals.  Arbonne markets most of its products as part of a comprehensive personal care, cosmetic, health and wellness regimen designed for combined and repeated use.

Whereas traditional marketing moves products from the manufacturer to wholesalers, warehousers, shippers, advertisers, and retailers before ever reaching the consumer, Arbonne markets its products in the United States, Canada, the United Kingdom, and Australia through a direct sales network of Arbonne Independent Consultants ("AICs").  AICs are independent contractors and may be individuals or registered business entities.  They are not employees of the

Company.  The AICs purchase Arbonne products from the Company at published discounted prices to then market and sell the products to consumers.  Arbonne's marketing relies on developing and keeping trusted relationships with its consumers and the AICs.  Consequently, Arbonne is focused on maintaining the quality of its products and services at a level that it believes exceeds that of standard retail brands.

AICs are eligible to earn commissions and incentives based on their retail volume and the retail volume of other AICs that they have directly or indirectly sponsored, also known as their "downline."  AICs are compensated in two basic ways:  (a) through retail profit on the sale of the Arbonne products that were purchased at a discount and (b) through commissions, overrides, and bonuses paid based on the AICs' product sales volume and the sales volume of their downline.

AICs operating in Canada contract directly with Arbonne's subsidiary, Arbonne International Distribution, Inc. ("AIDI"), which is proposed to be a debtor in any eventual chapter 11 cases.  AICs operating in the United Kingdom and Australia contract directly with Arbonne's foreign subsidiary, Arbonne Europe Sàrl ("AES"), which is not proposed to be a chapter 11 debtor.  Certain of Arbonne's other foreign subsidiaries, Arbonne International Canada, Inc. ("AICI"), Arbonne UK Limited ("AUKL"), and Arbonne Australia Pty Ltd. ("AAPL"), provide logistical support and services to the AICs operating in their respective countries, including leasing property, employing personnel and providing marketing and administrative services.  Arbonne also established subsidiary Arbonne Germany GmbH in the event the Company decides to begin operations in Germany.

Arbonne Institute of Research and Development, LLC ("AIRD"), also a proposed chapter 11 debtor, provides product development services for Arbonne.  AIRD is a Delaware limited liability company with a service agreement to use a Swiss laboratory facility whereat AIRD coordinates the efforts of master formulators as they research, develop, and finalize Arbonne's exclusive personal care products.  The proprietary formulas being developed by AIRD are owned by Arbonne and represent botanically-based products based on cutting-edge technologies and the latest advance in skin care science.  Neither Arbonne nor AIRD engage in any sales or other commercial activity in or from Switzerland.

For the last twelve months ending November 30, 2009, Arbonne had revenue of approximately $378 million and EBITDA of approximately $38 million.

**Levlad.**  Levlad was founded in 1972 in Venice Beach, California.  It was one of the first manufacturers of natural personal care products, with its founders starting off by collecting rainwater and blending it with natural herbs from their herb shop, then selling the mixture as the very first rainwater shampoo.  Currently, Levlad manufactures safe, performance driven and natural personal care products, including a line that is certified organic, by combining proven botanical, herbal, and floral treatments with modern ingredients and techniques.  Levlad's products include shampoos, conditioners, soaps, bath gels, lotions, deodorants, and toothpastes.  Levlad markets these products under the brand names Nature's Gate®, Nature's Gate Organics®, Nature's Gate Advanced Care®, Nature's Gate Organics Natural Results® Acne Care, and Rainwater Organics.  Levlad markets these products internationally, including throughout North America at natural food retailers, including Whole Foods, and specialty

retailers, including General Nutrition Centers (GNC), and Bed, Bath & Beyond. Levlad's brands hold leading market positions across key product categories.

Levlad also provides value-added, turn-key manufacturing and formulation services for private-label customers, including Arbonne. In such capacity, Levlad provides its customers a full range of services, including product creation, manufacturing, filling, product labeling and packaging design, raw material procurement, and collateral marketing development materials. In this capacity, Levlad has long-standing relationships with recognized name brand personal care product companies and specialty retailers – an average tenure of over twelve years for Levlad's top customers.

For the last twelve months ending November 30, 2009, Levlad had revenue of approximately $73 million and an EBITDA loss of approximately $6 million.

### 2.    Employees

As of November 30, 2009, the Company employed approximately 870 employees worldwide. Of that number, approximately 843 are employed by prospective debtors and approximately 27 are based with NPG's subsidiaries that are not proposed to be chapter 11 debtors. In addition to the Company's employees, as of November 30, 2009, Arbonne utilized a direct sales network of approximately 750,000 AICs.

As of November 30, 2009, Arbonne and its subsidiaries employed approximately 623 full-time, non-union employees, who provide services relating to customer service, sales, operations, executive, facilities, finance and accounting, strategy, human resources, sales, information technology, legal, marketing, supply chain, and warehouse. In the ordinary course, Arbonne also employs approximately 28 "leased" employees, either as a potential hire or for assistance on clerical projects; and approximately 33 consultants, for assistance on high level projects. As of November 30, 2009, Levlad employed approximately 220 full-time, non-union employees, who provide services relating to general management, human resources, finance, information technology, marketing, operations and manufacturing, research and development, sales, and field support. In the ordinary course, Levlad also employs approximately 61 "leased" employees on a temporary basis and approximately 9 consultants.

In the ordinary course of business, the Company has established various employee benefit plans and policies, which include health, dental and vision insurance, life and disability insurance, workers' compensation, unemployment compensation, tuition assistance, car allowance, reimbursable business expenses, vacation pay, paid time off, sick leave, a 401(k) plan with matching contributions, matching contributions to Social Security Obligations, and other similar benefits.

### 3.    Arbonne Independent Consultants

As set forth above, Arbonne is a direct selling company that operates in the United States, its territories, Canada and certain other international markets. Arbonne markets its exclusive line of high quality personal care products exclusively through the network of AICs. Specifically, Arbonne operates the AIC network in the U.S. and its territories and AIDI operates the network in Canada. AES operates the network in the U.K. and Australia. We depend on our AICs to

generate substantially all of our revenues.  To increase our revenues, we must increase the number of AICs or the productivity of our existing AICs.  Accordingly, our success depends on our ability to recruit, retain and motivate a large base of AICs.

During 2009, the AIC network included an average of almost 800,000 active AICs worldwide.  As stated in the agreements entered into by and between the appropriate Arbonne entity and each AIC (each, an "AIC Agreement"), AICs are independent contractors, and are not employees, agents, partners, legal representatives, or franchisees of Arbonne.  AICs are solely responsible for paying all expenses they incur, including but not limited to travel, food, lodging, secretarial, office, long distance telephone and other expenses.  AICs earn a profit by purchasing products at a discount directly from us and selling them to their customers, the ultimate consumer of the Company's products.  We generally have no arrangements with end users of our products beyond the AICs.  No single AIC accounts for more than 1% of our net sales.

The Arbonne entities maintain several programs related to the success of the AIC network, including different forms of payment to compensate AICs, rewards to incentivize AICs, events to train AICs, and logistics to follow an order from placement to shipment and back through returns if necessary.

4.    **Management**

Set forth in the table below are the names, position or positions of the current key executive officers of the Company's U.S. entities.  A brief biography of each of the officers is provided immediately following this list.

| Name | Position(s) |
| --- | --- |
| Katherine S. Napier | • President<br>   o NPG, Levlad HoldCo, Arbonne HoldCo, Levlad, AIRD<br><br>• Chief Executive Officer<br>   o Arbonne, Arbonne International Holdings, Inc. ("AIHI"), AIDI |
| Rita Davenport | • President<br>   o Arbonne |
| Mark I. Lehman | • Chief Financial Officer<br>   o NPG, Levlad, Arbonne, AIRD, AIHI, AIDI<br><br>• Secretary<br>   o NPG, Levlad HoldCo, Arbonne HoldCo, Levlad, Arbonne, AIRD, AIHI, AIDI |

| | • Treasurer |
| |     o Levlad HoldCo, Arbonne |
| |       HoldCo |
| Ashley J. Good | • Vice President |
| |     o AIHI, AIDI |

*Katherine (Kay) S. Napier*.  Ms. Napier joined Arbonne in August 2009, bringing three decades of experience in general management, marketing, international and strategic planning. Prior to joining Arbonne, Ms. Napier served as the Senior Vice President of McDonald's, where she spearheaded the launch of the healthy lifestyles initiative and led marketing efforts designed to appeal to women and families in both the U.S. and Europe—an important part of McDonald's legendary corporate turnaround.  Prior to that, Ms. Napier was a Vice President of the Procter & Gamble Company, where she was head of the North American Pharmaceutical division and the Corporate Women's Health & Vitality platform.  During her tenure, her division became the largest company profit contributor for North America.

*Rita Davenport*.  Ms. Davenport joined Arbonne in 1987 as an AIC and within one year reached Regional Vice President.  In addition to being Arbonne's President, Ms. Davenport is a successful, nationally-recognized entrepreneur, author and an award-winning speaker, having received the coveted CSP and CPAE awards from the National Speakers Association.  Prior to joining Arbonne, Ms. Davenport produced and hosted her own award-winning television show "Strategies for Success" for fifteen years, was viewed in over 32 million homes, and is now in the Broadcaster's Hall of Fame.

*Mark I. Lehman*.  Mr. Lehman joined Arbonne in 2004 and played a significant role in building the infrastructure necessary to support the company's growth both domestically and internationally.  Mr. Lehman joined Arbonne with extensive experience working with consumer product companies—with an emphasis in manufacturing and distribution—and a substantial history of working internationally, in Europe and Asia.  He has overall responsibility for finance, information technology, human resources, legal and the Company's international operations.

*Ashley J. Good*.  Ms. Good leads the Legal and Compliance departments of the Company. She is responsible for all aspects of the Company's legal affairs, including Company and AIC compliance, and Arbonne's intellectual property.  Prior to joining Arbonne, Ms. Good was a corporate attorney for the international law firm of Latham & Watkins, LLP.

## B.     Capital and Debt Structure

As of November 30, 2009, the Company's consolidated balance sheet reflected total assets of approximately $286 million.  Of this amount, approximately $24 million was comprised of cash and cash equivalents, approximately $26 million was comprised of property and equipment, net of depreciation, approximately $42 million was comprised of inventories, and approximately $194 million was comprised of other assets.  The Company's consolidated balance sheet also reflected total liabilities of approximately $804 million.

On or about June 19, 2006, Levlad and Arbonne, as borrowers, and Levlad HoldCo and Arbonne HoldCo (together, the "HoldCos"), as guarantors, entered into (a) a $410 million First Lien Credit Agreement (the "First Lien Credit Agreement") and (b) a $195 million Second Lien Credit Agreement (the "Second Lien Credit Agreement"), each with Canadian Imperial Bank of Commerce ("CIBC"), as administrative agent and collateral agent, and with other lenders from time to time party thereto. In addition to the guarantees of the HoldCos, the obligations of Levlad and Arbonne under the First Lien Credit Agreement and Second Lien Credit Agreement were guaranteed by proposed debtor AIRD and were secured by liens on substantially all of the borrowers' and guarantors' assets.

The proceeds from the First Lien Credit Agreement and the Second Lien Credit Agreement were used by Arbonne and Levlad to repay approximately $298 million in existing indebtedness that was incurred to finance the 2004 acquisition of Arbonne and Levlad by NPG.

On the same date, the HoldCos, as borrowers, also entered into the HoldCo Credit Agreement, which provided for a $135 million unsecured term loan facility (the "HoldCo Term Loan") with Credit Suisse, as the then administrative agent, and the HoldCo Lenders. The HoldCo Term Loan bears interest at a rate of 13.5% per annum, which may, at the option of the HoldCos, be payable in kind, capitalized, compounded, and added to the principal.

In March 2007, the Filing Entities refinanced their existing indebtedness under the First Lien Credit Agreement and Second Lien Credit Agreement. Specifically, on March 8, 2007, Levlad and Arbonne, as borrowers, and the HoldCos, as guarantors, entered into the $600 million OpCo Credit Agreement (together with the HoldCo Credit Agreement, the "Prepetition Credit Facilities") with CIBC, as administrative agent and collateral agent, and the OpCo Lenders. The OpCo Credit Agreement provides for term loans in the aggregate principal amount of $565 million (the "OpCo Term Loan") and a revolving credit facility of $35 million (the "OpCo Revolver," and together with the OpCo Term Loan and the HoldCo Term Loan, the "Prepetition Loans"), a portion of which may be used for letters of credit. In addition to the guarantees of the HoldCos, the obligations of Levlad and Arbonne under the OpCo Credit Agreement are guaranteed by prospective debtors AIRD, AIHI and AIDI, and are secured by liens on substantially all of the proposed debtors' assets (the "Prepetition Collateral").[4]

On June 12, 2009, the Filing Entities and the OpCo Lenders signed an amendment to the OpCo Credit Agreement (the "OpCo Credit Agreement Amendment"). At the time, the proposed debtors were in default on the OpCo Credit Agreement. Specifically, the proposed debtors had exceeded the permissible combined leverage ratio ("Leverage Ratio"), as set forth by a negative covenant in the OpCo Credit Agreement, and had failed to deliver audited financial statements and certificates signed by a designated representative, stating that the proposed debtors were not in default (collectively, the "Specified Defaults"). The OpCo Credit Agreement Amendment waived the Specified Defaults and temporarily eliminated the Leverage Ratio requirement but required the Company to generate minimum levels of EBITDA during the period in which the Leverage Ratio requirement was eliminated.

---

[4] Nothing contained herein shall constitute an admission by the Company of the validity, priority, extent or enforceability of the Prepetition Loans or any lien or security interest asserted by the Prepetition Lenders in connection with the Prepetition Collateral.

As of the date of this Disclosure Statement, the principal amount outstanding under the OpCo Term Loan is approximately $501 million. The principal amount outstanding under the OpCo Revolver is approximately $29 million, and the aggregate amount of outstanding letter of credit obligations is approximately $2 million. The total amount outstanding under the HoldCo Term Loan, as of the date of this Disclosure Statement, is approximately $215.6 million.

## C.      Events Leading to the Need for Restructuring

Although the Company had experienced a high rate of revenue growth through 2006 and early 2007, this was driven primarily by unusually higher levels of recruitment of new AICs, which was unsustainable. In 2005 and 2006, on a net basis, the Company added approximately 434,000 and 612,000 AICs, respectively. Because recruitment of AICs tends to be a leading indicator of later attrition, the historically high numbers of new consultants in those years resulted in attrition exceeding the recruiting levels in subsequent years. In 2007, 2008 and 2009, on a net basis, the Company lost approximately 108,000, 270,000 and 145,000 AICs, respectively. This attrition, combined with the downturn in the economy and the financial crisis later in 2008, caused a reduction in the Company's overall net sales.

The Company responded by implementing several cost saving and revenue producing initiatives, including (a) relocation of most of the Company's customer service and information technology operations to Dallas, Texas, which lowered expenses related to information technology contract labor and customer service temporary help as the Company was able to recruit full time employees at lower salaries, (b) conversion of certain AIC publications to an on-line only format, (c) a reduction in force at certain subsidiaries and reduction of warehouse operations to a single shift, (d) realigning the AIC compensation plan to incentivize early stage AICs interested in building a business, (e) development of targeted marketing and product strategies, and (f) expanding Arbonne's Regional Sales Manager program into underutilized geographic areas. Although the Company experienced some success with these initiatives, such success was unable to reverse the effects of the decrease in AICs combined with the global financial crisis.

Compounding this revenue reduction was the fact that the permitted maximum Leverage Ratio contained in the OpCo Credit Agreement was reduced in the fourth quarter of 2008. The tightening of the covenant requirements coupled with reduced revenue triggered a default under the OpCo Credit Agreement, and resulted in the Filing Entities' entry into the OpCo Credit Agreement Amendment with the OpCo Lenders. The OpCo Credit Agreement Amendment waived certain defaults and temporarily eliminated the Leverage Ratio requirement but required the Company to generate minimum levels of EBITDA during the period in which the Leverage Ratio requirement was eliminated. Although the Company was able to satisfy the EBITDA requirement for the third quarter of 2009, it became apparent at that time that it would not be able to do so going forward and that the Company's debt exceeded the amount that the Company could reasonably support.

Consequently, the Company, with the assistance of its financial and legal advisors, entered into discussions with the OpCo Lenders, HoldCo Lenders and principal stockholders in an attempt to implement a consensual restructuring of the Company's capital structure. The discussions have resulted in the proposed Restructuring. Further, during the period of

discussions, the Company entered into a forbearance agreement with the OpCo Lenders whereby the OpCo Lenders agreed to forbear from exercising remedies in connection with certain defaults by the Company under the OpCo Credit Agreement. The forbearance agreement has been extended from time to time and the forbearance period is currently extended through February 1, 2010 (subject to certain conditions contained therein).

The Company is seeking the approval of all Prepetition Lenders, but is prepared to pursue the Restructuring even if such unanimous support is not achieved. If each Prepetition Lender does not approve the Restructuring through the Out-of-Court Transaction, or if the Company for any reason determines that it would be more advantageous or expeditious, and there is sufficient support for the Plan, the Filing Entities intend to commence the Chapter 11 Cases and to consummate the Restructuring through the Plan, as set forth in the section of this Disclosure Statement entitled "The Chapter 11 Plan." To effect the Plan, sufficient holders of OpCo Debt and HoldCo Debt (i.e., holders representing at least 66 2/3% in principal amount and more than 50% in number of those impaired creditors entitled to vote in those classes that actually vote) must vote in favor of the Plan and the other conditions to consummation of the Plan must be satisfied. If we do not receive sufficient votes to effect the Restructuring in the Out-of-Court Transaction and we do not receive sufficient votes to accept the Plan, the Company expects that it will likely be necessary to file for bankruptcy protection without the benefit of an agreed plan of reorganization.

## V.

## SELECTED FINANCIAL INFORMATION

A.      **Annual Consolidated Financial Information for NPG**

As stated above, as of November 30, 2009, the Company's consolidated balance sheet reflected total assets of approximately $286 million. Of this amount, approximately $24 million was comprised of cash and cash equivalents, approximately $26 million was comprised of property and equipment, net of depreciation, approximately $42 million was comprised of inventories, and approximately $194 million was comprised of other assets. The Company's consolidated balance sheet also reflected total liabilities of approximately $804 million.

B.      **Consolidated Financial Statements for NPG**

Consolidated financial statements for the Company for the fiscal years ended December 2007 and December 2008 and as of November 30, 2009 and for the eleven months then ended, are attached to this Disclosure Statement as Schedule 5.

## VI.

## FINANCIAL PROJECTIONS AND ASSUMPTIONS

A.      **Purpose and Objectives**

The value of the securities to be issued pursuant to the Restructuring, through the Out-of-Court Transaction or the Plan, and the estimated recoveries by holders of Allowed Claims who

receive such securities depend in part upon the ability of the Company to achieve the financial results projected on the basis of their assumptions.

In order to maximize creditor recoveries, the Company must seek to maximize the value of their businesses. Additionally, for the Plan to meet the feasibility test of section 1129(a)(11) of the Bankruptcy Code, the Bankruptcy Court must conclude that confirmation of the Plan is not reasonably likely to lead to the liquidation or further reorganization of the Company.

With these considerations in mind, the Company's management and advisors formulated projections and assumptions, which in turn served as the basis for the Restructuring. The Company believes that the assumptions underlying the projections are reasonable under the circumstances and that achieving the projections set forth in this Disclosure Statement will maximize the value of the Company's businesses.

## B. Projected Consolidated Financial Statements

The Company's management and advisors prepared the projected operating and financial results (the "Projections") on a consolidated basis through the period ending December 31, 2014 (the "Projection Period"). The Projections are attached to this Disclosure Statement as Schedule 7.

The Projections should be read in conjunction with the assumptions, qualifications, and the footnotes to the tables containing the Projections as well as the "Risk Factors" section of this Disclosure Statement.

THE PROJECTIONS ARE PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING "ADEQUATE INFORMATION" UNDER SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE OUT-OF-COURT TRANSACTION AND PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE OUT-OF-COURT TRANSACTION AND PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF SECURITIES OF, OR CLAIMS OR EQUITY INTERESTS IN, THE COMPANY OR ANY OF ITS AFFILIATES.

THE ASSUMPTIONS AND RESULTANT PROJECTIONS AND SUBSEQUENTLY IDENTIFIED VARIANCES CONTAIN CERTAIN STATEMENTS THAT MAY BE CONSIDERED "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THE PROJECTIONS HAVE BEEN PREPARED BY THE COMPANY'S MANAGEMENT AND PROFESSIONALS. THESE PROJECTIONS AND SUBSEQUENTLY IDENTIFIED VARIANCES, IF ANY, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE BASED UPON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED OR MAY BE UNDERSTATED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE COMPANY'S CONTROL. THE COMPANY CAUTIONS THAT NO ASSURANCES CAN BE MADE AS TO THE ACCURACY OF THE

ASSUMPTIONS AND RESULTANT PROJECTIONS OR THE ABILITY OF THE COMPANY, THE FILING ENTITIES AND NEW NPG TO ACHIEVE THE PROJECTED RESULTS FOLLOWING THE RESTRUCTURING.  SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE, AND EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED, OR MAY BE UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER.  THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TO COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS.  THE COMPANY'S INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE PROJECTIONS AND, ACCORDINGLY, DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO.

THE COMPANY DOES NOT, AS A MATTER OF COURSE, PUBLISH ITS BUSINESS PLANS AND STRATEGIES OR PROJECTIONS OF ITS ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS.  ACCORDINGLY, THE COMPANY DOES NOT INTEND, AND DISCLAIMS ANY OBLIGATION, TO: (1) FURNISH UPDATED BUSINESS PLANS OR PROJECTIONS TO HOLDERS OF CLAIMS OR EQUITY INTERESTS PRIOR TO THE EFFECTIVE DATE, OR TO HOLDERS OF SECURITIES OF ANY FILING ENTITY, OR ANY OTHER PARTY AFTER THE EFFECTIVE DATE; (2) INCLUDE SUCH UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE BANKRUPTCY COURT OR ANY GOVERNMENTAL AGENCY OR ENTITY; OR (3) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE.  HOWEVER, FROM TIME TO TIME, THE COMPANY MAY PREPARE UPDATED PROJECTIONS IN CONNECTION WITH PURSUING FINANCINGS (INCLUDING THE EXIT FINANCING), CREDIT RATINGS AND OTHER PURPOSES.  SUCH PROJECTIONS MAY DIFFER MATERIALLY FROM THE PROJECTIONS PRESENTED HEREIN.

## VII.

## ENTERPRISE VALUE

THE STATEMENTS MADE HEREIN ARE PRESENTED PRIMARILY FOR THE PURPOSE OF PROVIDING "ADEQUATE INFORMATION" UNDER SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE OUT-OF-COURT TRANSACTION AND PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE OUT-OF-COURT TRANSACTION AND PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF SECURITIES OF, OR CLAIMS OR EQUITY INTERESTS IN, THE DEBTORS OR ANY OF THEIR AFFILIATES.

The Company has been advised by Blackstone Advisory Partners L.P. ("Blackstone") with respect to the enterprise value of the consolidated New NPG Group in connection with the Out-of-Court Transaction and the Plan. Blackstone's analysis of the enterprise value of the consolidated New NPG Group has been undertaken for the purpose of (i) providing "adequate information" under section 1125 of the Bankruptcy Code, and (ii) evaluating whether the Plan meets the so-called "best interests test" under section 1129(a)(7) of the Bankruptcy Code.

In analyzing the enterprise value of the consolidated New NPG Group, Blackstone (i) reviewed certain internal financial and operating data of the Company, including projections provided by management relating to the Company's businesses and prospects; (ii) met with certain members of senior management of the Company to discuss operations, capital structure considerations, and future prospects; (iii) reviewed publicly available financial data and considered the market value of public companies that Blackstone deemed generally comparable to the operating businesses of the Company; (iv) considered certain economic and industry information relevant to the Company's operating businesses; and (v) conducted such other studies, analyses, inquiries and investigations as Blackstone deemed appropriate. Blackstone's analysis incorporates numerous qualifications and contingencies, including but not limited to: (i) the ability of the New NPG Group to achieve all aspects of the Projections (attached hereto as Schedule 7), (ii) the state of the capital and credit markets as of the Effective Date and (iii) no material adverse change to the industry or in the operations of the New NPG Group due to economic slowdowns, as well as other unexpected events not forecasted by the Company.

Based on the foregoing, Blackstone believes that the enterprise value of the consolidated New NPG Group is significantly less than the principal amount of the OpCo Debt outstanding as of the date of this Disclosure Statement, which is approximately $530.5 million.

## VIII.

## INTERESTS OF CERTAIN PERSONS IN RESTRUCTURING

A.     **Plan Support Agreements**

1.     **OpCo Plan Support Agreement**

OpCo Lenders holding approximately 86% in principal amount of OpCo Debt and representing approximately 72% in number of the OpCo Lenders have executed and delivered the OpCo Plan Support Agreement. On the terms and subject to the conditions contained in the OpCo Plan Support Agreement, such OpCo Lenders and the Company have agreed, among other things, to take such steps as are reasonably necessary to support and achieve consummation of the Out-of-Court Transaction and, if necessary, confirmation and consummation of the Plan, including (in the case of the OpCo Lenders) voting to accept and approve the Restructuring. Additionally, on the terms and subject to the conditions of the OpCo Plan Support Agreement, each OpCo Lender party to the OpCo Plan Support Agreement and the Company have agreed not to solicit or support any alternative restructuring of the Company or take actions that could reasonably be expected to hinder or prevent the Restructuring.

The OpCo Plan Support Agreement terminates automatically upon the occurrence of the following events, unless such termination event is waived by the required OpCo Lenders (as set forth in the OpCo Plan Support Agreement):

- at 5:00 p.m. Eastern Time on February 1, 2010, if the Out-of-Court Transaction has not been consummated or the petitions for the Chapter 11 Cases have not been filed with the Bankruptcy Court (unless such failure is caused by a material breach by an OpCo Lender party to the OpCo Plan Support Agreement);

- if the Chapter 11 Cases commence prior to 5:00 p.m. Eastern Time on February 1, 2010, but the following circumstances occur (unless the failure to meet a deadline set forth below results from a material breach by an OpCo Lender party to the OpCo Plan Support Agreement),

  - if the Plan and Disclosure Statement are not filed with the Bankruptcy Court by the 2nd business day following the date the petitions for the Chapter 11 Cases are filed with the Bankruptcy Court;

  - if the Plan has not been confirmed by the 60th day after it is filed with the Bankruptcy Court;

  - if the Confirmation Order does not become a final order or the Plan has not been substantially completed by the 15th day following the confirmation of the Plan;

  - if the Bankruptcy Court grants relief that is inconsistent with the Plan and such inconsistent relief is not dismissed, vacated or modified within specified time periods;

  - if the Bankruptcy Court enters an order pursuant to section 1104 of the Bankruptcy Code appointing a trustee or an examiner with expanded powers to operate and manage the Company's business;

  - if the Bankruptcy Court dismisses any of the Chapter 11 Cases or converts them to a liquidation under chapter 7 of the Bankruptcy Code;

  - if the Company files any motion or pleading with the Bankruptcy Court that is inconsistent with the OpCo Plan Support Agreement or the Restructuring which is not withdrawn within specified time periods; or

  - any court enters a judgment or order that the OpCo Plan Support Agreement or a material portion thereof is unenforceable and such judgment is not dismissed, vacated or modified within specified time periods;

- the Company withdraws or revokes the Plan or files an alternative restructuring proposal with the Bankruptcy Court or proposes or otherwise supports such an alternative restructuring proposal with proper approval from NPG's board of directors;

26

- the Company engages in certain transactions that are outside the ordinary course of business; or

- a material breach by the Company of the OpCo Plan Support Agreement that is not remedied after written notice thereof.

The Company may terminate the OpCo Plan Support Agreement if: (i) any OpCo Lender party thereto materially breaches the OpCo Plan Support Agreement and such breach is not remedied after written notice thereof is received and such breach has a material adverse effect on the Company or its ability to consummate the Restructuring; (ii) the board of directors of the Company determines in good faith, after consultation with legal counsel, that the taking of any action under the OpCo Plan Support Agreement would be inconsistent with its applicable fiduciary obligations; provided, that nothing contained in the OpCo Plan Support Agreement is deemed to prevent the Company from taking or failing to take any action that it is obligated to take (or fail to take) in the performance of any fiduciary or similar duty which the Company owes to any other Person; (iii) if the Bankruptcy Court enters an order denying confirmation of the Plan; or (iv) if the Plan has not been consummated within 120 days after it is filed with the Bankruptcy Court (unless such failure is caused by a material breach by the Company).

Each OpCo Lender party to the OpCo Plan Support Agreement has agreed that if it transfers any of its OpCo Debt, the transferee must agree to be bound by the Plan Support Agreement.

## 2.    **HoldCo Plan Support Agreements**

As of the date of this Disclosure Statement, HoldCo Lenders holding approximately 80% in principal amount of HoldCo Debt and representing approximately 60% in number of the HoldCo Lenders have already executed and delivered HoldCo Plan Support Agreements. On the terms and subject to the conditions of the relevant HoldCo Plan Support Agreement, each HoldCo Lender has agreed, among other things, to take such steps as are reasonably necessary to support and achieve consummation of the Out-of-Court Transaction and, if necessary, confirmation and consummation of the Plan, including voting to accept and approve the Restructuring. Additionally, on the terms and subject to the conditions of the relevant HoldCo Plan Support Agreement, each HoldCo Lender party to a HoldCo Plan Support Agreement has agreed not to solicit or support any alternative restructuring of the Company or take actions that could reasonably be expected to hinder or prevent the Restructuring.

Each HoldCo Plan Support Agreement contains mutual releases whereby Harvest Partners IV and the relevant HoldCo Lender release each other (and their respective affiliates and related parties) from any and all claims, demands, causes of actions and rights of any kind arising from or relating to the events, circumstances, or conduct occurring before the date of payment of the relevant consent and release fee described below, and in any way arising out of or related to the HoldCo Debt that is the subject of the relevant HoldCo Plan Support Agreement, or the transactions related to the incurrence or holding of that debt or in any way related to Levlad HoldCo, Arbonne HoldCo or their subsidiaries. The release by the HoldCo Debtors does not affect their right to be treated as provided in the Restructuring and the Plan, including their right to receive New NPG Warrants. The releases do not apply to the Company unless Harvest

Partners IV notifies the relevant HoldCo Lender that it should apply to the Company. In the HoldCo Plan Support Agreements, Harvest Partners IV agrees to pay consent and release fees to the HoldCo Lenders party thereto in an amount of between approximately 4% and 5% of the HoldCo Debt subject to the respective HoldCo Plan Support Agreement. The aggregate of such fees, which are to be paid no later than January 15, 2010, is approximately $7.65 million. It is possible that additional HoldCo Lenders will enter into HoldCo Plan Support Agreements.

Each HoldCo Lender party to a HoldCo Plan Support Agreement has agreed that if it transfers any of its HoldCo Debt, the transferee must agree to be bound by the Plan Support Agreement.

## B. Harvest Management Agreement

In connection with NPG's November 2004 acquisition of Arbonne and Levlad, Arbonne and Levlad entered into a management agreement with Harvest. Under this agreement, Harvest received a one time fee in connection with consummation of the acquisition and was reimbursed for its out-of-pocket expenses incurred in connection with the acquisition. Arbonne and Levlad also agreed to pay Harvest an annual management fee, payable quarterly in advance, for financial advisory and strategic planning services. Harvest is also entitled to reimbursement for all reasonable out of pocket expenses incurred in connection with providing such financial advisory and strategic planning services. The terms of the OpCo Credit Agreement Amendment have prohibited the payment of the management fee to Harvest since June 12, 2009, but those fees have continued to accrue. Harvest has informed the Company that it will agree to terminate the management agreement and waive those fees in the Restructuring.

The management agreement provides that Arbonne and Levlad will indemnify Harvest and its affiliates from all losses related to or arising out of the services provided pursuant to the Management Agreement.

## C. Employment Agreements

### 1. Napier Employment Agreement

Arbonne is party to an employment agreement with Ms. Katherine S. Napier whereby Ms. Napier is employed as Chief Executive Officer of Arbonne. The agreement has a three (3) year term, commencing on August 17, 2009, and is automatically extended for additional one (1) year terms unless terminated by either party on ninety (90) days notice. During the term of the agreement, Ms. Napier shall also (i) serve as a director of Arbonne, (ii) to the extent requested by the NPG board of directors, serve as a director or officer of any parents or subsidiaries of Arbonne and (iii) serve as a member of, and report to, the NPG board of directors. The agreement provides Ms. Napier with a specified annual base salary, subject to review and possible increase by NPG's board of directors, and an annual incentive bonus, based on financial performance criteria determined by the NPG board of directors, of up to 100% of Ms. Napier's base salary. Additionally, Ms. Napier shall be eligible to receive a cash appreciation incentive bonus upon certain liquidity events equal to a specified percentage of the excess of NPG's enterprise value upon such liquidity event over $300,000,000. If Ms. Napier remains actively employed by Arbonne at the time of such liquidity event, she will receive the maximum amount

of such cash incentive appreciation bonus. The Restructuring would not qualify as a liquidity event for purposes of the incentive appreciation bonus. If Ms. Napier's employment is terminated by Arbonne without Cause (as defined in the agreement) or by Ms. Napier for Good Reason (as defined in the agreement), Ms. Napier is entitled to receive (in addition to accrued salary and benefits) a severance payment of one-twelfth (1/12th) of her highest annual rate of base salary during the term, payable ratably in monthly installments over the greater of twelve (12) months and the remainder of the term, as well as certain benefits and applicable bonus payments.

Ms. Napier's employment agreement may be renegotiated in connection with the Restructuring, but there is no agreement about what such amended terms might be.

The Company expects that Ms. Napier will participate in the Long Term Management Incentive Plan, although the extent of her participation will be determined by the board of directors of New NPG.

### 2.      **Lehman Employment Agreement**

On November 24, 2004, Arbonne entered into an employment agreement with NPG and Mr. Mark I. Lehman whereby Mr. Lehman is employed as Chief Financial Officer of Arbonne. The agreement had an initial two (2) year term, commencing on the closing of NPG's acquisition of Arbonne and Levlad and is automatically extended for additional one (1) year terms unless terminated by either Arbonne or Mr. Lehman on sixty (60) days notice. The agreement provides Mr. Lehman with a specified annual base salary, subject to review and possible increase by NPG's board of directors, and an annual incentive bonus, based on the extent to which Arbonne and Levlad achieve their target EBITDA, as determined by NPG's board of directors, of up to 150% of Mr. Lehman's base salary. The agreement also grants Mr. Lehman non-voting units of LLC interests in NPG which will be eliminated as contemplated by the Restructuring. If the agreement is terminated (i) by Arbonne other than for Cause (as defined in the agreement) and not due to Mr. Lehman's death or expiration of the employment term, (ii) by Mr. Lehman for Good Reason (as defined in the agreement) or (iii) on account of Mr. Lehman's disability, Mr. Lehman is entitled to a severance payment equal to his base salary for the greater of twelve (12) months and the remainder of the employment term (the "severance term"), payable, at Arbonne's discretion, in a lump sum or ratably over the severance term, as well as certain continued benefits during such period.

Mr. Lehman's employment agreement may be renegotiated in connection with the Restructuring, but there is no agreement about what such amended terms might be.

The Company expects that Mr. Lehman will participate in the Long Term Management Incentive Plan, although the extent of his participation will be determined by the board of directors of New NPG.

### 3.      **Davenport Employment Agreement**

Arbonne is party to an employment agreement with Ms. Rita Davenport whereby Ms. Davenport is employed as President of Arbonne. The agreement has a two (2) year term, commencing on January 1, 2006 and ending on December 31, 2007. Thereafter, the term

automatically extends for additional one (1) year terms until December 31, 2012, unless terminated by either party on sixty (60) days notice.  In the event that the term has not otherwise expired or been terminated, the term shall expire on December 31, 2012.  The agreement provides Ms. Davenport with a specified initial annual base salary.  Additionally, Davenport is entitled to receive an incentive bonus based on performance objectives and a potential bonus amount determined by Arbonne's CEO and other executives at the beginning of each fiscal year.  Pursuant to the agreement, Ms. Davenport also retains certain rights and obligations regarding the purchase and/or grant of units of LLC interests in NPG which will be eliminated as contemplated by the Restructuring.  If Ms. Davenport's employment is terminated by Arbonne for any reason other than for death, disability, expiration or nonrenewal of the term or Cause (as defined in the agreement), or if terminated by Ms. Davenport for Good Reason (as defined in the agreement), Ms. Davenport is entitled to receive (in addition to accrued salary and benefits) a severance payment equal to (12) months base salary, payable ratably over the severance term.

Ms. Davenport's employment agreement may be renegotiated in connection with the Restructuring, but there is no agreement about what such amended terms might be.

The Company expects that Ms. Davenport will participate in the Long Term Management Incentive Plan, although the extent of her participation will be determined by the board of directors of New NPG.

## IX.

## <u>EXPLANATION OF CHAPTER 11</u>

### A.      Filing Entities

The Company is seeking the approval of all Prepetition Lenders, but is prepared to pursue the Restructuring even if such unanimous support is not achieved.  If each Prepetition Lender does not approve the Restructuring through the Out-of-Court Transaction, or if the Company for any reason determines that it would be more advantageous or expeditious, and there is sufficient support for the Plan, then NPG and some or all of the prospective debtors identified below intend to commence individual Chapter 11 Cases to consummate the Restructuring through the Plan. Additionally, the Company may determine for any reason to include additional affiliates of the following prospective debtors as a Filing Entity in the Chapter 11 Cases:

| | |
|---|---|
| Natural Products Group, LLC (Fed. EIN 86-1119470) | Levlad, LLC (Fed. EIN 95-2973496) |
| Arbonne Intermediate Holdco, Inc. (Fed. EIN 87-0735363) | Arbonne Institute of Research and Development, LLC (Fed. EIN 33-0762250) |
| Levlad Intermediate Holdco, Inc. (Fed. EIN 87-0735367) | Arbonne International Holdings, Inc. (Fed. EIN 20-5585671) |
| Arbonne International, LLC (Fed. EIN 33-0762250) | Arbonne International Distribution, Inc. (Fed. EIN 20-5585608) |

## B.      Overview of Chapter 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code pursuant to which a debtor in possession may reorganize its business for the benefit of its creditors, stockholders, and other parties in interest.   The date on which a chapter 11 case is commenced is known as the Petition Date.

The commencement of a chapter 11 case creates an estate comprising all the legal and equitable interests of the debtor in possession as of the date the petition is filed.  Sections 1101, 1107 and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession" unless the bankruptcy court orders the appointment of a trustee.  If the Company commences a case under chapter 11, the Filing Entities intend to remain in possession of their property and continue to operate their businesses as debtors in possession.  See "Anticipated Events during the Chapter 11 Cases."

The filing of a chapter 11 petition also triggers the automatic stay provisions of the Bankruptcy Code.  Section 362 of the Bankruptcy Code provides, among other things, for an automatic stay of all attempts by creditors or other third parties to collect prepetition claims from the debtor or otherwise interfere with its property or business.  Exempted from the automatic stay are governmental authorities seeking to exercise regulatory or policing powers.  Except as otherwise ordered by the bankruptcy court, the automatic stay remains in full force and effect until the effective date of a confirmed plan of reorganization.

The consummation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan and any creditor of or equity security holder in the debtor, whether or not such creditor or equity security holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefore the obligations specified under the confirmed plan, and terminates all rights and interests of equity security holders.

The formulation of a plan of reorganization is the principal purpose of a chapter 11 case. The plan sets forth the means for satisfying claims against and interests in a debtor's estate. Unless a trustee is appointed, only a debtor may file a plan during the first 120 days of a chapter 11 case (the "Filing Period"), and the debtor will have 180 days to solicit acceptance of such plan (the "Solicitation Period").  As the Filing Entities intend to file the Plan on the first day of any Chapter 11 Cases, i.e. during the Filing Period, no other creditor or party in interest may file a plan until the expiration of the Solicitation Period.

## C. Plan of Reorganization

Although referred to as a plan of reorganization, a plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of the debtor's assets. In either event, upon confirmation of the plan, it becomes binding on the debtor and all of its creditors and equity holders, and the prior obligations owed by the debtor to such parties are compromised and exchanged for the obligations specified in the plan. For a description of key components of the Plan, see "Overview of the Plan," below.

After a plan of reorganization has been filed, the holders of impaired claims against and equity interests in a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the debtor to prepare and file a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. This Disclosure Statement is presented to holders of Claims against and Equity Interests in the Filing Entities to satisfy the requirements of section 1125 of the Bankruptcy Code in connection with the Filing Entities' solicitation of votes on the Plan.

## D. The Confirmation Hearing

If the Company commences the prepackaged Chapter 11 Cases, the Bankruptcy Court would schedule a hearing on the confirmation of the Plan (the "Confirmation Hearing"). At the Confirmation Hearing, the Bankruptcy Court would consider whether the Plan satisfies the various requirements of the Bankruptcy Code, including whether the Plan is feasible and whether it is in the best interests of the holders of Claims against and Equity Interests in the entities that have commenced Chapter 11 Cases. At that time, the Filing Entities would submit a report to the Bankruptcy Court concerning the votes for acceptance or rejection of the Plan by the parties entitled to vote thereon.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan. Any objection to confirmation of the Plan would have to be made in writing and filed with the Bankruptcy Court and served on all required parties by the objection deadlines set by the Bankruptcy Court. Unless an objection to confirmation is timely served and filed, it may not be considered by the Bankruptcy Court.

## E. Confirmation of a Plan

If all classes of claims and equity interests accept a plan of reorganization, the bankruptcy court may confirm the plan if the bankruptcy court independently determines that the requirements of section 1129(a) of the Bankruptcy Code have been satisfied. See "Plan Confirmation and Consummation Procedures – Confirmation of the Plan." **The Filing Entities believe that the Plan satisfies all the applicable requirements of section 1129(a) of the Bankruptcy Code.**

Chapter 11 of the Bankruptcy Code does not require that each holder of a claim or interest in a particular class vote in favor of a plan of reorganization for the bankruptcy court to determine that the class has accepted the plan. See "Plan Confirmation and Consummation Procedures."

In addition, classes of claims or equity interests that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan and thus are not entitled to vote. Furthermore, classes that are to receive no distribution under the plan are conclusively deemed to have rejected the plan. See "Plan Confirmation and Consummation Procedures."

Accordingly, acceptances of a plan will generally be solicited only from those persons who hold Claims or Equity Interests in an impaired class. **Holders of Claims and Equity Interests in the following classes are unimpaired and deemed to have accepted the Plan, and therefore, are not entitled to vote on the Plan: Class 1 – Priority Claims; Class 4 – Secured Claims; Class 5 – Unsecured Claims; and Class 7 – Other Equity Interests.**

**Holders of Class 6 – NPG Equity Interests, which are not entitled to a distribution under the Plan, are deemed to have rejected the plan and, therefore, are not entitled to vote on the Plan.**

**Only holders of Claims or Equity Interests in the following classes are impaired and entitled to vote to accept or reject the Plan: Class 2 – OpCo Lender Claims and Class 3 – HoldCo Lender Claims.** Only the votes of holders of Claims in these impaired Classes were solicited.

The Plan treats all Filing Entities as a single Estate solely for purposes of voting (where applicable) on the Plan, confirmation of the Plan and determining treatment of and making distributions in respect of Claims against and Equity Interests in the Filing Entities. The Plan contemplates that each of the Filing Entities will be able to satisfy the requirements of sections 1129(a)(8) of the Bankruptcy Code. Accordingly, for purposes of determining whether the Plan satisfies sections 1129(a)(8) of the Bankruptcy Code with respect to each of the Filing Entities, the Filing Entities will tabulate votes on an individual debtor basis. See "Plan Confirmation and Consummation Procedures – Confirmation of the Plan – Acceptance."

**X.**

**OVERVIEW OF THE PLAN**

**THE COMPANY HAS NOT COMMENCED A CHAPTER 11 CASE, NOR HAS IT TAKEN ANY CORPORATE ACTION AUTHORIZING THE COMMENCEMENT OF SUCH A CASE. IF THE RESTRUCTURING CANNOT BE CONSUMMATED THROUGH AN OUT-OF-COURT TRANSACTION, HOWEVER, THE COMPANY INTENDS TO COMMENCE CHAPTER 11 CASES UNDER THE BANKRUPTCY CODE TO RESTRUCTURE ITS FINANCIAL AFFAIRS. THIS DISCLOSURE STATEMENT SOLICITS YOUR ADVANCE ACCEPTANCE OF THE PLAN, WHICH CONTAINS IMPORTANT INFORMATION RELEVANT TO YOUR DECISION TO ACCEPT THE PLAN. PLEASE READ THE PLAN OF REORGANIZATION COMPLETELY AND CAREFULLY.**

To enhance the likelihood that the Company will succeed in its restructuring efforts, it has formulated the Plan for its reorganization under chapter 11 of the Bankruptcy Code. The Plan provides the treatment set forth below to holders of claims against and interests in the Filing

Entities, which treatment is substantially similar to the treatment provided pursuant to the Out-of-Court Transaction. If the Plan is confirmed and consummated, all holders of claims against and interests in the Filing Entities would receive the treatment set forth below, whether or not they vote for acceptance of the Plan.

The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in documents referred to therein. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statements of such terms and provisions.

The Plan itself and the documents referred to therein control the actual treatment of Claims against and interests in the Filing Entities under the Plan and will, upon the Effective Date, be binding upon all holders of Claims against and interests in the Filing Entities and the Estates, the Filing Entities as reorganized on and after the Effective Date (the "Reorganized Filing Entities") and other parties in interest. In the event of any conflict between this Disclosure Statement, on the one hand, and the Plan or any other operative document thereunder, on the other hand, the terms of the Plan and such other operative document are controlling.

## XI.

## ANTICIPATED EVENTS DURING THE CHAPTER 11 CASES

If the Company does not consummate the Restructuring through the Out-of-Court Transaction and pursues the Plan instead, the Filing Entities intend to file voluntary petitions for relief under chapter 11 of the Bankruptcy Code. At that time, all actions and proceedings against the Filing Entities and all acts to obtain property from the Filing Entities will be stayed under section 362 of the Bankruptcy Code. The Filing Entities will continue to operate their businesses and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

The Filing Entities do not expect the Chapter 11 Cases to be protracted. To expedite their emergence from chapter 11, the Filing Entities on the Petition Date, in addition to filing this Disclosure Statement and the Plan, would file motions seeking the relief detailed below, among other relief, from the Bankruptcy Court. Such relief, if granted, will facilitate the administration of the Chapter 11 Cases; there can be no assurance, however, that the Bankruptcy Court will grant the relief sought.

### A.      Timetable

Assuming that the Bankruptcy Court approves the Filing Entities' Disclosure Statement and confirms the Plan, on the schedule requested by the Filing Entities, the Filing Entities would seek to emerge from chapter 11 within approximately two (2) months of the Petition Date. There can be no assurance, however, that the Bankruptcy Court's orders will permit the Chapter 11 Cases to proceed as expeditiously as anticipated.

**B.** **First Day Pleadings and Orders**

**1.** **Joint Administration**

In order to expedite the administration of the Chapter 11 Cases and reduce administrative expenses, the Filing Entities intend to seek the joint administration of the Chapter 11 Cases for procedural purposes.

**2.** **Interim Compensation and Reimbursement of Professional Persons and Committee Members**

In an effort to enable all parties to monitor the costs of administration, enable the maintenance of a more level cash flow availability and implement efficient cash management, the Filing Entities intend to seek the approval and implementation of procedures they have developed with which all Professional Persons would be required to comply in seeking payment of compensation and reimbursement of expenses, and with which all members of any statutory committee would be required to comply in seeking reimbursement of their expenses.

**3.** **Combined Disclosure Statement and Confirmation Hearing**

The Filing Entities intend to seek an order scheduling a combined hearing on this Disclosure Statement and confirmation of the Plan, i.e., a Confirmation Hearing, for a date not more than 45 days following the Petition Date. At the Confirmation Hearing, the Filing Entities will seek approval of this Disclosure Statement and confirmation of the Plan pursuant to sections 1125, 1128 and 1129 of the Bankruptcy Code. At that time, the Filing Entities will also request that the Bankruptcy Court approve the prepetition solicitation of votes on the Plan. There can be no assurance that the Bankruptcy Court will approve the Filing Entities' request to schedule the Confirmation Hearing within 45 days of the Petition Date.

**4.** **Debtor-in-Possession Financing and Use of Cash Collateral**

As of the Petition Date, the Filing Entities will have granted the Prepetition Lenders security interests in substantially all of their Assets, including all cash (the "Cash Collateral"). Given the encumbrances upon substantially all of their Assets under the Old Debt, the Filing Entities may be unable to fund their day-to-day operations and preserve the value of their Assets as a going concern after the Petition Date absent some form of immediate relief allowing them use of their Assets that are or may become Cash Collateral.

Beyond emergency use of Cash Collateral, if the Filing Entities file for chapter 11, they intend to obtain short-term working capital financing under a senior secured debtor-in-possession financing facility (the "DIP Facility"), to provide them with the needed liquidity to ensure the efficient operation and future growth of their businesses and promote a successful reorganization.  Among other things, such DIP Facility will allow the Filing Entities to (a) maintain business relationships with vendors, suppliers, and the AICs, (b) make payroll, (c) make capital expenditures, (d) repay other debt obligations, and (e) satisfy other working capital and operational needs.

Accordingly, on the Petition Date, the Filing Entities intend to file a motion with the Bankruptcy Court to obtain an order (the "DIP Order") (a) authorizing the Filing Entities' use of cash, including Cash Collateral, on a final basis subject to certain limitations, (b) providing adequate protection to the Prepetition Lenders for any such use of Cash Collateral and (c), among other things, authorizing the Filing Entities to enter into the DIP Facility.

In accordance with the terms of the Restructuring Term Sheet, the OpCo Lenders have been given the opportunity to provide the DIP Facility (as lenders under the DIP Facility, the "DIP Lenders").  Under the terms of the Restructuring Term Sheet, the DIP Facility will be in the aggregate principal amount of up to $20 million, available in two draws as follows: (i) $10 million to be drawn on the effective date of the DIP Facility and (ii) up to $10 million to be available through June 30, 2010 in one subsequent draw upon the satisfaction of certain conditions to be determined, of which up to $2 million in the aggregate may be used to issue new letters of credit or replace existing letters of credit when they expire.  In addition, under the terms of the Restructuring Term Sheet, the obligations under the DIP Facility will be, inter alia, (a) secured by a first and priming lien in and to substantially all of the Company's assets, subject only to certain customary permitted liens, and (b) entitled to superpriority claim status in the Chapter 11 Cases pursuant to section 364(c)(1) of the Bankruptcy Code.

Under the Plan, on the Effective Date, all outstanding obligations of the Filing Entities to the DIP Agent and the DIP Lenders under or in respect of the DIP Facility shall be rolled up into loans under the New Term Loan portion of the Exit Facility with an aggregate principal amount for each of the DIP Lenders under the New Term Loan equal to the amount of such DIP Lenders' loans under the DIP Facility.[5]

### 5. __Business Operations__

#### a. *Cash Management*

Because the Filing Entities expect the Chapter 11 Cases to be pending for less than two (2) months, and because of the administrative hardship that any operating changes would impose, the Filing Entities intend to seek authority to continue using their existing cash management system, bank accounts and business forms and to follow their internal investment and deposit guidelines. Absent the Bankruptcy Court's authorization of the continued use of the cash management system, the Filing Entities' cash flow could be impaired to the detriment of the Filing Entities' Estate and creditors.

Continued use of their existing cash management system will facilitate the Filing Entities' smooth and orderly transition into the Chapter 11 Cases, minimize the disruption of their businesses while in chapter 11, and expedite their emergence from chapter 11. As a result of set-up time and expenses, requiring the Filing Entities to adopt and implement a new cash management system would likely increase the costs of the Chapter 11 Cases. For the same reasons, requiring the Filing Entities to close their existing bank accounts and establish new accounts or requiring them to create new business forms would only frustrate their efforts to reorganize expeditiously.

---

[5]     For further detail regarding the treatment of DIP Claims, please see Article XIII – "The Chapter 11 Plan."

### b.     *Maintenance of Utility Services*

In connection with the operation of their businesses and management of their properties, the Filing Entities obtain a wide range of utility services (collectively, the "Utility Services") from certain utility companies (the "Utility Companies"), including electricity, telephone and similar service suppliers for which no alternate service could be expected.  If the Filing Entities file Chapter 11 Cases, it will be essential that the Utility Services continue uninterrupted after the Petition Date.  As such, the Filing Entities intend to seek an order (i) prohibiting the Utility Companies from altering, refusing or discontinuing service to the Filing Entities, (ii) deeming the Utility Companies adequately assured of future payment, with limited exception, and (iii) establishing procedures for determining requests for additional adequate assurances of payment.

### c.     *Payment of Prepetition Trust Fund Taxes and Governmental Fees*

In the ordinary course of their operations, the Filing Entities collect sales, use, employee-related withholding and other trust fund type taxes (however denominated) (the "Trust Fund Taxes") from their customers and other parties and remit such taxes to the appropriate federal, state and local taxing authorities (collectively, the "Taxing Authorities").  In the Chapter 11 Cases, the Filing Entities intend to seek authority to pay prepetition Trust Fund Taxes owed to the Taxing Authorities in the ordinary course of business as such payments become due and payable and to the extent adequate funds are available to make such payments.

### d.     *Maintenance of Insurance Coverage*

In connection with the daily operation of their businesses, the Filing Entities maintain certain insurance policies (collectively, the "Insurance Policies") in respect of, among other things, personal property, commercial general liability, commercial automobile liability, cargo, umbrella liability, excess liability, kidnap and ransom, pollution, criminal liability, worker's compensation, and employment practices liability, fiduciary and director's and officer's liability. Certain of the Insurance Policies are financed through premium finance agreements, while other policies' premiums are paid directly.  The continuation of the Insurance Policies is crucial given that they provide a comprehensive range of coverage in full force and effect for the Company, its business and properties.  Accordingly, the Filing Entities intend to seek postpetition authority to (i) maintain insurance coverage levels required under their corporate risk program, including authority to revise, extend, supplement, renew or change insurance coverage as needed; (ii) maintain their insurance premium financing program, including authority to renew, supplement or enter new financing arrangements as needed; and (iii) pay any prepetition and postpetition obligations associated therewith.  The Filing Entities also seek to prevent insurance companies from giving notice of termination or otherwise modifying or cancelling any Insurance Policies without obtaining further relief from the Bankruptcy Court.

### e.     *Critical Vendors and Service Providers*

In the ordinary course of their businesses, the Filing Entities rely on certain third-party vendors and service providers to supply goods, materials and services that the Filing Entities cannot operate without or cannot replace without incurring exorbitant costs (the "Vendors"). The essential goods and services provided by these Vendors include, without limit, the supply of

personal care and nutritional products to be sold by the AICs; common carrier, warehousing and logistics services for the storage and shipment of products; webhosting for selling products and providing AIC training programs online; and credit card processing services for the placing of orders by AICs and their clients. Notwithstanding provisions of the Bankruptcy Code that would otherwise require the Filing Entities to defer payment of Trade Claims until the Effective Date, because of the essential nature of their Vendors, the Filing Entities intend to seek authority from the Bankruptcy Court to establish procedures for the resolution and payment of such Vendors' prepetition general unsecured claims against the Filing Entities arising from or with respect to the delivery of goods or services to the Filing Entities in the ordinary course of business, including to pay, in the ordinary course of business, the Trade Claims of those providers of goods and services that agree in writing to continue to provide the Filing Entities with customary trade terms on an ongoing basis. Such claims are among the claims included in the class of Claims denominated Class 5 – Unsecured Claims under the Plan, which will not be impaired under the Plan.

### 6. Employee-Related Matters

The Filing Entities believe that they have a valuable asset in their work force and that any delay in paying prepetition compensation or benefits to their employees would destroy their relationships with employees and irreparably harm employee morale at a time when the continued dedication, confidence and cooperation of their employees is most critical. The Filing Entities are grateful to their employees for their help, without which a restructuring would not be possible. Accordingly, the Filing Entities will seek authority to pay compensation and benefits in the Chapter 11 Cases which were accrued but unpaid as of the Petition Date.

### 7. Arbonne Independent Consultant Network

Although the AICs are not employees, the AICs are critical to ensuring the continuation and success of the Company's operations. Any delay in paying prepetition compensation or benefits to the AICs, or any disruption in honoring any other incentive discounts, rewards or other programs related to the AIC network, would destroy the Company's relationships with AICs and irreparably harm morale and retention at a time when the continued dedication, confidence and cooperation of the AICs is most critical. The Filing Entities are grateful to the AICs for their help, without which a restructuring would not be possible. Accordingly, the Filing Entities will seek authority to pay compensation and benefits in the Chapter 11 Cases which were accrued but unpaid as of the Petition Date and to maintain AIC-related programs in the ordinary course.

### C. Representation of the Filing Entities as Debtors in Possession

The Filing Entities intend to seek retention of certain professionals to represent and assist them in connection with the Chapter 11 Cases. These professionals have been intimately involved with the negotiation and development of the restructuring transactions and the Plan.

In 2005, the Company retained White & Case LLP ("White & Case") to provide legal advice with respect to various corporate and litigation matters. Subsequently, White & Case has provided legal advice with respect to a variety of issues, including restructuring and bankruptcy

advice, and preparation of the requisite petitions, pleadings, exhibits, lists and schedules in connection with the potential commencement of the Chapter 11 Cases. Thomas E Lauria, Craig H. Averch, and Matthew C. Brown are proposed to act as lead counsel for the Filing Entities in any Chapter 11 Cases.

In anticipation of the volume of matters that are likely to come before the Bankruptcy Court in the Chapter 11 Cases, and the special familiarity and experience with the practice and procedure of the District of Delaware, where the Filing Entities expect they might file any prospective Chapter 11 Cases, the Filing Entities also intend to retain Fox Rothschild LLP ("Fox Rothschild") to serve as Delaware bankruptcy co-counsel in connection with the prosecution of Chapter 11 Cases, with Jeffrey M. Schlerf to act as lead counsel.

The Filing Entities currently employ certain professionals, in the ordinary course of business, to render services to the Company (collectively, the "Ordinary Course Professionals"), including legal services and certain accounting, tax and consulting services, which are necessary to the day-to-day continuation of the Company's operations. The Filing Entities intend to seek authority to continue to employ the Ordinary Course Professionals.

In addition to White & Case, Fox Rothschild, and the Ordinary Course Professionals, the Filing Entities also intend to seek approval from the Bankruptcy Court for the retention of the following Professional Persons: (a) Blackstone as their financial advisor, led by Timothy R. Coleman and Henry S. Hsu; and (b) Kekst and Company Incorporated as their communications consultant, led by Michael Freitag. Additionally, AlixPartners, LLP would be retained to serve as Claims Agent and Noticing Agent.

**D.      Filing Entities' Schedules; Bar Date; Claims Objections and Estimated Amount of Claims**

      **1.      <u>Schedules and Statements</u>**

Section 521 of the Bankruptcy Code and Bankruptcy Rule 1007 direct that, unless otherwise ordered by the court, a debtor must prepare and file certain schedules of assets and liabilities, executory contracts and unexpired leases and related information (the "Schedules") and statements of financial affairs (the "Statements") within fifteen (15) days of the commencement of a chapter 11 case. The purpose of this requirement is to provide a debtor's creditors, equity security holders and other interested parties with sufficient information to make informed decisions with respect to the debtor's reorganization. The Filing Entities may request that the Bankruptcy Court extend the time to file the Schedules and Statements for sixty (60) days (for a total of ninety (90) days from the Petition Date).

      **2.      <u>Bar Date</u>**

Upon commencement of Chapter 11 Cases, the Filing Entities intend to seek establishment of a deadline (the "Bar Date") for holders of alleged Claims against them as of the Petition Date to file proofs of claim against them.

### 3. Claims Objections

In the ordinary course of business, the Filing Entities maintain books and records (the "Books and Records") that reflect, among other things, their liabilities and the amounts owed to their creditors in connection with such liabilities. Once a Bar Date is established and proofs of claim are filed in accordance therewith, the Filing Entities and their professionals intend to conduct a review of the proofs of claim submitted in the Chapter 11 Cases, including any supporting documentation, and compare the Claims asserted in the proofs of claim with the Books and Records to determine the validity of such Claims. Such review will form the basis of allowing or disallowing Claims for treatment under the Plan.

### 4. Estimation of Claims

Although no Chapter 11 Cases have commenced, no Bar Date established, and no proofs of claim filed, the Filing Entities realize the dollar amounts are critical to demonstrating the feasibility of the Plan, and therefore, as of the date hereof, estimate the total amount of Claims against them based on their Books and Records will be substantially as follows: Administrative Claims – $7.5 million; Tax Claims – $10.9 million; Priority Claims – $15.4 million; OpCo Lender Claims – $530.5 million; HoldCo Lender Claims – $215.6 million; Secured Claims – $0; Unsecured Claims – $8.7 million.

## XII.

## PENDING LITIGATION

The Filing Entities are involved in legal proceedings from time to time incidental to the ordinary conduct of their business. Litigation is subject to many uncertainties, and the outcome of individual matters is not predictable with assurance. It is reasonably possible that the final resolution of any litigation could require the Filing Entities to make additional expenditures in excess of reserves that may be established. In the ordinary course of business, various claims, suits and complaints have been filed against us in addition to the one specifically referred to below. Although the final resolution of any such matters could have a material effect on the Filing Entities' operating results for a particular reporting period, the Filing Entities believe that they should not materially affect their consolidated financial position.

Levlad is currently a defendant in one products-related lawsuit. Levlad is one of many defendants in that lawsuit, which is pending in the United States District Court for the Northern District of California, San Jose Division (the "District Court"). In that lawsuit, the plaintiff ("Plaintiff"), a manufacturer and seller of allegedly "organic" personal care and cosmetic products, filed a complaint (the "Complaint") alleging that the defendants have engaged in unfair competition by selling and marketing products using the term "organic." On December 14, 2009, the District Court entered an order dismissing the Complaint against defendants – including Levlad – for both lack of subject matter jurisdiction and failure to state a claim. However, the District Court provided Plaintiff with leave to amend the Complaint within thirty (30) days of the order. Accordingly, Plaintiff has until January 13, 2010 to amend its Complaint against Levlad and the other defendants.

The Company believes that the estimated costs of the above lawsuit involving Levlad will not have a material adverse effect on the Company's consolidated financial condition or liquidity. However, there is no assurance that the Company or Levlad will not be subject to additional claims in the future or that the ultimate liability with respect to the lawsuit will not present significantly greater and longer lasting financial exposure than currently expected. The ultimate liability with respect to the pending lawsuit, and any unasserted claims, is subject to various uncertainties, including, but not limited to, the following: the number of claims that are brought in the future; the costs of defending and settling these claims; the risk of an adverse jury verdict or verdicts; and possible changes in the litigation environment or federal and state law governing these claimants. Because of the uncertainties related to such claims, it is possible that the ultimate liability could have a material adverse effect on the Company's business, financial condition and results of operations.

<h1 style="text-align:center">XIII.</h1>

<h1 style="text-align:center"><u>THE CHAPTER 11 PLAN</u></h1>

As a result of the chapter 11 process and through the Plan, the Company expects that creditors will obtain a substantially greater recovery from the Estates than the recovery that would be available if the Assets had been liquidated under chapter 7 of the Bankruptcy Code. The Plan is annexed hereto as Schedule 3 and forms part of this Disclosure Statement. The summary of the Plan set forth below is qualified in its entirety by the more detailed provisions set forth in the Plan.

**A.      Treatment of Intercompany Claims**

**1.      <u>Settlement of Intercompany Claims</u>**

In settlement and compromise of certain existing and potential disputes regarding Intercompany Claims and related matters, pursuant to sections 1123(b)(3) and (6) of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan treats the Filing Entities as comprising a single Estate solely for purposes of voting on the Plan, confirmation of the Plan and making Plan Distributions in respect of Claims against and Equity Interests in the Filing Entities under the Plan. Such treatment shall not affect any Filing Entity's status as a separate legal entity, change the organizational structure of the Filing Entities' business enterprise, constitute a change of control of any Filing Entity for any purpose, cause a merger or consolidation of any legal entities, nor cause the transfer of any assets; and, except as otherwise provided by or permitted in the Plan, all Filing Entities shall continue to exist as separate legal entities. The above treatment serves only as a mechanism to effect a fair distribution of value to the Filing Entities' constituencies.

**2.      <u>Treatment of Guaranty and Joint Liability Claims Against a Filing Entity</u>**

Any holder of a Claim against a Filing Entity and a Claim based on a guaranty of such base Claim given by a Filing Entity shall receive only a single recovery in respect of such Claims. Any holder of a Claim against a Filing Entity and a Claim against another Filing Entity based on joint or joint and several liability of such Filing Entities shall receive only a single

recovery in respect of such Claims.

### 3. Intercompany Claims

Intercompany Claims and Administrative Claims between and among the Filing Entities shall be unimpaired under the Plan and, pursuant to section 1124 of the Bankruptcy Code, all legal, equitable, and contractual rights of the Filing Entities in respect of such Claims shall be fully reinstated and retained.

### B. Classification and Treatment of Claims and Equity Interests

Section 1123 of the Bankruptcy Code provides that a plan of reorganization must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1123, the Plan divides Claims and interests into Classes and sets forth the treatment for each Class (other than Administrative Claims and Tax Claims which, pursuant to section 1123(a)(1), need not and have not been classified). The Filing Entities are required, under section 1122 of the Bankruptcy Code, to classify Claims against and interests in the Filing Entities into Classes, each of which contain Claims and interests that are substantially similar to the other Claims and interests in such Class. We believe that the Plan has classified all Claims and Equity Interests in compliance with the provisions of section 1122, but if Chapter 11 Cases were to be commenced, it is possible that a holder of a Claim or interest may challenge our classification of Claims and interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In that event, we would intend, to the extent permitted by the Bankruptcy Code, the Plan and the Bankruptcy Court, to make such reasonable modifications of the classifications through the Plan to permit confirmation and to use the acceptances of the Plan that are marked on the Ballots for the purpose of obtaining the approval of the reconstituted Class or Classes of which each accepting holder ultimately would be deemed to be a member. Any such reclassification could adversely affect the Class in which such holder initially was a member, or any other Class in the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan. Furthermore, a reclassification of a Claim or interest after approval of the Plan could necessitate a resolicitation of acceptances of the Plan.

The classification of Claims and interests and the nature of distributions to members of each Class are summarized below. We believe that the consideration, if any, that would be provided through the Plan to holders of Claims and interests would reflect an appropriate resolution of their Claims and interests, and would take into account the differing nature and priority (including applicable contractual subordination) of such Claims and interests. The Bankruptcy Court would be required to find, however, that a number of statutory tests are met before it could confirm the Plan. Many of these tests are designed to protect the interests of holders of Claims or interests who would not be entitled to vote on the Plan, or would not vote to accept the Plan, but who would be bound by the provisions of the Plan if it were confirmed by the Bankruptcy Court. Although we believe that the Plan could be confirmed, there can be no assurance that the requirements of such applicable section of the Bankruptcy Code would be satisfied.

1. **Administrative Claims and Tax Claims**

As provided by section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Tax Claims shall not be classified under the Plan, and shall instead be treated separately as unclassified Claims and in accordance with sections 1129(a)(9)(A) and 1129(a)(9)(C) of the Bankruptcy Code, respectively. Such Claims are not designated as classes of Claims for the purposes of the Plan or for the purposes of sections 1123, 1124, 1125, 1126 or 1129 of the Bankruptcy Code.

*a.* *Treatment of Administrative Claims*

All Administrative Claims shall be treated as follows:

Time for Filing Administrative Claims. The holder of an Administrative Claim, other than (i) a DIP Claim, (ii) a Fee Claim, (iii) a liability incurred and payable in the ordinary course of business by a Filing Entity (and not past due), or (iv) an Administrative Claim that has been Allowed on or before the Effective Date, must file with the Bankruptcy Court and serve on the Filing Entities, the Creditors' Committee (if any) and the Office of the United States Trustee, notice of such Administrative Claim within thirty (30) days after service of Notice of Confirmation. Such notice must include at a minimum (i) the name of the Filing Entity or Filing Entities purported to be liable for the Administrative Claim, (ii) the name of the holder of the Administrative Claim, (iii) the amount of the Administrative Claim, and (iv) the basis of the Administrative Claim. **Failure to file and serve such notice timely and properly shall result in the Administrative Claim being forever barred and discharged.**

Time for Filing Fee Claims. Each Professional Person who holds or asserts a Fee Claim shall be required to file with the Bankruptcy Court, and serve on all parties required to receive notice, a Fee Application within forty (40) days after the Effective Date. **The failure to timely file and serve such Fee Application shall result in the Fee Claim being forever barred and discharged.**

Allowance of Administrative Claims/Fee Claims. An Administrative Claim with respect to which notice has been properly filed and served pursuant to Section 6.2(a) of the Plan shall become an Allowed Administrative Claim if no objection is filed within thirty (30) days after the later of (i) the Effective Date, or (ii) the date of service of the applicable notice of Administrative Claim or (iii) such later date as may be (A) agreed to by the holder of such Administrative Claim or (B) approved by the Bankruptcy Court on motion of a party in interest, without notice or a hearing. If an objection is filed within such 30-day period (or any extension thereof), the Administrative Claim shall become an Allowed Administrative Claim only to the extent allowed by Final Order. A Fee Claim in respect of which a Fee Application has been properly filed and served pursuant to Section 6.2(b) of the Plan shall become an Allowed Administrative Claim only to the extent allowed by order of the Bankruptcy Court.

Payment of Allowed Administrative Claims. On the Plan Distribution Date, each holder of an Allowed Administrative Claim shall receive (i) the amount of such holder's Allowed Administrative Claim in one Cash payment, or (ii) such other treatment as may be agreed upon in writing by the Filing Entities and such holder; provided, that such treatment shall not provide

a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Claim; provided, further, that an Administrative Claim representing a liability incurred in the ordinary course of business of the Filing Entities may be paid at the Filing Entities' election in the ordinary course of business.

Allowance and Satisfaction of DIP Claims.  On the Effective Date, all outstanding obligations of the Filing Entities to the DIP Agent and the DIP Lenders under or in respect of the DIP Facility shall be rolled up into loans under the New Term Loan portion of the Exit Facility with an aggregate principal amount for each of the DIP Lenders under the New Term Loan equal to the amount of such DIP Lenders' loans under the DIP Facility.

Upon payment and satisfaction in full of all obligations as provided in Section 6.2(e) of the Plan, the DIP Facility shall be deemed terminated, satisfied and discharged and the Filing Entities shall have no other obligations thereunder or under any note, guaranty, pledge, security, or other agreement or instrument, mortgage or Lien executed or delivered pursuant to, in connection with, or related to, the DIP Facility; and the DIP Agent and the DIP Lenders shall be deemed to have relinquished and released all of the Liens securing the DIP Claims, including, without limitation, Liens granted in connection with or under the DIP Facility or the DIP Order, and Liens, if any, arising under section 506(a) of the Bankruptcy Code in the event that the DIP Claims would be subject to a permissible setoff under section 553 of the Bankruptcy Code. From and after the Effective Date, the DIP Lenders shall, at the sole cost and expense of the New NPG Group, take all action necessary or reasonably requested by the New NPG Group to confirm the removal of any claims, security interests and Liens on the properties or assets of the Filing Entities or the New NPG Group or any other Person securing the DIP Facility. Notwithstanding Section 6.2(e) of the Plan, the provisions of the DIP Order that provide that they shall survive the confirmation and consummation of the Plan shall so survive and shall remain in full force and effect from and after the Confirmation Date.

Allowance and Satisfaction of Claims for Fees and Expenses of the Prepetition OpCo Agent.  On the Effective Date, the Filing Entities shall pay a Plan Distribution of Cash, without interest, in an amount equal to all fees and the reasonable out-of-pocket expenses (including, without limitation, reasonable fees and expenses of attorneys and advisors) incurred by, and administration fees payable to, the Prepetition OpCo Agent under the OpCo Credit Agreement for the period through the Effective Date, in each case to the extent not reimbursed on or prior to the Effective Date, without the necessity of filing a fee application or any other application of any kind or nature with the Bankruptcy Court.

### b.    *Treatment of Tax Claims*

At the election of the Filing Entities, each holder of an Allowed Tax Claim will receive in full satisfaction of such Allowed Tax Claim (a) payments in Cash, in regular installments over a period ending not later that five (5) years after the Petition Date, of a total value, as of the Effective Date, equal to the Allowed amount of such Claim; (b) a lesser amount in one Cash payment as may be agreed upon in writing by such holder; or (c) such other treatment as may be agreed upon in writing by such holder; provided, that such agreed upon treatment may not provide such holder with a return having a present value as of the Effective Date that is greater than the amount of such holder's Allowed Tax Claim or that is less favorable than the treatment

provided to the most favored nonpriority Unsecured Claims under the Plan. The Confirmation Order shall enjoin any holder of an Allowed Tax Claim from commencing or continuing any action or proceeding against any responsible person, officer or director of the Filing Entities that otherwise would be liable to such holder for payment of a Tax Claim so long as the Filing Entities are in compliance with Section 6.3 of the Plan. So long as the holder of an Allowed Tax Claim is enjoined from commencing or continuing any action or proceeding against any responsible person, officer or director under Section 6.3 of the Plan or pursuant to the Confirmation Order, the statute of limitations for commencing or continuing any such action or proceeding shall be tolled.

## 2. Treatment of Classified Claims against and Equity Interests in the Filing Entities

The classes of Claims against and Equity Interests in the Filing Entities shall be treated under the Plan as follows:

Class 1 – Priority Claims. Class 1 shall consist of all Priority Claims against the Filing Entities. Each Allowed Priority Claim against any of the Filing Entities shall be unimpaired under the Plan and, except to the extent that a holder of an Allowed Priority Claim agrees to a different treatment of such Allowed Priority Claim, pursuant to section 1124 of the Bankruptcy Code, all legal, equitable, and contractual rights of each holder of an Allowed Priority Claim in respect of such Claim shall be fully reinstated and retained, and such holder of an Allowed Priority Claim shall be paid in full and in Cash on or as soon as practicable after the latest to occur of (i) the Plan Distribution Date; (ii) the first Business Day after the date that is ten (10) Business Days after the date such Claim becomes an Allowed Priority Claim; and (iii) the date agreed to by the Filing Entities and the holder of the Allowed Priority Claim. Class 1 – Priority Claims are unimpaired under the Plan, and holders of such Claims are therefore deemed to accept the Plan and are not entitled to vote to accept or reject the Plan.

Class 2 – OpCo Lender Claims. Class 2 shall consist of all OpCo Lender Claims against the Filing Entities. Each holder of an Allowed OpCo Lender Claim against any of the Filing Entities shall receive, on the Effective Date, its Pro Rata Share of (i) the Reinstated OpCo Term Loan, and (ii) 85% of the New NPG Common Stock issued under the Plan on the Effective Date, subject to dilution for (a) New NPG Common Stock issuable upon the exercise of the New NPG Warrants, (b) New NPG Common Stock issuable upon the exercise of any New NPG Options that may be issued under the Long Term Management Incentive Plan (up to an additional 7.5% of the New NPG Common Stock, on a fully diluted basis), and (c) any additional New NPG Common Stock that may be awarded in accordance with the Long Term Management Incentive Plan. The OpCo Lender Claims shall be Allowed, not subject to offset, defense, counterclaim, reduction or credit of any kind whatsoever, in an amount equal to the sum of (i) the aggregate principal amount outstanding under the OpCo Credit Agreement as of the Petition Date, of approximately $530.5 million, plus (ii) accrued and unpaid interest and default interest under the OpCo Credit Agreement through the Petition Date, plus (iii) amounts drawn on the Letters of Credit from the Petition Date through the Effective Date, plus (iv) accrued and unpaid letter of credit fees, administrative fees, and other fees and expenses (including reasonable fees and out-of-pocket expenses of attorneys and advisors incurred by the Prepetition OpCo Agent and the OpCo Lenders) incurred under the OpCo Credit Agreement through the Petition Date. The

provisions of the DIP Order containing the Filing Entities' stipulations regarding indebtedness and security interests shall be deemed incorporated by reference in their entirety in the Plan as if fully set forth therein. Class 2 – OpCo Lender Claims are impaired under the Plan and holders of such Claims are therefore entitled to vote to accept or reject the Plan.

Class 3 – HoldCo Lender Claims. Class 3 shall consist of all HoldCo Lender Claims against the Filing Entities. Each holder of an Allowed HoldCo Lender Claim against any of the Filing Entities shall receive, on the Effective Date, its Pro Rata Share of the New NPG Warrants. The HoldCo Lender Claims shall be Allowed in the aggregate amount of $215.6 million. Class 3 – HoldCo Lender Claims are impaired under the Plan and holders of such Claims are therefore entitled to vote to accept or reject the Plan.

Class 4 – Secured Claims. Class 4 shall consist of all Secured Claims against the Filing Entities. Each Allowed Secured Claim, other than an OpCo Lender Claim, against any of the Filing Entities shall be unimpaired under the Plan, and either (i) all of the legal, equitable, and contractual rights to which such Allowed Secured Claim entitle the holder of such Claim shall be fully reinstated and retained on and after the Effective Date, or (ii) such holder shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for its Allowed Secured Claim, either (w) Cash in the full amount of such Allowed Secured Claim, including any postpetition interest accrued pursuant to section 506(b) of the Bankruptcy Code, (x) the proceeds of the sale or disposition of the collateral securing such Allowed Secured Claim to the extent of the value of the holder's secured interest in such collateral, (y) the collateral securing such Allowed Secured Claim and any interest on such Allowed Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (z) such other distribution as necessary to satisfy the requirements of section 1129 of the Bankruptcy Code. Class 4 – Secured Claims are unimpaired under the Plan, and holders of such Claims are therefore deemed to accept the Plan and are not entitled to vote to accept or reject the Plan.

Class 5 – Unsecured Claims. Class 5 shall consist of all Unsecured Claims against the Filing Entities. Unsecured Claims are any Claims against a Filing Entity other than an Administrative Claim, a Priority Claim, a Tax Claim, an OpCo Lender Claim, a HoldCo Lender Claim or a Secured Claim. Each Allowed Unsecured Claim against any of the Filing Entities shall be unimpaired under the Plan, and either (i) all of the legal, equitable, and contractual rights to which such Allowed Unsecured Claim entitle the holder of such Claim shall be fully reinstated and retained on and after the Effective Date, or (ii) such holder shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for its Allowed Unsecured Claim, Cash in the full amount of such Allowed Unsecured Claim, including any postpetition interest required to be paid thereon under applicable non-bankruptcy law. Class 5 – Unsecured Claims are unimpaired under the Plan, and holders of such Claims are therefore deemed to accept the Plan and are not entitled to vote to accept or reject the Plan.

Class 6 – NPG Equity Interests. Class 6 shall consist of all Equity Interests in NPG. On the Effective Date, all Equity Interests in NPG shall be cancelled, and each holder of an Equity Interest in NPG shall not be entitled to any distribution under the Plan. Holders of Equity Interests in NPG shall not be required to surrender their certificates or other instruments evidencing ownership of such Equity Interests. Class 6 – NPG Equity Interests are not entitled

to any distribution under the Plan and holders of such Equity Interests are therefore deemed to reject the Plan and are not entitled to vote to accept or reject the Plan.

Class 7 – Other Equity Interests. Class 7 shall consist of all Equity Interests in the Filing Entities, other than NPG. Each Allowed Equity Interest in the Filing Entities, other than NPG, shall be unimpaired under the Plan, and, pursuant to section 1124 of the Bankruptcy Code, all of the legal, equitable, and contractual rights to which such Equity Interests entitle the holder of such Equity Interests shall be fully reinstated and retained on and after the Effective Date. Class 7 – Other Equity Interests are unimpaired under the Plan, and holders of such Equity Interests are therefore deemed to accept the Plan and are not entitled to vote to accept or reject the Plan.

## C. Means for Implementation of the Plan

### 1. Operations Between the Confirmation Date and the Effective Date

During the period from the Confirmation Date through and until the Effective Date, the Filing Entities will continue to operate their businesses as debtors in possession, subject to the oversight of the Bankruptcy Court as provided in the Bankruptcy Code, the Bankruptcy Rules and all orders of the Bankruptcy Court that are then in full force and effect.

### 2. Implementing Transactions on or Prior to the Effective Date

The following transactions shall occur and be implemented pursuant to section 1123(a)(5) of the Bankruptcy Code on or prior to the Effective Date:

Without further order of the Bankruptcy Court, the Filing Entities shall take the following actions to restructure the organizational structure of the Filing Entities: (a) on or prior to the Effective Date, (i) Filing Entities Arbonne HoldCo and Levlad HoldCo shall merge, with Arbonne HoldCo surviving the merger as New HoldCo, and (ii) NPG shall be converted from a limited liability company to a Delaware corporation (New NPG); (b) on the Effective Date, the Equity Interests in NPG shall be cancelled and New NPG shall issue (i) 85% of the New NPG Common Stock to the OpCo Lenders as required by Section 5.1(b) of the Plan, (ii) 10% of the New NPG Common Stock to the New Term Lenders in connection with the New Term Loan portion of the Exit Facility, (iii) 5% of the New NPG Common Stock pursuant to the Long Term Management Incentive Plan, and (iv) 100% of the New NPG Warrants to the HoldCo Lenders as required by Section 5.1(c) of the Plan. The organizational chart below illustrates the structure of the Company following the Restructuring.



Company Organizational Chart
Following Restructuring

The issuance of the New NPG Common Stock and the New NPG Warrants and the distribution thereof shall be exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code.

On the Effective Date, Arbonne and Levlad, as borrowers, and certain other Filing Entities as guarantors, shall enter into the New Term Loan under the Exit Facility with the New Term Lenders. All obligations then outstanding under the DIP Facility shall be rolled into and become the obligations of the parties under the New Term Loan portion of the Exit Facility. The terms of the New Term Loan are set forth on Exhibit "F" to the Plan.

### 3. Corporate Action

The entry of the Confirmation Order shall constitute authorization for the New NPG Group, the Filing Entities and their Affiliates to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of, and to consummate, the Plan prior to, on and after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule or regulation, including, without limitation, any action required by the stockholders or directors of New NPG, the Filing Entities and their Affiliates, including, among other things, (a) the issuance of the New NPG Common Stock, the New NPG Warrants and the New NPG Options, the execution, delivery and performance of the Exit Facility (including the New Term Loan and Reinstated OpCo Term Loan) and the

incurrence of indebtedness and the granting of liens thereunder, (b) the adoption of the New NPG Constituent Documents, (c) the incurrence of all obligations contemplated by the Plan and the making of Plan Distributions, (d) the implementation of all settlements and compromises as set forth in or contemplated by the Plan, and (e) resolving all intercompany accounts of the Filing Entities through capital contributions, compromise, or in any other reasonable fashion.  On the Effective Date, the officers of the Filing Entities and the New NPG Group are authorized and directed to do all things and to execute and deliver all agreements, documents, instruments, notices and certificates as are contemplated by the Plan and to take all necessary actions required in connection therewith, in the name of and on behalf of the Filing Entities and the New NPG Group, as applicable.  All obligations of the Filing Entities to indemnify and hold harmless their current and former directors, officers and employees, whether arising under the Filing Entities' constituent documents, contract, law or equity, shall be assumed by, and assigned to, the applicable member of the New NPG Group upon the occurrence of the Effective Date with the same effect as though such obligations constituted executory contracts that are assumed (or assumed and assigned, as applicable) under section 365 of the Bankruptcy Code, and all such obligations shall be fully enforceable on their terms from and after the Effective Date.  The prosecution of any so-indemnified Cause of Action against the Persons to whom such right(s) of indemnification are owed shall be, upon the occurrence of the Effective Date, enjoined and prohibited.

### 4. Re-Vesting of Assets

Upon the occurrence of the Effective Date, except as otherwise expressly provided in the Plan, title to all of the Assets of the Filing Entities shall vest in the New NPG Group free and clear of all liens, Claims, Causes of Action, interests, security interests and other encumbrances and without further order of the Bankruptcy Court.  On and after the occurrence of the Effective Date, except as otherwise provided in the Plan, the New NPG Group may operate their businesses and may use, acquire and dispose of their Assets free of any restrictions of the Bankruptcy Code.

### 5. Initial Boards of Directors

Except as otherwise set forth herein or disclosed to the Bankruptcy Court prior to the conclusion of the Confirmation Hearing, on the Effective Date, the initial board of directors (or managers, as applicable) of each entity in the New NPG Group shall be comprised of the individuals who hold such positions as of the Effective Date.

On the Effective Date, the board of directors of New NPG shall consist of five members, composed of (i) the chief executive officer of Arbonne, (ii) one (1) director selected by Eos Capital Partners IV, L.P., (iii) one (1) director selected by TCW Shared Opportunity Fund V, L.P. and (iv) two (2) directors which shall be Independent Directors selected by the Majority Consenting OpCo Lenders other than Eos Capital Partners IV, L.P. and TCW Shared Opportunity Fund V, L.P.

The identities of the members of the board of directors (or managers, as applicable) of each member of the New NPG Group will be disclosed prior to the conclusion of the Confirmation Hearing.

From and after the Effective Date, the members of the board of directors (or managers, as applicable) of each member of the New NPG Group shall be selected and determined in accordance with the provisions of the respective New NPG Constituent Documents and applicable law.

### 6. Management and Officers

On the Effective Date, the New NPG Group will adopt the New NPG Constituent Documents. Except as otherwise set forth herein, the officers of the Filing Entities as of the Effective Date shall continue in such positions after the Effective Date with the New NPG Group in accordance with their respective employment agreements, if any, and applicable law. Subject to any applicable employment agreements and applicable law, from and after the Effective Date, the officers of each of the entities in the New NPG Group shall be selected and appointed by the board of directors or members, as applicable, of such entity, in accordance with, and pursuant to, the provisions of applicable law and the respective New NPG Constituent Documents.

### 7. Director and Officer Liability Insurance

The Filing Entities will purchase, on or before the Effective Date, an insurance policy that provides director and officer liability tail coverage for a period of six (6) years for, among others, any current or former directors and officers who will not be serving in such capacities after the Effective Date. The cost of the premium for such policy will not exceed $120,000.

### 8. Long Term Management Incentive Plan

On the Effective Date, the Filing Entities will implement a Long Term Management Incentive Plan for the benefit of certain employees of the Filing Entities which will provide for the issuance of Equity Interests in New NPG consisting of:

(a) An award of 5% of New NPG Common Stock upon the Effective Date, subject to four-year annual vesting and other terms; and

(b) New NPG Options as set forth on Exhibit "D" attached to the Plan and subject to other terms.

Eligibility to participate in the Long Term Management Incentive Plan will be determined by the chief executive officer and the compensation committee of the board of directors of New NPG. All New NPG Common Stock and New NPG Options issued under the Long Term Management Incentive Plan will be dilutive to the New NPG Common Stock granted to the OpCo Lenders and to the lenders under the New Term Loan portion of the Exit Facility and pursuant to the New NPG Warrants and not dilutive to any New NPG Common Stock or New NPG Options theretofore granted pursuant to the Long Term Management Incentive Plan.

### 9. Causes of Action

Except as otherwise provided in the Plan, (a) all Causes of Action of any of the Filing Entities and their respective Estates shall, upon the occurrence of the Effective Date, be transferred to, and be vested in, New NPG, and (b) the rights of New NPG to commence,

prosecute or settle such Causes of Action, in its sole discretion, shall be preserved notwithstanding the occurrence of the Effective Date.

No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the New NPG Group will not pursue any and all available Causes of Action against them. The New NPG Group and the Estates expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise provided in the Plan. Unless any Causes of Action against a Person are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Final Order, the Filing Entities and the New NPG Group expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon or after the confirmation or consummation of the Plan.

### 10. Appointment of the Disbursing Agent

Upon the occurrence of the Effective Date, New NPG will be appointed to serve as the Disbursing Agent and will have all powers, rights, duties and protections afforded the Disbursing Agent under the Plan.

### 11. Sources of Cash for Plan Distributions

All Cash necessary for the Disbursing Agent to make payments and Plan Distributions will be obtained from the Filing Entities' existing Cash balances or the liquidation of Assets.

### 12. Investment of Funds Held by the Disbursing Agent; Tax Reporting by the Disbursing Agent

The Disbursing Agent may, but shall not be required to, invest any funds held by the Disbursing Agent pending the distribution of such funds pursuant to the Plan in investments that are exempt from federal, state, and local taxes. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Disbursing Agent of a private letter ruling if the Disbursing Agent so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Disbursing Agent), the Disbursing Agent may (a) treat the funds and other property held by it as held in a single trust for federal income tax purposes in accordance with the trust provisions of the Internal Revenue Code (sections 641, et seq.), and (b) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.

### 13. Releases by the Filing Entities

**As of the Effective Date, for good and valuable consideration, the Filing Entities and the New NPG Group in their individual capacities and as Debtors in Possession will be deemed to release and forever waive and discharge all Causes of Action that are based in whole or part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Filing Entities, the New NPG Group, the Chapter 11 Cases, the Plan or the Disclosure Statement, and that could have**

been asserted by or on behalf of the Filing Entities or their Estates or the New NPG Group against (a) the Filing Entities' and their non-Filing Entity subsidiaries' present and former officers, directors, managers and employees, in their respective capacities as such, (b) holders of Equity Interests in NPG, including Harvest Partners, and their respective present and former officers, directors and employees, in their respective capacities as such, (c) the OpCo Lenders and the Prepetition OpCo Agent, in their respective capacities as such, (d) the HoldCo Lenders and the Prepetition HoldCo Agent, in their respective capacities as such, and (f) each of the foregoing's respective successors and assigns, and each of their respective agents, attorneys, advisors, accountants, investment bankers, bankruptcy and restructuring advisors, and financial advisors, in their respective capacities as such; except, that nothing in Section 8.13 of the Plan shall be construed to release any party or entity from (a) conduct that (i) would violate any provision in a written agreement with the Filing Entities or their non-Filing Entity subsidiaries relating to nonsolicitation, noncompetition, nondisparagement, nondisclosure/use of trade secrets and confidential information, and inventions, and return of company property, or (ii) is, with respect to the Filing Entities and their non-Filing Entity subsidiaries, theft, tortious interference with contract or a prospective business relationship, or defamation (including slander and libel), as determined by Final Order, or (b) any objections by the Filing Entities or the New NPG Group to Claims filed by such party or entity against any Filing Entity and/or its Estate (other than the Claims of the Prepetition OpCo Agent, the OpCo Lenders, the Prepetition HoldCo Agent, the HoldCo Lenders, the DIP Agent and the DIP Lenders, which are or will be deemed Allowed as set forth in the Plan and the DIP Order).

## 14. Releases by Creditors and Equity Security Holders

Subject to the occurrence of the Effective Date, any holder of a Claim or Equity Interest that is impaired or unimpaired under the Plan, for good and valuable consideration, will be presumed conclusively to have released each of (a) the Filing Entities, their non-Filing Entity subsidiaries, and the New NPG Group's respective present and former officers, directors, managers and employees, in their respective capacities as such, (b) holders of Equity Interests in NPG, including Harvest Partners, and their respective present and former officers, directors and employees, in their respective capacities as such, (c) the OpCo Lenders and the Prepetition OpCo Agent, in their respective capacities as such, (d) the HoldCo Lenders and the Prepetition HoldCo Agent, in their respective capacities as such, (e) the DIP Lenders and the DIP Agent, in their respective capacities as such, and (f) each of the foregoing's respective successors and assigns, and each of their respective agents, attorneys, advisors, accountants, investment bankers, bankruptcy and restructuring advisors, and financial advisors, in their respective capacities as such, from any Causes of Action that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Filing Entities, the New NPG Group, the Chapter 11 Cases, the Plan or the Disclosure Statement; except that the foregoing releases shall not apply to any holder of a Claim or Equity Interest if such holder "opts out" of the releases provided in Section 8.14 of the Plan by filing with the Bankruptcy Court on or prior to the Plan Objection Deadline a timely written notice of election to opt out of the releases contained in Section 8.14 of the Plan. Any "opt out" of the releases contained in Section 8.14 of the Plan shall not and shall not be construed in any way to affect any other release, exculpation or injunction provided

**in the Plan, including without limitation the releases, exculpations and injunctions provided in Sections 8.13, 12.3, 15.3, 15.6, 15.7, 15.8, and 15.23 of the Plan**.

**D.    Plan Distribution Provisions**

### 1.    Plan Distributions

Except as otherwise set forth in the Plan, the Disbursing Agent will make all Plan Distributions.  In the event a Plan Distribution will be payable on a day other than a Business Day, such Plan Distribution will instead be paid on the immediately succeeding Business Day, but will be deemed to have been made on the date otherwise due.  For federal income tax purposes, except to the extent a Plan Distribution is made in connection with reinstatement of an obligation pursuant to section 1124 of the Bankruptcy Code, a Plan Distribution will be allocated first to the principal amount of a Claim and then, to the extent the Plan Distribution exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest.  Except as otherwise provided herein, Plan Distributions will be made to the holders of Allowed Claims as reflected in the registry of claims maintained by the Claims Agent on the Effective Date.  The Disbursing Agent and its agents will have no obligation to recognize any transfer of a Claim after the Effective Date.

### 2.    Timing of Plan Distributions

Except for Plan Distributions that will be made on the Effective Date in accordance with the Plan, each Plan Distribution will be made on the relevant Plan Distribution Date therefor and will be deemed to have been timely made if made on such date or within ten (10) days thereafter.

### 3.    Address for Delivery of Plan Distributions/Unclaimed Plan Distributions

Subject to Bankruptcy Rule 9010, any Plan Distribution or delivery to a holder of an Allowed Claim shall be made at the address of such holder as set forth (a) in the Schedules, if any, or the Filing Entities' records, (b) on the proof of Claim filed by such holder, (c) in any notice of assignment filed with the Bankruptcy Court with respect to such Claim pursuant to Bankruptcy Rule 3001(e), or (d) in any notice served by such holder giving details of a change of address.  If any Plan Distribution is returned to the Disbursing Agent as undeliverable, no Plan Distributions shall be made to such holder unless the Disbursing Agent is notified of such holder's then current address within ninety (90) days after such Plan Distribution was returned. After such date, if such notice was not provided, a holder shall have forfeited its right to such Plan Distribution, and the undeliverable Plan Distributions shall be returned to New NPG.

### 4.    De Minimis Plan Distributions

No Plan Distribution of less than ten dollars ($10.00) shall be made by the Disbursing Agent to the holder of any Claim unless a request therefor is made in writing to the Disbursing Agent.  If no request is made as provided in the preceding sentence within ninety (90) days of the Effective Date, all such Plan Distributions shall revert to New NPG.

5. **Time Bar to Cash Payments**

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within one hundred and eighty (180) days after the date of issuance thereof. Requests for reissuance of any voided check shall be made directly to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued. Any claim in respect of such a voided check shall be made within one hundred and eighty (180) days after the date of issuance of such check. If no request is made as provided in the preceding sentence, any claims in respect of such voided check shall be discharged and forever barred and such unclaimed Plan Distribution shall revert to New NPG.

6. **Manner of Payment under the Plan**

Unless the Person receiving a Plan Distribution agrees otherwise, any Plan Distribution to be made in Cash under the Plan shall be made, at the election of the Disbursing Agent by check drawn on a domestic bank or by wire transfer from a domestic bank. Cash payments to foreign creditors may be, in addition to the foregoing, made at the option of the Disbursing Agent in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

7. **Expenses Incurred on or after the Effective Date and Claims of the Disbursing Agent**

Except as otherwise ordered by the Bankruptcy Court or as provided in the Plan, the amount of any reasonable fees and expenses incurred (or to be incurred) by the Disbursing Agent on or after the Effective Date (including, but not limited to, taxes) shall be paid when due. Professional fees and expenses incurred by the Disbursing Agent from and after the Effective Date in connection with the effectuation of the Plan shall be paid in the ordinary course of business. Any dispute regarding compensation shall be resolved by agreement of the parties, or if the parties are unable to agree, as determined by the Bankruptcy Court.

8. **Fractional Plan Distributions**

Notwithstanding anything to the contrary contained in the Plan, no Plan Distributions of fractional shares or fractions of dollars (whether in Cash or notes) will be made. Fractional shares and fractions of dollars (whether in Cash or notes) shall be rounded to the nearest whole unit (with any amount equal to or less than one-half share or one-half dollar, as applicable, to be rounded down).

9. **Special Distribution Provisions Concerning the Prepetition Credit Facilities**

The following additional provisions will apply specifically to Plan Distributions to be made to the holders of Allowed OpCo Lender Claims and Allowed HoldCo Lender Claims under the Plan:

### a. Service of the Prepetition OpCo Agent and the Prepetition HoldCo Agent

The Prepetition OpCo Agent and the Prepetition HoldCo Agent and their agents, successors and assigns or such entity appointed by the Prepetition Lenders will facilitate the making of Plan Distributions to the holders of Allowed OpCo Lender Claims and Allowed HoldCo Lender Claims for which they serve as agent and upon the completion thereof, will be discharged of all their respective obligations associated with the Prepetition Credit Facilities. The rights of holders of Allowed OpCo Lender Claims and Allowed HoldCo Lender Claims will continue in effect for the sole purpose of allowing the Prepetition OpCo Agent and the Prepetition HoldCo Agent to make Plan Distributions on account of such Claims.

### b. Distributions

On the Plan Distribution Date, all OpCo Lender Claims and HoldCo Lender Claims will be settled and compromised in exchange for the distribution to the Prepetition OpCo Agent and the Prepetition HoldCo Agent of the applicable Plan Distributions to the holders of Allowed OpCo Lender Claims and Allowed HoldCo Lender Claims as specified in Sections 5.1(b) and 5.1(c) of the Plan, as applicable; provided, that the Prepetition OpCo Agent and the Prepetition HoldCo Agent will return to the Disbursing Agent any Plan Distributions held on account of any Allowed OpCo Lender Claims and Allowed HoldCo Lender Claims as to which the requirements of Section 9.10 of the Plan are not satisfied by the first anniversary of the Effective Date.

### c. Enforcement of Rights of the Prepetition OpCo Agent and the Prepetition HoldCo Agent

The rights, liens (including the charging liens), and Claims of the Prepetition OpCo Agent and the Prepetition HoldCo Agent with respect to the collection of their fees, expenses or any indemnification obligations from the holders of Allowed OpCo Lender Claims and Allowed HoldCo Lender Claims will survive confirmation of the Plan and may be fully enforced by the Prepetition OpCo Agent and the Prepetition HoldCo Agent. All distributions to the Prepetition OpCo Agent and the Prepetition HoldCo Agent on behalf of the holders of Allowed OpCo Lender Claims and Allowed HoldCo Lender Claims shall be applied by the Prepetition OpCo Agent and the Prepetition HoldCo Agent as provided by the applicable agreement.

### 10.    Cancellation of Instruments

As a condition to receiving any Plan Distribution, on or before the Plan Distribution Date, to the extent that an Allowed Claim is evidenced by a certificate, instrument or note, other than any such certificate, instrument or note that is being reinstated or being left unimpaired under the Plan, such certificate, instrument or note will thereafter be cancelled and extinguished and will represent only the right, if any, to participate in the distributions contemplated by the Plan; provided, however, that the provisions of the OpCo Credit Agreement governing the relationship of the Prepetition OpCo Agent and the OpCo Lenders, including but not limited to those provisions relating to the Prepetition OpCo Agent's rights of indemnification from the OpCo Lenders, shall not be affected by and shall survive the Plan, entry of the Confirmation Order or the occurrence of the Effective Date; provided, further, that the provisions of the OpCo Credit

Agreement governing the Prepetition OpCo Agent's rights of indemnification from the Filing Entities (and following the Effective Date, from the New NPG Group) will not be affected by and will survive the Plan, entry of the Confirmation Order or the occurrence of the Effective Date.

**E.      Procedures for Resolving and Treating Contested Claims**

**1.      Objection Deadline**

As soon as practicable, but in no event later than one hundred and eighty (180) days after the Effective Date (subject to being extended by the order of the Bankruptcy Court upon motion of the Disbursing Agent without notice or a hearing), objections to Claims shall be filed with the Bankruptcy Court and served upon the holders of each of the Claims to which objections are made.

**2.      Prosecution of Contested Claims**

The Disbursing Agent may object to the allowance of Claims filed with the Bankruptcy Court with respect to which liability is disputed in whole or in part. All objections that are filed and prosecuted as provided in the Plan will be litigated to Final Order or compromised and settled in accordance with Section 10.3 of the Plan.

**3.      Claims Settlement**

Notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, from and after the Effective Date, the Disbursing Agent will have authority to settle or compromise all Claims and Causes of Action without further review or approval of the Bankruptcy Court.

**4.      Entitlement to Plan Distributions upon Allowance**

Notwithstanding any other provision of the Plan, no Plan Distribution will be made with respect to any Claim to the extent it is a Contested Claim, unless and until such Contested Claim becomes an Allowed Claim, subject to the setoff rights as provided in Section 15.19 of the Plan. When a Claim that is not an Allowed Claim as of the Effective Date becomes an Allowed Claim (regardless of when) the holder of such Allowed Claim will thereupon become entitled to receive the Plan Distributions in respect of such Claim, the same as though such Claim had been an Allowed Claim on the Effective Date.

**5.      Estimation of Claims**

The Disbursing Agent may, at any time, request that the Bankruptcy Court estimate any Contested Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Disbursing Agent has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Contested Claim, that estimated amount will constitute the Allowed amount of

such Claim for all purposes under the Plan. All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

**F.    Conditions Precedent to Confirmation of the Plan and the Occurrence of the Effective Date**

**1.    <u>Conditions Precedent to Confirmation</u>**

The following are conditions precedent to confirmation of the Plan:

(a)    The Clerk of the Bankruptcy Court shall have entered an order or orders (i) approving the Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (ii) approving the manner of solicitation of votes with respect to the Plan; (iii) determining that all votes are binding and have been properly tabulated as acceptances or rejections of the Plan; (iv) confirming and giving effect to the terms and provisions of the Plan; (v) determining that all applicable tests, standards and burdens in connection with the Plan have been duly satisfied and met by the Filing Entities and the Plan; (vi) approving the Plan Documents; and (vii) authorizing the Filing Entities to execute, enter into, and deliver the Plan Documents and to execute, implement, and to take all actions otherwise necessary or appropriate to give effect to the transactions contemplated by the Plan and the Plan Documents;

(b)    The Confirmation Order, the Plan and all other definitive documentation are consistent with the Restructuring Term Sheet and otherwise in form and substance reasonably satisfactory to the Filing Entities and the Majority Consenting OpCo Lenders; <u>provided</u>, that all post-restructuring documentation shall be in form and substance reasonably satisfactory only to the Majority Consenting OpCo Lenders;

(c)    The Confirmation Order shall include determinations that all of the settlements and compromises contained in the Plan meet the applicable standards under section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 for approval and implementation;

(d)    The Filing Entities shall have received a binding commitment for the New Term Loan portion of the Exit Facility with terms and conditions that are consistent with the Restructuring Term Sheet;

(e)    The Schedule of Rejected Executory Contracts and Unexpired Leases, if any, shall be reasonably satisfactory to the Filing Entities and the Majority Consenting OpCo Lenders; and

(f)    Subject to Sections 11.3 and 15.16 of the Plan, the Confirmation Order shall be entered no later than April 5, 2010.

## 2.    **Conditions Precedent to the Occurrence of the Effective Date**

The following are conditions precedent to the occurrence of the Effective Date:

(a)    Subject to Sections 11.3 and 15.16 of the Plan, the Confirmation Order shall have been entered no later than April 5, 2010, and such Confirmation Order shall have become a Final Order on or before the fifteenth (15th) day following entry of such order;

(b)    All necessary consents, authorizations and approvals shall have been given for the transfers of property and the payments provided for or contemplated by the Plan, including, without limitation, satisfaction or waiver of all conditions to (i) the obligations of the Filing Entities under the Plan and the Plan Documents, and (ii) the obligations of the New Term Lenders to make loans under the New Term Loan portion of the Exit Facility;

(c)    The Confirmation Order, the Plan and all other definitive documentation shall continue to be consistent with the Restructuring Term Sheet and otherwise in form and substance reasonably satisfactory to the Filing Entities and the Majority Consenting OpCo Lenders; provided, that all post-restructuring documentation shall continue to be in form and substance reasonably satisfactory only to the Majority Consenting OpCo Lenders;

(d)    All actions, documents and agreements necessary to implement the Plan and the transactions contemplated by the Plan shall have been effected or executed;

(e)    The Exit Facility shall have become effective and all conditions to the effectiveness thereof shall have been satisfied or waived;

(f)    The outstanding Letters of Credit either (i) shall have been (x) returned to the issuer marked cancelled or (y) cash collateralized with Cash in an amount equal to 105% of the face amount of the outstanding Letters of Credit or (ii) the issuer shall have been provided with back-to-back letters of credit in an amount equal to 105% of the face amount of the outstanding Letters of Credit and in form and substance and from a financial institution acceptable to the issuer;

(g)    The New NPG Common Stock and New NPG Warrants to be issued under the Plan shall have been duly authorized and, upon issuance, shall be validly issued and outstanding;

(h)    The payment of all fees, reasonable costs and expenses of (i) the DIP Agent incurred under the DIP Facility and (ii) the Prepetition OpCo Agent incurred under the OpCo Credit Agreement on or prior to the Effective Date; and

(i)    Subject to Sections 11.3 and 15.16 of the Plan, fifteen (15) days shall not have passed following entry of the Confirmation Order.

## 3.    **Waiver of Conditions**

The Filing Entities may, with the prior written consent of the Majority Consenting OpCo Lenders, waive any one or more of the conditions set forth in Section 11.1 or Section 11.2 of the

Plan without notice or order of the Bankruptcy Court and without notice to any parties in interest; provided, however, that, any extension by more than fifteen (15) days of the time periods set forth in Sections 11.1(f), 11.2(a) and 11.2(i) of the Plan shall require the prior written consent of the Requisite Consenting OpCo Lenders; provided further, however, that with respect to waiving the conditions set forth in Sections 11.1(f), 11.2(a) and 11.2(i) of the Plan, the prior written consent of the OpCo Lenders shall not be required if the non-occurrence of such condition or conditions is a result of a material breach of the OpCo Plan Support Agreement by one or more OpCo Lenders party to such agreement and such breach has a material adverse effect on the Filing Entities or their ability to consummate the transactions contemplated by the OpCo Lender Plan Support Agreement in accordance with the terms of the Restructuring Term Sheet.

### 4. Effect of Non-Occurrence of the Effective Date

If the Effective Date shall not occur, the Plan shall be null and void and nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims against or Equity Interests in a Filing Entity; (b) prejudice in any manner the rights of the Filing Entities, including, without limitation, any right to seek an extension of the exclusivity periods under section 1121(d) of the Bankruptcy Code; or (c) constitute an admission, acknowledgement, offer or undertaking by the Filing Entities.

## G. The Disbursing Agent

### 1. Powers and Duties

Pursuant to the terms and provisions of the Plan, the Disbursing Agent shall be empowered and directed to: (a) take all steps and execute all instruments and documents necessary to make Plan Distributions to holders of Allowed Claims; (b) comply with the Plan and the obligations thereunder; (c) employ, retain, or replace professionals to represent it with respect to its responsibilities; (d) object to Claims as specified in Article X of the Plan, and prosecute such objections; (e) compromise and settle any issue or dispute regarding the amount, validity, priority, treatment, or Allowance of any Claim as provided in Article X of the Plan; (f) make annual and other periodic reports regarding the status of distributions under the Plan to the holders of Allowed Claims that are outstanding at such time, with such reports to be made available upon request to the holder of any Contested Claim; and (g) exercise such other powers as may be vested in the Disbursing Agent pursuant to the Plan, the Plan Documents or order of the Bankruptcy Court.

### 2. Plan Distributions

Pursuant to the terms and provisions of the Plan, the Disbursing Agent shall make the required Plan Distributions specified under the Plan on the relevant Plan Distribution Date therefor.

### 3. Exculpation

**Except as otherwise provided in Section 12.3 of the Plan, the Disbursing Agent, together with its officers, directors, employees, agents, and representatives, are exculpated**

pursuant to the Plan by all Persons, holders of Claims and Equity Interests, and all other parties in interest, from any and all Causes of Action arising out of the discharge of the powers and duties conferred upon the Disbursing Agent (and each of its respective paying agents), by the Plan, any Final Order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except solely for actions or omissions arising out of the Disbursing Agent's willful misconduct or gross negligence. No holder of a Claim or an Equity Interest, or representative thereof, shall have or pursue any Cause of Action (a) against the Disbursing Agent or its respective officers, directors, employees, agents, and representatives for making Plan Distributions in accordance with the Plan, or (b) against any holder of a Claim for receiving or retaining Plan Distributions as provided for by the Plan. Nothing contained in Section 12.3 of the Plan shall preclude or impair any holder of an Allowed Claim or Allowed Equity Interest from bringing an action in the Bankruptcy Court against any Filing Entity to compel the making of Plan Distributions contemplated by the Plan on account of such Claim or Equity Interest.

**H.    Treatment of Executory Contracts and Unexpired Leases**

**1.    <u>Assumption and Rejection of Executory Contracts and Unexpired Leases</u>**

On the Effective Date, all executory contracts and unexpired leases of the Filing Entities will be assumed pursuant to the provisions of section 365 of the Bankruptcy Code, except: (i) any executory contracts and unexpired leases that are the subject of separate motions to reject, assume, or assume and assign filed pursuant to section 365 of the Bankruptcy Code by the Filing Entities before the Effective Date; (ii) contracts and leases listed in any "Schedule of Rejected Executory Contracts and Unexpired Leases" to be filed by the Filing Entities with the Bankruptcy Court prior to the Confirmation Hearing; (iii) all executory contracts and unexpired leases rejected under the Plan or by order of the Bankruptcy Court entered before the Effective Date; (iv) any executory contract or unexpired lease that is the subject of a dispute over the amount or manner of cure pursuant to the next section hereof and for which the Filing Entities make a motion to reject such contract or lease based upon the existence of such dispute filed at any time; and (v) any agreement, obligation, security interest, transaction or similar undertaking that the Filing Entities believe is not executory.

Inclusion of a contract, lease or other agreement on any "Schedule of Rejected Executory Contracts and Unexpired Leases" will constitute adequate and sufficient notice that (i) any Claims arising thereunder or related thereto shall be treated as Unsecured Claims under the Plan, and (ii) the Filing Entities are no longer bound by, or otherwise obligated to perform, any such obligations, transactions, or undertakings relating thereto or arising thereunder.

The Plan will constitute a motion to reject such executory contracts and unexpired leases set forth in any "Schedule of Rejected Executory Contracts and Unexpired Leases" filed by the Filing Entities with the Bankruptcy Court prior to the Confirmation Hearing, and the Filing Entities will have no liability thereunder except as is specifically provided in the Plan. The Filing Entities reserve the right to amend the Schedule of Rejected Executory Contracts and Unexpired Leases on or prior to the Confirmation Date to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) and unexpired lease(s) will be deemed to be, respectively,

assumed or rejected by the Filing Entities pursuant to Article XIII of the Plan.  Any such amendment to the Schedule of Rejected Executory Contracts and Unexpired Leases must be reasonably satisfactory to the Majority Consenting OpCo Lenders.  The Filing Entities will provide notice of any amendments to the Schedule of Rejected Executory Contracts and Unexpired Leases to the parties to the executory contracts or unexpired lease affected thereby.  The listing of a document on the Schedule of Rejected Executory Contracts and Unexpired Leases will not constitute an admission by the Filing Entities that such document is an executory contract or that the Filing Entities have any liability thereunder.  Entry of the Confirmation Order by the Clerk of the Bankruptcy Court will constitute approval of rejections under Section 13.1(c) of the Plan pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such rejected agreement, executory contract or unexpired lease is burdensome and that the rejection thereof is in the best interests of the Filing Entities and their Estates.

The Plan will constitute a motion to assume such executory contracts and unexpired leases assumed pursuant to Section 13.1(a) of the Plan.  Entry of the Confirmation Order by the Clerk of the Bankruptcy Court will constitute approval of such assumptions pursuant to sections 365(a) and (b) of the Bankruptcy Code.  Any non-Filing Entity counterparty to an agreement designated as being assumed in Section 13.1(a) of the Plan who disputes the assumption of such executory contract or unexpired lease must file with the Bankruptcy Court, and serve upon the Filing Entities, a written objection to the assumption, which objection shall set forth the basis for the dispute by no later than ten (10) Business Days prior to the Confirmation Hearing.  The failure to timely object will be deemed a waiver of any and all objections to the assumption of executory contracts and unexpired leases designated as being assumed in Section 13.1(a) of the Plan.

## 2. <u>Cure</u>

At the election of the Filing Entities, any monetary defaults under each executory contract and unexpired lease to be assumed under the Plan will be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code: (a) by payment of the default amount in Cash on the Effective Date or as soon thereafter as practicable; or (b) on such other terms as agreed to by the parties to such executory contract or unexpired lease.  The Filing Entities' election regarding satisfaction of any monetary default in excess of $100,000 under an executory contract or unexpired lease to be assumed under the Plan will require the prior written consent of the Majority Consenting OpCo Lenders.  In the event of a dispute regarding: (i) the amount of any cure payments; (ii) the ability to provide adequate assurance of future performance under the contract or lease to be assumed or assigned; or (iii) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order resolving the dispute and approving assumption or assignment, as applicable.  The Filing Entities believe that they are current on all obligations under all of the executory contracts and unexpired leases to be assumed pursuant to Section 13.1(a) of the Plan, and thus the Filing Entities do not believe that any cure obligations are owed.  Any non-Filing Entity counterparty to an executory contract or unexpired lease who disputes whether the Filing Entities have any cure obligations with respect to the executory contract or unexpired lease to which they are a party must file with the Bankruptcy Court, and serve upon the Filing Entities and the Creditors' Committee, a written objection regarding the cure obligation, which objection shall set forth the basis for the dispute, the alleged correct cure obligation, and any other objection related

to the assumption of the relevant agreement by no later than ten (10) Business Days prior to the Confirmation Hearing. If a non-Filing Entity counterparty fails to file and serve an objection which complies with the foregoing, the non-Filing Entity counterparty will be deemed to have waived any and all objections to the assumption of the relevant agreement as proposed by the Filing Entities, including the lack of any cure obligations.

**3.      Claims Arising from Rejection, Expiration or Termination**

Claims created by the rejection of executory contracts and unexpired leases or the expiration or termination of any executory contract or unexpired lease prior to the Confirmation Date must be filed with the Bankruptcy Court and served on the Filing Entities (a) in the case of an executory contract or unexpired lease rejected by the Filing Entities prior to the Confirmation Date, in accordance with the Bar Date Notice, or (b) in the case of an executory contract or unexpired lease that (i) was terminated or expired by its terms prior to the Confirmation Date, or (ii) is rejected pursuant to Article XIII of the Plan, no later than thirty (30) days after the Confirmation Date. Any such Claims for which a proof of claim is not filed and served by the deadlines set forth in the Bar Date Notice or Section 13.3 of the Plan, as applicable, will be forever barred from assertion and will not be enforceable against the Filing Entities, the New NPG Group, their respective Estates, Affiliates, or Assets. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as Unsecured Claims under the Plan subject to objection by the Disbursing Agent.

**I.      Retention of Jurisdiction**

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court will retain and will have exclusive jurisdiction over any matter (a) arising under the Bankruptcy Code, (b) arising in or related to the Chapter 11 Cases or the Plan, or (c) that relates to the following:

(a)      To hear and determine any and all motions or applications pending on the Confirmation Date or thereafter brought in accordance with Article XIII of the Plan for the assumption, assumption and assignment or rejection of executory contracts or unexpired leases to which any of the Filing Entities is a party or with respect to which any of the Filing Entities may be liable, and to hear and determine any and all Claims and any related disputes (including, without limitation, the exercise or enforcement of setoff or recoupment rights, or rights against any third party or the property of any third party resulting therefrom or from the expiration, termination or liquidation of any executory contract or unexpired lease);

(b)      To determine any and all adversary proceedings, applications, motions, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Disbursing Agent or the New NPG Group, as applicable, after the Effective Date;

(c)      To hear and determine any objections to the allowance of Claims, whether filed, asserted, or made before or after the Effective Date, including, without express or implied limitation, to hear and determine any objections to the classification of any Claim and to allow, disallow or estimate any Contested Claim in whole or in part;

(d)     To issue such orders in aid of execution of the Plan to the extent authorized or contemplated by section 1142 of the Bankruptcy Code;

(e)     To consider any modifications of the Plan, remedy any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(f)     To hear and determine all Fee Applications and applications for allowances of compensation and reimbursement of any other fees and expenses authorized to be paid or reimbursed under the Plan or the Bankruptcy Code;

(g)     To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with the Plan or its interpretation, implementation, enforcement, or consummation;

(h)     To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with the Confirmation Order (and all exhibits to the Plan) or its interpretation, implementation, enforcement, or consummation;

(i)     To the extent that Bankruptcy Court approval is required, to consider and act on the compromise and settlement of any Claim or Cause of Action by, on behalf of, or against the Estates;

(j)     To determine such other matters that may be set forth in the Plan, or the Confirmation Order, or that may arise in connection with the Plan, or the Confirmation Order;

(k)     To hear and determine matters concerning state, local, and federal taxes, fines, penalties, or additions to taxes for which the New NPG Group, the Filing Entities, the Debtors in Possession, or the Disbursing Agent may be liable, directly or indirectly, in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(l)     To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with any setoff and/or recoupment rights of the Filing Entities or any Person under the Plan;

(m)     To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with Causes of Action of the Filing Entities commenced by the Disbursing Agent, the Filing Entities or any third parties, as applicable, before or after the Effective Date;

(n)     To enter an order or final decree closing the Chapter 11 Cases;

(o)     To issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation, implementation or enforcement of the Plan or the Confirmation Order; and

(p)     To hear and determine any other matters related to the Plan and not inconsistent with chapter 11 of the Bankruptcy Code.

### J. Other Material Provisions of the Plan

#### 1. Substantial Consummation

On the Effective Date, the Plan will be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

#### 2. Payment of Statutory Fees

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid by the Filing Entities on or before the Effective Date.

#### 3. Satisfaction of Claims

The rights afforded in the Plan and the treatment of all Claims and Equity Interests therein will be in exchange for and in complete satisfaction, discharge, and release of all Claims and Equity Interests of any nature whatsoever against the Filing Entities and the Debtors in Possession, or any of their Estates, Assets, properties, or interests in property. Except as otherwise provided in the Plan, on the Effective Date, all Claims against and Equity Interests in the Filing Entities and the Debtors in Possession shall be satisfied, discharged, and released in full. Neither the New NPG Group nor the Filing Entities will be responsible for any pre-Effective Date obligations of the Filing Entities or the Debtors in Possession, except those expressly assumed by the New NPG Group or any such Filing Entity, as applicable. Except as otherwise provided in the Plan, all Persons will be precluded and forever barred from asserting against the New NPG Group, the Filing Entities, their respective successors or assigns, or their Estates, Affiliates, Assets, properties, or interests in property any event, occurrence, condition, thing, or other or further Claims or Causes of Action based upon any act, omission, transaction, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date, whether or not the facts of or legal bases therefor were known or existed prior to the Effective Date.

#### 4. Special Provisions Regarding Insured Claims

Plan Distributions to each holder of an Allowed Insured Claim against any Filing Entity will be made in accordance with the treatment provided under the Plan for the Class in which such Allowed Insured Claim is classified; except, that there shall be deducted from any Plan Distribution on account of an Insured Claim, for purposes of calculating the Allowed amount of such Claim, the amount of any insurance proceeds actually received by such holder in respect of such Allowed Insured Claim. Nothing in Section 15.4 of the Plan shall constitute a waiver of any Claim, right, or Cause of Action the Filing Entities or their Estates may hold against any Person, including any insurer. Pursuant to section 524(e) of the Bankruptcy Code, nothing in the Plan shall release or discharge any insurer from any obligations to any Person under applicable law or any policy of insurance under which a Filing Entity is an insured or beneficiary.

5. **Third Party Agreements; Subordination**

The Plan Distributions to the various classes of Claims and Equity Interests thereunder will not affect the right of any Person to levy, garnish, attach, or employ any other legal process with respect to such Plan Distributions by reason of any claimed subordination rights or otherwise. All such rights and any agreements relating thereto will remain in full force and effect, except as otherwise compromised and settled pursuant to the Plan. Plan Distributions will be subject to and modified by any Final Order directing distributions other than as provided in the Plan. The right of the Filing Entities to seek subordination of any Claim or Equity Interest pursuant to section 510 of the Bankruptcy Code is fully reserved, and the treatment afforded any Claim or Equity Interest that becomes a Subordinated Claim or subordinated Equity Interest at any time shall be modified to reflect such subordination. Unless the Confirmation Order provides otherwise, no Plan Distributions will be made on account of a Subordinated Claim or subordinated Equity Interest.

6. **Exculpation**

**None of the Filing Entities, the New NPG Group, Harvest Partners, the OpCo Lenders and the Prepetition OpCo Agent, in their respective capacities as such, the HoldCo Lenders and the Prepetition HoldCo Agent, in their respective capacities as such, the DIP Lenders and the DIP Agent, in their respective capacities as such, or any of their respective officers, directors, members, employees, agents, representatives, advisors, attorneys or successors and assigns will have or incur any liability to any Person for any act or omission in connection with, or arising out of, (a) the filing and prosecution of the Chapter 11 Cases, (b) the negotiation, filing and pursuit of approval of the Disclosure Statement, (c) the negotiation, filing and pursuit of confirmation of the Plan, (d) the consummation of the Plan, or (e) the implementation or administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence as determined by a Final Order, and, in all respects shall be entitled to rely upon the advice of counsel and all information provided by other exculpated persons herein without any duty to investigate the veracity or accuracy of such information with respect to their duties and responsibilities under the Plan.**

7. **Discharge of Liabilities**

Except as otherwise provided in the Plan, upon the occurrence of the Effective Date, the Filing Entities and the New NPG Group will be discharged from all Claims and Causes of Action to the fullest extent permitted by section 1141 of the Bankruptcy Code, and all holders of Claims and Equity Interests shall be precluded from asserting against the New NPG Group and its Affiliates, the Filing Entities, their Assets, or any property dealt with under the Plan, any further Claim or other Cause of Action based upon any act or omission, transaction, event, thing, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date.

**EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, NEW NPG AND ITS AFFILIATES WILL NOT HAVE OR BE CONSTRUED TO HAVE OR MAINTAIN ANY LIABILITY, CLAIM, OR OBLIGATION THAT IS BASED IN WHOLE OR IN PART**

**ON ANY ACT, OMISSION, TRANSACTION, EVENT, OTHER OCCURRENCE OR THING OCCURRING OR IN EXISTENCE ON OR PRIOR TO THE EFFECTIVE DATE OF THE PLAN AND NO SUCH LIABILITY, CLAIM, OR OBLIGATION FOR ANY ACTS WILL ATTACH TO NEW NPG OR ITS AFFILIATES.**

### 8.    Discharge of Filing Entities

Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, without further notice or order, all Claims against the Filing Entities of any nature whatsoever will be automatically discharged forever.  Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, the Filing Entities, the New NPG Group, their Estates, and all successors thereto will be deemed fully discharged and released from any and all Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), and 502(i) of the Bankruptcy Code, whether or not (a) a proof of claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim based upon such debt is allowed under section 502 of the Bankruptcy Code, or (c) the holder of a Claim based upon such debt has accepted the Plan. The Confirmation Order will be a judicial determination of discharge of all liabilities of the Filing Entities, the New NPG Group, their Estates, and all successors thereto.  As provided in section 524 of the Bankruptcy Code, such discharge shall void any judgment against the Filing Entities, the New NPG Group, their Estates, or any successor thereto at any time obtained to the extent it relates to a discharged Claim, and operates as an injunction against the prosecution of any action against the Filing Entities, the New NPG Group or property of the Filing Entities or the New NPG Group or their Estates to the extent it relates to a discharged Claim.

As set forth in the Plan, "Claim" means (a) any right to payment, whether or not such right is known or unknown, reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is known or unknown, reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured. For avoidance of doubt, "Claim" includes, without limitation, a right to payment, or equitable relief that gives rise to a right to payment, that has or has not accrued under non-bankruptcy law that is created by one or more acts or omissions of the Filing Entities if: (a) the act(s) or omission(s) occurred before or at the time of the Effective Date; (b) the act(s) or omission(s) may be sufficient to establish liability when injuries/damages are manifested; and (c) at the time of the Effective Date, the Filing Entities have received one or more demands for payment for injuries or damages arising from such acts or omissions.

### 9.    Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules), the laws of the State of New York, without giving effect to the conflicts of laws principles thereof, shall govern the construction of the Plan and any agreements, documents, and instruments executed in connection with the Plan, except as otherwise expressly provided in such instruments, agreements or documents.

10. **Expedited Determination**

The Disbursing Agent is authorized by the Plan to file a request for expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed with respect to the Filing Entities.

11. **Exemption from Transfer Taxes**

Pursuant to section 1146 of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, lien, pledge or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, will not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

12. **Interest and Attorneys' Fees**

Interest accrued after the Petition Date will accrue and be paid on Claims only to the extent specifically provided for in the Plan, the Confirmation Order, or as otherwise required by the Bankruptcy Court or by applicable law. No award or reimbursement of attorneys' fees or related expenses or disbursements shall be allowed on, or in connection with, any Claim, except as set forth in the Plan or as ordered by the Bankruptcy Court.

13. **Modification of the Plan**

As provided in section 1127 of the Bankruptcy Code, modification of the Plan may be proposed in writing by the Filing Entities (a) at any time before confirmation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Filing Entities will have complied with section 1125 of the Bankruptcy Code; or (b) at any time after confirmation and before substantial consummation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified, under section 1129 of the Bankruptcy Code, and the circumstances warrant such modifications. Notwithstanding the foregoing, any modification to the Plan must be approved in writing by the Majority Consenting OpCo Lenders; provided, that any modification, at any time, of (i) any term or provision of the Plan, the effect of which is to modify the form of, or decrease the amount or percentage of, the aggregate recovery (or any component thereof) to be paid, issued or distributed to the OpCo Lenders (or any one of them) by more than 0.75% of the aggregate outstanding amount of the OpCo Lender Claims, (ii) any term or provision of this Plan, the effect of which is to materially modify the form of, or materially increase the amount or percentage of, the recovery (or any component thereof) to be paid, issued or distributed to any Person(s) (other than the OpCo Lenders) pursuant to the Plan, (iii) Section 11.1(f), Section 11.2(a) or Section 11.2(i) of the Plan, the effect of which is to extend any of the time periods specified therein for a period of greater than fifteen (15) days, and (iv) any of the provisions of Section 15.16 of the Plan, will require the prior written consent of the Requisite Consenting OpCo Lenders. A holder of a Claim that has accepted the Plan will be deemed to have accepted such Plan as modified if the proposed

alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.

### 14. Corrective Action

Prior to the Effective Date, upon the prior written consent of the Majority Consenting OpCo Lenders, the Filing Entities may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Equity Interests.

### 15. Revocation of Plan

The Filing Entities reserve the right to revoke and withdraw the Plan and/or to adjourn the Confirmation Hearing with respect to any one or more of the Filing Entities prior to the occurrence of the Effective Date; provided, however, that unless otherwise agreed to in writing by the Majority Consenting OpCo Lenders, revocation of the Plan shall be permitted only in the event that the board of directors of the Filing Entities has determined in good faith, after consultation with legal counsel, that pursuing the Plan would be inconsistent with its applicable fiduciary obligations; provided further, that nothing contained in the Plan shall be deemed to prevent the Filing Entities from taking or failing to take any action that they are obligated to take (or fail to take) in the performance of their fiduciary or similar duty which the Filing Entities owe to any other Person.

If the Filing Entities revoke or withdraw the Plan with respect to any one or more of the Filing Entities in accordance with Section 15.18 of the Plan, or if the Effective Date does not occur as to any Filing Entity, then, as to such Filing Entity, the Plan and all settlements and compromises set forth in the Plan and not otherwise approved by a separate Final Order shall be deemed null and void and nothing contained therein and no acts taken in preparation for consummation of the Plan shall be deemed to constitute a waiver or release of any Claims against or Equity Interests in such Filing Entity or to prejudice in any manner the rights of any of the Filing Entities or any other Person in any other further proceedings involving such Filing Entity.

In the event that the Filing Entities choose to adjourn the Confirmation Hearing with respect to any one or more of the Filing Entities, the Filing Entities reserve the right to proceed with confirmation of the Plan with respect to those Filing Entities in relation to which the Confirmation Hearing has not been adjourned. With respect to those Filing Entities for which the Confirmation Hearing has been adjourned, and subject to Sections 15.16 and 15.18 of the Plan, the Filing Entities reserve the right to amend, modify, revoke or withdraw the Plan and/or submit any new plan of reorganization at such times and in such manner as they consider appropriate, subject to the provisions of the Bankruptcy Code.

### 16. Setoff Rights

Other than with respect to the OpCo Lender Claims and the DIP Claims (as to which any and all rights of setoff or recoupment have been waived), in the event that any Filing Entity has a Claim of any nature whatsoever against the holder of a Claim against such Filing Entity, then

such Filing Entity may, but is not required to, setoff against the Claim (and any payments or other Plan Distributions to be made in respect of such Claim hereunder) such Filing Entity's Claim against such holder, subject to the provisions of sections 553, 556 and 560 of the Bankruptcy Code. Neither the failure to setoff nor the allowance of any Claim under the Plan will constitute a waiver or release of any Claims that any Filing Entity may have against the holder of any Claim.

### 17. **Compliance with Tax Requirements**

In connection with the Plan, the Filing Entities and the Disbursing Agent, as applicable, will comply with all withholding and reporting requirements imposed by federal, state, local, and foreign taxing authorities and all Plan Distributions hereunder will be subject to such withholding and reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a Plan Distribution will have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any government unit, including income, withholding and other tax obligations, on account of such Plan Distribution. The Disbursing Agent has the right, but not the obligation, to not make a Plan Distribution until such holder has made arrangements satisfactory to the Disbursing Agent for payment of any such tax obligations.

### 18. **Rates**

The Plan does not provide for the change of any rate that is within the jurisdiction of any governmental regulatory commission after the occurrence of the Effective Date. Where a Claim has been denominated in foreign currency on a proof of Claim, the Allowed amount of such Claim shall be calculated in legal tender of the United States based upon the conversion rate in place as of the Petition Date and in accordance with section 502(b) of the Bankruptcy Code.

### 19. **Injunctions**

The Confirmation Order will contain an injunction permanently enjoining the commencement or prosecution of certain actions, which injunction will provide, among other things:

(a) **On the Effective Date and except as otherwise provided herein, all Persons who have been, are, or may be holders of Claims against or Equity Interests in the Filing Entities will be permanently enjoined from taking any of the following actions against or affecting the New NPG Group or its Affiliates, the Filing Entities or their Affiliates, the Estates, the Assets, or the Disbursing Agent, or any of their current or former respective members, directors, managers, officers, employees, agents, and professionals, successors and assigns or their respective assets and property with respect to such Claims or Equity Interests (other than actions brought to enforce any rights or obligations under the Plan):**

(i) **commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, all suits, actions, and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice);**

(ii)　enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order;

(iii)　creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance; and

(iv)　asserting any setoff, right of subrogation or recoupment of any kind; provided, that any defenses, offsets or counterclaims which the Filing Entities may have or assert in respect of the above referenced Claims are fully preserved in accordance with Section 15.19 of the Plan; and

(b)　all Persons are permanently enjoined from commencing or continuing in any manner any Cause of Action, whether directly, derivatively, on account of or respecting any Cause of Action which has been released pursuant to the Plan, including pursuant to Sections 8.13, 8.14, 12.3, 15.3, 15.6, 15.7, and 15.8 of the Plan.

## 20. Binding Effect

The Plan will be binding upon the New NPG Group, the Filing Entities, the holders of all Claims and Equity Interests, parties in interest, Persons and their respective successors and assigns. To the extent any provision of the Disclosure Statement or any other solicitation document may be inconsistent with the terms of the Plan, the terms of the Plan shall be binding and conclusive.

## 21. Severability

IN THE EVENT THE BANKRUPTCY COURT DETERMINES THAT ANY PROVISION OF THE PLAN IS UNENFORCEABLE EITHER ON ITS FACE OR AS APPLIED TO ANY CLAIM OR EQUITY INTEREST OR TRANSACTION, THE FILING ENTITIES MAY MODIFY THE PLAN IN ACCORDANCE WITH AND SUBJECT TO SECTION 15.16 OF THE PLAN SO THAT SUCH PROVISION SHALL NOT BE APPLICABLE TO THE HOLDER OF ANY SUCH CLAIM OR EQUITY INTEREST OR TRANSACTION. SUCH A DETERMINATION OF UNENFORCEABILITY SHALL NOT (A) LIMIT OR AFFECT THE ENFORCEABILITY AND OPERATIVE EFFECT OF ANY OTHER PROVISION OF THE PLAN OR (B) REQUIRE THE RESOLICITATION OF ANY ACCEPTANCE OR REJECTION OF THE PLAN.

## 22. No Admissions

None of the filing of the Plan, the taking by the Filing Entities, the OpCo Lenders and the Prepetition OpCo Agent, in their respective capacities as such, the HoldCo Lenders and the Prepetition HoldCo Agent, in their respective capacities as such, the DIP Lenders and the DIP Agent, in their respective capacities as such, of any action with respect to the Plan or any statement or provision contained herein shall be or be deemed to be an admission by any such party against interest, or be or be deemed to be a waiver of any rights, claims or remedies that such parties may have, and until the Effective Date all such rights and remedies are and shall be specifically reserved. In the event the Plan is not confirmed and the Confirmation Order is not

entered, the Plan and the Plan Documents, and any statement contained herein or therein, may not be used by any Person, party or entity against any of the Filing Entities, the OpCo Lenders, the Prepetition OpCo Agent, the HoldCo Lenders, the Prepetition HoldCo Agent, the DIP Lenders and the DIP Agent.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER CAUSES OF ACTION OR THREATENED CAUSES OF ACTION, THE PLAN SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THE PLAN SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, AND OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, NPG OR ANY OF ITS SUBSIDIARIES AND AFFILIATES, AS DEBTORS AND DEBTORS IN POSSESSION IN THE CHAPTER 11 CASES.

### 23. **Plan Controls**

Unless otherwise specified, all section, article, and exhibit references in the Plan are to the respective section in, article of, or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time. Words denoting the singular number shall include the plural number and vice versa, and words denoting one gender shall include the other gender. This Disclosure Statement may be referred to for purposes of interpretation to the extent any term or provision of the Plan is determined by the Bankruptcy Court to be ambiguous.

**XIV.**

**RISK FACTORS**

The holder of a Claim should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or reject the Restructuring and Plan.

### A.    **General Considerations**

The Out-of-Court Transaction and the Plan independently set forth the means for satisfying the Claims against and Equity Interests in the Filing Entities. Reorganization of the Filing Entities' businesses and operations under the proposed Restructuring also avoids the potentially adverse impact of a protracted and costly reorganization.

### B.    **Certain Considerations with Respect to the Restructuring**

The Restructuring may not be consummated. Each element of the Out-of-Court Transaction is conditioned on each other element. If we are unable to complete any element of the Out-of-Court Transaction, we may not be able to complete the Restructuring. Moreover, if the Restructuring is effected through an Out-of-Court Transaction, certain third party consents may be required and we cannot assure you that we will obtain those consents. Additionally, the

Restructuring contemplated by the Plan requires the approvals of the requisite Prepetition Lenders as described in the section hereof entitled "Explanation of Chapter 11 – Confirmation of a Plan" and the approval of the Bankruptcy Court. Consequently, there can be no assurance that the Restructuring will be completed as either an Out-of-Court Transaction or through the Plan.

The restructuring efforts may not be successful. The Restructuring is designed to improve the Company's consolidated balance sheet and capital structure over time by decreasing the Company's outstanding consolidated debt and significantly reducing its annual interest expense. However, these efforts may not be successful. Accordingly, the Company cannot ensure that it will be able to achieve its objectives with respect to its business restructuring strategy, regardless of whether the Restructuring is consummated.

The Plan may negate the acceptance requirements of the Out-of-Court Transaction. If the Out-of-Court Transaction is not consummated, but the Filing Entities receive sufficient votes in favor of the Plan, holders of Old Debt that did not vote to accept the Plan may nevertheless receive the same consideration as if they had accepted the Out-of-Court Transaction. If the Company chooses to effect the Restructuring through the Plan in the Chapter 11 Cases, all holders of Old Debt will be bound by the terms of the Plan whether or not they vote to accept the Plan. If the Plan is approved, a holder of Old Debt that did not vote to accept the Plan will nevertheless receive the same consideration as such holder would have received in the proposed Out-of-Court Transaction.

The Out-of-Court Transaction and the Plan may not be successful. If the Out-of-Court Transaction is not consummated and the Plan is not approved, the Company will likely need to seek relief under the Bankruptcy Code without the benefit of a plan of reorganization approved by the claimants, unless it is able to obtain alternative financing. If the Filing Entities seek bankruptcy relief under such circumstances, holders of Old Debt may receive consideration that is substantially less than what is being offered in the Restructuring. If the Company obtains alternative financing, that financing will likely be on a secured basis and the lenders providing such financing will have priority over holders of Old Debt in any ensuing bankruptcy.

## C.    Certain Considerations with Respect to the Company's Business

The following are considered to be critical risks to the success of the Company's business:

- The current downturn in economic and market conditions and decreased demand for retail goods could be prolonged and could materially and adversely affect the Company's business and financial position.

- If the Company fails to accurately anticipate market trends, respond on a timely basis with our own development of new products and enhancements to existing products, and achieve broad market acceptance of these products and enhancements, our competitive position may be harmed and we may not achieve sufficient growth in revenue to attain, or sustain, profitability.

- The Company may be unable to sustain significant customer and distributor relationships.

- Our sales are made to the ultimate consumer principally through the network of approximately 750,000 AICs worldwide. There is a high rate of turnover among AICs, which is a common characteristic of the direct-selling business. To maintain and grow our business in the future, we need to recruit, retain and service AICs on a continuing basis. If consumers change their purchasing habits, such as by reducing purchases of beauty and related products generally, or reducing purchases from AICs, this could reduce our sales and have a material adverse effect on our business, financial condition and results of operations.

- Any interruption or delay in the supply of product components, or the Company's inability to obtain product components from alternate sources at acceptable prices in a timely manner, could harm our business, financial condition and results of operations.

- The Company is subject to risks associated with international commerce, including unexpected changes in legal and regulatory requirements, changes in tariffs and trade policies, risks associated with the protection of intellectual property and political and economic instability. Furthermore, if any government bans or severely restricts our business method of direct selling, our business, financial condition and operating results may be adversely affected.

- The Company's results may be adversely affected by fluctuations in the cost or availability of raw materials and components.

- A significant product recall or product liability case could result in significant losses, destruction of product inventory, lost sales, adverse publicity, damage to reputation, loss of confidence or motivation of our AICs, and a loss of consumer confidence in the Company's products, which could have a material adverse effect on our business, financial condition and results of operations.

- If the Company is unable to attract or retain qualified personnel, our business and product development efforts could be harmed.

- If the Company is unable to obtain and adequately protect our intellectual property rights, our ability to commercialize our products could be substantially limited.

- The Company is subject to competition from a wide variety of companies, many of whom are not facing the financial difficulties affecting the Company. Worldwide, the Company competes against

products sold to consumers by other direct-selling and direct-sales companies and through the internet, and against products sold through the mass market and prestige retail channels. There are a number of direct-selling companies that sell product lines similar to the Company's, some of which also have worldwide operations and compete with us globally.

- The Company is subject to a broad range of environmental, health, and safety laws and regulations, and may be exposed to substantial environmental, health, and safety costs and liabilities.

## D.    Certain Bankruptcy Considerations

If the Company pursues the Restructuring through the Plan, and the Plan is not confirmed and consummated, there can be no assurance that any alternative plan of reorganization or restructuring would be on terms as favorable to the holders of impaired Claims as the terms of the Plan. In addition, if a protracted reorganization were to occur, there is a substantial risk that holders of Claims would receive less than they would receive under the Plan. See Schedule 6 – "Liquidation Analysis."

Necessity of the DIP Facility/New Term Loan. If the DIP Facility is not approved by the Bankruptcy Court or the Filing Entities do not enter into the New Term Loan portion of the Exit Facility, the Company will likely need to amend the Plan to provide for alternative treatment of Claims and Equity Interests. To the extent that the Filing Entities do not enter into the DIP Facility and New Term Loan portion of the Exit Facility as contemplated by the Plan, there can be no assurance that any alternative plan of reorganization would be on terms as favorable to the holders of impaired Claims and Equity Interests as the terms of the Plan. If any modifications to the Plan are material, it will be necessary to resolicit votes from those adversely affected by the modifications with respect to such amended Plan.

Risk of Non-Occurrence of the Effective Date. Although the Filing Entities believe that the Effective Date will occur reasonably soon after the Confirmation Date, there can be no assurance as to the timing or as to whether the Effective Date will occur, including whether the conditions sets forth above in "Summary of the Restructuring and Treatment Under the Plan – Conditions to Closing of the Restructuring" will occur.

General Effect. The filing of bankruptcy petitions by the Company, and the publicity attendant thereto, may adversely affect the Company's business. The Company believes that any such adverse effects may worsen during the pendency of protracted Chapter 11 Cases if the Plan is not confirmed as expected. In particular, the Company's success is dependent on its ability to recruit, retain and motivate its AICs. Publicity regarding the Restructuring and the filing of Chapter 11 Cases may adversely impact our ability to do that and may provide opportunities for other direct-selling companies to recruit our AICs away from us.

Effect of the Chapter 11 Cases on Relations with AICs and Suppliers. Although the Company believes that it has good relationships with its AICs and its suppliers and other vendors, and intends to seek authority from the Bankruptcy Court on the Petition Date to

continue its manufacturing, distribution and retail operations, as well as payment of AICs, suppliers and other vendors in the ordinary course, there can be no assurance that such AICs, suppliers and other vendors will continue to consummate transactions with the Company after the commencement of the Chapter 11 Cases. Moreover, it is possible that the commencement of the Chapter 11 Cases could harm the Company's ability to recruit new AICs and retain existing AICs. Therefore, the Chapter 11 Cases may adversely affect the Company's business.

## E.     Inherent Uncertainty of Financial Projections

The Projections set forth in Schedule 7 hereto cover the Company's operations through fiscal year 2014. These Projections are based on numerous assumptions, including the timing, confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Filing Entities, industry performance, general business and economic conditions and other matters, many of which are beyond the control of the Reorganized Filing Entities and some or all of which may not materialize. In addition, unanticipated events and circumstances occurring subsequent to the date that this Disclosure Statement is approved by the Bankruptcy Court may affect the actual financial results of the Filing Entities' or the Reorganized Filing Entities' operations. These variations may be material and may adversely affect the ability of the Reorganized Filing Entities to make payments with respect to post-Effective Date indebtedness. Because the actual results achieved throughout the periods covered by the Projections may vary from the projected results, the Projections should not be relied upon as a guaranty, representation or other assurance of the actual results that will occur.

Except with respect to the Projections and except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Disclosure Statement. The Company, Filing Entities and the Reorganized Filing Entities do not intend to update the Projections for the purposes hereof; thus, the Projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Projections.

## F.     Certain Considerations Relating to New NPG Common Stock and New NPG Warrants

Lack of Trading Market.  There is no existing market for the New NPG Common Stock to be issued to OpCo Lenders or the New NPG Warrants to be issued to HoldCo Lenders, and an active trading market may not develop for the New NPG Common Stock or the New NPG Warrants. The New NPG Common Stock and the New NPG Warrants to be issued in accordance with the Restructuring will not be listed for trading on any national securities exchange or quotation system. The Company intends as part of the Restructuring to implement restrictions in its Certificate of Incorporation that are intended to prevent New NPG from becoming a "reporting company" under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). The restrictions will likely further impact the development of an active trading market in the New NPG Common Stock and the New NPG Warrants. Even if an active trading market does develop, the Company cannot assure you that it will continue for any period of time or at what price or prices the New NPG Common Stock and New NPG Warrants will

trade. Lack of liquidity in the New NPG Common Stock and New NPG Warrants also may make it more difficult for the Company to raise additional capital, if necessary, to support its financing needs.

Transfer Restrictions. The New NPG Common Stock and New NPG Warrants to be issued in the Out-of-Court Transaction and Restructuring will be subject to certain restrictions on transfer pursuant to the Securities Act, as more fully set forth under "Securities Law Matters" hereof. Additionally, the New NPG Common Stock and New NPG Warrants will be subject to restrictions on transfer to prevent New NPG from becoming a "reporting company" under the Exchange Act, as more fully described under "Securities Law Matters" hereof.

Potential Dilution. The Long Term Management Incentive Plan will reserve certain shares of New NPG Common Stock for issuance to certain members of management and employees of New NPG. Additionally, the New NPG Warrants may be converted into shares of New NPG Common Stock. If the New NPG Warrants are converted into shares of New NPG Common Stock or New NPG Common Stock is issued under the Long Term Management Incentive Plan, the ownership percentage represented by the New NPG Common Stock distributed to OpCo Lenders on the Effective Date pursuant to the Restructuring will be diluted.

Dividends. The Company does not anticipate paying any cash dividends or other distributions with respect to the New NPG Common Stock in the foreseeable future.

## G. Methods of Solicitation

Section 1126(b) of the Bankruptcy Code provides that the holder of a claim against, or interest in, a debtor who accepts or rejects a plan of reorganization before the commencement of a chapter 11 case is deemed to have accepted or rejected such plan under the Bankruptcy Code so long as the solicitation of such acceptance was made in accordance with applicable non-bankruptcy law governing the adequacy of disclosure in connection with such solicitations, or, if such laws do not exist, such acceptance was solicited after disclosure of "adequate information," as defined in section 1125 of the Bankruptcy Code. In addition, Bankruptcy Rule 3018(b) states that a holder of a claim or interest who has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code will not be deemed to have accepted or rejected the plan if the court finds, after notice and a hearing, that the plan was not transmitted in accordance with reasonable solicitation procedures.

The Company believes that the use of the Disclosure Statement and Ballots for the purpose of soliciting acceptances of the Plan is in compliance with the Bankruptcy Code. Moreover, the Company believes that its solicitation of votes to accept or reject the Plan from Holders of Claims in Class 2 – OpCo Lender Claims and Class 3 – HoldCo Lender Claims is proper under applicable non-bankruptcy law, rules, and regulations, and contains adequate information as defined by section 1125(a) of the Bankruptcy Code. The Company also believes that it is not required to solicit any other class under the Bankruptcy Code or applicable non-bankruptcy law, rules, or regulations. While the Company believes its solicitation of the Plan meets the requirements of section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b), there can be no assurance that the Bankruptcy Court will agree. If the Bankruptcy Court determines that the solicitation does not comply with the requirements of section 1126(b)

of the Bankruptcy Code, the Company may seek to resolicit acceptances, and, in such event, confirmation of the Plan could be delayed and possibly jeopardized.

## H.     Classification and Treatment of Claims and Equity Interests

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against, and interests in, the Filing Entities. The Bankruptcy Code also provides that the Plan may place a Claim or interest in a particular Class only if such Claim or interest is substantially similar to the other Claims or interests of such Class. The Company believes that all Claims and Equity Interests have been appropriately classified in the Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Company presently anticipates that it would seek (i) to modify the Plan to provide for whatever classification might be required for confirmation and (ii) to use the acceptances received from any creditor pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such creditor ultimately is deemed to be a member. Any such reclassification of creditors, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such creditor was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan.  There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires resolicitation, the Filing Entities will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan of any holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such holder regardless of the Class as to which such holder is ultimately deemed to be a member.  The Company believes that under the Bankruptcy Rules the Filing Entities would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim of any creditor or equity holder.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or interest of a particular Class unless the holder of a particular Claim or interest agrees to a less favorable treatment of its Claim or interest.  The Company believes that it has complied with the requirement of equal treatment. However, to the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan.

Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and Effective Date of the Plan and could increase the risk that the Plan will not be consummated.

## I.     Claims Estimations

There can be no assurance that the estimated Claim amounts set forth herein are correct, and the actual amount of Allowed Claims may differ from the estimates.  The estimated amounts are subject to certain risks, uncertainties and assumptions.  Should one or more of these risks or

uncertainties materialize, or should underlying assumptions prove incorrect, the actual amount of Allowed Claims may vary from those estimated herein.

**XV.**

**PLAN CONFIRMATION AND CONSUMMATION PROCEDURES**

**A.      Overview**

A plan of reorganization may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of a debtor's assets.  In either event, upon confirmation of the plan, it becomes binding on the debtor and all of its creditors and equity holders, and the obligations owed by the debtor to such parties are compromised and exchanged for the obligations specified in the plan.  Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the debtor to prepare and file a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan.  This Disclosure Statement is presented to holders of Claims against and Equity Interests in the Filing Entities to satisfy the requirements of section 1125 of the Bankruptcy Code in connection with the Company's solicitation of votes on the Plan if the Company pursues the Restructuring through the Plan.

If all classes of claims and interests accept a plan of reorganization, the bankruptcy court may confirm the plan if the bankruptcy court independently determines that the requirements of section 1129(a) of the Bankruptcy Code have been satisfied.  Section 1129(a) sets forth the requirements for confirmation of a plan and, among other things, requires that a plan meet the "best interests of creditors" test and be "feasible."  The "best interests" test generally requires that the value of the consideration to be distributed to the holders of claims or equity interests under a plan may not be less than those parties would receive if the debtor were liquidated pursuant to a hypothetical liquidation occurring under chapter 7 of the Bankruptcy Code.  Under the "feasibility" requirement, the bankruptcy court generally must find that there is a reasonable probability that the debtor will be able to meet its obligations under a plan without the need for further financial reorganization.  The Company believes that the Plan satisfies all of the applicable requirements of section 1129(a) of the Bankruptcy Code, including, in particular, the "best interests of creditors" test and the "feasibility" requirement.

The Bankruptcy Code does not require that each holder of a claim or interest in a particular class vote in favor of a plan of reorganization for the bankruptcy court to determine that the class has accepted the plan.  Rather, a class of creditors will be determined to have accepted the plan if the bankruptcy court determines that the plan has been accepted by a majority in number and two-thirds in amount of those claims actually voting in such class.  Similarly, a class of equity security holders will have accepted the plan if the bankruptcy court determines that the plan has been accepted by holders of two-thirds of the number of shares actually voting in such class.

In addition, classes of claims or equity interests that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan and thus are not entitled to vote.  Furthermore, classes that are to receive no distribution under the plan are conclusively deemed to have rejected the plan.  Accordingly, acceptances of a plan will generally be solicited only from those persons who hold claims or equity interests in an impaired class.  A class is

"impaired" if the legal, equitable, or contractual rights associated with the claims or equity interests of that class are modified in any way under the plan. Modification for purposes of determining impairment, however, does not include curing defaults and reinstating maturity on the effective date of the plan. Class 2 – OpCo Lender Claims and Class 3 – HoldCo Lender Claims are impaired and entitled to vote on the Plan. Class 1 – Priority Claims, Class 4 – Secured Claims, Class 5 – Unsecured Claims, and Class 7 – Other Equity Interests are unimpaired and deemed to have accepted the Plan and, therefore, are not entitled to vote on the Plan. Class 6 – NPG Equity Interests is deemed to have rejected the Plan and, therefore, is not entitled to vote on the Plan.

**B.     Confirmation of the Plan**

**1.     <u>Elements of Section 1129 of the Bankruptcy Code</u>**

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the conditions to confirmation under section 1129 of the Bankruptcy Code are satisfied. Among the requirements for confirmation of a plan of reorganization are that:

(a)     The Plan complies with the applicable provisions of the Bankruptcy Code.

(b)     Each of the Filing Entities has complied with the applicable provisions of the Bankruptcy Code.

(c)     The Plan has been proposed in good faith and not by any means proscribed by law.

(d)     Any payment made or promised by the Filing Entities or by an entity issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court; and any such payment made before the confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

(e)     The Filing Entities have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer or voting trustee of the Filing Entities or a successor to the Filing Entities under the Plan and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and the Filing Entities have disclosed the identity of any Insider that will be employed or retained by such Filing Entity, and the nature of any compensation for such Insider.

(f)     With respect to each impaired class of Claims or Equity Interests, each holder of an impaired Claim or impaired Equity Interest either has accepted the Plan or will receive or retain under the Plan, on account of the Claims or Equity Interests held by such entity, property of a value, as of the applicable consummation date under the Plan, that is not less than the amount that such entity would receive or retain if the Filing Entities were liquidated on such date under chapter 7 of the Bankruptcy Code.

(g)     In the event that the Filing Entities do not move to confirm the Plan non-consensually, each class of Claims entitled to vote has either accepted the Plan or is not impaired under the Plan.

(h)     Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Claims and Priority Claims will be paid in full, in Cash, on the applicable consummation date and that Tax Claims will be paid in regular installments over a period ending not later than five (5) years after the date of assessment of such Claims, having a total value, as of the applicable consummation date, equal to the allowed amount of such Claims.

(i)     At least one impaired class of Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such class.

(j)     Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Filing Entities or any other successor to the Filing Entities under the Plan, unless such liquidation or reorganization is proposed in the Plan. See "Financial Projections and Assumptions."

(k)     All fees payable under section 1930 of Title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

The Filing Entities believe that the Plan will satisfy all the statutory provisions of chapter 11 of the Bankruptcy Code, that they have complied or will have complied with all of the provisions of the Bankruptcy Code, and that the Plan is being proposed and will be submitted to the Bankruptcy Court in good faith.

## 2.     Acceptance

A class of Claims will have accepted the Plan if the Plan is accepted, with reference to a class of Claims, by the holders of at least two-thirds in amount and more than one-half in number of the Allowed Claims of each such class of Claims.

The Filing Entities intend to tabulate all votes on the Plan on a non-consolidated basis, by-class and by-debtor, for the purpose of determining whether the Plan satisfies sections 1129(a)(8) of the Bankruptcy Code with respect to each Filing Entity.

## 3.     Confirmation Without Acceptance of All Impaired Classes: The "Cramdown" Alternative

If a plan is rejected by an impaired class, but "does not discriminate unfairly" and is "fair and equitable" as to such class, such plan nevertheless may be confirmed pursuant to the "cramdown" provisions of the Bankruptcy Code.  Specifically, section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if such plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it. A bankruptcy court may confirm a plan at the request of the debtors if the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted the plan.

A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

A plan is fair and equitable as to a class of claims which rejects such plan if it provides (a) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of such plan, equal to the allowed amount of such claim; or (b) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of equity interests that rejects a plan if such plan provides (a) that each holder of such equity interest included in the rejecting class receive or retain on account of that equity interest property that has a value, as of the effective date of such plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such equity interest; or (b) that the holder of any equity interest that is junior to the equity interests of such class will not receive or retain any property at all on account of such junior equity interest under such plan.

### 4. Best Interests Test

With respect to each impaired class of holders of Claims and Equity Interests, confirmation of the Plan requires that each such holder either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the applicable consummation date under the Plan, that is not less than the value such holder would receive or retain if the Filing Entities were liquidated under chapter 7 of the Bankruptcy Code.

To determine what holders of Claims and Equity Interests of each impaired class would receive if the Filing Entities were liquidated, the Bankruptcy Court must determine the proceeds that would be generated from the liquidation of the properties and interests in property of the Filing Entities in a chapter 7 liquidation case. The proceeds that would be available for satisfaction of Unsecured Claims against and Equity Interests in the Filing Entities would consist of the proceeds generated by disposition of the unencumbered equity in the properties and interests in property of the Filing Entities and the cash held by the Filing Entities at the time of the commencement of the liquidation case. Such proceeds would be reduced by the costs and expenses of the liquidation and by such additional administration and priority claims that may result from the termination of the business of the Filing Entities and the use of chapter 7 for the purposes of liquidation.

The costs of liquidation under chapter 7 of the Bankruptcy Code would include the fees payable to a trustee in bankruptcy, and the fees that would be payable to additional attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by the Filing Entities during the Chapter 11 Cases, such as compensation for attorneys, financial advisors, accountants and costs that are allowed in the chapter 7 case. In addition, Claims would arise by reason of the breach or rejection of obligations incurred and executory contracts entered into or assumed by the Filing Entities during the pendency of the Chapter 11 Cases.

The foregoing types of Claims and such other Claims which may arise in the liquidation cases or result from any pending Chapter 11 Cases would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay Unsecured Claims arising on or before the Petition Date.

To determine if the Plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of the liquidation of the properties and interests in property of the Filing Entities (net of the amounts attributable to the aforesaid claims) is then compared with the present value offered to such classes of Claims and Equity Interests under the Plan.

In applying the "best interests" test, it is possible that Claims and Equity Interests in the chapter 7 cases may not be classified according to the seniority of such Claims and Equity Interests as provided in the Plan. In the absence of a contrary determination by the Bankruptcy Court, all Unsecured Claims arising on or before the Petition Date which have the same rights upon liquidation would be treated as one class for the purposes of determining the potential distribution of the liquidation proceeds resulting from the chapter 7 cases of the Filing Entities. The distributions from the liquidation proceeds would be calculated ratably according to the amount of the Claim held by each creditor. Therefore, creditors who claim to be third-party beneficiaries of any contractual subordination provisions might have to seek to enforce such contractual subordination provisions in the Bankruptcy Court or otherwise. The Filing Entities believe that the most likely outcome of liquidation proceedings under chapter 7 would be the application of the rule of absolute priority of distributions. Under that rule, no junior creditor receives any distribution until all senior creditors are paid in full with interest, and no stockholder receives any distribution until all creditors are paid in full with interest.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Chapter 11 Cases, including: (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee; (ii) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" environment in which such a liquidation would likely occur; (iii) the adverse effects on the salability of business segments as a result of the likely departure of key employees and the loss of customers; and (iv) the substantial increases in claims which would be satisfied on a priority basis or on parity with creditors in the Chapter 11 Cases, the Filing Entities have determined that confirmation of the Plan will provide each holder of a Claim or Equity Interest with a greater recovery than it would receive pursuant to liquidation of the Filing Entities under chapter 7 of the Bankruptcy Code.

In order to determine the amount of liquidation value available to creditors, the Filing Entities prepared a liquidation analysis that provides an estimate of the proceeds that may be generated as a result of a hypothetical chapter 7 liquidation for the Filing Entities (the "Liquidation Analysis"). The Liquidation Analysis is attached to this Disclosure Statement as Schedule 6.

While the Filing Entities believe that the assumptions underlying the Liquidation Analysis are reasonable, it is possible that certain of those assumptions would not be realized in an actual liquidation. Notwithstanding the foregoing, the Filing Entities believe that any liquidation analysis with respect to the Filing Entities is inherently speculative. The Liquidation Analysis for the Filing Entities necessarily contains estimates of the net proceeds that would be received from a forced sale of assets and/or business units, as well as the amount of Claims that will ultimately become Allowed Claims. The estimate of the amount of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims under the Plan.

The Company believes that the recovery value under the Plan is greater than the Prepetition Lenders would receive in a chapter 7 liquidation. As set forth in the Liquidation Analysis, holders of OpCo Lender Claims would receive a recovery that would be no higher than 10.9% in liquidation. The best interests test standard is satisfied with respect to such lenders in that, under the Plan, the $125 million of the principal amount of the OpCo Debt will be reinstated pursuant to the Reinstated OpCo Term Loan. Additionally, because the Plan will deleverage the Company's assets, obligations under the Reinstated OpCo Term Loan are much less susceptible to the default risk. Further, the Company's ongoing obligations under the Reinstated OpCo Term Loan will be subject to the same recourse with respect to the assets of the Company, and thus, because the security interest is the same, the OpCo Lenders' interest in the Company's assets will not be affected.

Similarly, the best interests test standard is satisfied as to the HoldCo Lenders. As established in the Liquidation Analysis, the OpCo Lenders would receive less than a 100% recovery in liquidation; therefore, the HoldCo Lenders would not receive any recovery under that scenario. By contrast, under the Plan, the HoldCo Lenders will receive New NPG Warrants and, therefore, the ability to share in the potential upside of the Company's business going forward. Lastly, the Plan provides for the payment in full to all general unsecured creditors, which, according to the Liquidation Analysis, would not occur in a hypothetical chapter 7 case.

Accordingly, the Filing Entities believe that the "best interests" test of section 1129 of the Bankruptcy Code is satisfied because the Filing Entities believe that the members of each impaired Class will receive greater or equal value under the Plan than they would in a liquidation. Although the Filing Entities believe that the Plan meets the "best interests" test of section 1129(a)(7) of the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will determine that the Plan meets this test.

**5.** **Feasibility**

The Bankruptcy Code requires that the Bankruptcy Court determine that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Filing Entities. For purposes of showing that the Plan meets this feasibility standard, the Filing Entities have analyzed the ability of the Reorganized Filing Entities to meet their obligations under the Plan and retain sufficient liquidity and capital resources to conduct their business.

The Filing Entities believe that with the deleveraged capital structure contemplated under the Restructuring, the Filing Entities will be able to achieve the financial results set forth in the Projections. Based on the terms of the Plan, (it is assumed that the Effective Date will occur on or about thirty to sixty days following the Petition Date) at emergence the Reorganized Filing Entities shall have been released from more than $600 million in debt obligations and the ongoing interest payments related thereto.

Holders of Claims against and Equity Interests in the Filing Entities are advised, however, that the Projections were not prepared with a view toward compliance with the published guidelines of the American Institute of Certified Public Accountants or any other regulatory or professional agency or body or generally accepted accounting principles.

In addition to the assumptions footnoted in the Projections themselves, the Projections also assume that (i) the Plan will be confirmed and consummated in accordance with its terms, (ii) there will be no material adverse change in legislation or regulations, or the administration

thereof, including environmental legislation or, regulations, that will have an unexpected effect on the operations of the Reorganized Filing Entities, (iii) there will be no change in United States generally accepted accounting principles that will have a material effect on the reported financial results of the Reorganized Filing Entities, and (iv) there will be no material contingent or unliquidated litigation or indemnity claims applicable to the Reorganized Filing Entities. To the extent that the assumptions inherent in the Projections are based upon future business decisions and objectives, they are subject to change. In addition, although they are presented with numerical specificity and considered reasonable by the Filing Entities when taken as a whole, the assumptions and estimates underlying the Projections are subject to significant business, economic and competitive uncertainties and contingencies, many of which will be beyond the control of the Reorganized Filing Entities.

Accordingly, the Projections are only estimates that are necessarily speculative in nature. It can be expected that some or all of the assumptions in the Projections will not be realized and that actual results will vary from the Projections, which variations may be material and are likely to increase over time. The Projections should therefore not be regarded as a representation by the Filing Entities or any other person that the results set forth in the Projections will be achieved. In light of the foregoing, readers are cautioned not to place undue reliance on the Projections. The Projections should be read together with the information in the sections of this Disclosure Statement entitled "Risk Factors" which set forth important factors that could cause actual results to differ from those in the Projections.

The Filing Entities do not intend to update or otherwise revise the Projections, including any revisions to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events, even if any or all of the underlying assumptions do not come to fruition. Furthermore, the Filing Entities do not intend to update or revise the Projections to reflect changes in general economic or industry conditions. Whether actual results will conform to the Projections is subject to a number of risks and uncertainties, including all of the risks described under the section entitled "Risk Factors" above, as well as the following:

- the high degree of competition in the Filing Entities' business;

- the susceptibility of the Filing Entities' business to general economic conditions;

- discovery of unknown contingent liabilities;

- the interest rate environment;

- the ability to retain the customer base; and

- future capital requirements.

## C.     Effect of Confirmation

Under section 1141 of the Bankruptcy Code, the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor or equity security holder, whether or not the claim or interest of such creditor or equity security holder is impaired under the plan and whether or not such creditor or equity security holder voted to accept the plan. Further, after confirmation of a plan, the property dealt

with by the plan is free and clear of all claims and interests of creditors and equity security holders, except as otherwise provided in the plan or the confirmation order.

**XVI.**

**CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES**

The following discussion summarizes certain federal income tax consequences expected to result from the consummation of the Restructuring.  This discussion is based on the Internal Revenue Code of 1986, as amended (the "Tax Code") and on U.S. Treasury Regulations, each as available and in effect (or in certain cases, proposed) on the date of this Disclosure Statement, as well as judicial and administrative interpretations thereof available on or before such date.  All of the foregoing are subject to change, which change could apply retroactively and could affect the tax consequences described below.  There can be no assurance that the Internal Revenue Service (the "IRS") will not take a contrary view with respect to one or more of the issues discussed below, and no ruling from the IRS has been or is expected to be sought with respect to any issues which may arise under the Restructuring.

The following summary discusses certain U.S. federal income tax consequences of the Restructuring to the Company and the "Holders" of Old Debt and Equity Interests in NPG (the "NPG Equity Interests").  For purposes of this summary, a "Holder" is a beneficial owner of Old Debt, NPG Equity Interests, New NPG Common Stock, New NPG Warrants or the Reinstated OpCo Term Loan that, for U.S. federal income tax purposes, is: (a) a citizen or resident of the United States; (b) a corporation created or organized in or under the laws of the United States or any state thereof (including the District of Columbia); (c) an estate the income of which is subject to U.S. federal income taxation regardless of its source; or (d) a trust if such trust validly elects to be treated as a United States person for U.S. federal income tax purposes, or if (I) a court within the United States is able to exercise primary supervision over its administration and (II) one or more United States persons have the authority to control all of the substantial decisions of such trust.  This discussion is only for general information purposes and is not a complete analysis of all potential federal income tax consequences that may be applicable to the Company or any particular Holder.  The tax treatment of a Holder may vary depending upon such Holder's particular situation.

The following discussion does not address state, local or foreign tax considerations that may be applicable to the Company and Holders.  This summary does not address tax considerations applicable to Holders that may be subject to special tax rules, such as financial institutions, insurance companies, brokers, real estate investment trusts, regulated investment companies, grantor trusts, dealers or traders in securities, commodities or currencies, tax-exempt entities, tax-qualified retirement plans, persons that hold the OpCo Debt, the Reinstated OpCo Term Loan, New NPG Common Stock or New NPG Warrants as a position in a "straddle" or as part of a "hedging," "conversion" or "integrated" transaction for U.S. federal income tax purposes, persons that have a "functional currency" other than the U.S. dollar, persons who hold an equity interest or a security in the Company through a partnership (or other pass-through entity for U.S. federal income tax purposes), persons subject to the alternative minimum tax, persons who acquired an equity interest or a security in the Company in connection with the performance of services and persons who are not United States persons (as defined in the Tax

Code).  This discussion assumes that Holders of Old Debt and NPG Equity Interests have held such property as "capital assets" within the meaning of Tax Code Section 1221 (generally, property held for investment) and will hold the Reinstated OpCo Term Loan, New NPG Common Stock or New NPG Warrants as capital assets.  In addition, this discussion assumes that the Old Debt and Reinstated OpCo Term Loan will be treated as debt for federal income tax purposes.

If a partnership (or any other entity treated as a partnership for U.S. federal income tax purposes) holds Old Debt, NPG Equity Interests, New NPG Common Stock, New NPG Warrants or the Reinstated OpCo Term Loan, the tax treatment of a partner in such partnership generally will depend on the status of the partner and the activities of the partnership.  Any such partner should consult its tax advisor as to its tax consequences.

EACH HOLDER OF OLD DEBT AND NPG EQUITY INTERESTS IS URGED TO CONSULT ITS OWN TAX ADVISOR WITH RESPECT TO THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE RESTRUCTURING.  EACH HOLDER OF NEW NPG COMMON STOCK, NEW NPG WARRANTS AND THE REINSTATED OPCO TERM LOAN SHOULD CONSULT ITS OWN TAX ADVISOR WITH RESPECT TO THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE RECEIPT, OWNERSHIP AND DISPOSITION OF SUCH NEW NPG COMMON STOCK, NEW NPG WARRANTS OR REINSTATED OPCO TERM LOAN.

## INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE

PURSUANT TO INTERNAL REVENUE SERVICE CIRCULAR 230, WE HEREBY INFORM YOU THAT THE DESCRIPTION SET FORTH HEREIN WITH RESPECT TO U.S. FEDERAL TAX ISSUES WAS NOT INTENDED OR WRITTEN TO BE USED, AND SUCH DESCRIPTION CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING ANY PENALTIES THAT MAY BE IMPOSED ON THE TAXPAYER UNDER THE U.S. INTERNAL REVENUE CODE.  THIS DESCRIPTION IS LIMITED TO THE U.S. FEDERAL TAX ISSUES DESCRIBED HEREIN.  IT IS POSSIBLE THAT ADDITIONAL ISSUES MAY EXIST THAT COULD AFFECT THE U.S. FEDERAL TAX TREATMENT OF THE MATTER THAT IS THE SUBJECT OF THE DESCRIPTION NOTED HEREIN, AND THIS DESCRIPTION DOES NOT CONSIDER OR PROVIDE ANY CONCLUSIONS WITH RESPECT TO ANY SUCH ADDITIONAL ISSUES.  TAXPAYERS SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

A.       **U.S. Federal Income Tax Consequences to the Company**

1.       **Certain Transactions of the Company expected to occur prior to or as part of the Restructuring**

It is expected that the Levlad Merger will occur prior to the consummation of the Restructuring.  It is expected that the Levlad Merger will qualify as a tax-free reorganization pursuant to the Tax Code and thus no gain or loss will be recognized for federal income tax

purposes and Arbonne Holdco would acquire the assets of Levlad Holdco with a carryover (historical) tax basis.  If the Levlad Merger does not qualify as a tax-free reorganization, (i) any gain on the assets of Levlad generally would be recognized but any loss generally would not be recognized because of a special tax rule that prohibits the recognition of losses in a transaction between related parties and (ii) Arbonne Holdco generally would acquire the assets of Levlad Holdco with a fair market value tax basis.

Unless otherwise noted, for purposes of this discussion regarding "U.S. Federal Income Tax Consequences to the Company," references to the "Company" are references to the combined Levlad Holdco / Arbonne Holdco entity.

### 2.     Cancellation of Debt Income

The Company will realize a significant amount of cancellation of debt ("COD") income with respect to both (i) the restructuring and reinstatement of the OpCo Debt as the Reinstated OpCo Term Loan and issuance of New NPG Common Stock and (ii) the issuance of New NPG Warrants for HoldCo Debt pursuant to the Restructuring.  In particular, with respect to the OpCo Debt, the Company should recognize COD income equal to the excess of: (i) the issue price of the OpCo Debt, including accrued but unpaid interest (except to the extent the payment of such interest would give rise to a tax deduction) over (ii) the sum of (a) the issue price of the Reinstated OpCo Term Loan and (b) the fair market value of the New NPG Common Stock. With respect to the HoldCo Debt, the Company should recognize COD income equal to the excess of: (i) the issue price of the HoldCo Debt, including accrued but unpaid interest (except to the extent the payment of such interest would give rise to a tax deduction) over the fair market value of the New NPG Warrants.

The "issue price" of the Reinstated OpCo Term Loan issued to a Holder of the OpCo Debt will depend on whether either (x) the Reinstated OpCo Term Loan or (y) the OpCo Debt exchanged therefor are "publicly traded" under applicable Treasury Regulations.  If neither (a) the Reinstated OpCo Term Loan nor (b) the OpCo Debt exchanged therefor is so traded, the issue price of the Reinstated OpCo Term Loan will be equal to its stated principal amount.  If the Reinstated OpCo Term Loan is "traded on an established securities market," then the issue price of the Reinstated OpCo Term Loan will be the fair market value of the Reinstated OpCo Term Loan.  If the OpCo Debt is "traded on an established securities market" (but the Reinstated OpCo Term Loan received in exchange therefor is not), the issue price of the Reinstated OpCo Term Loan generally will be equal to the fair market value of the OpCo Debt exchanged therefor at the time of the exchange less the fair market value of the portion of the OpCo Debt allocable to New NPG Common Stock.  The Company has made no determination yet as to whether it will treat the Reinstated OpCo Term Loan or the OpCo Debt as "publicly traded" for this purpose.

Notwithstanding that the Company will realize COD income as a result of the Restructuring, under Section 108 of the Tax Code, such COD income will not be recognized (i) if the COD income occurs in a case brought under the Bankruptcy Code, provided the taxpayer is under the jurisdiction of a court in such case and the cancellation of indebtedness is granted by the court or is pursuant to a plan approved by the court (the "Bankruptcy Exception") or (ii) if the COD income occurs outside of a case brought under the Bankruptcy Code, to the extent the Company is insolvent within the meaning of Section 108(d)(3) of the Tax Code (the "Insolvency

Exception").  Generally, under Section 108(b) of the Tax Code, any COD income excluded from income under the Bankruptcy Exception or Insolvency Exception must be applied against and reduce certain tax attributes of the taxpayer.  Unless the taxpayer elects to have such reduction apply first against the basis of its depreciable property, such reduction is first applied against net operating losses ("NOLs") of the taxpayer (including NOLs from the taxable year of discharge and any NOL carryover to such taxable year) and then to certain tax credits, capital loss and capital loss carryovers, and tax basis in its assets (including stock of subsidiaries).  Provided the taxpayer has not elected to first reduce its tax basis in depreciable property, the taxpayer's tax basis in its assets generally may not be reduced below the amount of liabilities remaining immediately after the discharge of indebtedness (the "Write-down Limitation").  If the taxpayer is a member of a consolidated group and is required to reduce its basis in the stock of another group member, a "look-through rule" requires a corresponding reduction in the tax attributes of the lower-tier member.  If the amount of a taxpayer's excluded COD income exceeds the amount of attribute reduction resulting from the application of the foregoing rules, certain other tax attributes of the consolidated group may also be subject to reduction.

If the Restructuring occurs pursuant to the Plan, the Company will be under the jurisdiction of the Bankruptcy Court in such case and any cancellation of the Old Debt will be pursuant to the Plan.  As a result, in such case, the Company will not be required to recognize any COD income realized as a result of the implementation of the Restructuring.  If the Restructuring occurs through an Out-of Court Transaction, then the Company will not be required to recognize any COD income realized as a result of the Restructuring to the extent of the Company's insolvency.  As a result of utilizing one of these exclusions, however, the Company will be required to reduce its tax attributes in an amount equal to the amount of COD income excluded from income under the Bankruptcy Exception or Insolvency Exception, as the case may be.  The Company expects that the amount of COD excluded from income will significantly exceed all of its tax attributes.  Nevertheless, the Company expects to retain a certain amount of tax basis in its assets equal to the amount of liabilities of the Company immediately after the discharge pursuant to the Write-down Limitation.

Under recently enacted Section 108(i) of the Tax Code, a taxpayer generally may elect to defer COD income rather than exclude it under the Bankruptcy Exception or the Insolvency Exception.  Deferred COD income under this rule would be included in the taxpayer's income ratably over the five taxable-year period starting in 2014.  This election is irrevocable.  To the extent COD income is designated to be deferred under this rule, the taxpayer would not be required to reduce any of their tax attributes but would have COD income includible in gross income in future years.  The Company does not expect to make this election.

### 3.    Accrued Interest

To the extent that there exists accrued but unpaid interest on the Old Debt and to the extent that such accrued but unpaid interest has not been deducted previously by the Company, portions of payments made in consideration for the satisfaction of such Old Debt that are allocable to such accrued but unpaid interest should be deductible by the Company.  Any such interest that is not paid generally will not be deductible by the Company and generally will not give rise to COD income.

To the extent that the Company has previously taken a deduction for accrued but unpaid interest, any amounts so deducted that are paid will not give rise to any tax consequences to the Company.  If such amounts are not paid, they will give rise to COD income that would be excluded from gross income pursuant to the Bankruptcy Exclusion in the case of a Restructuring pursuant to the Plan or that would be excluded from gross income to the extent of the Company's insolvency under the Insolvency Exception in the case of a Restructuring pursuant to an Out-of-Court Transaction.  As a result, the Company generally would be required to reduce its tax attributes to the extent of such interest previously deducted and not paid.

### 4.  Utilization of Company Net Operating Loss Carryforwards

#### a.  Limitation on NOLs and Other Tax Attributes

Following the implementation of the Restructuring, any remaining NOLs, tax credit carryforwards, losses or deductions that are "built-in" (i.e., economically accrued but unrecognized) and possibly, certain other tax attributes of the Company allocable to periods prior to the effective date of the Restructuring (collectively, "Pre-Change Losses") may be subject to an annual limitation under Section 382 of the Tax Code if there is an "ownership change" of the Company (unless, in the case of a Restructuring pursuant to the Plan, a special bankruptcy exception applies, as discussed in "Special Bankruptcy Exceptions" below).  In general, an ownership change occurs when the percentage of a corporation's stock owned by certain "5 percent shareholders" increases by more than 50 percentage points in the aggregate over the lowest percentage owned by them at any time during the applicable "testing period" (generally, the shorter of (a) the 36-month period preceding the testing date or (b) the period of time since the most recent ownership change of the corporation).

#### b.  General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a loss corporation (or a loss consolidated group) that undergoes an ownership change would be subject is equal to the product of (i) the fair market value of the stock of the loss corporation immediately before the ownership change (with certain adjustments) multiplied by (ii) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs (determined based on interest rates published monthly by the IRS) (the "Section 382 Limitation").  Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.  However, the annual Section 382 Limitation may be further reduced if the loss corporation (or the loss consolidated group) (i) does not continue its historic business or uses a significant portion of its assets in a new business for two years after the ownership change or (ii) undergoes a second ownership change.  In addition, if a loss corporation (or loss consolidated group or subgroup) has a "net unrealized built-in loss" or "NUBIL" beyond a certain minimum amount immediately before an ownership change, then any built-in losses recognized during the following five years (up to the amount of the original net unrealized built-in loss) generally will be treated as a Pre-Change Loss and will be subject to the annual limitation.  Conversely, if the loss corporation (or loss consolidated group) has a net unrealized built-in gain (a "NUBIG") beyond a certain minimum amount immediately before an ownership change, any built-in gains recognized during the following five years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized.  A NUBIG or NUBIL generally is the

difference between the fair market value of a loss corporation's assets and its tax basis in the assets, subject to a statutorily-defined threshold amount.  The rules applicable to net unrealized built-in losses and net unrealized built-in gains generally apply to consolidated groups on a consolidated basis; however, with respect to net unrealized built-in losses, special rules apply to a corporation that joins the consolidated group within five years prior to the ownership change.

### c.      *Special Bankruptcy Exceptions*

The Tax Code provides two alternative bankruptcy exceptions from the Section 382 Limitation for loss corporations undergoing an ownership change pursuant to a bankruptcy proceeding.  The first exception, Section 382(l)(5) of the Tax Code, applies where qualified creditors and existing shareholders of the debtor receive at least fifty (50)% of the vote and value of the stock of the reorganized debtor in a case under the Bankruptcy Code.  Under this exception, a debtor's pre-ownership change NOLs are not subject to the Section 382 Limitation but are instead reduced by the amount of any interest deductions allowed during the three taxable years preceding the taxable year in which the ownership change occurs, and during the part of the taxable year prior to and including the effective date of the bankruptcy reorganization, in respect of the debt converted into stock of the debtor in the reorganization.  The second bankruptcy exception, Section 382(l)(6) of the Tax Code, provides relief in the form of a relaxed computation of the Section 382 Limitation.

In the case of the Restructuring pursuant to the Plan, it is not known at the present time whether the Section 382(l)(5) exception could be applicable to such ownership change.  Moreover, in such case, even if the Section 382(l)(5) exception is applicable, (i) the Section 382(l)(5) exception may require significant reductions in the Company's NOLs in the amount of certain previous interest deductions, as described above and (ii) a subsequent ownership change within the two-year period following the Effective Date would reduce the Section 382 Limitation for periods following the subsequent ownership change to zero.  Notwithstanding the foregoing discussion, after the Restructuring, the Company does not expect to have significant NOLs that will be subject to the Section 382 Limitation and thus does not expect to substantially benefit from qualifying under either of these bankruptcy exceptions.

### 5.      **Alternative Minimum Tax**

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the taxable year.  For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated, with further adjustments required if AMTI, determined without regard to adjusted current earnings ("ACE"), differs from ACE.  In addition, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, only 90% of its AMTI generally may be offset by available AMT NOL carryforwards.  Accordingly, for tax periods after the Effective Date, the Company may have to pay AMT regardless of whether they generate non-AMT NOLs or have sufficient non-AMT NOL carryforwards to offset regular taxable income for such periods.  In addition, if a corporation undergoes an "ownership change" within the meaning of Tax Code Section 382 and is in a NUBIL position on the date of the ownership change, the corporation's aggregate tax basis in its assets would be reduced for certain

AMT purposes to reflect the fair market value of such assets as of the change date. A corporation that pays AMT generally is later allowed a nonrefundable credit (equal to a portion of its prior year AMT liability) against its regular federal income tax liability in future taxable years when it is no longer subject to the AMT.

**B.     U.S. Federal Income Tax Consequences to Holders of Old Debt**

**1.     Consequences to Holders of the OpCo Debt**

*a.     Modification/Reinstatement of the OpCo Debt as the Reinstated OpCo Term Loan and Issuance of New NPG Common Stock*

*Recognition of Gain or Loss*.  Under applicable Treasury Regulations, the significant modification of a debt instrument will result in a deemed exchange of the "old" debt instrument for a "new" debt instrument and will be a taxable event pursuant to which gain or loss is recognized unless a non-recognition provision of the Tax Code applies.  A modification of a debt instrument is significant if the modified instrument differs materially either in kind or extent from the original debt instrument.  If a modification does not constitute a significant modification, the modification would not result in a "deemed exchange."

Pursuant to the Plan or the Out-of-Court Transaction, a portion of the OpCo Debt will be reinstated as the Reinstated OpCo Term Loan, resulting in, among other things, a significant decrease in the principal amount of the debt.  Based on the resulting change in yield on the OpCo Debt, the Company intends to treat the modification of the OpCo Debt into the Reinstated OpCo Term Loan as a significant modification.  As a result, the reinstatement of the OpCo Debt for the Reinstated OpCo Term Loan and New NPG Common Stock will be treated as a taxable exchange unless it qualifies as a tax-free reorganization (as discussed further in the immediately succeeding paragraph).

The exchange of the OpCo Debt for the Reinstated OpCo Term Loan and the New NPG Common Stock would not be a taxable exchange if it qualified as a tax-free reorganization (as a recapitalization) under the Tax Code.  Whether or not the exchange will qualify as a tax-free reorganization depends, in part, on whether the OpCo Debt and Reinstated OpCo Term Loan constitute "securities" for purposes of the reorganization provisions of the Tax Code.  The test of whether a debt obligation is a security involves an overall evaluation of the nature of the obligation, with the term of the obligation usually regarded as one of the most significant factors.  Debt obligations with a term of five years or less generally have not qualified as securities, whereas debt obligations with a term of ten years or more generally have qualified as securities.  Another important factor in determining whether a debt obligation is a security is the extent to which the obligation is subordinated to other liabilities of the issuer.  Generally, the more senior the debt obligation, the less likely it is to be a security.

It is unclear whether the OpCo Debt and Reinstated OpCo Term Loan each will constitute a security for federal income tax purposes.  The OpCo Debt's original maturity date was seven years after its issue date and the Reinstated OpCo Term Loan's maturity is five years after its issue date.  No authority has definitively determined whether debt with a seven-year or five-year maturity date is a security for U.S. federal income tax purposes.  If the OpCo Debt

constitutes a security for U.S. federal income tax purposes but the Reinstated OpCo Term Loan would not independently so constitute a security, the Reinstated OpCo Term Loan still could be considered a security if the Reinstated OpCo Term Loan is deemed to represent a continuation of the OpCo Debt in substantially the same form as the OpCo Debt. It is unclear whether the Reinstated OpCo Term Loan would be deemed to represent such a continuation of the OpCo Debt. If both the OpCo Debt and the Reinstated OpCo Term Loan constitute a security for U.S. federal income tax purposes, subject to the "Accrued but Unpaid Interest" discussion below, the exchange of the OpCo Debt for the Reinstated OpCo Term Loan and New NPG Common Stock generally would be a tax free exchange for U.S. federal income tax purposes. If the exchange were tax-free, the Holder (i) would not recognize gain or loss on the exchange (except with respect to amounts (if any) treated as paid for accrued but unpaid interest, which would be taxable as such), (ii) would allocate its tax basis among the Reinstated OpCo Term Loan and New NPG Common Stock in proportion to fair market value and (iii) would have a holding period for the Reinstated OpCo Term Loan and New NPG Common Stock that included its historic holding period for the OpCo Debt.

If the OpCo Debt or Reinstated OpCo Term Loan does not constitute a "security," then, subject to the "Accrued but Unpaid Interest" discussion below, the exchange of the OpCo Debt for the Reinstated OpCo Term Loan and New NPG Common Stock would be a taxable exchange for U.S. federal income tax purposes. As a result of such taxable exchange, a Holder generally would recognize gain or loss on such exchange in an amount equal to the difference, if any, between (i) the sum of (a) the issue price of the Reinstated OpCo Term Loan as determined under Section 1273 or 1274 of the Tax Code and (b) the fair market value of the New NPG Common Stock issued in exchange for the OpCo Debt, and (ii) such Holder's adjusted tax basis in the OpCo Debt exchanged therefor. Subject to the "Market Discount" discussion below, any gain recognized in a taxable exchange generally will be capital gain and will be long-term capital gain if, at the time of the deemed exchange, the OpCo Debt has been held for more than one year. A Holder's initial tax basis in the Reinstated OpCo Term Loan would be equal to the Reinstated OpCo Term Loan's issue price, and its holding period would begin on the day after the Effective Date. A Holder's initial tax basis in the New NPG Common Stock would be equal to the fair market value of the New NPG Common Stock, and its holding period would begin on the day after the Effective Date.

Holders should consult their tax advisors regarding the possibility that the OpCo Debt and Reinstated OpCo Term Loan each constitute a security and hence the exchange of such OpCo Debt for the Reinstated OpCo Term Loan and New NPG Common Stock would be treated as a tax free exchange in which no gain or loss would be recognized. In addition, Holders should consult their tax advisors regarding the character of any gain or loss recognized as long-term or short-term capital gain or loss, or as ordinary income or loss, as its character will be determined by a number of factors, including (but not limited to) the tax status of the Holder, whether the OpCo Debt constitutes a capital asset in the Holder's hands, whether the OpCo Debt has been held for more than one year, whether the OpCo Debt has bond premium or market discount, and whether and to what extent the Holder previously claimed a bad debt deduction with respect to the OpCo Debt. Holders also should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses, and as to whether any resulting gain recognition may be deferred under the installment method until principal is repaid on the Reinstated OpCo

Term Loan.  There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

### b. Consequences of Ownership of the Reinstated OpCo Term Loan Issued Pursuant to the Restructuring

*Interest*.  So long as the issue price of the Reinstated OpCo Term Loan is not less than the stated principal amount of such debt, it is expected that the Reinstated OpCo Term Loan will not be issued with original issue discount ("OID") for federal income tax purposes.  In such case, interest paid to a Holder under the Reinstated OpCo Term Loan will be includible in such Holder's gross income as ordinary interest income in accordance with such Holder's usual method of tax accounting.  If the issue price of the Reinstated OpCo Term Loan is less than the stated principal amount of such loans, then the Reinstated OpCo Term Loan likely would be treated as issued with OID with the consequences described below under "Original Issue Discount."

*Original Issue Discount*.  The Reinstated OpCo Term Loan generally would be treated as issued with OID if the principal amount of the Reinstated OpCo Term Loan plus all scheduled interest payments thereon, other than payments of qualified stated interest, exceeded the issue price of the Reinstated OpCo Term Loan by more than a de minimis amount.  The issue price of a debt instrument issued in exchange for another debt instrument depends on whether either debt instrument is considered publicly traded for purposes of the OID rules at any time during the sixty-day period ending thirty days after the issue date.  If neither debt instrument is publicly traded, the issue price of the new debt instrument will be its stated principal amount if the new debt instrument provides for adequate stated interest (i.e., interest at least at the applicable federal rate as of the issue date), or will be its imputed principal amount if the instrument does not provide for adequate stated interest.  If the new debt instrument is publicly traded, its issue price generally will be its trading price immediately following issuance.  If the old debt instrument is publicly traded, but the new debt instrument is not, the issue price of the new debt instrument generally will be the fair market value of the old debt instrument at the time of the exchange less the fair market value of the portion of the old debt instrument allocable to any other property received in the exchange.

A debt instrument generally will be considered to be publicly traded if certain pricing information related to the instrument generally is available on a quotation medium or readily available from dealers, brokers or traders.  Because the relevant trading period generally is in the future, it is impossible to predict whether the OpCo Debt or the Reinstated OpCo Term Loan will be publicly traded during the relevant period.  In the event that the Reinstated OpCo Term Loan is determined to be publicly traded, the issue price of the Reinstated OpCo Term Loan will be its trading price on or around the time of issuance.  If the OpCo Debt is determined to be publicly traded but the Reinstated OpCo Term Loan is not, the issue price of the Reinstated OpCo Term Loan will be the trading price of the OpCo Debt on or around the time of issuance.  In general, if the issue price of the Reinstated OpCo Term Loan is less than its principal amount by more than a de minimis amount, the Reinstated OpCo Term Loan would be treated as issued with OID and the rules described below would apply.

If the Reinstated OpCo Term Loan were treated as issued with OID (an "OID Loan"), a Holder of an OID Loan would be required to include OID in gross income on an annual basis under a constant yield accrual method, regardless of its regular method of tax accounting. In general, the amount of OID on a debt instrument is equal to the excess of (i) the sum of the debt instrument's stated redemption price at maturity over (ii) the issue price of the debt instrument as determined under Section 1273 or 1274 of the Tax Code. The stated redemption price at maturity of a debt instrument includes all payments on the instrument other than payments of "qualified stated interest." The Company intents to treat the stated interest on the Reinstated OpCo Term Loan as qualified stated interest.

A Holder of an OID Loan must include OID in gross income for U.S. federal income tax purposes on an annual basis under a constant yield accrual method regardless of its regular method of tax accounting. As a result, a Holder will include OID in income in advance of the receipt of cash attributable to such income. The amount of OID includible in income by an initial Holder of an OID Loan is the sum of the "daily portions" of OID with respect to the OID Loan for each day during the taxable year or portion thereof in which such Holder holds such OID Loan ("Accrued OID"). A daily portion is determined by allocating to each day in any "accrual period" a pro rata portion of the OID that accrued in such period. The "accrual period" of an OID Loan may be of any length and may vary in length over the term of the OID Loan, *provided* that each accrual period is no longer than one (1) year and each scheduled payment of principal or interest occurs either on the first or last day of an accrual period. The amount of OID that accrues with respect to any accrual period is the excess of (i) the product of the OID Loans' "adjusted issue price" at the beginning of such accrual period and its yield to maturity, determined on the basis of a constant yield method compounding at the close of each accrual period and properly adjusted for the length of such period, over (ii) the amount of qualified stated interest allocable to such accrual period. The adjusted issue price of an OID Loan at the start of any accrual period is equal to its issue price, increased by the Accrued OID for each prior accrual period and reduced by any prior payments made on such OID Loan (other than payments of qualified stated interest).

The rules regarding OID are complex. Accordingly, Holders are urged to consult their own tax advisors regarding their application.

*Sale, Exchange or Retirement of a Reinstated OpCo Term Loan.* Upon the sale, exchange or retirement of a Reinstated OpCo Term Loan a Holder generally will recognize taxable gain or loss equal to the difference, if any, between the amount realized on the sale, exchange or retirement, other than accrued but unpaid interest which will be taxable as such, and such Holder's adjusted tax basis in the Reinstated OpCo Term Loan. A Holder's adjusted tax basis in the Reinstated OpCo Term Loan generally will be the Holder's cost therefor, increased by any OID taken into account with respect to the Reinstated OpCo Term Loan and reduced by any principal payments received by such Holder. Any such gain or loss will be capital gain or loss. Capital gains of non-corporate Holders derived with respect to a sale, exchange, or other disposition of the Reinstated OpCo Term Loan held for more than one year may be eligible for reduced rates of taxation. The deductibility of capital losses is subject to limitations under the Tax Code.

*CPDI Rules*. The Company intends to treat the Reinstated OpCo Term Loan as subject to the Treasury Regulations governing "variable rate debt instruments" (the "VRDI Rules").  If, however, the Reinstated OpCo Term Loan is not subject to the VRDI Rules, the rules governing "contingent payment debt instruments" (the "CPDI Rules") may apply to the Reinstated OpCo Term Loan.  If the CPDI Rules apply to the Reinstated OpCo Term Loan, the tax consequences of owning and disposing of such loan may be materially different than those described above, including with respect to the character, timing, and amount of income, gain, or loss recognized. This discussion generally assumes that the CPDI Rules will not apply to the Reinstated OpCo Term Loan, but there can be no assurance in this regard. Holders are urged to consult their own tax advisors with respect to the appropriate treatment of the Reinstated OpCo Term Loan.

### c. Consequences of Ownership of New NPG Common Stock Issued Pursuant to the Restructuring

*Distributions*.  The gross amount of any distribution of cash or property made to a Holder with respect to the New NPG Common Stock generally will be includible in gross income by such Holder as dividend income to the extent such distributions are paid out of the current or accumulated earnings and profits of the Company as determined under U.S. federal income tax principles.  Dividends received by corporations may qualify for a dividends-received-deduction if certain holding period and taxable income requirements are satisfied, but such corporate Holders may be subject to "extraordinary dividend" provisions of the Tax Code. Dividends received by non-corporate Holders in taxable years beginning before January 1, 2011 may qualify for a reduced rate of taxation if certain holding period and other requirements are met.

A distribution in excess of the Company's current and accumulated earnings and profits will be treated first as a return of capital to the extent of the Holder's adjusted basis in the New NPG Common Stock and thereafter will be applied against and reduce such basis.  To the extent that such distribution exceeds the Holder's adjusted basis in its New NPG Common Stock, the distribution will be treated as capital gain, which will be treated as long-term capital gain if such Holder's holding period in its New NPG Common Stock exceeds one year as of the date of distribution.  Long term capital gains may be eligible for reduced rates of taxation.

*Sale or Exchange of New NPG Common Stock*.  For U.S. federal income tax purposes, a Holder generally will recognize capital gain or loss on the sale, exchange, or other taxable disposition of any of its New NPG Common Stock in an amount equal to the difference, if any, between the amount realized for the New NPG Common Stock and such Holder's adjusted tax basis in the New NPG Common Stock.  Subject to the rules discussed below in "Market Discount" and the recapture rules under Tax Code Section 108(e)(7), any such gain or loss generally will be capital gain or loss, and will be long term capital gain or loss if the Holder has held the New NPG Common Stock for more than one year as of the date of disposition.  Under the Tax Code Section 108(e)(7) recapture rules, a Holder may be required to treat gain recognized on the taxable disposition of the New NPG Common Stock as ordinary income if the Holder took a bad debt deduction with respect to the OpCo Debt or recognized an ordinary loss on the exchange of the OpCo Debt for New NPG Common Stock.  Holders should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses.

There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

2. **Consequences to Holders of HoldCo Debt**

a. *Issuance of New NPG Warrants for HoldCo Debt*

*Recognition of Gain or Loss*.  The federal income tax consequences of the consummation of the Plan or the Out-of-Court Transaction to Holders of HoldCo Debt depend, in part, on whether the HoldCo Debt and the New NPG Warrants each constitute a "security" for purposes of the "reorganization" provisions of the Tax Code.  Although it is not free from doubt, the Company intends to take the position that warrants are a security for purposes of the reorganization provisions.  Regarding whether the HoldCo Debt also is a security, as described above in the "Modification/Reinstatement of the OpCo Debt as the Reinstated OpCo Term Loan and Issuance of New NPG Common Stock" discussion, the test of whether a debt obligation is a security involves an overall evaluation of the nature of the obligation, with the term of the obligation usually regarded as one of the most significant factors.  Debt obligations with a term of five years or less generally have not qualified as securities, whereas debt obligations with a term of ten years or more generally have qualified as securities.  Another important factor in determining whether a debt obligation is a security is the extent to which the obligation is subordinated to other liabilities of the issuer.  Generally, the more senior the debt obligation, the less likely it is to be a "security."

It is unclear whether the HoldCo Debt will constitute a security for federal income tax purposes.  The HoldCo Debt is structurally subordinated to the OpCo Debt and its maturity date is eight years after its issue date.  No authority has definitively determined whether debt with an eight year maturity date is a security for U.S. federal income tax purposes.  If the HoldCo Debt constitutes a "security," then, subject to the "Accrued but Unpaid Interest" discussion below, the exchange of the HoldCo Debt for the New NPG Warrants generally would be a tax free exchange for U.S. federal income tax purposes.  If the exchange were tax-free, the Holder (i) would not recognize gain or loss on the exchange (except with respect to amounts (if any) treated as paid for accrued but unpaid interest, which would be taxable as such), (ii) would transfer its tax basis in the HoldCo Debt to the New NPG Warrants and (iii) would have a holding period for the New NPG Warrants that included its historic holding period for the HoldCo Debt.

If the HoldCo Debt does not constitute a "security," then, subject to the "Accrued but Unpaid Interest" discussion below, the exchange of HoldCo Debt for New NPG Warrants would be a taxable exchange for U.S. federal income tax purposes.  As a result of such taxable exchange, a Holder of HoldCo Debt generally would recognize gain or loss on such exchange in an amount equal to the difference (if any) between (i) the fair market value of the New NPG Warrants received as of the Exchange Date (that is not allocable to accrued interest), and (ii) such Holder's tax basis in the applicable HoldCo Debt surrendered.  Subject to the "Market Discount" discussion below, such gain or loss generally would be capital in nature and would be long-term capital gain or loss if the applicable HoldCo Debt was held for more than one year by such Holder.  To the extent that a portion of the New NPG Warrants received in the exchange is allocable to accrued interest, the Holder may recognize ordinary income.  A Holder's tax basis in the New NPG Warrants should be equal to the fair market value of the New NPG Warrants as of

the date of the exchange.  A Holder's holding period for the New NPG Warrants should begin on the day following the date of the exchange.

> **b.     Consequences of Ownership of New NPG Warrants Issued Pursuant to the Restructuring**

A Holder of a New NPG Warrant generally will not recognize gain or loss upon exercise of such warrant.  A Holder's tax basis in the New NPG Warrant received upon exercise of a New NPG Warrant will be equal to the sum of the Holder's tax basis in the New NPG Warrant and the exercise price.  Generally, the Holder will commence a new holding period with respect to the New NPG Warrant received on the date of exercise.  In general, anti-dilution adjustments do not result in constructive distributions.  However, an adjustment to the exercise price or conversion rate of the New NPG Warrants, or the failure to make such adjustments, may, in certain circumstances, result in constructive distributions that could be taxable to the Holder of the New NPG Warrants.  In such event, a Holder's tax basis in a New NPG Warrant generally should be increased by the amount of any dividend.  Upon the lapse or disposition of a New NPG Warrant, the Holder generally would recognize gain or loss equal to the difference between the amount received (zero in the case of a lapse) and its tax basis in the New NPG Warrant.  In general, such gain or loss would be a capital gain or loss, and would be long-term or short-term depending on the holding period of the New NPG Warrant.

### 3.     Consequences to Holders of NPG Equity Interests

On the Effective Date, all NPG Equity Interests will be canceled and thus Holders of such equity interests will receive no distribution under either the Plan or the Out-of-Court Transaction.  Holders of such equity interests may be entitled to claim a worthless stock deduction or otherwise claim a loss in an amount equal to the Holder's adjusted basis in the relevant equity interests.  A worthless stock deduction generally is treated as a loss from the sale or exchange of a capital asset.  Holders should consult their own tax advisers as to the appropriate tax year in which to claim a worthless stock deduction or otherwise claim a loss.

### 4.     Other Considerations

*Accrued But Unpaid Interest.*  In general, to the extent a Holder of a debt instrument receives cash or property in satisfaction of interest accrued during the holding period of such instrument, such amount will be taxable to such Holder as interest income (if not previously included in such Holder's gross income).  Conversely, such Holder may recognize a deductible loss to the extent that any accrued interest claimed or amortized original issue discount was previously included in its gross income and is not paid in full.  To the extent any property received pursuant to the Plan or Out-of-Court Transaction is considered attributable to unpaid accrued interest, a Holder will recognize ordinary income to the extent the value of the property exceeds the amount of unpaid accrued interest previously included in gross income by the Holder.  A Holder's tax basis in such property should be equal to the amount of interest income treated as satisfied by the receipt of the property, and its holding period in the property should begin on the day after the effective date of the Restructuring.  The extent to which cash or property received by a Holder of a debt instrument will be attributable to accrued but unpaid interest is unclear.  Pursuant to the Restructuring, all distributions in satisfaction of any Old Debt

will be allocated first to the principal amount of such Old Debt, and thereafter to accrued but unpaid interest, if any.  However, there is no assurance that such allocation will be respected by the IRS for U.S. federal income tax purposes.

Each Holder of Old Debt is urged to consult its tax advisor regarding the inclusion in income of amounts received in satisfaction of accrued but unpaid interest, the allocation of consideration between principal and interest, and the deductibility of previously included unpaid interest and original issue discount for tax purposes.

*Market Discount.*  If a Holder of Old Debt purchased such debt obligation at a price less than its issue price, the difference would constitute "market discount'' for U.S. federal income tax purposes.  A Holder that acquires a debt instrument at a market discount generally is required to treat any gain realized on the disposition of the instrument as ordinary income to the extent of accrued market discount not previously included in gross income by the Holder.  However, special rules apply to the disposition of a market discount obligation in certain types of non-recognition transactions, such as a recapitalization.  If the Restructuring results in an exchange that qualifies as a recapitalization, under these rules, a Holder that acquired Old Debt at a market discount generally should not be required to recognize any accrued market discount as income at the time of the exchange of the OpCo Debt for the Reinstated OpCo Term Loan and New NPG Common Stock or HoldCo Debt for New NPG Warrants.  Rather, on a subsequent taxable disposition of the Reinstated OpCo Term Loan, New NPG Common Stock or New NPG Warrants received in the exchange, any gain realized by the Holder on a disposition of the Reinstated OpCo Term Loan, New NPG Common Stock or New NPG Warrants will be ordinary income to extent of the market discount accrued on the respective Old Debt prior to the exchange.

*Amortizable Bond Premium.*  If a Holder's initial tax basis in Old Debt was greater than the sum of all amounts payable on the Old Debt (other than payments of qualified stated interest) after the acquisition date, the Holder generally will be considered to have acquired the Old Debt with amortizable bond premium.  A Holder that acquired Old Debt at a premium previously may have elected to amortize the premium over the term of the Old Debt.  A Holder that elected to amortize bond premium on Old Debt should have reduced its tax basis in the Old Debt by the amount of amortized bond premium used to offset interest income and may, in certain circumstances, be entitled to a deduction for any unamortized bond premium in the taxable year of the exchange.

## C.     Backup Withholding Tax and Information Reporting Requirements

U.S. federal backup withholding tax and information reporting requirements generally apply to certain payments to certain non-corporate Holders of the Company's stock or debt obligations regardless of whether such stock or debt obligations existed prior to the Restructuring or were issued pursuant to the Restructuring.  Information reporting generally will apply to payments under the Restructuring and to payments of dividends on, interest on, and proceeds from the sale or redemption of such stock or debt obligations made within the United States to a Holder of the Company's stock or debt obligations.

Holders may be subject to backup withholding (currently, at a rate of 28%) on the consideration received pursuant to the Plan. Backup withholding also may apply to interest, OID and principal payments on the Reinstated OpCo Term Loan, dividends paid on the New NPG Common Stock and proceeds received upon sale or other disposition of the Reinstated OpCo Term Loan, New NPG Common Stock or New NPG Warrants. Certain Holders (including corporations) generally are not subject to backup withholding. A Holder that is not otherwise exempt generally may avoid backup withholding by furnishing to the Company (or their paying agent) its taxpayer identification number and certifying, under penalties of perjury, that the taxpayer identification number provided is correct and that the Holder has not been notified by the IRS that it is subject to backup withholding.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a Holder's United States federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

THE ABOVE SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY. ALL HOLDERS OF OLD DEBT, NPG EQUITY INTERESTS, THE REINSTATED OPCO TERM LOAN, NEW NPG COMMON STOCK AND NEW NPG WARRANTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE U.S. FEDERAL, STATE, LOCAL OR FOREIGN TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE RESTRUCTURING.

## XVII.

## SECURITIES LAW MATTERS

The following discussion is a summary of certain securities laws implications arising from the implementation of the Restructuring and the issuance of the New NPG Common Stock and the New NPG Warrants pursuant to the Restructuring under the two methods of implementation contemplated by this Disclosure Statement. The first section discusses the U.S. securities laws that would be implicated if the Restructuring is effected through the Out-of-Court Transaction, and the second section discusses the issuance of the New Securities through the filing of Chapter 11 Cases under the Plan.

**A.     New Securities Issued in the Out-of-Court Transaction**

**1.     Issuance of New Securities**

The New Securities have not been registered under the Securities Act or the securities laws of any U.S. state or other jurisdiction, nor is such registration contemplated. Any New Securities issued in the Out-of-Court Transaction are being issued only under the private placement exemption provided by Section 4(2) of the Securities Act and similar exemptions under the laws of the states where the offering will be made. The New Securities may be offered or sold only to investors that are qualified institutional buyers ("QIBs") (as defined in Rule 144A under the Securities Act) or institutional "accredited investors" (as defined in Rule 501(a)(1), (2), (3) or (7)) under the Securities Act) ("IAIs"). Recipients of the New Securities will be required

to make certain acknowledgments, representations and agreements as to their status as QIBs or IAIs as set forth below under subsection D of this Article ("Representations and Acknowledgments").

### 2. Subsequent Transfers

New Securities issued pursuant to the Out-of-Court Transaction will not have been registered under the Securities Act and will therefore be considered "restricted securities" as defined in Rule 144 under the Securities Act. As such, subsequent resales by holders of the New Securities must be in compliance with the registration requirements of the Securities Act or an exemption therefrom.  Holders of New Securities who propose to transfer or sell shares pursuant to an exemption under the Securities Act must, prior to such transfer or sale, furnish to New NPG such certifications, legal opinions or other information as New NPG may reasonably require.  Certificates representing the New Securities that are restricted securities will bear a legend to the effect set forth below under subsection D of this Article as Representations and Acknowledgements.

Subject to the transfer restrictions noted under subsection C of this Article ("Additional Restrictions on Transfer"), Holders of the New Securities that are not deemed to be affiliates of the Company may transfer or sell the New Securities freely once they have satisfied a one-year holding period.  For holders of New NPG Warrants, the one-year holding period for the shares of New NPG Common Stock issuable upon the exercise of the warrants will commence upon the exercise of the warrants.  If the holder of a New NPG Warrant engages in a "cashless exercise" (if permitted) of the New NPG Warrant, in accordance with Rule 144(d)(3)(ii) under the Securities Act the one-year holding period for the shares of New NPG Common Stock issuable upon the exercise of the warrant will be deemed to have commenced upon the grant of the New NPG Warrant.  Holders of the New Securities that are deemed to be affiliates of the Company may transfer or sell such securities once they have satisfied a one-year holding period provided the following requirements of Rule 144 under the Securities Act are satisfied before effecting the transfer or sale of their shares:

- current information regarding the Company is available;

- the transfer or sale complies with the volume limitations and manner of sale requirements set forth in Rule 144; and

- a Form 144 is filed with the Securities and Exchange Commission ("SEC").

There is no guarantee that the Company will make available such current information or that holders will be able to make sales in compliance with the manner of sale requirements absent a trading market for the New Securities.

Holders of the New Securities may also transfer or sell such restricted securities under the so-called "Section 4(1½) exemption" from the registration requirements of the Securities Act. The Section 4(1½) exemption is based on reading Section 4(1) and Section 4(2) under the Securities Act together to provide an exemption for private resales of restricted securities. Section 4(1) under the Securities Act provides that an investor may resell restricted securities in

a non-public exempt transaction if such investor is not an issuer, underwriter or dealer under the Securities Act. This determination relies on whether the resale would meet the requirements of Section 4(2) under the Securities Act regarding offers and sales not involving a public offering. Accordingly, to satisfy the Section 4(1½) exemption, a holder of New Securities must not have acquired the New Securities with a view to distribution in violation of the Securities Act and purchasers in the resale must be sophisticated and have access to all material information about the Company. If such conditions are met, holders of the New Securities may be permitted to transfer or sell such restricted securities in private resales prior to the expiration of the one-year holding period.

Holders of the New Securities may also transfer or sell such restricted securities under the exemption from registration provided under Regulation S of the Securities Act. To qualify for the exemption under Regulation S, such holders of the New Securities must transfer or sell such restricted securities in an offshore transaction outside the United States to non-U.S. persons (as such terms are defined in Regulation S), which includes dealers or other professional fiduciaries in the United States acting on a discretionary basis for non-U.S. beneficial owners (other than an estate or trust). Further, in order to qualify for the exemption under Regulation S, holders of the New Securities may not engage in any directed selling efforts in the United States in contravention of the requirements of Rule 904(b) of Regulation S.

## B. New Securities Issued in Accordance with the Plan

### 1. Issuance of New Securities

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state securities laws if the securities are offered and sold under a plan of reorganization by the debtor, an affiliate participating in a joint plan with the debtor or a successor of to the debtor under the plan either (i) in exchange for a claim against the debtor or such affiliate for an interest in the debtor or such affiliate, or for a claim for an administrative expense in the case against the debtor or such affiliate; or (ii) principally in exchange for such claim or interest and partly for cash or property. Similarly, under section 1145(a)(2) of the Bankruptcy Code, the issuance of New NPG Common Stock upon the exercise of the New NPG Warrants or New NPG Options is exempt from registration assuming that the issuance of the New NPG Warrants and New NPG Options satisfies the requirements of section 1145(a)(1) of the Bankruptcy Code. Except as noted below, we believe that the offer and sale of the New Securities under the Plan satisfy the requirements of section 1145(a)(1) and (2) of the Bankruptcy Code and, therefore, are exempt from registration under the Securities Act and state securities laws.

### 2. Subsequent Transfers

Section 1145(c) of the Bankruptcy Code provides that the offer or sale of securities pursuant to section 1145(a) of the Bankruptcy Code is deemed to be a public offering. Accordingly, the New Securities to be issued under the Plan will not be deemed to be "restricted securities" under the Securities Act. Subject to the Additional Restrictions on Transfer (as described in subsection C of this Article), the New Securities to be issued pursuant to the Plan will generally be freely transferable by recipients following the initial issuance under the Plan

and all resales and subsequent transfers of the New Securities will be exempt from registration under the Securities Act and state securities laws, unless the holder is an "underwriter" with respect to such securities. Section 1145(b) of the Bankruptcy Code defines four types of "underwriters":

(i)      persons who purchase a claim against, an interest in, or a claim for an administrative expense against the debtor with a view to distributing any security received in exchange for such claim or interest;

(ii)     persons who offer to sell securities offered under a plan for the holders of such securities;

(iii)    persons who offer to buy such securities from the holders of such securities, if the offer to buy is:

        (A)     with a view to distributing such securities; and

        (B)     made under an agreement made in connection with the plan, the consummation of the plan or with the offer or sale of securities under the plan; and

(iv)    a person who is an "issuer" with respect to the securities, as the term "issuer" is defined in Section 2(a)(11) of the Securities Act.

Under Section 2(a)(11) of the Securities Act, an "issuer" includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control of the issuer.

To the extent that persons who receive New Securities pursuant to the Plan are deemed to be "underwriters," resales by such persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Persons deemed to be underwriters may, however, be permitted to resell such New Securities without registration pursuant to the provisions of Rule 144 under the Securities Act. These provisions may permit the resale of securities received by "underwriters" if current information regarding the issuer is publicly available and if volume limitations and certain other conditions described above are met. In addition, any person who is an "underwriter" but not an "issuer" with respect to the New Securities is, however, entitled to engage in exempt "ordinary trading transactions" within the meaning of section 1145(b) of the Bankruptcy Code.

Whether or not any particular person would be deemed to be an "underwriter" with respect to the New Securities or other security to be issued or extended, as applicable, pursuant to the Plan would depend upon various facts and circumstances applicable to that person. Accordingly, we express no view as to whether any particular person receiving New Securities or other securities under the Plan would be an "underwriter" with respect to such New Securities or other securities.

GIVEN THE COMPLEX AND SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER, WE DO NOT

MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO TRADE IN OR DISPOSE OF THE NEW SECURITIES TO BE DISTRIBUTED UNDER THE PLAN.  We recommend that potential recipients of the New Securities consult their own counsel concerning whether they may freely trade the New Securities under the Securities Act and/or state securities laws.  We have not undertaken, and do not intend, to file a registration statement in respect of any New Securities held by a holder that is an underwriter.

### 3. Delivery of Disclosure Statement

Under section 1145(a)(4) of the Bankruptcy Code, "stockbrokers" (as that term is defined in section 101(53A) of the Bankruptcy Code) are required to deliver to their customers, for the first 40 days after the Effective Date, a copy of this Disclosure Statement (and any information supplementing such Disclosure Statement ordered by the Bankruptcy Court) at or before the time of a transaction in any New Security issued under the Plan in order for such transaction to be exempt from the registration requirements of Section 5 of the Securities Act.

### C. Additional Restrictions on Transfer

The Company is currently not required to file reports with the SEC under the Exchange Act.  Under Section 12(g) of the Exchange Act, a company with total assets exceeding $1,000,000 and a class of equity security held of record by 500 or more persons must register such class of equity security with the SEC and become a "reporting company" under the Exchange Act.  The Company believes that the number of record holders of the New Securities will be less than 500 in the aggregate and that it will, therefore, not be required to become a "reporting company" under the Exchange Act as a result of the transactions provided for in the Disclosure Statement.

The New Securities will be subject to restrictions on transfer intended to limit the number of holders of record of the New Securities.  By staying below the thresholds for registration discussed above, New NPG will not become a "reporting company" under Section 12(g) of the Exchange Act.  Specifically, no holder of New Securities will be permitted to transfer any of the New Securities to any person, nor shall New NPG effect the transfer of any of the New Securities to any person, if, at the time of such transfer, New NPG has more than a certain total number (as will be specified in the constituent documents of New NPG) of record holders of each class of the New Securities.  Further, if the board of directors of New NPG reasonably determines that such transfer would, if effected, result in New NPG having more than such total number of holders of record of each class of the New Securities, such transfer will be prohibited. The New Securities may be subject to restrictions on transfer pursuant to a stockholders agreement to be entered into among the Company and the holders of New Securities.

### D. Representations and Acknowledgements

By acquiring the New Securities in the Out-of-Court Transaction, each holder will be deemed to have made the following acknowledgements and representations:

(1) It (A) is a QIB and is acquiring the New Securities for its own account or for the account of another QIB or (B) is an IAI and is acquiring the New Securities for its

own account or for the account(s) of other IAIs of which it is acting as fiduciary or agent;

(2) It understands that the New Securities in the Out-of-Court Transaction are being offered in a transaction not involving any public offering in the United States within the meaning of the Securities Act, that the New Securities have not been and will not be registered under the Securities Act or any other applicable securities laws and that (A) if in the future it decides to offer, resell, pledge or otherwise transfer any of the New Securities, such New Securities may be offered, resold, pledged or otherwise transferred only pursuant to an effective registration statement under the Securities Act or in accordance with an exemption from such requirements, and that (B) Holders of New Securities who propose to transfer or sell shares pursuant to an exemption must, prior to such transfer or sale, furnish to New NPG such certifications, legal opinions or other information as New NPG may reasonably require, and (C) it will, and each subsequent holder is required to, notify any subsequent purchaser of the New Securities from it of the resale restrictions referred to in clauses (A) and (B) above; and

(3) It understands that the New Securities will, unless otherwise agreed by the Company and the holder thereof, bear a legend substantially to the following effect:

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT AND, ACCORDINGLY, MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR IN ACCORDANCE WITH AN EXEMPTION FROM SUCH REGISTRATION REQUIREMENTS.

BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE HOLDER:

(1) AGREES THAT IT WILL NOT RESELL OR OTHERWISE TRANSFER THIS SECURITY EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR IN ACCORDANCE WITH AN EXEMPTION FROM SUCH REGISTRATION REQUIREMENTS AND, IN EACH CASE, IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS AND THE CONSTITUENT DOCUMENTS OF NEW NPG;

(2) IN CONNECTION WITH ANY RESALE OR TRANSFER PURSUANT TO AN EXEMPTION UNDER THE SECURITIES ACT, SHALL, PRIOR TO SUCH TRANSFER OR SALE, FURNISH TO NEW NPG SUCH CERTIFICATIONS, LEGAL OPINIONS OR OTHER INFORMATION AS IT MAY REASONABLY REQUIRE; AND

(3) AGREES THAT IT WILL DELIVER TO EACH PERSON TO WHOM THIS SECURITY OR AN INTEREST HEREIN IS TRANSFERRED A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND.

# XVIII.

## ALTERNATIVES TO CONFIRMATION AND
## CONSUMMATION OF THE PLAN

The Company has evaluated numerous alternatives to the Restructuring and the Plan, including, without limitation, the sale of the Filing Entities as a going concern, either as an entirety or on limited bases and the liquidation of the Filing Entities. After studying these alternatives, the Company has concluded that the Restructuring is the best alternative and, if the Restructuring is not effected through the Out-of-Court Transaction, the Plan will maximize recoveries of holders of Claims and Equity Interests. The following discussion provides a summary of the analysis of the Company supporting its conclusion that liquidation or an alternative plan of reorganization for the Filing Entities will not provide higher value to holders of Claims and Equity Interests.

## A.    Liquidation under Chapter 7 of the Bankruptcy Code

If the Restructuring is not effected through the Out-of-Court Transaction and the Filing Entities pursue the Plan, but no plan of reorganization can be confirmed, the Chapter 11 Cases of the Filing Entities may be converted to cases under chapter 7, in which event a trustee would be elected or appointed to liquidate the properties and interests in property of the Filing Entities for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code. The Company believes that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for under the Plan because of (1) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee for bankruptcy and professional advisors to such trustee; (2) the erosion in value of assets in the context of the expeditious liquidation required under chapter 7 and the "forced sale" environment in which such a liquidation would likely occur; (3) the adverse effects on the salability of business segments as a result of the likely departure of key employees and the loss of customers; and (4) the substantial increases in claims which would have to be satisfied on a priority basis or on parity with creditors in the Chapter 11 Cases. Accordingly, the Company has determined that confirmation of the Plan will provide each holder of a Claim or Equity Interest with a greater recovery than it would receive pursuant to liquidation of the Filing Entities under chapter 7.

A discussion of the effects that a chapter 7 liquidation would have on the holders of Claims and Equity Interests is set out in the Liquidation Analysis.

## B.    Alternative Plans of Reorganization

If the Plan is not confirmed, any other party in interest could undertake to formulate a different plan of reorganization. Such a plan of reorganization might involve either a reorganization and continuation of the business of the Filing Entities, the sale of the Filing Entities as a going concern, or an orderly liquidation of their properties and interests in property. With respect to an alternative plan of reorganization, the Company has examined various other alternatives in connection with the process involved in the formulation and development of the Plan. The Company believes that the Plan, as described herein, enables holders of Claims and Equity Interests to realize the best recoveries under the present circumstances. In a liquidation of the Filing Entities under chapter 11, the properties and interests in property would be sold in a more orderly fashion and over a more extended period of time than in a liquidation under chapter

7, probably resulting in marginally greater recoveries.  Further, if a trustee were not appointed, as one is not required in a chapter 11 case, the expenses for professional fees would most likely be lower than in a chapter 7 case.  However, although preferable to a chapter 7 liquidation, the Company believes that a liquidation under chapter 11 for the Filing Entities is a much less attractive alternative than the Plan because the recovery realized by holders of Claims and Equity Interests under the Plan is likely to be greater than their recovery under a chapter 11 liquidation.

The Company believes that the Plan affords holders of Claims the potential for the greatest recovery and, therefore, is in the best interests of such holders. The Plan as presented is the result of considerable negotiations among the Company and the Prepetition Lenders.

If, however, the requisite acceptances are not received, or the Plan is not confirmed and consummated, the theoretical alternatives include: (i) formulation of an alternative plan of reorganization or (ii) liquidation of the Filing Entities under chapter 7 or 11 of the Bankruptcy Code.

# SCHEDULE 1

## SCHEDULE 1

## LIST OF OTHER DEFINED TERMS

(Terms in this Schedule 1 are defined in the Disclosure Statement at the pages indicated below.)

AAPL ........................................................................................................................... 16
Accrued OID Loan ..................................................................................................... 94
ACE ............................................................................................................................ 90
Additional Restrictions on Transfer ........................................................................ 100
AES ............................................................................................................................ 16
AIC Agreement .......................................................................................................... 18
AICI ........................................................................................................................... 16
AICs ........................................................................................................................... 15
AIDI ........................................................................................................................... 16
AIHI ........................................................................................................................... 18
AIRD .......................................................................................................................... 16
AMT ........................................................................................................................... 90
AMTI .......................................................................................................................... 90
Arbonne HoldCo .......................................................................................................... i
Arbonne ........................................................................................................................ i
AUKL ......................................................................................................................... 16
Ballot ............................................................................................................................ i
Bankruptcy Code ........................................................................................................ iii
Bankruptcy Exception ............................................................................................... 87
Bankruptcy Rules ........................................................................................................ 2
Bar Date ..................................................................................................................... 39
Blackstone .................................................................................................................. 25
Books and Records .................................................................................................... 40
Cash Collateral ........................................................................................................... 35
Chapter 11 Cases ....................................................................................................... iii
CIBC .......................................................................................................................... 20
COD ........................................................................................................................... 87
Company ....................................................................................................................... i
Complaint ................................................................................................................... 40
Confirmation Hearing ................................................................................................ 32
CPDI Rules ................................................................................................................ 95
DIP Facility ................................................................................................................ 35
DIP Lenders ............................................................................................................... 36
DIP Order ................................................................................................................... 36
Disclosure Statement .................................................................................................... i
District Court ............................................................................................................. 40
Effective Date Shares .................................................................................................. 9
Effective Date ............................................................................................................... i
Exchange Act ............................................................................................................. 75
Exit Facility ................................................................................................................. ii
Filing Entities .............................................................................................................. 9

Filing Period...................................................................................................... 31
First Lien Credit Agreement ............................................................................. 20
Fox Rothschild .................................................................................................. 38
Harvest Partners IV .......................................................................................... 15
Harvest .............................................................................................................. 15
HoldCo Agent ................................................................................................... ii
HoldCo Credit Agreement ................................................................................ ii
HoldCo Debt ..................................................................................................... ii
HoldCo Lenders ................................................................................................ ii
HoldCo Plan Support Agreement ..................................................................... iii
HoldCo Term Loan ........................................................................................... 20
HoldCos ............................................................................................................ 20
Holder ............................................................................................................... 85
IAIs ................................................................................................................... 99
Insolvency Exception ....................................................................................... 87
Insurance Policies ............................................................................................ 37
IRS .................................................................................................................... 85
Leverage Ratio ................................................................................................. 20
Levlad HoldCo .................................................................................................. i
Levlad Merger ................................................................................................... i
Levlad ............................................................................................................... i
Liquidation Analysis ........................................................................................ 82
Long Term Management Incentive Plan ........................................................... 8
New HoldCo ...................................................................................................... i
New NPG Common Stock ................................................................................. i
New NPG Options ............................................................................................. 9
New NPG Warrants ........................................................................................... ii
New NPG ........................................................................................................... i
New Securities .................................................................................................. v
New Term Loan ................................................................................................. ii
NOLs ................................................................................................................. 88
NPG Equity Interests ........................................................................................ 85
NPG ................................................................................................................... i
NUBIG ............................................................................................................. 89
NUBIL .............................................................................................................. 89
OID Loan .......................................................................................................... 94
OID .................................................................................................................... 93
Old Debt ............................................................................................................ ii
OpCo Agent ...................................................................................................... i
OpCo Credit Agreement Amendment .............................................................. 20
OpCo Credit Agreement ................................................................................... i
OpCo Debt ........................................................................................................ i
OpCo Lenders ................................................................................................... i
OpCo Plan Support Agreement ........................................................................ iii
OpCo Revolver ................................................................................................. 20
OpCo Term Loan .............................................................................................. 20

Ordinary Course Professionals ................................................................................................ 38
Out-of-Court Transaction ........................................................................................................... i
Plaintiff ..................................................................................................................................... 40
Plan Support Agreements .......................................................................................................... iii
Plan ............................................................................................................................................. i
Pre-Change Losses .................................................................................................................... 89
Prepetition Collateral ................................................................................................................ 20
Prepetition Credit Facilities ...................................................................................................... 20
Prepetition Lenders ................................................................................................................... ii
Prepetition Loans ....................................................................................................................... 20
Projection Period ....................................................................................................................... 23
Projections ................................................................................................................................. 23
QIBs ............................................................................................................................................ v
Reinstated OpCo Term Loan ..................................................................................................... i
Reorganized Filing Entities ....................................................................................................... 34
Representations and Acknowledgments .................................................................................... 100
Restructuring Documents .......................................................................................................... ii
Restructuring ............................................................................................................................... i
Schedules ................................................................................................................................... 39
SEC ........................................................................................................................................... 100
Second Lien Credit Agreement ................................................................................................. 20
Section 382 Limitation .............................................................................................................. 89
Securities Act .............................................................................................................................. v
Solicitation Agent ....................................................................................................................... 3
Solicitation Period ..................................................................................................................... 31
Specified Defaults ...................................................................................................................... 20
Statements .................................................................................................................................. 39
Tax Code .................................................................................................................................... 85
Taxing Authorities ..................................................................................................................... 37
Transfer ...................................................................................................................................... iii
Trust Fund Taxes ....................................................................................................................... 37
Utility Companies ...................................................................................................................... 37
Utility Services ........................................................................................................................... 37
Vendors ...................................................................................................................................... 37
Voting Deadline ........................................................................................................................... i
Voting Record Date ..................................................................................................................... 4
VRDI Rules ................................................................................................................................ 95
White & Case ............................................................................................................................. 38
Write-down Limitation .............................................................................................................. 88

# SCHEDULE 2

# NATURAL PRODUCTS GROUP, LLC

### Summary of Principal Terms of Debt Restructuring

*This Summary of Principal Terms of Debt Restructuring (this "Term Sheet")[1] reflects the terms upon which the Company will consider restructuring its debt obligations and the Lenders will consider supporting such restructuring (the "Restructuring"). This Term Sheet has been prepared for discussion purposes only and is non-binding, but shall serve as the basis for further negotiations regarding a definitive agreement.*

*The statements contained in this Term Sheet and all discussions between and among the parties in connection therewith constitute privileged settlement communications entitled to protection under FRE 408 and shall not be treated as an admission regarding the truth, accuracy or completeness of any fact or the applicability or strength of any legal theory.*

## I.  PARTIES AND CERTAIN DEFINED TERMS

| Party/Term | Description |
|---|---|
| Company: | Natural Products Group, LLC ("NPG") and its direct and indirect subsidiaries. |
| OpCo Lenders: | The lenders under the OpCo Credit Agreement. |
| HoldCo Lenders: | The lenders under the HoldCo Credit Agreement. |
| Lenders: | The OpCo Lenders and the HoldCo Lenders. |
| OpCo Credit Agreement: | The Credit Agreement, dated as of March 8, 2007, among Arbonne Intermediate Holdco, Inc. and Levlad Intermediate Holdco, Inc., as guarantors, Levlad, LLC and Arbonne International, LLC, as borrowers (each being a "Borrower", and collectively being referred to herein as the "Borrowers"), the several lenders from time to time party thereto (the "OpCo Lenders"), Canadian Imperial Bank of Commerce, as administrative agent (in such capacity, the "Administrative Agent") and collateral agent (in such capacity, the "Collateral Agent"), CIBC World Markets Corp. and Credit Suisse Securities (USA) LLC, as joint lead arrangers and joint bookrunners, Credit Suisse, as syndication agent, and Freeport Financial LLC and General Electric Capital Corporation, as co-documentation agents, together with all documents, instruments and agreements executed or entered into in connection therewith, and any amendments thereto. |
| HoldCo Term Loan: | The HoldCo Credit Agreement, dated as of June 19, 2006, among Arbonne Intermediate Holdco, Inc. and Levlad Intermediate Holdco, Inc., as borrowers, the several lenders from time to time party thereto |

---

[1]  Capitalized terms shall have the meanings set forth below in this Term Sheet.

(the "HoldCo Lenders"), Credit Suisse, New York Branch, as administrative agent, Credit Suisse Securities (USA) LLC and CIBC World Markets Corp., as joint lead arrangers and joint bookrunners, CIBC World Markets Corp., as syndication agent, and CitiCorp North America, Inc. and UBS Securities LLC, as co-documentation agents, together with all documents, instruments and agreements executed or entered into in connection therewith, and any amendments thereto.

New Equity Interests: The equity interests to be issued by New NPG (as defined below) upon the closing of the Restructuring and pursuant to the Long Term Management Incentive Plan (the "New Equity Interests").

NPG Series A Warrants: Warrants that will provide the holder with the right to receive New Equity Interests upon the terms outlined in Exhibit "A" attached hereto (the "NPG Series A Warrants").

NPG Series B Options: Options that will provide the holder with the right to receive New Equity Interests upon the terms outlined in Exhibit "B" attached hereto (the "NPG Series B Options").

## II. RESTRUCTURING

Debt to be Restructured: Indebtedness subject to the Restructuring includes:

 (i) approximately $532 million in principal obligations, plus all swap amounts, accrued interest, fees and expenses outstanding under the OpCo Credit Agreement (the "OpCo Debt"); and

 (ii) approximately $202 million in principal obligations, plus all accrued interest, fees and expenses outstanding under the HoldCo Term Loan (the "HoldCo Debt").

Treatment of Equity Interests: Upon the closing of the Restructuring, the existing equity interests in NPG shall be cancelled and holders of such equity interests shall not receive any recovery. Equity interests in all of NPG's subsidiaries shall not be affected by the Restructuring. [Subject to diligence.]

Treatment of Other Claims and Interests: Except for the Debt to be Restructured and the existing equity interests in NPG, all other claims against, and equity interests in, the Company shall be unimpaired. [Need schedule of other claims.]

Restructuring of OpCo Debt: The obligations under the OpCo Credit Agreement shall be reinstated pursuant to a restructured credit facility (the "Restructured OpCo Facility") as follows:

 (i) $125 million of the OpCo Debt shall be reinstated as a new Term Loan (the "New Term Loan");

 (ii) [$407] million of the remaining OpCo Debt shall be converted

into New Equity Interests as set forth below;

(iii)    Interest on the New Term Loan shall accrue at a rate of LIBOR plus 7% per annum (with a LIBOR floor of 3%) payable as follows: 1% per annum payable quarterly in cash, with the balance payable quarterly on a paid in kind basis; provided, that if the Borrowers are in compliance with certain financial covenants to be developed, 50%-100% of such interest shall be paid in cash;

(iv)    The New Term Loan shall provide for annual amortization in an amount to be determined, based on Excess Cash Flow (to be defined in a manner satisfactory to the OpCo Lenders);

(v)    To be secured by a pari passu lien on all assets of the Company.

(vi)    The New Term Loan shall mature on the 5 year anniversary of the closing of the Restructuring; and

(vii)    Other terms of the Restructured OpCo Facility to be agreed upon by the OpCo Lenders and the Company.

In full satisfaction of the OpCo Debt not reinstated as provided above, the OpCo Lenders shall receive their pro rata share of 95% of the New Equity Interests subject to dilution in respect of (i) the NPG Series A Warrants, (ii) the NPG Series B Options and (iii) the New Equity Interests to be issued to the lenders under the New Term Facility (as defined below) as set forth on Exhibits "C" and "D" hereto.

The OpCo Lenders shall form a new C-Corp ("New NPG") to hold the New Equity Interests.

Certain OpCo Lenders may elect to have a portion of their New Equity Interests be characterized as having limited voting rights.

Restructuring of HoldCo Debt:    In full satisfaction of the HoldCo Debt, the HoldCo Lenders shall receive their pro rata share of the NPG Series A Warrants as set forth on Exhibit "A" attached hereto.

KEIP Program:    Key employee incentive plan (the "KEIP") to be developed on terms to be agreed upon.

Long Term Management Incentive Plan:    On the closing of the Restructuring, the Company shall implement a long term management incentive plan (the "Long Term Management Incentive Plan") for the benefit of certain employees of the Borrowers ("Management") in an aggregate amount equal to 12.5% of fully diluted shares consisting of:

(i)  An award of 5% of New Equity Interests upon consummation of the Restructuring, subject to 4-year annual vesting and other terms to be developed and agreed upon;

(ii)  NPG Series B Options as set forth on Exhibit "B" attached hereto;

(iii) Eligibility to participate in the Long Term Management Incentive Plan shall be determined by the CEO and the compensation committee of the board of directors of the Borrowers; and

(iv) All New Equity Interests and NPG Series B Options issued under the Long Term Management Incentive Plan shall be dilutive to the New Equity Interests granted to the OpCo Lenders and to the lenders under the New Term Facility and the NPG Series A Warrants granted to the HoldCo Lenders and not dilutive to any New Equity Interests or NPG Series B Options theretofore granted pursuant to the Long Term Management Incentive Plan.

| | |
|---|---|
| Implementation of Restructuring: | The Company, the OpCo Lenders and the HoldCo Lenders shall enter into a lock-up agreement (the "Lock-up Agreement") that provides for, *inter alia*, the approval of either (a) a unanimous out of court restructuring of the OpCo Debt, the HoldCo Debt, existing membership interests and all other claims and interests (the "Consensual Restructuring") or (b) a pre-packaged bankruptcy in which holders of at least sixty-six and two-thirds and more than one-half in number of each of the OpCo Debt and the HoldCo Debt agree to vote in favor of a plan of reorganization on the terms set forth herein (the "Pre-Packaged Plan"). If unanimous consent of both the OpCo Lenders and the HoldCo Lenders is received in respect of the Consensual Restructuring, the parties shall consummate the Consensual Restructuring. If unanimous consent of either the OpCo Lenders or the HoldCo Lenders is not received, the Company reserves the right to commence cases under chapter 11 of the United States Code to obtain an order confirming the Pre-Packaged Plan. The Lock-up Agreement shall have terms and conditions satisfactory to each of the OpCo Lenders, the HoldCo Lenders and NPG, including a termination event to the extent NPG does not commence a Chapter 11 proceeding and filed the Pre-Packaged plan by a date certain. |
| | Implementation of the Restructuring contemplated by this Term Sheet is subject to the on-going tax, environmental, regulatory, accounting and legal due diligence review by the Company, the Lenders and their advisors. |
| DIP/Working Capital Facility: | In connection with the Restructuring, the Company shall enter into either (a) in the case of the Consensual Restructuring, a term loan credit facility upon the terms outlined in Exhibit "C" attached hereto or (b) in the case of the Pre-Packaged Plan, a senior secured debtor-in-possession credit facility upon the terms outlined in Exhibit "D" attached hereto, which facility shall be rolled into an exit facility on the effective date of the Pre-Packaged Plan (the credit facility, whether implemented through the Consensual Restructuring or the Pre-Packaged Plan, shall be referred to herein as the "New Term Facility"). |
| Post-Reorganization Facilities: | The OpCo Lenders shall provide post-reorganization credit facilities in an aggregate principal amount of $145 million, consisting of (i) $125 million in respect of the obligations under the Restructured OpCo |

Facility and (ii) up to $[20][2] million in respect of the obligations under the New Term Facility.

| | |
|---|---|
| <u>Professional Fees</u>: | NPG shall provide a budget of anticipated professional fees which shall be satisfactory to the OpCo Lenders.  Fees paid to NPG's financial advisor shall be in an amount not to exceed $150,000 per month beginning October 1, 2009 plus a success fee not to exceed $1,500,000 million based upon a consummation of the Restructuring with a 100% credit to be provided for any monthly fees paid to NPG's financial advisor on or after January 31, 2010. |
| <u>Releases</u>: | Customary releases and continuation of indemnification for the Company's current officers, directors and shareholders, the OpCo Lenders, the HoldCo Lenders and their respective attorneys and advisors. The Company shall also purchase director and officer liability tail coverage for the resigning directors and officers on terms satisfactory to the Company and the majority of the OpCo Lenders. |
| <u>Documentation</u>: | All documentation, including any plan support agreement, plan of reorganization and post-restructuring credit documents, shall be satisfactory to the majority of OpCo Lenders approving any plan support agreement. |
| <u>Post-Reorganization Management</u>: | The post-reorganization management and board of directors shall be satisfactory to the OpCo Lenders. |

---

[2] Subject to due diligence.

**EXHIBIT "A"**

**NPG SERIES A WARRANTS**

**PRINCIPAL TERMS AND CONDITIONS**

**ISSUER:**           New NPG

**HOLDERS:**          HoldCo Lenders

**ENTITLEMENT:**     New NPG will authorize the issuance of the NPG Series A Warrants, which shall entitle the holders thereof to purchase New Equity Interests equal to 5% of the equity interests of New NPG (excluding New Equity Interests reserved for issuance pursuant to the Long Term Management Incentive Plan).

**EXERCISE:**         The aggregate cash exercise price of the NPG Series A Warrants shall be an amount equal to 100% of the principal amount of the OpCo Debt plus accrued interest as of the closing date of the Restructuring plus the principal, interest, fees and expenses outstanding under the New Term Facility as of the closing date of the Restructuring. The aggregate cash exercise price of the NPG Series A Warrants shall be allocated among all HoldCo Lenders Warrants on a pro rata basis.

**EXPIRATION:**       Each NPG Series A Warrant may be exercised at any time prior to the fifth anniversary of the closing date of the Restructuring.

**VOTING RIGHTS:**    Neither the NPG Series A Warrants nor the New Equity Interests purchased with such NPG Series A Warrants shall have any voting rights.

**TRANSFERABILITY:**  The NPG Series A Warrants will be not transferable.

                       The HoldCo Lenders will be required to enter into a stockholders agreement containing standard tag-along and drag-along rights prior to exercising any of the NPG Series A Warrants.

**GOVERNING LAW:**   Delaware

**OTHER TERMS:**     All other items to be developed on terms to be agreed upon.

# EXHIBIT "B"

## NPG SERIES B OPTIONS

## PRINCIPAL TERMS AND CONDITIONS

**ISSUER:**           New NPG

**HOLDERS:**         Management

**EXERCISE:**        Management shall receive NPG Series B Options to acquire an additional 5% of the New Equity Interests.  The exercise price shall be based upon an aggregate equity value of New NPG of $75 million.

Management shall receive additional NPG Series B Options to acquire an additional 2.5% of the New Equity Interests.  The exercise price shall be based upon an aggregate equity value of New NPG of $300 million.

**EXPIRATION**:    Each NPG Series B Option may be exercised at any time prior to the seventh anniversary of the closing date of the Restructuring.

**VESTING:**        Vesting schedule - annual based over a period of 4 years.

**GOVERNING LAW:**  Delaware

**OTHER TERMS:**   All other items to be developed on terms to be agreed upon.

# NEW TERM FACILITY

## PRINCIPAL TERMS AND CONDITIONS[3]

| | |
|---|---|
| **BORROWERS:** | Arbonne International, LLC and Levlad, LLC |

**AMOUNT:** Up to $[20] million available in two draws as follows: (i) $10 million shall be drawn on the effective date of the New Term Facility and (ii) up to $10 million shall be available through June 30, 2010 in one subsequent draw upon the satisfaction of certain conditions to be determined, of which up to $2 million in the aggregate may be used to issue new letters of credit or replace existing letters of credit when they expire.

**ADMINISTRATIVE AGENT:** TBD

**PARTICIPANTS:** Participation offered to all OpCo Lenders.

**PRICING AND OTHER INDUCEMENTS:** <u>Fees</u>: (i) 2.50% of each participating OpCo Lender's commitment <u>plus</u> (ii) 2.50% backstop fee payable to each of the Opco Lenders who have agreed prior to the date hereof to provide a backstop commitment (subject to customary conditions, including the execution of satisfactory letter agreements relative to such backstop), which fee shall be calculated based on the difference between the amount to be backstopped by each such lender and such lender's pro rata share of the commitment and shall be payable by the borrowers regardless of whether or not such amounts are committed at closing by such lenders. For purposes hereof, pro rata share shall be determined according to such OpCo Lender's proportionate percentage of the OpCo Debt.

<u>Interest Rate</u>: Interest on loans under the New Term Facility shall accrue at a rate equal to LIBOR plus 10% per annum (with a floor of 3%) payable quarterly.

<u>Deferred Fee</u>: 3% (the "Deferred Fee"), which Deferred Fee shall be fully earned on the effective date of the New Term Facility, and shall be payable on the one year anniversary thereof; provided, however, that the Deferred Fee shall be waived and not be due and payable if all obligations owing under the New Term Facility are indefeasibly paid in full in cash on or before the one year anniversary of the effective date of such facility.

<u>Participation Fee/Provider Fee</u>: In consideration of providing the commitment in respect of the New Term Facility, the lenders under the New Term Facility shall receive their pro rata share of 10% of the New Equity Interests.

---

[3] Out of court restructuring scenario.

<u>Default Rate</u>:  2%, above the otherwise applicable rate, but in no event in excess of the maximum lawful rate.

[Other terms TBD].

**EXISTING LETTERS OF CREDIT:**

All existing and new letters of credit will be cash collateralized in an amount at least equal to 105% of the aggregate stated amount of such letters of credit.

**MATURITY DATE:**

(i) 4 years, but may be prepaid in whole or in part, without penalty, at any time in the sole discretion of the borrowers.

(ii) Subject to retirement upon the sale of substantially all of the assets of Levlad, LLC.

**FIRST-OUT PRIORITY:**

To be subject to a first out priority ahead of obligations under the Restructured OpCo Facility.

**SECURITY:**

The obligations of the borrowers under the New Term Facility shall be secured by a pari passu lien in and to substantially all of the assets of the Company, subject only to certain customary permitted liens.

**CONDITIONS PRECEDENT/ COVENANTS:**

Usual and customary conditions and covenants for transactions of this type, including (i) satisfactory verification of certain matters relating to compliance with environmental laws and regulations, (ii) the Opco Lenders shall be satisfied that the Company is in compliance in all material respects with all applicable environmental laws and regulations, (iii) follow up audits by third party consultant engaged by the OpCo Lenders and (iv) submittal of required air permit applications for certain locations to be designated by the OpCo Lenders and agreed to by the Borrowers.

**FINANCIAL COVENANTS:**

Usual and customary for transactions of this type.

**REPRESENTATIONS AND WARRANTIES:**

Usual and customary for transactions of this type.

# EXHIBIT "D"

## DIP/EXIT FACILITY

## PRINCIPAL TERMS AND CONDITIONS[4]

**BORROWERS:** Arbonne International, LLC and Levlad, LLC

**AMOUNT:** Up to $[20] million (the "DIP Facility") available in two draws as follows: (i) $10 million shall be drawn on the effective date of the DIP Facility and (ii) up to $10 million shall be available through June 30, 2010 in one subsequent draw upon the satisfaction of certain conditions to be determined, of which up to $2 million in the aggregate may be used to issue new letters of credit or replace existing letters of credit when they expire. Upon the effective date of the Pre-Packaged Plan, all outstanding obligations under the DIP Facility will be rolled into the post-effective date term loan credit facility (the "Exit Facility"). Any commitment of an OpCo Lender to participate in the DIP Facility constitutes a commitment of such lender to participate in the Exit Facility.

**ADMINISTRATIVE AGENT:** TBD

**PARTICIPANTS:** Participation offered to all OpCo Lenders.

**PRICING AND OTHER INDUCEMENTS:** <u>Fees</u>: Comprised of (i) 2.50% of each participating OpCo Lender's commitment <u>plus</u> (ii) 2.50% backstop fee payable to each of the Opco Lenders who have agreed prior to the date hereof to provide a backstop commitment (subject to customary conditions, including the execution of satisfactory letter agreements relative to such backstop), which fee shall be calculated based on the difference between the amount to be backstopped by each such lender and such lender's pro rata share of the commitment and shall be payable by the borrowers regardless of whether or not such amounts are committed at closing by such lenders. For purposes hereof, pro rata share shall be determined according to such OpCo Lender's proportionate percentage of the OpCo Debt.

There will be no commitment fee payable in connection with the Exit Facility.

<u>Interest Rate</u>: Interest on loans under the DIP Facility shall accrue at a rate equal to LIBOR plus 10% per annum (with a LIBOR floor of 3%) payable quarterly.

<u>Deferred Fee</u>: 3% (the "Deferred Fee"), which Deferred Fee shall be fully earned on the effective date of the Exit Facility, and shall be payable on the one year anniversary thereof; provided, however, that the

---

[4] Pre-packaged bankruptcy scenario.

Deferred Fee shall be waived and not be due and payable if all obligations owing under the Exit Facility are indefeasibly paid in full in cash on or before the one year anniversary of the effective date of such facility.

<u>Participation Fee/Provider Fee</u>:  In consideration of providing the commitment in respect of the Exit Facility, the lenders under the DIP/Exit Facility shall receive their pro rata share of 10% of the New Equity Interests.

<u>Default Rate</u>:  2%, above the otherwise applicable rate, but in no event in excess of the maximum lawful rate.

[Other terms TBD].

**EXISTING LETTERS OF CREDIT:**

All existing and new letters of credit will be cash collateralized in an amount at least equal to 105% of the aggregate stated amount of such letters of credit.

**MATURITY DATES:**

The DIP Facility shall mature no later than [●] months from the date the cases are filed.

The Exit Facility shall mature on the 4 year anniversary of the effective date thereof.

**SECURITY:**

The obligations of the borrowers under the DIP Facility shall be secured by a first and priming lien in and to substantially all of the assets of the Company, subject only to certain customary permitted liens.  Pursuant to Section 364(c)(1) of the Bankruptcy Code, the obligations under the DIP Facility shall be entitled to superpriority claim status in the cases.

The obligations of the borrowers under the Exit Facility shall be secured by a first lien in and to substantially all of the assets of the Company, subject only to certain customary permitted liens.

**CONDITIONS PRECEDENT/ COVENANTS:**

Usual and customary conditions and covenants for transactions of this type, including (i) satisfactory verification of certain matters relating to compliance with environmental laws and regulations, (ii) the lenders under the DIP/Exit shall be satisfied that the Company is in compliance in all material respects with all applicable environmental laws and regulations, (iii) follow up audits by third party consultant engaged by the lenders under the DIP/Exit Facility and (iv) submittal of required air permit applications for certain locations to be designated by the lenders under the DIP/Exit Facility and agreed to by the Borrowers.

**FINANCIAL COVENANTS:**

Usual and customary for transactions of this type.

**REPRESENTATIONS AND WARRANTIES:**

Usual and customary for transactions of this type.

# SCHEDULE 3

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | ) Chapter 11 |
|  | ) |
| NATURAL PRODUCTS GROUP, LLC, <u>et</u> <u>al.</u>, | ) Case Nos. [To Be Determined] |
|  | ) |
|  | ) |
| Debtors. | ) |
|  | ) |

---

## JOINT CHAPTER 11 PLAN OF REORGANIZATION
## FOR NATURAL PRODUCTS GROUP, LLC AND ITS AFFILIATED DEBTORS

---

Dated: January __, 2010

WHITE & CASE LLP
Thomas E Lauria
Craig H. Averch
Matthew C. Brown
Wachovia Financial Center
200 South Biscayne Boulevard, 49th Floor
Miami, Florida 33131
(305) 371-2700

FOX ROTHSCHILD LLP
Jeffrey M. Schlerf (No. 3047)
Eric M. Sutty (No. 4007)
919 Market Street, Suite 1600
Wilmington, Delaware 19801
(302) 654-7444

PROPOSED ATTORNEYS FOR THE
DEBTORS AND DEBTORS IN
POSSESSION

# TABLE OF CONTENTS

ARTICLE I. DEFINITIONS AND INTERPRETATION ............................................................1

    1.1.    Definitions.................................................................................................1
    1.2.    Interpretation.............................................................................................1
    1.3.    Application of Definitions and Rules of Construction Contained in the
            Bankruptcy Code. ....................................................................................1
    1.4.    Other Terms. .............................................................................................1
    1.5.    Appendices and Plan Documents...............................................................1

ARTICLE II. RESOLUTION OF CERTAIN INTER-DEBTOR ISSUES ...............................2

    2.1.    Settlement of Intercompany Claims............................................................2
    2.2.    Treatment of Guaranty and Joint Liability Claims Against a Debtor.....................2
    2.3.    Intercompany Claims. ................................................................................2

ARTICLE III. CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS ..........................3

    3.1.    Administrative Claims and Tax Claims.......................................................3
    3.2.    Claims and Equity Interests. .......................................................................3
    3.3.    Separate Classification of Secured Claims. .................................................3

ARTICLE IV. IDENTIFICATION OF IMPAIRED CLASSES OF CLAIMS AND
            EQUITY INTERESTS....................................................................................4

    4.1.    Unimpaired Classes of Claims and Equity Interests....................................4
    4.2.    Impaired Classes of Claims and Equity Interests. .................................4
    4.3.    Impairment Controversies...........................................................................4

ARTICLE V. PROVISIONS FOR TREATMENT OF CLAIMS AND EQUITY
            INTERESTS UNDER THE PLAN ....................................................................4

    5.1.    Claims and Equity Interests. .......................................................................4

ARTICLE VI. PROVISIONS FOR TREATMENT OF UNCLASSIFIED CLAIMS
            UNDER THE PLAN.......................................................................................6

    6.1.    Unclassified Claims. ..................................................................................6
    6.2.    Treatment of Administrative Claims. ..........................................................6
    6.3.    Treatment of Tax Claims. ...........................................................................8

ARTICLE VII. ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF
            REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR EQUITY
            INTERESTS .................................................................................................9

    7.1.    Classes Entitled to Vote..............................................................................9
    7.2.    Class Acceptance Requirement....................................................................9
    7.3.    Cramdown...................................................................................................9
    7.4.    Confirmation of All Cases. .........................................................................9

ARTICLE VIII. MEANS FOR IMPLEMENTATION OF THE PLAN ........................................9

8.1.    Operations Between the Confirmation Date and the Effective Date. .....................9
8.2.    Implementing Transactions on or Prior to the Effective Date. ............................10
8.3.    Corporate Action..............................................................................................10
8.4.    Re-Vesting of Assets.........................................................................................11
8.5.    Initial Boards of Directors. ...............................................................................11
8.6.    Management and Officers..................................................................................12
8.7.    Director and Officer Liability Insurance............................................................12
8.8.    Long Term Management Incentive Plan.............................................................12
8.9.    Causes of Action...............................................................................................12
8.10.   Appointment of the Disbursing Agent...............................................................13
8.11.   Sources of Cash for Plan Distributions..............................................................13
8.12.   Investment of Funds Held by the Disbursing Agent; Tax Reporting by the
        Disbursing Agent...............................................................................................13
8.13.   Releases by the Debtors. ...................................................................................13
8.14.   Releases by Creditors and Equity Security Holders. ..........................................14

ARTICLE IX. PLAN DISTRIBUTION PROVISIONS ...........................................................15

9.1.    Plan Distributions.............................................................................................15
9.2.    Timing of Plan Distributions. ...........................................................................15
9.3.    Address for Delivery of Plan Distributions/Unclaimed Plan Distributions...........15
9.4.    De Minimis Plan Distributions. .........................................................................15
9.5.    Time Bar to Cash Payments...............................................................................16
9.6.    Manner of Payment under the Plan.....................................................................16
9.7.    Expenses Incurred on or after the Effective Date and Claims of the
        Disbursing Agent. .............................................................................................16
9.8.    Fractional Plan Distributions. ............................................................................16
9.9.    Special Distribution Provisions Concerning the Prepetition Credit Facilities.......16
9.10.   Cancellation of Instruments. .............................................................................17

ARTICLE X. PROCEDURES FOR RESOLVING AND TREATING CONTESTED
        CLAIMS ............................................................................................................18

10.1.   Objection Deadline. ..........................................................................................18
10.2.   Prosecution of Contested Claims. ......................................................................18
10.3.   Claims Settlement. ............................................................................................18
10.4.   Entitlement to Plan Distributions upon Allowance. ............................................18
10.5.   Estimation of Claims.........................................................................................18

ARTICLE XI. CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN
        AND THE OCCURRENCE OF THE EFFECTIVE DATE..............................19

11.1.   Conditions Precedent to Confirmation................................................................19
11.2.   Conditions Precedent to the Occurrence of the Effective Date. ...........................20
11.3.   Waiver of Conditions.........................................................................................20
11.4.   Effect of Non-Occurrence of the Effective Date. ................................................21

ARTICLE XII. THE DISBURSING AGENT ..........................................................................21

    12.1.   Powers and Duties ...............................................................................................21
    12.2.   Plan Distributions ...............................................................................................21
    12.3.   Exculpation. ........................................................................................................22

ARTICLE XIII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
    LEASES ...................................................................................................................22

    13.1.   Assumption and Rejection of Executory Contracts and Unexpired Leases. .........22
    13.2.   Cure ....................................................................................................................23
    13.3.   Claims Arising from Rejection, Expiration or Termination. ................................24

ARTICLE XIV. RETENTION OF JURISDICTION ....................................................................24

ARTICLE XV. MISCELLANEOUS PROVISIONS ....................................................................26

    15.1.   Substantial Consummation. .................................................................................26
    15.2.   Payment of Statutory Fees. .................................................................................26
    15.3.   Satisfaction of Claims. ........................................................................................26
    15.4.   Special Provisions Regarding Insured Claims. ....................................................26
    15.5.   Third Party Agreements; Subordination. .............................................................27
    15.6.   Exculpation. ........................................................................................................27
    15.7.   Discharge of Liabilities ......................................................................................27
    15.8.   Discharge of Debtors. .........................................................................................28
    15.9.   Notices. ..............................................................................................................28
    15.10.  Headings. ............................................................................................................29
    15.11.  Governing Law. ..................................................................................................29
    15.12.  Expedited Determination. ...................................................................................30
    15.13.  Exemption from Transfer Taxes. ........................................................................30
    15.14.  Notice of Entry of Confirmation Order and Relevant Dates. ...............................30
    15.15.  Interest and Attorneys' Fees. ..............................................................................30
    15.16.  Modification of the Plan. ....................................................................................30
    15.17.  Corrective Action. ..............................................................................................31
    15.18.  Revocation of Plan. ............................................................................................31
    15.19.  Setoff Rights. .....................................................................................................32
    15.20.  Compliance with Tax Requirements. ..................................................................32
    15.21.  Rates. .................................................................................................................32
    15.22.  Dissolution of the Creditors' Committee. ...........................................................32
    15.23.  Injunctions. ........................................................................................................33
    15.24.  Binding Effect. ...................................................................................................33
    15.25.  Successors and Assigns .......................................................................................34
    15.26.  Conflict between Plan, Disclosure Statement and Plan Documents ......................34
    15.27.  Severability. .......................................................................................................34
    15.28.  No Admissions. ..................................................................................................34

EXHIBITS

Glossary of Defined Terms..................................................................Exhibit A
List of Debtors.................................................................................Exhibit B
Terms of New NPG Warrants ..........................................................Exhibit C
Terms of New NPG Options .............................................................Exhibit D
Terms of Reinstated OpCo Term Loan.............................................Exhibit E
Terms of New Term Loan .................................................................Exhibit F

NPG and its affiliated Debtors and Debtors in Possession in the above-captioned chapter 11 cases hereby collectively and jointly propose the following chapter 11 plan of reorganization:

## ARTICLE I.

## DEFINITIONS AND INTERPRETATION

### 1.1. Definitions.

The capitalized terms used herein shall have the respective meanings set forth in the Glossary of Defined Terms attached hereto as Exhibit "A".

### 1.2. Interpretation.

Unless otherwise specified, all section, article, and exhibit references in the Plan are to the respective section in, article of, or exhibit to the Plan, as the same may be amended, waived, or modified from time to time. Words denoting the singular number shall include the plural number and vice versa, as appropriate, and words denoting one gender shall include the other gender. The Disclosure Statement may be referred to for purposes of interpretation to the extent any term or provision of the Plan is determined by the Bankruptcy Court to be ambiguous.

### 1.3. Application of Definitions and Rules of Construction Contained in the Bankruptcy Code.

Words and terms defined in section 101 of the Bankruptcy Code shall have the same meanings when used in the Plan, unless a different definition is given in the Glossary of Defined Terms. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan; provided, however, that "or" is disjunctive. The words "include" and "including" are without limitation.

### 1.4. Other Terms.

The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan.

### 1.5. Appendices and Plan Documents.

All appendices, schedules, and exhibits to the Plan and the Plan Documents are incorporated into the Plan by this reference and are a part of the Plan as if set forth in full herein. All Plan Documents shall be filed with the Bankruptcy Court not less than ten (10) days prior to the commencement of the Confirmation Hearing. Holders of Claims and Equity Interests may obtain a copy of the Plan Documents, once filed, at http://www.deb.uscourts.gov and http://www.alixpartners.com/cms, or by a written request sent to the following address:

White & Case LLP
Wachovia Financial Center
200 South Biscayne Boulevard
Suite 4900
Miami, Florida 33131
Attention:  Mark B. Fuhr
Telephone:  (305) 371-2700
Facsimile:   (305) 358-5744

# ARTICLE II.

## RESOLUTION OF CERTAIN INTER-DEBTOR ISSUES

**2.1.    Settlement of Intercompany Claims.**

In settlement and compromise of certain existing and potential disputes regarding Intercompany Claims and related matters, pursuant to sections 1123(b)(3) and (6) of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan treats the Debtors as comprising a single Estate solely for purposes of voting on the Plan, confirmation of the Plan and making Plan Distributions in respect of Claims against and Equity Interests in the Debtors under the Plan. Such treatment shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, nor cause the transfer of any assets; and, except as otherwise provided by or permitted in the Plan, all Debtors shall continue to exist as separate legal entities.  The above treatment serves only as a mechanism to effect a fair distribution of value to the Debtors' constituencies.

**2.2.    Treatment of Guaranty and Joint Liability Claims Against a Debtor.**

Any holder of a Claim against a Debtor and a Claim based on a guaranty of such base Claim given by a Debtor shall receive only a single recovery in respect of such Claims.  Any holder of a Claim against a Debtor and a Claim against another Debtor based on joint or joint and several liability of such Debtors shall receive only a single recovery in respect of such Claims.

**2.3.    Intercompany Claims.**

Intercompany Claims and Administrative Claims between and among the Debtors shall be unimpaired under the Plan and, pursuant to section 1124 of the Bankruptcy Code, all legal, equitable, and contractual rights of the Debtors in respect of such Claims shall be fully reinstated and retained.

# ARTICLE III.

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

For the purposes of organization, voting and all confirmation matters, <u>except</u> as otherwise provided herein, all Claims against and all Equity Interests in each of the Debtors shall be classified as set forth in this Article III.

**3.1.** **Administrative Claims and Tax Claims.**

As provided by section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Tax Claims shall not be classified under the Plan, and shall instead be treated separately as unclassified Claims on the terms set forth in Article VI.

**3.2.** **Claims and Equity Interests.**

The classes of Claims against and Equity Interests in the Debtors shall be classified under the Plan as follows:

<u>Class 1 – Priority Claims</u>.  Class 1 shall consist of all Priority Claims against the Debtors.

<u>Class 2 – OpCo Lender Claims</u>.  Class 2 shall consist of all OpCo Lender Claims against the Debtors.

<u>Class 3 – HoldCo Lender Claims</u>.  Class 3 shall consist of all HoldCo Lender Claims against the Debtors.

<u>Class 4 – Secured Claims</u>.  Class 4 shall consist of all Secured Claims, other than OpCo Lender Claims, against the Debtors.

<u>Class 5 – Unsecured Claims</u>.  Class 5 shall consist of all Unsecured Claims, other than HoldCo Lender Claims, against the Debtors.

<u>Class 6 – NPG Equity Interests</u>.  Class 6 shall consist of all Equity Interests in NPG.

<u>Class 7 – Other Equity Interests</u>.  Class 7 shall consist of all Equity Interests in the Debtors, other than NPG.

**3.3.** **Separate Classification of Secured Claims.**

Although Secured Claims against the Debtors, other than OpCo Lender Claims, have been placed in one category for purposes of nomenclature, each such Secured Claim shall be treated as a separate class for purposes of voting on the Plan and receiving Plan Distributions (to be designated as Class 4A, 4B, 4C, etc.).

# ARTICLE IV.

## IDENTIFICATION OF IMPAIRED
## CLASSES OF CLAIMS AND EQUITY INTERESTS

**4.1.** **Unimpaired Classes of Claims and Equity Interests.**

Class 1 – Priority Claims, Class 4 – Secured Claims, Class 5 – Unsecured Claims and Class 7 – Other Equity Interests are not impaired under the Plan.

**4.2.** **Impaired Classes of Claims and Equity Interests.**

Class 2 – OpCo Lender Claims, Class 3 – HoldCo Lender Claims and Class 6 – NPG Equity Interests are impaired under the Plan.

**4.3.** **Impairment Controversies.**

If a controversy arises as to whether any Claim or Equity Interest, or any class of Claims or Equity Interests, is impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy.

# ARTICLE V.

## PROVISIONS FOR TREATMENT OF CLAIMS
## AND EQUITY INTERESTS UNDER THE PLAN

**5.1.** **Claims and Equity Interests.**

The classes of Claims against the Debtors and Equity Interests in the Debtors shall be treated under the Plan as follows:

(a)   Class 1 – Priority Claims.

Each Allowed Priority Claim against any of the Debtors shall be unimpaired under the Plan and, except to the extent that a holder of an Allowed Priority Claim agrees to a different treatment of such Allowed Priority Claim, pursuant to section 1124 of the Bankruptcy Code, all legal, equitable, and contractual rights of each holder of an Allowed Priority Claim in respect of such Claim shall be fully reinstated and retained, and such holder of an Allowed Priority Claim shall be paid in full and in Cash on or as soon as practicable after the latest to occur of (i) the Plan Distribution Date; (ii) the first Business Day after the date that is ten (10) Business Days after the date such Claim becomes an Allowed Priority Claim; and (iii) the date agreed to by the Debtors and the holder of the Allowed Priority Claim.

(b)   Class 2 – OpCo Lender Claims.

Each holder of an Allowed OpCo Lender Claim against any of the Debtors shall receive, on the Effective Date, its Pro Rata Share of (i) the Reinstated OpCo Term Loan, and (ii) 85% of the New NPG Common Stock issued under the Plan on the Effective Date, subject to

dilution for (a) New NPG Common Stock issuable upon the exercise of the New NPG Warrants, (b) New NPG Common Stock issuable upon the exercise of any New NPG Options that may be issued under the Long Term Management Incentive Plan (up to an additional 7.5% of the New NPG Common Stock, on a fully diluted basis), and (c) any additional New NPG Common Stock that may be awarded in accordance with the Long Term Management Incentive Plan.

The OpCo Lender Claims shall be Allowed, not subject to offset, defense, counterclaim, reduction or credit of any kind whatsoever, in an amount equal to the sum of (i) the aggregate principal amount outstanding under the OpCo Credit Agreement as of the Petition Date, of approximately $530.5 million, plus (ii) accrued and unpaid interest and default interest under the OpCo Credit Agreement through the Petition Date, plus (iii) amounts drawn on the Letters of Credit from the Petition Date through the Effective Date, plus (iv) accrued and unpaid letter of credit fees, administrative fees, and other fees and expenses (including reasonable fees and out-of-pocket expenses of attorneys and advisors incurred by the Prepetition OpCo Agent and the OpCo Lenders) incurred under the OpCo Credit Agreement through the Petition Date. The provisions of the DIP Order containing the Debtors' stipulations regarding indebtedness and security interests shall be deemed incorporated by reference in their entirety as if fully set forth herein.

    (c)   Class 3 – HoldCo Lender Claims.

Each holder of an Allowed HoldCo Lender Claim against any of the Debtors shall receive, on the Effective Date, its Pro Rata Share of the New NPG Warrants. The HoldCo Lender Claims shall be Allowed in the aggregate amount of $215.6 million.

    (d)   Class 4 – Secured Claims.

Each Allowed Secured Claim, other than a OpCo Lender Claim, against any of the Debtors shall be unimpaired under the Plan, and either (i) all of the legal, equitable, and contractual rights to which such Allowed Secured Claim entitle the holder of such Claim shall be fully reinstated and retained on and after the Effective Date, or (ii) such holder shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for its Allowed Secured Claim, either (w) Cash in the full amount of such Allowed Secured Claim, including any postpetition interest accrued pursuant to section 506(b) of the Bankruptcy Code, (x) the proceeds of the sale or disposition of the collateral securing such Allowed Secured Claim to the extent of the value of the holder's secured interest in such collateral, (y) the collateral securing such Allowed Secured Claim and any interest on such Allowed Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (z) such other distribution as necessary to satisfy the requirements of section 1129 of the Bankruptcy Code.

    (e)   Class 5 – Unsecured Claims.

Each Allowed Unsecured Claim against any of the Debtors shall be unimpaired under the Plan, and either (i) all of the legal, equitable, and contractual rights to which such Allowed Unsecured Claim entitle the holder of such Claim shall be fully reinstated and retained on and after the Effective Date, or (ii) such holder shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for its Allowed Unsecured Claim, Cash in the full

amount of such Allowed Unsecured Claim, including any postpetition interest required to be paid thereon under applicable non-bankruptcy law.

     (f)    <u>Class 6 – NPG Equity Interests</u>.

       On the Effective Date, all Equity Interests in NPG shall be cancelled, and each holder of an Equity Interest in NPG shall not be entitled to any distribution under the Plan. Holders of Equity Interests in NPG shall not be required to surrender their certificates or other instruments evidencing ownership of such Equity Interests.

     (g)    <u>Class 7 – Other Equity Interests</u>.

       Each Allowed Equity Interest in the Debtors, other than in NPG, shall be unimpaired under the Plan, and, pursuant to section 1124 of the Bankruptcy Code, all of the legal, equitable, and contractual rights to which such Equity Interests entitle the holder of such Equity Interests shall be fully reinstated and retained on and after the Effective Date.

## ARTICLE VI.

## PROVISIONS FOR TREATMENT
## <u>OF UNCLASSIFIED CLAIMS UNDER THE PLAN</u>

**6.1.**    <u>**Unclassified Claims.**</u>

       Administrative Claims and Tax Claims are treated in accordance with sections 1129(a)(9)(A) and 1129(a)(9)(C) of the Bankruptcy Code, respectively. Such Claims are not designated as classes of Claims for the purposes of this Plan or for the purposes of sections 1123, 1124, 1125, 1126 or 1129 of the Bankruptcy Code.

**6.2.**    <u>**Treatment of Administrative Claims.**</u>

       All Administrative Claims shall be treated as follows:

     (a)    <u>Time for Filing Administrative Claims</u>.

       The holder of an Administrative Claim, other than (i) a DIP Claim, (ii) a Fee Claim, (iii) a liability incurred and payable in the ordinary course of business by a Debtor (and not past due), or (iv) an Administrative Claim that has been Allowed on or before the Effective Date, must file with the Bankruptcy Court and serve on the Debtors, the Creditors' Committee (if any) and the Office of the United States Trustee, notice of such Administrative Claim within thirty (30) days after service of Notice of Confirmation. Such notice must include at a minimum (i) the name of the Debtor(s) purported to be liable for the Administrative Claim, (ii) the name of the holder of the Administrative Claim, (iii) the amount of the Administrative Claim, and (iv) the basis of the Administrative Claim. **Failure to file and serve such notice timely and properly shall result in the Administrative Claim being forever barred and discharged.**

(b)    <u>Time for Filing Fee Claims</u>.

Each Professional Person who holds or asserts a Fee Claim shall be required to file with the Bankruptcy Court, and serve on all parties required to receive notice, a Fee Application within forty (40) days after the Effective Date.  **The failure to timely file and serve such Fee Application shall result in the Fee Claim being forever barred and discharged.**

(c)    <u>Allowance of Administrative Claims/Fee Claims</u>.

An Administrative Claim with respect to which notice has been properly filed and served pursuant to Section 6.2(a) shall become an Allowed Administrative Claim if no objection is filed within thirty (30) days after the later of (i) the Effective Date, or (ii) the date of service of the applicable notice of Administrative Claim or (iii) such later date as may be (A) agreed to by the holder of such Administrative Claim or (B) approved by the Bankruptcy Court on motion of a party in interest, without notice or a hearing.  If an objection is filed within such 30-day period (or any extension thereof), the Administrative Claim shall become an Allowed Administrative Claim only to the extent allowed by Final Order.  A Fee Claim in respect of which a Fee Application has been properly filed and served pursuant to Section 6.2(b) shall become an Allowed Administrative Claim only to the extent allowed by order of the Bankruptcy Court.

(d)    <u>Payment of Allowed Administrative Claims</u>.

On the Plan Distribution Date, each holder of an Allowed Administrative Claim shall receive (i) the amount of such holder's Allowed Administrative Claim in one Cash payment, or (ii) such other treatment as may be agreed upon in writing by the Debtors and such holder; <u>provided</u>, that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Claim; <u>provided</u>, <u>further</u>, that an Administrative Claim representing a liability incurred in the ordinary course of business of the Debtors may be paid at the Debtors' election in the ordinary course of business.

(e)    <u>Allowance and Satisfaction of DIP Claims</u>.

On the Effective Date, all outstanding obligations of the Debtors to the DIP Agent and the DIP Lenders under or in respect of the DIP Facility shall be rolled up into loans under the New Term Loan portion of the Exit Facility with an aggregate principal amount for each of the DIP Lenders under the New Term Loan equal to the amount of such DIP Lenders' loans under the DIP Facility.

Upon payment and satisfaction in full of all obligations as provided in this Section 6.2(e), the DIP Facility shall be deemed terminated, satisfied and discharged and the Debtors shall have no other obligations thereunder or under any note, guaranty, pledge, security, or other agreement or instrument, mortgage or Lien executed or delivered pursuant to, in connection with, or related to, the DIP Facility; and the DIP Agent and the DIP Lenders shall be deemed to have relinquished and released all of the Liens securing the DIP Claims, including, without limitation, Liens granted in connection with or under the DIP Facility or the DIP Order, and Liens, if any, arising under section 506(a) of the Bankruptcy Code in the event that the DIP

Claims would be subject to a permissible setoff under section 553 of the Bankruptcy Code. From and after the Effective Date, the DIP Lenders shall, at the sole cost and expense of the New NPG Group, take all action necessary or requested by the New NPG Group to confirm the removal of any claims, security interests and Liens on the properties or assets of the Debtors or the New NPG Group or any other Person securing the DIP Facility. Notwithstanding this Section 6.2(e), the provisions of the DIP Order that provide that they shall survive the confirmation and consummation of the Plan shall so survive and shall remain in full force and effect from and after the Confirmation Date.

    (f)    <u>Allowance and Satisfaction of Claims for Fees and Expenses of the Prepetition OpCo Agent</u>.

On the Effective Date, the Debtors shall pay a Plan Distribution of Cash, without interest, in an amount equal to all fees and the reasonable out-of-pocket expenses (including, without limitation, reasonable fees and expenses of attorneys and advisors) incurred by, and administration fees payable to, the Prepetition OpCo Agent under the OpCo Credit Agreement for the period through the Effective Date, in each case to the extent not reimbursed on or prior to the Effective Date, without the necessity of filing a fee application or any other application of any kind or nature with the Bankruptcy Court.

**6.3.**    **<u>Treatment of Tax Claims.</u>**

At the election of the Debtors, each holder of an Allowed Tax Claim will receive in full satisfaction of such Allowed Tax Claim (a) payments in Cash, in regular installments over a period ending not later that five (5) years after the Petition Date, of a total value, as of the Effective Date, equal to the Allowed amount of such Claim; (b) a lesser amount in one Cash payment as may be agreed upon in writing by such holder; or (c) such other treatment as may be agreed upon in writing by such holder; <u>provided</u>, that such agreed upon treatment may not provide such holder with a return having a present value as of the Effective Date that is greater than the amount of such holder's Allowed Tax Claim or that is less favorable than the treatment provided to the most favored nonpriority Unsecured Claims under the Plan. The Confirmation Order shall enjoin any holder of an Allowed Tax Claim from commencing or continuing any action or proceeding against any responsible person, officer or director of the Debtors that otherwise would be liable to such holder for payment of a Tax Claim so long as the Debtors are in compliance with this Section. So long as the holder of an Allowed Tax Claim is enjoined from commencing or continuing any action or proceeding against any responsible person, officer or director under this Section or pursuant to the Confirmation Order, the statute of limitations for commencing or continuing any such action or proceeding shall be tolled.

# ARTICLE VII.

## ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR EQUITY INTERESTS

**7.1.** **Classes Entitled to Vote.**

Class 2 – OpCo Lender Claims and Class 3 – HoldCo Lender Claims are impaired and entitled to vote on the Plan. Class 1 – Priority Claims, Class 4 – Secured Claims, Class 5 – Unsecured Claims, and Class 7 – Other Equity Interests are unimpaired and deemed to have accepted the Plan and, therefore, are not entitled to vote on the Plan. Class 6 – NPG Equity Interests is deemed to have rejected the Plan and, therefore, is not entitled to vote on the Plan.

**7.2.** **Class Acceptance Requirement.**

A class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such class that have voted on the Plan.

**7.3.** **Cramdown.**

If all applicable requirements for confirmation of the Plan are met as set forth in section 1129(a)(1) through (16) of the Bankruptcy Code, except subsection (8) thereof, then the Plan shall be treated as a request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code, notwithstanding the failure to satisfy the requirements of section 1129(a)(8), on the basis that the Plan is fair and equitable and does not discriminate unfairly with respect to each class of Claims that is impaired under, and has not accepted, the Plan.

**7.4.** **Confirmation of All Cases.**

Except as provided in Section 15.18, the Plan shall not be deemed to have been confirmed unless and until the Plan has been confirmed as to each of the Debtors.

## ARTICLE VIII.

## MEANS FOR IMPLEMENTATION OF THE PLAN

**8.1.** **Operations Between the Confirmation Date and the Effective Date.**

During the period from the Confirmation Date through and until the Effective Date, the Debtors shall continue to operate their businesses as debtors in possession, subject to the oversight of the Bankruptcy Court as provided in the Bankruptcy Code, the Bankruptcy Rules and all orders of the Bankruptcy Court that are then in full force and effect.

**8.2.    Implementing Transactions on or Prior to the Effective Date.**

The following transactions shall occur and be implemented pursuant to section 1123(a)(5) of the Bankruptcy Code on or prior to the Effective Date:

(a)    Debtors' Organizational Structure.

Without further order of the Bankruptcy Court, the Debtors shall take the following actions to restructure the organizational structure of the Debtors: (a) on or prior to the Effective Date, (i) Debtors Arbonne HoldCo and Levlad HoldCo shall merge, with Arbonne HoldCo surviving the merger (the surviving company referred to herein as "New HoldCo"), and (ii) NPG shall be converted from a limited liability company to a Delaware corporation (New NPG); (b) on the Effective Date, the Equity Interests in NPG shall be cancelled and New NPG shall issue (i) 85% of the New NPG Common Stock to the OpCo Lenders as set forth in Section 5.1(b), (ii) 10% of the New NPG Common Stock to the New Term Lenders in connection with the New Term Loan portion of the Exit Facility, (iii) 5% of the New NPG Common Stock pursuant to the Long Term Management Incentive Plan, and (iv) 100% of the New NPG Warrants to the HoldCo Lenders as set forth in Section 5.1(c).  The issuance of the New NPG Common Stock and the New NPG Warrants and the distribution thereof shall be exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code.

(b)    New Term Loan under the Exit Facility.

On the Effective Date, Arbonne and Levlad, as borrowers, and certain other Debtors as guarantors, shall enter into the New Term Loan under the Exit Facility with the New Term Lenders.  All obligations then outstanding under the DIP Facility shall be rolled into and become the obligations of the parties under the New Term Loan portion of the Exit Facility.  The terms of the New Term Loan are set forth on Exhibit "F" hereto.

**8.3.    Corporate Action.**

The entry of the Confirmation Order shall constitute authorization for the New NPG Group, the Debtors and their Affiliates to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of, and to consummate, the Plan prior to, on and after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule or regulation, including, without limitation, any action required by the stockholders or directors of New NPG, the Debtors and their Affiliates, including, among other things, (a) the issuance of the New NPG Common Stock, the New NPG Warrants and the New NPG Options, the execution, delivery and performance of the Exit Facility (including the New Term Loan and Reinstated OpCo Term Loan) and the incurrence of indebtedness and the granting of liens thereunder, (b) the adoption of the New NPG Constituent Documents, (c) the incurrence of all obligations contemplated by the Plan and the making of Plan Distributions, (d) the implementation of all settlements and compromises as set forth in or contemplated by the Plan, and (e) resolving all intercompany accounts of the Debtors through capital contributions, compromise, or in any other reasonable fashion.  On the Effective Date, the officers of the Debtors and the New NPG Group are authorized and directed to do all things and

to execute and deliver all agreements, documents, instruments, notices and certificates as are contemplated by the Plan and to take all necessary actions required in connection therewith, in the name of and on behalf of the Debtors and the New NPG Group, as applicable. All obligations of the Debtors to indemnify and hold harmless their current and former directors, officers and employees, whether arising under the Debtors' constituent documents, contract, law or equity, shall be assumed by, and assigned to, the applicable member of the New NPG Group upon the occurrence of the Effective Date with the same effect as though such obligations constituted executory contracts that are assumed (or assumed and assigned, as applicable) under section 365 of the Bankruptcy Code, and all such obligations shall be fully enforceable on their terms from and after the Effective Date. The prosecution of any so-indemnified Cause of Action against the Persons to whom such rights(s) of indemnification are owed shall be, upon the occurrence of the Effective Date, enjoined and prohibited.

**8.4.** <u>**Re-Vesting of Assets.**</u>

Upon the occurrence of the Effective Date, <u>except</u> as otherwise expressly provided in the Plan, title to all of the Assets of the Debtors shall vest in the New NPG Group free and clear of all liens, Claims, Causes of Action, interests, security interests and other encumbrances and without further order of the Bankruptcy Court. On and after the occurrence of the Effective Date, <u>except</u> as otherwise provided in the Plan, the New NPG Group may operate their businesses and may use, acquire and dispose of their Assets free of any restrictions of the Bankruptcy Code.

**8.5.** <u>**Initial Boards of Directors.**</u>

(a)     Except as otherwise set forth herein or disclosed to the Bankruptcy Court prior to the conclusion of the Confirmation Hearing, on the Effective Date, the initial board of directors (or managers, as applicable) of each entity in the New NPG Group shall be comprised of the individuals who hold such positions as of the Effective Date.

(b)     On the Effective Date, the board of directors of New NPG shall consist of five members, composed of (i) the chief executive officer of Arbonne, (ii) one (1) director selected by EOS, (iii) one (1) director selected by TCW and (iv) two (2) directors which shall be Independent Directors selected by the Majority Consenting OpCo Lenders other than EOS and TCW.

(c)     The identities of the members of the board of directors (or managers, as applicable) of each member of the New NPG Group will be disclosed prior to the conclusion of the Confirmation Hearing.

(d)     From and after the Effective Date, the members of the board of directors (or managers, as applicable) of each member of the New NPG Group shall be selected and determined in accordance with the provisions of the respective New NPG Constituent Documents and applicable law.

**8.6.    Management and Officers.**

On the Effective Date, the New NPG Group shall adopt the New NPG Constituent Documents.  Except as otherwise set forth herein, the officers of the Debtors as of the Effective Date shall continue in such positions after the Effective Date with the New NPG Group in accordance with their respective employment agreements, if any, and applicable law.  Subject to any applicable employment agreements and applicable law, from and after the Effective Date, the officers of each of the entities in the New NPG Group shall be selected and appointed by the board of directors or members, as applicable, of such entity, in accordance with, and pursuant to, the provisions of applicable law and the respective New NPG Constituent Documents.

**8.7.    Director and Officer Liability Insurance.**

The Debtors shall purchase, on or before the Effective Date, an insurance policy that provides director and officer liability tail coverage for a period of six (6) years for, among others, any current or former directors and officers who will not be serving in such capacities after the Effective Date.  The cost of the premium for such policy shall not exceed $120,000.

**8.8.    Long Term Management Incentive Plan.**

On the Effective Date, the Debtors shall implement a Long Term Management Incentive Plan for the benefit of certain employees of the Debtors which shall provide for the issuance of Equity Interests in New NPG consisting of:

(a)    An award of 5% of New NPG Common Stock upon the Effective Date, subject to four-year annual vesting and other terms; and

(b)    New NPG Options as set forth on Exhibit "D" attached hereto and subject to other terms.

Eligibility to participate in the Long Term Management Incentive Plan shall be determined by the chief executive officer and the compensation committee of the board of directors of New NPG.  All New NPG Common Stock and New NPG Options issued under the Long Term Management Incentive Plan shall be dilutive to the New NPG Common Stock granted to the OpCo Lenders and to the lenders under the New Term Loan portion of the Exit Facility and pursuant to the New NPG Warrants and not dilutive to any New NPG Common Stock or New NPG Options theretofore granted pursuant to the Long Term Management Incentive Plan.

**8.9.    Causes of Action.**

Except as otherwise provided in the Plan, (a) all Causes of Action of any of the Debtors and their respective Estates shall, upon the occurrence of the Effective Date, be transferred to, and be vested in, New NPG, and (b) the rights of New NPG to commence, prosecute or settle such Causes of Action, in its sole discretion, shall be preserved notwithstanding the occurrence of the Effective Date.

No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the New NPG Group will not pursue any and all available Causes of Action against them. The New NPG Group and the Estates expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise provided in the Plan. Unless any Causes of Action against a Person are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Final Order, the Debtors and the New NPG Group expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon or after the confirmation or consummation of the Plan.

### 8.10. Appointment of the Disbursing Agent.

Upon the occurrence of the Effective Date, New NPG shall be appointed to serve as the Disbursing Agent and shall have all powers, rights, duties and protections afforded the Disbursing Agent under the Plan.

### 8.11. Sources of Cash for Plan Distributions.

All Cash necessary for the Disbursing Agent to make payments and Plan Distributions shall be obtained from the Debtors' existing Cash balances or the liquidation of Assets.

### 8.12. Investment of Funds Held by the Disbursing Agent; Tax Reporting by the Disbursing Agent.

The Disbursing Agent may, but shall not be required to, invest any funds held by the Disbursing Agent pending the distribution of such funds pursuant to the Plan in investments that are exempt from federal, state, and local taxes. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Disbursing Agent of a private letter ruling if the Disbursing Agent so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Disbursing Agent), the Disbursing Agent may (a) treat the funds and other property held by it as held in a single trust for federal income tax purposes in accordance with the trust provisions of the Internal Revenue Code (sections 641, et seq.), and (b) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.

### 8.13. Releases by the Debtors.

As of the Effective Date, for good and valuable consideration, the Debtors and the New NPG Group in their individual capacities and as Debtors in Possession will be deemed to release and forever waive and discharge all Causes of Action that are based in whole or part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the New NPG Group, the Chapter 11 Cases, the Plan or the Disclosure Statement, and that could have been asserted by or on behalf of the Debtors or their Estates or the New NPG Group against (a) the Debtors' and their non-Debtor subsidiaries' present and former officers, directors, managers and

employees, in their respective capacities as such, (b) holders of Equity Interests in NPG, including Harvest Partners, and their respective present and former officers, directors and employees, in their respective capacities as such, (c) the OpCo Lenders and the Prepetition OpCo Agent, in their respective capacities as such, (d) the HoldCo Lenders and the Prepetition HoldCo Agent, in their respective capacities as such, (e) the DIP Lenders and the DIP Agent, in their respective capacities as such, and (f) each of the foregoing's respective successors and assigns, and each of their respective agents, attorneys, advisors, accountants, investment bankers, bankruptcy and restructuring advisors, and financial advisors, in their respective capacities as such; <u>except</u>, that nothing in this Section shall be construed to release any party or entity from (a) conduct that (i) would violate any provision in a written agreement with the Debtors or their non-Debtor subsidiaries relating to nonsolicitation, noncompetition, nondisparagement, nondisclosure/use of trade secrets and confidential information, and inventions, and return of company property, or (ii) is, with respect to the Debtors and their non-Debtor subsidiaries, theft, tortious interference with contract or a prospective business relationship, or defamation (including slander and libel), as determined by a Final Order, or (b) any objections by the Debtors or the New NPG Group to Claims filed by such party or entity against any Debtor and/or its Estate (other than the Claims of the Prepetition OpCo Agent, the OpCo Lenders, the Prepetition HoldCo Agent, the HoldCo Lenders, the DIP Agent and the DIP Lenders, which are or shall be deemed Allowed as set forth in this Plan and the DIP Order).

**8.14.** <u>Releases by Creditors and Equity Security Holders</u>.

Subject to the occurrence of the Effective Date, any holder of a Claim or Equity Interest that is impaired or unimpaired under the Plan, for good and valuable consideration, will be presumed conclusively to have released each of (a) the Debtors', their non-Debtor subsidiaries', and the New NPG Group's respective present and former officers, directors, managers and employees, in their respective capacities as such, (b) holders of Equity Interests in NPG, including Harvest Partners, and their respective present and former officers, directors and employees, in their respective capacities as such, (c) the OpCo Lenders and the Prepetition OpCo Agent, in their respective capacities as such, (d) the HoldCo Lenders and the Prepetition HoldCo Agent, in their respective capacities as such, (e) the DIP Lenders and the DIP Agent, in their respective capacities as such, and (f) each of the foregoing's respective successors and assigns, and each of their respective agents, attorneys, advisors, accountants, investment bankers, bankruptcy and restructuring advisors, and financial advisors, in their respective capacities as such, from any Causes of Action that are based in whole or part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the New NPG Group, the Chapter 11 Cases, the Plan or the Disclosure Statement; <u>except</u> that the foregoing releases shall not apply to any holder of a Claim or Equity Interest if such holder "opts out" of the releases provided in this Section 8.14 by filing with the Bankruptcy Court on or prior to the Plan Objection Deadline a timely written notice of election to opt out of the releases contained in this Section 8.14. Any "opt out" of the releases contained in this Section 8.14 shall not and shall not be construed in any way to affect any other release, exculpation or injunction provided in the Plan,

**including without limitation the releases, exculpations and injunctions provided in Sections 8.13, 12.3, 15.3, 15.6, 15.7, 15.8, and 15.23 of the Plan.**

## ARTICLE IX.

## PLAN DISTRIBUTION PROVISIONS

### 9.1. <u>Plan Distributions</u>.

<u>Except</u> as otherwise set forth in the Plan, the Disbursing Agent shall make all Plan Distributions. In the event a Plan Distribution shall be payable on a day other than a Business Day, such Plan Distribution shall instead be paid on the immediately succeeding Business Day, but shall be deemed to have been made on the date otherwise due. For federal income tax purposes, <u>except</u> to the extent a Plan Distribution is made in connection with reinstatement of an obligation pursuant to section 1124 of the Bankruptcy Code, a Plan Distribution will be allocated first to the principal amount of a Claim and then, to the extent the Plan Distribution exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest. Except as otherwise provided herein, Plan Distributions shall be made to the holders of Allowed Claims as reflected in the registry of claims maintained by the Claims Agent on the Effective Date. The Disbursing Agent and its agents shall have no obligation to recognize any transfer of a Claim after the Effective Date.

### 9.2. <u>Timing of Plan Distributions</u>.

<u>Except</u> for Plan Distributions that shall be made on the Effective Date in accordance with the Plan, each Plan Distribution shall be made on the relevant Plan Distribution Date therefor and shall be deemed to have been timely made if made on such date or within ten (10) days thereafter.

### 9.3. <u>Address for Delivery of Plan Distributions/Unclaimed Plan Distributions</u>.

Subject to Bankruptcy Rule 9010, any Plan Distribution or delivery to a holder of an Allowed Claim shall be made at the address of such holder as set forth (a) in the Schedules, if any, or the Debtors' records, (b) on the proof of Claim filed by such holder, (c) in any notice of assignment filed with the Bankruptcy Court with respect to such Claim pursuant to Bankruptcy Rule 3001(e), or (d) in any notice served by such holder giving details of a change of address. If any Plan Distribution is returned to the Disbursing Agent as undeliverable, no Plan Distributions shall be made to such holder unless the Disbursing Agent is notified of such holder's then current address within ninety (90) days after such Plan Distribution was returned. After such date, if such notice was not provided, a holder shall have forfeited its right to such Plan Distribution, and the undeliverable Plan Distributions shall be returned to New NPG.

### 9.4. <u>De Minimis Plan Distributions</u>.

No Plan Distribution of less than ten dollars ($10.00) shall be made by the Disbursing Agent to the holder of any Claim unless a request therefor is made in writing to the Disbursing

Agent. If no request is made as provided in the preceding sentence within ninety (90) days of the Effective Date, all such Plan Distributions shall revert to New NPG.

**9.5.   Time Bar to Cash Payments.**

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within one hundred and eighty (180) days after the date of issuance thereof. Requests for reissuance of any voided check shall be made directly to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued. Any claim in respect of such a voided check shall be made within one hundred and eighty (180) days after the date of issuance of such check. If no request is made as provided in the preceding sentence, any claims in respect of such voided check shall be discharged and forever barred and such unclaimed Plan Distribution shall revert to New NPG.

**9.6.   Manner of Payment under the Plan.**

Unless the Person receiving a Plan Distribution agrees otherwise, any Plan Distribution to be made in Cash under the Plan shall be made, at the election of the Disbursing Agent by check drawn on a domestic bank or by wire transfer from a domestic bank. Cash payments to foreign creditors may be, in addition to the foregoing, made at the option of the Disbursing Agent in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

**9.7.   Expenses Incurred on or after the Effective Date and Claims of the Disbursing Agent.**

Except as otherwise ordered by the Bankruptcy Court or as provided herein, the amount of any reasonable fees and expenses incurred (or to be incurred) by the Disbursing Agent on or after the Effective Date (including, but not limited to, taxes) shall be paid when due. Professional fees and expenses incurred by the Disbursing Agent from and after the Effective Date in connection with the effectuation of the Plan shall be paid in the ordinary course of business. Any dispute regarding compensation shall be resolved by agreement of the parties, or if the parties are unable to agree, as determined by the Bankruptcy Court.

**9.8.   Fractional Plan Distributions.**

Notwithstanding anything to the contrary contained herein, no Plan Distributions of fractional shares or fractions of dollars (whether in Cash or notes) will be made. Fractional shares and fractions of dollars (whether in Cash or notes) shall be rounded to the nearest whole unit (with any amount equal to or less than one-half share or one-half dollar, as applicable, to be rounded down).

**9.9.   Special Distribution Provisions Concerning the Prepetition Credit Facilities.**

The following additional provisions shall apply specifically to Plan Distributions to be made to the holders of Allowed OpCo Lender Claims and Allowed HoldCo Lender Claims under the Plan:

(a)     Service of the Prepetition OpCo Agent and the Prepetition HoldCo Agent.  The Prepetition OpCo Agent and the Prepetition HoldCo Agent and their agents, successors and assigns or such entity appointed by the Prepetition Lenders shall facilitate the making of Plan Distributions to the holders of Allowed OpCo Lender Claims and Allowed HoldCo Lender Claims for which they serve as agent and upon the completion thereof, shall be discharged of all their respective obligations associated with the Prepetition Credit Facilities.  The rights of holders of Allowed OpCo Lender Claims and Allowed HoldCo Lender Claims shall continue in effect for the sole purpose of allowing the Prepetition OpCo Agent and the Prepetition HoldCo Agent to make Plan Distributions on account of such Claims.

(b)     Distributions.  On the Plan Distribution Date, all OpCo Lender Claims and HoldCo Lender Claims shall be settled and compromised in exchange for the distribution to the Prepetition OpCo Agent and the Prepetition HoldCo Agent of the applicable Plan Distributions to the holders of Allowed OpCo Lender Claims and Allowed HoldCo Lender Claims as specified in Sections 5.1(b) and 5.1(c), as applicable; provided, that the Prepetition OpCo Agent and the Prepetition HoldCo Agent shall return to the Disbursing Agent any Plan Distributions held on account of any Allowed OpCo Lender Claims or Allowed HoldCo Lender Claims as to which the requirements of Section 9.10 are not satisfied by the first anniversary of the Effective Date.

(c)     Enforcement of Rights of the Prepetition OpCo Agent and the Prepetition HoldCo Agent.  The rights, liens (including the charging liens), and Claims of the Prepetition OpCo Agent and the Prepetition HoldCo Agent with respect to the collection of their fees, expenses or any indemnification obligations from the holders of Allowed OpCo Lender Claims and Allowed HoldCo Lender Claims shall survive confirmation of the Plan and may be fully enforced by the Prepetition OpCo Agent and the Prepetition HoldCo Agent.  All distributions to the Prepetition OpCo Agent and the Prepetition HoldCo Agent on behalf of the holders of Allowed OpCo Lender Claims and Allowed HoldCo Lender Claims shall be applied by the Prepetition OpCo Agent and the Prepetition HoldCo Agent as provided by the applicable agreement.

**9.10.   Cancellation of Instruments.**

As a condition to receiving any Plan Distribution, on or before the Plan Distribution Date, to the extent that an Allowed Claim is evidenced by a certificate, instrument or note, other than any such certificate, instrument or note that is being reinstated or being left unimpaired under the Plan, such certificate, instrument or note shall thereafter be cancelled and extinguished and shall represent only the right, if any, to participate in the distributions contemplated by this Plan; provided, however, that the provisions of the OpCo Credit Agreement governing the relationship of the Prepetition OpCo Agent and the OpCo Lenders, including but not limited to those provisions relating to the Prepetition OpCo Agent's rights of indemnification from the OpCo Lenders, shall not be affected by and shall survive the Plan, entry of the Confirmation Order or the occurrence of the Effective Date; provided, further, that the provisions of the OpCo Credit Agreement governing the Prepetition OpCo Agent's rights of indemnification from the Debtors (and following the Effective Date, from the New NPG Group) shall not be affected by and shall survive the Plan, entry of the Confirmation Order or the occurrence of the Effective Date.

# ARTICLE X.

## PROCEDURES FOR RESOLVING
## AND TREATING CONTESTED CLAIMS

### 10.1.  Objection Deadline.

As soon as practicable, but in no event later than one hundred and eighty (180) days after the Effective Date (subject to being extended by the order of the Bankruptcy Court upon motion of the Disbursing Agent without notice or a hearing), objections to Claims shall be filed with the Bankruptcy Court and served upon the holders of each of the Claims to which objections are made.

### 10.2.  Prosecution of Contested Claims.

The Disbursing Agent may object to the allowance of Claims filed with the Bankruptcy Court with respect to which liability is disputed in whole or in part.  All objections that are filed and prosecuted as provided herein shall be litigated to Final Order or compromised and settled in accordance with Section 10.3.

### 10.3.  Claims Settlement.

Notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, from and after the Effective Date, the Disbursing Agent shall have authority to settle or compromise all Claims and Causes of Action without further review or approval of the Bankruptcy Court.

### 10.4.  Entitlement to Plan Distributions upon Allowance.

Notwithstanding any other provision of the Plan, no Plan Distribution shall be made with respect to any Claim to the extent it is a Contested Claim, unless and until such Contested Claim becomes an Allowed Claim, subject to the setoff rights as provided in Section 15.19.  When a Claim that is not an Allowed Claim as of the Effective Date becomes an Allowed Claim (regardless of when) the holder of such Allowed Claim shall thereupon become entitled to receive the Plan Distributions in respect of such Claim, the same as though such Claim had been an Allowed Claim on the Effective Date.

### 10.5.  Estimation of Claims.

The Disbursing Agent may, at any time, request that the Bankruptcy Court estimate any Contested Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Disbursing Agent has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any Contested Claim, that estimated amount will constitute the Allowed amount of such Claim for all purposes under the Plan.  All of the objection, estimation, settlement, and

resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

## ARTICLE XI.

### CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE OCCURRENCE OF THE EFFECTIVE DATE

**11.1.** **Conditions Precedent to Confirmation.**

The following are conditions precedent to confirmation of the Plan:

(a) The Clerk of the Bankruptcy Court shall have entered an order or orders (i) approving the Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code, (ii) approving the manner of solicitation of votes with respect to the Plan, (iii) determining that all votes are binding and have been properly tabulated as acceptances or rejections of the Plan, (iv) confirming and giving effect to the terms and provisions of the Plan, (v) determining that all applicable tests, standards and burdens in connection with the Plan have been duly satisfied and met by the Debtors and the Plan, (vi) approving the Plan Documents, and (vii) authorizing the Debtors to execute, enter into, and deliver the Plan Documents and to execute, implement, and to take all actions otherwise necessary or appropriate to give effect to the transactions contemplated by the Plan and the Plan Documents;

(b) The Confirmation Order, the Plan and all other definitive documentation are consistent with the Restructuring Term Sheet and otherwise in form and substance reasonably satisfactory to the Debtors and the Majority Consenting OpCo Lenders; provided, that all post-restructuring documentation shall be in form and substance reasonably satisfactory only to the Majority Consenting OpCo Lenders;

(c) The Confirmation Order shall include determinations that all of the settlements and compromises contained in the Plan meet the applicable standards under section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 for approval and implementation;

(d) The Debtors shall have received a binding commitment for the New Term Loan portion of the Exit Facility with terms and conditions that are consistent with the Restructuring Term Sheet;

(e) The Schedule of Rejected Executory Contracts and Unexpired Leases, if any, shall be reasonably satisfactory to the Debtors and the Majority Consenting OpCo Lenders; and

(f) Subject to Section 11.3 and Section 15.16, the Confirmation Order shall be entered no later than April 5, 2010.

**11.2. <u>Conditions Precedent to the Occurrence of the Effective Date</u>.**

The following are conditions precedent to the occurrence of the Effective Date:

(a)        Subject to Section 11.3 and Section 15.16, the Confirmation Order shall have been entered no later than April 5, 2010, and such Confirmation Order shall have become a Final Order on or before the fifteenth (15th) day following entry of such order;

(b)        All necessary consents, authorizations and approvals shall have been given for the transfers of property and the payments provided for or contemplated by the Plan, <u>including</u>, without limitation, satisfaction or waiver of all conditions to (i) the obligations of the Debtors under the Plan and the Plan Documents, and (ii) the obligations of the New Term Lenders to make loans under the New Term Loan portion of the Exit Facility;

(c)        The Confirmation Order, the Plan and all other definitive documentation shall continue to be consistent with the Restructuring Term Sheet and otherwise in form and substance reasonably satisfactory to the Debtors and the Majority Consenting OpCo Lenders; <u>provided</u>, that all post-restructuring documentation shall continue to be in form and substance reasonably satisfactory only to the Majority Consenting OpCo Lenders;

(d)        All actions, documents and agreements necessary to implement the Plan and the transactions contemplated by the Plan shall have been effected or executed;

(e)        The Exit Facility shall have become effective and all conditions to the effectiveness thereof shall have been satisfied or waived;

(f)        The outstanding Letters of Credit either (i) shall have been (x) returned to the issuer marked cancelled or (y) cash collateralized with Cash in an amount equal to 105% of the face amount of the outstanding Letters of Credit or (ii) the issuer shall have been provided with back-to-back letters of credit in an amount equal to 105% of the face amount of the outstanding Letters of Credit and in form and substance and from a financial institution acceptable to the issuer;

(g)        The New NPG Common Stock and New NPG Warrants to be issued under the Plan shall have been duly authorized and, upon issuance, shall be validly issued and outstanding;

(h)        The payment of all fees, reasonable costs and expenses of (i) the DIP Agent incurred under the DIP Facility and (ii) the Prepetition OpCo Agent incurred under the OpCo Credit Agreement on or prior to the Effective Date; and

(i)        Subject to Section 11.3 and Section 15.16, fifteen (15) days shall not have passed following entry of the Confirmation Order.

**11.3. <u>Waiver of Conditions</u>.**

The Debtors may, with the prior written consent of the Majority Consenting OpCo Lenders, waive any one or more of the conditions set forth in Section 11.1 or Section 11.2 without notice or order of the Bankruptcy Court and without notice to any parties in interest;

provided, however, that, any extension by more than fifteen (15) days of the time periods set forth in Section 11.1(f), Section 11.2(a) and Section 11.2(i) shall require the prior written consent of the Requisite Consenting OpCo Lenders; provided further, however, that with respect to waiving the conditions set forth in Section 11.1(f), Section 11.2(a) and Section 11.2(i), the prior written consent of the OpCo Lenders shall not be required if the non-occurrence of such condition or conditions is a result of a material breach of the OpCo Plan Support Agreement by one or more OpCo Lenders party to such agreement and such breach has a material adverse effect on the Debtors or their ability to consummate the transactions contemplated by the OpCo Lender Plan Support Agreement in accordance with the terms of the Restructuring Term Sheet.

### 11.4. Effect of Non-Occurrence of the Effective Date.

If the Effective Date shall not occur, the Plan shall be null and void and nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims against or Equity Interests in a Debtor; (b) prejudice in any manner the rights of the Debtors, including, without limitation, any right to seek an extension of the exclusivity periods under section 1121(d) of the Bankruptcy Code; or (c) constitute an admission, acknowledgement, offer or undertaking by the Debtors.

## ARTICLE XII.

## THE DISBURSING AGENT

### 12.1. Powers and Duties.

Pursuant to the terms and provisions of the Plan, the Disbursing Agent shall be empowered and directed to (a) take all steps and execute all instruments and documents necessary to make Plan Distributions to holders of Allowed Claims; (b) comply with the Plan and the obligations thereunder; (c) employ, retain, or replace professionals to represent it with respect to its responsibilities; (d) object to Claims as specified in Article X, and prosecute such objections; (e) compromise and settle any issue or dispute regarding the amount, validity, priority, treatment, or Allowance of any Claim as provided in Article X; (f) make annual and other periodic reports regarding the status of distributions under the Plan to the holders of Allowed Claims that are outstanding at such time, with such reports to be made available upon request to the holder of any Contested Claim; and (g) exercise such other powers as may be vested in the Disbursing Agent pursuant to the Plan, the Plan Documents or order of the Bankruptcy Court.

### 12.2. Plan Distributions.

Pursuant to the terms and provisions of the Plan, the Disbursing Agent shall make the required Plan Distributions specified under the Plan on the relevant Plan Distribution Date therefor.

**12.3.    Exculpation.**

**Except** as otherwise provided in this Section, the Disbursing Agent, together with its officers, directors, employees, agents, and representatives, are exculpated pursuant to the Plan by all Persons, holders of Claims and Equity Interests, and all other parties in interest, from any and all Causes of Action arising out of the discharge of the powers and duties conferred upon the Disbursing Agent (and each of its respective paying agents), by the Plan, any Final Order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, **except** solely for actions or omissions arising out of the Disbursing Agent's willful misconduct or gross negligence.  No holder of a Claim or an Equity Interest, or representative thereof, shall have or pursue any Cause of Action (a) against the Disbursing Agent or its respective officers, directors, employees, agents, and representatives for making Plan Distributions in accordance with the Plan, or (b) against any holder of a Claim for receiving or retaining Plan Distributions as provided for by the Plan.  Nothing contained in this Section shall preclude or impair any holder of an Allowed Claim or Allowed Equity Interest from bringing an action in the Bankruptcy Court against any Debtor to compel the making of Plan Distributions contemplated by the Plan on account of such Claim or Equity Interest.

## ARTICLE XIII.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**13.1.    Assumption and Rejection of Executory Contracts and Unexpired Leases.**

(a)      On the Effective Date, all executory contracts and unexpired leases of the Debtors shall be assumed pursuant to the provisions of section 365 of the Bankruptcy Code, except: (i) any executory contracts and unexpired leases that are the subject of separate motions to reject, assume, or assume and assign filed pursuant to section 365 of the Bankruptcy Code by the Debtors before the Effective Date; (ii) contracts and leases listed in any "Schedule of Rejected Executory Contracts and Unexpired Leases" to be filed by the Debtors with the Bankruptcy Court prior to the Confirmation Hearing; (iii) all executory contracts and unexpired leases rejected under this Plan or by order of the Bankruptcy Court entered before the Effective Date; (iv) any executory contract or unexpired lease that is the subject of a dispute over the amount or manner of cure pursuant to the next section hereof and for which the Debtors make a motion to reject such contract or lease based upon the existence of such dispute filed at any time; and (v) any agreement, obligation, security interest, transaction or similar undertaking that the Debtors believe is not executory.

(b)      Inclusion of a contract, lease or other agreement on any "Schedule of Rejected Executory Contracts and Unexpired Leases" shall constitute adequate and sufficient notice that (i) any Claims arising thereunder or related thereto shall be treated as Unsecured Claims under the Plan, and (ii) the Debtors are no longer bound by, or otherwise obligated to perform, any such obligations, transactions, or undertakings relating thereto or arising thereunder.

(c)      The Plan shall constitute a motion to reject such executory contracts and unexpired leases set forth in any "Schedule of Rejected Executory Contracts and Unexpired

Leases" filed by the Debtors with the Bankruptcy Court prior to the Confirmation Hearing, and the Debtors shall have no liability thereunder except as is specifically provided in the Plan. The Debtors reserve the right to amend the Schedule of Rejected Executory Contracts and Unexpired Leases on or prior to the Confirmation Date to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) and unexpired lease(s) shall be deemed to be, respectively, assumed or rejected by the Debtors pursuant to this Article XIII. Any such amendment to the Schedule of Rejected Executory Contracts and Unexpired Leases must be reasonably satisfactory to the Majority Consenting OpCo Lenders. The Debtors will provide notice of any amendments to the Schedule of Rejected Executory Contracts and Unexpired Leases to the parties to the executory contracts or unexpired lease affected thereby. The listing of a document on the Schedule of Rejected Executory Contracts and Unexpired Leases shall not constitute an admission by the Debtors that such document is an executory contract or that the Debtors have any liability thereunder. Entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of rejections under this Section pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such rejected agreement, executory contract or unexpired lease is burdensome and that the rejection thereof is in the best interests of the Debtors and their Estates.

(d)     The Plan shall constitute a motion to assume such executory contracts and unexpired leases assumed pursuant to Section 13.1(a). Entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such assumptions pursuant to sections 365(a) and (b) of the Bankruptcy Code. Any non-Debtor counterparty to an agreement designated as being assumed in Section 13.1(a) who disputes the assumption of such executory contract or unexpired lease must file with the Bankruptcy Court, and serve upon the Debtors, a written objection to the assumption, which objection shall set forth the basis for the dispute by no later than ten (10) Business Days prior to the Confirmation Hearing. The failure to timely object shall be deemed a waiver of any and all objections to the assumption of executory contracts and unexpired leases designated as being assumed in Section 13.1(a).

## 13.2.   Cure.

At the election of the Debtors, any monetary defaults under each executory contract and unexpired lease to be assumed under this Plan shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code: (a) by payment of the default amount in Cash on the Effective Date or as soon thereafter as practicable; or (b) on such other terms as agreed to by the parties to such executory contract or unexpired lease. The Debtors' election regarding satisfaction of any monetary default in excess of $100,000 under an executory contract or unexpired lease to be assumed under this Plan shall require the prior written consent of the Majority Consenting OpCo Lenders. In the event of a dispute regarding: (i) the amount of any cure payments; (ii) the ability to provide adequate assurance of future performance under the contract or lease to be assumed or assigned; or (iii) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving assumption or assignment, as applicable. The Debtors believe that they are current on all obligations under all of the executory contracts and unexpired leases to be assumed pursuant to Section 13.1(a), and thus the Debtors do not believe that any cure obligations are owed. Any non-Debtor counterparty to an executory contract or

unexpired lease who disputes whether the Debtors have any cure obligations with respect to the executory contract or unexpired lease to which they are a party must file with the Bankruptcy Court, and serve upon the Debtors and the Creditors' Committee, a written objection regarding the cure obligation, which objection shall set forth the basis for the dispute, the alleged correct cure obligation, and any other objection related to the assumption of the relevant agreement by no later than ten (10) Business Days prior to the Confirmation Hearing. If a non-Debtor counterparty fails to file and serve an objection which complies with the foregoing, the non-Debtor counterparty shall be deemed to have waived any and all objections to the assumption of the relevant agreement as proposed by the Debtors, including the lack of any cure obligations.

**13.3.** **Claims Arising from Rejection, Expiration or Termination.**

Claims created by the rejection of executory contracts and unexpired leases or the expiration or termination of any executory contract or unexpired lease prior to the Confirmation Date must be filed with the Bankruptcy Court and served on the Debtors (a) in the case of an executory contract or unexpired lease rejected by the Debtors prior to the Confirmation Date, in accordance with the Bar Date Notice, or (b) in the case of an executory contract or unexpired lease that (i) was terminated or expired by its terms prior to the Confirmation Date, or (ii) is rejected pursuant to this Article XIII, no later than thirty (30) days after the Confirmation Date. Any such Claims for which a proof of claim is not filed and served by the deadlines set forth in the Bar Date Notice or this Section 13.3, as applicable, will be forever barred from assertion and shall not be enforceable against the Debtors, the New NPG Group, their respective Estates, Affiliates, or Assets. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as Unsecured Claims under the Plan subject to objection by the Disbursing Agent.

## ARTICLE XIV.

## RETENTION OF JURISDICTION

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall retain and shall have exclusive jurisdiction over any matter (a) arising under the Bankruptcy Code, (b) arising in or related to the Chapter 11 Cases or the Plan, or (c) that relates to the following:

(i)      To hear and determine any and all motions or applications pending on the Confirmation Date or thereafter brought in accordance with Article XIII hereof for the assumption, assumption and assignment or rejection of executory contracts or unexpired leases to which any of the Debtors is a party or with respect to which any of the Debtors may be liable, and to hear and determine any and all Claims and any related disputes (including, without limitation, the exercise or enforcement of setoff or recoupment rights, or rights against any third party or the property of any third party resulting therefrom or from the expiration, termination or liquidation of any executory contract or unexpired lease);

(ii)      To determine any and all adversary proceedings, applications, motions, and contested or litigated matters that may be pending on the Effective Date or that,

pursuant to the Plan, may be instituted by the Disbursing Agent or the New NPG Group, as applicable, after the Effective Date;

(iii)    To hear and determine any objections to the allowance of Claims, whether filed, asserted, or made before or after the Effective Date, including, without express or implied limitation, to hear and determine any objections to the classification of any Claim and to allow, disallow or estimate any Contested Claim in whole or in part;

(iv)    To issue such orders in aid of execution of the Plan to the extent authorized or contemplated by section 1142 of the Bankruptcy Code;

(v)    To consider any modifications of the Plan, remedy any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(vi)    To hear and determine all Fee Applications and applications for allowances of compensation and reimbursement of any other fees and expenses authorized to be paid or reimbursed under the Plan or the Bankruptcy Code;

(vii)    To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with the Plan or its interpretation, implementation, enforcement, or consummation;

(viii)    To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with the Confirmation Order (and all exhibits to the Plan) or its interpretation, implementation, enforcement, or consummation;

(ix)    To the extent that Bankruptcy Court approval is required, to consider and act on the compromise and settlement of any Claim or Cause of Action by, on behalf of, or against the Estates;

(x)    To determine such other matters that may be set forth in the Plan, or the Confirmation Order, or that may arise in connection with the Plan, or the Confirmation Order;

(xi)    To hear and determine matters concerning state, local, and federal taxes, fines, penalties, or additions to taxes for which the New NPG Group, the Debtors, the Debtors in Possession, or the Disbursing Agent may be liable, directly or indirectly, in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(xii)    To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with any setoff and/or recoupment rights of the Debtors or any Person under the Plan;

(xiii)    To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with Causes of Action of the Debtors commenced by the Disbursing Agent, the Debtors or any third parties, as applicable, before or after the Effective Date;

(xiv)    To enter an order or final decree closing the Chapter 11 Cases;

(xv)    To issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation, implementation or enforcement of the Plan or the Confirmation Order; and

(xvi)    To hear and determine any other matters related hereto and not inconsistent with chapter 11 of the Bankruptcy Code.

## ARTICLE XV.

## MISCELLANEOUS PROVISIONS

### 15.1.    Substantial Consummation.

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 15.2.    Payment of Statutory Fees.

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid by the Debtors on or before the Effective Date.

### 15.3.    Satisfaction of Claims.

The rights afforded in the Plan and the treatment of all Claims and Equity Interests herein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Equity Interests of any nature whatsoever against the Debtors and the Debtors in Possession, or any of their Estates, Assets, properties, or interests in property.  Except as otherwise provided herein, on the Effective Date, all Claims against and Equity Interests in the Debtors and the Debtors in Possession shall be satisfied, discharged, and released in full.  Neither the New NPG Group nor the Debtors shall be responsible for any pre-Effective Date obligations of the Debtors or the Debtors in Possession, except those expressly assumed by the New NPG Group or any such Debtor, as applicable.  Except as otherwise provided herein, all Persons shall be precluded and forever barred from asserting against the New NPG Group, the Debtors, their respective successors or assigns, or their Estates, Affiliates, Assets, properties, or interests in property any event, occurrence, condition, thing, or other or further Claims or Causes of Action based upon any act, omission, transaction, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date, whether or not the facts of or legal bases therefor were known or existed prior to the Effective Date.

### 15.4.    Special Provisions Regarding Insured Claims.

Plan Distributions to each holder of an Allowed Insured Claim against any Debtor shall be made in accordance with the treatment provided under the Plan for the Class in which such Allowed Insured Claim is classified; except, that there shall be deducted from any Plan

Distribution on account of an Insured Claim, for purposes of calculating the Allowed amount of such Claim, the amount of any insurance proceeds actually received by such holder in respect of such Allowed Insured Claim. Nothing in this Section 15.4 shall constitute a waiver of any Claim, right, or Cause of Action the Debtors or their Estates may hold against any Person, including any insurer. Pursuant to section 524(e) of the Bankruptcy Code, nothing in the Plan shall release or discharge any insurer from any obligations to any Person under applicable law or any policy of insurance under which a Debtor is an insured or beneficiary.

### 15.5. **Third Party Agreements; Subordination.**

The Plan Distributions to the various classes of Claims and Equity Interests hereunder shall not affect the right of any Person to levy, garnish, attach, or employ any other legal process with respect to such Plan Distributions by reason of any claimed subordination rights or otherwise. All such rights and any agreements relating thereto shall remain in full force and effect, except as otherwise compromised and settled pursuant to the Plan. Plan Distributions shall be subject to and modified by any Final Order directing distributions other than as provided in the Plan. The right of the Debtors to seek subordination of any Claim or Equity Interest pursuant to section 510 of the Bankruptcy Code is fully reserved, and the treatment afforded any Claim or Equity Interest that becomes a Subordinated Claim or subordinated Equity Interest at any time shall be modified to reflect such subordination. Unless the Confirmation Order provides otherwise, no Plan Distributions shall be made on account of a Subordinated Claim or subordinated Equity Interest.

### 15.6. **Exculpation.**

**None of the Debtors, the New NPG Group, Harvest Partners, the OpCo Lenders and the Prepetition OpCo Agent, in their respective capacities as such, the HoldCo Lenders and the Prepetition HoldCo Agent, in their respective capacities as such, the DIP Lenders and the DIP Agent, in their respective capacities as such, or any of their respective officers, directors, members, employees, agents, representatives, advisors, attorneys or successors and assigns will have or incur any liability to any Person for any act or omission in connection with, or arising out of, (a) the filing and prosecution of the Chapter 11 Cases, (b) the negotiation, filing and pursuit of approval of the Disclosure Statement, (c) the negotiation, filing and pursuit of confirmation of the Plan, (d) the consummation of the Plan, or (e) the implementation or administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence as determined by a Final Order, and, in all respects shall be entitled to rely upon the advice of counsel and all information provided by other exculpated persons herein without any duty to investigate the veracity or accuracy of such information with respect to their duties and responsibilities under the Plan.**

### 15.7. **Discharge of Liabilities.**

Except as otherwise provided in the Plan, upon the occurrence of the Effective Date, the Debtors and the New NPG Group shall be discharged from all Claims and Causes of Action to the fullest extent permitted by section 1141 of the Bankruptcy Code, and all holders of Claims and Equity Interests shall be precluded from asserting against the New NPG Group and its

Affiliates, the Debtors, their Assets, or any property dealt with under the Plan, any further Claim or other Cause of Action based upon any act or omission, transaction, event, thing, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date.

**EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, NEW NPG AND ITS AFFILIATES SHALL NOT HAVE OR BE CONSTRUED TO HAVE OR MAINTAIN ANY LIABILITY, CLAIM, OR OBLIGATION THAT IS BASED IN WHOLE OR IN PART ON ANY ACT, OMISSION, TRANSACTION, EVENT, OTHER OCCURRENCE OR THING OCCURRING OR IN EXISTENCE ON OR PRIOR TO THE EFFECTIVE DATE OF THE PLAN AND NO SUCH LIABILITY, CLAIM, OR OBLIGATION FOR ANY ACTS SHALL ATTACH TO NEW NPG OR ITS AFFILIATES.**

### 15.8. **Discharge of Debtors.**

Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, without further notice or order, all Claims against the Debtors of any nature whatsoever shall be automatically discharged forever.  Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, the Debtors, the New NPG Group, their Estates, and all successors thereto shall be deemed fully discharged and released from any and all Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), and 502(i) of the Bankruptcy Code, whether or not (a) a proof of claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code; (b) a Claim based upon such debt is allowed under section 502 of the Bankruptcy Code; or (c) the holder of a Claim based upon such debt has accepted the Plan. The Confirmation Order shall be a judicial determination of discharge of all liabilities of the Debtors, the New NPG Group, their Estates, and all successors thereto.  As provided in section 524 of the Bankruptcy Code, such discharge shall void any judgment against the Debtors, the New NPG Group, their Estates, or any successor thereto at any time obtained to the extent it relates to a discharged Claim, and operates as an injunction against the prosecution of any action against the Debtors, the New NPG Group or property of the Debtors or the New NPG Group or their Estates to the extent it relates to a discharged Claim.

### 15.9. **Notices.**

Any notices, requests, and demands to or upon the Debtors or the New NPG Group, or the Majority Consenting OpCo Lenders or Requisite Consenting OpCo Lenders, in order to be effective, shall be in writing (including, without express or implied limitation, by facsimile transmission), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

Natural Products Group, LLC
c/o Arbonne International, LLC
9400 Jeronimo Road
Irvine, CA 92618
Attention: Ashley J. Good, Esq.
Telephone: (949) 460-1147
Facsimile: (949) 460-1204

White & Case LLP
Wachovia Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131
Attention: Thomas E Lauria, Esq.
Telephone: (305) 371-2700
Facsimile: (305) 358-5744

Fox Rothschild LLP
919 N. Market St, 16th floor
Wilmington, DE 19801
Attention: Jeffrey M. Schlerf, Esq.
Telephone: (302) 622-4212
Facsimile: (302) 656-8920

Canadian Imperial Bank of Commerce
425 Lexington Avenue, 4th Floor
New York, NY 10017
Attn: Charles Mulkeen
Telephone: (212) 856-3880
Facsimile: (212) 856-4135

Kaye Scholer LLP
425 Park Avenue
New York, NY 10022
Attn: Mark F. Liscio, Esq.
Telephone: (212) 836-8000
Facsimile: (212) 836-6525

**15.10. <u>Headings</u>.**

The headings used in the Plan are inserted for convenience only, and neither constitute a portion of the Plan nor in any manner affect the construction of the provisions of the Plan.

**15.11. <u>Governing Law</u>.**

Unless a rule of law or procedure is supplied by federal law (<u>including</u> the Bankruptcy Code and the Bankruptcy Rules), the laws of the State of New York, without giving effect to the conflicts of laws principles thereof, shall govern the construction of the Plan and any agreements,

documents, and instruments executed in connection with the Plan, <u>except</u> as otherwise expressly provided in such instruments, agreements or documents.

**15.12. <u>Expedited Determination</u>.**

The Disbursing Agent is hereby authorized to file a request for expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed with respect to the Debtors.

**15.13. <u>Exemption from Transfer Taxes</u>.**

Pursuant to section 1146 of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, lien, pledge or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

**15.14. <u>Notice of Entry of Confirmation Order and Relevant Dates</u>.**

Promptly upon entry of the Confirmation Order, the Debtors shall publish as directed by the Bankruptcy Court and serve on all known parties in interest and holders of Claims and Equity Interests, Notice of Confirmation and all relevant deadlines and dates under the Plan, <u>including</u>, but not limited to, the deadline for filing notice of Administrative Claims, and the deadline for filing rejection damage Claims.

**15.15. <u>Interest and Attorneys' Fees</u>.**

Interest accrued after the Petition Date will accrue and be paid on Claims only to the extent specifically provided for in this Plan, the Confirmation Order, or as otherwise required by the Bankruptcy Court or by applicable law. No award or reimbursement of attorneys' fees or related expenses or disbursements shall be allowed on, or in connection with, any Claim, <u>except</u> as set forth in the Plan or as ordered by the Bankruptcy Court.

**15.16. <u>Modification of the Plan</u>.**

As provided in section 1127 of the Bankruptcy Code, modification of the Plan may be proposed in writing by the Debtors (a) at any time before confirmation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with section 1125 of the Bankruptcy Code; or (b) at any time after confirmation and before substantial consummation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified, under section 1129 of the Bankruptcy Code, and the circumstances warrant such modifications. Notwithstanding the foregoing, any modification to the Plan must be approved in writing by the Majority Consenting OpCo Lenders; <u>provided</u>, that any modification, at any time, of (i) any term or provision of this Plan, the effect of which is to modify the form of, or decrease the amount or percentage of, the aggregate recovery (or any component thereof) to be paid, issued or distributed to the OpCo Lenders (or

any one of them) by more than 0.75% of the aggregate outstanding amount of the OpCo Lender Claims, (ii) any term or provision of this Plan, the effect of which is to materially modify the form of, or materially increase the amount or percentage of, the recovery (or any component thereof) to be paid, issued or distributed to any Person(s) (other than the OpCo Lenders) pursuant to this Plan, (iii) Section 11.1(f), Section 11.2(a) or Section 11.2(i), the effect of which is to extend any of the time periods specified therein for a period of greater than fifteen (15) days, and (iv) any of the provisions of this Section 15.16, shall require the prior written consent of the Requisite Consenting OpCo Lenders.  A holder of a Claim that has accepted the Plan shall be deemed to have accepted such Plan as modified if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.

**15.17.  Corrective Action.**

Prior to the Effective Date, upon the prior written consent of the Majority Consenting OpCo Lenders, the Debtors may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Equity Interests.

**15.18.  Revocation of Plan.**

The Debtors reserve the right to revoke and withdraw the Plan and/or to adjourn the Confirmation Hearing with respect to any one or more of the Debtors prior to the occurrence of the Effective Date; provided, however, that unless otherwise agreed to in writing by the Majority Consenting OpCo Lenders, revocation of the Plan shall be permitted only in the event that the board of directors of the Debtors has determined in good faith, after consultation with legal counsel, that pursuing the Plan would be inconsistent with its applicable fiduciary obligations; provided further, that nothing contained in the Plan shall be deemed to prevent the Debtors from taking or failing to take any action that they are obligated to take (or fail to take) in the performance of their fiduciary or similar duty which the Debtors owe to any other Person.

If the Debtors revoke or withdraw the Plan with respect to any one or more of the Debtors in accordance with this Section 15.18, or if the Effective Date does not occur as to any Debtor, then, as to such Debtor, the Plan and all settlements and compromises set forth in the Plan and not otherwise approved by a separate Final Order shall be deemed null and void and nothing contained herein and no acts taken in preparation for consummation of the Plan shall be deemed to constitute a waiver or release of any Claims against or Equity Interests in such Debtor or to prejudice in any manner the rights of any of the Debtors or any other Person in any other further proceedings involving such Debtor.

In the event that the Debtors choose to adjourn the Confirmation Hearing with respect to any one or more of the Debtors, the Debtors reserve the right to proceed with confirmation of the Plan with respect to those Debtors in relation to which the Confirmation Hearing has not been adjourned.  With respect to those Debtors for which the Confirmation Hearing has been adjourned, and subject to this Section 15.18 and Section 15.16, the Debtors reserve the right to amend, modify, revoke or withdraw the Plan and/or submit any new plan of reorganization at

such times and in such manner as they consider appropriate, subject to the provisions of the Bankruptcy Code.

**15.19. <u>Setoff Rights</u>.**

Other than with respect to the OpCo Lender Claims and the DIP Claims (as to which any and all rights of setoff or recoupment have been waived), in the event that any Debtor has a Claim of any nature whatsoever against the holder of a Claim against such Debtor, then such Debtor may, but is not required to, setoff against the Claim (and any payments or other Plan Distributions to be made in respect of such Claim hereunder) such Debtor's Claim against such holder, subject to the provisions of sections 553, 556 and 560 of the Bankruptcy Code. Neither the failure to setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release of any Claims that any Debtor may have against the holder of any Claim.

**15.20. <u>Compliance with Tax Requirements</u>.**

In connection with the Plan, the Debtors and the Disbursing Agent, as applicable, shall comply with all withholding and reporting requirements imposed by federal, state, local, and foreign taxing authorities and all Plan Distributions hereunder shall be subject to such withholding and reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a Plan Distribution shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any government unit, <u>including</u> income, withholding and other tax obligations, on account of such Plan Distribution. The Disbursing Agent has the right, but not the obligation, to not make a Plan Distribution until such holder has made arrangements satisfactory to the Disbursing Agent for payment of any such tax obligations.

**15.21. <u>Rates</u>.**

The Plan does not provide for the change of any rate that is within the jurisdiction of any governmental regulatory commission after the occurrence of the Effective Date. Where a Claim has been denominated in foreign currency on a proof of Claim, the Allowed amount of such Claim shall be calculated in legal tender of the United States based upon the conversion rate in place as of the Petition Date and in accordance with section 502(b) of the Bankruptcy Code.

**15.22. <u>Dissolution of the Creditors' Committee</u>.**

Upon the Effective Date, the Creditors' Committee, if any, shall dissolve automatically, whereupon its members, professionals, and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to (a) applications for Fee Claims or reimbursement of expenses incurred as a member of the Creditors' Committee, and (b) any motions or other actions seeking enforcement or implementation of the provisions of the Plan or the Confirmation Order or pending appeals of orders entered in the Chapter 11 Cases.

**15.23.** **Injunctions.**

The Confirmation Order will contain an injunction permanently enjoining the commencement or prosecution of certain actions, which injunction shall provide, inter alia:

(a)     **On the Effective Date and <u>except</u> as otherwise provided herein, all Persons who have been, are, or may be holders of Claims against or Equity Interests in the Debtors shall be permanently enjoined from taking any of the following actions against or affecting the New NPG Group or its Affiliates, the Debtors or their Affiliates, the Estates, the Assets, or the Disbursing Agent, or any of their current or former respective members, directors, managers, officers, employees, agents, and professionals, successors and assigns or their respective assets and property with respect to such Claims or Equity Interests (other than actions brought to enforce any rights or obligations under the Plan):**

(i)     **commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (<u>including</u>, without limitation, all suits, actions, and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice);**

(ii)     **enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order;**

(iii)     **creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance; and**

(iv)     **asserting any setoff, right of subrogation or recoupment of any kind; <u>provided</u>, that any defenses, offsets or counterclaims which the Debtors may have or assert in respect of the above referenced Claims are fully preserved in accordance with Section 15.19; and**

(b)     **all Persons are permanently enjoined from commencing or continuing in any manner any Cause of Action, whether directly, derivatively, on account of or respecting any Cause of Action which has been released pursuant to the Plan, including pursuant to Sections 8.13, 8.14, 12.3, 15.3, 15.6, 15.7, and 15.8 of the Plan.**

**15.24.** **Binding Effect.**

The Plan shall be binding upon the New NPG Group, the Debtors, the holders of all Claims and Equity Interests, parties in interest, Persons and their respective successors and assigns. To the extent any provision of the Disclosure Statement or any other solicitation document may be inconsistent with the terms of the Plan, the terms of the Plan shall be binding and conclusive.

**15.25.** <u>**Successors and Assigns.**</u>

The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Person.

**15.26.** <u>**Conflict between Plan, Disclosure Statement and Plan Documents.**</u>

(a)    Except as provided in Section 15.26(b) below, in the event of any conflict between the terms and provisions in the Plan and the terms and provisions in the Disclosure Statement, the terms and provisions of the Plan shall control and govern.

(b)    In the event of any conflict between the terms and provisions in the Plan and the terms and provisions in the Plan Documents, including without limitation the Exit Facility, the terms and provisions of the Plan Documents shall control and govern.

**15.27.** <u>**Severability.**</u>

**IN THE EVENT THE BANKRUPTCY COURT DETERMINES THAT ANY PROVISION OF THE PLAN IS UNENFORCEABLE EITHER ON ITS FACE OR AS APPLIED TO ANY CLAIM OR EQUITY INTEREST OR TRANSACTION, THE DEBTORS MAY MODIFY THE PLAN IN ACCORDANCE WITH AND SUBJECT TO SECTION 15.16 SO THAT SUCH PROVISION SHALL NOT BE APPLICABLE TO THE HOLDER OF ANY SUCH CLAIM OR EQUITY INTEREST OR TRANSACTION. SUCH A DETERMINATION OF UNENFORCEABILITY SHALL NOT (A) LIMIT OR AFFECT THE ENFORCEABILITY AND OPERATIVE EFFECT OF ANY OTHER PROVISION OF THE PLAN OR (B) REQUIRE THE RESOLICITATION OF ANY ACCEPTANCE OR REJECTION OF THE PLAN.**

**15.28.** <u>**No Admissions.**</u>

None of the filing of the Plan, the taking by the Debtors, the OpCo Lenders and the Prepetition OpCo Agent, in their respective capacities as such, the HoldCo Lenders and the Prepetition HoldCo Agent, in their respective capacities as such, the DIP Lenders and the DIP Agent, in their respective capacities as such, of any action with respect to the Plan or any statement or provision contained herein shall be or be deemed to be an admission by any such party against interest, or be or be deemed to be a waiver of any rights, claims or remedies that such parties may have, and until the Effective Date all such rights and remedies are and shall be specifically reserved.  In the event the Plan is not confirmed and the Confirmation Order is not entered, the Plan and the Plan Documents, and any statement contained herein or therein, may not be used by any Person, party or entity against any of the Debtors, the OpCo Lenders, the Prepetition OpCo Agent, the HoldCo Lenders, the Prepetition HoldCo Agent, the DIP Lenders and the DIP Agent.

**AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER CAUSES OF ACTION OR THREATENED CAUSES OF ACTION, THIS PLAN SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR**

**LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS PLAN SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, AND OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, NPG OR ANY OF ITS SUBSIDIARIES AND AFFILIATES, AS DEBTORS AND DEBTORS IN POSSESSION IN THESE CHAPTER 11 CASES.**

Dated: January __, 2010

Respectfully submitted,

**NATURAL PRODUCTS GROUP, LLC**

By: _____
Name: Mark I. Lehman
Title:  Chief Financial Officer and Secretary

**ARBONNE INTERMEDIATE HOLDCO, INC.**

By: _____
Name: Mark I. Lehman
Title:  Secretary and Treasurer

**LEVLAD INTERMEDIATE HOLDCO, INC.**

By: _____
Name: Mark I. Lehman
Title:  Secretary and Treasurer

**ARBONNE INTERNATIONAL, LLC**

By: _____
Name: Mark I. Lehman
Title:  Chief Financial Officer and Secretary

**LEVLAD, LLC**

By: _____
Name: Mark I. Lehman
Title:  Chief Financial Officer and Secretary

**ARBONNE INSTITUTE OF RESEARCH AND DEVELOPMENT, LLC**

By: _____
Name: Mark I. Lehman
Title:   Chief Financial Officer and Secretary

**ARBONNE INTERNATIONAL HOLDINGS, INC.**

By: _____
Name: Mark I. Lehman
Title:   Chief Financial Officer and Secretary

**ARBONNE INTERNATIONAL DISTRIBUTION, INC.**

By: _____
Name: Mark I. Lehman
Title:   Chief Financial Officer and Secretary

**EXHIBIT "A"**

**GLOSSARY OF DEFINED TERMS**

1.      "Administrative Claim" means a Claim incurred by a Debtor (or its Estate) on or after the Petition Date and before the Effective Date for a cost or expense of administration in the Chapter 11 Cases entitled to priority under sections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation, Fee Claims, DIP Claims and any fees or charges assessed against the estates of the Debtors under section 1930 of chapter 123 of title 28 of the United States Code.

2.      "Affiliate" means, with respect to any Person, all Persons that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code, if such Person was a debtor in a case under the Bankruptcy Code.

3.      "AIRD" means Arbonne Institute of Research and Development, LLC.

4.      "Allowed," when used

(a)      with respect to any Claim, except for a Claim that is an Administrative Claim or a Letter of Credit Claim, means such Claim to the extent it is not a Contested Claim or a Disallowed Claim;

(b)      with respect to an Administrative Claim, means such Administrative Claim to the extent it has become fixed in amount and priority pursuant to the procedures set forth in Section 6.2(c) of this Plan;

(c)      with respect to a Letter of Credit Claim, means such Letter of Credit Claim to the extent the Debtors' reimbursement obligation to the holder of the Letter of Credit Claim has become noncontingent and fixed as a result of a draw on the underlying letter of credit by the counterparty thereto; and

(d)      with respect to Equity Interests in any Debtor, means the Equity Interests in any Debtor as reflected in the stock transfer ledger or similar register of such Debtor as of the Effective Date.

5.      "Arbonne" means Arbonne International, LLC.

6.      "Arbonne HoldCo" means Arbonne Intermediate Holdco, Inc.

7.      "Assets" means, with respect to any Debtor, all of such Debtor's right, title and interest of any nature in property of any kind, wherever located, as specified in section 541 of the Bankruptcy Code.

8.      "Avoidance Actions" means all Causes of Action of the Estates that arise under section 544, 545, 547, 548, 550, 551 and/or 553 of the Bankruptcy Code.

9.     "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as codified at title 11 of the United States Code, as amended from time to time and applicable to the Chapter 11 Cases.

10.     "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware, or such other court having jurisdiction over the Chapter 11 Cases.

11.     "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as prescribed by the United States Supreme Court pursuant to section 2075 of title 28 of the United States Code and as applicable to the Chapter 11 Cases.

12.     "Bar Date Notice" means the notice of establishment of a bar date for filing proofs of Claim against the Estates, as approved by the Bar Date Order.

13.     "Bar Date Order" means an order of the Bankruptcy Court entered in the Chapter 11 Cases, pursuant to Bankruptcy Rule 3003(c), (i) establishing a bar date for filing certain proofs of Claim in the Chapter 11 Cases; (ii) establishing ramifications for failure to comply therewith; (iii) approving a proof of Claim form and notice of bar date; and (iv) approving notice procedures.

14.     "Business Day" means any day other than a Saturday, a Sunday or any other day on which commercial banks are required or authorized to close for business in New York, New York.

15.     "Cash" means legal tender of the United States of America or readily marketable direct obligations of, or obligations guaranteed by, the United States of America.

16.     "Causes of Action" means all claims, rights, actions, causes of action, demands, liabilities, obligations, suits, debts, remedies, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages or judgments, whether known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, foreseen or unforeseen, asserted or unasserted, arising in law, equity or otherwise.

17.     "Chapter 11 Cases" means the cases that will be commenced under chapter 11 of the Bankruptcy Code in the Bankruptcy Court with respect to each of the Debtors styled as In re Natural Products Group, LLC, et al., Chapter 11 Case No. [To Be Determined].

18.     "Claim" means (a) any right to payment, whether or not such right is known or unknown, reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is known or unknown, reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.   For avoidance of doubt, "Claim" includes, without limitation, a right to payment, or equitable relief that gives rise to a right to payment, that has or has not accrued under non-bankruptcy law that is created by one or more acts or omissions of the Debtors if: (a) the act(s) or omission(s) occurred before or at the time of the Effective Date; (b) the act(s) or omission(s) may be sufficient to establish liability when

injuries/damages are manifested; and (c) at the time of the Effective Date, the Debtors have received one or more demands for payment for injuries or damages arising from such acts or omissions.

19.     "Claim Objection Deadline" means the deadline for filing objections to Claims as set forth in Section 10.1 of the Plan.

20.     "Claims Agent" means the Person designated by order of the Bankruptcy Court to process proofs of claim.

21.     "Company" shall mean the Debtors and their non-Debtor subsidiaries.

22.     "Confirmation Date" means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

23.     "Confirmation Hearing" means the hearing held by the Bankruptcy Court, as it may be continued from time to time, to consider confirmation of the Plan.

24.     "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan.

25.     "Contested" (a) when used with respect to a Claim, means such Claim as to which a proof of claim has been filed with the Bankruptcy Court, and as to which an objection was filed on or before the Claim Objection Deadline, unless and to the extent allowed in amount and/or priority by a Final Order of the Bankruptcy Court or the Plan; or as to which an objection has been filed on or before the Effective Date; provided, that a Claim that is fixed in amount and priority pursuant to the Plan or by Final Order on or before the Effective Date shall not be a Contested Claim; and (b) when used with respect to an Equity Interest, means such Equity Interest to the extent it is not reflected on the applicable Debtor's stock transfer ledger or similar register as of the Effective Date.

26.     "Creditors' Committee" means an Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases, if any.

27.     "Debtor" means any of NPG and its direct and indirect subsidiaries that are debtors in the Chapter 11 Cases, including those parties listed on Exhibit "B" to the Plan.

28.     "Debtor in Possession" means any Debtor, in its capacity as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

29.     "DIP Agent" means Canadian Imperial Bank of Commerce, as administrative and collateral agent under the DIP Facility.

30.     "DIP Claim" means a Claim of the DIP Lenders arising under, in connection with, or related to, the DIP Facility, including with respect to any and all guarantees, pledges and other agreements, documents, notes and instruments executed or delivered by any Debtor with respect to any and all obligations under the DIP Facility.

31.     "DIP Facility" means a Debtor-In-Possession Credit Agreement to be entered into between Arbonne and Levlad, as borrowers, and certain other Debtors as guarantors, the DIP Agent, and those OpCo Lenders who agree to participate as lenders, together with all documents, instruments, notes, instruments and other agreements executed, delivered or filed pursuant to or in connection with the aforementioned Debtor-In-Possession Credit Agreement and the orders of the Bankruptcy Court authorizing and governing such facility, as such Debtor-In-Possession Credit Agreement, documents, notes, instruments and other agreements may have been or shall be amended, supplemented, modified or allonged.

32.     "DIP Lender" means any lending institution from time to time party to the DIP Facility, and its successors and assigns.

33.     "DIP Order" means an order of the Bankruptcy Court approving the DIP Facility, authorizing the Debtors that are parties thereto to enter into the DIP Facility, granting certain rights, protections and liens to and for the benefit of the DIP Lenders as set forth therein, and authorizing the Debtors to make borrowings under the DIP Facility.

34.     "Disallowed" when used with respect to a Claim, means a Claim, or such portion of a Claim, that has been disallowed by a Final Order.

35.     "Disbursing Agent" means New NPG or, after the occurrence of the Effective Date, any agent selected by New NPG, acting on behalf of the Debtors in (a) making the Plan Distributions contemplated under the Plan, the Confirmation Order, or any other relevant Final Order, and (b) performing any other act or task that is or may be delegated to the Disbursing Agent under the Plan.

36.     "Disclosure Statement" means the disclosure statement filed with respect to the Plan, as it may be amended, supplemented, or otherwise modified from time to time, and the exhibits and schedules thereto.

37.     "Disclosure Statement Order" means the order entered by the Bankruptcy Court approving the Disclosure Statement as containing adequate information required under section 1125 of the Bankruptcy Code.

38.     "Effective Date" means a date selected by the Debtors which shall be a Business Day that is no later than three (3) days after all of the conditions specified in Section 11.2 have been satisfied or waived (to the extent waivable).

39.     "EOS" means Eos Capital Partners IV, L.P.

40.     "Equity Interest" means any outstanding ownership interest in any of the Debtors, including, without limitation, interests evidenced by common or preferred stock, membership interests, options, stock appreciation rights, restricted stock, restricted stock units, or their equivalents, or other rights to purchase or otherwise receive any ownership interest in any of the Debtors and any right to payment or compensation based upon any such interest, whether or not such interest is owned by the holder of such right to payment or compensation.

41.     "Estate" means the estate of any Debtor created by section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

42.     "Exit Facility" means the (a) credit agreement to be dated on or about the Effective Date and to be entered into between Arbonne and Levlad, as borrowers, and certain other subsidiaries of NPG, as guarantors, and the New Term Lenders and the OpCo Lenders, as applicable, and which will consist of the (i) New Term Loan and (ii) Reinstated OpCo Term Loan, and (b) all related documents, instruments and agreements entered into, executed or delivered in connection therewith.

43.     "Fee Application" means an application for allowance and payment of a Fee Claim (including Claims for "substantial contribution" pursuant to section 503(b) of the Bankruptcy Code).

44.     "Fee Claim" means a Claim of a Professional Person.

45.     "Final Order" means (a) an order or judgment of the Bankruptcy Court or any other court or adjudicative body of competent jurisdiction as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending, or (b) in the event that an appeal, writ of certiorari, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court or any other court or adjudicative body shall have been affirmed by the highest court to which such order was appealed, or certiorari has been denied, or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; provided, that no order shall fail to be a Final Order solely because of the possibility that a motion pursuant to section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be filed with respect to such order in the future.

46.     "Harvest Partners" means (a) Harvest Partners, LP, Harvest Partners, LLC, Harvest Partners, Inc., Harvest Partners IV, L.P., Harvest Partners IV GmbH & Co. KG, Harvest Associates IV, L.L.C., Harvest Advisors IV, L.L.C., Harvest Capital Associates IV, L.L.C., Harvest Employee Associates IV, L.L.C., Harvest Capital Associates Management IV, L.L.C., Harvest Associates IV Verwaltungs GmbH, Harvest IV GmbH, L.L.C., IST Associates, LLC, and IST Advisors, LLC and (b) each of their members, partners, principals and investors (but with respect to those entities identified in this subsection (b), only in their capacity as either a member, partner, principal or investor of any of the foregoing entities).

47.     "HoldCo Credit Agreement" means the HoldCo Credit Agreement, dated as of June 19, 2006, among Arbonne HoldCo and Levlad HoldCo, as borrowers, the several lenders from time to time party thereto, Wilmington Trust FSB, as successor in interest to Credit Suisse, New York Branch, as administrative agent, Credit Suisse Securities (USA) LLC and CIBC World Markets Corp., as joint lead arrangers and joint bookrunners, CIBC World Markets Corp., as syndication agent, and CitiCorp North America, Inc. and UBS Securities LLC, as co-documentation agents, together with all documents, instruments and agreements executed or entered into in connection therewith, and any amendments thereto.

48.     "HoldCo Lender Claim" means a Claim of a HoldCo Lender arising under the HoldCo Credit Agreement.

49.     "HoldCo Lenders" means the lenders under the HoldCo Credit Agreement.

50.     "Independent Director" means any Person who, on the Effective Date, (i) does not hold any shares of New NPG Common Stock, (ii) is not an Affiliate of any stockholder of New NPG or any Affiliate of a stockholder of New NPG, (iii) has no material business or other relationship with New NPG, a stockholder of New NPG, any Affiliate of a stockholder of New NPG or the lenders of New NPG, (iv) is not employed by or providing services to New NPG (and has not been so employed or provided such services within two years of the date of appointment) and (v) is qualified to act as a director of New NPG based on his or her experience and integrity.

51.     "Insider" means a Person that would fall within the definition assigned to such term in section 101(31) of the Bankruptcy Code.

52.     "Insured Claim" means any Claim against a Debtor for which the Debtor is entitled to indemnification, reimbursement, contribution or other payment under a policy of insurance wherein a Debtor is an insured or beneficiary of the coverage of any of the Debtors.

53.     "Intercompany Claim" means a Claim held by any Debtor against any other Debtor based on any fact, action, omission, occurrence or thing that occurred or came into existence prior to the Petition Date.

54.     "Internal Revenue Code" means the Internal Revenue Code of 1986, as amended, and any applicable rulings, regulations (including temporary and proposed regulations) promulgated thereunder, judicial decisions, and notices, announcements, and other releases of the United States Treasury Department or the IRS.

55.     "IRS" means the United States Internal Revenue Service.

56.     "Letter of Credit" means and refers to any letter of credit issued under the OpCo Credit Agreement prior to the Petition Date.

58.     "Letter of Credit Claim" means a Claim against a Debtor (other than a Claim in respect of a Letter of Credit) that is covered in whole or in part by a letter of credit issued at the request of any Debtor with respect to which an actual draw on such letter of credit has been made.

59.     "Levlad" means Levlad, LLC.

60.     "Levlad HoldCo" means Levlad Intermediate Holdco, Inc.

61.     "Long Term Management Incentive Plan" means that certain incentive plan covering certain members of the senior management of the New NPG Group to be adopted by New NPG on the Effective Date.

62.     "Majority Consenting OpCo Lenders" means the Requisite Consenting OpCo Lenders that hold a majority of the outstanding principal amount of the Allowed OpCo Lender Claims held by the Requisite Consenting OpCo Lenders.

63.     "New HoldCo" means the legal entity formed by the merger of Arbonne HoldCo and Levlad HoldCo pursuant to the Plan.

64.     "New NPG" means the legal entity selected by the Debtors to serve as the ultimate parent of the New NPG Group.

65.     "New NPG Common Stock" means the common stock of New NPG.

66.     "New NPG Constituent Documents" means the by-laws and certificates of incorporation for New NPG and New HoldCo, as of the Effective Date.  The New NPG Constituent Documents shall be in substantially the form filed with the Bankruptcy Court as Plan Documents.

67.     "New NPG Group" means New NPG and its direct and indirect subsidiaries.

68.     "New NPG Guarantors" means all of the domestic subsidiaries of New NPG, each of which shall guarantee the obligations of New NPG under the Exit Facility.

69.     "New NPG Options" means the options to be issued pursuant to the Long Term Management Incentive Plan and which shall have the terms set forth on Exhibit "D" hereto.

70.     "New NPG Warrants" means the warrants to be issued to the HoldCo Lenders on the Effective Date pursuant to the Plan and which shall have the terms set forth on Exhibit "C" hereto.

71.     "New Term Loan" means the term loan to be provided as part of the Exit Facility, on the terms set forth on Exhibit "F" hereto.

72.     "New Term Lender" means any lending institution from time to time party to the Exit Facility that provides loans under the New Term Loan, and its successors and assigns.

73.     "Notice of Confirmation" means the notice of entry of the Confirmation Order.

74.     "NPG" means Natural Products Group, LLC.

75.     "OpCo Credit Agreement" means the Credit Agreement, dated as of March 8, 2007, among Arbonne HoldCo and Levlad HoldCo, as guarantors, Levlad and Arbonne, as borrowers, the several lenders from time to time party thereto, Canadian Imperial Bank of Commerce, as administrative agent and collateral agent, CIBC World Markets Corp. and Credit Suisse Securities (USA) LLC, as joint lead arrangers and joint bookrunners, Credit Suisse, as syndication agent, and Freeport Financial LLC and General Electric Capital Corporation, as co-documentation agents, together with all documents, instruments and agreements executed or entered into in connection therewith, and any amendments thereto.

76.     "OpCo Lender Claim" means any Claim against any of the Debtors arising under, in connection with, or related to, the OpCo Credit Agreement, including, without limitation, any Claim with respect to any and all guarantees, pledges, notes and other agreements and documents executed and/or delivered by any Debtor pursuant to, in connection with, or related to, the OpCo Credit Agreement, including, without limitation, any Claim under the Loan Documents (as defined in the OpCo Credit Agreement) and the Letters of Credit.

77.     "OpCo Lenders" means, collectively, the lenders and other institutions that are parties to the OpCo Credit Agreement and their respective successors and assigns.

78.     "OpCo Plan Support Agreement" means that certain plan support agreement dated as of December 18, 2009, by and among certain of the Debtors and certain of the OpCo Lenders.

79.     "Person" means an individual, corporation, partnership, limited liability company, joint venture, trust, estate, unincorporated association, unincorporated organization, governmental entity, or political subdivision thereof, or any other entity.

80.     "Petition Date" means, with respect to any Debtor, the date on which the Chapter 11 Case of such Debtor was commenced.

81.     "Plan" means this chapter 11 plan, either in its present form or as it may be amended, supplemented, or otherwise modified from time to time, and the exhibits and schedules hereto, as the same may be in effect at the time such reference becomes operative.

82.     "Plan Distribution" means the payment or distribution under the Plan of Cash, Assets, securities or instruments evidencing an obligation under the Plan to the holder of an Allowed Claim or Allowed Equity Interest.

83.     "Plan Distribution Date" means with respect to any Claim, (a) the Effective Date or a date that is as soon as reasonably practicable after the Effective Date, if such Claim is then an Allowed Claim, or (b) if not Allowed on the Effective Date, a date that is as soon as reasonably practicable after the date such Claim becomes Allowed, but is not earlier than thirty (30) days following the previous Plan Distribution Date.

84.     "Plan Documents" means the documents that aid in effectuating the Plan as specifically identified as such herein and filed with the Bankruptcy Court as specified in Section 1.5 of the Plan including, without limitation, the Exit Facility, New NPG Constituent Documents, New NPG Options, and New NPG Warrants.

85.     "Plan Objection Deadline" means the deadline established by the Bankruptcy Court for filing objections to confirmation of the Plan.

86.     "Prepetition Agents" means the Prepetition OpCo Agent and the Prepetition HoldCo Agent, each in their respective capacities as administrative agents in respect of the Prepetition Credit Facilities.

87.     "Prepetition Credit Facilities" means the OpCo Credit Agreement and the HoldCo Credit Agreement.

88.     "Prepetition HoldCo Agent" means Wilmington Trust FSB, as administrative agent under the HoldCo Credit Agreement.

89.     "Prepetition Lenders" means the OpCo Lenders and the HoldCo Lenders.

90.     "Prepetition OpCo Agent" means Canadian Imperial Bank of Commerce, as administrative agent under the OpCo Credit Agreement.

92.     "Priority Claim" means any Claim to the extent such Claim is entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than Secured Claims, Administrative Claims, and Tax Claims.

93.     "Professional Person" means a Person retained or to be compensated for services rendered or costs incurred on or after the Petition Date and on or prior to the Effective Date pursuant to sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code in these Chapter 11 Cases.

94.     "Pro Rata Share" means the proportion that an Allowed Claim bears to the aggregate amount of all Claims in a particular class, including Contested Claims, but excluding Disallowed Claims, (a) as calculated by the Disbursing Agent; or (b) as determined or estimated by the Bankruptcy Court.

95.     "Reinstated OpCo Term Loan" means the term loan under the Exit Facility that will reinstate $125 million of obligations under the OpCo Credit Agreement on the terms set forth on Exhibit "E" hereto.

96.     "Requisite Consenting OpCo Lenders" means OpCo Lenders comprising more than one-half of the number of all OpCo Lenders that vote to accept or reject the Plan and holding at least two-thirds of the aggregate amount of Allowed OpCo Lender Claims that vote to accept or reject the Plan.

97.     "Restructuring Term Sheet" means that certain term sheet that is annexed to the Disclosure Statement as Schedule 2.

98.     "Schedules" means, unless otherwise stated, the schedules of assets and liabilities and list of Equity Interests and the statements of financial affairs, if any, filed by the Debtors with the Bankruptcy Court.

99.     "Secured Claim" means (a) a Claim secured by a lien on any Assets, which lien is valid, perfected, and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, and which is duly established in the Chapter 11 Cases, but only to the extent of the value of the holder's interest in the collateral that secures payment of the Claim; (b) a Claim against the Debtors that is subject to a valid right of recoupment or setoff under section 553 of the Bankruptcy Code, but only to the extent of the Allowed amount subject to recoupment or setoff as provided in section 506(a) of the Bankruptcy Code; and (c) a Claim deemed or treated under the Plan as a Secured Claim; provided, that, to the extent that the value of such interest is less than the amount of the Claim which has the

benefit of such security, the unsecured portion of such Claim shall be treated as an Unsecured Claim unless, in any such case the class of which such Claim is a part makes a valid and timely election in accordance with section 1111(b) of the Bankruptcy Code to have such Claim treated as a Secured Claim to the extent Allowed.

100.     "Securities Act" means the Securities Act of 1933, 15 U.S.C. §§ 77a, <u>et</u> <u>seq.</u>

101.     "Solicitation Agent" means the Person selected by the Debtors to act as the Debtors' agent in soliciting the Plan and tabulating votes in connection with the Plan.

102.     "Subordinated Claim" means a Claim against any Debtor subordinated by a Final Order.

103.     "Tax Claim" means a Claim against any of the Debtors that is of a kind specified in section 507(a)(8) of the Bankruptcy Code.

104.     "TCW" means TCW Shared Opportunity Fund V, L.P.

105.     "Unsecured Claim" means any Claim against a Debtor other than an Administrative Claim, a Priority Claim, a Tax Claim, a Fee Claim, a Secured Claim, an OpCo Lender Claim, or a HoldCo Lender Claim.

106.     "Voting Deadline" means the deadline established by the Debtors for voting to accept or reject the Plan.

# EXHIBIT "B"

## LIST OF DEBTORS

### List of the Debtors and Tax Identification Numbers

| Case No. | Debtor | Tax ID Number |
|---|---|---|
| To Be Determined | Natural Products Group, LLC | 86-1119470 |
| To Be Determined | Arbonne Intermediate Holdco, Inc. | 87-0735363 |
| To Be Determined | Levlad Intermediate Holdco, Inc. | 87-0735367 |
| To Be Determined | Arbonne International, LLC | 33-0762250 |
| To Be Determined | Levlad, LLC | 95-2973496 |
| To Be Determined | Arbonne Institute of Research and Development, LLC | 33-0762250 |
| To Be Determined | Arbonne International Holdings, Inc. | 20-5585671 |
| To Be Determined | Arbonne International Distribution, Inc. | 20-5585608 |

# EXHIBIT "C"

## NEW NPG WARRANTS

### PRINCIPAL TERMS AND CONDITIONS

**ISSUER:**    New NPG

**HOLDERS:**    HoldCo Lenders

**ENTITLEMENT:**    New NPG will authorize the issuance of the New NPG Warrants, which shall entitle the holders thereof to purchase New NPG Common Stock equal to 5% of the equity interests of New NPG (excluding New NPG Common Stock reserved for issuance pursuant to the Long Term Management Incentive Plan).

**EXERCISE:**    The aggregate cash exercise price of the New NPG Warrants shall be an amount equal to 100% of the principal amount, plus all swap amounts, accrued interest, fees and expenses outstanding under the OpCo Credit Agreement as of the Effective Date plus the principal, interest, fees and expenses outstanding under the New Term Loan portion of the Exit Facility as of the Effective Date. The aggregate cash exercise price of the New NPG Warrants shall be allocated among all holders of New NPG Warrants on a Pro Rata basis.

**EXPIRATION:**    Each New NPG Warrant may be exercised at any time prior to the fifth anniversary of the Effective Date.

**VOTING RIGHTS:**    Neither the New NPG Warrants nor the New NPG Common Stock purchased pursuant to such New NPG Warrants shall have any voting rights.

**TRANSFERABILITY:**    The New NPG Warrants will be not transferable. The holders of New NPG Warrants shall be required to enter into a stockholders agreement containing standard tag-along and drag-along rights prior to exercising any of the New NPG Warrants.

**GOVERNING LAW:**    Delaware

**OTHER TERMS:**    All other items to be developed on terms to be agreed upon.

# EXHIBIT "D"

## NEW NPG OPTIONS

### PRINCIPAL TERMS AND CONDITIONS

**ISSUER:** New NPG

**HOLDERS:** Certain members of management of the New NPG Group

**EXERCISE:** New NPG Options will be issued to permit holders thereof to acquire 5% in the aggregate of the New NPG Common Stock. The exercise price shall be based upon an aggregate equity value of New NPG of $75 million.

New NPG Options will be issued to permit holders thereof to acquire an additional 2.5% of the New NPG Common Stock. The exercise price shall be based upon an aggregate equity value of New NPG of $300 million.

**EXPIRATION**: Each New NPG Option may be exercised at any time prior to the seventh anniversary of the Effective Date.

**VESTING:** Annual based over a period of 4 years

**GOVERNING LAW:** Delaware

**OTHER TERMS:** All other items to be developed on terms to be agreed upon.

**EXHIBIT "E"**

**REINSTATED OPCO TERM LOAN**

**PRINCIPAL TERMS AND CONDITIONS**

**BORROWERS:** Arbonne International, LLC and Levlad, LLC

**AMOUNT:** $125 million

**ADMINISTRATIVE AGENT:** Canadian Imperial Bank of Commerce

**LENDERS:** OpCo Lenders

**PRICING:** Interest on the Reinstated OpCo Term Loan shall accrue at a rate of LIBOR plus 7% per annum (with a LIBOR floor of 3%), payable quarterly on a paid in kind basis; provided, that if the borrowers are in compliance with certain financial covenants to be developed, 50%-100% of such interest shall be paid in cash.

The Reinstated OpCo Term Loan shall provide for annual amortization in an amount to be determined, based on Excess Cash Flow (to be defined in a manner satisfactory to the OpCo Lenders).

**MATURITY DATE:** 5 years, but may be prepaid in whole or in part, without penalty, at any time in the sole discretion of the borrowers.

**SECURITY:** The obligations of the borrowers under the Reinstated OpCo Term Loan shall be secured by a pari passu lien in and to substantially all of the assets of the Company, subject only to certain customary permitted liens.

**COVENANTS:** Usual and customary for transactions of this type.

**FINANCIAL COVENANTS:** Usual and customary for transactions of this type.

**REPRESENTATIONS AND WARRANTIES:** Usual and customary for transactions of this type.

## NEW TERM LOAN

### PRINCIPAL TERMS AND CONDITIONS

| | |
|---|---|
| **BORROWERS:** | Arbonne International, LLC and Levlad, LLC |
| **AMOUNT:** | On the Effective Date, all outstanding obligations under the DIP Facility will be rolled into the New Term Loan portion of the Exit Facility. The DIP Facility will provide for borrowings up to $20 million available in two draws as follows: (i) $10 million shall be drawn on the effective date of the DIP Facility and (ii) up to $10 million shall be available through June 30, 2010 in one subsequent draw upon the satisfaction of certain conditions to be determined, of which $2 million in the aggregate may be used to issue new letters of credit or replace existing letters of credit when they expire. Any commitment of an OpCo Lender to participate in the DIP Facility constitutes a commitment of such lender to participate in the New Term Loan portion of the Exit Facility. |
| **ADMINISTRATIVE AGENT:** | TBD |
| **PARTICIPANTS:** | All OpCo Lenders who are DIP Lenders. |
| **PRICING AND OTHER INDUCEMENTS:** | Commitment Fee: None (commitment fee paid in connection with DIP Facility). |
| | Interest Rate: LIBOR plus 10% per annum (with a LIBOR floor of 3%) payable quarterly. |
| | Deferred Fee: 3% (the "Deferred Fee"), which Deferred Fee shall be fully earned on the effective date of the DIP Facility, and shall be payable on the one year anniversary thereof; provided, however, that the Deferred Fee shall be waived and not be due and payable if all obligations owing under the New Term Loan are indefeasibly paid in full in cash on or before the one year anniversary of the effective date of such facility. |
| | Participation Fee/Provider Fee: In consideration of providing the commitment in respect of the New Term Loan, the lenders under the New Term Loan portion of the Exit Facility shall receive their Pro Rata share of 10% of the New NPG Common Stock on the Effective Date. |
| | Default Rate: 2%, above the otherwise applicable rate, but in no event in excess of the maximum lawful rate. |
| **LETTERS OF CREDIT:** | Letters of credit will be cash collateralized in an amount at least equal to 105% of the aggregate stated amount of such letters of credit. |
| **MATURITY DATE:** | 4 years, but may be prepaid in whole or in part, without penalty, at any time in the sole discretion of the borrowers. |

**SECURITY:** The obligations of the borrowers under the New Term Loan shall be secured by a first lien in and to substantially all of the assets of the Company, subject only to certain customary permitted liens.

**COVENANTS:** Usual and customary conditions and covenants for transactions of this type, including (i) satisfactory verification of certain matters relating to compliance with environmental laws and regulations, (ii) the New Term Lenders shall be satisfied that the Company is in compliance in all material respects with all applicable environmental laws and regulations, (iii) follow up audits by third party consultant engaged by the New Term Lenders and (iv) submittal of required air permit applications for certain locations to be designated by the New Term Lenders and agreed to by the borrowers.

**FINANCIAL COVENANTS:** Usual and customary for transactions of this type.

**REPRESENTATIONS AND WARRANTIES:** Usual and customary for transactions of this type.

# SCHEDULE 4

# NATURAL PRODUCTS GROUP, LLC, *ET AL.*

## BALLOT FOR ACCEPTING OR REJECTING THE PROPOSAL TO RESTRUCTURE AND JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION FOR NATURAL PRODUCTS GROUP, LLC AND ITS AFFILIATED DEBTORS

### THIS BALLOT IS EXCLUSIVELY FOR USE BY HOLDERS OF CLASS 2 – OPCO LENDER CLAIMS

On January 13, 2010, Natural Products Group, LLC and certain of its direct and indirect subsidiaries (collectively, with all subsidiaries, the "Company") commenced their efforts to restructure (the "Restructuring") the Company's debt by proposing that holders of Old Debt[1] exchange their Old Debt for new debt and/or equity interests in New NPG. The Company is seeking to effect the Restructuring through an out-of-court transaction (the "Out-of-Court Transaction") but may effect the Restructuring through a Joint Prepackaged Chapter 11 Plan of Reorganization of Natural Products Group, LLC and Its Affiliated Debtors (the "Plan"). Consequently, the Company has commenced the solicitation of votes to accept or reject the Out-of-Court Transaction and Plan from holders of their Old Debt. The Restructuring, the Out-of-Court Transaction and the Plan are explained in greater detail in the Disclosure Statement relating to the Restructuring (as the same may be amended or supplemented from time to time, the "Disclosure Statement") to which this ballot (the "Ballot") is annexed. The Company is seeking the approval of all the Prepetition Lenders, but is prepared to pursue the Restructuring even if such unanimous support is not achieved. If all of the Prepetition Lenders do not approve the Restructuring through the Out-of-Court Transaction, or if the Company for any reason determines that it would be more advantageous or expeditious, and there is sufficient support for the Plan, NPG and certain of its subsidiaries and affiliates, including Arbonne HoldCo, Levlad HoldCo, Arbonne and Levlad, intend to commence cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and seek immediate confirmation of the Plan.

| VOTING DEADLINE |
|---|
| THIS BALLOT **MUST BE ACTUALLY RECEIVED** BY THE SOLICITATION AGENT ON OR BEFORE **JANUARY 27, 2010 AT NOON (12 P.M.)** PREVAILING EASTERN TIME |

If you have more than one claim entitled to vote, please complete a separate ballot for each claim pursuant to which you are entitled to vote.

**Item 1. Voting Classification and Amount.** The undersigned certifies that as of the Voting Record Date it is a holder of a Class 2 – OpCo Lender Claim against the Company in the following unpaid amount (insert amount in the box below):

| $ |
|---|

**Item 2. Vote.** As an OpCo Lender, your election to accept the terms of the Restructuring means that you:

(i)  vote in favor of the Out-of-Court Transaction and Plan;

(ii)  agree to the releases, injunctions, and exculpations contained in the Plan and this Ballot;

---

[1]      Capitalized terms not otherwise defined herein have the meanings ascribed to such terms in the Disclosure Statement (or the Plan, as referenced therein).

(iii)  agree to exchange your OpCo Lender Claim for the New NPG Common Stock and the Reinstated OpCo Term Loan as set forth in the Disclosure Statement and Plan;

(iv)  agree to be bound by the terms of the Reinstated OpCo Term Loan portion of the Exit Facility and the ancillary security, collateral and other documents related thereto; and

(v)  agree not to sell, assign, transfer, hypothecate or otherwise dispose of, directly or indirectly (a "Transfer"), all or any of your Old Debt (or any option thereon or any right or interest related thereto, including any voting rights associated therewith), unless the transferee thereof agrees in writing to accept and be bound by the terms of this Ballot.  Any Transfer of Old Debt that does not comply with the foregoing requirement shall be void and shall be treated as if it never occurred.

The undersigned votes the above-listed Class 2 – OpCo Lender Claim (check one box):

| ☐ **Accept** the Out-of-Court Transaction and Plan | ☐ **Reject** the Out-of-Court Transaction and Plan |

### Item 3.  Opt-Out Election re: Plan Release.[2]

If you elect not to grant the releases contained in Section 8.14 of the Plan as they relate to the opt-out release parties set forth in Section 8.14 of the Plan, you must file with the Bankruptcy Court on or prior to the Confirmation Date a timely written notice of election to opt out of the releases contained in Section 8.14 of the Plan.  **If you do not file a notice of election to opt out of the releases contained in Section 8.14 of the Plan or if you are a party to the OpCo Plan Support Agreement, you will be deemed to consent to the releases set forth in Section 8.14 of the Plan to the fullest extent permitted by applicable law.**  The full text of Section 8.14 of the Plan is set forth at the end of this Ballot.  **This Item 3 is not applicable in the event the Restructuring is effected through the Out-of-Court Transaction.**

### Item 4.  Out-of-Court Transaction Release.

**Your election above to accept the terms of the Out-of-Court Transaction means that, subject to the occurrence of the Effective Date, for good and valuable consideration, you will be presumed conclusively to have released each of (a) the Company, New NPG, their Affiliates, and their respective present and former officers, directors, managers and employees, in their respective capacities as such, (b) holders of Equity Interests in NPG, including Harvest Partners, and their respective present and former officers, directors and employees, in their respective capacities as such, (c) the other OpCo Lenders and the Prepetition OpCo Agent, in their respective capacities as such, (d) the HoldCo Lenders and the Prepetition HoldCo Agent, in their respective capacities as such, (e) the DIP Lenders and the DIP Agent, in their respective capacities as such, and (f) each of the foregoing's respective successors and assigns, and each of their respective agents, attorneys, advisors, accountants, investment bankers, bankruptcy and restructuring advisors, and financial advisors, in their respective capacities as such, from any Causes of Action that are based in whole or part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to your OpCo Lender Claim, the Company, or the New NPG Group.  Item 3 above is NOT applicable to the release in this Item 4.**

### Item 5.  Certifications.

By signing your Ballot, you acknowledge: (1) that the solicitation of votes to accept or reject the Out-of-Court Transaction and the Plan is subject to all the terms and conditions set forth in the Disclosure Statement, (2) that you have received a copy of the Disclosure Statement, (3) that the vote

---

[2]  The Opt-Out Election becomes applicable <u>only</u> if the Restructuring is effected through the Plan after the commencement of Chapter 11 Cases.  It is <u>not</u> applicable in the event the Restructuring is effected through the Out-of-Court Transaction.

on the Out-of-Court Transaction and the Plan is being made pursuant to the terms and conditions set forth therein, (4) that you are deemed to have made each of the representations and acknowledgements set forth in Section XVII ("Securities Law Matters"), Subsection D ("Representations and Acknowledgements") of the Disclosure Statement, and (5) that a vote to accept the Out-of-Court Transaction and the Plan is an affirmative consent to the releases, injunctions, and exculpations contained in the Plan and this Ballot, and you have the full power and authority to vote to accept or reject the Out-of-Court Transaction and the Plan on behalf of the claimant listed herein.

PLEASE READ THIS ENTIRE BALLOT, INCLUDING THE VOTING INSTRUCTIONS BELOW, BEFORE COMPLETING.  PLEASE COMPLETE, DATE AND SIGN THIS BALLOT AND RETURN THE SIGNED BALLOT TO THE SOLICITATION AGENT IDENTIFIED IN THE VOTING INSTRUCTIONS BELOW.

Name of Creditor:_____
(Print or Type)

By:_____
(Signature of Creditor or Authorized Agent)

Print Name of Signatory:_____

Title:_____
(If Appropriate)

Street Address:_____

_____
(City, State and Zip Code)

Telephone Number:  (___) _____

_____
(Federal Tax I.D. No.)

Date Completed:_____

## VOTING INSTRUCTIONS

This Ballot is submitted to you to solicit your vote to accept the terms of the Out-of-Court Transaction and the Plan, which are described in the Disclosure Statement to which this Ballot is annexed.  A copy of the Plan is attached as Schedule 3 to the Disclosure Statement.  The Company has NOT filed for relief under chapter 11 of the Bankruptcy Code, and the Disclosure Statement has not been filed with or approved by the Bankruptcy Court, the Securities and Exchange Commission or any other governmental or regulatory agency.  The Disclosure Statement will be submitted to the Bankruptcy Court for approval only if the Company seeks relief under chapter 11 of the Bankruptcy Code and confirmation of the Plan.  If you wish to receive additional copies of the Disclosure Statement, please contact the Solicitation Agent, AlixPartners, LLP, at (877) 788-2814.

If the Restructuring is not effected through the Out-of-Court Transaction, the Company intends to commence Chapter 11 Cases, and the Plan can be confirmed by the Bankruptcy Court and thereby made binding on you if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of the Allowed Claims that have actually voted in each class of claims entitled to vote on the Plan.  In the event the requisite acceptances are not obtained, the Bankruptcy Court may nevertheless confirm the Plan if the Bankruptcy Court finds that the Plan provides fair and equitable treatment to, and does not discriminate unfairly against, the class or classes rejecting it and otherwise satisfies the requirements of section 1129 of the Bankruptcy Code.

**HOW TO VOTE:**

Please complete, sign and date this Ballot and return it to the Solicitation Agent at:

**VOTING DEADLINE:**

**If your Ballot is not ACTUALLY RECEIVED by Noon (12 p.m.), Prevailing Eastern Time, on January 27, 2010, it will not be counted. Ballots transmitted by any means, including facsimile, telecopy transmission or electronic mail, WILL BE accepted and counted as a vote to accept or reject the Out-of-Court Transaction and the Plan. Unsigned Ballots will not be counted.**

**Holders of Claims that take no action, or fail to take timely action, may nevertheless be bound by the terms of the Plan and have the applicable treatment applied to their Old Debt if the Plan is consummated.**

Subject to the terms of the Plan Support Agreements, the Company reserves the right to extend the Voting Deadline in its sole and absolute discretion, which may be for any or no reason, and to terminate or withdraw the proposal for the Restructuring in any respect. Any extension of the Voting Deadline will be communicated by the Company no later than 10:00 a.m., Prevailing Eastern Time, on the next business day following the previously scheduled Voting Deadline.

This Ballot is for voting purposes only and does not constitute and shall not be deemed a proof of claim or interest or an admission by the Company of the validity of a claim or interest.

**IF YOU HAVE ANY QUESTIONS CONCERNING THE DISCLOSURE STATEMENT, THE PLAN, THIS BALLOT OR THE VOTING INSTRUCTIONS, OR IF YOU NEED A BALLOT OR ADDITIONAL COPIES OF ANY MATERIALS ACCOMPANYING THIS BALLOT, PLEASE CONTACT ALIXPARTNERS, LLC AT (877) 788-2814.**

**Section 8.14 of the Plan, entitled "Releases by Creditors and Equity Security Holders," states:**

**Subject to the occurrence of the Effective Date, any holder of a Claim or Equity Interest that is impaired or unimpaired under the Plan, for good and valuable consideration, will be presumed conclusively to have released each of (a) the Debtors', their non-Debtor subsidiaries', and the New NPG Group's respective present and former officers, directors, managers and employees, in their respective capacities as such, (b) holders of Equity Interests in NPG, including Harvest Partners, and their respective present and former officers, directors and employees, in their respective capacities as such, (c) the OpCo Lenders and the Prepetition OpCo Agent, in their respective capacities as such, (d) the HoldCo Lenders and the Prepetition HoldCo Agent, in their respective capacities as such, (e) the DIP Lenders and the DIP Agent, in their respective capacities as such, and (f) each of the foregoing's respective successors and assigns, and each of their respective agents, attorneys, advisors, accountants, investment bankers, bankruptcy and restructuring advisors, and financial advisors, in their respective capacities as such, from any Causes of Action that are based in whole or part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the New NPG Group, the Chapter 11 Cases, the Plan or the Disclosure Statement; <u>except</u> that the foregoing releases shall not apply to**

**any holder of a Claim or Equity Interest if such holder "opts out" of the releases provided in this Section 8.14 by filing with the Bankruptcy Court on or prior to the Plan Objection Deadline a timely written notice of election to opt out of the releases contained in this Section 8.14. Any "opt out" of the releases contained in this Section 8.14 shall not and shall not be construed in any way to affect any other release, exculpation or injunction provided in the Plan, including without limitation the releases, exculpations and injunctions provided in Sections 8.13, 12.3, 15.3, 15.6, 15.7, 15.8, and 15.23 of the Plan.**

# NATURAL PRODUCTS GROUP, LLC, *ET AL.*

## BALLOT FOR ACCEPTING OR REJECTING THE PROPOSAL TO RESTRUCTURE AND JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION FOR NATURAL PRODUCTS GROUP, LLC AND ITS AFFILIATED DEBTORS

**THIS BALLOT IS EXCLUSIVELY FOR USE BY HOLDERS OF CLASS 3 – HOLDCO LENDER CLAIMS**

On January 13, 2010, Natural Products Group, LLC and certain of its direct and indirect subsidiaries (collectively, with all subsidiaries, the "Company") commenced their efforts to restructure (the "Restructuring") the Company's debt by proposing that holders of Old Debt[1] exchange their Old Debt for new debt and/or equity interests in New NPG. The Company is seeking to effect the Restructuring through an out-of-court transaction (the "Out-of-Court Transaction") but may effect the Restructuring through a Joint Prepackaged Chapter 11 Plan of Reorganization of Natural Products Group, LLC and Its Affiliated Debtors (the "Plan"). Consequently, the Company has commenced the solicitation of votes to accept or reject the Out-of-Court Transaction and Plan from holders of their Old Debt. The Restructuring, the Out-of-Court Transaction and the Plan are explained in greater detail in the Disclosure Statement relating to the Restructuring (as the same may be amended or supplemented from time to time, the "Disclosure Statement") to which this ballot (the "Ballot") is annexed. The Company is seeking the approval of all the Prepetition Lenders, but is prepared to pursue the Restructuring even if such unanimous support is not achieved. If all of the Prepetition Lenders do not approve the Restructuring through the Out-of-Court Transaction, or if the Company for any reason determines that it would be more advantageous or expeditious, and there is sufficient support for the Plan, NPG and certain of its subsidiaries and affiliates, including Arbonne HoldCo, Levlad HoldCo, Arbonne and Levlad, intend to commence cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and seek immediate confirmation of the Plan.

---

**VOTING DEADLINE**
THIS BALLOT **MUST BE ACTUALLY RECEIVED** BY THE SOLICITATION AGENT ON OR BEFORE **JANUARY 27, 2010 AT NOON (12 P.M.) PREVAILING EASTERN TIME**

---

If you have more than one claim entitled to vote, please complete a separate ballot for each claim pursuant to which you are entitled to vote.

**Item 1. Voting Classification and Amount.** The undersigned certifies that as of the Voting Record Date it is a holder of a Class 3 – HoldCo Lender Claim against the Company in the following unpaid amount (insert amount in the box below):

| $ |
|---|

**Item 2. Vote.** As a HoldCo Lender, your election to accept the terms of the Restructuring means that you:

(i) vote in favor of the Out-of-Court Transaction and Plan;

(ii) agree to the releases, injunctions, and exculpations contained in the Plan and this Ballot;

---

[1] Capitalized terms not otherwise defined herein have the meanings ascribed to such terms in the Disclosure Statement (or the Plan, as referenced therein).

(iii) agree to exchange your HoldCo Lender Claim for the New NPG Warrants as set forth in the Disclosure Statement and Plan; and

(iv) agree not to sell, assign, transfer, hypothecate or otherwise dispose of, directly or indirectly (a "Transfer"), all or any of your Old Debt (or any option thereon or any right or interest related thereto, including any voting rights associated therewith), unless the transferee thereof agrees in writing to accept and be bound by the terms of this Ballot. Any Transfer of Old Debt that does not comply with the foregoing requirement shall be void and shall be treated as if it never occurred.

The undersigned votes the above-listed Class 3 – HoldCo Lender Claim (check one box):

| ☐ **Accept** the Out-of-Court Transaction and Plan | ☐ **Reject** the Out-of-Court Transaction and Plan |
|---|---|

**Item 3. Opt-Out Election re: Plan Release.[2]**

If you elect not to grant the releases contained in Section 8.14 of the Plan as they relate to the opt-out release parties set forth in Section 8.14 of the Plan, you must file with the Bankruptcy Court on or prior to the Confirmation Date a timely written notice of election to opt out of the releases contained in Section 8.14 of the Plan. **If you do not file a notice of election to opt out of the releases contained in Section 8.14 of the Plan or if you are a party to a HoldCo Plan Support Agreement, you will be deemed to consent to the releases set forth in Section 8.14 of the Plan to the fullest extent permitted by applicable law.** The full text of Section 8.14 of the Plan is set forth at the end of this Ballot. **This Item 3 is not applicable in the event the Restructuring is effected through the Out-of-Court Transaction.**

**Item 4. Out-of-Court Transaction Release.**

**Your election above to accept the terms of the Out-of-Court Transaction means that, subject to the occurrence of the Effective Date, for good and valuable consideration, you will be presumed conclusively to have released each of (a) the Company, New NPG, their Affiliates, and their respective present and former officers, directors, managers and employees, in their respective capacities as such, (b) holders of Equity Interests in NPG, including Harvest Partners, and their respective present and former officers, directors and employees, in their respective capacities as such, (c) the OpCo Lenders and the Prepetition OpCo Agent, in their respective capacities as such, (d) the other HoldCo Lenders and the Prepetition HoldCo Agent, in their respective capacities as such, (e) the DIP Lenders and the DIP Agent, in their respective capacities as such, and (f) each of the foregoing's respective successors and assigns, and each of their respective agents, attorneys, advisors, accountants, investment bankers, bankruptcy and restructuring advisors, and financial advisors, in their respective capacities as such, from any Causes of Action that are based in whole or part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to your HoldCo Lender Claim, the Company, or the New NPG Group. Item 3 above is NOT applicable to the release in this Item 4.**

**Item 5. Certifications.**

By signing your Ballot, you acknowledge: (1) that the solicitation of votes to accept or reject the Out-of-Court Transaction and the Plan is subject to all the terms and conditions set forth in the Disclosure Statement, (2) that you have received a copy of the Disclosure Statement, (3) that the vote on the Out-of-Court Transaction and the Plan is being made pursuant to the terms and conditions set forth therein, (4) that you are deemed to have made each of the representations and acknowledgements set forth in Section XVII ("Securities Law Matters"), Subsection D

---

[2] The Opt-Out Election becomes applicable <u>only</u> if the Restructuring is effected through the Plan after the commencement of Chapter 11 Cases. It is <u>not</u> applicable in the event the Restructuring is effected through the Out-of-Court Transaction.

("Representations and Acknowledgements") of the Disclosure Statement, and (5) that a vote to accept the Out-of-Court Transaction and the Plan is an affirmative consent to the releases, injunctions, and exculpation contained in the Plan and this Ballot, and you have the full power and authority to vote to accept or reject the Out-of-Court Transaction and the Plan on behalf of claimant listed herein.

PLEASE READ THIS ENTIRE BALLOT, INCLUDING THE VOTING INSTRUCTIONS BELOW, BEFORE COMPLETING.  PLEASE COMPLETE, DATE AND SIGN THIS BALLOT AND RETURN THE SIGNED BALLOT TO THE SOLICITATION AGENT IDENTIFIED IN THE VOTING INSTRUCTIONS BELOW.

Name of Creditor:_____
(Print or Type)

By:_____
(Signature of Creditor or Authorized Agent)

Print Name of Signatory:_____

Title:_____
(If Appropriate)

Street Address:_____

_____
(City, State and Zip Code)

Telephone Number:  (____) _____

_____
(Federal Tax I.D. No.)

Date Completed:_____

## VOTING INSTRUCTIONS

This Ballot is submitted to you to solicit your vote to accept the terms of the Out-of-Court Transaction and the Plan, which are described in the Disclosure Statement to which this Ballot is annexed.  A copy of the Plan is attached as Schedule 3 to the Disclosure Statement.  The Company has NOT filed for relief under chapter 11 of the Bankruptcy Code, and the Disclosure Statement has not been filed with or approved by the Bankruptcy Court, the Securities and Exchange Commission or any other governmental or regulatory agency.  The Disclosure Statement will be submitted to the Bankruptcy Court for approval only if the Company seeks relief under chapter 11 of the Bankruptcy Code and confirmation of the Plan.  If you wish to receive additional copies of the Disclosure Statement, please contact the Solicitation Agent, AlixPartners, LLP, at (877) 788-2814.

If the Restructuring is not effected through the Out-of-Court Transaction, the Company intends to commence Chapter 11 Cases, and the Plan can be confirmed by the Bankruptcy Court and thereby made binding on you if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of the Allowed Claims that have actually voted in each class of claims entitled to vote on the Plan.  In the event the requisite acceptances are not obtained, the Bankruptcy Court may nevertheless confirm the Plan if the Bankruptcy Court finds that the Plan provides fair and equitable treatment to, and does not discriminate unfairly against, the class or classes rejecting it and otherwise satisfies the requirements of section 1129 of the Bankruptcy Code.

**HOW TO VOTE:**

Please complete, sign and date this Ballot and return it to the Solicitation Agent at:

**VOTING DEADLINE:**

**If your Ballot is not ACTUALLY RECEIVED by Noon (12 p.m.), Prevailing Eastern Time, on January 27, 2010, it will not be counted. Ballots transmitted by any means, including facsimile, telecopy transmission or electronic mail, WILL BE accepted and counted as a vote to accept or reject the Out-of-Court Transaction and the Plan. Unsigned Ballots will not be counted.**

**Holders of Claims that take no action, or fail to take timely action, may nevertheless be bound by the terms of the Plan and have the applicable treatment applied to their Old Debt if the Plan is consummated.**

Subject to the terms of the Plan Support Agreements, the Company reserves the right to extend the Voting Deadline in its sole and absolute discretion, which may be for any or no reason, and to terminate or withdraw the proposal for the Restructuring in any respect. Any extension of the Voting Deadline will be communicated by the Company no later than 10:00 a.m., Prevailing Eastern Time, on the next business day following the previously scheduled Voting Deadline.

This Ballot is for voting purposes only and does not constitute and shall not be deemed a proof of claim or interest or an admission by the Company of the validity of a claim or interest.

**IF YOU HAVE ANY QUESTIONS CONCERNING THE DISCLOSURE STATEMENT, THE PLAN, THIS BALLOT OR THE VOTING INSTRUCTIONS, OR IF YOU NEED A BALLOT OR ADDITIONAL COPIES OF ANY MATERIALS ACCOMPANYING THIS BALLOT, PLEASE CONTACT ALIXPARTNERS, LLC AT (877) 788-2814.**

**Section 8.14 of the Plan, entitled "Releases by Creditors and Equity Security Holders," states:**

**Subject to the occurrence of the Effective Date, any holder of a Claim or Equity Interest that is impaired or unimpaired under the Plan, for good and valuable consideration, will be presumed conclusively to have released each of (a) the Debtors', their non-Debtor subsidiaries', and the New NPG Group's respective present and former officers, directors, managers and employees, in their respective capacities as such, (b) holders of Equity Interests in NPG, including Harvest Partners, and their respective present and former officers, directors and employees, in their respective capacities as such, (c) the OpCo Lenders and the Prepetition OpCo Agent, in their respective capacities as such, (d) the HoldCo Lenders and the Prepetition HoldCo Agent, in their respective capacities as such, (e) the DIP Lenders and the DIP Agent, in their respective capacities as such, and (f) each of the foregoing's respective successors and assigns, and each of their respective agents, attorneys, advisors, accountants, investment bankers, bankruptcy and restructuring advisors, and financial advisors, in their respective capacities as such, from any Causes of Action that are based in whole or part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the New NPG Group, the Chapter 11 Cases, the Plan or the Disclosure Statement; <u>except</u> that the foregoing releases shall not apply to**

any holder of a Claim or Equity Interest if such holder "opts out" of the releases provided in this Section 8.14 by filing with the Bankruptcy Court on or prior to the Plan Objection Deadline a timely written notice of election to opt out of the releases contained in this Section 8.14. Any "opt out" of the releases contained in this Section 8.14 shall not and shall not be construed in any way to affect any other release, exculpation or injunction provided in the Plan, including without limitation the releases, exculpations and injunctions provided in Sections 8.13, 12.3, 15.3, 15.6, 15.7, 15.8, and 15.23 of the Plan.

# SCHEDULE 5

**SCHEDULE 5**

**SELECTED FINANCIAL INFORMATION**

**A.       Annual Financial Information for Natural Products Group**

For the year ended December 31, 2008, Natural Products Group reported a $48 million net loss on a consolidated basis.  The total cash and cash equivalents of Natural Products Group and its subsidiaries, on a consolidated basis, as of December 31, 2008 was approximately $38 million.

For the year ended December 31, 2007, Natural Products Group reported a $3 million net loss on a consolidated basis.  The total cash and cash equivalents of Natural Products Group and its subsidiaries, on a consolidated basis, as of December 31, 2007 was approximately $16 million.

For the eleven months ended November 30, 2009, Natural Products Group reported a $40 million net loss on a consolidated basis.  The total cash and cash equivalents of Natural Products Group and its subsidiaries, on a consolidated basis, as of November 30, 2009 was approximately $24 million.

**B.       Financial Statements for Natural Products Group**

The annual financial statements should be read in conjunction with the financial statements and notes thereto included in Natural Products Group's Consolidated Financial Statements for the year ended December 31, 2008.

**Natural Products Group**
**Condensed Consolidated Balance Sheet**

| (in thousands) | For the eleven months ended November 30, 2009[1] | For the years ended December 31, | |
| --- | --- | --- | --- |
| | | 2008[1] | 2007[1] |
| | (Unaudited) | | |
| **Assets** | | | |
| Current Assets | | | |
| Cash and Cash Equivalents | $23,674 | $37,558 | $16,393 |
| Accounts Receivable, net | 4,400 | 3,598 | 10,247 |
| Inventories, net | 41,737 | 59,343 | 78,983 |
| Income Taxes Receivable | 22,543 | 20,040 | 8,251 |
| Deferred Income Tax Assets | 8,386 | 8,384 | 12,702 |
| Prepaid Expense and Other Current Assets | 4,862 | 5,121 | 5,998 |
| Total current assets | 105,602 | 134,044 | 132,574 |
| Property, Plant and Equipment, net | 25,831 | 35,421 | 43,652 |
| Deferred Debt Issuance Costs, net | 17,385 | 15,355 | 18,495 |
| Goodwill | 115,134 | 115,134 | 140,901 |
| Intangible Assets, net | 19,121 | 21,241 | 33,087 |
| Other Assets | 2,459 | 801 | 954 |
| Total assets | $285,532 | $321,996 | $369,663 |
| **Liabilities and Members' Deficit** | | | |
| Current Liabilities | | | |
| Accounts Payable | $9,350 | $13,853 | $20,096 |
| Accrued Expense | 44,456 | 36,116 | 41,223 |
| Current Portion of Long-Term Debt | 5,307 | 5,865 | 9,791 |
| Deferred Revenues | 16,388 | 13,289 | 20,927 |
| Other Current Liabilities | - | 1,031 | - |
| Total Current Liabilities | 75,501 | 70,154 | 92,037 |
| Long-Term Debt, net of current portion | 726,951 | 728,159 | 706,427 |
| Deferred Income Tax Liabilities[2] | 1,413 | 2,286 | 7,266 |
| Other Long-Term Liabilities | 49 | 87 | 2,677 |
| Total Liabilities | 803,914 | 800,686 | 808,407 |
| Commitments and Contingencies | | | |
| Members' Deficit | | | |
| Members' Capital Accounts | (503,405) | (463,035) | (422,734) |
| Excess of Purchase Price over Predecessor Basis | (15,762) | (15,762) | (15,762) |
| Accumulated Other Comprehensive Income (loss) | 785 | 107 | (248) |
| Total Members' Deficit | (518,382) | (478,690) | (438,744) |
| Total Liabilities and Members' Deficit | $285,532 | $321,996 | $369,663 |

[1]  The financial data for the periods ended December 31, 2008 and 2007 have been derived from the Company's audited consolidated financial statements appearing in the Company's Consolidated Financial Statements for the year ended December 31, 2008.  The Balance Sheet for the period ended November 30, 2009 has been adjusted to reflect the asset and liability accounts used in the audited financial statements.

[2]  Net of long-term deferred income tax assets.

**Natural Products Group**
**Condensed Consolidated Statements of Operation**

| *(in thousands)* | For the eleven months ended November 30, 2009 | For the years ended December 31, 2008[1] | 2007[1] |
|---|---|---|---|
| | (Unaudited) | | |
| **Revenue** | | | |
| Net Sales | $370,993 | $569,157 | $722,494 |
| Cost of Goods Sold | 107,631 | 163,541 | 194,830 |
| Gross Profit | 263,362 | 405,616 | 527,664 |
| | | | |
| **Operating Expenses** | | | |
| Overrides and Incentive Expenses | 129,093 | 188,768 | 242,650 |
| Selling and Marketing Expenses | 63,220 | 77,722 | 103,451 |
| General and Administrative Expenses | 65,944 | 94,514 | 101,950 |
| Research and Development Expenses | 1,303 | 1,654 | 1,879 |
| Impairment of Goodwill and Intangible Assets | - | 33,720 | - |
| Total Operating Expenses | 259,560 | 396,378 | 449,930 |
| | | | |
| Net Income from Operations | 3,802 | 9,238 | 77,734 |
| | | | |
| Interest Expense | 57,010 | 59,012 | 70,488 |
| Loss on Extinguishment of Debt | - | - | 14,053 |
| Other Expenses | (299) | 889 | 121 |
| Loss Before Income Taxes | (52,909) | (50,663) | (6,928) |
| | | | |
| Benefit from Income Taxes | (12,683) | (2,309) | (3,511) |
| Net Loss | ($40,226) | ($48,354) | ($3,417) |

[1] The financial data for the periods ended December 31, 2008 and 2007 have been derived from the Company's audited consolidated financial statements appearing in the Company's Consolidated Financial Statements for the year ended December 31, 2008.

**Natural Products Group**
**Condensed Consolidated Statements of Cash Flows**

| (in thousands) | For the eleven months ended November 30, 2009[1] | For the years ended December 31, 2008[1] | 2007[1] |
|---|---|---|---|
| | (Unaudited) | | |
| **Cash flows from operating activities** | | | |
| Net loss | ($40,226) | ($48,354) | ($3,417) |
| Adjustments to Reconcile Net Loss to Net Cash Provided by Operating Activities | | | |
| Depreciation and Amortization | 19,427 | 22,966 | 21,054 |
| Non-cash Interest Expense | 24,958 | 28,023 | 24,053 |
| Impairment of Goodwill and Intangible Assets | - | 33,720 | - |
| Stock Compensation Expense | 97 | 8,353 | 365 |
| Provision for Doubtful Accounts and Inventory Obsolescence | 4,182 | 15,614 | 8,946 |
| Deferred Income Taxes | (870) | (662) | (3,850) |
| Non-cash Portion of Loss on Extinguishment of Debt | - | - | 10,154 |
| (Gain)/Loss on Sale of Assets | 73 | - | - |
| Deferred Debt Issuance Costs | 1,454 | - | - |
| Change in Assets and Liabilities | | | |
| Accounts Receivable | (838) | 6,484 | (3,857) |
| Inventories | 13,460 | 4,191 | 9,716 |
| Prepaid Expenses and Other Current Assets | 1,292 | 878 | (1,028) |
| Accounts Payable | (4,500) | (6,243) | (4,783) |
| Accrued Expenses | (4,124) | (5,785) | (22,179) |
| Income Taxes Receivable | (2,503) | (11,789) | (11,443) |
| Deferred Revenues | 3,097 | (7,638) | (3,778) |
| Accrued Interest Expense | 884 | - | - |
| Other | (2,733) | (1,736) | 1,422 |
| Net Cash Provided by Operating Activities | 13,130 | 38,022 | 21,375 |
| | | | |
| **Cash flows from investing activities** | | | |
| Purchases of Fixed Assets | (7,546) | (11,488) | (15,719) |
| Purchases of Derivative Financial Instruments | - | (172) | - |
| Net Cash Used in Investing Activities | (7,546) | (11,660) | (15,719) |
| | | | |
| **Cash flows from financing activities** | | | |
| Repurchase of Member Interests | - | (300) | (200) |
| Payment of Cash Distributions | - | - | (540) |
| Proceeds from Long-term Borrowings | - | 39,000 | - |
| Payments on Long-term Borrowings | (10,100) | (9,000) | - |
| Proceeds from Issuance of Long-term Debt | - | - | 565,000 |
| Payments on Long-term Debt | (4,488) | (35,677) | (583,608) |
| Payment of Debt Issuance Costs | (5,071) | - | (3,839) |
| Net Cash used in financing activities | (19,659) | (5,977) | (23,187) |
| | | | |
| Effect of Exchange Rate Changes on Cash and Cash Equivalents | 191 | 780 | (434) |
| | | | |
| Net Increase (Decrease) in Cash and Cash Equivalents | (13,884) | 21,165 | (17,965) |
| Cash and Cash Equivalents, Beginning of Period | 37,558 | 16,393 | 34,358 |
| Cash and cash equivalents, End of Period | $23,674 | $37,558 | $16,393 |

---

[1] The financial data for the periods ended December 31, 2008 and 2007 have been derived from the Company's audited consolidated financial statements appearing in the Company's Consolidated Financial Statements for the year ended December 31, 2008. The financial data for the period ended November 30, 2009 includes accounts not used in the audited financial statements.

# SCHEDULE 6

**SCHEDULE 6**

**LIQUIDATION ANALYSIS**

**A.      Introduction and Reservations**[1]

The Company, with the assistance of their financial advisors, have prepared this Liquidation Analysis (the "Liquidation Analysis") for the purpose of evaluating whether the Plan meets the so-called best interests test under section 1129(a)(7) of the Bankruptcy Code. The Liquidation Analysis has been prepared assuming that, in the event the Company files the Chapter 11 Cases, such cases convert to chapter 7 proceedings under the Bankruptcy Code on February 28, 2010 (the "Liquidation Date") and the Company's assets are liquidated in a traditional liquidation with the loss of going concern value attributable to these assets. A chapter 7 trustee (the "Trustee") would be appointed or elected to commence the liquidation of all of the Company's assets. To maximize recovery, the liquidation is assumed to occur over a three to five month period (the "Wind Down Period"). The Liquidation Analysis is based on unaudited book values as of November 30, 2009, and these values, in total, are assumed to be representative of the Company's assets and liabilities as of the Liquidation Date. The Liquidation Analysis, however, does not include recoveries resulting from any potential preference claims, fraudulent conveyance litigation, or other avoidance actions.

Estimating recoveries in any hypothetical chapter 7 liquidation is an uncertain process due to the number of unknown variables and is necessarily speculative. Thus, extensive estimates and assumptions have been made that, although considered reasonable by the Company's management and its financial advisors, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the control of the Debtors.

THE COMPANY MAKES NO REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE ESTIMATES AND ASSUMPTIONS OR A TRUSTEE'S ABILITY TO ACHIEVE FORECASTED RESULTS. IN THE EVENT THE CHAPTER 11 CASES ARE CONVERTED TO CHAPTER 7 PROCEEDINGS, ACTUAL RESULTS MAY VARY MATERIALLY FROM THE ESTIMATES AND PROJECTIONS SET FORTH IN THE LIQUIDATION ANALYSIS.

The Liquidation Analysis indicates the values, which may be obtained upon disposition of assets pursuant to a hypothetical chapter 7 liquidation, as an alternative to continued operation of the business as proposed under the Plan. Accordingly, values discussed herein are different than amounts referred to in the Plan and other sections or Schedules to the Disclosure Statement, which illustrate the value of the Company's business as a going concern.

---

[1]      Unless otherwise defined herein, each capitalized term shall have the meaning ascribed to it in the Disclosure Statement to which this Liquidation Analysis is attached.

In preparing the Liquidation Analysis, the amount of Allowed Claims has been projected based on a review of the Company's books and records. Additional Claims were estimated to include certain post-petition obligations that would be asserted in a hypothetical chapter 7 liquidation. These potential Claims include, without limitation, Claims for trade payables and accrued expenses incurred during the Chapter 11 Cases. In the event litigation were necessary to resolve Claims asserted in a chapter 7 liquidation, the delay could be prolonged and Claims could further increase. The effects of this delay on the value of distributions under the hypothetical liquidation have not been considered. No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the estimated amounts set forth in the Liquidation Analysis. THE ESTIMATED AMOUNT OF ALLOWED CLAIMS SET FORTH IN THE LIQUIDATION ANALYSIS SHOULD NOT BE RELIED ON FOR ANY OTHER PURPOSE, INCLUDING, WITHOUT LIMITATION, ANY DETERMINATION OF THE VALUE OF ANY DISTRIBUTION TO BE MADE ON ACCOUNT OF ALLOWED CLAIMS UNDER THE PLAN. THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY AND SIGNIFICANTLY DIFFER FROM THE AMOUNT OF CLAIMS ESTIMATED IN THE LIQUIDATION ANALYSIS.

NOTHING CONTAINED IN THIS HYPOTHETICAL LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE COMPANY.

EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THIS LIQUIDATION ANALYSIS WAS PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT THESE ANALYSES IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE COMPANY DOES NOT INTEND AND DOES NOT UNDERTAKE ANY OBLIGATION TO UPDATE OR OTHERWISE REVISE THE LIQUIDATION ANALYSIS (OR ANY OTHER PART OF THE DISCLOSURE STATEMENT) TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THIS LIQUIDATION ANALYSIS IS PREPARED OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE LIQUIDATION ANALYSIS MAY NOT BE RELIED ON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE OUT-OF-COURT TRANSACTION AND PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE LIQUIDATION ANALYSIS.

THIS LIQUIDATION ANALYSIS WAS DEVELOPED SOLELY FOR PURPOSES OF THE FORMULATION AND NEGOTIATION OF THE OUT-OF-COURT TRANSACTION AND PLAN AND TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE OUT-OF-COURT TRANSACTION AND PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE OUT-OF-COURT TRANSACTION AND PLAN AND SHOULD NOT BE USED OR RELIED ON FOR

ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF SECURITIES OF, OR CLAIMS OR INTERESTS IN, THE COMPANY OR ANY OF ITS AFFILIATES.

## <u>Natural Products Group's Hypothetical Liquidation Analysis</u>
### (unaudited)

The Liquidation Analysis should be read in conjunction with the accompanying Notes. Based on Debtors' November 30, 2009 Unaudited Balance Sheet Data**.**

($ in thousands)

| Balance Sheet Items | Notes | 11/30/2009 Book Value | Estimated Recovery Low % | Estimated Recovery High % | Estimated Recovery Low $ | Estimated Recovery High $ |
|---|---|---|---|---|---|---|
| Debtors | | | | | | |
| Assets | | | | | | |
| Cash and Cash Equivalents | 1 | $ 23,674 | 100.0% | 100.0% | $ 23,674 | $ 23,674 |
| Accounts Receivable, Net | 2 | 4,400 | 76.7% | 85.9% | 3,376 | 3,778 |
| Inventories | 3 | 41,737 | 37.8% | 43.3% | 15,776 | 18,077 |
| Deferred Income Tax Assets | 4 | 8,386 | 0.0% | 0.0% | | |
| Prepaid Expenses | 5 | 4,862 | 0.0% | 0.0% | - | - |
| Property, Plant and Equipment, Net | 6 | 25,831 | 19.2% | 24.4% | 4,952 | 6,304 |
| Deferred Debt Issuance Costs | 7 | 17,385 | 0.0% | 0.0% | - | - |
| Goodwill | 8 | 115,134 | 0.0% | 0.0% | - | - |
| Intangible Assets, Net | 9 | 19,121 | 0.0% | 0.0% | - | - |
| Income Tax Receivable | 10 | 22,543 | 90.1% | 90.1% | 20,303 | 20,303 |
| Other Assets | 11 | 2,459 | 40.6% | 42.7% | 998 | 1,050 |
| **Total Assets** | | **$ 285,532** | | | **$ 69,078** | **$ 73,185** |
| | | | | | | |
| Wind - Down Expenses | | | | | | |
| | | | | | | |
| Wind - Down Operating Costs | 12 | | | | $ (10,605) | $ (8,677) |
| Trustee Fees | 13 | | | | (2,072) | (2,196) |
| Professional Fees | 14 | | | | (4,000) | (3,000) |
| Total Wind - Down Expenses | | | | | $ (16,678) | $ (13,873) |
| | | | | | | |
| **Net Proceeds Available for Payments of Claims** | | | | | **$ 52,401** | **$ 59,312** |

| | Notes | Estimated Recovery Low $ | Estimated Recovery High $ |
|---|---|---|---|
| Secured Claims | | | |
| OpCo Lender Claims and Other Secured Claims | 15 | $ 52,401 | $ 59,312 |
| | | | |
| Excess in Proceeds over Secured Claims | | - | - |
| | | | |
| Administrative Claims | | | |
| 503(b)(9) Claims | 16 | - | - |
| Post-Petition Claims | 17 | - | - |
| Total Administrative Claims | | - | - |
| | | | |
| Excess in Proceeds over Secured and Administrative Claims | | - | - |
| | | | |
| Net Proceeds Available for Payment of Unsecured Claims | 18 / 19 | - | - |

**B.** **Assumptions and Notes**

**Assets**

All assets are included net of the cost of their disposal.

1.  Cash & Equivalents – Reflects cash and equivalents held in all bank accounts.

2.  Accounts Receivable, Net – Accounts Receivable consists primarily of Levlad trade receivables as well as Arbonne other receivables from overpayment of utility and tax bills and miscellaneous amounts due from vendors. Recovery on Levlad trade receivables is assumed at 75%–85% net of reserves. Recovery on Arbonne other receivables varies depending on the receivable and is assumed at 0%–100%.

3.  Inventories – Inventories are comprised of raw materials, work in progress, finished goods and other various supplies at both Arbonne and Levlad. Recovery on Arbonne raw materials are assumed to have no recovery value based on the assumption that these materials, which are specific to Arbonne's products, will have no market value. Arbonne work-in-progress inventories are assumed to be too specific to have a market value. Recovery on Arbonne's finished goods is assumed at 75%–85% of cost net of reserves for excess and obsolete products, business aid materials and component inventory. Business aids and components are not assumed to have liquidation value. Recovery of Levlad raw materials are assumed at 5%–15% of cost of all non-Arbonne related component inventory (which represent 28% of Levlad raw materials), net of obsolete products. Arbonne related raw materials have no recovery value. Levlad work-in-progress and finished goods are assumed to have a recovery of 95%–100% of cost, net of obsolete products, due to the made-to-order nature of most of the products.

4.  Deferred Income Tax Assets – Deferred Income Tax Assets are estimated to have no recovery value.

5.  Prepaid Expenses – Prepaid expenses include prepaid insurance, marketing, rent, taxes, product giveaways, maintenance, deposits on space rentals and other. Prepaid expenses are estimated to provide no recovery value.

6.  Property, Plant & Equipment, net – Property, Plant & Equipment consists of machinery and equipment, furniture and fixtures, software, computer equipment, leasehold improvements, construction in process and other. Arbonne machinery and equipment has an assumed recovery value of 25%–35% of net book value. Arbonne's furniture and fixtures are assumed to have a recovery range of 15%–25%. Arbonne's computer

equipment is assumed to have a recovery of 35%–45%. Levlad machinery and equipment and related construction in process are assumed to have a recovery of 75%–85% due to the resaleability to its competitors within a close proximity. Levlad's furniture and fixtures are assumed to have a recovery range of 45%–55%. Levlad's computer equipment is assumed to have a recovery of 15%–25%. Software for both Arbonne and Levlad is estimated to have no recovery value as it is unique to Natural Products Group's operations. Leasehold improvements for both Arbonne and Levlad are also estimated to have no recovery value.

7. <u>Deferred Debt Issuance Costs</u> – Deferred Debt Issuance Costs include the capitalized costs from previous financings and is estimated to have no recovery value.

8. <u>Goodwill</u> – Goodwill is estimated to have no recovery value.

9. <u>Intangible Assets, net</u> – Intangible Assets are comprised of patents, trade names, and its distribution network and are estimated to have no recovery value.

10. <u>Income Tax Receivable</u> – Receivables due from the ability to carry back NOLs to prior years' income are based on pending refunds or anticipated refund filings.

11. <u>Other Assets</u> – Arbonne Other Assets primarily represent upfront lease and credit line deposits. It is assumed that Arbonne will recover 95%–100% of its credit line deposit. Upfront lease deposits have no recovery value.

**Wind-Down Expenses**

12. <u>Wind-Down Operating Costs</u> – The Company anticipates that the liquidation process would take three to five months. Wind-down operating costs include compensation expense, severance and certain building operating expenses including rent, electricity, and maintenance that would be required to maintain the properties during a sale process.

13. <u>Trustee Fees</u> – Trustee fees are assumed to be 3% of the gross proceeds from the liquidation of the assets.

14. <u>Professional Fees</u> – Professional fees represent estimates for the professional fees during a chapter 7 liquidation.

**Secured Claims**

15. <u>OpCo Lender Claims and Other Secured Claims</u> – Secured claims include pre-petition Allowed OpCo Lender Claims and other secured claims against the Company.

**Administrative Claims**

16.    503(b)(9) Claims – Estimated based on the value of goods received by the company within a typical 20-day period.

17.    Post-Petition Claims – Include restructuring costs, rent, and other post-petition expenses that are estimated to be due and unpaid on February 28, 2010.

**Unsecured Claims**

18.    Accounts Payable and Accrued Expenses – General unsecured claims include both prepetition and post-petition accounts payable and accrued expenses.

19.    HoldCo Lender Claims – Unsecured claims include pre-petition Allowed HoldCo Lender Claims.

# SCHEDULE 7

## SCHEDULE 7

## FINANCIAL PROJECTIONS & ASSUMPTIONS

These Projections should be read in conjunction with the assumptions, qualifications and explanations set forth herein as well as the "Financial Projections & Assumptions" and "Risk Factors" sections of the Disclosure Statement, which can be found at pages 22 and 71 thereof, respectively.

The Projections set forth below have been prepared based on the assumption that the Effective Date will be February 28, 2010. Although the Company is seeking to cause the Effective Date to occur as soon as practicable, there can be no assurance as to when or if the Effective Date will actually occur.

Natural Products Group Projected Consolidated Statements of Operations set forth below present the projected consolidated results of operations of Natural Products Group from 2010 through 2014. The financial statements include various estimated Exit Costs and Financing adjustments which reflect the assumed effects of Confirmation, including the settlement of various liabilities and related securities issuances, cash payments and borrowings.

**THE PROJECTIONS ARE PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING "ADEQUATE INFORMATION" UNDER SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE OUT-OF-COURT TRANSACTION AND PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE OUT-OF-COURT TRANSACTION AND PLAN AND SHOULD NOT BE USED OR RELIED ON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF SECURITIES OF, OR CLAIMS OR EQUITY INTERESTS IN, THE COMPANY OR ANY OF ITS AFFILIATES.**

**THE ASSUMPTIONS AND RESULTANT PROJECTIONS AND SUBSEQUENTLY IDENTIFIED VARIANCES CONTAIN CERTAIN STATEMENTS THAT MAY BE CONSIDERED "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THE PROJECTIONS HAVE BEEN PREPARED BY THE COMPANY'S MANAGEMENT AND PROFESSIONALS. THESE PROJECTIONS AND SUBSEQUENTLY IDENTIFIED VARIANCES, IF ANY, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED OR MAY BE UNDERSTATED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE COMPANY'S CONTROL. THE COMPANY CAUTIONS THAT NO ASSURANCES CAN BE MADE AS TO THE ACCURACY OF THE ASSUMPTIONS AND RESULTANT PROJECTIONS OR THE ABILITY OF THE**

COMPANY, THE FILING ENTITIES AND THE NEW NPG GROUP TO ACHIEVE THE PROJECTED RESULTS FOLLOWING THE RESTRUCTURING. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE, AND EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED, OR MAY BE UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED ON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TO COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THE COMPANY'S INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE PROJECTIONS AND, ACCORDINGLY, DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO, ASSUME NO RESPONSIBILITY FOR THE PROJECTIONS AND DISCLAIM ANY ASSOCIATION WITH THE PROJECTIONS.

THE PROJECTIONS DO NOT REFLECT THE IMPACT OF FRESH START REPORTING IN ACCORDANCE WITH THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS' STATEMENT OF POSITION 90-7, "FINANCIAL REPORTING BY ENTITITES IN REORGANIZATION UNDER THE BANKRUPTCY CODE". THE IMPACT OF FRESH START REPORTING, WHEN REFLECTED AT THE EFFECTIVE DATE, MAY HAVE A MATERIAL IMPACT ON THE REORGANIZED COMPANY'S CONSOLIDATED BALANCE SHEET AND PROSPECTIVE RESULTS OF OPERATIONS. THE COMPANY AND ITS PROFESSIONALS, HOWEVER, DO NOT BELIEVE AT THIS TIME THAT FRESH START ADJUSTMENTS IN SUCH BALANCE SHEET WILL HAVE A MATERIAL IMPACT ON PROJECTED RECOVERIES FOR CREDITORS.

THE COMPANY DOES NOT, AS A MATTER OF COURSE, PUBLISH ITS BUSINESS PLANS AND STRATEGIES OR PROJECTIONS OF ITS ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS. ACCORDINGLY, THE COMPANY DOES NOT INTEND, AND DISCLAIMS ANY OBLIGATION, TO: (1) FURNISH UPDATED BUSINESS PLANS OR PROJECTIONS TO HOLDERS OF CLAIMS OR EQUITY INTERESTS PRIOR TO THE EFFECTIVE DATE, OR TO HOLDERS OF SECURITIES OF ANY FILING ENTITY, OR ANY OTHER PARTY AFTER THE EFFECTIVE DATE; (2) INCLUDE SUCH UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE BANKRUPTCY COURT OR ANY GOVERNMENTAL AGENCY OR ENTITY; OR (3) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE. HOWEVER, FROM TIME TO TIME, THE COMPANY MAY PREPARE UPDATED

**PROJECTIONS IN CONNECTION WITH PURSUING FINANCINGS (INCLUDING IN CONNECTION WITH THE NEW TERM LOAN), CREDIT RATINGS AND OTHER PURPOSES.  SUCH PROJECTIONS MAY DIFFER MATERIALLY FROM THE PROJECTIONS PRESENTED HEREIN.**

## Natural Products Group's Consolidated Statement of Operations
### (Unaudited)

($ in thousands)

| | Fiscal Year Ending December 31, | | | | |
|---|---|---|---|---|---|
| | **2010** | **2011** | **2012** | **2013** | **2014** |
| Net Sales | $ 417,605 | $ 438,222 | $ 464,140 | $ 538,899 | $ 594,415 |
| Cost of Goods Sold | 115,110 | 119,384 | 126,364 | 143,218 | 156,068 |
| Gross Profit | $ 302,495 | $ 318,838 | $ 337,776 | $ 395,681 | $ 438,346 |
| Total Operating Expenses | $ 288,474 | $ 293,806 | $ 305,922 | $ 342,552 | $ 371,570 |
| Income / (Loss) from Operations | $ 14,021 | $ 25,032 | $ 31,854 | $ 53,129 | $ 66,777 |
| Interest Expense, Net | 15,464 | 10,092 | 7,250 | 4,899 | 1,085 |
| Income / (Loss) Before Income Taxes | $ (1,443) | $ 14,940 | $ 24,604 | $ 48,229 | $ 65,692 |
| Provision (Benefit) for Income Taxes | (570) | 5,892 | 9,710 | 19,046 | 25,945 |
| Net Income / (Loss) | $ (873) | $ 9,049 | $ 14,894 | $ 29,184 | $ 39,746 |
| EBITDA[1] | $ 32,282 | $ 37,146 | $ 43,022 | $ 62,154 | $ 75,237 |

Please read in conjunction with associated notes.

[1] Excludes one-time restructuring fees, fresh start accounting adjustments impacting EBITDA and Oracle implementation costs related to fresh start accounting.

Natural Products Group Projected Consolidated Balance Sheets set forth below present the projected consolidated financial position of Natural Products Group including the contemplated new capital structure of Natural Products Group, giving effect to confirmation and consummation of the transactions contemplated by the Out-of-Court Transaction and the Plan, as of the end of each fiscal year from 2010 to 2014.

<u>**Natural Products Group's Projected Consolidated Balance Sheet**</u>
(Unaudited)

($ in thousands)

| | Fiscal Year Ending December 31, | | | | |
|---|---|---|---|---|---|
| | **2010** | **2011** | **2012** | **2013** | **2014** |
| **Assets:** | | | | | |
| Cash and Cash Equivalents | $ 68,960 | $ 20,000 | $ 20,000 | $ 20,000 | $ 40,557 |
| Accounts Receivable, Net of Allowance | 3,525 | 3,806 | 4,056 | 4,363 | 4,617 |
| Inventories | 50,236 | 52,170 | 55,148 | 59,239 | 60,644 |
| Deferred Income Tax Assets | 8,386 | 8,386 | 8,386 | 8,386 | 8,386 |
| Prepaid Expenses and Other Current Assets | 7,381 | 7,423 | 7,685 | 8,063 | 8,431 |
| Total Current Assets | 138,488 | 91,785 | 95,275 | 100,051 | 122,635 |
| | | | | | |
| Property, Plant and Equipment, Net | 17,532 | 13,574 | 10,764 | 10,307 | 10,628 |
| Deferred Debt Issuance Costs | 375 | 250 | 125 | - | - |
| Reorganization Value in Excess of Book Value | 294,505 | 294,505 | 294,505 | 294,505 | 294,505 |
| Income Taxes Receivable | 814 | 814 | 814 | 814 | 814 |
| Other Assets | 10,396 | 10,396 | 10,396 | 10,396 | 10,396 |
| Total Assets | $ 462,109 | $ 411,323 | $ 411,879 | $ 416,073 | $ 438,977 |
| | | | | | |
| **Liabilities and Shareholders Equity** | | | | | |
| Accounts Payable | $ 10,631 | $ 12,137 | $ 13,328 | $ 14,920 | $ 15,983 |
| Accrued Expenses | 29,821 | 33,769 | 36,509 | 40,670 | 43,468 |
| Deferred Revenues | 12,616 | 16,451 | 18,350 | 20,858 | 22,440 |
| Total Current Liabilities | 53,068 | 62,357 | 68,187 | 76,447 | 81,892 |
| | | | | | |
| New Debt Issued | 144,829 | 75,704 | 55,536 | 22,286 | - |
| Deferred Income Tax Liabilities | 7,561 | 7,561 | 7,561 | 7,561 | 7,561 |
| Total Liabilities | $ 205,458 | $ 145,623 | $ 131,285 | $ 106,294 | $ 89,453 |
| | | | | | |
| **Shareholders Equity:** | | | | | |
| Total Shareholders Equity[(1)] | $ 256,652 | $ 265,700 | $ 280,594 | $ 309,778 | $ 349,524 |
| | | | | | |
| Total Liabilities and Shareholders Equity | $ 462,109 | $ 411,323 | $ 411,879 | $ 416,073 | $ 438,977 |

Please read in conjunction with associated notes.

---

[(1)] On or about the Effective Date, NPG will be converted from a Delaware limited liability company to a Delaware corporation.

Natural Products Group's Projected Consolidated Statements of Cash Flows set forth below present the projected consolidated cash flows of Natural Products Group from 2010 through 2014.

## Natural Products Group's Consolidated Statement of Cash Flows
### (Unaudited)

($ in thousands)

| | Fiscal Year Ending December 31, | | | | |
|---|---|---|---|---|---|
| | **2010** | **2011** | **2012** | **2013** | **2014** |
| Cash Flows from Operating Activities | | | | | |
| Net Income (Loss) | $ (873) | $ 9,049 | $ 14,894 | $ 29,184 | $ 39,746 |
| Adjustments to Net Income | | | | | |
| Depreciation and Amortization | 15,145 | 12,113 | 11,168 | 9,025 | 8,461 |
| Noncash Interest Expense | 9,954 | 125 | 125 | 125 | - |
| Changes in Working Capital Accounts | | | | | |
| Accounts Receivable (Increase) / Decrease | 7 | (281) | (250) | (306) | (254) |
| Inventories (Increase) / Decrease | (2,301) | (1,935) | (2,978) | (4,091) | (1,404) |
| Prepaid Expenses and Other Current Assets (Increase) / Decrease | (630) | (42) | (263) | (378) | (368) |
| Income Taxes Receivable (Increase) / Decrease | 20,303 | - | - | - | - |
| Accounts Payable Increase / (Decrease) | (68) | 1,506 | 1,191 | 1,591 | 1,064 |
| Other Accrued Expenses Increase / (Decrease) | 3,254 | 3,948 | 2,740 | 4,161 | 2,799 |
| Deferred Revenues Increase / (Decrease) | 1,721 | 3,835 | 1,899 | 2,507 | 1,583 |
| Liabilities Subject to Compromise | 3,580 | - | - | - | - |
| Cash Provided By / (Used In) Operating Activities | $ 50,093 | $ 28,319 | $ 28,527 | $ 41,818 | $ 51,625 |
| | | | | | |
| Cash Flows from Investing Activities | | | | | |
| Acquisition of Property, Plant and Equipment, Net | (7,956) | (8,155) | (8,359) | (8,568) | (8,782) |
| Cash Provided By / (Used In) Investing Activities | $ (7,956) | $ (8,155) | $ (8,359) | $ (8,568) | $ (8,782) |
| | | | | | |
| Cash Flows from Financing Activities | | | | | |
| Delayed Term Loan Drawdown / (Repayment) | 10,000 | (10,000) | - | - | - |
| Payment of Long-Term Debt | - | (59,125) | (20,168) | (33,250) | (22,286) |
| Payment of Debt Issuance Costs | (500) | - | - | - | - |
| Cash Provided By / (Used In) Financing Activities | $ 9,500 | $ (69,125) | $ (20,168) | $ (33,250) | $ (22,286) |
| | | | | | |
| Cash and Cash Equivalents, Beginning of Period | $ 17,323 | $ 68,960 | $ 20,000 | $ 20,000 | $ 20,000 |
| Net Increase (Decrease) in Cash and Cash Equivalents | 51,637 | (48,960) | - | - | 20,557 |
| Cash and Cash Equivalents, End of Period | $ 68,960 | $ 20,000 | $ 20,000 | $ 20,000 | $ 40,557 |

Please read in conjunction with associated notes.

<u>**Notes to Financial Projections**</u>

**A.     Accounting Policies**

The Projections have been prepared using accounting policies that are consistent with those applied in the Company's historical financial statements.

The Company believes, at this point, that it will qualify for treatment under fresh start accounting principles outlined in SOP 90-7.  The Projections do not reflect the impact of fresh start reporting; however, assets and liabilities have been adjusted to reflect the capital structure upon emergence.

**B.     Summary of Significant Assumptions**

The Company, with the assistance of various professionals, prepared the Projections for each of the five years ending December 31, 2010 through 2014.  The Projections reflect numerous assumptions, including various assumptions regarding the anticipated future performance of the Company, industry performance, general business and economic conditions and other matters, most of which are beyond the control of the Company.  Therefore, although the Projections are necessarily presented with numerical specificity, the actual results achieved during the Projection Period will vary from the projected results.  These variations may be material.  Although the Company believes that the assumptions underlying the Projections, when considered on an overall basis, are reasonable in light of current circumstances, no representation can be or is being made with respect to the accuracy of the Projections or the ability of Company to achieve the projected results of operations.  In deciding whether to vote to accept or reject the Out-of-Court Transaction and the Plan, claimants must make their own determinations as to the reasonableness of such assumptions and the reliability of the Projections.

Additional information relating to the principal assumptions used in preparing the Projections is set forth below:

- *General Market Conditions*

The Projections take into account the current market environment in which the Company competes, including many economic and financial forces that are beyond the control of the Company's management.  Economic growth or slowdowns on a global or regional basis may impact the New NPG Group's performance.  Availability and the price of material resources used to support the production of the New NPG Group's product offerings will also impact profitability.  In general, the Projections assume that economic conditions will improve over the Projection Period.

- *Methodology*

The Projections were prepared based on several key assumptions as discussed below.

- ***Arbonne International***

  o Net Sales

  Net sales are expected to increase by approximately 7%, 5%, 6%, 17% and 11% in 2010, 2011, 2012, 2013 and 2014, respectively. Net sales were projected based on improvements in consultant sponsoring and purchasing behavior as new training programs increase consultant retention and new product line initiatives increase sales.

  o Gross Margin

  Gross margin as a percentage of net sales is expected to remain constant over the Projection Period at 77%. Constant costs as a percentage of total orders are assumed.

  o Selling, General and Administrative Expenses

  Selling, general and administrative ("SG&A") expenses include overrides and incentive expenses, selling, marketing, distribution, general and administrative, and research and development expenses. As a percentage of net sales, Arbonne SG&A expenses are projected to decline gradually over the Projection Period from approximately 71% in 2010 to 65% in 2014, driven by the realization of cost reduction initiatives implemented in late 2008 and 2009, reduced capital expenditures and the leveraging of fixed costs over a greater revenue base.

- ***Levlad LLC***

  o Net Sales

  Net sales are projected to decline by 2% in 2010, and increase 13%, 6%, 11% and 8% in 2011, 2012, 2013 and 2014, respectively. The projected rebound beginning in 2011 is driven by increased sales at Arbonne and expected recoveries in consumer discretionary spending, which will begin in 2010.

  o Gross Margin

  Gross margin as a percentage of net sales is expected to improve slightly over the forecasted period from 12.5% in 2010 to 13.1% in 2014. Improvements are based on fixed costs remaining constant while revenue increases.

  o Selling, General and Administrative Expenses

  SG&A expenses include selling, marketing, general and administrative, and research and development expenses. As a percentage of net sales, Levlad SG&A expenses are projected to improve over the Projection Period from approximately 20% in 2010 to 14% in 2014, driven by declining depreciation expense and by revenue growth that is outpacing the 5% increase in year-over-year expenses.

- ***Corporate Expenses and Other***

    o <u>Interest Expense, net</u>

The Projections reflect interest expense incurred related to borrowings under the New Term Loan and the Reinstated OpCo Term Loan. The New Term Loan is projected to possess the following terms: a principal balance capacity of $20 million with an assumed draw of $10 million in 2010, a maturity of 4 years, and an interest rate of LIBOR + 10.0%, subject to a LIBOR floor of 3.0%. The Reinstated OpCo Term Loan, which is projected to have the following terms: a principal balance of $125 million, a maturity of 5 years and an interest rate of LIBOR + 7.0%, subject to a LIBOR floor of 3.0%. Interest on the Reinstated OpCo Term Loan will be paid-in-kind until the Company is in compliance with certain covenants still to be determined. Interest expense is net of cash held by the New NPG Group, which is assumed to earn interest at a rate of 1.5% per year.

    o <u>Income Taxes</u>

The Projections calculate income tax expense based on the federal and state tax rate of 39.5%, applied to pre-tax income. The Projections assume all net operating losses ("NOLs") are eliminated due to the size of cancellation of indebtedness income ("CODI"). It is therefore assumed that the Company will pay taxes on pre-tax income in its 2010 tax year. The Projections include a tax refund of $20 million in 2010 due to the ability to carry back losses to 2004 to 2008 income.

    o <u>Working Capital</u>

Working capital is comprised of accounts receivable, inventory, prepaid expenses and other current assets, accounts payable, accrued expenses and deferred revenue. Working capital projections assume that customer payments, inventory turnover and trade terms will remain relatively constant over the projected period.

    o <u>Capital Expenditures</u>

Capital expenditures for the Projection Period are based on Natural Product Group's capital spending budget and are primarily related to technology enhancements. In 2011 through 2014, capital expenditures are projected to increase by 2.5% per year.

    o <u>Capital Structure</u>

The capital structure upon emergence of the New NPG Group is assumed as follows:

    (a)    New Term Loan: On or after the Effective Date, the New NPG Group will be indebted under the New Term Loan, which is projected to possess the following terms: a principal balance capacity of $20 million with an assumed draw of $10 million in 2010, a maturity of 4 years, and an interest rate of LIBOR + 10.0%, subject to a LIBOR floor of 3.0%. The New Term Loan will be funded

by certain OpCo Lenders and (in the event of the need for a chapter 11 filing) will be used to refinance the DIP Facility (in the event of the Chapter 11 Cases were commenced), pay fees and expenses and fund working capital needs.

(b)     Reinstated OpCo Term Loan: On or after the Effective Date, the New NPG Group will be indebted under the Reinstated OpCo Term Loan, which is projected to have the following terms: a principal balance of $125 million, a maturity of 5 years and an interest rate of LIBOR + 7.0%, subject to a LIBOR floor of 3.0%.  Interest will be paid-in-kind until the Company is in compliance with certain covenants still to be determined.  The Reinstated OpCo Term Loan will be allocated pro rata among the OpCo Lenders under Out-of-Court Transaction and the Plan and will represent restated debt involving no new money funding.

(c)     New NPG Common Stock: For purposes of the Projections only, value of the common equity of New NPG has been assumed to be approximately $252.5 million upon emergence.