## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| NATURAL PRODUCTS GROUP, LLC, et al.,[1] | ) | Case No. 10-_____ (    ) |
|  | ) |  |
|  | ) | Jointly Administered |
| Debtors. | ) |  |
|  | ) |  |

## DEBTORS' MOTION FOR (I) INTERIM AND FINAL ORDERS UNDER 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e) AND FED. R. BANKR. P. 2002, 4001 AND 9014 (A) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING, (B) AUTHORIZING DEBTORS TO USE CASH COLLATERAL, AND (C) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, AND (II) FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b), (c) AND (d)

Natural Products Group, LLC ("NPG") and its affiliated debtors and debtors in possession (collectively, the "Debtors") file this motion (the "Motion") pursuant to sections 105(a), 361, 362, 363, 364 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") for entry of an interim order (substantially in the form attached hereto as Exhibit "A", the "Interim Order") and a final order (the "Final Order" and together with the Interim Order, the "DIP Orders") (i) (a) authorizing the Debtors to enter into senior secured, superpriority debtor-in-possession financing facility, in an amount up to $10 million on an interim basis, including a $250,000 letter of credit facility, with an additional $10 million available on a final basis (as

---

[1] The debtors and debtors in possession in these cases are Natural Products Group, LLC (Fed. EIN 86-1119470); Arbonne Intermediate Holdco, Inc. (Fed. EIN 87-0735363); Levlad Intermediate Holdco, Inc. (Fed. EIN 87-0735367); Arbonne International, LLC (Fed. EIN 33-0762250); Levlad, LLC (Fed. EIN 95-2973496); Arbonne Institute of Research and Development, LLC (Fed. EIN 33-0762250); Arbonne International Holdings, Inc. (Fed. EIN 20-5585671); and Arbonne International Distribution, Inc. (Fed. EIN 20-5585608).

amended, modified or otherwise in effect from time to time, the "DIP Facility"), substantially on

the terms set forth in the debtor-in-possession credit agreement attached as Exhibit "A" to the

Interim Order (as amended, supplemented, or otherwise modified and in effect from time to time,

the "DIP Credit Agreement,"[2] together with all other agreements, documents, notes, certificates,

and instruments executed and/or delivered with, to or in favor of the DIP Secured Parties (as

defined below), the "DIP Financing Agreements"), and (b) granting the DIP Liens and the DIP

Superpriority Claims (in each case, as defined below); (ii) authorizing the interim use of Cash

Collateral (as defined below) on a consensual basis on the terms set forth in the Interim Order;

(iii) granting "adequate protection" to the Prepetition Secured Parties (as defined below);

(iv) modifying the automatic stay as imposed by section 362 of the Bankruptcy Code to the

extent necessary to implement and effectuate the terms of the DIP Facility and the DIP Orders;

and (v) scheduling a final hearing with respect to the relief requested herein (the "Final

Hearing"). In support of the Motion, the Debtors rely upon and refer this Court to the Affidavit

of Mark I. Lehman in Support of First Day Motions and Applications (the "Lehman Affidavit"),

and the declaration of Henry S. Hsu in support of the Motion (the "Hsu Declaration" and

together with the Lehman Affidavit, the "Affidavits"), and respectfully represent as follows:

## Preliminary Statement

1.     Prior to the commencement of these chapter 11 cases (the "Chapter 11

Cases"), the Debtors' operations were funded, in part, with the proceeds of a credit facility

described more fully below, among Arbonne International, LLC ("Arbonne") and Levlad, LLC

("Levlad"), as borrowers (the "Borrowers"), Arbonne Intermediate Holdco, Inc. ("Arbonne

HoldCo") and Levlad Intermediate Holdco, Inc. ("Levlad HoldCo"), as guarantors (the

---

[2]     Capitalized terms used but not defined herein shall have the meanings given to them in the DIP Credit
Agreement or, if not defined in the DIP Credit Agreement, the Interim Order.

"Guarantors"), and the lenders thereunder (the "OpCo Lenders"). The indebtedness of the Debtors under such prepetition credit facility (the "OpCo Debt") is secured by liens on substantially all of the Debtors' respective properties and assets.

2. As set forth below and in the Lehman Affidavit, the Debtors have filed a proposed plan of reorganization and related disclosure statement, solicitation of which has already been completed. Assuming the Court approves such disclosure statement and confirms the Debtors' plan of reorganization on the schedule proposed by the Debtors, the Debtors are seeking to emerge from chapter 11 within approximately one and a half months.

3. During that time, the Debtors require the use of cash which comprises the cash collateral of the OpCo Lenders securing the OpCo Debt within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral"),[3] and the proceeds of the proposed $20 million DIP Facility, mainly to fund day-to-day operations and maintain and preserve the Debtors' assets (including the Prepetition Collateral), in all cases for the benefit of the Debtors' estates and creditors, including the OpCo Lenders. The availability to the Debtors of sufficient working capital and liquidity to finance their operations is vital to their ability to maintain their operations and is necessary for the preservation and maximization of their estates as a whole, pending their contemplated reorganization.

4. The Debtors seek authority during the interim period, and pursuant to the terms of the Interim Order, to use Cash Collateral and to borrow $10 million of the proposed $20

---

[3] Section 363(a) of the Bankruptcy Code defines "cash collateral" as:

> [C]ash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property . . . subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title[.]

11 U.S.C. § 363(a).

million DIP Facility, the other $10 million of which would only become available on a final basis after the Final Hearing.

5.     As discussed more fully below, the Debtors propose to secure their obligations under the DIP Facility by, among other things, granting to the DIP Agent (as defined below) for the benefit of the DIP Secured Parties (as defined below), first, junior, and first and priming liens on, and security interests in, substantially all of the Company's assets, with certain exceptions and, in each case, subject to a "carve out" described more fully below. The DIP Credit Agreement and the DIP Orders also provide the proposed lenders under the DIP Facility (the "DIP Lenders") with allowed superpriority administrative expense claims.

6.     The DIP Credit Agreement and the DIP Orders provide for, among other things, budgetary constraints on the use of Cash Collateral and the proceeds of the DIP Facility. The proceeds will provide credit for up to approximately four months to fund the cases—the outstanding amount of the DIP Facility will be rolled into an exit facility at confirmation.

7.     The Prepetition Secured Parties are also provided adequate protection, solely to the extent of any diminution in the value of their interests in the Prepetition Collateral as more fully set forth in the DIP Orders (and subject to a "carve out"), in the form of replacement security interests in and liens on substantially all of the Debtors' assets and property (with certain exclusions) and superpriority claims (in each case, in accordance with their relative priorities, and junior and subject to the liens and superpriority claims granted to the DIP Lenders), as well as reasonable professional fees and expenses incurred by the Prepetition Administrative Agent under the Prepetition Credit Agreement. If the Debtors are unable to obtain approval of the use of Cash Collateral the DIP Facility, their ability to consummate their carefully constructed prepackaged bankruptcy will be jeopardized, reducing recoveries to all

creditors. Entry of the Interim Order, and, after the requisite notice and the Final Hearing, the Final Order is therefore (a) critical to the Debtors' ability to reorganize pursuant to the Bankruptcy Code, (b) in the best interests of the Debtors and their estates, and (c) necessary to avoid irreparable harm to the Debtors, their creditors and their assets, business, goodwill, reputation and employees. Furthermore, access to the Cash Collateral and the initial proceeds under the DIP Facility on an interim basis is necessary to avoid immediate and irreparable harm to the Debtors pending the Final Hearing. The Debtors, therefore, respectfully request that this Motion be granted.

## Bankruptcy Rule 4001 Statement

8. In accordance with Bankruptcy Rule 4001, the following sets forth a concise summary of material terms of the proposed DIP Facility and the DIP Orders:[4]

| BORROWERS: | Arbonne and Levlad |
|---|---|
| GUARANTORS: | Arbonne HoldCo, Levlad HoldCo and each Subsidiary Guarantor |
| DIP AGENT: | Canadian Imperial Bank of Commerce, as administrative agent and collateral agent |
| DIP LENDERS: | The several banks and other financial institutions or entities from time to time party to the DIP Credit Agreement |
| DIP FACILITY: | Superpriority secured debtor-in-possession credit facility in the aggregate principal amount of $20 million, including a subfacility for Letters of Credit not to exceed $250,000. |
| AVAILABILITY: | Up to $10 million in the aggregate under the DIP Facility will be available upon entry of the Interim Order, with the remaining $10 million to become available upon entry of the Final Order. |
| CLOSING DATE: | Following Bankruptcy Court approval. |
| MATURITY DATE: | May 31, 2010 |
| TERMINATION DATE: | The earlier to occur of (i) the Maturity Date and (ii) the date the DIP Credit Agreement is terminated either by Borrowers or by the Required Lenders as follows: |
| | The Borrowers shall have the right, upon not less than three Business Days' notice to the Administrative Agent, to terminate the Commitments |

---

[4] This summary is not intended to limit the terms of the DIP Facility, including in respect of any use of Cash Collateral, in each case as set forth in the DIP Credit Agreement, the Interim Order and the Final Order. Reference should be made to the Interim Order, the DIP Credit Agreement and the Final Order for the full terms thereof.

5

or the L/C Commitment or, from time to time, to reduce the amount of the Commitments or the L/C Commitment. Any such reduction shall be in an amount equal to $500,000, or a whole multiple thereof, and shall reduce permanently the Commitments then in effect.

If any of the Events of Default shall occur and be continuing, then, and in any such event, notwithstanding the provisions of section 362 of the Bankruptcy Code, but subject to the Financing Orders, among other things, without further order of or application to the Bankruptcy Court and with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to the Borrowers declare all or any portion of the Commitments to be terminated forthwith, whereupon the Commitments or such portion thereof shall immediately terminate.

COMMITMENT PERIOD: The period from the Closing Date to the earlier to occur of (i) the Termination Date and (ii) June 30, 2010.

USE OF PROCEEDS: To fund the Debtors' day-to-day operations and general corporate purposes and to maintain and preserve the Debtors' assets

AGREED BUDGET: The Debtors' use of Cash Collateral and DIP Facility proceeds will be in accordance with a rolling 13-week detailed budget (with such supporting detail as the Administrative Agent and its financial advisors may request). The Agreed Budget is attached to the DIP Credit Agreement as Exhibit K.

SECURITY: All property of the HoldCos, the Borrowers and their respective Subsidiaries, owned on the Closing Date or acquired thereafter, upon which a Lien is purported to be created by any Security Document or any Financing Order

INTEREST RATE: Each Eurodollar Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Eurodollar Rate determined for such day plus 10.00%;

Each ABR Loan shall bear interest at a rate per annum equal to the ABR plus 9.00%

FEES: The Borrowers agree to pay to the Lenders and the Administrative Agent the fees in the amounts and on the dates as set forth in any fee agreements with the Lenders and/or the Administrative Agent and to perform any other obligations contained therein.

CARVE OUT: "Carve Out" means (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930 of title 28 of the United States Code and (ii) after the occurrence and during the continuance of an Event of Default, the payment of allowed professional fees and disbursements incurred by the Loan Parties or any official committee of unsecured creditors appointed in these chapter 11 cases, in an aggregate amount incurred after the Event of Default not in excess of $1,000,000 (plus all unpaid professional fees and expenses allowed by the Bankruptcy Court that were incurred prior to the occurrence of such Event of Default and which were incurred in accordance with the Agreed Budget), provided that (w) cash or other amounts on deposit in the L/C Cash Collateral Account shall not be

subject to the Carve Out, (x) no portion of the Carve Out shall be available to pay any such professional fees and expenses incurred in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation or any threatened litigation against the Administrative Agent, the Lenders or the Prepetition Secured Parties, and (y) so long as an Event of Default shall not have occurred and be continuing, the Carve Out shall not be reduced by the payment of fees and expenses allowed by the Bankruptcy Court and payable under sections 328, 330 and 331 of the Bankruptcy Code.

DIP LIENS:

As security for the DIP Obligations, effective and perfected upon the date of this Interim Order and without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the DIP Agent of any Collateral, the following security interests and liens are hereby granted by the Debtors to the DIP Agent, for its own benefit and the benefit of the DIP Lenders (all property identified in clauses (a), (b) and (c) below being collectively referred to as the "Collateral"), subject only to the Carve Out (all such liens and security interests granted to the DIP Agent, for its benefit and for the benefit of the DIP Lenders, pursuant to this Interim Order and the DIP Documents, the "DIP Liens"):

(a) First Lien On Unencumbered Property. Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Agent (for its own benefit and the benefit of the DIP Lenders) is hereby granted a valid, binding, continuing, enforceable, fully-perfected first priority lien on, and security interest in, all tangible and intangible prepetition and postpetition property of the Debtors, whether existing on or as of the Petition Date or thereafter acquired, that, on or as of the Petition Date, is not subject to valid, perfected, enforceable and unavoidable liens or are not subject to valid, enforceable and unavoidable liens perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (collectively, the "Unencumbered Property"), including without limitation, any and all unencumbered cash, accounts receivable, other rights to payment, inventory, general intangibles, contracts, documents, instruments, securities, chattel paper, owned real estate, real property leaseholds, fixtures, machinery, equipment, deposit accounts, patents, copyrights, trademarks, tradenames, rights under license agreements and other intellectual property, capital stock of or other ownership interests in (including partnership, member or trust interests) the subsidiaries of the Debtors, wherever located, and the proceeds, products, rents and profits thereof, whether arising from section 552(b) of the Bankruptcy Code or otherwise, of all of the foregoing, provided that, the Unencumbered Property shall not include the Causes of Action but, subject to the entry of the Final Order, Unencumbered Property shall include any proceeds or property recovered in respect of any Causes of Action.

(b) Liens Junior To Certain Existing Liens. Pursuant to section 364(c)(3) of the Bankruptcy Code, the DIP Agent (for its own benefit and the benefit of the DIP Lenders) is hereby granted a valid, binding,

continuing, enforceable, fully-perfected junior lien on, and security interest in all tangible and intangible prepetition and postpetition property of the Debtors (other than the property described in clauses (a) and (c) of this caption, as to which the DIP Liens will be as described in such clauses), whether now existing or hereafter acquired, that is subject to valid, perfected, enforceable and unavoidable liens in existence immediately prior to the Petition Date or to valid, enforceable and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, which security interests and liens in favor of the DIP Agent and the DIP Lenders are immediately junior only to such valid, perfected and unavoidable liens.

(c) Liens Priming Prepetition Secured Lenders' Liens. Pursuant to section 364(d)(1) of the Bankruptcy Code, the DIP Agent (for its own benefit and the benefit of the DIP Lenders) is hereby granted a valid, binding, continuing, enforceable, fully-perfected first priority, senior priming lien on, and security interest in, all Prepetition Collateral. The DIP Liens on the Prepetition Collateral shall be senior in all respects to the security interests in, and liens on, the Prepetition Collateral of the Prepetition Collateral Agent (for the benefit of itself and the Prepetition Secured Parties) (including, without limitation, the Adequate Protection Liens (as defined in paragraph 15(b) below), but shall not be senior to any valid, perfected, enforceable and unavoidable security interests in and liens of other parties, if any, on the Prepetition Collateral existing as of the Petition Date or to any valid, perfected and unavoidable interests in such property arising out of liens to which the liens of the Prepetition Collateral Agent (for the benefit of itself and the other Prepetition Secured Parties) become subject after the Petition Date as permitted by section 546(b) of the Bankruptcy Code.

(d) Liens Senior To Certain Other Liens. The DIP Liens and the Adequate Protection Liens shall not be, (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (B) any liens arising after the Petition Date, including without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors or (ii) subordinated to or made *pari passu* with any other lien or security interest under sections 363 or 364 of the Bankruptcy Code or otherwise.

ADEQUATE
PROTECTION:

The Prepetition Administrative Agent and the other Prepetition Secured Parties are entitled, pursuant to sections 105, 361, 363 and 364 of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral, including the Cash Collateral, in an amount equal to the Collateral Diminution (as defined below). As used in this Interim Order, "Collateral Diminution" shall mean an amount equal to the diminution of the value of any of the Prepetition Collateral upon which any of the Prepetition Secured Parties have valid, perfected, enforceable and unavoidable liens or security interests from and after the Petition Date

8

for any reason provided for in the Bankruptcy Code, including, without limitation, the priming of the Prepetition Collateral Agent's security interests in and liens on the Prepetition Collateral by the DIP Liens, and the depreciation, sale, loss or use of such Prepetition Collateral, including Cash Collateral, whether in accordance with the terms and conditions of this Interim Order, the DIP Credit Agreement or otherwise. Cash payments from the proceeds of the Prepetition Collateral made to the Prepetition Collateral Agent pursuant to paragraph 15(d) of this Interim Order shall not constitute Collateral Diminution. As adequate protection for any Collateral Diminution, the Prepetition Administrative Agent, the Prepetition Collateral Agent and the other Prepetition Secured Parties are hereby granted the following:

(a)     Adequate Protection Claims. Allowed superpriority administrative claims as provided in section 507(b) of the Bankruptcy Code, with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including without limitation, sections 326, 328, 330, 331 and 726 of the Bankruptcy Code, and shall at all times be senior to the rights of the Debtors, and any successor trustee or any creditor, in the Cases or any subsequent proceedings under the Bankruptcy Code (the "Adequate Protection Claims"), which shall have recourse to and be payable from all pre- and post-petition property of the Debtors including, without limitation, subject to entry of the Final Order, the proceeds or property recovered in respect of Causes of Action. The Adequate Protection Claims shall be subject and subordinate only to (i) the Carve Out and (ii) the Superpriority Claims granted in respect of the DIP Obligations. Except to the extent expressly set forth in this Interim Order or the DIP Credit Agreement, the Prepetition Administrative Agent and the other Prepetition Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Adequate Protection Claims unless and until all DIP Obligations shall have indefeasibly been paid in full in cash and the Commitments and the L/C Commitments have been terminated.

(b)     Adequate Protection Liens. As security for the payment of the amount of any Collateral Diminution, the Prepetition Administrative Agent (for itself and for the benefit of the Prepetition Secured Parties) is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements or other agreements) a valid, perfected replacement security interest in and lien on all of the Collateral including, without limitation, subject to entry of the Final Order, the proceeds or property recovered in respect of Causes of Action, subject and subordinate only to (i) valid, perfected and enforceable prepetition liens (if any) which are senior to the Prepetition Secured Parties' liens or security interests as of the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, (ii) the DIP Liens and any liens on the Collateral senior to such DIP Liens, and (iii) the Carve Out (the "Adequate Protection Liens").

(c)     Fees And Expenses. As additional adequate protection, subject to section 506(b) of the Bankruptcy Code, the Debtors shall pay indefeasibly in cash: (i) the reasonable professional fees and expenses (including, but not limited to, the fees and disbursements of counsel, third-party consultants, including financial consultants, and auditors) incurred by the Prepetition Administrative Agent under the Prepetition Credit Agreement arising prior to the Petition Date; and (ii) on a current basis, the reasonable professional fees and expenses (including, but not limited to, the fees and disbursements of counsel, third-party consultants, including financial consultants, and auditors) incurred by the Prepetition Administrative Agent under the Prepetition Credit Agreement arising subsequent to the Petition Date. The payment of the fees, expenses and disbursements set forth in this paragraph 15(c) of the Interim Order (including professional fees and expenses of Kaye Scholer LLP, Potter Anderson & Corroon LLP, Capstone Advisory Group, LLC and any other professionals or advisors retained by or on behalf of the Prepetition Administrative Agent) shall be made within ten (10) business days after the receipt by the Debtors, the Committee, if any, and the United States Trustee (the "Review Period") of invoices thereof (the "Invoiced Fees") (subject in all respects to applicable privilege or work product doctrines) and without the necessity of filing formal fee applications, including such amounts arising before and after the Petition Date; provided, however, that the Debtors, the Committee, if any, and the United States Trustee may preserve their right to dispute the payment of any portion of the Invoiced Fees (the "Disputed Invoiced Fees") if, within the Review Period, (i) the Debtors pay in full the Invoiced Fees, including the Disputed Invoiced Fees; and (ii) the Debtors, the Committee, if any, or the United States Trustee file with the Court a motion or other pleading, on at least ten (10) days prior written notice to the Prepetition Administrative Agent of any hearing on such motion or other pleading, setting forth the specific objections to the Disputed Invoiced Fees.

(d)     Following the indefeasible payment in full in accordance with the DIP Credit Agreement of all DIP Obligations and the termination of the Commitments and the L/C Commitment, as additional adequate protection and without prejudice to the right of any other party (but subject to the limitations thereon described below in paragraph 20), the Debtors shall pay indefeasibly in cash to the Prepetition Administrative Agent, for the benefit of the Prepetition Secured Parties, in permanent reduction of the outstanding principal balance of the Prepetition Indebtedness in accordance with the application of payments provisions of the Prepetition Loan Documents, all proceeds from a sale, lease or other disposition of the Collateral, after deducting the necessary direct costs of the Debtors in connection therewith which are reasonably acceptable to the Prepetition Administrative Agent. If there is a dispute concerning whether an expense constitutes a necessary direct cost, the amount of such expense shall nevertheless be paid to the Prepetition Administrative Agent, and the Debtors reserve the right to seek a Court order directing reimbursement of such amount. Subject to and as permitted by the DIP Credit Agreement,

such proceeds (i) will be paid directly to the Prepetition Administrative Agent or (ii) if received by the Debtors, will be paid by the Debtors to the Prepetition Administrative Agent on the same business day as received by the Debtors.

(e) Information. The Debtors shall promptly provide to the Prepetition Administrative Agent any written financial information, periodic reporting or other information that is provided to, or required to be provided to, the DIP Agent or the DIP Lenders, and such other reports, information and materials as reasonably requested by the Prepetition Administrative Agent.

PRIORITY: The Guarantee and Collateral Agreement, taken together with the Interim Order, and as applicable, the Final Order, is effective to create in favor of the Collateral Agent, for the benefit of the Administrative Agent and the Lenders, a legal, valid and enforceable first priority security interest in the Collateral described therein and proceeds thereof. Pursuant to the terms of the Interim Order and Final Order, no filing or other action will be necessary to perfect or protect such Liens and security interests. Pursuant to and to the extent provided in the Interim Order and the Final Order, the Obligations of the Loan Parties will constitute allowed administrative expense claims in the Chapter 11 Cases under Section 364(c) of the Bankruptcy Code, having priority over all administrative expense claims and unsecured claims against such Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code and all superpriority administrative expense claims granted to any other Person, subject, as to priority, only to the Carve-Out.

The Borrowers shall (i) cause all of the Collateral (including, without limitation, all owned and leased real and personal property of each Loan Party) to be subject at all times to first priority, perfected and, in the case of real property (whether leased or owned), title insured Liens in favor of the Collateral Agent to secure the Obligations pursuant to the terms and conditions hereof, the Security Documents, the Interim Order and the Final Order.

FINANCIAL REPORTING: An updated rolling 13-week detailed budget;

Audited combined balance sheet of the Holdcos and their respective consolidated Subsidiaries (net of all appropriate intercompany eliminations) as at the end of such year and the related audited combined statements of income and of cash flows (net of all appropriate intercompany eliminations) for such year;

Unaudited combined balance sheet of Holdings, the Holdcos and their respective consolidated Subsidiaries (net of all appropriate intercompany eliminations) as at the end of such quarter and the related unaudited combined statements of income and of cash flows (net of all appropriate intercompany eliminations) for such quarter and the portion of the fiscal

11

year through the end of such quarter;

Unaudited combined balance sheets of Holdings, the Holdcos and their respective consolidated Subsidiaries (net of all appropriate intercompany eliminations) as at the end of such month (other than the third, sixth, ninth and twelfth such months) and the related unaudited combined statements of income and of cash flows (net of all appropriate intercompany eliminations) for such month and the portion of the fiscal year through the end of such month; and

Such additional financial and other information as the Administrative Agent (on behalf of any Lender) may from time to time reasonably request

| | |
|---|---|
| FINANCIAL COVENANTS: | Minimum Total Operating Cash Flow (subject to permitted variances), tested bi-weekly |
| AFFIRMATIVE AND NEGATIVE COVENANTS: | Customary for financings of this type, as set forth more fully in Sections 6 and 7 of the DIP Credit Agreement. The Interim Order requires the Debtors to comply with certain of these covenants, as modified, upon entry of the Interim Order and during the interim period. |
| REPRESENTATIONS AND WARRANTIES: | Include, inter alia: (i) delivery of financial statements that present fairly in all material respects the combined financial position in accordance with GAAP, (ii) confirmation of no changes that would have a Material Adverse Effect, and (iii) Loan Parties are in compliance in all material respects with the terms and conditions of the Interim Order or the Final Order. |
| EVENTS OF DEFAULT: | Customary and appropriate for financings of this type (subject to customary and appropriate grace periods), including, without limitation, failure to make payments when due, breaches of representations and warranties, defaults under other agreements or instruments of indebtedness, bankruptcy, certain violations of ERISA, impairment of security interests in the DIP Collateral, invalidity of guaranties, and noncompliance with covenants. |
| CONDITIONS PRECEDENT: | Include, inter alia: (i) execution and delivery of Loan Documents, (ii) delivery of legal opinions, (iii) satisfaction of the Administrative Agent and the Lenders with the Agreed Budget, and (iv) entry of an Interim Order by the Bankruptcy Court. |
| CONDITIONS TO EACH EXTENSION OF CREDIT: | Include, inter alia: (i) no default or event of default shall have occurred, (ii) accuracy of representations in all material respects, and (iii) the Interim Order, or following entry thereof, the Final Order shall be in full force and effect. |
| CONDITIONS TO SECOND EXTENSION OF CREDIT: | Agreement of each Lender to make any extension of credit requested to be made by it after the Closing Date is subject to the entry of a confirmation order from the Bankruptcy Court with respect to a reorganization plan in the Chapter 11 Cases that is consistent with the terms and conditions set forth in the term sheet annexed to the Plan Support Agreement. |
| INDEMNIFICATION: | The Borrowers agree to indemnify each Lender for, and to hold each Lender harmless from, any loss or expense that such Lender may sustain or incur as a consequence of (a) default by either Borrower in making a borrowing of, conversion into or continuation of Eurodollar Loans after |

|  | such Borrower has given a notice requesting the same in accordance with the provisions of the DIP Credit Agreement, (b) default by either Borrower in making any prepayment of or conversion from Eurodollar Loans after such Borrower has given a notice thereof in accordance with the provisions of the DIP Credit Agreement or (c) the making of a prepayment of Eurodollar Loans on a day that is not the last day of an Interest Period with respect thereto. Such indemnification may include an amount equal to the excess, if any, of (i) the amount of interest that would have accrued on the amount so prepaid, or not so borrowed, converted or continued, for the period from the date of such prepayment or of such failure to borrow, convert or continue to the last day of such Interest Period (or, in the case of a failure to borrow, convert or continue, the Interest Period that would have commenced on the date of such failure) in each case at the applicable rate of interest for such Loans provided for herein (excluding, however, the Applicable Margin included therein, if any) over (ii) the amount of interest (as reasonably determined by such Lender) that would have accrued to such Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the interbank eurodollar market. A certificate as to any amounts payable pursuant to Section 2.19 of the DIP Credit Agreement submitted to the Borrowers by any Lender shall be conclusive in the absence of manifest error. This covenant shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder. |
|---|---|
| CONVERSION TO EXIT FACILITY: | Each of the Lenders agrees to extend to the Borrowers post chapter 11 exit financing on the terms and conditions set forth in the term sheet annexed to the DIP Credit Agreement as Exhibit J. The commitment of each Lender with respect to such exit financing shall be its Percentage of the aggregate amount of such financing. |

## Disclosure Pursuant to Bankruptcy Rule 4001 and Compliance with Local Rule 4001-2

9.    The provisions described in Bankruptcy Rule 4001(c)(1)(B)(i)-(xi), to the extent applicable, are set out in the following sections of the DIP Credit Agreement and the Interim Order:

- *Grant of a Priority or Lien on Property of the Estate*: DIP Credit Agreement §§ 4.19, 6.10; Interim Order ¶¶ 9, 15(b).

- *Adequate Protection or Priority for a Claim that Arose Before Commencement of Chapter 11 Cases*: Interim Order ¶ 15.

- *Determination of Validity, Enforceability, Priority, or Amount of Claim that Arose Before Commencement of Case or of any Lien Securing the Claim*: Interim Order ¶¶ 5(b), (d), (e), 15(b), 20.

- *Waiver or Modification of Bankruptcy Code Provisions or Applicable Rules Relating to Automatic Stay*: Interim Order ¶ 11.

- *Waiver or Modification of any Entity's Authority or Right to File Plan, Seek Extension of Exclusivity, Request Use of Cash Collateral or Request Authority to Obtain Credit*: Not Applicable.

- *Establishment of Deadlines for Filing Plan, Approval of Disclosure Statement, Hearing on Confirmation or Entry of Confirmation Order*: Not Applicable.

- *Waiver or Modification of Applicability of Nonbankruptcy Law Relating to Perfection of Lien on Property of Estate or on Foreclosure or Other Enforcement of Lien*: DIP Credit Agreement §§ 4.19, 9.3; Interim Order ¶ 10.

- *Release, Waiver, or Limitation on any Claim or Other Cause of Action Belonging to Estate*: DIP Credit Agreement § 8(i)-(ii), 10.5, 10.12(e), 10.14; Interim Order ¶¶ 5(c), 11, 20.

- *Indemnification of any Entity*: DIP Credit Agreement §§ 2.18(c), (h), 2.19, 9.4, 9.7, 10.5, 10.6(h).

- *Release, Waiver, or Limitation of any Right under § 506(c)*: DIP Credit Agreement § 10.21(a); Interim Order ¶¶ 12, 13.

- *Granting of a Lien on any Claim or Cause of Action Arising under §§ 544, 545, 547, 548, 549, 553(b), 723(a) or 724(a)*: Interim Order ¶¶ 9, 15(b).

10. Local Rule 4001-2 also requires that certain provisions of the DIP Facility be highlighted and that the Debtors provide justification for the inclusion of such highlighted provisions. Set forth below are the provisions of the DIP Facility that are required to be identified in accordance with Local Rule 4001-2. As discussed more fully below, the provisions of the DIP Facility as to which disclosure is required pursuant to Local Rule 4001-2 are all justified under the circumstances of these Chapter 11 Cases. The Debtors were unable to obtain financing on more favorable terms from sources other than the DIP Lenders, and without such

financing the Debtors' ability to consummate their carefully constructed prepackaged bankruptcy will be jeopardized. The Debtors thus respectfully submit that the facts and circumstances of these Chapter 11 Cases demonstrate that the above-described provisions, which are set forth in greater detail below, are necessary and appropriate and should be authorized and approved by this Court.

11. *Waiver of Claims Against Secured Creditor*. Local Rule 4001-2(a)(i)(B) requires identification of provisions or findings of fact that bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order and the creditors' committee, if formed, at least sixty (60) days from the date of its formation to investigate such matters. Del. Bankr. L. R. 4001-2(a)(i)(B). In the Interim Order, the Debtors stipulate, among other things, that (a) the Prepetition Indebtedness constitutes the legal, valid and binding obligations of the Debtors, not subject to avoidance, subordination, recharacterization, recovery, attack, offset, counterclaim, defense or Claim of any kind pursuant to the Bankruptcy Code or applicable nonbankruptcy law; (b) each Debtor forever waives and releases any and all Claims, counterclaims, causes of action, defenses or setoff rights against each of the Prepetition Secured Parties, whether arising at law or in equity, including any recharacterization, subordination, avoidance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state of federal law; (c) the Debtors have granted valid, binding, perfected, enforceable, first priority liens upon and security interests in the Prepetition Collateral to the Prepetition Collateral Agent for the benefit of the Prepetition Secured Parties, not subject to avoidance, subordination, recharacterization, recovery, attack, offset, counterclaim, defense or

Claim of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (d) substantially all cash, securities or other property (and the proceeds therefrom) as of the Petition Date, including without limitation, all cash, securities or other property (and the proceeds therefrom) and other amounts on deposit or maintained by the Debtors in the Depository Institutions were subject to rights of set-off and valid, perfected, enforceable, first priority liens under the Prepetition Loan Documents and applicable law, for the benefit of the Prepetition Secured Parties; (e) each of the Debtors waives any right to seek relief, including without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the DIP Agent or the DIP Lenders set forth in the Interim Order or the DIP Documents; and (f) the Prepetition Administrative Agent (for itself and for the benefit of the Prepetition Secured Parties) is granted the Adequate Protection Liens, which are valid and perfected. Interim Order ¶¶ 5(b)-(e), 11, 15(b); see also DIP Credit Agreement §§ 8(i)-(ii), 10.5, 10.12(e).

12.     The Interim Order, however, is consistent with the Local Rule, as it makes such admissions, stipulations and releases binding upon the Debtors and all other parties in interest for all purposes only unless (1) a party (subject in all respects to any agreement or applicable law which may limit or affect such entity's right or ability to do so) has properly filed an adversary proceeding or contested matter by no later than the date that is the earlier of (a) five (5) business days prior to the hearing in respect of confirmation of a plan of reorganization in the Debtors' Cases or (b) seventy-five (75) days from the entry of the Interim Order (or, in the case of the Committee, if any, sixty (60) days from the appointment of the Committee, if any), (x) challenging the amount, validity, enforceability, priority or extent of the Prepetition Indebtedness or the Prepetition Secured Parties' security interests in and liens upon the Prepetition Collateral,

or (y) otherwise asserting any claims or causes of action against the Prepetition Secured Parties on behalf of the Debtors' estates, and (2) the Court rules in favor of the plaintiff in any such timely and properly filed adversary proceeding or contested matter. Id ¶ 20.

13. *Section 506(c) Waiver*. Local Rule 4001-2(a)(i)(C) requires explicit disclosure of provisions that constitute a waiver, without notice, of the estates' rights under Bankruptcy Code section 506(c). Del. Bankr. L. R. 4001-2(a)(i)(C). The Interim Order provides that subject to and effective upon entry of the Final Order, except to the extent of the Carve Out, no costs or expenses of administration of the Cases or any resulting future proceeding shall be charged against or recovered from the Collateral or the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent or the Prepetition Administrative Agent, as the case may be, and that such consent may not be implied from action or inaction, or deemed from provisions of the Interim Order. Interim Order ¶ 12; see also DIP Credit Agreement § 10.21. The proposed limitation is only requested subject to entry of the Final Order, and thus is not being imposed without notice. Id.

14. *Liens on Avoidance Actions*. Local Rule 4001-2(a)(i)(D) requires the identification of provisions that immediately grant to prepetition secured creditors liens on the debtor's claims and causes of action arising under sections 544, 545, 547, 548 and 549 of the Bankruptcy Code. Del. Bankr. L. R. 4001-2(a)(i)(D). The Interim Order provides as security for the DIP Obligations and as adequate protection for the amount of any Collateral Diminution, the granting of the DIP Liens and the Adequate Protection Liens in, among other things and subject to the entry of the Final Order, proceeds or property recovered in respect of any Causes of

Action. Interim Order ¶¶ 9, 15(b). Under the terms of the Interim Order, such liens are not granted in the Causes of Action themselves.

15.    *Priming Liens*. Local Rule 4001-2(a)(i)(G) requires a description of any provisions of the proposed debtor-in-possession facility which contemplate a priming of any secured lien without the consent of that lienor. Del. Bankr. L. R. 4001-2(a)(i)(G). As discussed more fully herein, the liens of the Prepetition Secured Parties are primed by the DIP Liens, and the Prepetition Secured Parties are provided with adequate protection to the extent of any Diminution in Value of their interests in the Prepetition Collateral, in the form of replacement Adequate Protection Liens, Adequate Protection Claims, and as to the Prepetition Administrative Agent, the reasonable professional fees and expenses incurred in connection with the Prepetition Credit Agreement. Interim Order ¶¶ 9(c), 15. Finally, the Prepetition Agent, on behalf of the Prepetition Secured Parties has expressly consented to such priming on the terms proposed in the DIP Credit Agreement.

16.    *Other Local Rules Not Implicated by DIP Facility*. No separate disclosure or discussion is required with respect to subsections A, E and F of Local Rule 4001-2(a)(i), as there are no provisions in the DIP Facility that are implicated by the requirements therein. See Local Rule 4001-2(a)(i)(A) (Cross-Collateralization Protection); Local Rule 4001-2(a)(i)(E) (Roll-up of Prepetition Debt as Postpetition Debt); and Local Rule 4001-2(a)(i)(F) (Disparate Treatment for Creditors' Committee Professionals).

## Background

17.    On January 27, 2010 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to

operate their respective businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

18. No creditors' committee has been appointed in these cases by the Office of the United States Trustee. No trustee or examiner has been requested or appointed in any of the Debtors' chapter 11 cases.

## A. Overview of Business Operations

19. NPG, together with its Debtor and non-Debtor affiliates (collectively, the "Company"), are leaders in the manufacture and distribution of personal care products. The Company operates primarily through Debtors Arbonne and Levlad. Arbonne is headquartered in Irvine, California and, either directly or through a subsidiary, has additional leased facilities located in Greenwood, Indiana; Dallas, Texas; Toronto, Ontario, Canada; Calgary, Alberta, Canada; New South Wales, Australia; Northampton, United Kingdom; and Munich, Germany. Levlad is headquartered in Chatsworth, California and has several other leased facilities in that area.[5]

20. **NPG**. In 2004, the predecessor to Harvest Partners, L.P. ("Harvest"), a leading New York-based private equity investment firm specializing in management buyouts and growth financings of middle-market companies, formed NPG as a special purpose entity to complete the acquisitions of Arbonne and Levlad. Harvest, through its subsidiary Harvest Partners IV, L.P., along with other investors, provided approximately $93 million for the acquisitions. NPG serves as the ultimate parent of the Company.

21. **Arbonne**. Arbonne was founded in Switzerland in 1975 with the goal of developing skin care products based on natural, botanical principles, and it relocated its

---

[5] An organizational chart illustrating the structure of the Company as of the Petition Date is included in the Lehman Affidavit.

headquarters and primary operations to the United States in 1980. Arbonne now sells its own branded line of hundreds of botanically based personal care, cosmetic and wellness products, including skin care, body and hair care, cosmetics, aromatherapy, and nutritional products. Arbonne's products are botanically based, pH correct, dermatologist tested, hypoallergenic, and never tested on animals. Arbonne markets most of its products as part of a comprehensive personal care, cosmetic, health and wellness regimen designed for combined and repeated use.

22.     Whereas traditional marketing moves products from the manufacturer to wholesalers, warehousers, shippers, advertisers, and retailers before ever reaching the consumer, Arbonne markets its products in the United States, Canada, the United Kingdom, and Australia through a direct sales network of Arbonne Independent Consultants ("AICs"). AICs are independent contractors and may be individuals or registered business entities. They are not employees of the Company. The AICs purchase Arbonne products from the Company at published discounted prices to then market and sell the products to consumers. Arbonne's marketing relies on developing and keeping trusted relationships with its consumers and the AICs. Consequently, Arbonne is focused on maintaining the quality of its products and services at a level that it believes exceeds that of standard retail brands.

23.     AICs are eligible to earn commissions and incentives based on their retail volume and the retail volume of other AICs that they have directly or indirectly sponsored, also known as their "downline." AICs are compensated in two basic ways: (a) through retail profit on the sale of the Arbonne products that were purchased at a discount and (b) through commissions, overrides, and bonuses paid based on the AICs' product sales volume and the sales volume of their downline.

24.     AICs operating in Canada contract directly with Arbonne's subsidiary, Arbonne International Distribution, Inc. ("AIDI"), which is a Debtor in these cases. AICs operating in the United Kingdom and Australia contract directly with Arbonne's non-Debtor foreign subsidiary, Arbonne Europe Sàrl ("AES"). Certain of Arbonne's other foreign subsidiaries, Arbonne International Canada, Inc. ("AICI"), Arbonne UK Limited ("AUKL"), and Arbonne Australia Pty Ltd. ("AAPL"), provide logistical support and services to the AICs operating in their respective countries, including leasing property, employing personnel and providing marketing and administrative services. Arbonne also established subsidiary Arbonne Germany GmbH in the event the Company decides to begin operations in Germany.

25.     Arbonne Institute of Research and Development, LLC ("AIRD"), also a Debtor in these cases, provides product development services for Arbonne. AIRD is a Delaware limited liability company with a service agreement to use a Swiss laboratory facility at which AIRD coordinates the efforts of master formulators as they research, develop, and finalize Arbonne's exclusive personal care products. The proprietary formulas being developed by AIRD are owned by Arbonne and represent botanically-based products based on cutting-edge technologies and the latest advances in skin care science. Neither Arbonne nor AIRD engage in any sales or other commercial activity in or from Switzerland.

26.     For the last twelve months ending November 30, 2009, Arbonne had revenue of approximately $378 million and EBITDA of approximately $38 million.

27.     **Levlad**. Levlad was founded in 1972 in Venice Beach, California. It was one of the first manufacturers of natural personal care products, with its founders starting off by collecting rainwater and blending it with natural herbs from their herb shop, then selling the mixture as the very first rainwater shampoo. Currently, Levlad manufactures safe, performance

driven and natural personal care products, including a line that is certified organic, by combining proven botanical, herbal, and floral treatments with modern ingredients and techniques. Levlad's products include shampoos, conditioners, soaps, bath gels, lotions, deodorants, and toothpastes. Levlad markets these products under the brand names Nature's Gate®, Nature's Gate Organics®, Nature's Gate Advanced Care®, Nature's Gate Organics Natural Results® Acne Care, and Rainwater Organics. Levlad markets these products internationally, including throughout North America at natural food retailers, including Whole Foods, and specialty retailers, including General Nutrition Centers (GNC), and Bed, Bath & Beyond. Levlad's brands hold leading market positions across key product categories.

28.     Levlad also provides value-added, turn-key manufacturing and formulation services for private-label customers, including Arbonne. In such capacity, Levlad provides its customers a full range of services, including product creation, manufacturing, filling, product labeling and packaging design, raw material procurement, and collateral marketing development materials. In this capacity, Levlad has long-standing relationships with recognized name brand personal care product companies and specialty retailers – an average tenure of over twelve years for Levlad's top customers.

29.     For the last twelve months ending November 30, 2009, Levlad had revenue of approximately $73 million and an EBITDA loss of approximately $6 million.

30.     As of the Petition Date, the Company employed approximately 867 employees worldwide. Of that number, approximately 792 are employed by the Debtors and approximately 75 are based with NPG's non-debtor subsidiaries. In addition to the Company's employees, Arbonne utilizes a direct sales network of approximately 750,000 AICs.

### B. Capital and Debt Structure

31.     As of November 30, 2009, the Company's consolidated balance sheet reflected total assets of approximately $286 million. Of this amount, approximately $24 million was comprised of cash and cash equivalents, approximately $26 million was comprised of property and equipment, net of depreciation, approximately $42 million was comprised of inventories, and approximately $194 million was comprised of other assets. The Company's consolidated balance sheet also reflected total liabilities of approximately $804 million. As of the Petition Date, the Debtors' books and records reflect that they have approximately $4.3 million in cash on hand.

32.     On or about June 19, 2006, Levlad and Arbonne, as borrowers, and Levlad HoldCo and Arbonne HoldCo (together with Levlad HoldCo, the "HoldCos"), as guarantors, entered into (a) a $410 million First Lien Credit Agreement (the "First Lien Credit Agreement") and (b) a $195 million Second Lien Credit Agreement (the "Second Lien Credit Agreement"), each with Canadian Imperial Bank of Commerce ("CIBC"), as administrative agent and collateral agent, and with other lenders from time to time party thereto. In addition to the guarantees of the HoldCos, the obligations of Levlad and Arbonne under the First Lien Credit Agreement and Second Lien Credit Agreement were guaranteed by Debtor AIRD and were secured by liens on substantially all of the borrowers' and guarantors' assets.

33.     The proceeds from the First Lien Credit Agreement and the Second Lien Credit Agreement were used by Arbonne and Levlad to repay approximately $298 million in existing indebtedness that was incurred to finance the 2004 acquisition of Arbonne and Levlad by NPG.

34.     On the same date, the HoldCos, as borrowers, also entered into the HoldCo Credit Agreement, which provided for a $135 million unsecured term loan facility (the

"HoldCo Term Loan") with Credit Suisse, as the then administrative agent, and with other lenders from time to time party thereto (the "HoldCo Lenders"). The HoldCo Term Loan bears interest at a rate of 13.5% per annum, which may, at the option of the HoldCos, be payable in kind, capitalized, compounded, and added to the principal.

35.     In March 2007, the Debtors refinanced their existing indebtedness under the First Lien Credit Agreement and Second Lien Credit Agreement. Specifically, on March 8, 2007, Levlad and Arbonne, as borrowers, and the HoldCos, as guarantors, entered into a $600 million Credit Agreement (as amended, supplemented, modified or otherwise in effect from time to time, the "OpCo Credit Agreement," and together with the HoldCo Credit Agreement, the "Prepetition Credit Facilities") with CIBC, as administrative agent and collateral agent, and the OpCo Lenders (together with the HoldCo Lenders, the "Prepetition Lenders"). The OpCo Credit Agreement provides for term loans in the aggregate principal amount of $565 million (the "OpCo Term Loan") and a revolving credit facility of $35 million (the "OpCo Revolver," and together with the OpCo Term Loan and the HoldCo Term Loan, the "Prepetition Loans"), a portion of which may be used for letters of credit. In addition to the guarantees of the HoldCos, the obligations of Levlad and Arbonne under the OpCo Credit Agreement are guaranteed by Debtors AIRD, Arbonne International Holdings, Inc., and AIDI, and are secured by liens on substantially all of the Debtors' assets (the "Prepetition Collateral").[6]

36.     On June 12, 2009, the Debtors and the OpCo Lenders signed an amendment to the OpCo Credit Agreement (the "OpCo Credit Agreement Amendment"). At the time, the Debtors were in default on the OpCo Credit Agreement. Specifically, the Debtors had exceeded the permissible combined leverage ratio ("Leverage Ratio"), as set forth by a negative

---

[6]     Nothing contained herein shall constitute an admission by the Debtors of the validity, priority, extent or enforceability of the Prepetition Loans or any lien or security interest asserted by the Prepetition Lenders in connection with the Prepetition Collateral.

covenant in the OpCo Credit Agreement, and had failed to deliver audited financial statements and certificates signed by a designated representative, stating that the Debtors were not in default (collectively, the "Specified Defaults"). The OpCo Credit Agreement Amendment waived the Specified Defaults and temporarily eliminated the Leverage Ratio requirement but required the Company to generate minimum levels of EBITDA during the period in which the Leverage Ratio requirement was eliminated.

37.     As of the Petition Date, the principal amount outstanding under the OpCo Term Loan is approximately $501 million. The principal amount outstanding under the OpCo Revolver is approximately $29 million, and the aggregate amount of outstanding letter of credit obligations is approximately $1.1 million. The total amount outstanding under the HoldCo Term Loan, as of the Petition Date, is approximately $217 million.

### C.     Events Leading to the Commencement of the Chapter 11 Cases

38.     Although the Company had experienced a high rate of revenue growth through 2006 and early 2007, this was driven primarily by unusually higher levels of recruitment for new AICs, which was unsustainable. In 2005 and 2006, on a net basis, the Company added approximately 434,000 and 612,000 AICs, respectively. Because recruitment of AICs tends to be a leading indicator of later attrition, the historically high numbers of new consultants in those years resulted in attrition exceeding the recruiting levels in subsequent years. In 2007, 2008 and 2009, on a net basis, the Company lost approximately 108,000, 270,000 and 145,000 AICs, respectively. This attrition, combined with the downturn in the economy and the financial crisis later in 2008, caused a reduction in the Company's overall net sales.

39.     The Company responded by implementing several cost saving and revenue producing initiatives, including (a) relocation of most of the Company's customer service and information technology operations to Dallas, Texas, which lowered expenses related

to information technology contract labor and customer service temporary help as the Company was able to recruit full time employees at lower salaries, (b) conversion of certain AIC publications to an on-line only format, (c) a reduction in force at certain subsidiaries and reduction of warehouse operations to a single shift, (d) realigning the AIC compensation plan to incentivize early stage AICs interested in building a business, (e) development of targeted marketing and product strategies, and (f) expanding Arbonne's Regional Sales Manager program into underutilized geographic areas. Although the Company experienced some success with these initiatives, such success was unable to reverse the effects of the decrease in AICs combined with the global financial crisis.

40.      Compounding this revenue reduction was the fact that the permitted maximum Leverage Ratio contained in the OpCo Credit Agreement was reduced in the fourth quarter of 2008. The tightening of the covenant requirements coupled with reduced revenue triggered a default under the OpCo Credit Agreement, and resulted in the Debtors' entry into the OpCo Credit Agreement Amendment with the OpCo Lenders. The OpCo Credit Agreement Amendment waived certain defaults and temporarily eliminated the Leverage Ratio requirement but required the Company to generate minimum levels of EBITDA during the period in which the Leverage Ratio requirement was eliminated. Although the Company was able to satisfy the EBITDA requirement for the third quarter of 2009, it became apparent at that time that it would not be able to do so going forward and that the Company's debt exceeded the amount that the Company could reasonably support.

41.      Consequently, the Company, with the assistance of its financial and legal advisors, entered into discussions with the OpCo Lenders, HoldCo Lenders and principal stockholders in an attempt to implement a consensual restructuring of the Company's capital

structure. Further, during the period of discussions, the Company entered into a forbearance agreement with the OpCo Lenders whereby the OpCo Lenders agreed to forbear from exercising remedies in connection with certain defaults by the Company under the OpCo Credit Agreement. The forbearance agreement has been extended from time to time and the forbearance period is currently extended through February 1, 2010 (subject to certain conditions contained therein).

42.     Following these extensive discussions—which, among other things, involved negotiating and finalizing term sheets reflecting the material terms of a proposed restructuring, and entry into plan support agreements with a majority of the OpCo Lenders and the HoldCo Lenders[7]—on January 13, 2010, the Company solicited acceptances of the final form of restructuring proposal (the "Restructuring"), which was set forth in that certain Proposal to Restructure, Disclosure Statement and Solicitation of Acceptances of a Prepackaged Plan of Reorganization (the "Disclosure Statement"), filed concurrently herewith. As set forth in the Disclosure Statement, the Company sought approval of the Restructuring through a consensual transaction outside of bankruptcy with the unanimous support of the Prepetition Lenders (the "Out-of-Court Transaction"), or, if such unanimous consent was not obtained, in accordance with the terms of the prepackaged plan of reorganization (the "Plan") attached to the Disclosure Statement, subject to bankruptcy court approval.

43.     As more fully described in the Disclosure Statement, the Plan generally provides for the satisfaction of (a) the OpCo Debt through the (i) reinstatement of an aggregate of $125 million of the existing OpCo Debt under the Reinstated OpCo Term Loan,[8] and (ii) issuance upon the Effective Date of 85% of the New NPG Common Stock (subject to dilution for

---

[7]     A more detailed description of the plan support agreements may be found in the Disclosure Statement, which has been filed concurrently herewith.

[8]     The capitalized terms used in this paragraph have the meanings ascribed to such terms in the Disclosure Statement and Plan, which have been filed concurrently herewith.

New NPG Common Stock issuable upon the exercise of the New NPG Warrants or any New NPG Options that may be issued and/or awarded under a new Long Term Management Incentive Plan); and (b) the HoldCo Debt through the issuance of New NPG Warrants, which will entitle the holders thereof to purchase New NPG Common Stock equal to an aggregate of 5% of the New NPG Common Stock (subject to dilution for New NPG Common Stock issuable upon the exercise of any New NPG Options that may be issued and/or awarded under the Long Term Management Incentive Plan). Notably, with the exception of the Prepetition Lenders and the existing holders of equity interests in NPG, all of the Company's creditors and equity holders are unimpaired under and deemed to have accepted the Plan. The existing holder of equity interests in NPG will have their equity cancelled and, therefore, are deemed to have rejected the Plan.

44. The deadline to vote to accept or reject the proposed Restructuring (whether effectuated through an Out-of-Court Transaction or through the Plan) expired on January 27, 2010 at 12:00 noon (Prevailing Eastern Time). Although the Prepetition Lenders overwhelmingly voted in favor of the Restructuring, the Debtors were unable to consummate the Restructuring through the Out-of-Court Transaction. To prevent the consequences of defaults under the OpCo Credit Agreement, preserve the Debtors' business as a going-concern, and restructure their debt in accordance with the Plan, the Debtors commenced these cases under chapter 11 of the Bankruptcy Code.

## Jurisdiction

45. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

46.     By this Motion, the Debtors seek entry of the DIP Orders, inter alia:

(i)     under sections 363, 364(c) and 364(d) of the Bankruptcy Code, authorizing the Debtors to obtain, as Borrowers or Guarantors, as applicable, senior secured superpriority priming debtor-in-possession financing under the terms and conditions of the DIP Credit Agreement and the other DIP Financing Agreements, consisting of a loan facility in an aggregate principal amount of $20 million, up to $10 million of which would be available on an interim basis, including a $250,000 letter of credit facility, with up to an additional $10 million to become available on a final basis, from CIBC, as administrative agent (in such capacity, the "DIP Administrative Agent") for itself and the DIP Lenders, and as collateral agent (in such capacity, the "DIP Collateral Agent", together with the DIP Administrative Agent, the "DIP Agent", and collectively with the fronting and issuing banks for the Letters of Credit, the DIP Lenders and each other secured party under the DIP Loan Documents from time to time, the "DIP Secured Parties"), and authorizing the Debtors to enter into and comply in all respects with the DIP Financing Agreements, and approving the terms and conditions of the DIP Financing Agreements;

(ii)    under sections 363 and 364 of the Bankruptcy Code, authorizing the Debtors to use the proceeds of the DIP Facility in a manner consistent with the terms and conditions of the DIP Financing Agreements, and in accordance with the Approved Budget, (i) to fund the Chapter 11 Cases, (ii) to pay fees and expenses associated with the DIP Facility, and (iii) for working capital and other corporate purposes of the Debtors;

(iii)   under sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, as security for the repayment of the borrowings and all other obligations arising under the DIP Financing Agreements, authorizing the Debtors to grant to the DIP Agent (for the benefit of the DIP Secured Parties) first priority priming, valid, perfected and enforceable liens, subject to certain exceptions, including the Carve Out, upon substantially all of the Debtors' real and personal property, as described below and in the DIP Orders, the DIP Credit Agreement and the other DIP Financing Agreements;

(iv)    under section 364(c)(1) of the Bankruptcy Code, granting in favor of the DIP Agent (for the benefit of the DIP Secured Parties) a superpriority administrative expense claim (the "DIP Superpriority Claim") in respect of all Obligations under (and as defined in) the

DIP Credit Agreement (the "DIP Obligations"), subject only to the payment of the Carve Out;

(v) under sections 361, 363(c)(2) and 363(e) of the Bankruptcy Code, authorizing the use of Cash Collateral by the Debtors, in accordance with the Approved Budget, and under the terms set forth in the DIP Orders;

(vi) under sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, authorizing the granting to the Prepetition Agent, for the benefit of the Prepetition Secured Parties, of the Adequate Protection Liens and Adequate Protection Claims to the extent of any Diminution in Value of the Prepetition Agent's interests in the Prepetition Collateral, and having the priorities set forth in the DIP Orders; as well as additional adequate protection in the form of the payment of fees and expenses incurred by the Prepetition Administrative Agent in connection with the Prepetition Credit Agreement;

(vii) under section 362 of the Bankruptcy Code, modifying the automatic stay to the extent necessary to implement and effectuate the terms and provisions of the DIP Orders, the DIP Credit Agreement and the other DIP Financing Agreements;

(viii) scheduling the Final Hearing on or prior to the hearing to consider confirmation of the Debtors' Plan, but in any event a date that is no later than thirty (30) days from entry of the Interim Order to consider entry of the Final Order granting the relief requested in the Motion on a final basis, including final approval of the Debtors' use of Cash Collateral and entry into the DIP Credit Agreement, and approving the form of notice with respect to the Final Hearing;

(ix) waiving any right to surcharge collateral pursuant to section 506(c) of the Bankruptcy Code; and

(x) waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for the immediate effectiveness of the DIP Orders.

## Basis for Relief

**A.** **The Debtors' Need for Financing and Use of Cash Collateral**

47. As indicated above, the financing requested herein is being requested for only a short period of time, as the Debtors contemplate exiting chapter 11 within approximately

one and a half months. Despite the proposed expedited term of the Chapter 11 Cases, however, such financing is critical to the Debtors' operations and their ability to preserve the Prepetition Collateral. The proposed financing under the DIP Facility (the "DIP Financing") is needed to maintain an appropriate level of liquidity and help fund the Debtors' day-to-day operations. Furthermore, the DIP Financing was negotiated as part of the Debtors' prepackaged bankruptcy; if the Debtors are unable to obtain approval of the proposed DIP Facility and use of Cash Collateral on an interim and final basis, their ability to consummate their carefully constructed prepackaged bankruptcy will be jeopardized.

48.     The Debtors require sufficient liquidity during these cases to fund working capital and general corporate requirements for essential, day-to-day operations, to preserve and maintain the value of the Debtors' assets (including the Prepetition Collateral) and fund their reorganization efforts in an amount consistent with the Debtors' receivables and payables, in accordance with the Agreed Budget for the benefit of their estates and creditors, including the OpCo Lenders. The preservation and maintenance of the Debtors' assets and going concern value is of utmost significance and importance to a successful reorganization of the Debtors pursuant to the provisions of chapter 11 of the Bankruptcy Code.

49.     The Debtors require the immediate use of cash on hand, the DIP Facility, and other income generated from its commercial activities in order to maintain their day-to-day business operations and pay employees, vendors and AICs on a timely basis. Absent such relief from the Court, the Debtors will not have sufficient liquidity to ensure uninterrupted business operations and will suffer a substantial loss of value to the detriment of all parties in interest. Since the Debtors generate revenues through the sale of products to consultants who are not employees of the Debtors, forecasting the timing of revenues on a weekly basis is challenging.

Within the first two weeks of the Cases, the Debtors are forecasting approximately $18 million in revenues. If this forecast is too high or if the timing of the revenues is later than anticipated, the liquidity of the Debtors will be negatively impacted. Therefore it is critical that the Debtors have the initial $10 million of the DIP Facility in place on an interim basis in order to ensure that the Debtors have enough cash to operate the business. Moreover, it is necessary that the AICs understand that the Debtors will be able to pay all independent consultants, employees and vendors in the ordinary course of business. Absent such a showing, the AICs will likely pursue opportunities with competitors in the industry, which would be crippling to the Debtors' business. Finally, the DIP Financing was negotiated as part of the Debtors' prepackaged bankruptcy; if the Debtors are unable to obtain interim approval of the DIP Facility and use of Cash Collateral on an interim and final basis, their ability to consummate their carefully constructed prepackaged bankruptcy will be jeopardized. Without the liquidity provided by the use of the Cash Collateral and the DIP Facility, the Debtors' objective of restructuring their businesses as a going concern, while maintaining the value of their assets for the benefit of creditors, could fail without opportunity to achieve the purposes of the chapter 11 process.

50.     The interests of the OpCo Lenders will be protected and enhanced by the Debtors' use of Cash Collateral and the DIP Facility because such relief will ensure the uninterrupted operation of the Debtors' business and operations that secure the lenders' claims, thus protecting the Debtors' revenue streams and protecting the going concern value of the Debtors. In the absence of approval of the DIP Facility, AICs who rely upon the commissions paid by the Debtors may likely discontinue working for the Debtors. The DIP Facility is critical to the Debtors' ability to weather any unexpected challenges they may face during the chapter 11 process, including the possibility that the Debtors' projected revenues will be lower than

expected upon notice of a bankruptcy filing. Moreover, employees, customers and trade creditors will expect the Debtors to have more than ample access to liquidity in order to continue operations.

51. The ability of the Debtors to finance their operations and the availability to them of sufficient working capital and liquidity is vital to their ability to maintain these operations. If the Debtors are unable to obtain such financing and to use Cash Collateral for such purposes, the recoveries to all creditors, including the OpCo Lenders, would be greatly reduced since, under a liquidation scenario, the value of the Debtors' estates would decline dramatically. Entry of the Interim Order is therefore (i) critical to the Debtors' ability to reorganize pursuant to the Bankruptcy Code, (ii) in the best interests of the Debtors and their estates and (iii) necessary to avoid irreparable harm to the Debtors, their creditors, and their assets, businesses, goodwill, reputation and employees.

**B.      The Debtors' Entry into the DIP Facility Is Authorized Under Section 364 of the Bankruptcy Code**

52. Section 364 of the Bankruptcy Code gives bankruptcy courts the power to authorize postpetition financing for a chapter 11 debtor in possession. See In re Defender Drug Stores, Inc., 126 B.R. 76, 81 (Bankr. D. Ariz. 1991), aff'd, 145 B.R. 312 (B.A.P. 9th Cir. 1992).

53. Bankruptcy courts have the power to authorize secured postpetition financing under section 364 of the Bankruptcy Code, which provides, in pertinent part, as follows:

>            (c)      If the [debtor in possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –
>
>                      (1)      with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

> (2)     secured by a lien on property of the estate
> that is not otherwise subject to a lien; or
>
> (3)     secured by a junior lien on property of the
> estate that is subject to a lien.
>
> (d)(1)  The court, after notice and a hearing, may authorize
> the obtaining of credit or the incurring of debt secured by a senior
> or equal lien on property of the estate that is subject to a lien only
> if –
>
> > (A)     the [debtor in possession] is unable to obtain
> > such credit otherwise; and
> >
> > (B)     there is adequate protection of the interest of
> > the holder of the lien on the property of the estate on which
> > such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(c)-(d)(1).

54.     "Having recognized the natural reluctance of lenders to extend credit to a company in bankruptcy, Congress designed [section] 364 to provide 'incentives to the creditor to extend post-petition credit.'" Defender Drug Stores, 126 B.R. at 81 (quoting Unsecured Creditors' Comm. v. First Nat'l Bank & Trust Co. of Escanaba (In re Ellingsen MacLean Oil Co.), 834 F.2d 599, 603 (6th Cir. 1987), cert. denied, 488 U.S. 817 (1988)).  The incentives enumerated in section 364 are not intended to be an exhaustive list of the inducements that a court may grant.  Id.  In fact, it is not uncommon for a court to approve a lending arrangement containing terms that far exceed those authorized by section 364.  Id.

55.     Generally, courts apply a three-part test to determine whether a debtor in possession may obtain credit under section 364(c) of the Bankruptcy Code.  Under such test, the Debtors may incur postpetition financing under the DIP Facility pursuant to section 364(c) if they demonstrate that (a) they cannot obtain credit unencumbered or without superpriority status, (b) the DIP Facility is necessary to preserve the assets of their estates, and (c) the terms of the DIP Facility are fair, reasonable and adequate given the circumstances of the Debtor-borrowers

and the proposed lenders. See In re Crouse Group, Inc., 71 B.R. 544, 549-50 (Bankr. E.D. Pa. 1987); see also In re Aqua Assocs., 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991).

56. In addition, section 364(d)(1) of the Bankruptcy Code authorizes a debtor in possession to incur superpriority senior secured debtor or "priming" liens if (a) the debtor is unable to obtain financing from another source and (b) the interests of the secured creditors whose liens are being primed by the postpetition financing are adequately protected. 11 U.S.C. § 364(d)(1); see also Aqua Assocs., 123 B.R. at 196. Consent by the secured creditors to priming obviates the need to show adequate protection. See Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected."). Accordingly, the Debtors may incur "priming" liens under the DIP Facility if they are unable to obtain unsecured or junior secured credit and either (i) the Prepetition Secured Parties have consented or (ii) the Prepetition Secured Parties' interests in collateral are adequately protected.

57. Against this statutory backdrop, courts will evaluate the facts and circumstances of a debtor's case and accord significant weight to the necessity for obtaining the financing. See, e.g., In re Ames Dep't Stores, Inc., 115 B.R. 34, 40-41 (Bankr. S.D.N.Y. 1990). Debtors in possession are generally permitted to exercise their basic business judgment consistent with their fiduciary duties when evaluating the necessity of proposed protections for a party extending credit under section 364 of the Bankruptcy Code. Id. at 38.

(i)     The Debtors Are Unable to Obtain Unsecured or Junior Secured Credit

58. To show that the credit required is not obtainable on an unsecured basis, the Debtors need only demonstrate "by a good faith effort that credit was not available" without

the protections afforded to potential lenders by section 364(c) or (d) of the Bankruptcy Code. Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986); see also Anchor Sav. Bank, 99 B.R. at 120 n.4 (noting that the debtor satisfied the requirement of section 364(d) by "approach[ing] all lenders reasonably likely to be willing to make a junior or unsecured loan"); Ames, 115 B.R. at 37-40 (debtor in possession must show that it has made a reasonable effort to seek other sources of financing under section 364(a) and (b) of the Bankruptcy Code). Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." Snowshoe, 789 F.2d at 1088; see also In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1998) (finding that "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing" where the debtor "suffers some financial stress and has little or no unencumbered property"), aff'd sub nom., Anchor Sav. Bank, 99 B.R. at 117.

59.     As discussed above and in the Affidavits, the Debtors' assets are subject to the Prepetition Liens asserted by the Prepetition Secured Parties. Because of the Debtors' substantial amount of prepetition debt, obtaining the financing needed as unsecured debt on an administrative priority basis, or as debt which would be secured solely by liens junior to the liens of the Prepetition Secured Parties, was not a viable option, especially from a third party who did not already have a financial interest in the Debtors to protect. Moreover, the Prepetition Secured Parties would not have consented to the granting of senior or *pari passu* liens to a new third party debtor-in-possession lender. In fact, the DIP Financing here is part of the Debtors' prepackaged bankruptcy, the terms of which were heavily negotiated by, among others, the Prepetition Secured Parties. The Debtors thus concluded that adequate alternative financing terms more

favorable than those to be provided by the DIP Lenders under the DIP Facility are currently unobtainable.

      (ii)     The Prepetition Secured Parties' Interests in the Collateral Are Adequately Protected

        60.     If a debtor is unable to obtain credit under the provisions of section 364(c) of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien (i.e., a priming lien). See 11 U.S.C. § 364(d). Such relief may be granted so long as there is adequate protection of the secured creditor's interests in the property on which the senior lien is supposed to be granted. See id.; see also Aqua, 123 B.R. at 196. Although the Bankruptcy Code does not explicitly define "adequate protection," section 361 of the Bankruptcy Code provides that it may take the form of (1) a cash payment or periodic cash payments to the extent that there is a decrease in the lien holder's property interest; (2) an additional or replacement lien to the extent that there is a decrease in the lien holder's property interest; or (3) other relief that will result in a secured party's realizing the indubitable equivalent of its property interest. See 11 U.S.C. § 361.

        61.     Where a debtor's proposed use of funds from additional postpetition financing augment the value of the secured creditor's collateral, adequate protection exists. Sky Valley, 100 B.R. at 114 (noting the flexible nature of section 361(3) and collecting cases). The Debtors believe that the measures of protection set forth in the DIP Facility constitute adequate protection. In addition to replacement liens on substantially all assets, junior in priority only to the DIP Liens and any existing senior liens (and subject to the Carve Out), the Prepetition Agent and Prepetition Secured Parties will receive superpriority administrative expense claims, and reasonable professional fees and expenses incurred by the Prepetition Administrative Agent in connection with the Prepetition Credit Agreement. Moreover, the use of any DIP Facility

proceeds shall be solely in accordance with the Approved Budget and subject to borrowing base requirements. Accordingly, the DIP Facility not only maintains the value of the collateral in which the Prepetition Secured Parties are receiving replacement liens, it increases the collateral base and strengthens the value of the Debtors' businesses.

62.     Finally, as mentioned above, consent may take the place of adequate protection under section 364(d)(1) of the Bankruptcy Code, and the Debtors have obtained the consent of the Prepetition Agent on behalf of the Prepetition Secured Parties to use the Cash Collateral and enter into the DIP Facility on the terms set forth in the DIP Orders.

(iii)     The DIP Facility Is Fair, Reasonable, and in the Best Interests of the Estates

63.     The Debtors believe that the terms and conditions of the DIP Facility are fair and reasonable. The DIP Facility is necessary to support the Debtors' ongoing operations during the expedited term of the Chapter 11 Cases and will signal the Debtors' continued strength to compete in the marketplace for new business. The DIP Facility will also ensure the continued support of the Debtors' AICs, customers and critical suppliers. Furthermore, as is more fully explained in the Affidavits, the Debtors, with Blackstone's assistance, undertook an effort to obtain the best available terms for debtor-in-possession financing. Based upon these efforts, the interest rates and fees appear to be consistent with the existing market for debtor-in-possession loans of this nature. The Debtors believe that the proposed DIP Facility is the best financing available and well within the exercise of sound business judgment.

64.     Bankruptcy courts consistently defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious. See Trans World Airlines, Inc. v. Travellers Int'l AG. (In re Trans World Airlines, Inc.), 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that an interim loan, receivables facility and asset-based facility were approved because they "reflect[ed] sound and

prudent business judgment . . . [were] reasonable under the circumstances and in the best interests [of the debtor] and its creditors"); In re Simasko Prod. Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("In exercising [the debtor's] business judgment of conducting its drilling operations, it has found it necessary to obtain loans to make these endeavors possible."). In fact, "[m]ore exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985); see also Simasko Prod., 47 B.R. at 449 ("Business judgments should be left to the board room and not to this Court." (quoting In re Lifeguard Indus. Inc., 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983)). Consistent with this authority, the Debtors respectfully submit that the Court should approve the Debtors' decision to accept and enter into the proposed DIP Facility.

65.    Moreover, the Debtors have made a concerted good faith effort to obtain credit on the most favorable terms available. Prior to the Petition Date, the Debtors and their financial advisors discussed the financing with fourteen (14) lenders, of which five (5) lenders expressed an interest. Upon further discussions and diligence, only one (1) potential lender provided an indicative term sheet. From a fee and pricing perspective, the indicative term sheet was approximately the same as offered by the current DIP Lenders but provided more flexibility with respect to the ability to draw the funds than that offered in the DIP Facility. However, the DIP Facility was ultimately determined to provide the requisite liquidity on the most advantageous terms given that the Prepetition Secured Parties expressed their lack of consent to a senior or *pari passu* third party debtor-in-possession lender. Absent such consent, distracting and costly litigation over the propriety of any priming or *pari passu* third party debtor-in-

possession financing would likely have ensued, with potentially severe consequences for the

Debtors, their estates, and creditors. Against this backdrop, the Debtors carefully evaluated the

proposed financing structure from the DIP Lenders, engaged in negotiations with the DIP

Lenders regarding the proposed terms, and eventually agreed to the DIP Lenders' proposal as the

proposal best suited to the Debtors' needs. The terms and conditions of the DIP Facility were

negotiated by the parties (and their legal and financial advisors) in good faith and at arms' length

and, as outlined above, were instituted for the purpose of enabling the Debtors to meet ongoing

operational expenses while in chapter 11 and to preserve the going concern status of the Debtors

as well as the value of the Prepetition Collateral. Accordingly, the DIP Lenders should be

provided with the benefit and protection of section 364(e) of the Bankruptcy Code, such that if

any of the provisions of the DIP Facility are later modified, vacated, stayed or terminated by

subsequent order of this or any other Court, the DIP Lenders will be fully protected with respect

to any amounts previously disbursed.

### C. The Use of Cash Collateral Is Appropriate Under the Current Circumstances and Should Be Authorized

66.     The Court should authorize the Debtors to use Cash Collateral, whether

existing as of the Petition Date or arising thereafter based on the conversion of existing non-cash

collateral into cash. A copy of a proposed budget for the use of Cash Collateral is attached to the

Interim Order. It is essential to the continued operation of the Debtors that they obtain authority

to use Cash Collateral to fund payroll and other operating needs, including the costs of

administration of the Chapter 11 Cases. Currently, the Debtors have little or no available cash or

assets readily convertible into cash that are not likely subject to the Prepetition Secured Parties'

asserted liens and security interests.

67.     If the Debtors are permitted to use Cash Collateral to fund ongoing business operations and administration of these chapter 11 cases, the Debtors will preserve the value of the Debtors' assets as a going concern. Thus, the Debtors can continue to run their business successfully, but only if they are allowed to use Cash Collateral in the course of their day-to-day operations. Without such use, the detrimental result to the estate will be rapid and ultimately disastrous, given the nature of the Debtors' business. Access to Cash Collateral is crucial to the Debtors' ability to avoid immediate and irreparable harm to their estates, creditors, and ongoing businesses both before and after the Final Hearing.

68.     Section 363(c)(2) of the Bankruptcy Code sets forth the requirements for a debtor's proposed use of cash collateral. Specifically, section 363(c)(2) provides, in pertinent part:

> The trustee [or debtor in possession] may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless –
> (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2). Additionally, section 105(a) of the Bankruptcy Code, provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

69.     The Debtors respectfully submit that the proposed use of Cash Collateral, in conjunction with the DIP Facility, is necessary for the Debtors to have sufficient liquidity during the chapter 11 process to preserve their assets and property (including the Prepetition Collateral). The Debtors' proposed use of Cash Collateral thus prejudices no one; it affirmatively and directly benefits the Debtors' estates and creditors, including the Prepetition Secured Parties, and enhances the prospects of a successful outcome of the Chapter 11 Cases.

**D.** **The Proposed Adequate Protection for the Use of Cash Collateral Is Appropriate**

70. In considering whether to authorize use of cash collateral, a court generally must find that the interests of the holder of the secured claim are adequately protected. See 11 U.S.C. § 363(e). Section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property . . . proposed to be used, sold, or leased, by the trustee [or debtor in possession], the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). The Debtors' use of Cash Collateral is conditioned upon adequate protection being provided to the Prepetition Secured Parties, as set forth in the DIP Orders.

71. The Prepetition Secured Parties' primary form of adequate protection will be the Debtors' use of Cash Collateral to preserve the going concern value of the Debtors' assets and solely in accordance with the Approved Budget. Courts have held that adequate protection may be demonstrated by a showing that the going concern value of the debtor is preserved by the debtor's continuing operations and use of cash collateral. See, e.g., In re Snowshoe Co., Inc., 789 F.2d at 1087-89 (trustee reported that ski resort would lose 50% to 90% of its fair market value if it ceased operations). Additionally, as mentioned above, the Debtors will be granting replacement liens and superpriority claims as adequate protection, something that is commonplace. See, e.g., MBank Dallas N.A. v. O'Connor (In re O'Connor), 808 F.2d 1393, 1396-98 (10th Cir. 1987) (allowing the debtor to replace a lien on cash with a lien on property likely to be worth five times as much); Owens-Corning Fiberglas Corp. v. Ctr. Wholesale, Inc. (In re Ctr. Wholesale, Inc.), 759 F.2d 1440, 1450 (9th Cir. 1985) (observing that a lien on additional property of the debtor would likely constitute adequate protection for the secured creditor); Wrecclesham Grange, 221 B.R. at 981) (noting that a replacement lien of equal value

on postpetition rents is adequate protection); In re Stein, 19 B.R. 458, 459 (Bankr. E.D. Pa. 1982) (continued lien on debtors' crops, livestock and equipment resulted in an increase rather than a decrease in collateral, and debtors were granted authority to use cash collateral to meet operating expenses during chapter 11 proceedings).

72.     For the foregoing reasons, the Debtors respectfully submit that the adequate protection contemplated herein (described in more detail above) and in the DIP Orders is appropriate and should be approved.

### Request for a Final Hearing

73.     Pursuant to Bankruptcy Rule 4001(b)(2), the Debtors respectfully request that the Court set a date for the Final Hearing on or prior to the hearing to consider confirmation of the Debtors' Plan, but in any event a date that is no later than thirty (30) days from entry of the Interim Order and approve the provisions for notice of the Final Hearing and the objection procedures that are set forth in the Interim Order.

### The Need for Immediate Relief Pending a Final Hearing

74.     Bankruptcy Rule 4001(b) provides that a final hearing on a motion for authorization to use cash collateral may not be commenced earlier than fourteen (14) days after service of such motion. Fed. R. Bankr. P. 4001(b)(2). Upon request, however, a court may conduct a preliminary expedited hearing on a motion and authorize the use of only that amount of cash collateral as is necessary to avoid immediate and irreparable harm to the debtors' estates pending a final hearing, based on the business exigencies of individual cases. See id. The Debtors submit that, for the reasons set forth herein, authority to use Cash Collateral on an interim basis as requested in the Motion is necessary to enable the Debtors to maintain ongoing operations and avert the immediate and irreparable harm to their business.

## Waiver of Bankruptcy Rules 6004(a) and (h)

75.     Should the Court grant the Motion and enter the DIP Orders, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale or lease of property under Bankruptcy Rule 6004(h).

## Notice

76.     Notice of this Motion has been provided to the Office of the United States Trustee for the District of Delaware, counsel to the agents for the Prepetition Lenders, the Debtors' 30 largest unsecured creditors on a consolidated basis (including counsel if known), and all parties requesting notices pursuant to Bankruptcy Rule 2002. The Debtors submit that no other or further notice need be provided.

77.     No previous motion for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request entry of an order (i) granting the relief requested herein and (ii) granting the Debtors such other and further relief as the Court deems just and proper.

Dated: January 27, 2010
       Wilmington, Delaware

FOX ROTHSCHILD LLP

By: _____
Jeffrey M. Schlerf (No. 3047)
Eric M. Sutty (No. 4007)
John H. Strock (No. 4965)
Citizens Bank Center, Suite 1600
919 North Market Street
Wilmington, Delaware 19801
Telephone: (302) 654-7444

– and –

Thomas E Lauria
Craig H. Averch
Matthew C. Brown
WHITE & CASE LLP
Wachovia Financial Center
200 South Biscayne Boulevard, 49th Floor
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744

Proposed Attorneys for the Debtors
and Debtors in Possession