# Exhibit A

DEBTOR-IN-POSSESSION CREDIT AGREEMENT

among

LEVLAD INTERMEDIATE HOLDCO, INC.

and

ARBONNE INTERMEDIATE HOLDCO, INC.,
as Guarantors and as Debtors and Debtors-in-Possession,

LEVLAD, LLC

and

ARBONNE INTERNATIONAL, LLC,
as Borrowers and as Debtors and Debtors-in-Possession,

The Several Lenders from Time to Time Parties Hereto,

and

CANADIAN IMPERIAL BANK OF COMMERCE,
as Administrative Agent and Collateral Agent

Dated as of _____ ___, 2010

# TABLE OF CONTENTS

Page

SECTION 1. DEFINITIONS ........................................................................................... 2
    1.1    Defined Terms ............................................................................................ 2
    1.2    Other Definitional Provisions ................................................................... 19

SECTION 2. AMOUNT AND TERMS OF COMMITMENTS ...................................... 20
    2.1    Commitments ............................................................................................. 20
    2.2    Procedure for Borrowing .......................................................................... 20
    2.3    Exit Financing .......................................................................................... 21
    2.4    [Intentionally Deleted] ............................................................................. 21
    2.5    [Intentionally Deleted] ............................................................................. 21
    2.6    [Intentionally Deleted] ............................................................................. 21
    2.7    Fees, etc. ................................................................................................... 21
    2.8    Termination or Reduction of Commitments ............................................. 21
    2.9    Optional Prepayments ............................................................................... 21
    2.10   Mandatory Prepayments and Commitment Reductions ........................... 21
    2.11   Conversion and Continuation Options ...................................................... 23
    2.12   Limitations on Eurodollar Tranches ......................................................... 23
    2.13   Interest Rates and Payment Dates ............................................................. 23
    2.14   Computation of Interest and Fees ............................................................. 24
    2.15   Inability to Determine Interest Rate .......................................................... 24
    2.16   Pro Rata Treatment and Payments ............................................................ 25
    2.17   Requirements of Law ................................................................................ 26
    2.18   Taxes ......................................................................................................... 27
    2.19   Indemnity .................................................................................................. 30
    2.20   Change of Lending Office; Replacement of Lenders ............................... 30

SECTION 3. LETTERS OF CREDIT ............................................................................ 31
    3.1    L/C Commitment ...................................................................................... 31
    3.2    Procedure for Issuance of Letter of Credit ............................................... 32
    3.3    Fees and Other Charges ............................................................................ 32
    3.4    [INTENTIONALLY DELETED] .............................................................. 33
    3.5    Reimbursement Obligation of the Borrowers ........................................... 33
    3.6    Obligations Absolute ................................................................................ 33
    3.7    Letter of Credit Payments ......................................................................... 34
    3.8    Applications .............................................................................................. 34

SECTION 4. REPRESENTATIONS AND WARRANTIES ......................................... 34
    4.1    Financial Condition .................................................................................. 34
    4.2    No Change ................................................................................................. 34
    4.3    Existence; Good Standing; Compliance with Law .................................. 35
    4.4    Power; Authorization; Enforceable Obligations ...................................... 35
    4.5    No Legal Bar ............................................................................................. 35
    4.6    Litigation .................................................................................................. 35

| | | |
|---|---|---|
| 4.7 | No Default | 36 |
| 4.8 | Ownership of Property; Liens | 36 |
| 4.9 | Intellectual Property | 36 |
| 4.10 | Taxes | 36 |
| 4.11 | Federal Regulations | 36 |
| 4.12 | Labor Matters | 37 |
| 4.13 | ERISA | 37 |
| 4.14 | Investment Company Act | 37 |
| 4.15 | Subsidiaries | 37 |
| 4.16 | Agreed Budget; Use of Proceeds | 38 |
| 4.17 | Environmental Matters | 38 |
| 4.18 | Accuracy of Information, etc. | 39 |
| 4.19 | Security Documents | 39 |
| 4.20 | Financing Orders | 39 |
| 4.21 | Regulation H | 40 |

**SECTION 5. CONDITIONS PRECEDENT** ................................................. 40
| | | |
|---|---|---|
| 5.1 | Conditions to Initial Extension of Credit | 40 |
| 5.2 | Conditions to Each Extension of Credit | 42 |
| 5.3 | Condition to Second Extension of Credit | 42 |

**SECTION 6. AFFIRMATIVE COVENANTS** ................................................. 43
| | | |
|---|---|---|
| 6.1 | Financial Statements | 43 |
| 6.2 | Certificates; Other Information | 44 |
| 6.3 | Payment of Obligations | 46 |
| 6.4 | Maintenance of Existence; Compliance | 46 |
| 6.5 | Maintenance of Property; Insurance | 46 |
| 6.6 | Inspection of Property; Books and Records; Discussions | 46 |
| 6.7 | Notices | 47 |
| 6.8 | Environmental Laws | 47 |
| 6.9 | [Intentionally Deleted] | 48 |
| 6.10 | Agreement to Deliver Security Documents | 48 |
| 6.11 | Reinvestment Notice | 48 |
| 6.12 | Subsidiaries | 48 |
| 6.13 | Compliance with Financing Orders | 49 |
| 6.14 | Financial Advisor and Agent Financial Advisor | 49 |
| 6.15 | Further Assurances | 49 |

**SECTION 7. NEGATIVE COVENANTS** ................................................. 49
| | | |
|---|---|---|
| 7.1 | [Intentionally Deleted] | 49 |
| 7.2 | Indebtedness | 49 |
| 7.3 | Liens | 50 |
| 7.4 | Fundamental Changes | 52 |
| 7.5 | Disposition of Property | 53 |
| 7.6 | Restricted Payments | 53 |
| 7.7 | Capital Expenditures | 54 |

7.8     Investments ......................................................................................... 54
7.9     Optional Payments and Modifications of Certain Debt Instruments ................... 55
7.10    Transactions with Affiliates ................................................................... 56
7.11    Sales and Leasebacks .......................................................................... 56
7.12    Swap Agreements ............................................................................... 56
7.13    Changes in Fiscal Periods ..................................................................... 56
7.14    Negative Pledge Clauses ...................................................................... 56
7.15    Clauses Restricting Subsidiary Distributions ............................................. 57
7.16    Lines of Business ................................................................................ 57
7.17    Compliance with Budget ....................................................................... 57
7.18    Chapter 11 Claims .............................................................................. 57
7.19    Revision of Orders; Applications to Bankruptcy Court ................................. 58

SECTION 8. EVENTS OF DEFAULT ................................................................... 58

SECTION 9. THE AGENTS .............................................................................. 64
9.1     Appointment ...................................................................................... 64
9.2     Delegation of Duties ............................................................................ 65
9.3     Exculpatory Provisions ......................................................................... 65
9.4     Reliance ............................................................................................ 65
9.5     Notice of Default ................................................................................ 66
9.6     Non-Reliance on Agents and Other Lenders .............................................. 67
9.7     Indemnification ................................................................................... 67
9.8     Agent in Its Individual Capacity ............................................................. 68
9.9     Successor Administrative Agent and Collateral Agent ................................... 68
9.10    Security Document Matters ................................................................... 69

SECTION 10. MISCELLANEOUS ...................................................................... 69
10.1    Amendments and Waivers .................................................................... 69
10.2    Notices ............................................................................................ 70
10.3    No Waiver; Cumulative Remedies .......................................................... 71
10.4    Survival of Representations and Warranties ............................................... 71
10.5    Payment of Expenses and Taxes ............................................................ 71
10.6    Successors and Assigns; Participations and Assignments ............................... 73
10.7    Adjustments; Set-off ........................................................................... 75
10.8    Counterparts ...................................................................................... 76
10.9    Severability ....................................................................................... 76
10.10   Integration ........................................................................................ 76
10.11   **GOVERNING LAW** ......................................................................... 76
10.12   Submission To Jurisdiction; Waivers ....................................................... 76
10.13   Acknowledgements .............................................................................. 77
10.14   Releases of Guarantees and Liens ........................................................... 77
10.15   Confidentiality ................................................................................... 78
10.16   USA Patriot Act ................................................................................. 79
10.17   Joint and Several Liability of the Borrowers .............................................. 79
10.18   **WAIVERS OF JURY TRIAL** .............................................................. 80

10.19  [Intentionally Deleted] ................................................................................ 80

10.20  Usury Savings ...................................................................................... 80

10.21  Certain Bankruptcy Matters .................................................................. 81

SCHEDULES:

| | |
|---|---|
| 1 | Commitments |
| 1.1 | Real Property |
| 4.3 | Existence; Compliance with Law |
| 4.4 | Consents, Authorizations, Filings and Notices |
| 4.15 | Subsidiaries |
| 7.2(d) | Existing Indebtedness |
| 7.3(f) | Existing Liens |
| 7.8 | Existing Investments |

EXHIBITS:

| | |
|---|---|
| A | Form of Guarantee and Collateral Agreement |
| B | [Intentionally Deleted] |
| C | Form of Closing Certificate |
| D | Form of Assignment and Assumption Agreement |
| E | Form of Legal Opinion of White & Case LLP |
| F | Form of Exemption Certificate |
| G | Business Plan |
| H | Form of Borrowing Request |
| I | Form of Interim Order |
| J | Exit Term Sheet |
| K | Agreed Budget |

DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "Agreement"), dated as of _____ ___, 2010, among LEVLAD INTERMEDIATE HOLDCO, INC., a Delaware corporation and a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code (as hereinafter defined) ("Levlad Holdco"), ARBONNE INTERMEDIATE HOLDCO, INC., a Delaware corporation and a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code ("Arbonne Holdco" and, together with Levlad Holdco, the "Holdcos"), LEVLAD, LLC, a Delaware limited liability company and a debtor and a debtor-in-possession under Chapter 11 of the Bankruptcy Code ("Levlad"), ARBONNE INTERNATIONAL, LLC, a Delaware limited liability company and a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code ("Arbonne" and, together with Levlad, the "Borrowers"), the several banks and other financial institutions or entities from time to time party to this Agreement (including, without limitation, each Issuing Lender (as hereinafter defined)) (the "Lenders") and CANADIAN IMPERIAL BANK OF COMMERCE, as administrative agent and collateral agent.

## W I T N E S S E T H :

WHEREAS, the Borrowers entered into that certain $600,000,000 First Lien Credit Agreement, dated as of March 8, 2007 (as amended to date, the "Prepetition Credit Agreement"), among the Holdcos, the Borrowers, the several banks and other financial institutions or entities parties thereto (the "Prepetition Lenders"), and Canadian Imperial Bank of Commerce, as administrative agent and collateral agent (in such capacity, the "Prepetition Agent"), pursuant to which the Prepetition Lenders agreed, subject to the terms and conditions therein contained, to make available to the Borrowers certain credit facilities as provided for therein; and

WHEREAS, on _____ ___, 2010 (the "Petition Date"), each of the Borrowers, the Holdcos and each other Loan Party (as hereinafter defined) has filed in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") a voluntary petition for relief under Chapter 11 of the Bankruptcy Code and has continued in the possession of its assets and in the management of its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code, and such reorganization cases are being jointly administered under Case Number _____ (each a "Chapter 11 Case" and, collectively, the "Chapter 11 Cases"); and

WHEREAS, the Borrowers have requested the Lenders make available to the Borrowers a debtor-in-possession loan facility in an amount not to exceed $20,000,000, which extensions of credit the Borrowers may use for the purposes permitted hereunder;

WHEREAS, the Borrowers have requested the Issuing Lenders make available to the Borrowers a debtor-in-possession letter of credit facility in an amount not to exceed the L/C Commitment (as hereinafter defined); and

WHEREAS, the Lenders and the Issuing Lender are willing to make available to the Borrowers such facilities upon the terms and subject to the conditions set forth herein;

NOW, THEREFORE, in consideration of the premises and the mutual agreements herein contained and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto hereby agree as follows:

# SECTION 1.   DEFINITIONS

1.1   <u>Defined Terms</u>.  As used in this Agreement, the terms listed in this Section 1.1 shall have the respective meanings set forth in this Section 1.1.

"<u>ABR</u>":  means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1% and (c) 4.00%.  For purposes hereof: "<u>Prime Rate</u>" shall mean the rate of interest per annum publicly announced from time to time by Canadian Imperial Bank of Commerce as its prime rate in effect at its principal office in New York City (the Prime Rate not being intended to be the lowest rate of interest charged by Canadian Imperial Bank of Commerce in connection with extensions of credit to debtors).  Any change in the ABR due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective as of the opening of business on the effective day of such change in the Prime Rate or the Federal Funds Effective Rate, respectively.

"<u>ABR Loans</u>":  Loans the rate of interest applicable to which is based upon the ABR.

"<u>Act</u>":  as defined in Section 10.16.

"<u>Administrative Agent</u>":  Canadian Imperial Bank of Commerce, together with its affiliates, as the administrative agent for the Lenders under this Agreement and the other Loan Documents, together with any of its successors.

"<u>Affected Loans</u>":  as defined in Section 2.10(c).

"<u>Affiliate</u>":  as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) of such Person (provided that with respect to any Group Member, this clause (a) shall apply only as the term "Affiliate" is used in Section 7.10) or (b) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"<u>Agent Financial Advisor</u>":  as defined in Section 6.14(b).

"<u>Agents</u>":  the collective reference to the Collateral Agent and the Administrative Agent.

"<u>Agreed Budget</u>":  as defined in Section 4.16.

"<u>Agreement</u>":  as defined in the preamble hereto.

"<u>Applicable Margin</u>":

(a)   for each Loan that is a Eurodollar Loan, 10.00%; and

(b)      for each Loan that is an ABR Loan, 9.00%.

"Application": an application, in such form as the relevant Issuing Lender may specify from time to time, requesting such Issuing Lender to open a Letter of Credit.

"Approved Fund": any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Arbonne": as defined in the preamble hereto.

"Arbonne Holdco": as defined in the preamble hereto.

"Assignment and Assumption": an Assignment and Assumption Agreement, substantially in the form of Exhibit D.

"Available Commitment": as to any Lender at any time, an amount equal to the excess, if any, of (a) such Lender's Commitment then in effect over (b) the aggregate principal amount of all Loans held by such Lender then outstanding.

"Bankruptcy Code": the Bankruptcy Code in Title 11 of the United States Code, as amended, modified, succeeded or replaced from time to time.

"Bankruptcy Court": as defined in the recitals hereto.

"Benefited Lender": as defined in Section 10.7(a).

"Board": the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Borrowers": as defined in the preamble hereto.

"Borrowing Date": any Business Day specified by a Borrower as a date on which such Borrower requests the Lenders to make Loans hereunder.

"Borrowing Request": a request for the borrowing of Loans, duly executed by an authorized officer of the Borrowers and substantially in the form of Exhibit H.

"Business": as defined in Section 4.17(b).

"Business Day": a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close, provided, that with respect to notices and determinations in connection with, and payments of principal and interest on, Eurodollar Loans, such day is also a day for trading by and between banks in Dollar deposits in the interbank eurodollar market.

"Canadian dollars": dollars in lawful currency of Canada.

"Capital Expenditures": for any period, with respect to any Person, the aggregate of all expenditures by such Person and its Subsidiaries for the acquisition or leasing (pursuant to a capital lease) of fixed or capital assets or additions to equipment (including replacements, capitalized repairs and improvements during such period) that are required to be capitalized under GAAP on a consolidated balance sheet of such Person and its Subsidiaries.

"Capital Lease Obligations": as to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP and, for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

"Capital Stock": any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

"Carve Out": (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930 of title 28 of the United States Code and (ii) after the occurrence and during the continuance of an Event of Default, the payment of allowed professional fees and disbursements incurred by the Loan Parties or the official committee of unsecured creditors appointed in the Chapter 11 Cases (the "Committee"), if any such Committee is appointed in the Chapter 11 Cases, in an aggregate amount incurred after the Event of Default not in excess of $1,000,000 (plus all unpaid professional fees and expenses allowed by the Bankruptcy Court that were incurred prior to the occurrence of such Event of Default and which were incurred in accordance with the Agreed Budget), provided that (w) cash or other amounts on deposit in the L/C Cash Collateral Account shall not be subject to the Carve Out, (x) no portion of the Carve Out shall be available to pay any such professional fees and expenses incurred in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation or any threatened litigation against the Administrative Agent, the Lenders or the Prepetition Secured Parties and (y) so long as an Event of Default shall not have occurred and be continuing, the Carve Out shall not be reduced by the payment of fees and expenses allowed by the Bankruptcy Court and payable under Sections 328, 330 and 331 of the Bankruptcy Code.

"Cash Equivalents": (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States Government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition; (b) certificates of deposit, time deposits, eurodollar time deposits or overnight bank deposits having maturities of six months or less from the date of acquisition issued by any Lender or by any commercial bank organized under the laws of the United States or any state thereof having combined capital and surplus of not less than $500,000,000; (c) commercial paper of an issuer rated at least A-1 by S&P or P-1 by Moody's, or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally, and maturing within six months from the date of acquisition; (d) repurchase obligations of any

Lender or of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than 30 days, with respect to securities issued or fully guaranteed or insured by the United States Government; (e) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A by S&P or A by Moody's, or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally; (f) securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (b) of this definition; (g) money market mutual or similar funds that invest exclusively in assets satisfying the requirements of clauses (a) through (f) of this definition; (h) money market funds that (i) comply with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, as amended, (ii) are rated AAA by S&P or Aaa by Moody's, or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally and (iii) have portfolio assets of at least $5,000,000,000 or (i) securities issued by any Person or shares of mutual funds rated at least A- by S&P or A3 by Moody's, or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named ratings agencies cease publishing ratings of commercial paper issuers generally, and in either case either (x) having maturities of 270 days or less from the date of acquisition or (y) which are subject to a repricing arrangement (such as a Dutch auction) not more than 270 days after the date of acquisition by any Person which such Person believes in good faith will permit such person to sell such security or shares at par in connection with such repricing mechanism.

"Chapter 11 Case" and "Chapter 11 Cases": as defined in the recitals hereto.

"Closing Date": the date on which the conditions precedent set forth in Section 5.1 shall have been satisfied, which date is _____, 2010.

"Code": the Internal Revenue Code of 1986, as amended from time to time.

"Collateral": all property of the Loan Parties, now owned or hereafter acquired, upon which a Lien is purported to be created by any Security Document or any Financing Order.

"Collateral Agent": Canadian Imperial Bank of Commerce, together with any of its successors.

"Commitment": as to any Lender, the obligation of such Lender, if any, to make Loans in an aggregate principal not to exceed the amount set forth under the heading "Commitment" opposite such Lender's name on Schedule 1 hereto, or, as the case may be, in the Assignment and Assumption pursuant to which such Lender became a party hereto, as the same may be changed from time to time pursuant to the terms hereof. The original amount of the Total Commitments is $20,000,000.

"Commitment Period": the period from the Closing Date to the earlier to occur of (i) the Termination Date and (ii) June 30, 2010.

"Commonly Controlled Entity": with respect to either Borrower, an entity, whether or not incorporated, that is part of a group that includes such Borrower and that is treated as a single employer under Section 414(B) or (C) of the Code.

"Conduit Lender": any special purpose corporation organized and administered by any Lender for the purpose of making Loans otherwise required to be made by such Lender and designated by such Lender in a written instrument; provided, that the designation by any Lender of a Conduit Lender shall not relieve the designating Lender of any of its obligations to fund a Loan under this Agreement if, for any reason, its Conduit Lender fails to fund any such Loan, and the designating Lender (and not the Conduit Lender) shall have the sole right and responsibility to deliver all consents and waivers required or requested under this Agreement with respect to its Conduit Lender, and provided, further, that no Conduit Lender shall (a) be entitled to receive any greater amount pursuant to Section 2.17, 2.18, 2.19 or 10.5 than the designating Lender would have been entitled to receive in respect of the extensions of credit made by such Conduit Lender or (b) be deemed to have any Commitment.

"Contractual Obligation": as to any Person, any provision of any security issued by such Person or of any written agreement, instrument or other written undertaking to which such Person is a party or by which it or any of its property is bound.

"Default": any of the events specified in Section 8, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Defaulting Lender": at any time, any Lender with respect to which a Lender Default is then in effect.

"Disposition": with respect to any property, any sale, lease, sale and leaseback, assignment, conveyance, transfer or other disposition thereof. The terms "Dispose" and "Disposed of" shall have correlative meanings.

"Disqualified Lender": one financial institution (and its Affiliates) designated one time, in writing by the Borrowers to the Administrative Agent to which no Loans or Commitments may be assigned at any time.

"Dollar Equivalent": of any amount means, at the time of determination thereof, (a) if such amount is expressed in Dollars, such amount, (b) if such amount is expressed in Canadian dollars, the equivalent of such amount in Dollars determined using the rate of exchange quoted by Canadian Imperial Bank of Commerce in New York City at 11:00 A.M., New York City time, on the date of determination to prime banks in New York City for the spot purchase in the New York City foreign exchange market of such amount of Dollars with Canadian dollars.

"Dollars" and "$": dollars in lawful currency of the United States.

"Domestic Subsidiary": any Subsidiary of either Borrower organized under the laws of any jurisdiction within the United States.

"Eligible Assignee": (a) a Lender; (b) an Affiliate of a Lender; (c) an Approved Fund; and (d) any other Person (other than a natural person) approved by the Administrative Agent; provided that notwithstanding the foregoing, "Eligible Assignee" shall not include a Disqualified Lender, the Borrowers or any of the Borrowers' Affiliates or Subsidiaries.

"Environmental Laws": any and all foreign, Federal, state, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees, requirements of any Governmental Authority or other Requirements of Law (including common law) regulating, relating to or imposing liability or standards of conduct concerning protection of human health or the environment, as now or may at any time hereafter be in effect.

"ERISA": the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Eurocurrency Reserve Requirements": for any day as applied to a Eurodollar Loan, the aggregate (without duplication) of the maximum rates (expressed as a decimal fraction) of reserve requirements in effect on such day (including basic, supplemental, marginal and emergency reserves) under any regulations of the Board or other Governmental Authority having jurisdiction with respect thereto dealing with reserve requirements prescribed for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board) maintained by a member bank of the Federal Reserve System.

"Eurodollar Base Rate": with respect to each day during each Interest Period pertaining to a Eurodollar Loan, the rate per annum determined on the basis of the rate for deposits in Dollars for a period equal to such Interest Period commencing on the first day of such Interest Period appearing on Reuters Screen LIBOR01 Page as of 11:00 A.M., London time, two Business Days prior to the beginning of such Interest Period. In the event that such rate does not appear on Reuters Screen LIBOR01 Page (or otherwise on such screen), the "Eurodollar Base Rate" shall be determined by reference to such other comparable publicly available service for displaying eurodollar rates as may be selected by the Administrative Agent or, in the absence of such availability, by reference to the rate at which the Administrative Agent is offered Dollar deposits at or about 10:00 A.M., New York City time, two Business Days prior to the beginning of such Interest Period in the interbank eurodollar market where its eurodollar and foreign currency and exchange operations are then being conducted for delivery on the first day of such Interest Period for the number of days comprised therein.

"Eurodollar Loans": Loans the rate of interest applicable to which is based upon the Eurodollar Rate.

"Eurodollar Rate": with respect to each day during each Interest Period pertaining to a Eurodollar Loan, the greater of (i) 3.00% and (ii) a rate per annum determined for such day in accordance with the following formula (rounded upward to the nearest 1/100th of 1%):

"Eurodollar Tranche":  the collective reference to Eurodollar Loans the then current Interest Periods with respect to all of which begin on the same date and end on the same later date (whether or not such Loans shall originally have been made on the same day).

"Event of Default":  any of the events specified in Section 8, provided that any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Excluded Foreign Subsidiary":  any Foreign Subsidiary in respect of which either (a) the pledge of all of the Capital Stock of such Subsidiary as Collateral or (b) the guaranteeing by such Subsidiary of the Obligations, would, in the good faith judgment of the Borrowers, result in material adverse tax consequences to either Holdco or any of their respective Subsidiaries.

"Existing Letters of Credit":  those letters of credit listed on Schedule 1.1A

"FDA":  the United States Food and Drug Administration.

"Federal Funds Effective Rate":  for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day of such transactions received by Canadian Imperial Bank of Commerce from three federal funds brokers of recognized standing selected by it.

"Final Order":  the order or judgment of the Bankruptcy Court as entered on the docket of the Bankruptcy Court approving this Agreement and the other Loan Documents, in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders, which order or judgment is in effect and not stayed, and as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for reargument or rehearing shall then be pending, or, if pending, no stay pending appeal shall have been granted.

"Financial Advisor":  as defined in Section 6.14(a).

"Financing Orders:  collectively, the Interim Order and the Final Order.

"Flood Zone":  as defined in Section 4.21.

"Flow Through Entity":  an entity that is treated as a partnership not taxable as a corporation, a grantor trust or a disregarded entity for United States federal income tax purposes or subject to treatment on a comparable basis for purposes of state, local or foreign tax law.

"Foreign Subsidiary":  any Subsidiary of either Borrower that is not a Domestic Subsidiary.

"Fund": any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"Funding Office": the office of the Administrative Agent specified in Section 10.2 or such other office as may be specified from time to time by the Administrative Agent as its funding office by written notice to the Borrowers and the Lenders.

"GAAP": generally accepted accounting principles in the United States as in effect from time to time. In the event that any "Accounting Change" (as defined below) shall occur and such change results in a change in the method of calculation of financial covenants, standards or terms in this Agreement, then the Borrowers and the Administrative Agent agree to enter into negotiations in order to amend such provisions of this Agreement so as to reflect equitably such Accounting Changes with the desired result that the criteria for evaluating the Holdcos' or the Borrowers' financial condition shall be the same after such Accounting Changes as if such Accounting Changes had not been made. Until such time as such an amendment shall have been executed and delivered by the Borrowers, the Administrative Agent and the Required Lenders, all financial covenants, standards and terms in this Agreement shall continue to be calculated or construed as if such Accounting Changes had not occurred. "Accounting Changes" refers to changes in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants or, if applicable, the SEC.

"Governmental Authority": any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization (including the National Association of Insurance Commissioners and any Regulatory Authority).

"Group Members": the collective reference to the Holdcos, the Borrowers and their respective Subsidiaries.

"Guarantee and Collateral Agreement": the Guarantee and Collateral Agreement to be executed and delivered by the Holdcos, the Borrowers and each Subsidiary Guarantor, substantially in the form of Exhibit A.

"Guarantee Obligation": as to any Person (the "guaranteeing person"), any obligation, including a reimbursement, counterindemnity or similar obligation, of the guaranteeing Person that guarantees or in effect guarantees, or which is given to induce the creation of a separate obligation by another Person (including any bank under any letter of credit) that guarantees or in effect guarantees, any Indebtedness, leases or dividends (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary

obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrowers in good faith.

"Guarantors": the collective reference to the Holdcos and the Subsidiary Guarantors.

"Holdco Credit Agreement": the Credit Agreement, dated as of June 19, 2006, among Arbonne Holdco, Levlad Holdco, Credit Suisse Securities (USA) LLC, as joint lead arranger and joint bookrunner, CIBC World Markets Corp., as joint lead arranger and joint bookrunner, Credit Suisse, Cayman Islands Branch, as administrative agent and the several banks and other financial institutions or entities parties thereto, as such agreement may be amended, supplemented or otherwise modified in accordance with the terms thereof.

"Holdco Loan Documents": a "Loan Document" under (and as defined in) the Holdco Credit Agreement.

"Holdco Loans": the "Loans" as defined in the Holdco Credit Agreement.

"Holdcos": as defined in the preamble hereto.

"Holdings": Natural Products Group, LLC, a Delaware limited liability company.

"Honor Date": as defined in Section 3.5(a).

"Indebtedness": of any Person at any date, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services (other than (x) trade payables incurred in the ordinary course of such Person's business that are not overdue by more than 120 days and (y) intercompany liabilities arising out of licenses of Intellectual Property), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Capital Lease Obligations of such Person, (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under or in respect of bankers' acceptances, letters of credit, surety bonds or similar arrangements, (g) the liquidation value of

all preferred Capital Stock of such Person which is mandatorily redeemable prior to the Maturity Date, (h) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (g) above, (i) all obligations of the kind referred to in clauses (a) through (h) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation (provided that, if the Person has not assumed or otherwise become liable in respect of such obligation, such Indebtedness shall be deemed to be in an amount equal to the lesser of the aggregate amount of such Indebtedness and the fair market value of the property to which such Lien relates as determined in good faith by such Person), and (j) for the purposes of Section 8(e) only, all obligations of such Person in respect of Swap Agreements. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor.

"Indemnified Liabilities": as defined in Section 10.5.

"Insolvency": with respect to any Multiemployer Plan, the condition that such Plan is insolvent within the meaning of Section 4245 of ERISA.

"Insolvent": pertaining to a condition of Insolvency.

"Intellectual Property": the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including copyrights, copyright licenses, patents, patent licenses, trademarks, trademark licenses, technology, know-how and processes, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Interest Payment Date": as to any Loan, the last Business Day of each March, June, September and December, commencing March 31, 2010, the date of any repayment or prepayment made in respect thereof and the final maturity date of such Loan.

"Interest Period": as to any Eurodollar Loan, (a) initially, the period commencing on the borrowing or conversion date, as the case may be, with respect to such Eurodollar Loan and ending (x) one or two months thereafter or (y) if available to all Lenders, on any date that is less than one month thereafter, as selected by the relevant Borrower in its notice of borrowing or notice of conversion, as the case may be, given with respect thereto; and (b) thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such Eurodollar Loan and ending (x) one or two months thereafter or (y) if available to all Lenders, on any date that is less than one month thereafter, as selected by the relevant Borrower by irrevocable notice to the Administrative Agent not later than 1:00 P.M., New York City time, on the date that is three Business Days prior to the last day of the then current Interest Period with respect thereto; provided that, all of the foregoing provisions relating to Interest Periods are subject to the following:

(i)  if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

(ii)  neither Borrower may select an Interest Period that would extend beyond the Maturity Date; and

(iii)  any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of a calendar month.

"Interim Order":  the order or judgment of the Bankruptcy Court as entered on the docket of the Bankruptcy Court with respect to the Chapter 11 Cases substantially in the form of Exhibit I hereto, approving, *inter alia*, this Agreement and the other Loan Documents, and (a) authorizing the incurrence by the Loan Parties of the post-petition secured indebtedness in accordance with this Agreement, and (b) approving the payment by the Loan Parties of the fees contemplated by this Agreement and the other Loan Documents.

"Investments":  as defined in Section 7.8.

"Issuing Lender":  Canadian Imperial Bank of Commerce or any other Lender requested by Canadian Imperial Bank of Commerce and approved by the Borrowers, or any affiliate of Canadian Imperial Bank of Commerce or such Lender, in its capacity as issuer of any Letter of Credit.

"L/C Cash Collateral Account":  as defined in Section 3.1(c).

"L/C Commitment":  $250,000.

"L/C Obligations":  at any time, an amount equal to the sum of (a) the aggregate then undrawn and unexpired amount of the then outstanding Letters of Credit (which, in the case of Letters of Credit denominated in Canadian dollars, shall be the Dollar Equivalent of such amount) and (b) the aggregate amount of Unreimbursed Amounts (which, in the case of Letters of Credit denominated in Canadian Dollars, shall be the Dollar Equivalent of such Unreimbursed Amounts).

"Lender Default":  (a) the refusal (which has not been retracted) of a Lender to make available its portion of any Loan which such Lender is required to make or fund, or (b) a Lender having notified in writing the applicable Borrower and/or the Administrative Agent that it does not intend to comply with its obligations under Section 2.2.

"Lenders":  as defined in the preamble hereto; provided, that unless the context otherwise requires, each reference herein to the Lenders shall be deemed to include any Conduit Lender.

"Letters of Credit": as defined in Section 3.1(a).

"Levlad": as defined in the preamble hereto.

"Levlad Holdco": as defined in the preamble hereto.

"Lien": any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any capital lease having substantially the same economic effect as any of the foregoing).

"LLC Agreement": Amended and Restated Limited Liability Company Agreement, dated as of November 24, 2004, by and among Holdings, the Sponsor, the individuals listed on Schedule I attached thereto, and TCW/Crescent Mezzanine, LLC, a Delaware limited liability company.

"Loan": as defined in Section 2.1.

"Loan Documents": this Agreement, the Security Documents, the Notes, the fee agreements referred to in Section 2.7 and any amendment, waiver, supplement or other modification to any of the foregoing.

"Loan Parties": each Group Member that is a party to a Loan Document.

"Material Adverse Effect": a material adverse effect on (a) the business, property, operations or financial condition of the Borrowers and their Subsidiaries taken as a whole or (b) the validity or enforceability of this Agreement or any of the other Loan Documents or the rights or remedies of the Administrative Agent or the Lenders hereunder or thereunder.

"Materials of Environmental Concern": any gasoline or petroleum (including crude oil or any fraction thereof) or petroleum products or any materials or wastes characterized, defined or regulated as hazardous, toxic, dangerous, or words of similar meaning and effect in or under any Environmental Law, including asbestos, polychlorinated biphenyls and urea-formaldehyde insulation.

"Maturity Date": May 31, 2010.

"Maximum Lawful Rate": as defined in Section 10.20.

"Moody's": Moody's Investors Service, Inc.

"Mortgages": each of the mortgages and deeds of trust made by any Loan Party in favor of, or for the benefit of, the Administrative Agent for the benefit of the Lenders, in form and substance reasonably satisfactory to the Administrative Agent.

"Multiemployer Plan": a Plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"<u>Net Cash Proceeds</u>": (a) in connection with any Recovery Event, the proceeds thereof in the form of cash and Cash Equivalents (including any such proceeds received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but only as and when received), net of attorneys' fees, accountants' fees, investment banking fees, amounts required to be applied to the repayment of Indebtedness secured by a Lien expressly permitted hereunder on any asset that is the subject of such Recovery Event (other than any Lien pursuant to a Security Document) and other customary fees and expenses actually incurred in connection therewith and net of taxes paid or reasonably estimated to be payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements) and (b) in connection with any issuance or sale of Capital Stock or any incurrence of Indebtedness, the cash proceeds received from such issuance or incurrence, net of attorneys' fees, investment banking fees, accountants' fees, underwriting discounts and commissions and other customary fees and expenses actually incurred in connection therewith.

"<u>Non-Consenting Lender</u>": any Lender that has failed to consent to a proposed amendment, waiver, discharge or termination which pursuant to the terms of Section 10.1 requires the consent of all Lenders or of each Lender directly affected thereby and with respect to which the Required Lenders shall have granted their consent.

"<u>Non-Excluded Taxes</u>": as defined in Section 2.18(a).

"<u>Non-U.S. Lender</u>": as defined in Section 2.18(a).

"<u>Notes</u>": the collective reference to any promissory note evidencing Loans.

"<u>Obligations</u>": the unpaid principal of and interest (including interest accruing after the maturity of the Loans and Reimbursement Obligations and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to either Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) on the Loans and all other obligations and liabilities of the Borrowers to the Administrative Agent, to the Collateral Agent or to any Lender (or, in the case of Treasury Management Products, any Agent or affiliate of any Agent or Lender), whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, any other Loan Document, the Letters of Credit, any Treasury Management Products or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including all fees, charges and disbursements of counsel to the Administrative Agent, to the Collateral Agent or to any Lender that are required to be paid by the Borrowers pursuant hereto) or otherwise.

"<u>Other Taxes</u>": any and all present or future stamp or documentary taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery, enforcement or performance of this Agreement or any other Loan Document.

"<u>Participant</u>": as defined in Section 10.6(d).

"PBGC": the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor).

"Petition Date": as defined in the recitals hereto.

"Percentage": as to any Lender (i) at any time prior to the expiration or termination of the Commitments, the percentage which such the sum of Lender's Commitment plus the aggregate principal amount of such Lender's Loans then outstanding then constitutes of the sum of the Total Commitments plus the aggregate principal amount of the Loans of all Lenders then outstanding or (ii) at any time after the Commitments shall have expired or terminated, the percentage which the aggregate principal amount of such Lender's Loans then outstanding then constitutes of the aggregate principal amount of the Loans of all Lenders then outstanding.

"Person": an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"Plan": with respect to either Borrower, any employee benefit plan that is covered by ERISA and in respect of which such Borrower or a Commonly Controlled Entity of such Borrower is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Plan Support Agreement": the Plan Support Agreement, dated as of December 18, 2009, among the Holdcos, the Borrowers and the "Consenting Lenders" party thereto, as such agreement may be amended supplemented or otherwise modified in accordance with the terms thereof.

"Prepetition Agent": as defined in the recitals hereto.

"Prepetition Credit Agreement": as defined in the recitals hereto.

"Prepetition Lenders": as defined in the recitals hereto.

"Prepetition Secured Parties": the Prepetition Agent, the Prepetition Lenders, the "Collateral Agent"(as defined in the Prepetition Credit Agreement), the "Issuing Lender"(as defined in the Prepetition Credit Agreement) and any other Person owed an "Obligation"(as defined in the Prepetition Credit Agreement) under the Prepetition Credit Agreement.

"Presumed Tax Rate": the highest effective marginal statutory combined U.S. federal, state and local income tax rate prescribed for a corporation doing business in New York City (taking into account (i) the deductibility of state and local income taxes for U.S. federal income tax purposes, assuming the limitation of Section 68(a)(2) of the Code applies and taking into account any impact of the Code, and (ii) the character (long-term or short-term capital gain, dividend income or other ordinary income) of the applicable income).

"Projections": as defined in Section 6.2(c).

"Properties": as defined in Section 4.17(a).

"Recovery Event": any settlement of or payment in respect of any property or casualty insurance claim or any condemnation proceeding relating to any asset of any Group Member in excess of $250,000.

"Register": as defined in Section 10.6(c).

"Regulation U": Regulation U of the Board as in effect from time to time.

"Regulatory Authority": any federal, national, multinational, state, provincial or local regulatory agency, department, bureau or other Governmental Authority with authority over the manufacture, packaging, labeling, development, promotion, sale, storage or transport of the products of either Borrower as it relates to the business of direct marketing and direct selling of natural skin care, health and beauty products in a jurisdiction, including the FDA and the European Medicines Evaluation Agency.

"Reimbursement Obligation": the obligation of the Borrowers to reimburse each Issuing Lender pursuant to Section 3.5 for amounts drawn under Letters of Credit.

"Reinvestment Deferred Amount": with respect to any Reinvestment Event, the aggregate Net Cash Proceeds received by either of the Holdcos or any of their Domestic Subsidiaries in connection therewith that are not applied to prepay the Loans pursuant to Section 2.10(a) as a result of the delivery of a Reinvestment Notice.

"Reinvestment Event": any Recovery Event in respect of which a Borrower has delivered a Reinvestment Notice.

"Reinvestment Notice": a written notice executed by a Responsible Officer of a Borrower stating that no Event of Default has occurred and is continuing and that such Borrower (directly or indirectly through a Subsidiary) intends and expects to use all or a specified portion of the Net Cash Proceeds of a Recovery Event to acquire or repair assets useful in the business of the Holdcos and their Domestic Subsidiaries.

"Reinvestment Prepayment Amount": with respect to any Reinvestment Event, the Reinvestment Deferred Amount relating thereto less any amount expended prior to the relevant Reinvestment Prepayment Date to acquire or repair assets useful in the business of the Holdcos and their Domestic Subsidiaries.

"Reinvestment Prepayment Date": the earlier of (i) the date occurring six (6) months after such Reinvestment Event and (ii) the date on which the Borrowers shall have delivered the notice required by Section 6.11 with respect to all or any portion of the relevant Reinvestment Deferred Amount.

"Related Parties": with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"Reorganization":  with respect to any Multiemployer Plan, the condition that such plan is in reorganization within the meaning of Section 4241 of ERISA.

"Reportable Event":  any of the events set forth in Section 4043(c) of ERISA, other than those events as to which the thirty day notice period is waived.

"Required Lenders":  at any time (i) prior to the termination of the Commitments, the holders of more than 50% of the sum of (x) the Total Commitments then in effect plus (y) the aggregate principal amount of all Loans of all Lenders then outstanding or (ii) if the Commitments have been terminated, the aggregate principal amount of all Loans of all Lenders then outstanding.

"Requirement of Law":  as to any Person, the certificate of incorporation and by-laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Responsible Officer":  with respect to any Person, the chief executive officer, president or chief financial officer of such Person, but in any event, with respect to financial matters, the chief financial officer of such Person or, in each case, any other officer of such Person designated as such in writing to, and reasonably acceptable to, the Administrative Agent.

"Restricted Payments":  as defined in Section 7.6.

"S&P":  Standard & Poor's Ratings Services.

"SEC":  the Securities and Exchange Commission, any successor thereto and any analogous Governmental Authority.

"Securitization":  a public or private offering, by any Lender or any of its direct or indirect Affiliates or their respective successors and assigns, of securities which represent an interest in, or which are collateralized in whole or in part by, such Lender's Loans.

"Security Documents":  the collective reference to the Guarantee and Collateral Agreement and all other security documents hereafter delivered to the Administrative Agent granting a Lien on any property of any Person to secure the obligations and liabilities of any Loan Party under any Loan Document.

"Single Employer Plan":  any Plan that is covered by Title IV of ERISA, but that is not a Multiemployer Plan.

"Specified Lien":  those valid, perfected, enforceable and unavoidable Liens on property of the Loan Parties in existence immediately prior to the Petition Date with respect to which the Administrative Agent has been granted a junior Lien pursuant to Section 364(c)(3) of the Bankruptcy Code.

"Sponsor": Harvest Partners IV, LP, a Delaware limited partnership and Harvest Partners IV GmbH and Co. KG, a German limited liability company.

"Subsidiary": as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or of which shares of Capital Stock are at the time owned by such Person and the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of either Holdco.

"Subsidiary Guarantor": each Subsidiary of either Borrower other than any Excluded Foreign Subsidiary.

"Swap Agreement": any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of either Borrower or any of its Subsidiaries shall be a "Swap Agreement".

"Termination Date": the earlier to occur of (i) the Maturity Date and (ii) the date this Agreement is terminated either by Borrowers pursuant to Section 2.8 or by the Required Lenders pursuant to Section 8.

"Testing Period": each period commencing January 23, 2010 and ending on the dates set forth below:

> February 5, 2010
> February 19, 2010
> March 5, 2010
> March 19, 2010
> April 2, 2010

"Total Commitments": at any time, the aggregate amount of the Commitments then in effect.

"Total Operating Cash Flow": with respect to any Testing Period, the difference between the Borrowers' (i) "Net Cash Flow" for such period minus (ii) the sum of "Fees/Cash Interest Payments," "Principal Payments," "Borrowings," "Utilities Deposit," "Cash Collateral for L/C" and "Restructuring & Advisory Fees" for such period (in each case as such terms are used in the Agreed Budget).

"Transaction":  (i) the entering into of the Loan Documents and the incurrence of the Loans on the Closing Date, and (ii) the payment of all premiums, fees and expenses in connection with the foregoing.

"Transferee":  any Eligible Assignee or Participant.

"Treasury Management Products":  standard banking products including, but not limited to, pooling, automated clearing house ("ACH"), daylight overdrafts, credit cards and credit card processing entered into prior to or after the Closing Date by either Borrower or any of its Subsidiaries and any Lender or Agent or, in either case, affiliate thereof.

"Type":  as to any Loan, its nature as an ABR Loan or a Eurodollar Loan.

"United States" or "U.S.":  the United States of America.

"Unreimbursed Amount":  as defined in Section 3.5(b).

"Wholly Owned Subsidiary":  as to any Person, any other Person all of the Capital Stock of which (other than directors' qualifying shares required by law) is owned by such Person directly and/or through other Wholly Owned Subsidiaries.

"Wholly Owned Subsidiary Guarantor":  any Subsidiary Guarantor that is a Wholly Owned Subsidiary of either Borrower.

1.2    Other Definitional Provisions.  (a)  Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings provided herein when used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)    As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, (i) accounting terms relating to any Group Member not defined in Section 1.1 and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP, (ii) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation", (iii) the word "incur" shall be construed to mean incur, create, issue, assume, become liable in respect of or suffer to exist (and the words "incurred" and "incurrence" shall have correlative meanings), (iv) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Capital Stock, securities, revenues, accounts, leasehold interests and contract rights, and (v) references to agreements or other Contractual Obligations shall, unless otherwise specified or prohibited by the Loan Documents, be deemed to refer to such agreements or Contractual Obligations as amended, supplemented, restated or otherwise modified from time to time.

(c)    The words "hereof", "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d)     The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

SECTION 2.   AMOUNT AND TERMS OF COMMITMENTS

2.1   <u>Commitments</u>. (a)  Subject to the terms and conditions hereof, each Lender severally agrees to make no more than two loans ("<u>Loans</u>") to the Borrowers during the Commitment Period in an aggregate principal amount at any one time outstanding which does not exceed the amount of such Lender's Commitment.  Subject to the terms and conditions hereof, the initial Loan made by each Lender hereunder shall be an amount not to exceed such Lender's Percentage of $10,000,000, and shall be made by such Lender to the Borrowers on the Closing Date.  Notwithstanding anything to the contrary contained herein, no Lender shall make a Loan hereunder if, after giving effect thereto, the aggregate amount of the Available Commitments would be less than zero or any Lender's Available Commitment would be less than zero.  The Loans may from time to time be Eurodollar Loans or ABR Loans, as determined by the relevant Borrower and notified to the Administrative Agent in accordance with Sections 2.2 and 2.11.

(b)     The Borrowers shall repay all outstanding Loans on the Termination Date.

2.2   <u>Procedure for Borrowing</u>.  The Borrowers may borrow under the Commitments during the Commitment Period on any Business Day; <u>provided</u> that the Borrowers shall give the Administrative Agent irrevocable notice in the form of a Borrowing Request (which Borrowing Request must be received by the Administrative Agent prior to 1:00 P.M., New York City time, (a) three Business Days prior to the requested Borrowing Date, in the case of Eurodollar Loans, or (b) on the requested Borrowing Date, in the case of ABR Loans, specifying (i) the amount and Type of Loans to be borrowed, (ii) the requested Borrowing Date, (iii) the identity of the Borrower to which the requested Loans are to be made and (iv) in the case of Eurodollar Loans, the respective amounts of each such Type of Loan and the respective lengths of the initial Interest Period therefor; <u>provided</u> that the initial borrowing of Loans shall occur on the Closing Date.  Upon receipt of any such Borrowing Request from the Borrowers, the Administrative Agent shall promptly notify each Lender thereof.  Each Lender will make the amount of its <u>pro rata</u> share of each borrowing available to the Administrative Agent for the account of the relevant Borrower at the Funding Office prior to 2:00 P.M., New York City time, on the Borrowing Date requested by the Borrowers, in each case in funds immediately available to the Administrative Agent.  Such borrowing will then be made available to the relevant Borrower by the Administrative Agent crediting such account as is designated by the Borrowers in the applicable Borrowing Request with the aggregate of the amounts made available to the Administrative Agent by the Lenders and in like funds as received by the Administrative Agent.  Notwithstanding anything to the contrary contained herein, no more than two (2) Borrowing Requests (inclusive of the Borrowing Request made in connection with the borrowing of Loans to occur on the Closing Date.) may be submitted by the Borrowers hereunder; <u>provided</u>, that, unless consented to by the Required Lenders, the second Borrowing Request shall not exceed $5,000,000.

2.3     Exit Financing.

Each of the Lenders agrees to extend to the Borrowers post Chapter 11 exit financing on the terms and conditions set forth in the term sheet annexed hereto as Exhibit J. The commitment of each Lender with respect to such exit financing shall be its Percentage of the aggregate amount of such financing.

2.4     [Intentionally Deleted].

2.5     [Intentionally Deleted].

2.6     [Intentionally Deleted].

2.7     Fees, etc.  The Borrowers agree to pay to the Lenders and the Administrative Agent the fees in the amounts and on the dates as set forth in any fee agreements with the Lenders and/or the Administrative Agent and to perform any other obligations contained therein.

2.8     Termination or Reduction of Commitments.  The Borrowers shall have the right, upon not less than three Business Days' notice to the Administrative Agent, to terminate the Commitments or the L/C Commitment or, from time to time, to reduce the amount of the Commitments or the L/C Commitment.  Any such reduction shall be in an amount equal to $500,000, or a whole multiple thereof, and shall reduce permanently the Commitments then in effect.

2.9     Optional Prepayments.  The Borrowers may at any time and from time to time prepay the Loans, in whole or in part, without premium or penalty, upon irrevocable notice delivered to the Administrative Agent no later than 1:00 P.M., New York City time, three Business Days prior thereto, in the case of Eurodollar Loans, and no later than 1:00 P.M., New York City time, one Business Day prior thereto, in the case of ABR Loans, which notice shall specify the date and amount of prepayment and whether the prepayment is of Eurodollar Loans or ABR Loans; provided, that if a Eurodollar Loan is prepaid on any day other than the last day of the Interest Period applicable thereto, the Borrowers shall also pay any amounts owing pursuant to Section 2.19.  Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.  If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with (except in the case of ABR Loans, which interest shall be paid in accordance with Section 2.13) accrued interest to such date on the amount prepaid.  Partial prepayments shall be in an aggregate principal amount of $500,000 or a whole multiple thereof.

2.10    Mandatory Prepayments and Commitment Reductions.  (a) If on any date either of the Holdcos or any of their Domestic Subsidiaries shall receive Net Cash Proceeds from any Recovery Event then, unless a Reinvestment Notice shall be delivered in respect thereof within five Business Days of Recovery Event, an amount equal to 100% of such Net Cash Proceeds shall be applied on such fifth Business Day toward the prepayment of the Loans as set forth in Section 2.10(b); provided, that, notwithstanding the foregoing, on each Reinvestment Prepayment Date, an amount equal to the Reinvestment Prepayment Amount with respect to the

relevant Reinvestment Event shall be applied toward the prepayment of the Loans as set forth in Section 2.10(b).

(b)     In connection with any voluntary prepayments by the Borrowers pursuant to Section 2.9, any voluntary prepayment thereof shall be applied first to ABR Loans to the full extent thereof before application to Eurodollar Loans, in each case in a manner that minimizes the amount of any payments required to be made by the Borrowers pursuant to Section 2.19. The application of any prepayment pursuant to this Section 2.10 shall be made, as between ABR Loans and Eurodollar Loans, in such order as the Borrowers shall direct to the Administrative Agent (or, in the absence of such direction, first, to ABR Loans and, second, to Eurodollar Loans). Each prepayment of the Loans under this Section 2.10 (except in the case of ABR Loans, which interest shall be paid in accordance with Section 2.13) shall be accompanied by accrued interest to the date of such prepayment on the amount prepaid.

(c)     Notwithstanding the foregoing provisions of this Section 2.10, if at any time the mandatory repayment of Loans pursuant to this Section 2.10 would result in the Borrowers' incurring breakage costs under Section 2.19 as a result of Eurodollar Loans being repaid other than on the last day of an Interest Period applicable hereto (any such Eurodollar Loans, "Affected Loans"), the Borrowers may elect, by written notice to the Administrative Agent, to have the provisions of the following sentence be applicable so long as (x) no Default or Event of Default then exists and (y) the aggregate principal amount of such Affected Loans is at least $100,000. At the time any Affected Loans are otherwise required to be prepaid, the Borrowers may elect to deposit 100% (or such lesser percentage elected by the Borrowers as not being repaid) of the principal amounts that otherwise would have been paid in respect of the Affected Loans (but in any event not less than $100,000 in aggregate principal amount) with the Administrative Agent to be held as security for the obligations of the Borrowers hereunder pursuant to a cash collateral agreement to be entered into in form and substance reasonably satisfactory to the Administrative Agent that shall provide for investments of such deposits in Cash Equivalents, with such cash collateral to be released upon the request of the Borrowers from such cash collateral account (and applied to repay the principal amount of such Eurodollar Loans) upon each occurrence thereafter of the last day of an Interest Period applicable to such Eurodollar Loans (or such earlier date or dates as shall be requested by the Borrowers), with the amount to be so released and applied on the last day of each Interest Period to be the amount of such Eurodollar Loans to which such Interest Period applies (or, if less, the amount remaining in such cash collateral account); provided that (i) interest in respect of such Affected Loans shall continue to accrue thereon at the rate provided hereunder until such Affected Loans have been repaid in full and (ii) at any time while an Event of Default has occurred and is continuing or upon written notice from the Required Lenders, the Required Lenders may direct the Administrative Agent (in which case the Administrative Agent shall, and is hereby authorized by the Borrowers to, follow said directions) to apply any or all proceeds on deposit in such collateral account to the payment of such Affected Loans. All risk of loss in respect of investments made as contemplated in this clause (f) shall be on the Borrowers. Under no circumstances shall the Administrative Agent be liable or accountable to the Borrowers or any other Person for any decrease in the value of the cash collateral account or for any loss resulting from the sale of any investment so made.

2.11   Conversion and Continuation Options.  (a)  The Borrowers may elect from time to time to convert Eurodollar Loans to ABR Loans by giving the Administrative Agent prior irrevocable notice of such election no later than 1:00 P.M., New York City time, on the third Business Day preceding the proposed conversion date, provided that any such conversion of Eurodollar Loans may only be made on the last day of an Interest Period with respect thereto. The Borrowers may elect from time to time to convert ABR Loans to Eurodollar Loans by giving the Administrative Agent prior irrevocable notice of such election no later than 1:00 P.M., New York City time, on the third Business Day preceding the proposed conversion date (which notice shall specify the length of the initial Interest Period therefor); provided that no ABR Loan may be converted into a Eurodollar Loan when any Event of Default has occurred and is continuing and the Administrative Agent or the Required Lenders have determined in its or their sole discretion not to permit such conversions.  Upon receipt of any such notice the Administrative Agent shall promptly notify each Lender thereof.

(b)   Any Eurodollar Loan may be continued as such upon the expiration of the then current Interest Period with respect thereto by the Borrowers' giving irrevocable notice to the Administrative Agent, in accordance with the applicable provisions of the term "Interest Period" set forth in Section 1.1, of the length of the next Interest Period to be applicable to such Loans, provided that no Eurodollar Loan may be continued as such when any Event of Default has occurred and is continuing and the Administrative Agent has or the Required Lenders have determined in its or their sole discretion not to permit such continuations, and provided, further, that if the Borrowers shall fail to give any required notice as described above in this paragraph or if such continuation is not permitted pursuant to the preceding proviso such Loans shall be automatically converted to ABR Loans on the last day of such then expiring Interest Period. Upon receipt of any such notice the Administrative Agent shall promptly notify each Lender thereof.

2.12   Limitations on Eurodollar Tranches.  Notwithstanding anything to the contrary in this Agreement, all borrowings, conversions and continuations of Eurodollar Loans and all selections of Interest Periods shall be in such amounts and be made pursuant to such elections so that, (a) after giving effect thereto, the aggregate principal amount of the Eurodollar Loans comprising each Eurodollar Tranche shall be equal to at least $500,000 and (b) no more than three (3) Eurodollar Tranches shall be outstanding at any one time.

2.13   Interest Rates and Payment Dates.  (a)  Each Eurodollar Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Eurodollar Rate determined for such day plus the Applicable Margin.

(b)   Each ABR Loan shall bear interest at a rate per annum equal to the ABR plus the Applicable Margin.

(c)   If any Default or Event of Default occurs and is continuing, the Obligations shall bear interest at a rate per annum as follows: (i) in the case of the Loans, the rate that would otherwise be applicable thereto pursuant to the foregoing provisions of this Section plus 2%, and (ii) in the case of any other Obligation, a rate per annum equal to the rate then applicable to ABR Loans plus 2%.

(d)     Interest shall be payable in arrears on each Interest Payment Date, commencing March 31, 2010, provided that interest accruing pursuant to paragraph (c) of this Section shall be payable from time to time on demand.

2.14     Computation of Interest and Fees. (a) Interest and fees payable pursuant hereto shall be calculated on the basis of a 360-day year for the actual days elapsed, except that, with respect to ABR Loans the rate of interest on which is calculated on the basis of the Prime Rate, the interest thereon shall be calculated on the basis of a 365- (or 366-, as the case may be) day year for the actual days elapsed. The Administrative Agent shall as soon as practicable notify the Borrowers and the Lenders of each determination of a Eurodollar Rate. Any change in the interest rate on a Loan resulting from a change in the ABR or the Eurocurrency Reserve Requirements shall become effective as of the opening of business on the day on which such change becomes effective. The Administrative Agent shall as soon as practicable notify the Borrowers and the Lenders of the effective date and the amount of each such change in interest rate.

(b)     Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be conclusive and binding on the Borrowers and the Lenders in the absence of manifest error. The Administrative Agent shall, at the request of the Borrowers, deliver to the Borrowers a statement showing the quotations used by the Administrative Agent in determining any interest rate pursuant to Section 2.13(a).

2.15     Inability to Determine Interest Rate. If prior to the first day of any Interest Period:

(a)     the Administrative Agent shall have determined (which determination shall be conclusive and binding upon the Borrowers) that, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining the Eurodollar Rate for such Interest Period, or

(b)     the Administrative Agent shall have received notice from the Required Lenders that the Eurodollar Rate determined or to be determined for such Interest Period will not adequately and fairly reflect the cost to such Lenders (as conclusively certified by such Lenders) of making or maintaining their affected Loans during such Interest Period,

the Administrative Agent shall give telecopy or telephonic notice thereof to the Borrowers and the relevant Lenders as soon as practicable thereafter. If such notice is given (x) any Eurodollar Loans requested to be made on the first day of such Interest Period shall be made as ABR Loans, (y) any Loans that were to have been converted on the first day of such Interest Period to Eurodollar Loans shall be continued as ABR Loans and (z) any outstanding Eurodollar Loans shall be converted, on the last day of the then-current Interest Period, to ABR Loans. Until such notice has been withdrawn by the Administrative Agent (which the Administrative Agent hereby agrees to do upon its reasonable determination that the circumstances described in preceding clause (a) and (b) no longer exist), no further Eurodollar Loans shall be made or continued as such, nor shall either Borrower have the right to convert Loans to Eurodollar Loans.

2.16    Pro Rata Treatment and Payments.  (a) Each borrowing by either Borrower from the Lenders hereunder and any reduction of the Commitments of the Lenders shall be made pro rata according to the respective Percentages of the Lenders.

(b)    Each payment (including each prepayment) by either Borrower on account of principal of and interest on the Loans shall be made pro rata according to the respective outstanding principal amounts of the Loans then held by the Lenders.  Amounts prepaid on account of the Loans may not be reborrowed.

(c)    All payments (including prepayments) to be made by either Borrower hereunder, whether on account of principal, interest, fees or otherwise, shall be made in immediately available funds without setoff, counterclaim or other deduction and shall be made prior to 1:00 P.M., New York City time, on the due date thereof to the Administrative Agent, for the account of the Lenders, at the Funding Office, in Dollars and in immediately available funds. Subject to the provisions of Section 3.5 in respect of the reimbursement by the Borrowers of drafts under any Letter of Credit, the Administrative Agent shall distribute such payments to the Lenders promptly upon receipt in like funds as received.  If any payment hereunder (other than payments on the Eurodollar Loans) becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day.  If any payment on a Eurodollar Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day.  In the case of any extension of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate during such extension.

(d)    Unless the Administrative Agent shall have been notified in writing by any Lender prior to a borrowing that such Lender will not make the amount that would constitute its share of such borrowing available to the Administrative Agent, the Administrative Agent may assume that such Lender is making such amount available to the Administrative Agent, and the Administrative Agent may, in reliance upon such assumption, make available to the applicable Borrower a corresponding amount.  If such amount is not made available to the Administrative Agent by the required time on the Borrowing Date therefor, such Lender shall pay to the Administrative Agent, on demand, such amount with interest thereon, at a rate equal to the daily average Federal Funds Effective Rate plus any administrative costs for the period until such Lender makes such amount immediately available to the Administrative Agent.  A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this paragraph shall be conclusive in the absence of manifest error.  If such Lender's share of such borrowing is not made available to the Administrative Agent by such Lender within three Business Days after such Borrowing Date, the Administrative Agent shall also be entitled to recover such amount with interest thereon at the rate per annum applicable to ABR Loans, on demand, from the relevant Borrower.

(e)    Unless the Administrative Agent shall have been notified in writing by the Borrowers prior to the date of any payment due to be made by the Borrowers hereunder that the Borrowers will not make such payment to the Administrative Agent, the Administrative Agent may assume that the Borrowers are making such payment, and the Administrative Agent may,

but shall not be required to, in reliance upon such assumption, make available to the Lenders their respective pro rata shares of a corresponding amount. If such payment is not made to the Administrative Agent by the Borrowers within three Business Days after such due date, the Administrative Agent shall be entitled to recover, on demand, from each Lender to which any amount which was made available pursuant to the preceding sentence, such amount with interest thereon at the rate per annum equal to the daily average Federal Funds Effective Rate. Nothing herein shall be deemed to limit the rights of the Administrative Agent or any Lender against either Borrower.

        2.17   Requirements of Law. (a) If the adoption of or any change in any Requirement of Law or in the interpretation or application thereof or compliance by any Lender or any Issuing Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the date hereof:

        (i)     shall subject any Lender to any tax of any kind whatsoever with respect to this Agreement, any Letter of Credit, any Application or any Eurodollar Loan made by it, or change the basis of taxation of payments to such Lender in respect thereof (except for Non-Excluded Taxes covered by Section 2.18 and changes in the rate of tax on the overall net income of such Lender);

        (ii)    shall impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, loans or other extensions of credit by, or any other acquisition of funds by, any office of such Lender or such Issuing Lender that is not otherwise included in the determination of the Eurodollar Rate; or

        (iii)   shall impose on such Lender any other condition;

and the result of any of the foregoing is to increase the cost to such Lender or such Issuing Lender, by an amount that such Lender deems to be material, of making, converting into, continuing or maintaining Eurodollar Loans or issuing Letters of Credit, or to reduce any amount receivable hereunder in respect thereof, then, in any such case, the Borrowers shall promptly pay such Lender or such Issuing Lender, upon its demand, any additional amounts necessary to compensate such Lender or such Issuing Lender for such increased cost or reduced amount receivable. If any Lender or any Issuing Lender becomes entitled to claim any additional amounts pursuant to this paragraph, it shall promptly notify the Borrowers (with a copy to the Administrative Agent) of the event by reason of which it has become so entitled.

        (b)    If any Lender or any Issuing Lender shall have determined that the adoption of or any change in any Requirement of Law regarding capital adequacy or in the interpretation or application thereof or compliance by such Lender or such Issuing Lender or any corporation controlling such Lender or such Issuing Lender with any request or directive regarding capital adequacy (whether or not having the force of law) from any Governmental Authority made subsequent to the date hereof shall have the effect of reducing the rate of return on such Lender's, such Issuing Lender's or such corporation's capital as a consequence of its obligations hereunder or under or in respect of any Letter of Credit to a level below that which such Lender or such corporation could have achieved but for such adoption, change or

compliance (taking into consideration such Lender's or such corporation's policies with respect to capital adequacy) by an amount deemed by such Lender to be material, then from time to time, after submission by such Lender to the Borrowers (with a copy to the Administrative Agent) of a written request therefor, the Borrowers shall pay to such Lender such additional amount or amounts as will compensate such Lender or such corporation for such reduction.

(c)     A certificate as to any additional amounts payable pursuant to this Section submitted by any Lender to the Borrowers (with a copy to the Administrative Agent) shall be conclusive in the absence of manifest error.  Notwithstanding anything to the contrary in this Section, the Borrowers shall not be required to compensate a Lender pursuant to this Section for any amounts incurred more than nine months prior to the date that such Lender notifies the Borrowers of such Lender's intention to claim compensation therefor; provided that, if the circumstances giving rise to such claim have a retroactive effect, then such nine-month period shall be extended to include the period of such retroactive effect.  The obligations of the Borrowers pursuant to this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.18     Taxes.  (a)  All payments made by the Borrowers under this Agreement shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, excluding (i) net income or profits taxes (including branch profits or similar taxes) and franchise taxes (imposed in lieu of net income taxes) imposed on the Administrative Agent or any Lender as a result of a present or former connection between the Administrative Agent or such Lender and the jurisdiction of the Governmental Authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from the Administrative Agent or such Lender having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or any other Loan Document) and (ii) any taxes imposed on a Lender (or Transferee) and the Administrative Agent that is not a "U.S. Person" as defined in Section 7701(a)(30) of the Code (a "Non-U.S. Lender") as a result of such Lender's or the Administrative Agent's (in the event the Lender acting as Administrative Agent is a Non-U.S. Lender) failure to satisfy the reporting requirements as set forth in any statute enacted (or regulation or administrative guidance promulgated thereunder) after the date hereof that is based on, or similar to, the "Foreign Account Tax Compliance Act of 2009 (HR 3933, S. 1934).  If any such non-excluded taxes, levies, imposts, duties, charges, fees, deductions or withholdings ("Non-Excluded Taxes") or Other Taxes are required to be withheld from any amounts payable to the Administrative Agent or any Lender hereunder, the amounts so payable to the Administrative Agent or such Lender shall be increased to the extent necessary to yield to the Administrative Agent or such Lender (after payment of all Non-Excluded Taxes and Other Taxes) interest or any such other amounts payable hereunder at the rates or in the amounts specified in this Agreement, provided, however, that the Borrowers shall not be required to increase any such amounts payable to any Lender or the Administrative Agent with respect to any Non-Excluded Taxes (i) that are attributable to the Administrative Agent's or such Lender's failure to comply with the requirements of paragraph (d), (e) or (f) of this Section or (ii) that are withholding taxes imposed by the United States or any jurisdiction to which a Lender or the Administrative Agent has a present or former connection on amounts payable to such Lender or the Administrative Agent at

the time such Lender or the Administrative Agent becomes a party to this Agreement, except to the extent that the Administrative Agent's or such Lender's assignor (if any) was entitled, at the time of assignment, to receive additional amounts from the Borrowers with respect to such withholding taxes pursuant to this paragraph.

(b)     In addition, the Borrowers shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)     Whenever any Non-Excluded Taxes or Other Taxes are payable by either Borrower, as promptly as possible thereafter such Borrower shall send to the Administrative Agent for its own account or for the account of the relevant Lender, as the case may be, a certified copy of an original official receipt received by such Borrower (to the extent available) or other reasonable documentary evidence satisfactory to such Lender showing payment thereof. If either Borrower fails to pay any Non-Excluded Taxes or Other Taxes when due to the appropriate taxing authority or fails to remit to the Administrative Agent the required receipts or other required documentary evidence, the Borrowers shall indemnify the Administrative Agent and the Lenders for any incremental taxes, interest or penalties that may become payable by the Administrative Agent or any Lender as a result of any such failure.

(d)     (i) Each Lender (or Transferee) and the Administrative Agent that is a Non-U.S. Lender shall deliver to the Borrowers and the Administrative Agent (or, in the case of a Participant, to the Lender from which the related participation shall have been purchased) two duly completed, accurate and original executed copies of either U.S. Internal Revenue Service Form W-8BEN or Form W-8ECI, or, in the case of a Non-U.S. Lender claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest", a statement substantially in the form of Exhibit F and a Form W-8BEN, or any subsequent versions thereof or successors thereto, properly completed and duly executed by such Non-U.S. Lender claiming complete exemption from, or a reduced rate of, U.S. federal withholding tax on all payments by the Borrowers under this Agreement and the other Loan Documents. Such forms shall be delivered by each Non-U.S. Lender on or before the date it becomes a party to this Agreement (or, in the case of any Participant, on or before the date such Participant purchases the related participation). In addition, each Non-U.S. Lender shall deliver such forms promptly upon the obsolescence or invalidity of any form previously delivered by such Non-U.S. Lender. Each Non-U.S. Lender shall promptly notify the Borrowers at any time it determines that it is no longer in a position to provide any previously delivered certificate to the Borrowers (or any other form of certification adopted by the U.S. taxing authorities for such purpose). Notwithstanding any other provision of this paragraph, a Non-U.S. Lender shall not be required to deliver any form pursuant to this paragraph that such Non-U.S. Lender is not legally able to deliver.

(ii)     Each Non-U.S. Lender, to the extent it does not act or ceases to act for its own account with respect to any portion of any sums paid or payable to such Lender under any of the Loan Documents (for example, in the case of a typical participation by such Lender), shall deliver to the Administrative Agent on the date when such Non-U.S. Lender ceases to act for its own account with respect to any portion of any such sums paid or payable, and at such other times as may be necessary in the determination of the Administrative Agent (in the reasonable exercise of its discretion), (x) two duly signed completed copies of the forms or statements

required to be provided by such Lender as set forth above, to establish the portion of any such sums paid or payable with respect to which such Lender acts for its own account that is not subject to U.S. withholding tax, and (y) two duly signed original completed copies of IRS Form W-8IMY (or any successor thereto), together with any information required to be transmitted with such form, and any other certificate or statement of exemption required under the Code, to establish that such Lender is not acting for its own account with respect to a portion of any such sums payable to such Lender.

(e)     Upon the request of the Administrative Agent, each Lender that is a "United States person" within the meaning of Section 7701(a)(30) of the Code shall deliver to the Administrative Agent two duly signed original completed copies of IRS Form W-9. If such Lender fails to deliver such forms, then the Administrative Agent may withhold from any interest payment to such Lender an amount equivalent to the applicable back-up withholding tax imposed by the Code, without reduction.

(f)     A Lender or the Administrative Agent that is entitled to an exemption from or reduction of non-U.S. withholding tax under the law of the jurisdiction in which either Borrower is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to such Borrower (with a copy to the Administrative Agent), at the time or times prescribed by applicable law or reasonably requested by such Borrower, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate, provided that such Lender is legally entitled to complete, execute and deliver such documentation and in such Lender's judgment such completion, execution or submission would not materially prejudice the legal position of such Lender.

(g)     If the Administrative Agent or any Lender determines, in its sole reasonable discretion, that it has received a refund (or credit which it has elected to receive in lieu of such refund) of any Non-Excluded Taxes or Other Taxes as to which it has been indemnified by a Borrower or with respect to which a Borrower has paid additional amounts pursuant to this Section 2.18, it shall pay over such refund (or credit which it has elected to receive in lieu of such refund) to such Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by such Borrower under this Section 2.18 with respect to the Non-Excluded Taxes or Other Taxes giving rise to such refund (or credit which it has elected to receive in lieu of such refund)), net of all out-of-pocket expenses of the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund (or credit which it has elected to receive in lieu of such refund)); provided, that such Borrower, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to such Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority. This paragraph shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes which it deems confidential) to the Borrowers or any other Person.

(h)     If any Governmental Authority asserts that the Administrative Agent did not properly withhold or backup withhold, as the case may be, any tax or other amount from

payments made to or for the account of any Lender, such Lender shall indemnify the Administrative Agent therefor, including all penalties and interest, any taxes imposed by any jurisdiction on the amounts payable to the Administrative Agent under this Section, and costs and expenses (including attorney fees) of the Administrative Agent.

(i)     Each of the Administrative Agent and each Lender agrees that it will contest a Non-Excluded Tax at the Borrowers' expense if (i) the Borrowers furnish to it an opinion of White & Case LLP or such other reputable tax counsel (such counsel being reasonably acceptable to the relevant Lender or the Administrative Agent, as the case may be) to the effect that such Non-Excluded Tax was wrongfully or illegally imposed, and (ii) the Administrative Agent or such Lender determines, in its sole reasonable discretion, that it, or in the case of such Lender, its applicable lending office, would not be materially disadvantaged or prejudiced in any manner whatsoever as a result of such contest.

(j)     The agreements in this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.19    Indemnity.  The Borrowers agree to indemnify each Lender for, and to hold each Lender harmless from, any loss or expense that such Lender may sustain or incur as a consequence of (a) default by either Borrower in making a borrowing of, conversion into or continuation of Eurodollar Loans after such Borrower has given a notice requesting the same in accordance with the provisions of this Agreement, (b) default by either Borrower in making any prepayment of or conversion from Eurodollar Loans after such Borrower has given a notice thereof in accordance with the provisions of this Agreement or (c) the making of a prepayment of Eurodollar Loans on a day that is not the last day of an Interest Period with respect thereto.  Such indemnification may include an amount equal to the excess, if any, of (i) the amount of interest that would have accrued on the amount so prepaid, or not so borrowed, converted or continued, for the period from the date of such prepayment or of such failure to borrow, convert or continue to the last day of such Interest Period (or, in the case of a failure to borrow, convert or continue, the Interest Period that would have commenced on the date of such failure) in each case at the applicable rate of interest for such Loans provided for herein (excluding, however, the Applicable Margin included therein, if any) over (ii) the amount of interest (as reasonably determined by such Lender) that would have accrued to such Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the interbank eurodollar market.  A certificate as to any amounts payable pursuant to this Section submitted to the Borrowers by any Lender shall be conclusive in the absence of manifest error.  This covenant shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.20    Change of Lending Office; Replacement of Lenders.  (a)  Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 2.17 or 2.18(a) with respect to such Lender, it will, if requested by the Borrowers, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event with the object of avoiding the consequences of such event; provided, that such designation is made on terms that, in the sole judgment of such Lender, cause such Lender and its lending office(s) to suffer no economic, legal or regulatory disadvantage, and

provided, further, that nothing in this Section shall affect or postpone any of the obligations of the Borrowers or the rights of any Lender pursuant to Section 2.17 or 2.18(a).

(b)     At their sole expense and effort, the Borrowers shall be permitted to replace any Lender that (a) requests reimbursement for amounts owing pursuant to Section 2.17 or 2.18(a), (b) is a Defaulting Lender or (c) is a Non-Consenting Lender, with a replacement financial institution upon notice to such Lender and the Administrative Agent; provided that (i) such replacement does not conflict with any Requirement of Law, (ii) no Event of Default shall have occurred and be continuing after giving effect to such replacement, (iii) in the case of any such replacement resulting from a claim for compensation under Section 2.17 or payments required to be made pursuant to Section 2.18(a), prior to any such replacement, such Lender shall have taken no action under Section 2.20(a) so as to eliminate the continued need for payment of amounts owing pursuant to Section 2.17 or 2.18(a), (iv) in the case of any such replacement resulting from a Lender's being a Non-Consenting Lender, prior to any such replacement, such Lender shall not have granted the relevant consent, (v) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts), (vi) the Borrower shall be liable to such replaced Lender under Section 2.19 if any Eurodollar Loan owing to such replaced Lender shall be purchased other than on the last day of the Interest Period relating thereto, (vii) the replacement financial institution, if not already a Lender, shall be reasonably satisfactory to the Administrative Agent, (viii) the replaced Lender shall be obligated to make such replacement in accordance with the provisions of Section 10.6 (provided that the Borrower shall be obligated to pay the registration and processing fee referred to therein), (ix) in the case of any such assignment resulting from a claim for compensation under Section 2.17 or payments required to be made pursuant to Section 2.18(a), such assignment will result in a reduction in such compensation or payments, (x) until such time as such replacement shall be consummated, the Borrower shall pay all additional amounts (if any) required pursuant to Section 2.17 or Section 2.18(a), as the case may be, and (xi) any such replacement shall not be deemed to be a waiver of any rights that the Borrower, the Administrative Agent or any other Lender shall have against the replaced Lender.


# SECTION 3.   LETTERS OF CREDIT

3.1     <u>L/C Commitment</u>. (a) Subject to the terms and conditions hereof, each Issuing Lender agrees to issue Letters of Credit for the account of either Borrower on any Business Day during the Commitment Period in such form as may be approved from time to time by such Issuing Lender (such letters of credit, the "<u>Letters of Credit</u>"); provided that an Issuing Lender shall not issue any Letter of Credit if, after giving effect to such issuance, the L/C Obligations would exceed the L/C Commitment. Each Letter of Credit (i) shall be denominated in Dollars or in Canadian dollars and (ii) shall expire no later than the first anniversary of its date of issuance.

(b)     No Issuing Lender shall at any time be obligated to issue any Letter of Credit if such issuance would conflict with, or cause such Issuing Lender to exceed any limits imposed by, any applicable Requirement of Law.

(c)     In addition to the terms and conditions (including limitations) set forth herein with respect to Letters of Credit, it shall be a condition precedent to the issuance of a Letter of Credit that the Borrowers deposit cash and/or Cash Equivalents in an amount at least equal to 105% of the face amount of such Letters of Credit into an account (the "L/C Cash Collateral Account") established by the Borrowers under the sole and exclusive control of the Administrative Agent pursuant to documentation in form and substance satisfactory to the Administrative Agent and the applicable Issuing Lender (which documents are hereby consented to by the Lenders). The Borrowers hereby grant to the Administrative Agent, for the benefit of the Secured Parties (as defined in the Guarantee and Collateral Agreement), a security interest in all such cash and/or Cash Equivalents in the L/C Cash Collateral Account and all proceeds of the foregoing. If, on the 90th day after the Closing Date, the Administrative Agent determines that as a result in fluctuations in the exchange rate of the Canadian Dollar against the U.S. Dollar, the amount then on deposit in the L/C Cash Collateral Account is less than 105% of the face amount of all outstanding Letters of Credit, the Administrative Agent shall notify the Borrowers of such deficiency and the Borrowers shall promptly (and, in any event, within two (2) Business Days of such notice) deposit cash and/or Cash Equivalents in an amount equal to such deficiency into the L/C Cash Collateral Account.

3.2     Procedure for Issuance of Letter of Credit. The Borrowers may from time to time request that an Issuing Lender issue a Letter of Credit by delivering to such Issuing Lender at its address for notices specified herein an Application therefor, completed to the satisfaction of such Issuing Lender, and such other certificates, documents and other papers and information as such Issuing Lender may request. Upon receipt of any Application, the applicable Issuing Lender will process such Application and the certificates, documents and other papers and information delivered to it in connection therewith in accordance with its customary procedures and shall promptly issue the Letter of Credit requested thereby (but in no event shall such Issuing Lender be required to issue any Letter of Credit earlier than three Business Days after its receipt of the Application therefor and all such other certificates, documents and other papers and information relating thereto) by issuing the original of such Letter of Credit to the beneficiary thereof or as otherwise may be agreed to by such Issuing Lender and the relevant Borrower. The applicable Issuing Lender shall furnish a copy of such Letter of Credit to such Borrower promptly following the issuance thereof. Such Issuing Lender shall promptly furnish to the Administrative Agent, which shall in turn promptly furnish to the Lenders, notice of the issuance of each Letter of Credit (including the amount thereof).

3.3     Fees and Other Charges. (a) The Borrowers shall pay to the applicable Issuing Lender for its own account a fronting fee of 0.25% per annum (calculated on the basis of a 360-day year for the actual days elapsed) on the undrawn and unexpired amount of each Letter of Credit, payable quarterly in arrears on the last Business Day of each March, June, September and December occurring after the issuance date. In addition, on the date that a Letter of Credit is issued pursuant to the terms hereof, the Borrowers shall pay an application fee to each Issuing Lender in an amount equal to 2.50% of the face amount of such Letter of Credit.

(b)     In addition to the foregoing fees, the Borrowers shall pay or reimburse such Issuing Lender for such normal and customary costs and expenses as are incurred or charged by such Issuing Lender in issuing, negotiating, effecting payment under, amending or otherwise administering any Letter of Credit.

(c)     For purposes of determining fees payable in respect of Letters of Credit pursuant to this Section 3.3, all such Dollar Equivalent face amounts of the Letters of Credit shall be determined on the date of issuance of such Letter of Credit using the Dollar Equivalent of the amount of such Letters of Credit and shall be payable in Dollars.

3.4     [INTENTIONALLY DELETED]

3.5     Reimbursement Obligation of the Borrowers.     (a) If any draft is paid under any Letter of Credit, the relevant Borrower shall reimburse the applicable Issuing Lender for the amount of (a) the draft so paid and (b) any taxes, fees, charges or other costs or expenses incurred by the Issuing Lender in connection with such payment, not later than 2:00 P.M., New York City time, on (i) the Business Day that such Borrower receives notice of such draft, if such notice is received on such day prior to 12:00 Noon, New York City time, or (ii) if clause (i) above does not apply, the Business Day immediately following the day that such Borrower receives such notice (each such date, the "Honor Date").  Each such payment shall be made to the applicable Issuing Lender at its address for notices referred to herein in the denominated currency of such Letter of Credit and in immediately available funds.  Interest shall be payable on any such amounts from the date on which the relevant draft is paid until payment in full at the rate set forth in (x) until the Business Day next succeeding the date of the relevant notice, Section 2.13(b) and (y) thereafter, Section 2.13(c).

(b)     If the Borrowers fail to reimburse the applicable Issuing Lender by the Honor Date, such Issuing Lender shall promptly deliver to the Administrative Agent a notice stating the Honor Date and the amount of the unreimbursed drawing (the "Unreimbursed Amount").  Upon receipt of such notice, the Administrative Agent shall direct that funds, in an amount equal to the Unreimbursed Amount, be paid to the applicable Issuing Lender to reimburse such Issuing Lender for such Unreimbursed Amount from amounts on deposit in or otherwise credited to the L/C Cash Collateral Account.

3.6     Obligations Absolute.  Each Borrower's obligations under this Section 3 shall be absolute and unconditional under any and all circumstances and irrespective of any setoff, counterclaim or defense to payment that such Borrower may have or have had against an Issuing Lender, any beneficiary of a Letter of Credit or any other Person.  Each Borrower also agrees with each Issuing Lender that such Issuing Lender shall not be responsible for, and such Borrower's Reimbursement Obligations under Section 3.5 shall not be affected by, among other things, the validity or genuineness of documents or of any endorsements thereon, even though such documents shall in fact prove to be invalid, fraudulent or forged, or any dispute between or among such Borrower and any beneficiary of any Letter of Credit or any other party to which such Letter of Credit may be transferred or any claims whatsoever of such Borrower against any beneficiary of such Letter of Credit or any such transferee.  No Issuing Lender shall be liable for any error, omission, interruption or delay in transmission, dispatch or delivery of any message or advice, however transmitted, in connection with any Letter of Credit, except for errors or

omissions found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Issuing Lender. Each Borrower agrees that any action taken or omitted by an Issuing Lender under or in connection with any Letter of Credit or the related drafts or documents, if done in the absence of gross negligence or willful misconduct, shall be binding on such Borrower and shall not result in any liability of such Issuing Lender to such Borrower.

3.7    Letter of Credit Payments. If any draft shall be presented for payment under any Letter of Credit, the applicable Issuing Lender shall promptly notify the Borrowers of the date and amount thereof. The responsibility of any Issuing Lender to the relevant Borrower in connection with any draft presented for payment under any Letter of Credit shall, in addition to any payment obligation expressly provided for in such Letter of Credit, be limited to determining that the documents (including each draft) delivered under such Letter of Credit in connection with such presentment are substantially in conformity with such Letter of Credit.

3.8    Applications. To the extent that any provision of any Application related to any Letter of Credit is inconsistent with the provisions of this Section 3, the provisions of this Section 3 shall apply.

SECTION 4.    REPRESENTATIONS AND WARRANTIES

To induce the Administrative Agent, the Lenders and the Issuing Lenders to enter into this Agreement and to make the Loans and issue Letters of Credit, each Holdco and each Borrower hereby jointly and severally represent and warrant to the Administrative Agent, each Lender and each Issuing Lender that:

4.1    Financial Condition. The audited combined balance sheet of the Holdcos and their respective consolidated Subsidiaries (net of all appropriate intercompany eliminations) as at December 31, 2008 and the related audited combined statements of income and of cash flows (net of all appropriate intercompany eliminations) for the fiscal year ended on such date, present fairly in all material respects the combined financial condition of such Persons as at such date, and the combined results of their operations and their combined cash flows for the fiscal year then ended. Such financial statements, including the related schedules and notes thereto, have been prepared in accordance with GAAP applied consistently throughout the periods involved (except as approved by Pricewaterhouse Coopers and disclosed therein). No Group Member has any material Guarantee Obligations, contingent liabilities and liabilities for taxes, or any long-term leases or unusual forward or long-term commitments, including any interest rate or foreign currency swap or exchange transaction or other obligation in respect of derivatives, that are not reflected in the most recent financial statements referred to in this paragraph. During the period from December 31, 2008 to and including the date hereof there has been no Disposition by any Group Member of any material part of its business or property.

4.2    No Change. Since December 31, 2008, there has been no development or event that has had or could reasonably be expected to have a Material Adverse Effect, except (i) the commencement of the Chapter 11 Cases and (ii) the continuation of the circumstances giving rise to the filing thereof or as a result thereof.

4.3     Existence; Good Standing; Compliance with Law.  Each Group Member (a) is duly organized, validly existing and (except as set forth on Schedule 4.3) in good standing (or, if applicable in a foreign jurisdiction, enjoys the equivalent status under the laws of any foreign jurisdiction of organization) under the laws of the jurisdiction of its organization, (b) has the power and authority, and the legal right, to own and operate its property, to lease the property it operates as lessee and to conduct the business in which it is currently engaged, (c) except as set forth on Schedule 4.3, is duly qualified as a foreign corporation or other organization and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification except where the failure to be so qualified or in good standing could not reasonably be expected, in the aggregate, to have a Material Adverse Effect and (d) is in compliance with all Requirements of Law except to the extent that the failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

4.4     Power; Authorization; Enforceable Obligations.  Subject to the entry and effectiveness of the Financing Orders, each Loan Party has the power and authority, and the legal right, to make, deliver and perform the Loan Documents to which it is a party and, in the case of the Borrowers, to obtain extensions of credit hereunder.  Each Loan Party has taken all necessary organizational action to authorize the execution, delivery and performance of the Loan Documents to which it is a party and, in the case of the Borrowers, to authorize the extensions of credit on the terms and conditions of this Agreement.  No consent or authorization of, filing with, notice to or other act by or in respect of, any Governmental Authority or any other Person is required in connection with the extensions of credit hereunder or with the execution, delivery, performance, validity or enforceability of this Agreement or any of the Loan Documents, except (i) the Financing Orders, (ii) consents, authorizations, filings and notices described in Schedule 4.4, which consents, authorizations, filings and notices have been obtained or made and are in full force and effect and (iii) such consents, authentications, filings and notices the failure to obtain which could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.  Each Loan Document has been duly executed and delivered on behalf of each Loan Party party thereto.  Upon entry of the Interim Order (and, as applicable, the Final Order), this Agreement constitutes, and each other Loan Document upon execution will constitute, a legal, valid and binding obligation of each Loan Party party thereto, enforceable against each such Loan Party in accordance with its terms.

4.5     No Legal Bar.  The execution, delivery and performance of this Agreement and the other Loan Documents, the issuance of Letters of Credit, the borrowings hereunder and the use of the proceeds thereof will not violate any Requirement of Law or any Contractual Obligation of any Group Member (except to the extent that any such violations could not, in the aggregate, reasonably be expected to have a Material Adverse Effect) and will not result in, or require, the creation or imposition of any Lien on any of their respective properties or revenues pursuant to any Requirement of Law or any such Contractual Obligation (other than the Liens created by the Security Documents and the Financing Orders).  No Requirement of Law or Contractual Obligation applicable to Holdings or any of its Subsidiaries would reasonably be expected to have a Material Adverse Effect.

4.6     Litigation.  Other than the Chapter 11 Cases, no litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the

knowledge of either Holdco or either Borrower, threatened by or against any Group Member or against any of their respective properties or revenues (a) with respect to any of the Loan Documents or any of the transactions contemplated hereby or thereby, or (b) that could reasonably be expected to have a Material Adverse Effect.

4.7     No Default. No Group Member is in default under or with respect to any of its Contractual Obligations (other than with respect to Indebtedness) in any respect that could reasonably be expected to have a Material Adverse Effect.

4.8     Ownership of Property; Liens. Each Group Member has title in fee simple to, or a valid leasehold interest in, all its real property, and good title to, or a valid leasehold interest in, all its other property, and none of such property is subject to any Lien except as permitted by Section 7.3.

4.9     Intellectual Property. Each Group Member owns, or has the rights to use, all Intellectual Property necessary for the conduct of its business as currently conducted. Except as could not reasonably be expected to have a Material Adverse Effect, no claim has been asserted and is pending by any Person challenging or questioning the use of any Intellectual Property or the validity or effectiveness of any Intellectual Property owned by any Group Member, nor does either Holdco or either Borrower know of any valid basis for any such claim. Except as could not reasonably be expected to have a Material Adverse Effect, the operation of the business of each Group Member does not infringe on the Intellectual Property rights of any Person.

4.10     Taxes. Each Group Member has filed or caused to be filed all material Federal, state and other tax returns that are required to be filed and has paid all taxes shown to be due and payable on said returns or on any assessments made against it or any of its property and all other material taxes, fees or, except as prohibited by the Bankruptcy Code, other charges imposed on it or any of its property by any Governmental Authority (other than any which are not yet delinquent or the amount or validity of which are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of the relevant Group Member); except as set forth on Schedule 7.3(f) and except as otherwise permitted pursuant to Section 7.3(a) no tax Lien has been filed, and, to the knowledge of the Holdcos and the Borrowers, no claim is being asserted, with respect to any such tax, fee or other charge. All taxes which the Borrowers are (or were) required by law to withhold or collect in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder or other third party have been duly withheld or collected, and have been timely paid over to the proper authorities to the extent due and payable, except to the extent the failure to withhold or collect any such taxes could not, in the aggregate, reasonably be expected to result in a Material Adverse Effect.

4.11     Federal Regulations. No part of the proceeds of any Loans, and no other extensions of credit hereunder, will be used (a) for "buying" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U as now and from time to time hereafter in effect for any purpose that violates the provisions of the Regulations of the Board or (b) for any purpose that violates the provisions of the Regulations of the Board. If reasonably requested by any Lender or the Administrative Agent, the Borrowers will furnish to

the Administrative Agent and each Lender a statement to the foregoing effect in conformity with the requirements of FR Form G-3 or FR Form U-1, as applicable, referred to in Regulation U.

4.12 <u>Labor Matters</u>. Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect: (a) there are no strikes or other labor disputes against any Group Member pending or, to the knowledge of either Holdco or either Borrower, threatened; (b) hours worked by and payment made to employees of each Group Member have not been in violation of the Fair Labor Standards Act or any other applicable Requirement of Law dealing with such matters; (c) all payments due from any Group Member on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the relevant Group Member; (d) the Borrowers have complied in all material respects with all Requirements of Law relating to the hiring and retention of all employees, leased employees and independent contractors relating to classification, wages, hours, equal opportunity and collective bargaining; and (e) each Borrower has classified all individuals who perform services for it correctly under each employee benefit plan, ERISA, the Code and other applicable law as common law employees, independent contractors or leased employees.

4.13 <u>ERISA</u>. Neither a Reportable Event nor an "accumulated funding deficiency" (within the meaning of Section 412 of the Code or Section 302 of ERISA) has occurred during the five-year period prior to the date on which this representation is made with respect to any Plan, and each Plan has complied in all respects with the applicable provisions of ERISA and the Code, except with respect to all of the foregoing events, individually and in the aggregate, as could not reasonably be expected to have a Material Adverse Effect. No termination of a Single Employer Plan has occurred, and no Lien in favor of the PBGC or a Plan has arisen, during such five-year period which has resulted in any material liability that remains unsatisfied. The present value of all accrued benefits under each Single Employer Plan (based on those assumptions used to fund such Plans) did not, as of the last annual valuation date prior to the date on which this representation is made, exceed the value of the assets of such Plan allocable to such accrued benefits by an amount which could result in a material liability to the Borrowers or to any Commonly Controlled Entity under ERISA. Neither the Borrowers nor any Commonly Controlled Entity has had a complete or partial withdrawal from any Multiemployer Plan that has resulted or could reasonably be expected to result in a material liability under ERISA. Neither the Borrowers nor any Commonly Controlled Entity would become subject to any material liability under ERISA if the Borrowers or any such Commonly Controlled Entity were to withdraw completely from all Multiemployer Plans as of the valuation date most closely preceding the date on which this representation is made, except as could not reasonably be expected to have a Material Adverse Effect. No such Multiemployer Plan is in Reorganization or Insolvent, except as could not result in a material liability to the Borrowers or to any Commonly Controlled Entity under ERISA.

4.14 <u>Investment Company Act</u>. No Loan Party is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended.

4.15 <u>Subsidiaries</u>. On the Closing Date, (a) Schedule 4.15 sets forth the name and jurisdiction of incorporation of each Subsidiary of Holdings and, as to each such Subsidiary of the Borrowers, the percentage of each class of Capital Stock owned by Holdings or any Loan

Party and (b) there are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments (other than stock options granted to employees or directors and directors' qualifying shares) of any nature relating to any Capital Stock of Holdings or any Subsidiary, except (i) as set forth on Schedule 4.15, (ii) pursuant to the LLC Agreement and (iii) as created by the Loan Documents. Holdings has no direct Subsidiaries other than Levlad Holdco and Arbonne Holdco. Levlad Holdco and Arbonne Holdco have no direct Subsidiaries other than, respectively, Levlad and Arbonne.

      4.16    <u>Agreed Budget; Use of Proceeds</u>.  A true and complete copy of the initial 13-week detailed budget (such initial budget, as updated in accordance with the provisions of Section 6.2(n), the "<u>Agreed Budget</u>"), which shall be in form and substance satisfactory to the Administrative Agent and the Lenders is attached as Exhibit K hereto.  The proceeds of the Loans shall be used for general corporate purposes and as otherwise permitted under the Agreed Budget.

      4.17    <u>Environmental Matters</u>.  Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect:

      (a)    the facilities and properties owned, leased or operated by any Group Member (the "<u>Properties</u>") do not contain, and have not previously contained, any Materials of Environmental Concern in amounts or concentrations or under circumstances that constitute or constituted a violation of, or could give rise to liability under, any Environmental Law;

      (b)    no Group Member has received or is aware of any pending or threatened notice of violation, alleged violation, non-compliance, liability or potential liability regarding environmental matters or compliance with Environmental Laws with regard to any of the Properties or the business operated by any Group Member (the "<u>Business</u>");

      (c)    Materials of Environmental Concern have not been transported or disposed of from the Properties in violation of, or in a manner or to a location that could give rise to liability under, any Environmental Law, nor have any Materials of Environmental Concern been generated, treated, stored or disposed of at, on or under any of the Properties in violation of, or in a manner that could give rise to liability under, any applicable Environmental Law;

      (d)    no judicial proceeding or governmental or administrative action is pending or, to the knowledge of the Holdcos and the Borrowers, threatened, under any Environmental Law to which any Group Member is or will be named as a party with respect to the Properties or the Business, nor are there any consent decrees or other decrees, consent orders, administrative orders or other orders, or other administrative or judicial requirements outstanding under any Environmental Law with respect to the Properties or the Business;

      (e)    there has been no release or threat of release of Materials of Environmental Concern at or from the Properties, or arising from or related to the operations of any Group Member in connection with the Properties or otherwise in

connection with the Business, in violation of or in amounts or in a manner that could give rise to liability under Environmental Laws;

(f) the Properties and all operations at the Properties are in compliance, and have in the last five years been in compliance, with all applicable Environmental Laws, and there is no contamination at, under or about the Properties or violation of any Environmental Law with respect to the Properties or the Business; and

(g) no Group Member has assumed any liability of any other Person under Environmental Laws.

4.18 Accuracy of Information, etc. No written statement or information contained in any document, certificate or written statement furnished by or on behalf of any Loan Party to the Administrative Agent or the Lenders, or any of them, for use in connection with the transactions contemplated by this Agreement or the other Loan Documents, contained, as of the date such statement, information, document or certificate was so furnished, any untrue statement of a material fact, taken as a whole, or omitted to state a material fact necessary to make the statements contained herein or therein, taken as whole, not materially misleading in light of the circumstances under which such statements are made. The projections and pro forma financial information contained in the materials referenced above are based upon good faith estimates and assumptions believed by management of the Borrowers to be reasonable at the time made, it being recognized by the Lenders that such financial information as it relates to future events is not to be viewed as fact and that actual results during the period or periods covered by such financial information may differ from the projected results set forth therein by a material amount.

4.19 Security Documents. (a) The Guarantee and Collateral Agreement, taken together with the Interim Order, and as applicable, the Final Order, is effective to create in favor of the Collateral Agent, for the benefit of the Administrative Agent and the Lenders, a legal, valid and enforceable first priority security interest in the Collateral described therein and proceeds thereof. Pursuant to the terms of the Interim Order and Final Order, no filing or other action will be necessary to perfect or protect such Liens and security interests. Pursuant to and to the extent provided in the Interim Order and the Final Order, the Obligations of the Loan Parties will constitute allowed administrative expense claims in the Chapter 11 Cases under Section 364(c) of the Bankruptcy Code, having priority over all administrative expense claims and unsecured claims against such Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code and all superpriority administrative expense claims granted to any other Person, subject, as to priority, only to the Carve-Out.

(b) Schedule 1.1 lists, as of the Closing Date, each parcel of owned real property and each leasehold interest in real property located in the United States and held by either Holdco or any of its Subsidiaries.

4.20 Financing Orders. (a) The Loan Parties are in compliance in all material respects with the terms and conditions of the Interim Order or the Final Order, as applicable.

(b)     Each of the Interim Order (with respect to the period from the date the Interim Order is entered until the entry of the Final Order) or the Final Order (from after the date the Final Order is entered) is in full force and effect and has not been vacated, reversed or rescinded or, without the prior written consent of the Administrative Agent, in its sole discretion, amended or modified and no appeal of such order has been timely filed or, if timely filed, no stay pending such appeal is currently effective.

4.21    Regulation H.  Except as set forth in Schedule 1.1, no improved real property owned by either Holdco or any of its Subsidiaries is located in an area that has been identified by the Secretary of Housing and Urban Development as an area having special flood hazards and in which flood insurance has been made available under the National Flood Insurance Act of 1968 (any such area, a "Flood Zone") unless a flood insurance certificate has been delivered to the Administrative Agent and the Borrowers have complied with the provisions of Section 6.5(b) to the extent so requested by the Administrative Agent.

SECTION 5.    CONDITIONS PRECEDENT

5.1    Conditions to Initial Extension of Credit.  The agreement of each Lender to make the initial extension of credit requested to be made by it is subject to the satisfaction, prior to or concurrently with the making of such extension of credit on the Closing Date, of the following conditions precedent:

(a)     Credit Agreement; Guarantee and Collateral Agreement.  The Administrative Agent shall have received (i) this Agreement, executed and delivered by the Administrative Agent, the Lenders, the Holdcos and the Borrowers, (ii) the Guarantee and Collateral Agreement, executed and delivered by the Holdcos, the Borrowers and each Subsidiary Guarantor and (iii) an Acknowledgement and Consent in the form attached to the Guarantee and Collateral Agreement, executed and delivered by each Issuer (as defined therein), if any, that is not a Loan Party.

(b)     Agreed Budget.  The Administrative Agent and the Lenders shall have received and been reasonably satisfied with the Agreed Budget.

(c)     [INTENTIONALLY DELETED].

(d)     Proceedings.  All proceedings taken in connection with the execution of this Agreement, all other Loan Documents and all documents and papers related thereto and approval thereof by the Bankruptcy Court including, without limitation, the nature, scope and extent of notices to interest parties with respect to all hearings related hereto and thereto) shall be reasonably satisfactory in form, scope and substance to the Agents and the Lenders.

(e)     First Day Orders.  All "First Day Orders" or other orders entered or to be entered at the time of the Petition Date shall be reasonably satisfactory in form and substance to the Agents and the Lenders in all respects.

(f)     Approvals.  All governmental and third party approvals (including landlords' and other consents) necessary in connection with the Transaction, the