continuing operations of the Group Members (including shareholder approvals, if any) and the transactions contemplated hereby shall have been obtained on terms reasonably satisfactory to the Administrative Agent and be in full force and effect except for such approvals or consents the failure to obtain which could not, in the aggregate, be reasonably expected to have a Material Adverse Effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose adverse conditions on the Transaction or the financing contemplated hereby.

(g)     Lien Searches. The Administrative Agent shall have received the results of a recent lien search in each relevant jurisdiction of the Loan Parties and such search shall reveal no liens on any of the assets of the Loan Parties except for liens permitted by Section 7.3 or discharged on or prior to the Closing Date pursuant to documentation reasonably satisfactory to the Administrative Agent.

(h)     Fees. The Lenders and the Administrative Agent shall have received all fees required to be paid on the Closing Date, and the Administrative Agent shall have received reimbursement for all expenses for which invoices have been presented (including the reasonable fees and expenses of legal counsel), on or before the Closing Date.

(i)     Closing Certificate; Certified Certificate of Incorporation; Good Standing Certificates. The Administrative Agent shall have received (i) a certificate of each Loan Party, dated the Closing Date, substantially in the form of Exhibit C, with appropriate insertions and attachments, including the certificate of incorporation of each Loan Party that is a corporation certified by the relevant authority of the jurisdiction of organization of such Loan Party, and (ii) a long form good standing certificate for each Loan Party from its jurisdiction of organization.

(j)     Legal Opinions. The Administrative Agent shall have received the executed legal opinion of White & Case LLP, counsel to the Holdcos and their Subsidiaries, substantially in the form of Exhibit E. Such legal opinion shall cover such matters incident to the transactions contemplated by this Agreement as the Administrative Agent may reasonably require.

(k)     Insurance. The Administrative Agent shall have received insurance certificates satisfying the requirements of Section 5.2(b) of the Guarantee and Collateral Agreement.

(l)     Interim Order. The Interim Order shall have been entered by the Bankruptcy Court, which Interim Order shall be in form and substance satisfactory to the Agents and the Lenders and shall have been entered on such prior notice to such parties in accordance with Bankruptcy Rule 4001 (as determined by the Administrative Agent), and the Agents shall have received a copy of same, and such order shall be in full force and effect and shall not have been (i) stayed, vacated, revised or rescinded or (ii) without the prior written consent of the Agents and the Lenders, in their sole discretion, amended or modified.

(m)     Environmental/Regulatory Matters. The Administrative Agent and the Lenders shall have received satisfactory evidence of (i) correction of matters identified in an agreement among the Borrowers, General Electric Capital Corporation and the Administrative Agent relating to compliance with Environmental Laws and (ii) submittal of all air permit applications required for compliance in all material respects with Environmental Laws. The Administrative Agent and the Lenders shall have received satisfactory evidence that the Loan Parties are in compliance in all material respects with applicable Environmental Laws.

(n)     Existing Letters of Credit. The Administrative Agent shall have received evidence in form and substance satisfactory to it that the Existing Letters of Credit shall have been cash collateralized by the deposit of cash and/or Cash Equivalents in an amount at least equal to 105% of the face amount of such Existing Letters of Credit into an account established by the Borrowers under the sole and exclusive control of the Prepetition Agent pursuant to documentation in form and substance satisfactory to the Prepetition Agent.

5.2     Conditions to Each Extension of Credit. The agreement of each Lender to make any extension of credit requested to be made by it on any date (including its initial extension of credit) is subject to the satisfaction of the following conditions precedent:

(a)     Representations and Warranties. Each of the representations and warranties made by any Loan Party in or pursuant to the Loan Documents shall be true and correct in all material respects on and as of such date as if made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects as of such earlier date).

(b)     No Default. No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the extensions of credit requested to be made on such date.

(c)     Financing Orders. The Interim Order or, following entry thereof, the Final Order, shall be in full force and effect, and shall not have been vacated, reversed or rescinded, and an appeal of such order shall not have been timely filed and a stay of such order pending appeal shall not be presently effective, and without the prior written consent of the Agents, such order shall not have been amended or modified.

Each borrowing by and issuance of a Letter of Credit on behalf of a Borrower hereunder shall constitute the making of a representation and warranty by the Borrowers as of the date of such extension of credit that the conditions contained in this Section 5.2 have been satisfied.

5.3     Condition to Second Extension of Credit. Notwithstanding anything to the contrary contained herein, the agreement of each Lender to make any extension of credit requested to be made by it after the Closing Date is subject to the entry of a confirmation order from the Bankruptcy Court with respect to a reorganization plan in the Chapter 11 Cases that is

consistent the terms and conditions set forth in the term sheet annexed to the Plan Support Agreement.

## SECTION 6.   AFFIRMATIVE COVENANTS

The Holdcos and the Borrowers hereby jointly and severally agree that, so long as the Commitments remain in effect, the L/C Commitment remains in effect, any Letter of Credit remains outstanding or any Loan or other amount is owing to any Lender, any Issuing Lender or the Administrative Agent hereunder, each of the Holdcos and the Borrowers shall and shall cause each of its Subsidiaries to:

6.1     <u>Financial Statements</u>.  Furnish to the Administrative Agent (for delivery to each Lender, with posting to Intralinks or any such other electronic document delivery service to constitute adequate delivery):

(a)     as soon as available, but in any event within 120 days after the end of each fiscal year of the Holdcos, a copy of the audited combined balance sheet of the Holdcos and their respective consolidated Subsidiaries (net of all appropriate intercompany eliminations) as at the end of such year and the related audited combined statements of income and of cash flows (net of all appropriate intercompany eliminations) for such year, setting forth in each case in comparative form the figures for the previous year, reported on with respect to Holdings and its consolidated Subsidiaries or either Holdco and their respective consolidated Subsidiaries, by PricewaterhouseCoopers or other independent certified public accountants of nationally recognized standing;

(b)     as soon as available, but in any event not later than 30 days after the end of each fiscal quarter of the Holdcos, the unaudited combined balance sheet of Holdings, the Holdcos and their respective consolidated Subsidiaries (net of all appropriate intercompany eliminations) as at the end of such quarter and the related unaudited combined statements of income and of cash flows (net of all appropriate intercompany eliminations) for such quarter and the portion of the fiscal year through the end of such quarter, setting forth in each case (x) in comparative form the figures for the previous year and the figures for such quarter in the Projections, certified by a Responsible Officer of each Borrower as being fairly stated in all material respects (subject to the absence of footnotes and to normal year-end audit adjustments) and (y) prepared on a consolidated and consolidating basis (such financial statements to be in the form delivered pursuant to the Prepetition Credit Agreement); and

(c)     as soon as available, but in any event not later than 30 days following the end of each month occurring during each fiscal year of the Holdcos (other than the third, sixth, ninth and twelfth such months), the unaudited combined balance sheets of Holdings, the Holdcos and their respective consolidated Subsidiaries (net of all appropriate intercompany eliminations) as at the end of such month and the related unaudited combined statements of income and of cash flows (net of all appropriate intercompany eliminations) for such month and the portion of the fiscal year through the end of such month, setting forth in each case (x) in comparative form the figures for the previous year, certified by a Responsible Officer of each Borrower as being fairly stated

in all material respects (subject to the absence of footnotes and to normal year-end audit adjustments) and (y) prepared on a consolidated and consolidating basis (such financial statements to be in the form delivered pursuant to the Prepetition Credit Agreement).

All such financial statements shall be complete and correct in all material respects and shall be prepared in reasonable detail and in accordance with GAAP applied (except as approved by such accountants or officer, as the case may be, and disclosed in reasonable detail therein) consistently throughout the periods reflected therein and with prior periods.

6.2    Certificates; Other Information. Furnish to the Administrative Agent (for delivery to each Lender, with posting to Intralinks or any such other electronic document delivery service to constitute adequate delivery):

(a)    concurrently with the delivery of the financial statements referred to in Section 6.1(a), a certificate of the independent certified public accountants reporting on such financial statements stating that in making the examination necessary therefor no knowledge was obtained of any Default or Event of Default, except as specified in such certificate;

(b)    concurrently with the delivery of any financial statements pursuant to Section 6.1, a certificate of a Responsible Officer of each Borrower stating that such Responsible Officers have obtained no knowledge of any Default or Event of Default except as specified in such certificate;

(c)    as soon as available, and in any event no later than 30 days after the end of each fiscal year of the Holdcos, a detailed combined budget of the Holdcos and their respective consolidated Subsidiaries prepared on a quarterly basis for the following fiscal year (including a projected combined balance sheet of the Holdcos and their respective consolidated Subsidiaries (net of all appropriate intercompany eliminations), the related combined statements of projected cash flow (net of all appropriate intercompany eliminations), projected changes in financial position and projected income and a description of the underlying assumptions applicable thereto), and, as soon as available, significant final management-approved revisions, if any, of such budget and projections with respect to such fiscal year (collectively, the "Projections"), which Projections shall in each case be accompanied by a certificate of a Responsible Officer of each Borrower stating that, to such Responsible Officer's knowledge, such Projections are based on estimates, information and assumptions believed to be reasonable at the time such Projections were prepared;

(d)    within 45 days after the end of each fiscal quarter of the Holdcos, a narrative discussion and analysis of (i) the financial condition and results of operations of the Holdcos and their respective Subsidiaries for such fiscal quarter and for the period from the beginning of the then current fiscal year to the end of such fiscal quarter, as compared to the portion of the Projections covering such periods and to the comparable periods of the previous year and (ii) the sources and uses of cash for such quarter (including describing such sources and uses as the wind down of excess component inventory or the use of trade credit to increase cash levels);

(e)     within five days after the same are sent, copies of all financial statements and reports that either Holdco sends to the lenders under the Holdco Credit Agreement, the holders of any other class of its debt securities (or debt obligations) or the holders of any class of its public equity securities and, within five days after the same are filed, copies of all financial statements and reports that either Holdco or either Borrower may make to, or file with, the SEC;

(f)     concurrently with the delivery of any annual financial statements pursuant to Section 6.1(a), a certificate of a Responsible Officer of Arbonne setting forth in comparative form the figures for such year in the Projections;

(g)     promptly, such additional financial and other information as the Administrative Agent (on behalf of any Lender) may from time to time reasonably request;

(h)     as soon as available, and in any event no later than 15 days following the end of each month occurring during each fiscal year of the Holdcos, a report setting forth an analysis of (i) net consultant additions by category, (ii) average order size, (iii) the number of preferred clients and (iv) the total net sales orders, in each case compared to the Borrowers' business plan annexed hereto as Exhibit G;

(i)     as soon as available, and in any event no later than 3 days following the end of each calendar week, the 'Daily Sales and Sponsoring' report of the Borrowers;

(j)     prior to the filing thereof in the Bankruptcy Court, all material filings related to the transactions contemplated by this Agreement and the other Loan Documents;

(k)     promptly, all pleadings, motions, applications, financial information and other papers and documents filed by any of the Loan Parties in any of the Chapter 11 Cases;

(l)     promptly, all written reports given by any of the Loan Parties to any official or unofficial creditors' committee in the Chapter 11 Cases;

(m)     by no later than the third (3rd) Business Day of each week as of the prior week, a comparison of actual receipts and disbursements to the projected receipts and disbursements in the Agreed Budget and a variance analysis for such week and a cumulative variance analysis from the Closing Date to such date,  together with a certificate of the chief financial officer of the Borrowers that the Loan Parties are in compliance with Section 7.17 (and with such supporting detail as the Administrative Agent and its financial advisors may request); and

(n)     by no later than the third (3rd) Business Day of every other week (commencing February 10, 2010), an updated rolling 13-week detailed budget (with such supporting detail as the Administrative Agent and its financial advisors may request); provided, that if (a) any of the material assumptions underlying the initial Agreed Budget change or (b) the Borrowers develop a more dynamic model for preparation of a budget

that materially impacts the information set forth in the initial Agreed Budget, the Borrowers may submit a proposed revised budget for the relevant 13-week period and if such revised budget is in form and substance satisfactory to the Administrative Agent and the Required Lenders, such revised budget shall become the "Agreed Budget" hereunder.

6.3     Payment of Obligations. To the extent permitted by the Bankruptcy Court and provided for in the Agreed Budget, pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all its material obligations of whatever nature (including taxes, but excluding Indebtedness), except where (a) the amount or validity thereof is currently being contested in good faith by appropriate proceedings and reserves in conformity with GAAP with respect thereto have been provided on the books of the relevant Group Member or (b) the failure to do so could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

6.4     Maintenance of Existence; Compliance. (a)(i) Preserve, renew and keep in full force and effect its organizational existence and (ii) take all reasonable action to maintain all rights, privileges and franchises necessary or desirable in the normal conduct of its business, except, in each case, as otherwise permitted by Section 7.4 and except, in the case of clause (ii) above, to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; and (b) comply with all Contractual Obligations (other than Contractual Obligations in respect of Indebtedness) and Requirements of Law except to the extent that failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

6.5     Maintenance of Property; Insurance. (a)(i) Keep all property useful and necessary in its business in good working order and condition, ordinary wear and tear excepted and (ii) maintain with financially sound and reputable insurance companies insurance on all its property in at least such amounts and against at least such risks (but including in any event public liability, product liability and business interruption) as are usually insured against in the same general area by similarly sized companies engaged in the same or a similar business.

(b)     With respect to any parcel of improved property that is located in a Flood Zone, if requested by the Administrative Agent, deliver to the Administrative Agent (i) a policy of flood insurance that (x) covers such parcel of improved property, (y) is written in an amount not less than the outstanding principal amount of the indebtedness secured thereby that is reasonably allocable to such real property or the maximum limit of coverage made available with respect to the particular type of property under the National Flood Insurance Act of 1968, whichever is less, and (z) has a term ending not later than the maturity of the indebtedness secured thereby or that may be extended to such maturity date, and (ii) confirmation that the Borrowers have received the notice required pursuant to Section 208(e)(3) of Regulation H of the Board.

6.6     Inspection of Property; Books and Records; Discussions. (a) Keep proper books of records and account in which full, true and correct entries in conformity with GAAP shall be made of all dealings and transactions in relation to its business and activities and (b) upon reasonable advance notice permit representatives of any Lender to coordinate through the Administrative Agent to visit and inspect any of its properties and examine and make

abstracts from any of its books and records at any reasonable time and as often as may reasonably be desired and to discuss the business, operations, properties and financial and other condition of the Group Members with officers and employees of the Group Members and with their independent certified public accountants.

6.7     Notices.  Promptly, after any Responsible Officer of the Holdcos or the Borrowers obtains actual knowledge thereof, give notice to the Administrative Agent (for delivery to each Lender, with posting to Intralinks or any such other electronic document delivery service to constitute adequate delivery) of:

(a)     the occurrence of any Default or Event of Default;

(b)     any (i) default or event of default under any Contractual Obligation of any Group Member or (ii) litigation, investigation or proceeding that may exist at any time between any Group Member and any Governmental Authority, that in either case, if not cured or if adversely determined, as the case may be, could reasonably be expected to have a Material Adverse Effect;

(c)     any litigation or proceeding affecting any Group Member (i) in which the amount involved is $1,000,000 or more and not covered by insurance or (ii) which relates to any Loan Document;

(d)     the following events, promptly and in any event within 30 days after either Borrower knows thereof:  (i) the occurrence of any Reportable Event with respect to any Plan, a failure to make any required material contribution to a Plan, the creation of any Lien in favor of the PBGC or a Plan or any withdrawal from, or the termination, Reorganization or Insolvency of, any Multiemployer Plan or (ii) the institution of proceedings or the taking of any other action by the PBGC or such Borrower or any Commonly Controlled Entity or any Multiemployer Plan with respect to the withdrawal from, or the termination, Reorganization or Insolvency of, any Plan; and

(e)     any development or event that has had or could reasonably be expected to have a Material Adverse Effect.

Each notice pursuant to this Section 6.7 shall be accompanied by a statement of such Responsible Officer setting forth details of the occurrence referred to therein and stating what action the relevant Group Member proposes to take with respect thereto.

6.8     Environmental Laws.  (a)  Comply with, and make commercially reasonable efforts to ensure compliance in all material respects by all tenants and subtenants, if any, with, all applicable Environmental Laws, and obtain and comply with and maintain, and make commercially reasonable efforts to ensure that all tenants and subtenants obtain and comply with and maintain, any and all licenses, approvals, notifications, registrations or permits required by applicable Environmental Laws.  For purposes of this Section 6.8(a), noncompliance by any Loan Party with any applicable Environmental Law or any license, approval, notification, registration or permit required by such Environmental Laws shall be deemed not to constitute a breach of this covenant provided that, in any case, such non-compliance, and any other

noncompliance with Environmental Law, in the aggregate, could not reasonably be expected to give rise to a Material Adverse Effect.

(b) Conduct and complete all investigations, studies, sampling and testing, and all remedial, removal and other actions required under Environmental Laws and promptly comply with all orders and directives of all Governmental Authorities regarding Environmental Laws. For purposes of this Section 6.8(b), non-compliance by any Loan Party with such actions, orders or directives shall be deemed not to constitute a breach of this covenant provided that, in any case, such non-compliance, and any other non-compliance with Environmental Laws, in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(c) Cooperate fully with a third party consultant engaged by the Lenders to conduct an audit of the Loan Parties' compliance with Environmental Laws, which audit shall take place no later than March 8, 2010, and promptly take all commercially reasonable actions required to correct any material deficiencies identified in such audit.

(d) Arrange, at their own cost and expense, for an annual audit of the Loan Parties' compliance with Environmental Laws, conducted by a third party consultant approved by the Administrative Agent (which approval shall not be unreasonably withheld), with the first such audit taking place no later than March 31, 2011 and promptly take all commercially reasonable actions required to correct any material deficiencies identified in any such audit.

6.9 [Intentionally Deleted].

6.10 Agreement to Deliver Security Documents (i) Cause all of the Collateral (including, without limitation, all owned and leased real and personal property of each Loan Party) to be subject at all times to first priority, perfected and, in the case of real property (whether leased or owned), title insured Liens in favor of the Collateral Agent to secure the Obligations pursuant to the terms and conditions hereof, the Security Documents, the Interim Order and the Final Order, and (ii) deliver such other documentation as the Collateral Agent or the Administrative Agent may reasonably request in connection with the foregoing, including, without limitation, appropriate UCC-1 financing statements, mortgages, real estate title insurance policies, surveys, environmental reports, landlord's waivers, certified resolutions and other organizational and authorizing documents of such Person, favorable opinions of counsel to such Person (which shall cover, among other things, the legality, validity, binding effect and enforceability of the documentation referred to above and the perfection of the Collateral Agent's Liens thereunder), all in form, content and scope reasonably satisfactory to the Agents.

6.11 Reinvestment Notice. Promptly, after the Borrowers shall have determined in good faith not to acquire or repair assets useful in the business of the Holdcos and their Domestic Subsidiaries with all or any portion of any Reinvestment Deferred Amount, give notice to the Administrative Agent thereof.

6.12 Subsidiaries. Within 30 days thereof, give notice to the Administrative Agent of any matter which, if existing on the Closing Date, would have been required to be set forth on Schedule 4.15.

6.13    Compliance with Financing Orders.  Comply with the Interim Order and the Final Order, as applicable, and each of the other orders entered by the Bankruptcy Court.

6.14    Financial Advisor and Agent Financial Advisor.  (a)  Continue to retain a financial advisor (the "Financial Advisor") reasonably satisfactory to the Administrative Agent and the Required Lenders to evaluate strategic alternatives and provide other financial advisory services as deemed appropriate by the Borrowers.  Reasonable direct access to the Financial Advisor shall be provided to the Administrative Agent and the Lenders in connection with the transactions contemplated hereby and the Administrative Agent's and the Lenders' review and evaluation of the operations and financial performance of the Borrowers; provided, that, in no event shall the Financial Advisor's fees exceed $150,000 per month.

(b)    Cooperate fully, and shall cause their respective employees, agents, auditors, advisors, consultants and other persons to cooperate fully, with the Administrative Agent's financial advisor (whether Capstone Advisory Group, LLC or any other consultant or advisor selected by the Administrative Agent) (the "Agent Financial Advisor") in connection with the transactions contemplated by this Agreement, the compliance by the Borrowers of the covenants and conditions under this Agreement and for continued financial advisory services as deemed appropriate by the Administrative Agent and the Required Lenders.

(c)    Deliver to the Agent Financial Advisor all substantive reports and other non-privileged work-product prepared by the Borrowers' business consultants retained to provide consulting services with respect to the Borrowers' consultant base.

6.15    Further Assurances.  Execute and deliver, or cause to be executed and delivered, to the Administrative Agent or the Collateral Agent, as the case may be, such documents and agreements, and shall take or cause to be taken such actions, as such Agent may, from time to time, reasonably request to carry out the terms and conditions of this Agreement and the other Loan Documents.

## SECTION 7.   NEGATIVE COVENANTS

The Holdcos and the Borrowers hereby jointly and severally agree that, so long as the Commitments remain in effect, the L/C Commitment remains in effect, any Letter of Credit remains outstanding or any Loan or other amount is owing to any Lender, any Issuing Lender or the Administrative Agent hereunder, each of the Holdcos and the Borrowers shall not, and shall not permit any of its Subsidiaries to, directly or indirectly:

7.1    [Intentionally Deleted].

7.2    Indebtedness.  Create, issue, incur, assume, become liable in respect of or suffer to exist any Indebtedness, except:

(a)    Indebtedness of any Loan Party pursuant to any Loan Document;

(b)    to the extent provided for in the Agreed Budget, Indebtedness of (i) either Borrower to any Wholly Owned Subsidiary Guarantor and (ii) any Wholly Owned Subsidiary Guarantor to another Wholly Owned Subsidiary Guarantor;

(c)     Guarantee Obligations incurred in the ordinary course of business by either Borrower or any of its Subsidiaries of obligations of either Borrower or any Wholly Owned Subsidiary Guarantor;

(d)     Indebtedness outstanding on the date hereof and listed on Schedule 7.2(d);[1]

(e)     Capital Lease Obligations, in an aggregate principal amount not to exceed $500,000 at any one time outstanding;

(f)     [intentionally deleted];

(g)     [intentionally deleted];

(h)     Indebtedness in respect of bid bonds, appeal bonds and similar obligations, in each case provided in the ordinary course of business, including those incurred to secure health, safety and environmental obligations in the ordinary course of business;

(i)     Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business or other cash management services in the ordinary course of business; and

(j)     Indebtedness supported by a Letter of Credit, in a principal amount not in excess of the stated amount of such Letter of Credit

7.3     Liens.  Subject to the Financing Orders, create, incur, assume or suffer to exist any Lien upon any of its property, whether now owned or hereafter acquired, except (but only to the extent, (i) if created, incurred, assumed or suffered by it on or after the Petition Date, such Liens are (A) junior to the Liens of the Collateral Agent, the Administrative Agent and the Lenders hereunder and junior to the adequate protection liens granted to the Prepetition Secured Parties pursuant to the Financing Orders and (B) approved by the Bankruptcy Court with the prior written consent of the Administrative Agent and (ii) if created, incurred, assumed or suffered by it before the Petition Date, such Liens (A) have the priority set forth in the Financing Orders and (b) are valid, perfected and enforceable and unavoidable in accordance with applicable law):

(a)     Liens for taxes not yet delinquent or that are being contested in good faith by appropriate proceedings, provided that adequate reserves with respect thereto are maintained on the books of the applicable Borrower or its Subsidiaries, as the case may be, in conformity with GAAP;

---

[1]     Schedule should include any existing intercompany debt, the Prepetition Credit Agreement and the Holdco Loan Agreement.

(b)     carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business securing obligations that are not overdue for a period of more than 45 days or that are being contested in good faith by appropriate proceedings;

(c)     pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation;

(d)     deposits to secure the performance of bids, trade contracts (other than for borrowed money), leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(e)     easements, rights-of-way, restrictions and other similar encumbrances existing on the Closing Date or incurred in the ordinary course of business that, in the aggregate, do not materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of either Borrower or any of their Subsidiaries;

(f)     Liens in existence on the date hereof listed on Schedule 7.3(f), securing Indebtedness permitted by Section 7.2(d) and other obligations described in such Schedule, provided that no such Lien is spread to cover any additional property after the Closing Date and that the amount of Indebtedness secured thereby (if any) is not increased;

(g)     Liens securing Indebtedness of either Borrower or any of their Subsidiaries permitted to be incurred pursuant to Section 7.3(e) to finance the acquisition of fixed or capital assets provided that such Liens attach only to the property financed by such Indebtedness;

(h)     Liens created pursuant to the Security Documents and the Financing Orders;

(i)     any interest or title of a lessor under any lease entered into by either Borrower or any of their Subsidiaries in the ordinary course of its business and covering only the assets so leased;

(j)     Liens securing judgments that do not constitute an Event of Default under clause (h) of Section 8;

(k)     Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of either Holdco or any of their Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Holdcos and their Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Holdcos or any of their Subsidiaries in the ordinary course of business;

(l)     Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights;

(m)     Liens securing obligations in respect of trade-related letters of credit issued on behalf of any Foreign Subsidiary in the ordinary course of business and covering the goods (or the documents of title in respect of such goods) financed by such letters of credit and the proceeds and products thereof;

(n)     licenses, leases and subleases to others in the ordinary course of business not interfering in any material respect with the business of the Holdcos and their Subsidiaries granted in a manner consistent with past practice;

(o)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(p)     [intentionally deleted];

(q)     prepayments and other credits to suppliers made in the ordinary course of business;

(r)     [intentionally deleted];

(s)     [intentionally deleted]; and

(t)     Liens arising out of licenses to use Intellectual Property permitted pursuant to Section 7.5(h).

7.4     <u>Fundamental Changes</u>.  Enter into any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of all or substantially all of its property or business, except that:

(a)     either Borrower may be merged or consolidated with or into the other Borrower;

(b)     (i) any Subsidiary of either Borrower may be merged or consolidated with or into such Borrower (<u>provided</u> that such Borrower shall be the continuing or surviving corporation) or with or into any Wholly Owned Subsidiary Guarantor of either Borrower (<u>provided</u> that the Wholly Owned Subsidiary Guarantor shall be the continuing or surviving corporation), (ii) any Subsidiary that is not a Guarantor may merge with or consolidate into any other Subsidiary that is not a Guarantor or (iii) subject to compliance with the terms of Section 5.5 of the Guarantee and Collateral Agreement, any Subsidiary (other than a Borrower) may liquidate or dissolve or change its form of entity if the Borrowers determine in good faith that such liquidation or dissolution is in the best interests of the Holdcos and their Subsidiaries and is not disadvantageous to the Lenders;

(c)     any Subsidiary of either Borrower may Dispose of any or all of its assets to such Borrower or any Wholly Owned Subsidiary Guarantor of either Borrower (upon voluntary liquidation or otherwise); and

(d)  any Investment expressly permitted by Section 7.8 may be structured as a merger, consolidation or amalgamation.

7.5  <u>Disposition of Property</u>.  Dispose of any of its property, whether now owned or hereafter acquired, or, in the case of any Subsidiary of a Borrower, issue or sell any shares of such Subsidiary's Capital Stock to any Person, except:

(a)  the Disposition of excess, obsolete or worn out property in the ordinary course of business;

(b)  the sale of inventory in the ordinary course of business;

(c)  Dispositions permitted by Section 7.4(c);

(d)  the sale or issuance of any Capital Stock of any Subsidiary of a Borrower to a Borrower or any Wholly Owned Subsidiary Guarantor;

(e)  licenses, leases and subleases in the ordinary course of business by either Holdco or any of their Subsidiaries;

(f)  the sale of defaulted receivables in the ordinary course of business and not as part of an accounts receivable financing transaction;

(g)  [intentionally deleted];

(h)  either Borrower and any of its respective Subsidiaries may grant licenses to use Intellectual Property in foreign jurisdictions to Foreign Subsidiaries; and

(i)  the creation, incurrence, assumption or existence of Liens permitted under Section 7.3 and the making of Restricted Payments permitted under Section 7.6.

7.6  <u>Restricted Payments</u>.  Declare or pay any dividend (other than dividends payable solely in the same class and type of the Capital Stock of the Person making such dividend with respect to which such dividend is paid) on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any Capital Stock of either Holdco or any of their Subsidiaries, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of either Holdco or any of their Subsidiaries (collectively, "<u>Restricted Payments</u>"), except:

(a)  any Subsidiary of a Borrower may make Restricted Payments to such Borrower or any Wholly Owned Subsidiary Guarantor that is a Subsidiary of such Borrower;

(b)  any Subsidiary that is not a Wholly Owned Subsidiary of either Borrower may make Restricted Payments to its shareholders generally so long as such Borrower or its respective Subsidiary which owns the Capital Stock in the Subsidiary making such Restricted Payment receives at least its proportionate share thereof (based upon its

relative holding of the Capital Stock in the Subsidiary making such Restricted Payment and taking into account the relative preferences, if any, of the various classes of Capital Stock of such Subsidiary);

(c)     [intentionally deleted];

(d)     the Borrowers may pay dividends to their respective Holdcos, and the Holdcos may use the proceeds of such dividends to pay dividends to Holdings to permit Holdings to (i) pay corporate overhead expenses of Holdings incurred in the ordinary course of its business not to exceed $250,000 in the aggregate in any fiscal year of the Holdcos and other fees and expenses incurred in the ordinary course of business in connection with the maintenance of Holdings' existence and its ownership of the Holdcos and the Borrowers, and (ii) pay any taxes that are due and payable by Holdings on behalf of the consolidated group that includes the Holdcos and the Borrowers;

(e)     non-cash repurchases of Capital Stock deemed to occur upon exercise of stock options if such Capital Stock represents a portion of the exercise price of such options shall be permitted; and

(f)     with respect to each tax year (or portion thereof) that the Borrowers qualify as a Flow Through Entity, the Borrowers may pay dividends to their respective Holdcos in an aggregate amount equal to (i) the product of (x) the amount of aggregate net taxable income of the Borrowers allocated to the Holdcos for such period and (y) the Presumed Tax Rate for such period, less (ii) any distributions (other than distributions permitted under this Section 7.6(f) and other than payments otherwise not prohibited by this Agreement as of the Closing Date), if any, received by the Holdcos during such period; provided that the amount of such payments in respect of any tax year does not exceed the amount that the Borrowers would have been required to pay in respect of federal, state or local taxes (as the case may be) in respect of such year if the Borrowers paid such taxes directly as stand-alone taxpayers), provided, furthermore, that if the amount of payments from any Borrower to its respective Holdco is insufficient to allow such Holdco to satisfy its tax liabilities in full, such Borrower shall make additional payments to such Holdco in an amount not exceeding the amount necessary for such Holdco to pay its actual tax liabilities.

7.7     Capital Expenditures.  Make any Capital Expenditure unless provided for in the Agreed Budget.

7.8     Investments.  Make any advance, loan, extension of credit (by way of guaranty or otherwise but excluding intercompany current liabilities in the ordinary course of business in connection with the cash management operations of the Holdcos and their Subsidiaries) or capital contribution to, or purchase any Capital Stock, bonds, notes, debentures or other debt securities of, or any assets constituting a business unit of, or make any other investment in, any Person (all of the foregoing, "Investments"), except:

(a)     extensions of trade credit in the ordinary course of business;

(b)     investments in Cash Equivalents;

(c)     Guarantee Obligations permitted by Section 7.2;

(d)     loans and advances to employees of any Group Member in the ordinary course of business (including for travel, entertainment and relocation expenses) in an aggregate amount for all Group Members not to exceed $200,000 at any one time outstanding;

(e)     Investments in assets useful in the business of either Borrower and its Subsidiaries made by such Borrower or any of its Subsidiaries with the proceeds of any Reinvestment Deferred Amount;

(f)     intercompany Investments by any Group Member in either Borrower or any Person that, prior to such investment, is a Wholly Owned Subsidiary Guarantor;

(g)     Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with or judgments against, customers and suppliers, in each case in the ordinary course of business;

(h)     accounts receivable arising and trade credit granted in the ordinary course of business and any securities received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary to prevent or limit loss, and any prepayments and other credits to suppliers made in the ordinary course of business;

(i)     Swap Agreements permitted pursuant to Section 7.12;

(j)     Investments existing on the Closing Date and listed on Schedule 7.8;

(k)     Investments resulting from pledges and deposits referred to in Sections 7.3(c), (d) and (q); and

(l)     Investments made by either Borrower or any of its Domestic Subsidiaries in Foreign Subsidiaries in connection with the funding of any royalty payments or other similar consideration required under license agreements permitted pursuant to Section 7.5(h), so long as at the time of any such Investment the respective Foreign Subsidiary pays the related royalties or other similar consideration within 10 Business Days of the consummation of such Investment.

7.9     Optional Payments and Modifications of Certain Debt Instruments. (a) Make or offer to make any optional or voluntary payment, prepayment, repurchase or redemption of or otherwise optionally or voluntarily defease or segregate funds with respect to the Holdco Loans; (b) amend, modify, waive or otherwise change, or consent or agree to any amendment, modification, waiver or other change to, any of the terms of any preferred stock of either Holdco or any Subsidiary; or (c) amend, modify, waive or otherwise change, or consent or agree to any amendment, modification, waiver or other change to, any of the terms of any of the Holdco Loan Documents in any manner.

7.10     Transactions with Affiliates.  Enter into any transaction, including any purchase, sale, lease or exchange of property, the rendering of any service or the payment of any management, advisory or similar fees, with any Affiliate (other than the Holdcos, the Borrowers or any Wholly Owned Subsidiary Guarantor) unless such transaction is (a) not otherwise prohibited under this Agreement, and (b) upon fair and reasonable terms no less favorable to the relevant Group Member than it would obtain in a comparable arm's length transaction with a Person that is not an Affiliate, except that (v) the Holdcos and their Subsidiaries may enter into agreements with any Group Member, and perform the obligations thereunder, in connection with administrative support services and other management related services, (w) this Section 7.10 shall not prohibit (1) the making of any dividend or distribution payable pursuant to Section 7.6 or (2) Investments in Affiliates made or existing in accordance with Section 7.8(d), (f) or (j), and (x) the Holdcos and the Borrowers and their Subsidiaries may (1) pay customary fees to non-officer directors of the Holdcos and their Subsidiaries, (2) pay customary fees and indemnities to directors, officers and employees of the Holdcos and their Subsidiaries in the ordinary course of business and (3) enter into employment agreements in the ordinary course of business.

7.11     Sales and Leasebacks.  Enter into any arrangement with any Person providing for the leasing by any Group Member of real or personal property that has been or is to be sold or transferred by such Group Member to such Person or to any other Person to whom funds have been or are to be advanced by such Person on the security of such property or rental obligations of such Group Member.

7.12     Swap Agreements.  After the Closing Date, enter into any Swap Agreement.

7.13     Changes in Fiscal Periods.  Permit the fiscal year of Arbonne to end on a day other than December 31, or permit the fiscal year of either Holdco or Levlad to end on a day other than the Sunday closest to December 31, or change any such Person's method of determining fiscal quarters; provided that the Holdcos may change their and their Subsidiaries' fiscal year end to another date (and change its and its Subsidiaries fiscal quarters to end on dates consistent therewith) so long as (i) the Borrowers shall have given the Administrative Agent at least ten Business Days' prior written notice thereof and (ii) on or prior to the date of such change in fiscal year and fiscal quarters, the Borrowers and the Required Lenders shall have entered into certain technical amendments and modifications to this Agreement to preserve the intent of the parties with respect to any provisions of this Agreement deemed appropriate by the Administrative Agent and the Borrowers.

7.14     Negative Pledge Clauses.  Enter into or suffer to exist or become effective any agreement that prohibits or limits the ability of any Group Member to create, incur, assume or suffer to exist any Lien upon any of its property or revenues, whether now owned or hereafter acquired, to secure its obligations under the Loan Documents to which it is a party other than (a) [intentionally deleted], (b) any agreements governing any purchase money Liens or Capital Lease Obligations otherwise permitted hereby (in which case, any prohibition or limitation shall only be effective against the assets financed thereby), (c) customary provisions restricting subletting or assignment of any lease governing any leasehold interest of the Holdcos or any of their Subsidiaries, (d) customary provisions restricting assignment of any licensing agreement (in which the Holdcos or any of their Subsidiaries is the licensee) or other contract entered into by

the Holdcos or any of their Subsidiaries in the ordinary course of business, (e) restrictions on the transfer of any asset subject to a Lien permitted by Section 7.3(f), (m) or (t) and (f) any operating lease or capital lease, insofar as the provisions thereof limit grants of a security interest in, or other assignments of, the related leasehold interest to any other Person.

7.15    Clauses Restricting Subsidiary Distributions.  Enter into or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any Subsidiary of either Borrower to (a) make Restricted Payments in respect of any Capital Stock of such Subsidiary held by, or pay any Indebtedness owed to, either Borrower or any other Subsidiary of either Borrower, (b) make loans or advances to, or other Investments in, either Borrower or any other Subsidiary of either Borrower or (c) transfer any of its assets to either Borrower or any other Subsidiary of either Borrower, except for such encumbrances or restrictions existing under or by reason of (i) any restrictions existing under the Loan Documents or the Financing Orders, (ii) any restrictions under the Holdco Loan Documents, so long as such restrictions are not more expansive in scope than those contained in the Holdco Loan Documents as of the Closing Date, (iii) any restrictions with respect to a Subsidiary imposed pursuant to an agreement that has been entered into in connection with the Disposition of all or substantially all of the Capital Stock or assets of such Subsidiary (to the extent such Disposition is permitted by this Agreement), (iv) customary provisions restricting subletting or assignment of any lease governing any leasehold interest of the Holdcos or any of their Subsidiaries, (v) customary provisions restricting assignment of any licensing agreement (in which the Holdcos or any of their Subsidiaries is the licensee) or other contract entered into by the Holdcos or any of their Subsidiaries in the ordinary course of business, (vi) restrictions on the transfer of any asset subject to a Lien permitted by Section 7.3(f), (m) or (t), (vii) any operating lease or capital lease, insofar as the provisions thereof limit grants of a security interest in, or other assignments of, the related leasehold interest to any other Person, and (viii) customary provisions in partnership agreements, limited liability company organizational or governing documents, joint venture agreements and other similar agreements entered into in the ordinary course of business in connection with an Investment expressly permitted under Section 7.8 that restricts the transfer of Capital Stock in or assets of such partnership, limited liability company, joint venture or similar Person.

7.16    Lines of Business.  Enter into any business, either directly or through any Subsidiary, except for those businesses in which the Borrowers and their Subsidiaries are engaged on the date of this Agreement or that are reasonably related thereto.

7.17    Compliance with Budget.  Except as otherwise provided herein or approved by the Administrative Agent and the Required Lenders, the Loan Parties shall not (a) use any cash or the proceeds of any Loans in a manner or for a purpose other than in accordance with this Agreement, the Financing Orders and the Agreed Budget or (b) permit Total Operating Cash Flow (which shall be calculated in a manner consistent with the preparation of the Agreed Budget) for the applicable Testing Period to be less than Total Operating Cash Flow reflected in the Agreed Budget for such Testing Period, subject to a variance of not more than $5,000,000, tested every other week, commencing February 10, 2010 with respect to the Testing Period ending February 5, 2010.

7.18    Chapter 11 Claims.  Incur, create, assume, suffer to exist or permit any administrative expense, unsecured claim, or other super priority claim or lien which is *pari passu*

with or senior to the claims or liens, as the case may be, of the Administrative Agent and the Lenders against the Loan Parties hereunder, or apply to the Bankruptcy Court for authority so to do, except for Specified Liens and the Carve-Out.

7.19 <u>Revision of Orders; Applications to Bankruptcy Court</u>. (i) Seek, consent to or suffer to exist any modification, stay, vacation or amendment of the Interim Order or the Final Order except for any modifications and amendments agreed to in writing by Administrative Agent and the Required Lenders or (ii) apply to the Bankruptcy Court for authority to take any action prohibited by this Section 7 (except to the extent such application and the taking of such action is conditioned upon the receiving the written consent of the Administrative Agent and the Required Lenders).

SECTION 8.   EVENTS OF DEFAULT

If any of the following events shall occur and be continuing:

(a)   the Borrowers shall fail to pay any principal of any Loan or Reimbursement Obligation when due in accordance with the terms hereof; or the Borrowers shall fail to pay any interest on any Loan or Reimbursement Obligation, or any other amount payable hereunder or under any other Loan Document, within three days after any such interest or other amount becomes due in accordance with the terms hereof; or

(b)   any representation or warranty made by any Loan Party herein or in any other Loan Document or that is contained in any certificate, document or financial or other statement furnished by it at any time under or in connection with this Agreement or any such other Loan Document shall prove to have been inaccurate in any material respect on or as of the date made or deemed made; or

(c)   any Loan Party shall default in the observance or performance of any agreement contained in Section 6.1, Section 6.2, clause (i) or (ii) of Section 6.4(a) (with respect to the Holdcos and the Borrowers only), Section 6.7(a), Section 6.8, Section 6.13, Section 6.14 or Section 7 of this Agreement or Section 5.5 or 5.7(b) of the Guarantee and Collateral Agreement; or

(d)   any Loan Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of this Section), and such default shall continue unremedied for a period of 10 days after notice to the relevant Borrower from the Administrative Agent or the Required Lenders; or

(e)   any Group Member shall (i) default in making any payment of any principal of any Indebtedness (including any Guarantee Obligation, but excluding the Loans) on the scheduled or original due date with respect thereto; or (ii) default in making any payment of any interest on any such Indebtedness beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created; or (iii) default in the observance or performance of any other agreement or

condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with the expiry of any grace periods and the giving of notice (if required), such Indebtedness to become due prior to its stated maturity or (in the case of any such Indebtedness constituting a Guarantee Obligation) to become payable; <u>provided</u>, that a default, event or condition described in clause (i), (ii) or (iii) of this paragraph (e) shall not at any time constitute an Event of Default (A) unless, at such time, one or more defaults, events or conditions of the type described in clauses (i), (ii) and (iii) of this paragraph (e) shall have occurred and be continuing with respect to Indebtedness the outstanding principal amount of which exceeds in the aggregate $500,000 or (B) if any such defaults, events or conditions is a result of the Chapter 11 Cases; or

(f)     [intentionally deleted]; or

(g)     (i) any Person shall engage in any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan, (ii) any "accumulated funding deficiency" (as defined in Section 302 of ERISA), whether or not waived, shall exist with respect to any Plan or any Lien in favor of the PBGC or a Plan shall arise on the assets of any Group Member or any Commonly Controlled Entity, (iii) a Reportable Event shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Single Employer Plan, which Reportable Event or commencement of proceedings or appointment of a trustee is reasonably likely to result in the termination of such Plan for purposes of Title IV of ERISA, (iv) any Single Employer Plan shall terminate for purposes of Title IV of ERISA, (v) any Group Member or any Commonly Controlled Entity shall, or is reasonably likely to, incur any liability in connection with a withdrawal from, or the Insolvency or Reorganization of, a Multiemployer Plan or (vi) any other event or condition shall occur or exist with respect to a Plan; and in each case in clauses (i) through (vi) above, such event or condition, together with all other such events or conditions, if any, could, reasonably be expected to have a Material Adverse Effect; or

(h)     one or more judgments or decrees shall be entered against any Group Member involving in the aggregate a liability (not paid or fully covered by insurance as to which the relevant insurance company has acknowledged coverage) of $1,000,000 or more, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within 30 days from the entry thereof; or

(i)     any of the Security Documents shall cease, for any reason, to be in full force and effect, or any Loan Party or any Affiliate of any Loan Party shall so assert, or any Lien created by any of the Security Documents shall cease to be enforceable and of the same effect and priority purported to be created thereby; or

(j)     the guarantee contained in Section 2 of the Guarantee and Collateral Agreement shall cease, for any reason, to be in full force and effect or any Loan Party or any Affiliate of any Loan Party shall so assert; or

(k)     (i) the Sponsor shall cease to have the power to vote or direct the voting of securities having a majority of the ordinary voting power for the election of directors of Holdings (determined on a fully diluted basis); (ii) the Sponsor shall cease to own of record and beneficially an amount of Capital Stock of Holdings equal to at least 51% of the amount of Capital Stock of Holdings owned by the Sponsor of record and beneficially as of the Closing Date; (iii) Holdings shall cease to directly own and control, of record and beneficially, 100% of each class of outstanding Capital Stock of Levlad Holdco free and clear of all Liens; (iv) Holdings shall cease to directly own and control, of record and beneficially, 100% of each class of outstanding common stock of Arbonne Holdco free and clear of all Liens, (v) Levlad Holdco shall cease to directly own and control, of record and beneficially, 100% of each class of outstanding Capital Stock of Levlad free and clear of all Liens (except Liens created by the Guarantee and Collateral Agreement and the Financing Orders, Liens permitted by Section 7.3(a) and Liens granted under the "Security Documents" (as defined in the Prepetition Credit Agreement)); (vi) Arbonne Holdco shall cease to directly or indirectly own and control, of record and beneficially, 100% of each class of outstanding Capital Stock of Arbonne free and clear of all Liens (except Liens created by the Guarantee and Collateral Agreement and the Financing Orders, Liens permitted by Section 7.3(a) and Liens granted under the "Security Documents" (as defined in the Prepetition Credit Agreement)); or (vii) Levlad shall cease to directly own and control, of record and beneficially, 100% of each class of outstanding preferred stock of Arbonne Holdco free and clear of all Liens (except Liens created by the Guarantee and Collateral Agreement and the Financing Orders, Liens permitted by Section 7.3(a) and Liens granted under the "Security Documents" (as defined in the Prepetition Credit Agreement)); or

(l)     any of Holdings or the Holdcos shall (i) conduct, transact or otherwise engage in, or commit to conduct, transact or otherwise engage in, any business or operations other than those incidental to its existence and its direct or indirect ownership (as the case may be) of the Capital Stock of Levlad and Arbonne, (ii) incur, create, assume or suffer to exist any Indebtedness, Liens or other liabilities or financial obligations, except (w) nonconsensual obligations imposed by operation of law, (x) obligations in existence on the Petition Date pursuant to the Holdco Loan Documents, (y) obligations with respect to the Loan Documents to which it is a party and (z) obligations in existence on the Petition Date with respect to its Capital Stock (including, with respect to Holdings, pursuant to the LLC Agreement) or (iii) own, lease, manage or otherwise operate any properties or assets (including cash (other than cash (A) received in connection with dividends made by Levlad and Arbonne in accordance with Section 7.6 pending application in the manner contemplated by said Section and (B) in transit from the holders of the Capital Stock of Holdings to the Borrowers) and Cash Equivalents) other than the ownership of shares of Capital Stock of the Holdcos or the Borrowers, as the case may be; or

(m)     any Loan Party voluntarily or involuntarily dissolves or is dissolved, liquidates or is liquidated or files a motion with the Bankruptcy Court seeking authorization to dissolve or liquidate; or

(n)     the Bankruptcy Court fails to enter the Final Order within thirty (30) days of the entry of the Interim Order (with such changes as the Administrative Agent may agree to); or

(o)     an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court (or any of the Loan Parties shall file an application or motion for entry of an order) (i) appointing a trustee under Section 1104 of the Bankruptcy Code, (ii) appointing an examiner with enlarged powers (beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business under Section 1106(b) of the Bankruptcy Code, or (iii) dismissing or converting any of the Chapter 11 Cases to a Chapter 7 case; or

(p)     any Loan Party fails or neglects to comply with any provision of the Final Order or the Interim Order, as applicable; or

(q)     (i) an order shall be entered by the Bankruptcy Court confirming a plan of reorganization in the Chapter 11 Cases which does not (x) contain a provision for termination of all of the Lenders' Commitments, termination of the L/C Commitment and payment in full of all Obligations and the cash collateralization or return of all Letters of Credit on the date of effectiveness of such plan (or the roll up of such Obligations and such Letters of Credit not so returned or cash collateralized into the exit financing facility described in Section 2.3) and in each case in a manner satisfactory to the Administrative Agent and the Lenders on or before the effective date of such plan and (y) provide for the continuation of the Liens and priorities in favor of the Collateral Agent until such effective date or (ii) any Loan Party (or any other party with the support of any of the Loan Parties) shall have filed a plan of reorganization that violates clause (i) of this subparagraph in the Chapter 11 Cases; or

(r)     any Loan Party (or by any party with the support of any of the Loan Parties) shall have filed a plan of reorganization in the Chapter 11 Cases that is inconsistent with the terms and conditions set forth in the term sheet annexed to the Plan Support Agreement; or

(s)     [intentionally deleted]; or

(t)     an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court (i) to revoke, reverse, stay for a period in excess of ten (10) days, vacate or rescind any provision of any Financing Order, (ii) to modify, supplement or amend any provision of the Interim Order or the Final Order without the consent of the Administrative Agent or (iii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to any of the Loan Parties, equal or superior to the priority of the Lenders in respect of the Obligations, except for allowed administrative expenses having priority over the Obligations only to the extent set forth in the definition of Carve-Out, or (iv) to grant or permit the grant of a Lien on the Collateral (other than as permitted by Section 7.3) or (v) an order shall be entered by the Bankruptcy Court dismissing any of the Chapter 11 Cases which does not contain a provision for termination of all of the

Lenders' Commitments, the termination of the L/C Commitment and payment in full in cash of all Obligations and the cash collateralization or return of all Letters of Credit (or the roll up of such Obligations and such Letters of Credit not so returned or cash collateralized into the exit financing facility described in Section 2.3) in a manner satisfactory to the Administrative Agent upon such dismissal; or

(u)     the Bankruptcy Court enters an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code for any reason to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) with respect to assets of any Loan Party where the aggregate value of the property subject to all such order or orders is greater than $100,000; or

(v)     any provision of the Interim Order, the Final Order, this Agreement or any other Loan Document shall for any reason cease to be valid or binding or enforceable against any of the Loan Parties, or any of the Loan Parties shall so state in writing; or any of the Loan Parties shall commence or join in any legal proceeding to contest in any manner that the Interim Order, the Final Order, this Agreement or any other Loan Document constitutes a valid and enforceable agreement or any of the Loan Parties shall commence or join in any legal proceeding to assert that it has no further obligation or liability under the Interim Order, the Final Order, this Agreement or any other Loan Document; or

(w)     any of the Loan Parties shall seek to, or shall support (whether by way of motion or other pleadings filed with the Bankruptcy Court or any other writing executed by any Loan Party or by oral argument) any other Person's motion to, (1) disallow in whole or in part any of the Obligations arising under this Agreement or any other Loan Document, (2) disallow in whole or in part any of the Indebtedness owed by the Loan Parties under the Prepetition Credit Agreement or any other "Loan Document" (as defined in the Prepetition Credit Agreement), (3) challenge the validity and enforceability of the Liens or security interests granted or confirmed herein or in the Interim Order or the Final Order in favor of the Collateral Agent or (4) challenge the validity and enforceability of the Liens or security interests in favor of the Prepetition Secured Parties; or

(x)     Holdings or any of the Loan Parties shall make, without the prior written consent of the Administrative Agent, any payment (as adequate protection or otherwise), or application for authority to pay, on account of any claim or Indebtedness arising prior to the Petition Date other than those payments in respect of "adequate protection obligations" permitted pursuant to the terms of the Financing Orders and payments authorized by the Bankruptcy Court in respect of (x) any such payments required and/or permitted in the "First Day Orders" reasonably satisfactory to the Administrative Agent and (y) accrued payroll and related expenses as of the Petition Date or as described in and provided for in the Agreed Budget; or

(y)     (i) any of the Loan Parties shall cease to have the exclusive right pursuant to Section 1121 of the Bankruptcy Code to file a plan of reorganization, (ii) an order shall

have been entered modifying the adequate protection obligations granted in any Financing Order without the prior written consent of the Administrative Agent, or (iii) an order shall have been entered by the Bankruptcy Court avoiding or requiring disgorgement by the Administrative Agent or any of the Lenders of any amounts received in respect of the Obligations; or

(z)     if any Loan Party is enjoined, restrained or in any way prevented by order of a court of competent jurisdiction (other than an order of the Bankruptcy Court approved by the Required Lenders) from continuing to conduct all or any material part of its business affairs.

then, and in any such event, notwithstanding the provisions of Section 362 of the Bankruptcy Code, but subject to the Financing Orders, any or all of the following actions may be taken without further order of or application to the Bankruptcy Court:  (i) with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to the Borrowers declare all or any portion of the Commitments to be terminated forthwith, whereupon the Commitments or such portion thereof shall immediately terminate; (ii) with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to the Borrowers, declare all or any portion of the Loans (with accrued interest thereon) and all or any portion of other amounts owing under this Agreement and the other Loan Documents (including all amounts of L/C Obligations, whether or not the beneficiaries of the then outstanding Letters of Credit shall have presented the documents required thereunder) to be due and payable forthwith, whereupon the same shall immediately become due and payable; (iii) the Administrative Agent may, or upon the request of the Issuing Lenders shall, by notice to the Borrowers, declare all or any portion of the L/C Commitment to be terminated forthwith, whereupon the L/C Commitment or such portion thereof shall immediately terminate; and (iv) with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by providing five (5) Business Days' prior written notice to the Borrowers (with a copy to counsel for the Committee, if any, and to the United States Trustee for the District of Delaware), direct the Collateral Agent to enforce any and all of the Liens and rights created pursuant to the Security Documents and the Financing Orders (including, the right to setoff monies of the Loan Parties in accounts maintained with any Agent or any Lender).  Amounts held in the L/C Cash Collateral Account shall be applied by the Administrative Agent to the payment of drafts drawn under all Letters of Credit with respect to which presentment for honor shall not have occurred at the time of an acceleration pursuant to this paragraph, and the unused portion thereof after all such Letters of Credit shall have expired or been fully drawn upon, if any, shall be applied to repay other Obligations hereunder and under the other Loan Documents.  After all such Letters of Credit shall have expired or been fully drawn upon, all Reimbursement Obligations shall have been satisfied and all other Obligations (excluding Obligations in respect of Treasury Management Products) shall have been fully satisfied, the balance, if any, in the L/C Cash Collateral Account shall be returned to the relevant Borrower (or such other Person as may be lawfully entitled thereto).  Except as expressly provided above in this Section, presentment, demand, protest and all other notices of any kind are hereby expressly waived by the Borrowers.

Upon the occurrence and during the continuance of an Event of Default, the automatic stay arising pursuant to Bankruptcy Code Section 362 shall be vacated and terminated in accordance with the Interim Order or the Final Order, as applicable, so as to permit the Administrative Agent and the Lenders full exercise of all of their rights and remedies based on the occurrence of an Event of Default, including, without limitation, all of their rights and remedies with respect to the Collateral.  With respect to the Agents' and Lenders' exercise of their rights and remedies, the Loan Parties agree and warrant as follows:

> (i)     the Loan Parties waive and, release, and shall be enjoined from attempting to contest, delay, or otherwise dispute the exercise by the Agents and the Lenders of their rights and remedies before the Bankruptcy Court or otherwise; except only as expressly stated in subparagraph (ii) of this paragraph; and

> (ii)    when the Administrative Agent or the Lenders seek to enforce their rights and remedies based on an Event of Default, and if any Loan Party disputes that an Event of Default has occurred, a Loan Party will be entitled to file an emergency motion with the Bankruptcy Court disputing whether an Event of Default has occurred.  Unless otherwise agreed in writing by Administrative Agent, any such motion shall be heard within five (5) Business Days after it is filed, subject to the availability of the Bankruptcy Court.  At the hearing on the emergency motion, the only issue that will be heard by the Bankruptcy Court will be whether an Event of Default has occurred and has not been cured, and, if an Event of Default has occurred and has not been cured, the Administrative Agent and the Lenders will be entitled to continue to exercise all of their rights and remedies without the necessity of any further notice or order and the Loan Parties hereby waive any right to seek relief, including, without limitation, under Section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the Agents or the Lenders set forth in the Financing Orders or the Loan Documents.  Furthermore, nothing herein shall be construed to impose or reimpose any stay or injunction of any kind against the Administrative Agent or the Lenders.

## SECTION 9.   THE AGENTS

9.1     Appointment.  Each Lender and each Issuing Lender hereby irrevocably designates and appoints the Administrative Agent as the agent of such Lender under this Agreement and the other Loan Documents and the Collateral Agent as the agent of such Lender, such Issuing Lender and the Administrative Agent under the Security Documents, and each such Lender irrevocably authorizes the Administrative Agent and the Collateral Agent, as the case may be, in such capacities, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent and the Collateral Agent, as the case may be, by the terms of this Agreement and the other Loan Documents, as applicable, together with such other powers as are reasonably incidental thereto.  Notwithstanding any provision to the contrary elsewhere in this Agreement, neither the Administrative Agent nor the Collateral Agent shall have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties,

obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Administrative Agent or the Collateral Agent. The Administrative Agent and each Lender and each Issuing Lender understand and agree that all Liens created by the Security Documents and the Financing Orders in the Collateral have been created in favor of the Collateral Agent, for the benefit of the Administrative Agent and the Secured Parties (as defined in the Guarantee and Collateral Agreement), that all rights to take remedial action with respect to the Collateral under the Security Documents and the Financing Orders have been granted to the Collateral Agent and that neither the Administrative Agent nor any Lender has the right to take any such remedial action with respect to the Collateral other than through the Collateral Agent.

9.2     Delegation of Duties. Each of the Administrative Agent and the Collateral Agent may execute any of its duties under this Agreement and the other Loan Documents by or through agents or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. Neither the Administrative Agent nor the Collateral Agent shall be responsible for the negligence or misconduct of any agents or attorneys in-fact selected by it with reasonable care.

9.3     Exculpatory Provisions. Neither any Agent nor any of their respective officers, directors, employees, agents, attorneys-in-fact or affiliates shall be (i) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Loan Document (except to the extent that any of the foregoing are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from its or such Person's own gross negligence or willful misconduct) or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Agents under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of any Loan Party a party thereto to perform its obligations hereunder or thereunder. The Agents shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party.

9.4     Reliance. (a) The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any instrument, writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, telex or teletype message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to the Holdcos or the Borrowers), independent accountants and other experts selected by the Administrative Agent. The Administrative Agent may deem and treat the payee of any Note as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent. The Administrative Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders (or, if so specified by this Agreement, all Lenders) as it deems

appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders (or, if so specified by this Agreement, all Lenders), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans.

(b)     The Collateral Agent shall be entitled to rely, and shall be fully protected in relying, upon any instrument, writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, telex or teletype message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to the Holdcos or the Borrowers), independent accountants and other experts selected by the Collateral Agent. The Collateral Agent may deem and treat the payee of any Note as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent. The Collateral Agent shall be fully justified in failing or refusing to take any action under any Security Document or the Financing Orders unless it shall first receive the direction of the Administrative Agent under Section 8 or such advice or concurrence of the Required Lenders (or, if so specified by this Agreement, all Lenders) as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. The Collateral Agent shall in all cases be fully protected in acting, or in refraining from acting, under the Security Documents at the direction of the Administrative Agent under Section 8 or in accordance with a request of the Required Lenders (or, if so specified by this Agreement, all Lenders), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans.

9.5     Notice of Default. (a) The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless the Administrative Agent has received notice from a Lender, either Holdco or either Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that the Administrative Agent receives such a notice, the Administrative Agent shall give notice thereof to the Lenders. The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or, if so specified by this Agreement, all Lenders); provided that unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

(b)     The Collateral Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless the Collateral Agent has received notice from the Administrative Agent, a Lender, either Holdco or either Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default". The Collateral Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Administrative Agent under Section 8, or by the

Required Lenders (or, if so specified by this Agreement, all Lenders); provided that unless and until the Collateral Agent shall have received such directions, the Collateral Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

9.6     Non-Reliance on Agents and Other Lenders.  Each Lender expressly acknowledges that neither the Agents nor any of their respective officers, directors, employees, agents, attorneys-in-fact or affiliates have made any representations or warranties to it and that no act by any Agent hereafter taken, including any review of the affairs of a Loan Party or any affiliate of a Loan Party, shall be deemed to constitute any representation or warranty by any Agent to any Lender.  Each Lender represents to the Agents that it has, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their affiliates and made its own decision to make its Loans hereunder and enter into this Agreement.  Each Lender also represents that it will, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their affiliates.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, neither the Administrative Agent nor the Collateral Agent shall have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of any Loan Party or any affiliate of a Loan Party that may come into the possession of the Administrative Agent or the Collateral Agent or any of their respective officers, directors, employees, agents, attorneys-in-fact or affiliates.

9.7     Indemnification.  The Lenders agree to indemnify each Agent in its capacity as such (to the extent not reimbursed by the Holdcos or the Borrowers and without limiting the obligation of the Holdcos or the Borrowers to do so), ratably according to their respective Percentages in effect on the date on which indemnification is sought under this Section (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with such Percentages immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Loans) be imposed on, incurred by or asserted against such Agent in any way relating to or arising out of, the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent under or in connection with any of the foregoing; provided that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from such Agent's gross negligence or willful misconduct.  The

agreements in this Section shall survive the payment of the Loans and all other amounts payable hereunder.

9.8    <u>Agent in Its Individual Capacity</u>. Each Agent, each Lender and each Issuing Lender and its affiliates may make loans to, accept deposits from and generally engage in any kind of business with any Loan Party or Holdings as though (in the case of each Agent) such Agent were not an Agent. With respect to its Loans made or renewed by it and with respect to any Letter of Credit issued by it, each Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any Lender and may exercise the same as though it were not an Agent, and the terms "Lender" and "Lenders" shall include each Agent in its individual capacity.

9.9    <u>Successor Administrative Agent and Collateral Agent</u>. (a) The Administrative Agent may resign as Administrative Agent upon 30 days' notice to the Lenders and the Borrowers. If the Administrative Agent shall resign as Administrative Agent under this Agreement and the other Loan Documents, then the Required Lenders shall appoint from among the Lenders a successor agent for the Lenders, whereupon such successor agent shall succeed to the rights, powers and duties of the Administrative Agent, and the term "Administrative Agent" shall mean such successor agent effective upon such appointment and approval, and the former Administrative Agent's rights, powers and duties as Administrative Agent shall be terminated, without any other or further act or deed on the part of such former Administrative Agent or any of the parties to this Agreement or any holders of the Loans. If no successor agent has accepted appointment as Administrative Agent by the date that is 30 days following a retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective, and the Lenders shall assume and perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above. After any retiring Administrative Agent's resignation as Administrative Agent, the provisions of this Section 9 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under this Agreement and the other Loan Documents.

(b)    The Collateral Agent may resign as Collateral Agent upon 30 days' notice to the Lenders and the Borrowers. If the Collateral Agent shall resign as Collateral Agent under this Agreement and the other Loan Documents, then the Required Lenders shall appoint from among the Lenders a successor collateral agent, whereupon such successor collateral agent shall succeed to the rights, powers and duties of the Collateral Agent, and the term "Collateral Agent" shall mean such successor collateral agent effective upon such appointment and approval, and the former Collateral Agent's rights, powers and duties as Collateral Agent shall be terminated, without any other or further act or deed on the part of such former Collateral Agent or any of the parties to this Agreement or any holders of the Loans. If no successor collateral agent has accepted appointment as Collateral Agent by the date that is 30 days following a retiring Collateral Agent's notice of resignation, the retiring Collateral Agent (after consultation with the Borrowers) may appoint a financial institution rated at least A by S&P or A by Moody's, as a successor collateral agent, whereupon such successor collateral agent shall succeed to the rights, powers and duties of the Collateral Agent, and the term "Collateral Agent" shall mean such successor collateral agent effective upon such appointment and approval, and the former Collateral Agent's rights, powers and duties as Collateral Agent shall be terminated, without any

other or further act or deed on the part of such former Collateral Agent or any of the parties to this Agreement or any holders of the Loans. After any retiring Collateral Agent's resignation as Collateral Agent, the provisions of this Section 9 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Collateral Agent under this Agreement and the other Loan Documents.

9.10 <u>Security Document Matters</u>. The Agents and the Lenders expressly acknowledge and agree that the Security Documents may be enforced only by the action of the Collateral Agent acting upon the instructions of the Administrative Agent under Section 8 or the Required Lenders and that no other such Person shall have any right individually to seek to enforce or to enforce the Security Documents or to realize upon the security to be granted thereby or by the Financing Orders, it being understood and agreed that such rights and remedies may be exercised by the Collateral Agent for the benefit of such Persons upon the terms of the Security Documents and the Financing Orders.

## SECTION 10.  MISCELLANEOUS

10.1 <u>Amendments and Waivers</u>. Neither this Agreement, any other Loan Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this Section 10.1. The Required Lenders and each Loan Party party to the relevant Loan Document may, or, with the written consent of the Required Lenders, the Administrative Agent, each Issuing Lender and each Loan Party party to the relevant Loan Document may, from time to time, (a) enter into written amendments, supplements or modifications hereto and to the other Loan Documents for the purpose of adding any provisions to this Agreement or the other Loan Documents or changing in any manner the rights of the Lenders, the Issuing Lenders or of the Loan Parties hereunder or thereunder or (b) waive, on such terms and conditions as the Required Lenders, the Issuing Lenders or the Administrative Agent, as the case may be, may specify in such instrument, any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences; provided, however, that no such waiver and no such amendment, supplement or modification shall (i) forgive the principal amount or extend the final scheduled date of maturity of any Loan, reduce the stated rate of any interest or fee payable hereunder (except in connection with the waiver of applicability of any post-default increase in interest rates (which waiver shall be effective with the consent of the Required Lenders) or extend the scheduled date of any payment thereof, or increase the amount or extend the expiration date of any Lender's Commitment, the L/C Commitment or waive any Default under Section 8(a), in each case without the written consent of each Lender and each Issuing Lender directly affected thereby; (ii) eliminate or reduce the voting rights of any Lender or any Issuing Lender under this Section 10.1 without the written consent of such Lender or such Issuing Lender; (iii) reduce any percentage specified in the definition of Required Lenders, consent to the assignment or transfer by either Borrower of any of its rights and obligations under this Agreement and the other Loan Documents, release all or substantially all of the Collateral or release all or substantially all of the Subsidiary Guarantors from their obligations under the Guarantee and Collateral Agreement, in each case without the written consent of all Lenders and all Issuing Lenders; (iv) amend, modify or waive any provision of Section 2.16 without the written consent of all Lenders and all Issuing Lenders; (v) [intentionally deleted]; (vi) [intentionally deleted]; (vii) amend, modify or waive any provision of Section 9 without the written consent of each Agent directly affected

thereby; or (viii) (a) amend, modify or waive any provision of Section 3, the definition of L/C Collateral Account or the conditions precedent to the issuance of any Letter of Credit or (b) change the order of application of amounts on deposit in or credited to the L/C Cash Collateral Account or the proceeds thereof or release or subordinate any lien on the L/C Cash Collateral Account or related assets, in each case without the written consent of each Issuing Lender. Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon the Loan Parties, the Lenders, the Issuing Lenders, the Administrative Agent and all future holders of the Loans. In the case of any waiver, the Loan Parties, the Lenders and the Administrative Agent shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

      10.2   <u>Notices</u>. All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or three Business Days after being deposited in the mail, postage prepaid, or, in the case of telecopy notice, when received, addressed (a) in the case of the Holdcos, the Borrowers, the Administrative Agent and the Collateral Agent, as follows, and (b) in the case of the Lenders, as set forth in an administrative questionnaire delivered to the Administrative Agent or, in the case of a Lender which becomes a party to this Agreement pursuant to an Assignment and Assumption, in such Assignment and Assumption, or (c) in the case of any party, to such other address as such party may hereafter notify to the other parties hereto:

|  |  |
|---|---|
| The Holdcos: | Levlad Intermediate Holdco, Inc./Arbonne Intermediate Holdco, Inc.<br>c/o Harvest Partners, Inc.<br>280 Park Avenue<br>New York, New York  10017<br>Attention:  Christopher Whalen<br>             and Michael DeFlorio<br>Telecopy:  212-812-0100<br>Telephone: 212-599-6300 |
| The Borrowers: | Arbonne International, LLC<br>c/o Harvest Partners, Inc.<br>280 Park Avenue<br>New York, New York  10017<br>Attention:  Christopher Whalen<br>             and Michael DeFlorio<br>Telecopy:  212-812-0100<br>Telephone: 212-599-6300 |
| with a copy to: | Arbonne International, LLC<br>9400 Jeronimo |

Irvine, California 92618
Attention: Mark Lehman
Telecopy: 949-855-4361
Telephone: 949-460-1343

The Administrative Agent
and the Collateral Agent: Canadian Imperial Bank of Commerce
425 Lexington Avenue
New York, New York 10017
Attention: Allen Lozanovski/Bernard D'Aquila
Telecopy: 866-580-0016
Telephone: 416-542-4506/416-542-4498

provided that any notice, request or demand to or upon the Administrative Agent or the Lenders shall not be effective until received; provided, further, that any notice sent by the Administrative Agent, any Issuing Lender or any other Lender to either or both of the Borrowers shall be effective if sent care of Arbonne at the address for the Borrowers set forth above; and provided, further, that Arbonne is authorized to have the exclusive right and obligation to give notices hereunder and under the other Loan Documents, on behalf of either or both of the Borrowers and no notice given by Levlad shall be deemed to have any force or effect.

Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to Section 2 unless otherwise agreed by the Administrative Agent and the applicable Lender. The Administrative Agent or either Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

10.3    No Waiver; Cumulative Remedies. No failure to exercise and no delay in exercising, on the part of the Administrative Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

10.4    Survival of Representations and Warranties. All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans and other extensions of credit hereunder.

10.5    Payment of Expenses and Taxes. The Borrowers jointly and severally agree (a) to pay or reimburse each Agent and each Lender party to the commitment letter, dated as of January 7, 2010, with the Borrowers, for all their respective reasonable documented out-of-pocket costs and expenses incurred in connection with the development, preparation, syndication

and execution of, and any amendment, supplement or modification to, this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby, including the reasonable documented fees and disbursements of the Agent Financial Advisor and of counsel to the Agents and the Lenders, (b) to pay or reimburse each Lender, each Issuing Lender and each Agent for all its costs and expenses incurred in connection with the enforcement or preservation of any rights under this Agreement, the other Loan Documents and any such other documents, including the fees and disbursements of the Agent Financial Advisor, counsel (including the allocated fees and expenses of in-house counsel) to each Lender, each Issuing Lender and of counsel to the Administrative Agent and the Collateral Agent, (c) to pay, indemnify, and hold each Lender, each Issuing Lender and each Agent harmless from, any and all recording and filing fees and any and all liabilities with respect to, or resulting from any delay in paying, stamp, excise and other similar taxes, if any, that may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement, the other Loan Documents and any such other documents, and (d) to pay, indemnify, and hold each Lender, each Issuing Lender and each Agent and their respective officers, directors, employees, affiliates, agents and controlling persons (each, an "<u>Indemnitee</u>") harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the other Loan Documents and any such other documents, including any of the foregoing relating to the use of proceeds of the Loans or the violation of, noncompliance with or liability under, any Environmental Law applicable to the operations of any Group Member or any of the Properties and the reasonable fees and expenses of legal counsel in connection with claims, actions or proceedings by any Indemnitee against any Loan Party under any Loan Document (all the foregoing in this clause (d), collectively, the "<u>Indemnified Liabilities</u>"), <u>provided</u>, that the Borrowers shall have no obligation hereunder to any Indemnitee with respect to Indemnified Liabilities to the extent such Indemnified Liabilities are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnitee. Without limiting the foregoing, and to the extent permitted by applicable law, the Borrowers agree not to assert and to cause their respective Subsidiaries not to assert, and hereby waive and agree to cause their respective Subsidiaries to waive, all rights for contribution or any other rights of recovery with respect to all claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature, under or related to Environmental Laws, that any of them might have by statute or otherwise against any Indemnitee. All amounts due under this Section 10.5 shall be payable not later than 10 days after written demand therefor. Statements payable by the Borrowers pursuant to this Section 10.5 shall be submitted to Mark Lehman (Telephone No. 949-460-1343) (Telecopy No. 949-855-4361) and Christopher Whalen and Michael DeFlorio (Telephone No. 212-599-6300) (Telecopy No. 212-812-0100), at the address of the Borrowers set forth in Section 10.2, or to such other Person or address as may be hereafter designated by the Borrowers in a written notice to the Administrative Agent. The agreements in this Section 10.5 shall survive repayment of the Loans and all other amounts payable hereunder.

10.6 <u>Successors and Assigns; Participations and Assignments</u>. (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of any Issuing Lender that issues any Letter of Credit), except that the Borrowers may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of paragraph (b) of this Section, (ii) by way of participation in accordance with the provisions of paragraph (d) of this Section or (iii) by way of pledge or assignment of a security interest subject to the restrictions of paragraph (f) of this Section (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in paragraph (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b) Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); <u>provided</u> that (i) except in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it or in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the applicable Commitment is not then in effect, the principal outstanding balance of the Loan of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Effective Date" is specified in the Assignment and Assumption, as of the Effective Date) shall not be less than $1,000,000 in the case of any assignment (provided that simultaneous assignments by or to Funds managed by the same or related investment managers shall be treated as one assignment for purposes of determining whether the minimum assignment requirement has been met), unless the Administrative Agent otherwise consents (such consent not to be unreasonably withheld or delayed); (ii) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loan or the Commitment assigned; (iii) any assignment must be approved by the Administrative Agent and each Issuing Lender (each such approval not to be unreasonably withheld or delayed); and (iv) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500 (except in the case of an assignment to an Affiliate of the assigning Lender or an Approved Fund of the assigning Lender, $500 (<u>provided</u> that only one such fee shall be payable in connection with simultaneous assignments to or by two or more Funds managed by the same or related investment managers; <u>provided</u>, <u>further</u>, that no such fee shall be payable in connection with the first five (5) assignments to Affiliates of the assigning Lender or an Approved Fund of the assigning Lender)), and the Eligible Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an administrative questionnaire in a form satisfactory to the Administrative Agent. Subject to acceptance and recording thereof by the Administrative Agent pursuant to paragraph (c) of this Section, from and after the effective date specified in each

Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 2.17, 2.18, 2.19 and 10.5 with respect to facts and circumstances occurring prior to the effective date of such assignment. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (d) of this Section.

(c)     The Administrative Agent, acting solely for this purpose as an agent of the Borrowers, shall maintain at one of its offices in New York a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, and the Borrowers, the Administrative Agent, each Issuing Lender and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.

(d)     Any Lender may at any time, without the consent of, or notice to, the Borrowers or the Administrative Agent, sell participations to any Person (other than a natural person the Disqualified Lender, or the Borrowers or any of the Borrowers' Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrowers, the Administrative Agent, each Issuing Lender and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that requires the consent of each Lender directly affected thereby pursuant to the proviso to the second sentence of Section 10.1 and that directly affects such Participant. Subject to paragraph (e) of this Section, the Borrowers agree that each Participant shall be entitled to the benefits of Sections 2.17, 2.18 and 2.19 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.7(b) as though it were a Lender, provided such Participant agrees to be subject to Section 10.7(a) as though it were a Lender.

(e)     A Participant shall not be entitled to receive any greater payment under Sections 2.17 or 2.18 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrowers' prior written consent. A Participant that would be a Non-U.S. Lender if it were a Lender shall not be entitled to the benefits of Section 2.18 unless the Borrowers are notified of the participation sold to such Participant and such Participant complies with Sections 2.18(d) and (e) as though it were a Lender.

(f)     (i) Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, (ii) any Lender that is a fund, trust or similar entity may assign or pledge all or any portion of the Loans held by it (and any Notes evidencing such Loans) to a trustee under any indenture to which such Lender is a party in support of its obligations to the trustee for the benefit of the applicable trust beneficiaries, and (iii) any Lender may pledge all or any portion of the Loans held by it (and any Notes evidencing such Loans) to its lenders or its Approved Funds' lenders for collateral security purposes; provided in each case that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)     Each Borrower, upon receipt of written notice from the relevant Lender, agrees to issue Notes to any Lender requiring Notes to facilitate transactions of the type described in paragraph (f) above.

(h)     Notwithstanding the foregoing, any Conduit Lender may assign any or all of the Loans it may have funded hereunder to its designating Lender without the consent of the Borrowers or the Administrative Agent and without regard to the limitations set forth in Section 10.6(b). Each of the Holdcos, the Borrowers, each Lender and the Administrative Agent hereby confirms that it will not institute against a Conduit Lender or join any other Person in instituting against a Conduit Lender any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding under any state bankruptcy or similar law, for one year and one day after the payment in full of the latest maturing commercial paper note issued by such Conduit Lender; provided, however, that each Lender designating any Conduit Lender hereby agrees to indemnify, save and hold harmless each other party hereto for any loss, cost, damage or expense arising out of its inability to institute such a proceeding against such Conduit Lender during such period of forbearance.

10.7    Adjustments; Set-off. (a) Except to the extent that this Agreement expressly provides for payments to be allocated to a particular Lender, if any Lender (a "Benefited Lender") shall receive any payment of all or part of the Obligations (excluding Obligations in respect of Treasury Management Products) owing to it, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set-off or otherwise), in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of the Obligations (excluding Obligations in respect of Treasury Management Products) owing to such other Lender, such Benefited Lender shall purchase for cash from the other Lenders a participating interest in such portion of the Obligations owing to each such other Lender, or shall provide such other Lenders with the benefits of any such collateral, as shall be necessary to cause

such Benefited Lender to share the excess payment or benefits of such collateral ratably with each of the Lenders; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.

(b)     In addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, without prior notice to the Holdcos or the Borrowers, any such notice being expressly waived by the Holdcos and the Borrowers to the extent permitted by applicable law, upon any amount becoming due and payable by the Holdcos or the Borrowers hereunder (whether at the stated maturity, by acceleration or otherwise), to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch or agency thereof to or for the credit or the account of either Holdco or either Borrower, as the case may be.  Each Lender agrees promptly to notify the Borrowers and the Administrative Agent after any such setoff and application made by such Lender, provided that the failure to give such notice shall not affect the validity of such setoff and application.

10.8     Counterparts.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  Delivery of an executed signature page of this Agreement by facsimile transmission or by electronic mail in portable document format (.pdf) shall be effective as delivery of a manually executed counterpart hereof.  A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrowers and the Administrative Agent.

10.9     Severability.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

10.10     Integration.  This Agreement, the other Loan Documents and the Financing Orders represent the entire agreement of the Holdcos, the Borrowers, the Administrative Agent and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Administrative Agent or any Lender relative to the subject matter hereof not expressly set forth or referred to herein, in the other Loan Documents or in the Financing Orders.

10.11     **GOVERNING LAW**.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

10.12     Submission To Jurisdiction; Waivers.  Each Holdco and each Borrower hereby irrevocably and unconditionally:

(a) except for matters within the exclusive jurisdiction of the Bankruptcy Court, submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of the courts of the State of New York, the courts of the United States for the Southern District of New York, and appellate courts from any thereof;

(b) consents that any such action or proceeding may be brought in such courts and, except for matters within the exclusive jurisdiction of the Bankruptcy Court, waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c) agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Holdco or such Borrower, as the case may be, at its address set forth in Section 10.2 or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

(d) agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and

(e) waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section any special, exemplary, punitive or consequential damages.

10.13 Acknowledgements. Each of the Holdcos and the Borrowers hereby acknowledges that:

(a) it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b) neither the Administrative Agent nor any Lender has any fiduciary relationship with or duty to either Holdco or either Borrower arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between Administrative Agent and Lenders, on one hand, and the Holdcos and the Borrowers, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c) no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among the Holdcos, the Borrowers and the Lenders.

10.14 Releases of Guarantees and Liens. (a) Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Collateral Agent is hereby irrevocably authorized by each Lender (without requirement of notice to or consent of any Lender except as expressly required by Section 10.1) to take any action requested by either

Borrower having the effect of releasing any Collateral or guarantee obligations (i) to the extent necessary to permit consummation of any transaction not prohibited by any Loan Document (which, for clarity's sake, shall exclude the release of Liens on any Collateral so that such Collateral may secure Indebtedness (other than the Obligations) permitted to be incurred hereunder or that has been consented to in accordance with Section 10.1 or (ii) under the circumstances described in paragraph (b) below.

(b)     At such time as the Loans, the Reimbursement Obligations and the other obligations under the Loan Documents (other than (i) indemnification obligations not yet due and (ii) obligations under or in respect of Treasury Management Products) shall have been paid in full, the Commitments have been terminated, the L/C Commitment has been terminated and no Letters of Credit shall be outstanding, the Collateral shall be released from the Liens created by the Security Documents, and the Security Documents and all obligations (other than those expressly stated to survive such termination) of the Collateral Agent, the Administrative Agent and each Loan Party under the Security Documents shall terminate, all without delivery of any instrument or performance of any act by any Person.

10.15   Confidentiality. Each of the Administrative Agent and each Lender agrees to keep confidential all non-public information provided to it by any Loan Party, the Administrative Agent or any Lender pursuant to or in connection with this Agreement; provided that nothing herein shall prevent the Administrative Agent or any Lender from disclosing any such information (a) to the Administrative Agent, any other Lender or any affiliate thereof, (b) to any pledgee under Section 10.6(f), any actual or prospective Transferee or any direct or indirect counterparty to any Swap Agreement (or any professional advisor to such counterparty) (provided, such pledgee, Transferee, counterparties and advisors are advised of and agree to be bound by the provisions of this Section 10.15), (c) to its employees, directors, agents, attorneys, accountants and other professional advisors or those of any of its affiliates and, subject to an agreement to comply with the provisions of this Section, to its trustees and portfolio management services, (d) upon the request or demand of any Governmental Authority, (e) in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Requirement of Law, (f) if requested or required to do so in connection with any litigation or similar proceeding, (g) that has been publicly disclosed other than by virtue of a breach of this Section 10.15 by the Person making such disclosure, (h) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender, (i) subject to an agreement to comply with the provisions of this Section, to any Person that is an investor or prospective investor in a Securitization that agrees that its access to information regarding the Loan Parties and the Loans is solely for purposes of evaluating an investment in such Securitization, (j) subject to an agreement to comply with the provisions of this Section, to any Person that is a trustee, collateral manager, servicer, backup servicer, noteholder or secured party in a Securitization in connection with the administration, servicing and reporting on the assets serving as collateral for such Securitization, (k) to any nationally recognized rating agency that requires access to information regarding the Loan Parties and the Loans in connection with ratings issued with respect to a Securitization (provided that any such rating agency keeps confidential all non-public information in a manner consistent with ratings agency industry standards) or (l) in connection with the exercise of any remedy hereunder or under any other Loan Document.

10.16   USA Patriot Act.  Each Lender which is subject to Section 326 of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), hereby notifies the Borrowers that, pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies each of the Borrowers, which information includes the name and address of each of the Borrowers and other information that will allow such Lender to identify each Borrower in accordance with the Act.

10.17   Joint and Several Liability of the Borrowers.  Each Borrower hereby irrevocably and unconditionally agrees that it is jointly and severally liable for all of the liabilities, obligations, covenants and agreements of the Borrowers hereunder and under the other Loan Documents, whether now or hereafter existing or due or to become due.  The obligations of the Borrowers under the Loan Documents may be enforced by the Administrative Agent and the Lenders against either Borrower or both Borrowers in any manner or order selected by the Administrative Agent or the requisite Lenders in their sole discretion.  Each Borrower hereby irrevocably waives (i) any rights of subrogation and (ii) any rights of contribution, indemnity or reimbursement, in each case, that it may acquire or that may arise against the other Borrower due to any payment or performance made under this Agreement, in each case until all Obligations (other than Obligations in respect of Treasury Management Products) shall have been fully satisfied.  Without limiting the foregoing provisions of this Section 10.17, each Borrower acknowledges and agrees that:

(a)     its obligations under this Agreement shall remain enforceable against it even though such obligations may be unenforceable or not allowable against the other Borrower due to the existence of an insolvency proceeding involving the other Borrower;

(b)     its obligations under this Agreement are independent of the obligations of the other Borrower, and a separate action or actions may be brought and prosecuted against it in respect of such obligations irrespective of whether any action is brought against the other Borrower or the other Borrower is joined in any such action or actions;

(c)     it hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to, any or all of the following:

(i)     any lack of validity or enforceability of this Agreement or any agreement or instrument relating thereto in respect of the other Borrower;

(ii)     any change in the time, manner or place of payment of, or in any other term of, all or any of the obligations of the other Borrower under or in respect of this Agreement, or any other amendment or waiver of or any consent to departure from this Agreement, in respect of the other Borrower;

(iii)     any change, restructuring or termination of the structure or existence of the other Borrower;

(iv)     the failure of any other Person to execute or deliver any other agreement or the release or reduction of liability of any other Person with respect to any obligations of the Borrowers under this Agreement; or

(v)  any other circumstance (including any statute of limitations but other than the Obligations having been fully satisfied) or any existence of or reliance on any representation by any other Person that might otherwise constitute a defense available to, or a discharge of, the other Borrower;

(d)  its obligations under this Agreement shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any such obligations is rescinded or must otherwise be returned by any Person upon the insolvency, bankruptcy or reorganization of the other Borrower, all as though such payment had not been made; and

(e)  it hereby unconditionally and irrevocably waives any right to revoke its joint and several liability under the Loan Documents and acknowledges that such liability is continuing in nature and applies to all obligations of the Borrowers under the Loan Documents, whether existing now or in the future.

Anything herein or in any other Loan Document to the contrary notwithstanding, the maximum liability of each Borrower under this Agreement and under the other Loan Documents (in its capacity as a joint and several obligor and a guarantor) shall in no event exceed the amount which can be guaranteed by such Borrower under applicable federal and state laws relating to fraudulent conveyances or transfers or the insolvency of debtors (after giving effect to any applicable right of contribution established in Section 2.2 of the Guarantee and Collateral Agreement).

10.18  **WAIVERS OF JURY TRIAL. THE HOLDCOS, THE BORROWERS, THE ADMINISTRATIVE AGENT AND THE LENDERS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.**

10.19  [Intentionally Deleted].

10.20  Usury Savings. Notwithstanding anything to the contrary contained in this Agreement, if a court of competent jurisdiction determines in a final order that the rate of interest payable hereunder exceeds the highest rate of interest permissible under applicable law (the "Maximum Lawful Rate"), then so long as the Maximum Lawful Rate would be so exceeded, the rate of interest payable hereunder shall be equal to the Maximum Lawful Rate; provided that, if at any time thereafter the rate of interest payable hereunder is less than the Maximum Lawful Rate, the Borrowers shall continue to pay interest hereunder until such time as the total interest received by the Administrative Agent, on behalf of the Lenders, is equal to the total interest that would have been received had the interest rate payable hereunder been (but for the operation of this Section) the interest rate payable as otherwise provided in this Agreement. Thereafter, interest hereunder shall be paid at the rate(s) of interest and in the manner provided in Section 2.13, unless and until the rate of interest again exceeds the Maximum Lawful Rate, and at that time this Section shall again apply. In no event shall the total interest received by any Lender pursuant to the terms hereof exceed the amount that such Lender could lawfully have received had the interest due hereunder been calculated for the full term hereof at the Maximum

Lawful Rate. If the Maximum Lawful Rate is calculated pursuant to this Section, such interest shall be calculated at a daily rate equal to the Maximum Lawful Rate divided by the number of days in the year in which such calculation is made. If, notwithstanding the provisions of this Section, a court of competent jurisdiction shall determine by final, non-appealable order that a Lender has received interest hereunder in excess of the Maximum Lawful Rate, the Administrative Agent shall, to the extent permitted by applicable law, promptly refund any excess to the Borrowers or as such court may otherwise order.

10.21 <u>Certain Bankruptcy Matters</u>. (a) Except to the extent provided otherwise in the Interim Order or the Final Order (as applicable), the Borrowers hereby agree that the Obligations shall (i) constitute superpriority allowed administrative expense claims in the Chapter 11 Cases having priority pursuant to Section 364(c)(1) of the Bankruptcy Code over all administrative expense claims and unsecured claims against the Borrowers now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code and all superpriority administrative expense claims granted to any other Person, subject, as to priority, only to the Carve-Out, the establishment of which superpriority shall have been approved and authorized by the Bankruptcy Court and (ii) be secured pursuant to Sections 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code subject only to Specified Liens and, to the extent provided in any of the Financing Orders, shall not be subject to claims against the Collateral pursuant to Section 506(c) of the Bankruptcy Code.

(b) The Collateral Agent's Liens and the administrative expense claim priority granted pursuant to clause (a) above have been independently granted by the Loan Documents, and may be independently granted by other Loan Documents heretofore or hereafter entered into. The Collateral Agent's Liens and the administrative expense claim priority granted pursuant to clause (a) above, this Agreement, the Interim Order, the Final Order and the other Loan Documents supplement each other, and the grants, priorities, rights and remedies of the Lenders and the Agents hereunder and thereunder are cumulative. In the event of a direct conflict between the Interim Order or the Final Order, on the one hand, and any other Loan Document, on the other hand, the Interim Order or the Final Order, as the case may be, shall control.

(c) Notwithstanding anything to the contrary contained herein or elsewhere:

(i) The Collateral Agent's Liens on Collateral of the Loan Parties shall be deemed valid and perfected by entry of the Interim Order and the Final Order, as the case may be, which entry of the Interim Order shall have occurred on or prior to the Closing Date. The Agents and the Lenders shall not be required to file, register or publish any financing statements, mortgages, hypothecs, notices of Lien or similar instruments in any jurisdiction or filing or registration office, or to take possession of any Collateral or to take any other action in order to validate, render enforceable or perfect the Liens on Collateral granted by or pursuant to this Agreement, the Interim Order, the Final Order or any other Loan Document. If any Agent or the Required Lenders shall, in its or their sole discretion, from time to time elect to file, register or publish any such financing statements, mortgages, hypothecs, notices of Lien or similar instruments, take possession of any Collateral, or take any other action to validate, render enforceable or perfect all or any portion of the Collateral Agent's Liens on Collateral, all such

documents and actions shall be deemed to have been filed, registered, published or recorded or taken at the time and on the date the Interim Order is entered.

(ii)     The Liens, lien priorities, superpriority administrative expense claims and other rights and remedies granted to the Agents and the Lenders pursuant to this Agreement, the Interim Order, the Final Order or the other Loan Documents (specifically including, but not limited to, the existence, perfection, enforceability and priority of the Liens provided for herein and therein, and the administrative expense claim priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of debt by the Borrowers (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by dismissal or conversion of the Chapter 11 Cases, or by any other act or omission whatsoever.  Without limiting the generality of the foregoing, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(1)     except for the Carve-Out, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of any Lender or any Agent against the Borrowers in respect of any Obligation;

(2)     the Collateral Agent's Liens on Collateral shall constitute valid, enforceable and perfected first priority Liens subject only to Specified Liens, to which such Liens shall or may be subordinate and junior, and shall be prior to all other Liens, now existing or hereafter arising, in favor of any other creditor or other Person; and

(3)     the Collateral Agent's Liens on the Collateral shall continue to be valid, enforceable and perfected without the need for any Agent or any Lender to file, register or publish any financing statements, mortgages, hypothecs, notices of Lien or similar instruments or to otherwise perfect the Collateral Agent's Liens under applicable nonbankruptcy law.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

LEVLAD INTERMEDIATE HOLDCO, INC.,
a Debtor and Debtor-in-Possession

By: _____
       Name:
       Title:


ARBONNE INTERMEDIATE HOLDCO,
INC., a Debtor and Debtor-in-Possession

By: _____
       Name:
       Title:


LEVLAD, LLC, a Debtor and Debtor-in-Possession

By: _____
       Name:
       Title:


ARBONNE INTERNATIONAL, LLC, a
Debtor and Debtor-in-Possession

By: _____
       Name:
       Title:

CANADIAN IMPERIAL BANK OF
COMMERCE, as Administrative Agent and
Collateral Agent

By: _____
    Name:
    Title:

_____,
as a Lender

By: _____
    Name:
    Title:

# Exhibit K

# **AGREED BUDGET**

# Arbonne International, LLC and Levlad, LLC
## 13 Week Cash Flow Forecast

*($ in thousands)*

| | 1<br>01/22/10<br>Actual | 2<br>01/29/10<br>Budget | 3<br>02/05/10<br>Budget | 4<br>02/12/10<br>Budget | 5<br>02/19/10<br>Budget | 6<br>02/26/10<br>Budget | 7<br>03/05/10<br>Budget | 8<br>03/12/10<br>Budget | 9<br>03/19/10<br>Budget | 10<br>03/26/10<br>Budget | 11<br>04/02/10<br>Budget | 12<br>04/09/10<br>Budget | 13<br>04/16/10<br>Budget |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts** | | | | | | | | | | | | | |
| Sales Orders/Receipts | $ 6,089 | $ 7,407 | $ 10,850 | $ 7,557 | $ 7,380 | $ 8,424 | $ 12,685 | $ 9,181 | $ 9,181 | $ 9,181 | $ 14,107 | $ 9,106 | $ 9,106 |
| Tax Refund | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Cash Receipts | 6,089 | 7,407 | 10,850 | 7,557 | 7,380 | 8,424 | 12,685 | 9,181 | 9,181 | 9,181 | 14,107 | 9,106 | 9,106 |
| **Cash Disbursements:** | | | | | | | | | | | | | |
| Overrides & Bonuses - Check Issuance | - | - | - | (3,070) | - | - | - | (3,371) | - | - | - | (4,756) | - |
| Overrides, ACH Payments | - | - | - | (7,895) | - | - | - | (8,669) | - | - | - | (12,229) | - |
| Total Overrides and Bonuses | - | - | - | (10,965) | - | - | - | (12,040) | - | - | - | (16,985) | - |
| Accounts Payable Check Issuance | | | | | | | | | | | | | |
| Inventory | (2,179) | (2,142) | (2,431) | (1,730) | (2,330) | (1,816) | (3,009) | (2,614) | (2,104) | (1,894) | (2,894) | (2,394) | (1,994) |
| Freight In/Freight Out | (75) | (877) | (356) | (356) | (456) | (456) | (620) | (620) | (620) | (620) | (586) | (586) | (586) |
| Rent | (255) | (116) | - | - | - | (250) | (200) | - | (238) | (250) | (200) | - | - |
| Utilities | - | - | (59) | (118) | (118) | (59) | (59) | (59) | (59) | (59) | (59) | (59) | (59) |
| HR/Employee Benefits | (284) | - | (155) | (155) | (155) | (155) | (155) | (155) | (155) | (155) | (155) | (155) | (155) |
| Temp/Contractors * | (115) | - | (225) | (375) | (365) | (225) | (225) | (225) | (225) | (225) | (225) | (225) | (225) |
| Professional Svc/Consulting | - | - | (75) | (150) | (150) | (75) | (75) | (75) | (75) | (75) | (75) | (75) | (75) |
| Events | (201) | (51) | - | (13) | (74) | (72) | - | - | (468) | (808) | - | - | (600) |
| Marketing | (35) | - | (272) | (322) | (322) | (272) | (169) | (169) | (169) | (169) | (169) | (169) | (169) |
| IT * | - | (26) | (120) | (120) | (60) | (60) | (60) | (60) | (60) | (60) | (60) | (60) | (60) |
| Insurance | - | (686) | - | - | - | (210) | - | - | - | (210) | - | - | - |
| Other Accounts Payable | (124) | (378) | (439) | (440) | (410) | (424) | (352) | (352) | (352) | (378) | (383) | (417) | (417) |
| Total Accounts Payable | (3,268) | (4,276) | (4,132) | (3,779) | (4,439) | (4,074) | (4,924) | (4,329) | (4,525) | (4,903) | (4,806) | (4,139) | (4,339) |
| Payroll * | (1,672) | - | (1,654) | - | (1,715) | - | (1,731) | - | (1,735) | - | (1,735) | - | (1,735) |
| Sales Tax; Check Issuance | - | - | - | - | (682) | - | - | - | (749) | - | - | - | (1,057) |
| Sales Tax; ACH Payments | - | (45) | (78) | (77) | (1,437) | (454) | (76) | (76) | (1,570) | (492) | (86) | (111) | (2,219) |
| Total Sale Tax Payments | - | (45) | (78) | (77) | (2,119) | (454) | (76) | (76) | (2,319) | (492) | (86) | (111) | (3,276) |
| **Debt Service:** | | | | | | | | | | | | | |
| Fees / Cash Interest Payments | - | (831) | - | - | - | (5) | - | - | - | - | (229) | - | - |
| Principal Payments | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Borrowings | - | 10,000 | - | - | - | - | - | - | - | - | - | - | - |
| Total Debt Related Payments | - | 9,169 | - | - | - | (5) | - | - | - | - | (229) | - | - |
| Special Payroll Run | (61) | - | - | - | - | - | - | - | - | - | - | - | - |
| Utilities Deposit | - | (236) | - | - | - | - | - | - | - | - | - | - | - |
| Cash Collateral for LCs | - | - | - | - | (212) | - | - | - | - | - | - | - | - |
| Restructuring & Advisory Fees | (754) | (1,353) | (5) | (5) | (5) | (255) | (5) | (5) | (3) | (303) | (3) | (3) | - |
| Funding for Foreign Operations | (1,700) | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Disbursements | (7,454) | 3,259 | (5,869) | (14,826) | (8,491) | (4,789) | (6,737) | (16,451) | (8,583) | (5,698) | (6,858) | (21,238) | (9,350) |
| Net Cash Flow | $ (1,365) | $ 10,666 | $ 4,981 | $ (7,270) | $ (1,111) | $ 3,635 | $ 5,948 | $ (7,269) | $ 599 | $ 3,483 | $ 7,248 | $ (12,132) | $ (244) |
| Beginning Book Cash | $ 6,745 | $ 5,380 | $ 16,045 | $ 21,026 | $ 13,757 | $ 12,645 | $ 16,281 | $ 22,229 | $ 14,960 | $ 15,558 | $ 19,041 | $ 26,289 | $ 14,158 |
| Net Cash Flow | (1,365) | 10,666 | 4,981 | (7,270) | (1,111) | 3,635 | 5,948 | (7,269) | 599 | 3,483 | 7,248 | (12,132) | (244) |
| Ending Book Cash Balance | $ 5,380 | $ 16,045 | $ 21,026 | $ 13,757 | $ 12,645 | $ 16,281 | $ 22,229 | $ 14,960 | $ 15,558 | $ 19,041 | $ 26,289 | $ 14,158 | $ 13,914 |

Note:
* Includes expenditures that will be classified as CapEx.