## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| NATURAL PRODUCTS GROUP, LLC, et al.,[1] | ) | Case No. 10- |
|  | ) |  |
|  | ) | Jointly Administered |
| Debtors. | ) |  |
|  | ) |  |

## AFFIDAVIT OF MARK I. LEHMAN IN
## SUPPORT OF FIRST DAY MOTIONS AND APPLICATIONS

| STATE OF CALIFORNIA | ) |  |
|---|---|---|
|  | ) ss.: |  |
| COUNTY OF ORANGE | ) |  |

Mark I. Lehman, being duly sworn, deposes and says:

1.      On January 27, 2010 (the "Petition Date"), National Products Group, LLC ("NPG") and certain of its direct and indirect subsidiaries (collectively, the "Debtors"), as debtors and debtors in possession, each commenced a case under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") in this Court. I am Secretary and Treasurer of Arbonne Intermediate Holdco, Inc. ("Arbonne HoldCo"), and Levlad Intermediate Holdco, Inc. ("Levlad HoldCo"); and Chief Financial Officer and Secretary of all the other Debtors, including Arbonne International, LLC ("Arbonne") and Levlad, LLC ("Levlad"). As such, I am familiar with the day-to-day operations, business and financial affairs of the Debtors.

---

[1]      The debtors and debtors in possession in these cases are Natural Products Group, LLC (Fed. EIN 86-1119470); Arbonne Intermediate Holdco, Inc. (Fed. EIN 87-0735363); Levlad Intermediate Holdco, Inc. (Fed. EIN 87-0735367); Arbonne International, LLC (Fed. EIN 33-0762250); Levlad, LLC (Fed. EIN 95-2973496); Arbonne Institute of Research and Development, LLC (Fed. EIN 33-0762250); Arbonne International Holdings, Inc. (Fed. EIN 20-5585671); and Arbonne International Distribution, Inc. (Fed. EIN 20-5585608).

2. I submit this affidavit (the "Affidavit") to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of the first day motions and applications (collectively, the "First Day Motions"). Except as otherwise indicated, all facts set forth in this Affidavit are based upon my personal knowledge, information provided to me by certain of the Debtors' employees, my review of relevant documents or my opinion based upon my experience, knowledge and information concerning the operations and financial affairs of the Debtors. If I were called upon to testify, I would testify competently to the facts set forth in this Affidavit. I am authorized to submit this Affidavit.

3. This Affidavit is divided into two sections. Section I provides a brief description of the Debtors' current organizational structure and operations, their current financial condition and the events giving rise to these cases. Section II sets forth those facts which are most germane to this Court's determination of the Debtors' various First Day Motions and is intended to supplement any other affidavits submitted in direct support of such motions.

## I.
## BACKGROUND AND EVENTS LEADING TO
## THE COMMENCEMENT OF THE CHAPTER 11 CASES

### A.  Overview of Business Operations

4. NPG, together with its Debtor and non-Debtor affiliates (collectively, the "Company"), are leaders in the manufacture and distribution of personal care products. The Company operates primarily through Debtors Arbonne and Levlad. Arbonne is headquartered in Irvine, California and, either directly or through a subsidiary, has additional leased facilities located in Greenwood, Indiana; Dallas, Texas; Toronto, Ontario, Canada; Calgary, Alberta, Canada; New South Wales, Australia; Northampton, United Kingdom; and Munich, Germany.

2

Levlad is headquartered in Chatsworth, California and has several other leased facilities in that area. The organizational chart below illustrates the structure of the Company as of the Petition Date.



Company Organizational Chart as of
Date of The Petition Date

5. **NPG**. In 2004, the predecessor to Harvest Partners, L.P. ("Harvest"), a leading New York-based private equity investment firm specializing in management buyouts and growth financings of middle-market companies, formed NPG as a special purpose entity to complete the acquisitions of Arbonne and Levlad. Harvest, through its subsidiary Harvest Partners IV, L.P., along with other investors, provided approximately $93 million for the acquisitions. NPG serves as the ultimate parent of the Company.

6. **Arbonne**. Arbonne was founded in Switzerland in 1975 with the goal of developing skin care products based on natural, botanical principles, and it relocated its headquarters and primary operations to the United States in 1980. Arbonne now sells its own

3

branded line of hundreds of botanically based personal care, cosmetic and wellness products, including skin care, body and hair care, cosmetics, aromatherapy, and nutritional products. Arbonne's products are botanically based, pH correct, dermatologist tested, hypoallergenic, and never tested on animals. Arbonne markets most of its products as part of a comprehensive personal care, cosmetic, health and wellness regimen designed for combined and repeated use.

7.     Whereas traditional marketing moves products from the manufacturer to wholesalers, warehousers, shippers, advertisers, and retailers before ever reaching the consumer, Arbonne markets its products in the United States, Canada, the United Kingdom, and Australia through a direct sales network of Arbonne Independent Consultants ("AICs"). AICs are independent contractors and may be individuals or registered business entities. They are not employees of the Company. The AICs purchase Arbonne products from the Company at published discounted prices to then market and sell the products to consumers. Arbonne's marketing relies on developing and keeping trusted relationships with its consumers and the AICs. Consequently, Arbonne is focused on maintaining the quality of its products and services at a level that it believes exceeds that of standard retail brands.

8.     AICs are eligible to earn commissions and incentives based on their retail volume and the retail volume of other AICs that they have directly or indirectly sponsored, also known as their "downline." AICs are compensated in two basic ways: (a) through retail profit on the sale of the Arbonne products that were purchased at a discount and (b) through commissions, overrides, and bonuses paid based on the AICs' product sales volume and the sales volume of their downline.

9.     AICs operating in Canada contract directly with Arbonne's subsidiary, Arbonne International Distribution, Inc. ("AIDI"), which is a Debtor in these cases. AICs

4

operating in the United Kingdom and Australia contract directly with Arbonne's non-Debtor foreign subsidiary, Arbonne Europe Sàrl ("AES"). Certain of Arbonne's other foreign subsidiaries, Arbonne International Canada, Inc. ("AICI"), Arbonne UK Limited ("AUKL"), and Arbonne Australia Pty Ltd. ("AAPL"), provide logistical support and services to the AICs operating in their respective countries, including leasing property, employing personnel and providing marketing and administrative services. Arbonne also established subsidiary Arbonne Germany GmbH in the event the Company decides to begin operations in Germany.

10.     Arbonne Institute of Research and Development, LLC ("AIRD"), also a Debtor in these cases, provides product development services for Arbonne. AIRD is a Delaware limited liability company with a service agreement to use a Swiss laboratory facility at which AIRD coordinates the efforts of master formulators as they research, develop, and finalize Arbonne's exclusive personal care products. The proprietary formulas being developed by AIRD are owned by Arbonne and represent botanically-based products based on cutting-edge technologies and the latest advances in skin care science. Neither Arbonne nor AIRD engage in any sales or other commercial activity in or from Switzerland.

11.     For the last twelve months ending November 30, 2009, Arbonne had revenue of approximately \$378 million and EBITDA of approximately \$38 million.

12.     **Levlad**. Levlad was founded in 1972 in Venice Beach, California. It was one of the first manufacturers of natural personal care products, with its founders starting off by collecting rainwater and blending it with natural herbs from their herb shop, then selling the mixture as the very first rainwater shampoo. Currently, Levlad manufactures safe, performance driven and natural personal care products, including a line that is certified organic, by combining proven botanical, herbal, and floral treatments with modern ingredients and techniques. Levlad's

5

products include shampoos, conditioners, soaps, bath gels, lotions, deodorants, and toothpastes. Levlad markets these products under the brand names Nature's Gate®, Nature's Gate Organics®, Nature's Gate Advanced Care®, Nature's Gate Organics Natural Results® Acne Care, and Rainwater Organics. Levlad markets these products internationally, including throughout North America at natural food retailers, including Whole Foods, and specialty retailers, including General Nutrition Centers (GNC), and Bed, Bath & Beyond. Levlad's brands hold leading market positions across key product categories.

13. Levlad also provides value-added, turn-key manufacturing and formulation services for private-label customers, including Arbonne. In such capacity, Levlad provides its customers a full range of services, including product creation, manufacturing, filling, product labeling and packaging design, raw material procurement, and collateral marketing development materials. In this capacity, Levlad has long-standing relationships with recognized name brand personal care product companies and specialty retailers – an average tenure of over twelve years for Levlad's top customers.

14. For the last twelve months ending November 30, 2009, Levlad had revenue of approximately \$73 million and an EBITDA loss of approximately \$6 million.

15. As of the Petition Date, the Company employed approximately 867 employees worldwide. Of that number, approximately 792 are employed by the Debtors and approximately 75 are based with NPG's non-debtor subsidiaries. In addition to the Company's employees, Arbonne utilizes a direct sales network of approximately 750,000 AICs.

B. **Capital and Debt Structure**

16. As of November 30, 2009, the Company's consolidated balance sheet reflected total assets of approximately \$286 million. Of this amount, approximately \$24 million

6

was comprised of cash and cash equivalents, approximately $26 million was comprised of property and equipment, net of depreciation, approximately $42 million was comprised of inventories, and approximately $194 million was comprised of other assets. The Company's consolidated balance sheet also reflected total liabilities of approximately $804 million. As of the Petition Date, the Debtors' books and records reflect that they have approximately $4.3 million in cash on hand.

17. On or about June 19, 2006, Levlad and Arbonne, as borrowers, and Levlad HoldCo and Arbonne HoldCo (together, the "HoldCos"), as guarantors, entered into (a) a $410 million First Lien Credit Agreement (the "First Lien Credit Agreement") and (b) a $195 million Second Lien Credit Agreement (the "Second Lien Credit Agreement"), each with Canadian Imperial Bank of Commerce ("CIBC"), as administrative agent and collateral agent, and with other lenders from time to time party thereto. In addition to the guarantees of the HoldCos, the obligations of Levlad and Arbonne under the First Lien Credit Agreement and Second Lien Credit Agreement were guaranteed by Debtor AIRD and were secured by liens on substantially all of the borrowers' and guarantors' assets.

18. The proceeds from the First Lien Credit Agreement and the Second Lien Credit Agreement were used by Arbonne and Levlad to repay approximately $298 million in existing indebtedness that was incurred to finance the 2004 acquisition of Arbonne and Levlad by NPG.

19. On the same date, the HoldCos, as borrowers, also entered into the HoldCo Credit Agreement, which provided for a $135 million unsecured term loan facility (the "HoldCo Term Loan") with Credit Suisse, as the then administrative agent, and with other lenders from time to time party thereto (the "HoldCo Lenders"). The HoldCo Term Loan bears

●

7

interest at a rate of 13.5% per annum, which may, at the option of the HoldCos, be payable in kind, capitalized, compounded, and added to the principal.

20.     In March 2007, the Debtors refinanced their existing indebtedness under the First Lien Credit Agreement and Second Lien Credit Agreement. Specifically, on March 8, 2007, Levlad and Arbonne, as borrowers, and the HoldCos, as guarantors, entered into a $600 million Credit Agreement (as amended, supplemented, modified or otherwise in effect from time to time, the "OpCo Credit Agreement," and together with the HoldCo Credit Agreement, the "Prepetition Credit Facilities") with CIBC, as administrative agent and collateral agent, and other lenders from time to time party thereto (the "OpCo Lenders," and together with the HoldCo Lenders, the "Prepetition Lenders"). The OpCo Credit Agreement provides for term loans in the aggregate principal amount of $565 million (the "OpCo Term Loan") and a revolving credit facility of $35 million (the "OpCo Revolver," and together with the OpCo Term Loan and the HoldCo Term Loan, the "Prepetition Loans"), a portion of which may be used for letters of credit. In addition to the guarantees of the HoldCos, the obligations of Levlad and Arbonne under the OpCo Credit Agreement are guaranteed by Debtors AIRD, Arbonne International Holdings, Inc., and AIDI, and are secured by liens on substantially all of the Debtors' assets (the "Prepetition Collateral").[2]

21.     On June 12, 2009, the Debtors and the OpCo Lenders signed an amendment to the OpCo Credit Agreement (the "OpCo Credit Agreement Amendment"). At the time, the Debtors were in default on the OpCo Credit Agreement. Specifically, the Debtors had exceeded the permissible combined leverage ratio ("Leverage Ratio"), as set forth by a negative

---

[2]     Nothing contained herein shall constitute an admission by the Debtors of the validity, priority, extent or enforceability of the Prepetition Loans or any lien or security interest asserted by the Prepetition Lenders in connection with the Prepetition Collateral.

covenant in the OpCo Credit Agreement, and had failed to deliver audited financial statements and certificates signed by a designated representative, stating that the Debtors were not in default (collectively, the "Specified Defaults"). The OpCo Credit Agreement Amendment waived the Specified Defaults and temporarily eliminated the Leverage Ratio requirement but required the Company to generate minimum levels of EBITDA during the period in which the Leverage Ratio requirement was eliminated.

22.    As of the Petition Date, the principal amount outstanding under the OpCo Term Loan is approximately $501 million. The principal amount outstanding under the OpCo Revolver is approximately $29 million, and the aggregate amount of outstanding letter of credit obligations is approximately $1.1 million. The total amount outstanding under the HoldCo Term Loan, as of the Petition Date, is approximately $217 million.

## C.    Events Leading to the Commencement of the Chapter 11 Cases

23.    Although the Company had experienced a high rate of revenue growth through 2006 and early 2007, this was driven primarily by unusually higher levels of recruitment for new AICs, which was unsustainable. In 2005 and 2006, on a net basis, the Company added approximately 434,000 and 612,000 AICs, respectively. Because recruitment of AICs tends to be a leading indicator of later attrition, the historically high numbers of new consultants in those years resulted in attrition exceeding the recruiting levels in subsequent years. In 2007, 2008 and 2009, on a net basis, the Company lost approximately 108,000, 270,000 and 145,000 AICs, respectively. This attrition, combined with the downturn in the economy and the financial crisis later in 2008, caused a reduction in the Company's overall net sales.

24.    The Company responded by implementing several cost saving and revenue producing initiatives, including (a) relocation of most of the Company's customer

9

service and information technology operations to Dallas, Texas, which lowered expenses related to information technology contract labor and customer service temporary help as the Company was able to recruit full time employees at lower salaries, (b) conversion of certain AIC publications to an on-line only format, (c) a reduction in force at certain subsidiaries and reduction of warehouse operations to a single shift, (d) realigning the AIC compensation plan to incentivize early stage AICs interested in building a business, (e) development of targeted marketing and product strategies, and (f) expanding Arbonne's Regional Sales Manager program into underutilized geographic areas. Although the Company experienced some success with these initiatives, such success was unable to reverse the effects of the decrease in AICs combined with the global financial crisis.

25. Compounding this revenue reduction was the fact that the permitted maximum Leverage Ratio contained in the OpCo Credit Agreement was reduced in the fourth quarter of 2008. The tightening of the covenant requirements coupled with reduced revenue triggered a default under the OpCo Credit Agreement, and resulted in the Debtors' entry into the OpCo Credit Agreement Amendment with the OpCo Lenders. The OpCo Credit Agreement Amendment waived certain defaults and temporarily eliminated the Leverage Ratio requirement but required the Company to generate minimum levels of EBITDA during the period in which the Leverage Ratio requirement was eliminated. Although the Company was able to satisfy the EBITDA requirement for the third quarter of 2009, it became apparent at that time that it would not be able to do so going forward and that the Company's debt exceeded the amount that the Company could reasonably support.

26. Consequently, the Company, with the assistance of its financial and legal advisors, entered into discussions with the OpCo Lenders, HoldCo Lenders and principal

10

stockholders in an attempt to implement a consensual restructuring of the Company's capital structure. Further, during the period of discussions, the Company entered into a forbearance agreement with the OpCo Lenders whereby the OpCo Lenders agreed to forbear from exercising remedies in connection with certain defaults by the Company under the OpCo Credit Agreement. The forbearance agreement has been extended from time to time and the forbearance period is currently extended through February 1, 2010 (subject to certain conditions contained therein).

27.     Following these extensive discussions—which, among other things, involved negotiating and finalizing term sheets reflecting the material terms of a proposed restructuring, and entry into plan support agreements with a majority of the OpCo Lenders and the HoldCo Lenders[3]—on January 13, 2010, the Company solicited acceptances of the final form of restructuring proposal (the "Restructuring"), which was set forth in that certain Proposal to Restructure, Disclosure Statement and Solicitation of Acceptances of a Prepackaged Plan of Reorganization (the "Disclosure Statement"), filed concurrently herewith. As set forth in the Disclosure Statement, the Company sought approval of the Restructuring through a consensual transaction outside of bankruptcy with the unanimous support of the Prepetition Lenders (the "Out-of-Court Transaction"), or, if such unanimous consent was not obtained, in accordance with the terms of the prepackaged plan of reorganization (the "Plan") attached to the Disclosure Statement, subject to bankruptcy court approval.

28.     As more fully described in the Disclosure Statement, the Plan generally provides for the satisfaction of (a) the OpCo Debt[4] through the (i) reinstatement of an aggregate of $125 million of the existing OpCo Debt under the Reinstated OpCo Term Loan, and (ii)

---

[3]     A more detailed description of the plan support agreements may be found in the Disclosure Statement, which has been filed concurrently herewith.

[4]     All capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Disclosure Statement and Plan, which have been filed concurrently herewith.

11

issuance upon the Effective Date of 85% of the New NPG Common Stock (subject to dilution for New NPG Common Stock issuable upon the exercise of the New NPG Warrants or any New NPG Options that may be issued and/or awarded under a new Long Term Management Incentive Plan); and (b) the HoldCo Debt through the issuance of New NPG Warrants, which will entitle the holders thereof to purchase New NPG Common Stock equal to an aggregate of 5% of the New NPG Common Stock (subject to dilution for New NPG Common Stock issuable upon the exercise of any New NPG Options that may be issued and/or awarded under the Long Term Management Incentive Plan). Notably, with the exception of the Prepetition Lenders and the existing holders of equity interests in NPG, all of the Company's creditors and equity holders are unimpaired under and deemed to have accepted the Plan. The existing holder of equity interests in NPG will have their equity cancelled and, therefore, are deemed to have rejected the Plan.

29. The deadline to vote to accept or reject the proposed Restructuring (whether effectuated through an Out-of-Court Transaction or through the Plan) expired on January 27, 2010 at 12:00 noon (Prevailing Eastern Time). Although the Prepetition Lenders overwhelmingly voted in favor of the Restructuring, the Debtors were unable to consummate the Restructuring through the Out-of-Court Transaction. To prevent the consequences of defaults under the OpCo Credit Agreement, preserve the Debtors' business as a going-concern, and restructure their debt in accordance with the Plan, the Debtors commenced these cases under chapter 11 of the Bankruptcy Code.

## II.
## FACTS IN SUPPORT OF FIRST DAY MOTIONS

30. Concurrently with the filing of their chapter 11 petitions, the Debtors have filed the First Day Motions. The Debtors request that the relief requested in each of the First Day Motions described below be granted, as each request for relief constitutes a critical element

12

in achieving the successful rehabilitation and reorganization of the Debtors for the benefit of all parties in interest.

## A. Debtors' Motion for Joint Administration of Cases (the "Joint Administration Motion")

31.     The Debtors seek the joint administration of their chapter 11 cases for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

32.     Joint administration of the Debtors' chapter 11 cases will expedite the administration of these cases and reduce administrative expenses without prejudicing any creditor's substantive rights. For example, joint administration will permit the Clerk of the Court to utilize a single general docket for these cases and combine notices to creditors of the Debtors' respective estates and other parties in interest. The Debtors anticipate that numerous notices, applications, motions, other pleadings and orders in these cases will affect many or all of the Debtors. Joint administration will permit counsel for all parties in interest to include the Debtors' respective cases in a single caption on the numerous documents that will be filed and served in these cases. Joint administration also will enable parties in interest in each of the above-captioned chapter 11 cases to be apprised of the various matters before the Court in all of these cases.

33.     Because these cases involve multiple Debtors with numerous parties in interest, the entry of an order of joint administration will: (a) significantly reduce the number of duplicate pleadings that otherwise would be filed with the Clerk of the Court; (b) simplify, for the Office of the United States Trustee, the supervision of the administrative aspects of these

13

chapter 11 cases; (c) render the completion of various administrative tasks less costly; and (d) minimize the number of unnecessary delays associated with the administration of numerous separate chapter 11 cases. Additionally, because the Debtors are not seeking the substantive consolidation of the Debtors' estates, the rights of parties in interest will not be prejudiced by the proposed joint administration of these cases as each creditor may still file its claim against a particular estate. In fact, the rights of all creditors will be enhanced by the reduction in costs resulting from joint administration.

34.     In addition, the Debtors seek approval of the form of caption set forth on Exhibit "A" to the Joint Administration Motion. The Debtors submit that the use of this caption, without specific reference to every debtor and their individual case numbers, will eliminate cumbersome and confusing procedures and ensure uniformity of pleadings.

35.     The Debtors believe that joint administration of the Debtors' chapter 11 cases, and under the combined caption, is in their best interests, as well as those of their respective estates, creditors and other parties in interest.

**B.      Debtors' Motion for Order (I) Authorizing Continued Use of Existing (A) Cash Management System and Bank Accounts and (B) Business Forms; (II) Authorizing Continued Postpetition Intercompany Transactions; and (III) Waiving Investment and Deposit Requirements (the "Cash Management Motion")**

36.     The Debtors seek (a) authority to continue to use the Debtors' existing (i) Cash Management System and Bank Accounts (each as defined below) and (ii) business forms; (b) authority to continue postpetition intercompany transactions (as described below); and (c) a waiver of investment and deposit requirements.

37.     As is typical with most large corporate enterprises, in the ordinary course of their businesses and prior to the Petition Date, the Debtors in large part utilized an integrated

cash management system that provides for well-established mechanisms for the collection, concentration, management and disbursement of funds used in the Debtors' and their non-Debtor affiliates' business operations (the "Cash Management System"). A list of the Debtors' bank accounts (the "Debtor Accounts") and their non-Debtor affiliates' bank accounts (the "Non-Debtor Accounts," and collectively with the Debtor Accounts, the "Bank Accounts") is set forth on Exhibit "A" to the Cash Management Motion.[5]

38.     Through the Cash Management System, the Debtors are able to monitor their cash position on a daily basis, and disbursements are controlled primarily by the Debtors' financial personnel located at Arbonne's headquarters in Irvine, California. By centralizing control over the Cash Management System, the Debtors are able to facilitate cash forecasting and reporting, monitor the collection and disbursement of funds and maintain control over the administration of the various Bank Accounts required to effect the collection, disbursement and movement of cash.

39.     As reflected in Exhibit "A" to the Cash Management Motion, the Company maintains numerous Bank Accounts, which are primarily maintained at Bank of America, N.A. ("Bank of America"), and Citibank N.A. ("Citibank"). Specifically, the Debtors' Cash Management System primarily consists of (a) a master concentration account in the name of Arbonne, (b) additional concentration accounts in the names of other Debtors and non-Debtor entities, and (c) various zero-balance accounts for certain disbursements, payroll, AIC overrides and taxes.

---

[5]     The Debtors believe that the list of Bank Accounts in Exhibit "A" to the Cash Management Motion includes a complete list of all of the Debtor Accounts. However, in the event than one or more of the Debtor Accounts may have been inadvertently omitted from Exhibit "A", such accounts are included in the definition of "Bank Accounts."

40. Arbonne Accounts. Arbonne maintains concentration accounts at Bank of America and Citibank, and also maintains various zero-balance accounts at Bank of America and Citibank. Historically, the Debtors' Cash Management System primarily revolved around Arbonne's master concentration account at Citibank, into which substantially all of the funds received by the Debtors were either directly deposited or transferred from other Debtor and non-Debtor concentration accounts on a monthly or other periodic basis. The funds deposited in the master concentration account historically have included, among other things, revenues from the operations of the Debtors and their non-Debtor subsidiaries, and payments to Arbonne for the delivery of inventory to certain of its subsidiaries.

41. Payroll for Arbonne employees, AIC overrides made by direct deposit, and certain other operating expenses generally have been paid directly out of the master concentration account. The zero-balance accounts at Citibank are automatically funded daily from the master concentration account and have been utilized for certain check disbursements, AIC overrides paid by check, sales taxes and minor payroll runs.

42. In recent months, Arbonne and most of its subsidiaries have been in the process of moving their accounts from Citibank to Bank of America, and have established accounts at Bank of America that essentially mirror the concentration, zero-balance and other accounts that exist at Citibank.

43. Arbonne Subsidiary Accounts. AICs operating in Canada contract directly with AIDI, and AICs operating in Europe and Australia contract directly with AES. Revenue generated by AIDI through sales in Canada is deposited in AIDI's concentration account held at

16

Bank of America,[6] and revenue generated by AES through sales in Australia and the U.K. is deposited in AES's concentration account held at Citibank. Revenue generated by AIDI and AES is periodically upstreamed to Arbonne, usually on a monthly basis, in payment for inventory, for reimbursement of AIC override payments made by Arbonne on foreign sales, and, if applicable, when excess cash has accumulated at AIDI.

44. When additional funding is needed at AIDI and AES, Arbonne, in the ordinary course of its business prior to the Petition Date, provided funding by way of intercompany loans and accounts through the Cash Management System. For example, pursuant to that certain loan agreement and subordination agreement dated February 2009 by and between Arbonne and AES, Arbonne is obligated, inter alia, to fund any shortfall AES experiences in operating its segment of the AIC network, which includes all AICs operating in Australia and Europe. Such deficit funding, if necessary, is provided by transfers from Arbonne's master concentration account to the concentration accounts of AES.

45. Certain of Arbonne's other foreign subsidiaries, AICI, AUKL, and AAPL (collectively, the "Service Entities"), which provide logistical support to the AICs operating in Canada, the U.K. and Australia, respectively, maintain concentration accounts, various disbursement accounts and imprest accounts at Bank of America and/or Citibank. Pursuant to the servicing agreements between AIDI and AICI, AES and AUKL, and AES and AAPL, the Service Entities are paid a management fee, which funds such entities' payroll, taxes and other operating expenses.

---

6     AIDI also maintains accounts at Citibank that essentially mirror the AIDI accounts at Bank of America. Like the Arbonne accounts, however, AIDI's Citibank accounts are being wound down and will ultimately be closed.

46.     Levlad Accounts. Levlad maintains at Citibank a concentration account
and zero-balance accounts for certain check disbursements and payroll. Revenue received for its
manufacturing services is deposited into the Citibank concentration account and the zero-balance
accounts are automatically funded by the concentration account to cover checks and debits on
those accounts. Like Arbonne, Levlad is in the process of transitioning its accounts to Bank of
America and has thus established accounts at Bank of America that essentially mirror its
accounts at Citibank.

47.     Intercompany Transactions. Receivables and payables that result from
inventory movement between the Debtors and between Debtors and non-Debtors are classified
by the Debtors as trade receivables and payables; most other advances and transfers between the
Debtors and their affiliates are classified by the Debtors as non-trade receivables and payables.
Intercompany transactions that are related to trade items are booked as intercompany payables
and are non-interest bearing. Intercompany transactions that are related to non-trade items are
booked as intercompany loans and, if such loan is for longer than 90 days, generally accrue
interest.

48.     Subject to the provisions of any order entered with respect to the authority
of the Debtors to use cash collateral or obtain debtor-in-possession financing, the Debtors intend
to continue funding their non-Debtor affiliates' operations, as needed, so long as the Debtors
determine that providing such funding in the form of an intercompany transaction would be in
the best interests of their estates and creditors. If the intercompany transactions were to be
discontinued, the Cash Management System and related administrative controls would be
disrupted to the detriment of the Debtors and their estates.

18

49. The Debtors submit that the cost and expense of creating a new cash management system or changing bank accounts would not only force the Debtors to incur significant and unnecessary costs and expenses, but would impair the ordinary operation of the Debtors' businesses.

50. Forcing the Debtors to employ a new cash management system and new bank accounts would cause confusion, disrupt payroll, introduce inefficiency at a time when efficiency is most critical and place a strain on the Debtors' relationships with customers and vendors. The Debtors believe these relationships must be maintained if the Debtors are to be given the opportunity to reorganize successfully. Indeed, asking customers to remit payments to new and different accounts will result in a significant slowdown in the Debtors' collection of receipts just at the time when prompt collection is most critical.

51. Similarly, the Debtors, their employees and vendors would suffer great hardship if the Debtors were required to substitute new debtor-in-possession bank accounts for their existing Bank Accounts. Substitution of the Debtors' Bank Accounts would essentially render this Court's approval of the continuation of the intercompany accounting and cash management procedures, if granted, meaningless, and inevitably lead to the same delays, confusion and disruption of the Debtors' businesses, including significant slowdown in the collection of payments from customers, that would result from a discontinuation of the intercompany accounting and cash management procedures.

52. Business Forms. Additionally, the Debtors do not print their own business forms and stationery. Thus, substantial time and expense would be required if the Debtors were required to print new business forms and stationery merely to indicate "debtor in possession." Changing the business forms at this critical, early stage of their chapter 11 cases would be

19

expensive and burdensome to the Debtors' estates and present an unnecessary distraction, extremely disruptive to the Debtors' business operations.

53. Waiver of Investment and Deposit Requirement. Finally, the Debtors seek a waiver of the strict application of the requirements of section 345 of the Bankruptcy Code. The financial institutions at which the Debtors maintain their Bank Accounts are financially stable banking institutions. All of the Debtors' deposits are prudent and designed to yield the maximum reasonable net return on the funds invested. The Debtors seek authority to maintain their cash in the Bank Accounts in a safe and prudent manner, in accordance with their existing practices.

54. By preserving business continuity and avoiding the operational and administrative paralysis that changing the Cash Management System, Bank Accounts, and business forms would necessarily entail, all parties in interest will be best served and the Debtors will benefit considerably from the relief requested in the Cash Management Motion.

## C. Debtors' Motion for Authority to Pay Prepetition Wages, Compensation and Employee Benefits (the "Wage Motion")

55. Pursuant to the Wage Motion, the Debtors seek authority to pay certain prepetition obligations owing to the Debtors' employees (as specifically set forth and defined in the Wage Motion, the "Prepetition Employee Obligations"). The Debtors seek authority to honor the Prepetition Employee Obligations as payment of such obligations is critical and essential to employee morale and future business needs.

56. As stated above, the Company employs approximately 867 non-union employees worldwide. Of that number, approximately 792 are employed by Debtors and approximately 75 are based with NPG's non-Debtor subsidiaries. Arbonne employs approximately 573 full-time, non-union employees, who provide services relating to customer

service, sales, operations, executive, facilities, finance and accounting, strategy, human resources, information technology, legal, marketing, supply chain, and warehouse. In the ordinary course, Arbonne also employs approximately 31 "leased" employees, either as a potential hire or for assistance on clerical projects; and approximately 62 consultants, for assistance on high level projects.[7] Levlad employs approximately 219 full-time, non-union employees, who provide services relating to general management, human resources, finance, information technology, marketing, operations and manufacturing, research and development, sales, and field support. In the ordinary course, Levlad also employs approximately 72 "leased" employees on a temporary basis and approximately 8 consultants.

## Wages, Salaries, and Other Compensation

57.    Payroll Obligations. The Debtors seek to be authorized to honor all outstanding payroll obligations. Approximately 7% of the Debtors' payroll costs represent compensation paid to "Senior Executives,"[8] with the remaining 93% representing compensation to middle management or rank and file employees.[9]

58.    Arbonne employees are paid bi-weekly in arrears, with a Saturday payroll close date and Friday pay date. In addition to their normal hourly rates, certain regular hourly-paid employees are eligible for overtime premiums.[10] On a monthly basis, Arbonne's gross

---

[7]    AICs are independent contractors, and are not employees, agents, partners, legal representatives, or franchisees of the Debtors. As described below, the Debtors are seeking through a separate motion various form of relief with respect to honoring prepetition obligations to the AICs.

[8]    As of the Petition Date, the Debtors employed five "Senior Executives," which, solely for the purposes of the Wage Motion, is defined to include the corporate officers, presidents and chief operating officers for each of the Debtors.

[9]    Arbonne and Levlad both have various bonus plans – including built-in, discretionary, flat rate and performance-based – for their Senior Executives and other employees. Except as specifically set forth in the Wage Motion, the Debtors are not seeking authority to approve such bonus plans, but reserve the right to seek to pay the prepetition component, if any, of such bonus plans at the appropriate time.

[10]    Eligible employees may receive time-and-one-half the employee's normal rate of pay for hours worked beyond eight in a single workday, the first eight hours worked on the seventh consecutive day worked in a single

21

payroll averages approximately $2,465,000 in the aggregate for its permanent employees.[11] The last regular payroll date for Arbonne employees was January 22, 2010 (the "Arbonne Last Payroll"). Due to the lag in payroll, the Debtors estimate that approximately $1,378,000 in the aggregate has accrued but is not yet due to Arbonne's employees until the next pay date, with no employees owed in excess of $10,950.

59.     Levlad employees are paid bi-weekly in arrears, with a Saturday payroll close and Wednesday pay date. As with Arbonne, in addition to their normal hourly rates, certain permanent hourly-paid Levlad employees are eligible for overtime premiums. One current employee – the Director of Sales – is also entitled to receive commissions. On a monthly basis, Levlad's gross payroll averages approximately $280,000 in the aggregate for its permanent employees. The last regular payroll date for Levlad employees was January 21, 2010 (the "Levlad Last Payroll" and together with the Arbonne Last Payroll, the "Last Payroll"). Due to the lag in payroll, the Debtors estimate that approximately $156,500 in the aggregate has accrued but is not yet due to Levlad's employees until the next pay date, with no employees owed in excess of $10,950.

60.     In sum, the Debtors estimate that approximately $1,534,500 in unpaid wages and salary is owing to all of their employees in the aggregate for services rendered prior to the Petition Date.

61.     Due to the timing of the Last Payroll, payroll checks for some employees who do not receive compensation by direct deposit likely remain in float. In addition, although

---

workweek, and all hours worked in excess of 40 regular hours in one workweek; and double the employee's regular rate of pay for all hours worked beyond 12 in a single workday, and the hours worked beyond eight on the seventh consecutive day worked in a single workweek.

[11]     The Company leases, rather than hires, temporary employees. Accordingly, compensation for such employees is conducted through the lease and not payroll.

22

the Debtors believe that most payroll checks relating to payroll periods prior to the Last Payroll have been presented to and honored by the applicable drawee banks, certain employees may fail to cash or deposit their paychecks in a timely manner. Accordingly, it is possible that some checks will remain in float postpetition that banks will not honor absent explicit authority and direction to do so. Furthermore, while the Debtors do not believe material amounts, if any, remain owing for past payroll periods, to the extent any such amounts remain owing, the Debtors believe that the administrative costs resulting from determining such information with precision substantially exceed any benefit to be gained from such exercise. The Debtors believe that no employee is owed in excess of $10,950 on account of payroll checks in float.

62.     Vacation, Paid Time Off, and Sick Leave. In addition to wages and salary, certain of the Debtors' employees accrue paid vacation time based on length of service and sick time at a flat rate. The Company observes specific paid holidays, which the employees may take as paid time off. Arbonne employees may take three personal holidays per year, and Levlad employees may take one personal holiday per year. Employees may take limited paid time off under certain other circumstances as well. The Debtors intend to permit employees to continue to use any such accrued but unused time off in the ordinary course.

63.     Arbonne does not provide payment in lieu of accrued but unused sick time; Levlad pays employees at the beginning of each year for unused sick pay from the year before. Arbonne employees who are terminated would normally be entitled to receive cash in lieu of accrued but unused vacation upon separation, but are not entitled to payment for unused sick time or holidays upon separation. The Debtors intend to continue these practices in the ordinary course.

23

64. Leased Employees. As described above, the Debtors employ
approximately 89 individuals as leased employees (the "Leased Employees"), who provide
services including, but not limited to, customer service, human resources, finance and
accounting, marketing, operations and manufacturing, research and development, and sales.[12]
The Leased Employees are employed by the Debtors through third-party agencies. The Debtors
believe that these third-party agencies will likely terminate services if they are not paid amounts
owing and that such termination would be significantly detrimental to the Debtors' businesses.
On average, the Debtors pay approximately $300,000 per month to the third-party agencies on
the Leased Employees' behalf.

## Allowances and Reimbursable Business Expenses

65. Car Allowances. Three of the Debtors' employees that are required to
travel frequently in the course of their employment are provided with a regular monthly car
allowance of $800 each (the "Car Allowances"). The Car Allowances are designed to cover the
costs of gas, wear and tear, and maintenance for the employees' personal vehicles, and are
included in the Debtors' regular payrolls.

66. Reimbursable Business Expenses. Prior to the Petition Date and in the
ordinary course of their businesses, the Debtors reimbursed employees for certain business
expenses incurred in the scope of their employment. Based upon historical averages,
approximately 215 employees incur expenses monthly aggregating on average $190,000, relating
to, among other things, business related travel expenses, business meals, car rentals and a variety
of miscellaneous expenses (collectively, the "Reimbursable Expenses"). All of the
Reimbursable Expenses were incurred on the Debtors' behalf in connection with employment by

---

[12] The descriptions and requests for relief contained in the Wage Motion with respect to the Leased
Employees do not include the AICs. As described below, the Debtors have filed a separate motion seeking various
forms of relief with respect to honoring prepetition obligations to the AICs.

24

the Debtors and in reliance by the Debtors' employees that such expenses would be reimbursed. Although the Debtors believe they are current on prepetition Reimbursable Expenses, it is likely that a modest amount of Reimbursable Expenses remains owing due to the lag time between when an employee incurs an expense and when the employee submits a request for reimbursement. The Debtors estimate that, as of the Petition Date, the total amount owed for Reimbursable Expenses is no more than $50,000, with no one employee estimated to receive in excess of $20,000.

## Employee Benefits

67.     In the ordinary course of their businesses, and as is customary for most large companies, the Debtors have established various employee benefit plans and policies that provide employees with medical, dental, prescription, disability and life insurance, employee savings, and other similar benefits (collectively, the "Employee Benefits"). The Employee Benefits are generally described below.

68.     Health, Dental and Vision Insurance. An important element of the Employee Benefits is medical, dental and similar health insurance. The Debtors maintain several premium-based insurance plans, as further described below. The Debtors believe that they are current on all payments under such plans; however, to the extent that any premiums remain unpaid as of the Petition Date or any portion of the current month's payment may be characterized as a prepetition obligation, the Debtors seek to be authorized to pay such amounts.

69.     Arbonne maintains premium-based medical plans (which include prescription drug benefits) for all its employees administered by Blue Cross affiliates. The average monthly cost of the plans to Arbonne is approximately $340,761. Arbonne also provides all of its eligible full-time employees with fully funded dental insurance administered by

25

Managed Dental Care of California, for an average monthly cost of $31,833; and vision insurance administered by Vision Service Plan, for an average monthly cost of $7,958. Arbonne also provides its employees access to health savings accounts, for an average monthly cost of $498.75.

70.     Levlad maintains premium-based medical plans (which include prescription drug benefits) for its employees, differing based on whether the employee is hourly-paid or salaried. The average monthly cost to Levlad for such plans is $130,239 in the aggregate.

71.     Levlad Hourly-Paid Employees. Hourly employees are covered by an HMO plan administered by Blue Cross of California,[13] for which Levlad pays the entire premium on the employee's behalf, for an average monthly cost of $86,204.

72.     Levlad Salaried Employees. Levlad provides fully-funded HMO or PPO plan coverage, at the employee's option, administered by Blue Cross affiliates,[14] for each salaried employee and one dependent, for an average monthly cost of $30,908. The employee may pay for family coverage for an additional premium to be deducted from weekly payroll. Levlad provides fully-funded PPO dental plan coverage for each salaried employee and one dependent, administered by The Guardian, for an average monthly cost of $9,812.

73.     Life and Disability Insurance. The Debtors maintain certain premium-based life and disability insurance plans, as further described below. The Debtors believe that they are current on all such payments; however, to the extent that any premiums remain unpaid as of the Petition Date or any portion of the current month's payment may be characterized as a prepetition obligation, the Debtors seek to be authorized to pay such amounts.

---

[13]     Levlad sponsors the same HMO plans as Arbonne.

[14]     In addition to the HMO plans listed above, Levlad sponsors the same PPO plans as Arbonne.

MIAMI 820996 (2K)

74.     Arbonne provides all of its eligible full-time employees with fully funded life insurance administered by Lincoln. Under this plan, employees are also provided with dismemberment insurance at no extra cost, which supplements the premium-based disability insurance provided by the State of California (the "SDI Plan") that is automatically deducted from weekly payroll. The average monthly cost to Arbonne is $24,100.

75.     Levlad provides all of its eligible employees with fully funded $15,000 life insurance policies for themselves, without dependent coverage, administered by Lincoln Financial. The average monthly cost is $2,135. Levlad also sponsors the SDI Plan, which provides eligible employees for benefits during periods of personal illness. The average monthly cost of the plan is approximately $1,300, all of which is borne by the Debtors.

76.     Workers' Compensation. The Debtors maintain workers' compensation policies to cover injuries sustained by their employees during the policy year. The policy is a fixed premium-based zero-deductible policy. The annual 2010 premiums for Arbonne and Levlad are $544,788 and $1,254,790, respectively; the monthly premiums are $45,399 and $104,566, respectively. These premiums have been financed along with certain other of the Debtors' insurance policies under a premium finance agreement.[15] Besides the premium, the Debtors do not have additional liability with respect to the workers' compensation policies.

## Employee Purchase Plan

77.     Arbonne offers its full-time employees the opportunity to purchase its products at prices discounted from the retail price as a benefit of their employment (the "Employee Purchase Plan"). Under the Employee Purchase Plan, employees have the option to pay the purchase price by money order, or to have the purchase price automatically deducted

---

[15]     Through the Insurance Motion (defined below), the Debtors are separately seeking authority to pay any premiums associated with their insurance premiums, including their financed workers' compensation policies.

from their payroll checks. Arbonne intends to fulfill the purchases made pursuant to the Employee Purchase Plan prepetition, maintain the Employee Purchase Plan in the ordinary course of business, and continue offering its employees the option to have the purchase price deducted via payroll.

**Educational Assistance**

78. Arbonne provides tuition coverage and course registration fee reimbursement for full-time employees (the "Educational Assistance"). Employees whose positions are eliminated before course completion remain eligible for reimbursement; however, employees who voluntarily resign their employment or whose employment is terminated for cause are no longer eligible for Educational Assistance. Reimbursement is made on a graduated scale tied to course performance, and is capped at $2,500 per employee per calendar year. Arbonne projects to spend less than $1,000 per month on account of Educational Assistance in 2010. The Debtors believe Arbonne is current on prepetition amounts owing for Educational Assistance; however, to the extent that any such amounts remain unpaid or may be characterized as prepetition obligations, the Debtors seek to be authorized to pay such amounts.

**Retirement and Unemployment Benefits**

79. $\underline{401(k) \text{ Contributions}}$. The Debtors offer all eligible employees[16] an opportunity to participate in a 401(k) plan (the "401(k) Plan"). Under the 401(k) Plan, the Debtors' eligible employees may contribute up to the maximum dollar amount set by federal regulations. The employees are automatically enrolled for 1% contributions unless and until they opt out.

---

[16]    An employee is eligible to participate in the 401(k) Plan after the employee has been employed by the Debtors for six months, and is not a union employee or non-resident alien.

MIAMI 820996 (2K)

80.     The Debtors have established a modest and limited matching program to induce all employees to participate in this valuable resource (the "401(k) Matching Obligations"). A participating employee's entitlement to receive the Matching Obligations vests over time. The 401(k) Matching Obligations are in the discretion of the Debtors, but as of the Petition Date, were fifty cents for every dollar the employee contributes to the 401(k) Plan, up to 1.5% of deferral (with 6% fixed cap) subject to the relevant statutory caps. The Debtors' Matching Obligations are contributed to the 401(k) Plan on a bi-weekly basis. The average annual cost to the Debtors for participating in the 401(k) Plan is $196,067 for Arbonne and $70,151 for Levlad. The Debtors estimate that as of the Petition Date, no more than $26,510 in Matching Obligations have accrued but not yet been contributed to the 401(k) Plan during 2010.

81.     Social Security. Social Security is an important part of every employee's retirement benefits. Arbonne makes a matching contribution to each of its employees' Social Security taxes (the "SS Matching Obligations," and together with the 401(k) Matching Obligations, the "Matching Obligations"). The average amount of monthly SS Matching Obligations is approximately $94,150. The Debtors estimate that as of the Petition Date, no more than $52,602 in SS Matching Obligations have accrued but not yet been contributed to the employees' Social Security taxes.

82.     Unemployment Compensation. Each year Arbonne contributes to the California Unemployment Insurance Fund on behalf of its employees (the "Unemployment Obligations"). The Debtors estimate that Arbonne's total contribution in 2010 will be approximately $123,900. Prior to the Petition Date, the Debtors provided severance benefits to their employees only through formal individualized severance agreements. There is no general

29

severance policy. The Debtors estimate that as of the Petition Date, no more than $46,154 in Unemployment Obligations have accrued but not yet been paid.

83. The Debtors submit that it is essential for the morale and maintenance of trust of the employees that necessary steps are taken to protect the employees' retirement and unemployment benefits, including Matching Obligations and Unemployment Obligations. Accordingly, to the extent that any portion of the Matching Obligations and Unemployment Obligations may be considered the payment of prepetition claims, the Debtors seek authority to pay such amounts.

## Administrative Service Providers

84. As is customary in the case of most large companies in the ordinary course of their businesses, the Debtors use third parties to administer employee benefit plans and payroll services (the "Administrative Service Providers"). Specifically, the Debtors use ADP to process payroll, The Standard to administer the 401(k) Plan, and Connexis to manage Flex Plan Benefits. The Debtors estimate that the average monthly cost of these services is approximately $17,750 in the aggregate. The continued support of the Administrative Service Providers is crucial to the Debtors' ability to maintain accurate and meaningful books and records, including, but not limited to, books and records reflecting the Debtors' employee benefit and payroll obligations. The Debtors believe that they are current with respect to amounts owing to Administrative Service Providers; however, to the extent that any such amounts remain unpaid or may be characterized as prepetition obligations, the Debtors seek to be authorized to pay such amounts.

## Withholdings From Employee Paychecks

85. The Debtors deduct certain amounts from their employees' paychecks for the payment of the employee portion of health, dental and welfare insurance premiums; flexible

30

benefit plans that provide for withholdings on a pre-tax basis of certain medical and dental premiums, and reimbursable medical expenses; 401(k) Plan deductions; and other miscellaneous amounts (collectively, the "Employee Deductions"). The Employee Deductions comprise property of the Debtors' employees and are forwarded by the Debtors to appropriate third-party recipients at varying times.

86.     The Debtors may also be in possession of various withholdings, such as payroll taxes, social security, unemployment, garnishments, child support payments, etc. (together with the Employee Deductions, the "Deductions"). It is likely that funds have been deducted from employee wages but have not yet been forwarded to the appropriate third-party recipients. The Debtors seek authority to forward the Deductions to the appropriate parties. Without such authority, the Debtors expose their officers and directors to personal liability.

87.     The Debtors' employees are an essential component of a successful reorganization. Any deterioration in employee morale and welfare at this critical time undoubtedly would have a devastating impact on the Debtors, the value of their assets and businesses, and ultimately, the Debtors' ability to reorganize. For the foregoing reasons, the Debtors believe that it is in the best interests of the estate to grant the relief requested by the Wage Motion.

**D.     Debtors' Motion to Preserve the Arbonne Independent Consultants Network and, in Connection Therewith, for Authority to (A) Pay Certain Prepetition Claims; (B) Honor and Maintain Incentive Discounts and Other Rewards; and (C) Maintain Related Programs in the Ordinary Course (the "AIC Relief Motion")**

88.     Pursuant to the AIC Relief Motion, the Debtors seek to honor the Arbonne Debtors' prepetition commitments under the several programs related to the success of the AIC network (collectively, the "AIC Programs"), including to (a) pay accrued but unpaid

commissions, overrides and bonuses paid on AICs' product sales volume and the sales volume of other AICs on their team (the "AIC Payments") on account of services rendered (i.e. goods sold) prepetition, (b) honor AIC Payment checks in float but not presented or otherwise honored timely for payment, (c) pay any prepetition premium amounts owing on account of the fully funded life and accidental death and dismemberment insurance policies, (d) complete outstanding orders that were placed prepetition but have not yet been shipped, including through regular logistics, the Autoship Program (as defined below), and Backorders (as defined below), (e) process returns commenced prepetition pursuant to the Product Return Policy (as defined below), (f) honor prepetition Guarantees (as defined below), (g) honor Incentives (as defined below) extended to the AICs prepetition, including but not limited to Virtual Vouchers (as defined below), (h) permit the AIC's to redeem prepetition ASAP Points (as defined below) they have accumulated, and (i) pay other miscellaneous AIC related expenses and benefits pursuant to the procedures described hereinafter (collectively, the "Prepetition Obligations"). The Debtors seek authority to honor these obligations as such continuity is critical and essential to AIC morale and future business needs.

89.     As mentioned above, Arbonne is a direct selling company that operates in the United States, its territories, Canada and certain other international markets. Arbonne markets its exclusive line of high quality personal care products exclusively through the network of AICs. Specifically, Arbonne operates the AIC network in the U.S. and its territories and AIDI (together with Arbonne, the "Arbonne Debtors") operates the network in Canada. AES operates the network in the U.K. and Australia.

90.     AICs operate in a "successline" genealogy, which includes an AIC and all AICs who have been sponsored below (the "downline"), regardless of whether they were

32

personally sponsored or not. Conversely, the "upline" is the line of sponsors that links any particular AIC to Arbonne. "Downline" may refer to a sponsorship line of unlimited depth; however, for purposes of compensation and as used in the AIC Relief Motion, the depth of the downline is subject to certain limitations, as set forth in the AIC Agreements (as defined below).

91.     AICs earn compensation not only based on their personal sales through their retail profits and commissions and overrides based on their personal retail volume ("PRV"), but also on the sales of their downline through overrides and commissions based on their downlines' retail volume ("RV").[17] The downline AICs also benefit by developing their skills and understanding by learning from the experience of their upline AICs, who agree to provide support and training to their downline AICs. This incentive structure encourages experienced AICs to recruit, train, and lead newer AICs, which is vital to maintaining and expanding the Arbonne Debtors' customer base.

92.     During 2009, the AIC network included an average of almost 800,000 active AICs worldwide. The AIC network is divided by general levels of activity as follows: Preferred Client, Consultant, Manager,[18] and Vice President.[19] Preferred Clients are generally retail clients who want to enjoy a discount on Arbonne's products and qualify simply by paying a registration fee. Consultants are the first level of AICs that are engaged in the business of reselling Arbonne's products and qualify by (a) paying a registration fee, (b) paying an upgrade fee from Preferred Client, or (c) becoming active in the business by meeting certain thresholds of

---

[17]     PRV is based on sales attributable to an AIC's own consultant identification number, and the sales of their personally sponsored Preferred Clients; RV is based on sales of an AIC's entire downline. For AICs in Canada and the U.K., PRV and RV are referred to as personal qualifying volume (PQV) and qualifying volume (QV), respectively.

[18]     Managers are further divided into the following levels of activity: District Manager, Executive District Manager, Area Manager, and Executive Area Manager.

[19]     Vice Presidents are further divided into the following levels of activity: Regional Vice President, Executive Regional Vice President, National Vice President, and Executive National Vice President.

33

PRV and sponsoring new Preferred Clients or Consultants; they maintain their Consultant status solely through their PRV. Managers qualify based on PRV and maintain their status based on RV. Vice Presidents qualify and maintain their status based on RV. All AICs also must pay an annual renewal fee.

93. As stated in the agreements entered into by and between the appropriate Arbonne Debtor and each AIC (each, an "AIC Agreement"), AICs are independent contractors, and are not employees, agents, partners, legal representatives, or franchisees of the Arbonne Debtors. AICs are solely responsible for paying all expenses they incur, including but not limited to travel, food, lodging, secretarial, office, long distance telephone and other expenses. Upon cancellation, termination or nonrenewal of an AIC Agreement, AICs agree to waive all rights, including but not limited to property rights, to their former downline organization and to any bonuses, commissions or other remuneration derived through the sales and other activities of their former downline organization.

94. The Arbonne Debtors maintain AIC Programs, including different forms of payment to compensate AICs, rewards to incentivize AICs, events to train AICs, and logistics to follow an order from placement to shipment and back through returns if necessary. The Arbonne Debtors intend to maintain the AIC Programs in the ordinary course, and honor certain prepetition obligations related thereto, as further described below.

95. Commissions, Overrides, Bonuses and Other Compensation. There are two basic ways in which the AICs can earn compensation: through retail profit on sales of products purchased at discounted prices from the Arbonne Debtors ("Consultant Profits"); and through AIC Payments.

34

96.     AICs can buy Arbonne products at discounted prices for resale to clients (or for personal use). The suggested retail price ("SRP") for items sold to clients reflects a retail markup potential for AICs in the United States and its territories. AICs do not receive Consultant Profits as payments from the Arbonne Debtors. The Arbonne Debtors intend to continue selling products at discounted prices to AICs in the ordinary course so that such AICs can maintain their Consultant Profits.

97.     AICs can also earn the AIC Payments, which consist of commissions on RV from sales,[20] overrides on override volume ("OV"),[21] and certain cash bonuses based on their own sales of products and the sales of their downline of sponsored AICs. Vice Presidents who maintain certain RV sales are eligible for additional cash bonuses through the Mercedes-Benz Cash Bonus Program when they provide proof that they own or lease a white Mercedes-Benz automobile (the "Mercedes-Benz Bonus Program"). During 2009, the Arbonne Debtors estimate that they paid in excess of $137.6 million in AIC Payments, including through the Mercedes-Benz Bonus Program, to AICs in the United States and its territories.

98.     All AIC Payments are calculated at the end of the achievement calendar month and paid the following calendar month. The minimum amount for which the Arbonne Debtors will issue a check for an AIC Payment is $25. If an AIC's AIC Payments do not equal or exceed $25, the Arbonne Debtors will accrue the AIC Payments until they total $25 (or until the last commission cycle of the year), after which a check will issue. AIC Payment checks are processed and generated after the end of each month and are scheduled to mail within 10 business days after month-end; direct deposit is available only to Area Managers and above in the U.S. and Canada. Because compensation is based on the actual sales of products and

---

[20]     Preferred Clients are not eligible for commissions.

[21]     OV equals 65% of RV.

services to end consumers, when a product is returned to the Arbonne Debtors for a refund or is repurchased by the Arbonne Debtors (as described further below), attributable AIC Payments will be deducted, beginning in the month in which the refund is given, and continuing every pay period thereafter until the corresponding AIC Payments are recovered. Because AICs are not employees of the Arbonne Debtors, including for federal or state tax purposes, the Arbonne Debtors generally do not withhold any sums from AIC Payments for tax purposes.

99.     The last regular date the Arbonne Debtors issued AIC Payments was January 8, 2010 (the "Last AIC Payout") for AIC Payments accrued in December. Due to the lag between when AICs earn AIC Payments (and for low volume AICs, when AICs earn AIC Payments of at least $25) and when payment is made, the Arbonne Debtors estimate that they will owe approximately $11.5 million in the aggregate in accrued and unpaid AIC Payments for services rendered (i.e. products sold) by the AICs prior to the Petition Date. The Arbonne Debtors intend to pay AIC Payments and payments under the Mercedes-Benz Bonus Program that accrued prepetition.

100.    Due to the timing of the Last AIC Payout, checks for AICs who do not receive compensation by direct deposit likely remain in float. In addition, although the Arbonne Debtors believe that most checks relating to AIC Payment periods prior to the Last AIC Payout have been presented to and honored by the applicable drawee banks, certain AICs may fail to cash or deposit their checks in a timely manner. Accordingly, it is possible that some checks will remain in float postpetition that banks will not honor absent explicit authority and direction by the Court to do so. Furthermore, while the Arbonne Debtors do not believe material amounts, if any, remain owing for past AIC Payment periods, to the extent any such amounts remain owing, the Arbonne Debtors believe that the administrative costs resulting from determining such

36

information with precision substantially exceed any benefit to be gained from such exercise. The Arbonne Debtors intend to honor AIC Payment checks in float.

101. <u>Life and AD&D Insurance</u>. The Arbonne Debtors provide all eligible Regional Vice Presidents and above in the U.S. and Canada, while they remain AICs, with fully funded life and accidental death and dismemberment insurance policies (the "Employee Insurance Policies") administered by Lincoln National Life Insurance Company. The Employee Insurance Policies, each providing up to a $100,000 benefit, are premium-based and the average monthly cost to the Arbonne Debtors is approximately $40,000. The Arbonne Debtors believe that they are current on all such payments; however, to the extent that any premiums remain unpaid as of the Petition Date or any portion of the current month's payment may be characterized as a prepetition obligation, the Arbonne Debtors intend to pay such amounts. The Arbonne Debtors also intend to maintain the Employee Insurance Policies in the ordinary course.

102. Except as described in the immediately preceding paragraph, the Arbonne Debtors do not provide insurance coverage to the AICs. AICs must provide their own workers' compensation insurance, if required or applicable. AICs must further provide all insurance coverage they require or desire with respect to their business, including, without limitation, medical and hospitalization insurance, automobile insurance and general comprehensive liability insurance.

103. <u>Product Order Logistics, Programs, and Policies.</u> In the ordinary course of business, AICs and their registered clients order product from the Arbonne Debtors, which then ship product from their distribution facilities to the AICs and their clients. The Arbonne Debtors have implemented certain logistics, programs, and policies that they intend to maintain in the ordinary course, as described below.

37

104.    Orders.  Orders may be made by mail, express carrier, fax, phone or

internet.  Orders must be received by the end of the last business day of the month to qualify for

AIC Payments and other rewards or incentives.  The Arbonne Debtors make every effort to ship

products within 24 hours of receiving and processing an order, and most orders ship within this

time frame.  Due to heavy volumes during mid-month and end-of-month peak periods, some

orders may take as long as 72 hours (three business days) to ship.  Shipments in the continental

United States may take from one to seven business days to arrive; delivery times outside the

continental United States vary further.  Due to the lag in receiving, processing, shipping, and

delivery of orders, the Arbonne Debtors estimate that they hold approximately $7 million in the

aggregate paid by clients and AICs for orders placed prior to the Petition Date that have not yet

shipped. The Arbonne Debtors intend to complete such outstanding orders, and honor new

orders, in the ordinary course.

105.    Autoship Program.  The Arbonne Debtors' autoship program (the

"Autoship Program") allows AICs and clients to place standing orders for products that ship on a

pre-specified date each month pursuant to an Autoship Program agreement entered into by each

Autoship Program participant.  The Autoship Program participants specify the products and the

respective quantities of each product that they wish to have automatically shipped each month.

The Arbonne Debtors continue to ship automatically the products selected on a monthly basis

without the participants having to submit refill orders, subject to the participants' right to cancel

participation in the Autoship Program at any time.

106.    Pursuant to the terms of the Autoship Program, the Arbonne Debtors are

authorized to automatically charge the participants' credit card for each Autoship Program order

plus shipping, handling, and applicable sales tax, up to seven days prior to the shipping date,

38

which may be selected as any day of the month between the 5th and the 25th. As of the Petition Date, the Arbonne Debtors estimate that approximately $90,000 in Autoship Program orders have been charged to the participants' credit cards without the corresponding orders having been shipped. The Arbonne Debtors intend to complete such outstanding prepetition orders and continue the Autoship Program in the ordinary course.

107.    Product Returns.  Clients, and AICs who certify that they are purchasing product for personal consumption purposes only, may return products purchased from the Arbonne Debtors. In such circumstances and in the ordinary course of business, the Arbonne Debtors will refund the cost of the merchandise and in certain instances will refund shipping costs associated with the returned products (the "Product Return Policy"). Where the item being returned is a free gift or promotional item, the item may only be exchanged for the same item or an item of equal or lesser value. AICs may not return inventory or business aids for a refund, unless they are voluntarily or involuntarily terminating their relationship with the Arbonne Debtors, or electing not to renew. In such a case, the Arbonne Debtors will repurchase the products and business aids at 90 percent of the AIC's original purchase price (less appropriate setoffs and legal claims, if any, and regardless of when the original purchase was made), provided such products and business aids are in re-saleable condition.

108.    In 2009, the Arbonne Debtors paid approximately $2.8 million on account of returns under the Product Return Policy. The Arbonne Debtors estimate that, as of the Petition Date, returns in transit or in process will result in payments by the Arbonne Debtors in the approximate amount of $437,000. The Arbonne Debtors intend to continue processing the returns commenced prepetition, and maintain their Product Return Policy in the ordinary course.

109.    Guarantees. The Arbonne Debtors offer a 45-day money-back guarantee
(the "Guarantee") on all their products purchased by AICs, their personal clients, and those who
order from the Arbonne website or a conforming AIC website. Shipping fees are not refundable.
Returns based on dissatisfaction with Arbonne products take four to six weeks to process. Due
to the lag between when the Guarantee begins and expires, the Arbonne Debtors estimate that
approximately $31.2 million in prepetition orders qualify for the Guarantee as of the Petition
Date.[22] The Arbonne Debtors intend to honor prepetition Guarantees and maintain the Guarantee
policy in the ordinary course.

110.    Backorders. The Arbonne Debtors permit AICs and clients to place an
order for an item even if it is currently out of stock ("Backorders"). When Backorders are
placed, the credit card will be charged when the order is taken, and the item will ship to the AIC
or client when the item becomes available. If an item is on backorder for 30 days, AICs or
clients are contacted with the option to cancel the item or continue to wait until the order can be
filled. The Arbonne Debtors estimate that they hold approximately $665,000 in the aggregate
paid by AICs and clients for orders placed prior to the Petition Date that have not yet been made
available to ship to the AICs and clients. The Arbonne Debtors intend to complete outstanding
prepetition Backorders, and continue their practices regarding Backorders in the ordinary course.

111.    Variances and Adjustments. If an order does not match the payment
remitted, due to a pricing or addition error, the difference will be deducted or added to the AIC's
discount and/or AIC Payments or products/business aids will be added, deleted or substituted
until the total value matches the amount remitted (the "Variances and Adjustments"). The

---

[22]      Such number is calculated based on annual revenue over a 45-day period.

Arbonne Debtors intend to continue their practices related to Variances and Adjustments in the ordinary course.

112.    Product Offers and Rewards.    In addition to AIC Payments, AICs accrue incentive offers and rewards based on volume of sales, as detailed below. The Arbonne Debtors intend to permit AICs to continue to use any such accrued but unused offers and rewards in the ordinary course. The Arbonne Debtors do not provide payment in lieu of unused offers or rewards. As with the AIC Payments, offers or rewards that were paid to AICs on account of products subsequently returned will be deducted from the AICs and those upline that received corresponding remuneration.

113.    Product-Related Benefits and Incentives.    The Arbonne Debtors offer several incentives (the "Incentives") for AICs to accumulate PRV and increase the increment thereof from one order to the next. Some offers are extended automatically to AICs based on activity in the Autoship Program or level of downline sales achievement, while others are featured monthly online on Arbonne's website and/or in its monthly on-line magazine *UpClose*. Certain common examples of Incentives include:

- Virtual Vouchers. Participants in the Autoship Program earn "Virtual Vouchers" based on the average amount of their monthly standing orders, which are "paid" every six months and may be redeemed for discounted or free products in future purchases from the Arbonne Debtors. The Arbonne Debtors also issue Virtual Vouchers in limited additional circumstances. The Virtual Vouchers are not redeemable for cash; rather, they merely entitle AICs and clients to purchase additional product from the Arbonne Debtors at a discount. Virtual Vouchers are valid for six months from issue date. The Arbonne Debtors estimate that as of the Petition Date approximately $55,000 in Virtual Vouchers have been accrued but not redeemed.

- Complimentary Products. As an incentive to maintain or increase activity levels, AICs may be eligible to receive complimentary products when they accumulate certain PRV in their first month, after two orders in their first two months, and after every four orders without time limit. AICs may also receive gifts – including product vouchers, logo items and business aids – for

41

achieving a certain SRP in cumulative personal sales the first two weeks of each month and/or each month. As an additional incentive to increase activity, following promotion to Area Manager and above, AICs receive certain status gifts, such as license plate frames, jewelry, and logo lapel insignias.

- Discount Programs. New AICs receive a special offer during their first two months, which is repeated for all AICs during their anniversary month every year they remain active, to purchase a certain amount of product for half the SRP. The Discount with Purchase (DwP) Program provides a further discount on specific products, as advertised. With the Purchase with Purchase (PwP) Program, at certain incremental amounts of product ordered on Arbonne's website at the SRP, AICs and clients are given the option to purchase additional products at up to a 60% discount, as advertised. With every order of certain RV, AICs receive a special product offer to help them host events or to offer as gifts to their hosts. As "The Ultimate Reward," AICs may enjoy a further discount on product with every SRP order increment of a certain amount.

The Arbonne Debtors intend to honor Incentives extended to the AICs prepetition, including but not limited to Virtual Vouchers, and continue providing Incentives in the ordinary course of business.

114. AIC Events. Every year, the Arbonne Debtors host various conferences for the AICs, including the Arbonne Select Awards Program Trip, the National Training Celebration ("NTC") for all AICs globally, the Canadian NTC for AICs in Canada, the U.K. NTC for AICs in the U.K., the Australia NTC for AICs in Australia, the NVP Retreat for National Vice Presidents and Executive National Vice Presidents, the NVP Challenge Trip and other various trips for sales challenge achievers such as the "Areas in Paradise" and "New York City Experience" trips (collectively, the "AIC Events"). These events are vital to the success of the AIC program because they motivate AICs through recognition award programs and provide a forum for training for the new year. For example, every AIC is invited and encouraged to attend the NTC, where the Arbonne Debtors host recognition meetings, dinners and luncheons for thousands of dedicated AICs in honor of their sales and sponsoring achievements. In addition,

42

every NTC offers training by top field and industry speakers, grants prizes and awards for achieving high sales volume and launches new products and programs for the continued success of the Arbonne Debtors and the AIC network. The Arbonne Debtors believe the AIC Events are necessary to the success of the Arbonne Debtors and the AIC network. Accordingly, the Arbonne Debtors intend to continue hosting the AIC Events in the ordinary course.

115.    Arbonne Select Awards Program. Consultants and above may participate in the Arbonne Select Awards Program ("ASAP"). From December 1 through November 30 each year, participants can accumulate points (the "ASAP Points") each month (up to a monthly cap) based on the activity generated in that given month, including accumulation of PRV, accumulation of RV, sponsorship of new consultants with qualified volume, follow-up with new recruits, and promoting out of a level. ASAP Points then may be redeemed for conference fees and travel reimbursements in connection with AIC Events if they qualify by a certain deadline specific to the event, or else buy in. For example, the ASAP trip for 2010 is scheduled for October. Points earned during the qualification period beginning December 1, 2009 will be redeemable for this trip. AICs may also redeem ASAP Points for other ASAP awards offered at any given time, such as certain merchandise or other events. For example, the 2010 NTC is scheduled for March. AICs may use points accumulated during the ASAP qualification period of December 1, 2008 through November 30, 2009 to be redeemed for hotel accommodations at the NTC. ASAP Points must be claimed by December 31 following the end of the accumulation period, and are nonrefundable. The Arbonne Debtors intend to permit the AIC's to redeem the two months of prepetition ASAP Points they have accumulated, including for the AIC Events as applicable, and maintain ASAP in the ordinary course.

43

116.     The Debtors seek authority to honor the Prepetition Obligations because such continuity is critical and essential to the Arbonne Debtors' ability to maintain the AIC network and generate revenue.

**E.     Debtors' Motion for Authority to Serve Pleadings and Notices on the Arbonne Independent Consultants by Electronic Mail (the "AIC Notice Motion")**

117.     The Debtors seek authority to serve applicable pleadings and notices (the "Papers") on the AICs via electronic mail. The Debtors maintain contact information relating to the AICs, including their names, addresses, telephone numbers, fax numbers (if applicable), and electronic mail addresses, all of which are required to be supplied on an AIC application. In the ordinary course of business, the Debtors communicate with the AICs primarily via correspondence sent to their respective electronic mail addresses. Pursuant to the AIC SuccessPlan Policies & Procedures, effective as of February 2009, AICs consent to be notified by Arbonne by electronic mail, United States mail, overnight courier, or other reasonable commercial means.

118.     As of the Petition Date, there are approximately 750,000 active AICs worldwide. In addition, there are approximately 1,250,000 former AICs whose status either (a) lapsed in the last two years or (b) was terminated in the last four years. With such a large number, the service of Papers on the AICs via traditional means would prove expensive, inefficient, and unduly burdensome. The Debtors estimate that photocopying and mailing costs alone could exceed $10,000,000 in the aggregate. Incurring these costs would reduce the value of the Debtors' estates to the detriment of their stakeholders. Electronic mail, furthermore, is a reliable and effective means to transmit information to the AICs. For these reasons, the Debtors believe the Court should approve the relief requested in the AIC Notice Motion.

44

**F.     Debtors' Motion for Authority to Pay Prepetition
         Trust Fund Taxes in the Ordinary Course of
         Business (the "Trust Fund Taxes Motion")**

119.     The Debtors seek authority to pay prepetition sales, use, excise, "value-added", "goods and services", employee-related withholding, license and other trust fund type taxes (however denominated, the "Trust Fund Taxes") owed to the appropriate federal, state, local, and foreign taxing authorities (each, a "Taxing Authority") in the ordinary course of business, as such payments become due and payable and to the extent adequate funds are available to make such payments. The Debtors seek authority to pay the Trust Fund Taxes to avoid the serious disruption to their reorganization efforts that would result from nonpayment of such taxes.

120.     In the ordinary course of business, the Debtors collect Trust Fund Taxes from their customers, employees and other parties, and subsequently remit such taxes to the appropriate Taxing Authority. For instance, the Debtors withhold certain taxes (including FICA and Medicare taxes) from their employees' paychecks, which amounts are remitted periodically to the appropriate federal, state and local Taxing Authorities. Furthermore, by virtue of its business operations, Arbonne is required to charge, depending on the jurisdiction, sales tax, "value-added" taxes, "goods and services" taxes and/or other applicable taxes on all purchases made by AICs and clients in the U.S., Canada and the U.K., and remit such taxes collected to the respective states and local taxing jurisdictions. Unless an AIC submits a current and valid exemption certificate and registration license, Arbonne generally collects and remits sales taxes on behalf of AICs. The Debtors also pay a business license tax to approximately 185 taxing authorities, which may be calculated based on gross sales or a flat fee. The Debtors may also be responsible for remitting use taxes to the appropriate Taxing Authorities on personal property

45

and certain related services. These use taxes primarily arise from the purchase of goods outside of the states where the Debtors operate. The process by which the Debtors remit the Trust Fund Taxes varies, depending on the nature of the tax at issue and the Taxing Authority to which the relevant tax is to be paid.

121.    There is often a lag-time between the time when the Debtors incur an obligation to pay the Trust Fund Taxes and the date when payment of such taxes is due. Various governmental units may therefore have claims against the Debtors for Trust Fund Taxes that have accrued, but are unpaid and not yet due, as of the Petition Date. The relevant Taxing Authority may also make retrospective adjustments to determine any payment deficiency or surplus for a particular period resulting in a demand for further payment from or refund to the taxpayer. The Debtors estimate that the total amount of prepetition Trust Fund Taxes owing to the various Taxing Authorities as of the Petition Date will not exceed $4.5 million.

122.    Because the Trust Fund Taxes do not constitute estate property, their payment will not adversely affect the Debtors or their creditors. Moreover, many Taxing Authorities impose personal liability on the officers and directors of corporations to the extent such taxes are collected but not remitted. The Debtors' officers and directors may be subject to civil or even criminal liability as a result of such non-payment. The prosecution of such actions during the pendency of these cases would be a significant distraction, and therefore, be detrimental to the Debtors' reorganization efforts.

123.    Additionally, some, if not all, of the Taxing Authorities may audit the Debtors if the Trust Fund Taxes are not paid forthwith. Such audits needlessly would divert the Debtors' attention away from the reorganization process and diminish their estates. The Trust Fund Taxes represent a relatively de minimis portion of the Debtors' unsecured liabilities.

46

124. Accordingly, the Debtors seek authority to continue to pay such Trust Fund Taxes in full in the ordinary course of business. The Debtors believe that granting the relief requested in the Trust Fund Taxes Motion is appropriate and in the best interest of the Debtors, their estates and their creditors.

**G. Debtors' Motion for an Interim and Final Order (I) Prohibiting Utility Companies From Altering, Refusing or Discontinuing Service to the Debtors, (II) Deeming Utility Companies Adequately Assured of Future Payment and (III) Establishing Procedures for Determining Requests for Additional Adequate Assurance (the "Utility Motion")**

125. The Debtors seek entry of an order (a) prohibiting the Utility Companies (defined below) from altering, refusing or discontinuing service to the Debtors, (b) deeming the Utility Companies adequately assured of future payment and (c) establishing procedures for determining requests for additional adequate assurances of payment.

126. In connection with the operation of their businesses and management of their properties, the Debtors procure electricity, telephone and similar services (together, the "Utility Services") from a number of different utility companies. A list identifying all or substantially all of the utility companies providing services to the Debtors is annexed to the Utility Motion as Exhibit "A" (such utility companies together with any utility companies inadvertently excluded from Exhibit "A", the "Utility Companies").

127. Historically, the Debtors have paid all amounts owing to the Utility Companies on a timely basis. To the best of the Debtors' knowledge, the Debtors are current with respect to all of their undisputed invoices for Utility Services provided by the Utility Companies, except where the commencement of these chapter 11 cases may have interrupted some of these payments. Prior to the Petition Date, the average aggregate monthly cost of Utility Services provided by the Utility Companies was approximately $237,000.

47

128.     Because of the scope of the Debtors' operations, it is essential that the Utility Services continue uninterrupted. If the Utility Companies are permitted to terminate Utility Services, the Debtors' operations will be irreparably harmed and their ability to reorganize jeopardized.

129.     The Debtors have proposed to provide adequate assurance of payment for future services to the Utility Companies by placing a deposit (a "Utility Deposit") with certain of the Utility Companies[23] in an amount equal to 50% of the Debtors' estimated cost of monthly utility consumption for each such Utility Company. The aggregate amount of all such deposits for the Utility Companies listed on Exhibit "A" to the Debtors' Utility Motion would be approximately $118,500. Certain of these Utility Companies hold deposits as of the Petition Date or are beneficiaries under a surety bond agreement. Through the Utility Motion, the Debtors have also sought to establish reasonable procedures by which Utility Companies may request additional adequate assurance of future payment, in the event that such Utility Companies believe that its Utility Deposit is insufficient.

130.     The Debtors submit that granting the relief requested in the Utility Motion is both necessary and appropriate to avoid any harm to their businesses. The relief requested in the Utility Motion will afford the Debtors an opportunity to successfully reorganize and will not prejudice the rights of any of the Utility Companies.

---

[23]     The Debtors have proposed to make Utility Deposits only to those Utility Companies that do not currently hold a deposit of 50% of the Debtors' estimated monthly cost. Several Utility Companies currently hold deposits of up to 50% and thus do not require additional sums to provide adequate assurance. The Debtors will not provide additional sums to such Utility Companies as the interests of these Utility Companies are sufficiently protected by their existing deposits.

## H. Debtors' Motion for Authority to Pay Certain Prepetition Claims of Vendors and Service Providers in the Ordinary Course of Business (the "Prepetition Vendors Motion")

131.    The Debtors seek authority to pay the liquidated, non-contingent, prepetition claims (the "Prepetition Vendor Claims") owed to the Vendors (as defined below) in the ordinary course of business.

132.    In the ordinary course of their business, the Debtors rely on certain third-party vendors and service providers to supply goods, materials and services that the Debtors cannot operate without or cannot replace without incurring exorbitant costs (collectively, the "Vendors"). The essential goods and services provided by these Vendors include, among other things, raw materials and components that are critical to the manufacturing process, common carrier, and warehousing and logistics services for the storage and shipment of products, webhosting for selling products and providing AIC training programs online, credit card processing services for the placing of orders by AICs and their clients, and professional and consulting services that are not otherwise subject to fee applications under the Bankruptcy Code or the Plan. The Debtors believe that some of the Vendors may refuse to continue to provide essential goods and services if the Debtors do not promptly pay prepetition amounts outstanding.

133.    The Debtors' inability to maintain their existing relationships with their Vendors could cause production disruptions if such parties cease providing goods and services, even for a short period of time. In many instances, the Vendors represent the sole source providers of such goods or services or are otherwise not replaceable in a timely and cost effective manner. The Debtors, for example, do business with numerous Vendors without the benefit of contracts. Such Vendors are not obligated to honor particular trade terms or to continue to do business with the Debtors going forward.

49

134.     In addition to not being contractually bound to perform, certain of the Debtors' Vendors, such as shippers, for example, may be secured creditors as a result of their ability to assert liens against the Debtors' property. Additionally, a large percentage of the Debtors' existing payables to Vendors are on account of goods sold to the Debtors in the ordinary course of business within 20 days prior to the Petition Date and, as such, these Vendors may be entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code. The Debtors also rely on numerous foreign Vendors located in Canada, for, among other things, maintaining the distribution network of the Debtors. Given that some of the Vendors are located exclusively outside of the United States, such Vendors may not be subject to the jurisdiction of this Court and may be unwilling to continue to do business with the Debtors absent the timely payment of their Prepetition Vendor Claims.

135.     Given that the Debtors operate in a highly-competitive industry, where supply-chain excellence is critical in maintaining market share, any discontinuity in the provision of the essential goods and services provided by the Vendors could have a severe detrimental impact upon the Debtors' estates, as well as on the timely fulfillment of orders, the quality of products the Debtors manufacture and distribute, the integrity of the Debtors' reputation, and, ultimately, the loyalty of the AICs and their clients.

136.     As of the Petition Date, the Debtors estimate that the aggregate amounts owed to Vendors to be no more than $7.3 million. Of that total, the Debtors estimate that approximately $500,000 is owed to foreign Vendors. The Debtors further estimate that approximately $2.85 million of the total amount of Prepetition Vendor Claims may be entitled to priority under section 503(b)(9) of the Bankruptcy Code.

50

137. The Debtors' prepackaged Plan was prepared and negotiated in an effort to effectuate a comprehensive reorganization of the Debtors' capital structure, while having as limited an impact on the Debtors' ongoing business operations as possible. To that end, the Plan leaves unimpaired all allowed Priority Claims, Administrative Claims, Unsecured Claims and Secured Claims (as each such term is defined in the Plan) to ensure minimal disruption to the Debtors' business operations as a result of the chapter 11 process. Additionally, the Debtors' prepackaged Plan has been overwhelmingly accepted by those creditors that are impaired and thus authorized to vote under the Plan. Given that the Plan is strongly supported by the Debtors' major creditor constituencies—i.e., the OpCo Lenders and the HoldCo Lenders—the Debtors, consistent with the ultimate goal of preserving their business while effectuating the restructuring, are seeking authority to pay the Prepetition Vendor Claims in the ordinary course of business, which payment the holders of such claims would otherwise be entitled to receive upon consummation of the prepackaged Plan. The Debtors submit that the payment of such Claims in the ordinary course will preserve their enterprise value for all parties in interest and is entirely consistent with the terms of the Plan that has been approved by the Debtors' creditors.

138. Although the Debtors seek authorization to pay the Prepetition Vendor Claims in the ordinary course of business, the Debtors seek to pay no more than $7.3 million in respect of such claims. Further, the Debtors propose that they be authorized to pay the Prepetition Vendor Claims in the ordinary course of business subject to the following conditions (the "Claim Payment Conditions"):

(a)     By accepting payment on account of its Prepetition Vendor Claim, the Vendor must continue doing business with the Debtors in the ordinary course according to terms no less favorable to the Debtors than those in place prior to the Petition Date;

(b)     The claimant must waive its right to file or otherwise assert against any or all of the Debtors, their estates, or the Debtors' customers, any claim or lien related to any prepetition amounts allegedly owed to the Vendor by the Debtors at the time of payment of the Prepetition Vendor Claim arising from agreements or other arrangements entered into prior to the Petition Date;

(c)     To the extent the Vendor has already obtained or asserted any such claim or lien, it must take all necessary actions to withdraw such claim or lien; and

(d)     To the extent that a Vendor paid pursuant to any order entered on the Prepetition Vendors Motion refuses to continue doing business with the Debtors in the ordinary course, it must immediately disgorge any payments made on account of its Prepetition Vendor Claims to the Debtors estates.

139.     The Debtors submit that the relief requested in the Prepetition Vendors Motion is essential, appropriate and in the best interests of the Debtors, their creditors and all parties in interest.

I.     **Debtors' Motion for Entry of an Order (I) Authorizing Debtors to (A) Maintain Insurance Program, (B) Maintain Insurance Premium Financing Program, (C) Pay Insurance Premiums in the Ordinary Course and (D) Pay All Obligations Associated Therewith; and (II) Preventing Insurance Companies from Giving any Notice of Termination or Otherwise Modifying any Insurance Policy Without Obtaining Relief from the Automatic Stay (the "Insurance Motion")**

140.     The Debtors seek authority to (a) maintain insurance coverage levels required under their corporate risk program, including authority to revise, extend, supplement, renew or change insurance coverage as needed, (b) maintain their insurance premium financing program, including authority to renew, supplement or enter new financing arrangements as needed, (c) pay any prepetition and postpetition obligations associated therewith, and (d) prevent

MIAMI 820996 (2K)

insurance companies from giving any notice of termination or otherwise modifying or cancelling any insurance policies or surety bonds without obtaining relief from the automatic stay.

141. In the ordinary course of business, the Debtors maintain a corporate risk program pursuant to which the Debtors procure numerous insurance policies (each, as may be revised, extended, supplemented, renewed or changed, an "Insurance Policy"). The Debtors maintain the Insurance Policies in amounts and types of coverage in accordance with laws governing the multiple jurisdictions in which the Debtors do business, as well as in accordance with their numerous contractual obligations. The Insurance Policies provide domestic and international coverage for, among other things, personal property, commercial general liability, commercial automobile liability, cargo, umbrella liability, excess liability, kidnap and ransom, pollution, criminal liability, worker's compensation, and employment practices liability, fiduciary and director's and officer's liability.

142. The total annual premiums under the Debtors' 2010 Insurance Policies equal approximately $2,446,823. The current carriers of the Insurance Policies (as may be revised, extended, supplemented, renewed or changed, the "Insurance Carriers") are set forth in Exhibit "A" to the Insurance Motion, along with the corresponding type of coverage and individual annual premiums.

143. Policies With Financed Premiums. Certain of the Debtors' insurance premiums are financed pursuant to a premium finance agreement (the "Premium Finance Agreement") between NPG, as insured, and AFCO Premium Acceptance, Inc., as lender, which agreement, upon execution, was assigned and transferred to and serviced by AFCO Acceptance Corporation ("AFCO"). Under the Premium Finance Agreement, the Debtors pay an initial down payment and monthly installments thereafter to AFCO in exchange for AFCO's agreement

53

to pay the full annual insurance premium, in advance, to the Debtors' insurers. The total annual premiums under the nine Insurance Policies currently covered by the Premium Finance Agreement for the 2010 policy period equal $2,146,357. Under the Premium Finance Agreement, the Debtors made a down payment of $641,657 and, after assessment of a $19,179 finance charge, financed a total of $1,516,380. The financed amount is payable in eight monthly installments of $189,547, due on the thirtieth day of each month. As of the Petition Date, the Debtors estimate that the full financed amount of $1,516,380 remains to be paid to AFCO on account of the financed Insurance Policies for the 2010 policy period.

144.    The Debtors have four policies that they intend to finance under the Premium Finance Agreement for the 2010 policy period but are not yet covered thereunder. The total annual premiums under these four additional Insurance Policies equal $115,465; however, the total amount that remains to be paid to AFCO on account of these additional financed Insurance Policies equals $201,571 because the Debtors will pay for six years of coverage under the directors and officers runoff policy.

145.    The Debtors' obligations under the Premium Finance Agreement are secured by all unearned premiums or dividends payable to the Debtors under the Insurance Policies covered by the Premium Finance Agreement, and loss payments that reduced unearned premiums. Under the Premium Finance Agreement, AFCO is appointed as the Debtors' attorney in fact with authority to, among other things, cancel the Insurance Policies in the event of non-payment.

146.    Policies Without Financed Premiums. The Debtors do not finance the premiums payable under their remaining four Insurance Policies. Premiums under two of these Insurance Policies equal $49,362, and were paid in previous years. Premiums under the

54

remaining two of these Insurance Policies equal $135,638, and are paid in nine monthly installments, from January to September. As of the Petition Date, the Debtors estimate that approximately $84,747 in premiums remains unpaid on account of these unfinanced Insurance Policies for the 2010 policy period.

147.    Prepetition premiums or other amounts due and owing on the Insurance Policies and Premium Finance Agreement are minimal compared with the potential risk to the value of the Debtors' estates absent insurance coverage. The Debtors submit that payment of these obligations is critically necessary to the continued viability of the Debtors' business, and therefore, to its successful reorganization.

## J.    Debtors' Application for Order Authorizing and Approving the Appointment of AlixPartners, LLP as Noticing, Claims, and Balloting Agent for the Bankruptcy Court

148.    The Debtors seek to retain AlixPartners, LLP ("AlixPartners") as their noticing, claims and balloting agent as of the commencement of these cases (the "Claims, Noticing and Balloting Agent"). The Debtors have selected AlixPartners both because of the firm's experience in chapter 11 cases of this size and the reasonableness of its fees.

149.    AlixPartners has substantial experience in the matters upon which it is to be engaged. The Debtors understand that it is one of the country's leading chapter 11 administrators with vast experience in noticing, claims processing, claims reconciliation, balloting and distributions. AlixPartners specializes in noticing, claims agent and balloting services, and has a proprietary claims management system in which claims are effectively managed for the Clerk of the Court. By appointing AlixPartners as the noticing, claims and balloting agent in these chapter 11 cases, parties in interest will benefit from AlixPartners' significant experience and the efficient and cost-effective methods it has developed.

**K. Debtors' Motion for (I) Interim and Final Orders under 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and Fed. R. Bankr. P. 2002, 4001 and 9014 (A) Authorizing Debtors to Obtain Postpetition Financing, (B) Authorizing Debtors to Use Cash Collateral, and (C) Granting Adequate Protection to Prepetition Secured Parties, and (II) Final Hearing Pursuant to Bankruptcy Rules 4001(B), (C) and (D) (the "Cash Collateral and DIP Motion")**

150. The Debtors seek entry of (A) an interim order (substantially in the form attached to the Cash Collateral and DIP Motion as Exhibit "A", the "Interim Order") (i) (a) authorizing the Debtors to enter into senior secured, superpriority debtor-in-possession financing facility, in an amount up to $10 million on an interim basis, including a $250,000 letter of credit facility, with an additional $10 million available on a final basis (as amended, modified or otherwise in effect from time to time, the "DIP Facility"), substantially on the terms set forth in the debtor-in-possession credit agreement attached to the Cash Collateral and DIP Motion as Exhibit "B" (as amended, supplemented, or otherwise modified and in effect from time to time, the "DIP Credit Agreement,"[24] together with all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to or in favor of the DIP Secured Parties (as defined below), the "DIP Financing Agreements"), and (b) granting the DIP Liens and the DIP Superpriority Claims (in each case, as defined below); (ii) authorizing the interim use of Cash Collateral (as defined below) on a consensual basis on the terms set forth in the Interim Order; (iii) granting "adequate protection" to the Prepetition Secured Parties (as defined below); (iv) modifying the automatic stay as imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the DIP Facility and the DIP Orders;

---

[24] Capitalized terms used in this section but not defined herein shall have the meanings given to them in the DIP Credit Agreement or, if not defined in the DIP Credit Agreement, the Interim Order.

and (v) scheduling a final hearing with respect to the relief requested herein (the "Final Hearing").

151.    As set forth above, the Debtors have filed a proposed prepackaged Plan and related Disclosure Statement, solicitation of which has already been completed. Assuming the Court approves such Disclosure Statement and confirms the Debtors' prepackaged Plan on the schedule proposed by the Debtors, the Debtors are seeking to emerge from chapter 11 within approximately one and a half months.

152.    To achieve and confirm these highly-negotiated and carefully-constructed prepackaged chapter 11 cases, the Debtors require the use of cash which comprises the cash collateral of the OpCo Lenders securing the OpCo Debt within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral"), and the proceeds of the proposed $20 million DIP Facility, mainly to fund day-to-day operations and maintain and preserve the Debtors' assets (including the Collateral), in all cases for the benefit of the Debtors' estates and creditors, including the OpCo Lenders. The availability to the Debtors of sufficient working capital and liquidity to finance their operations is vital to their ability to maintain their operations and is necessary for the preservation and maximization of their estates as a whole, pending their contemplated reorganization.

153.    The Debtors seek authority during the interim period, and pursuant to the terms of the Interim Order, to use Cash Collateral and to borrow $10 million of the proposed $20 million DIP Facility, the other $10 million of which would only become available on a final basis after the Final Hearing.

154.    The financing requested in the Cash Collateral and DIP Motion is being sought for only a short period of time, as the Debtors contemplate exiting chapter 11 within

approximately one and a half months. Despite the proposed expedited term of the chapter 11 cases, however, such financing is critical to the Debtors' operations and their ability to preserve the Prepetition Collateral. The proposed financing under the DIP Facility (the "DIP Financing") is needed to maintain an appropriate level of liquidity and help fund the Debtors' day-to-day operations. Furthermore, the DIP Financing was negotiated as part of the Debtors' prepackaged bankruptcy; if the Debtors are unable to obtain approval of the proposed DIP Facility and use of Cash Collateral on an interim and final basis, their ability to consummate their carefully constructed prepackaged bankruptcy will be jeopardized.

155. Among other things, the Debtors need to assure their existing and future AICs and customers of their ability to operate in chapter 11 in the ordinary course. Moreover, the liquidity to be provided pursuant to the DIP Facility is necessary for the Debtors' continued existence as a going concern, particularly at this critical juncture when the Debtors must continue to service and maintain the confidence of their AICs, customers, and suppliers and assure them that the Debtors' businesses will remain viable despite these chapter 11 cases. Without access to the proceeds of the DIP Facility and authorization to use Cash Collateral, the Debtors' customers and suppliers may hesitate to continue to do business with them.

156. The Debtors' business operations have historically had more than $10 million of cash on hand to provide operating flexibility in the event revenues are lower than expected, the timing of revenues is different than forecasted or working capital needs are greater than anticipated. Accordingly, the Debtors have an immediate need to use Cash Collateral, the DIP Facility, and other income generated from its commercial activities in order to maintain their day-to-day business operations and pay employees, vendors and AICs on a timely basis and complete the restructuring process on the proposed expedited basis. Absent such relief from the

58

Court, the Debtors will not have sufficient liquidity to ensure uninterrupted business operations and could suffer a substantial loss of value to the detriment of all parties in interest. Moreover, authorization to use Cash Collateral and the initial proceeds of the DIP Facility on an interim basis is necessary to avoid immediate and irreparable harm to the Debtors, pending the Final Hearing.

157. The Debtors' assets are subject to the Prepetition Liens asserted by the Prepetition Secured Parties. Because of the Debtors' substantial amount of pre-petition debt, obtaining the financing needed as unsecured debt on an administrative priority basis, or as debt which would be secured solely by liens junior to the liens of the Prepetition Secured Parties, was not a viable option, especially from a third party who did not already have a financial interest in the Debtors to protect. Moreover, the Prepetition Secured Parties would not have consented to the granting of senior or *pari passu* liens to a new third party debtor-in-possession lender. In fact, the DIP Financing here is part of the Debtors' prepackaged bankruptcy, the terms of which were heavily negotiated by, among others, the Prepetition Secured Parties. The Debtors thus concluded that adequate alternative financing terms more favorable than those to be provided by the DIP Lenders under the DIP Facility are currently unobtainable.

**The DIP Facility Is Fair, Reasonable, and in the Best Interests of the Estates**

158. The Debtors believe that the terms and conditions of the DIP Facility are fair and reasonable. The DIP Facility is necessary to support the Debtors' ongoing operations during the expedited term of these chapter 11 cases and will signal the Debtors' continued strength to compete in the marketplace for new business. The DIP Facility will also ensure the continued support of the Debtors' AICs, customers and critical suppliers. Furthermore, Blackstone Advisory Partners L.P. ("Blackstone") was hired as a financial advisor to NPG on October 20, 2008 in connection with the amendment to the OpCo Debt agreement and continued

to advise the Debtors with respect to a potential restructuring. As is more fully explained in the declaration of Henry S. Hsu in support of the Cash Collateral and DIP Motion filed concurrently herewith, the Debtors, with Blackstone's assistance, undertook an effort to obtain the best available terms for debtor-in-possession financing. Based upon these efforts, the interest rates and fees appear to be consistent with the existing market for debtor-in-possession loans of this nature. The Debtors therefore concluded that the DIP Facility provided the requisite liquidity on the most advantageous terms, given the fact that the Prepetition Secured Parties expressed their lack of consent to a priming or *pari passu* third party debtor-in-possession lender. The Debtors believe that the proposed DIP Facility is the best financing available and well within the exercise of sound business judgment.

159. Moreover, as stated above, the terms of the DIP Facility and the DIP Orders were negotiated in good faith and at arm's length between the Debtors and the DIP Lenders.

## The Use of Cash Collateral Is Appropriate Under the Current Circumstances and Should Be Authorized

160. The Court should authorize the Debtors to use Cash Collateral, whether existing as of the Petition Date or arising thereafter based on the conversion of existing non-cash collateral into cash. A copy of a proposed budget for the use of Cash Collateral is attached to the DIP Credit Agreement. It is essential to the continued operation of the Debtors that they obtain authority to use Cash Collateral to fund payroll and other operating needs, including the costs of administration of the chapter 11 cases. Currently, the Debtors have little or no available cash or assets readily convertible into cash that are not likely subject to the Prepetition Secured Parties' asserted liens and security interests.

161.     If the Debtors are permitted to use Cash Collateral to fund ongoing

business operations and administration of these chapter 11 cases, the Debtors will preserve the

value of the Debtors' assets as a going concern. Thus, the Debtors can continue to run their

business successfully, but only if they are allowed to use Cash Collateral in the course of their

day-to-day operations. Without such use, the detrimental result to the estate will be rapid and

ultimately disastrous, given the nature of the Debtors' business. Access to Cash Collateral is

crucial to the Debtors' ability to avoid immediate and irreparable harm to their estates, creditors,

and ongoing businesses both before and after the Final Hearing.

162.     The Debtors respectfully submit that the proposed use of Cash Collateral,

in conjunction with the DIP Facility, is necessary for the Debtors to have sufficient liquidity

during the chapter 11 process to preserve their assets and property (including the Prepetition

Collateral). The Debtors' proposed use of Cash Collateral thus prejudices no one; it

affirmatively and directly benefits the Debtors' estates and creditors, including the Prepetition

Secured Parties, and enhances the prospects of a successful outcome of the chapter 11 cases.

163.     If the Debtors are unable to obtain approval of the use of Cash Collateral

and the DIP Facility on a final basis, their ability to consummate their carefully constructed

prepackaged bankruptcy will be jeopardized, reducing recoveries to all creditors. Entry of the

Interim Order, and, after the requisite notice and the Final Hearing, the Final Order is therefore

(i) critical to the Debtors' ability to reorganize pursuant to the Bankruptcy Code, (ii) in the best

interests of the Debtors and their estates, and (iii) necessary to avoid irreparable harm to the

Debtors, their creditors and their assets, business, goodwill, reputation and employees.

Furthermore, access to the Cash Collateral and the initial proceeds under the DIP Facility on an

interim basis is necessary to avoid immediate and irreparable harm to the Debtors pending the

Final Hearing. The Debtors, therefore, believe that the relief sought in the Cash Collateral and DIP Motion is in the best interest of the Debtors and their estates.

**L.** **Debtors' Motion for Entry of an Order (I) Scheduling a Combined Hearing to Consider (A) Approval of the Disclosure Statement, (B) Approval of the Prepetition Solicitation Procedures and Forms of Ballots, and (C) Confirmation of the Prepackaged Plan; (II) Establishing Deadline and Procedures to Object to the Disclosure Statement and Prepackaged Plan; (III) Approving the Form and Manner of Notice of (A) Commencement of the Chapter 11 Cases and (B) the Combined Hearing; (IV) Directing the Office of the United States Trustee to not Convene a Meeting of Creditors or Appoint a Statutory Committee; and (V) Granting Related Relief (the "Combined Hearing Motion")**

164.    The Debtors seek an order (i) scheduling a combined hearing (the "Combined Hearing") to consider: (a) approval of the Disclosure Statement, (b) approval of the prepetition solicitation procedures (the "Solicitation Procedures") and forms of voting ballots, and (c) confirmation of the prepackaged Plan; (ii) establishing deadlines and procedures for filing objections to the adequacy of the Disclosure Statement and the Solicitation Procedures, and confirmation of the prepackaged Plan; (iii) approving the form and manner of notice of: (a) the commencement of the chapter 11 cases and (b) the Combined Hearing; (iv) directing the Office of the United States Trustee to not convene a meeting of creditors or appoint any statutory committee; and (v) granting related relief. The Debtors believe such relief is in the best interest of their estates and all parties in interest.

165.    The Debtors engaged AlixPartners to act as its voting and solicitation agent (the "Solicitation Agent") for the purpose of distributing the Disclosure Statement, the prepackaged Plan and the customized ballots (the "Ballots," together with the Disclosure Statement and the prepackaged Plan, the "Solicitation Package") to all holders of claims required

to approve the Restructuring and entitled to vote to accept or reject the prepackaged Plan; specifically, the Prepetition Lenders.

166.    On January 13, 2010, the Debtors, through their Solicitation Agent, mailed a copy of the Solicitation Package by overnight delivery to each of the Prepetition Lenders.

167.    The Debtors established January 27, 2010 at 12:00 p.m. as the deadline for receipt of votes to accept or reject the Restructuring and the prepackaged Plan (the "Voting Deadline").

## Request for Combined Hearing

168.    The Debtors submit that a combined hearing in these chapter 11 cases would promote judicial economy and the expedient and economical reorganization of the Debtors. The potential adverse effects of the chapter 11 filings upon the Debtors' businesses and going concern value will be minimized, and the benefit to creditors maximized through prompt distributions and the reduction of administrative expenses of the estate. Therefore, the Debtors seek entry of the Combined Hearing Order, setting a date for the Combined Hearing at which this Court will consider (a) approval of the Disclosure Statement and the Solicitation Procedures and (b) confirmation of the prepackaged Plan. The Debtors seek, subject to the Court's availability, that the Combined Hearing be set on a date that is on or within seven (7) days of the deadline established by the Court for filing objections to the Disclosure Statement and Plan (as discussed below).

## Request to Shorten Notice of Combined Hearing and Deadline to Object to Adequacy of Disclosure Statement, Solicitation Procedures and Confirmation of the Prepackaged Plan

169.    The Debtors submit that cause exists in these cases to reduce the time within which parties in interest may file objections to the Disclosure Statement and Plan, and

request that the Court set February 15, 2010 as the last date to file objections ("Objections") to the adequacy of the Disclosure Statement, the Solicitation Procedures, or confirmation of the prepackaged Plan (the "Objection Deadline") and set the Combined Hearing on a date that is on or within seven (7) days of the Objection Deadline.

170.    As set forth above, the Debtors' primary operating business and source of revenue is Debtor Arbonne (and its subsidiaries), which utilizes a direct sales network of independent consultants (AICs) to market and sell Arbonne products. The success and viability of Arbonne's business is dependent upon its reputation and the loyalty of its customers, which are in turn dependent on the AIC network.

171.    To help maintain the AIC network, Arbonne hosts various conferences for the AICs ever year to recognize the AICs' achievements and to provide training by top field and industry speakers. The most notable of these conferences is the NTC, to which every AIC is invited and encouraged to attend and where Arbonne hosts recognition meetings, dinners and luncheons for thousands of dedicated AICs in honor of their sales and sponsoring achievements. The NTC for 2010 is scheduled to begin on March 16, 2010.

172.    The Debtors believe that failure to emerge from chapter 11, or to at least confirm the prepackaged Plan in advance of the NTC could have a negative impact on the AIC network and Arbonne's revenues. Permitting the Debtors to shorten the notice period with respect to the Objection Deadline and Combined Hearing would help eliminate this concern and ensure that value is maximized for the Debtors' stakeholders. Further, shortening the notice period with respect to the Objection Deadline and Combined Hearing will not prejudice parties in interest.

64

173.     As set forth above, prior to the Petition Date, the Debtors negotiated the

terms of the Restructuring with their major creditor constituencies, and solicited votes on the

Restructuring and prepackaged Plan through the Disclosure Statement, which solicitation

commenced on January 13, 2010. Thus, if February 15, 2010 is set as the Objection Deadline,

the creditors holding claims in the impaired classes entitled to vote on the Plan will have had the

Disclosure Statement and Plan for approximately thirty-three (33) days in advance of the

Objection Deadline and approximately forty (40) days in advance of the Combined Hearing.

174.     Furthermore, it should be noted that holders of OpCo Lender Claims and

holders of HoldCo Lender Claims (the two impaired classes of claims entitled to vote on the

prepackaged Plan) voted overwhelmingly in favor of the prepackaged Plan, and that, with the

exception of these two classes of claims and the holders of equity interests in NPG, all other

classes of claims and interests are unimpaired under the Plan. Thus, there is no reason to delay

consideration of the adequacy of the Disclosure Statement and confirmation of the prepackaged

Plan and cause exists to shorten the notice period with respect to the Objection Deadline and

Combined Hearing.

175.     Accordingly, the Debtors seek that (a) the Court establish February 15,

2010 as the Objection Deadline and (b), subject to the Court's availability, schedule the

Combined Hearing on a date that is on or within seven (7) days of the Objection Deadline.

**Procedures for Objections to Adequacy of**
**Disclosure Statement, Solicitation Procedures**
**and Confirmation of the Prepackaged Plan**

176.     The Debtors propose that the Court direct that any Objections must: (a) be

made in writing; (b) state the name and address of the objecting party and the nature and amount

of the claim against or interest in the Debtors asserted by such party; (c) state with particularity

65

the legal and factual basis for such Objection, including, if applicable, suggested language to be added or existing language to be amended or deleted from the Disclosure Statement, prepackaged Plan and/or order confirming the prepackaged Plan; and (d) be filed with the Bankruptcy Court no later than 4:00 p.m. (Prevailing Eastern Time) on the Objection Deadline and served so as to be received no later than the Objection Deadline by the following parties at the following addresses: (i) White & Case LLP, 200 South Biscayne Boulevard, Suite 4900, Miami, Florida 33131 (Attn: Matthew C. Brown, Esq.), and Fox Rothschild LLP, Citizens Bank Center, Suite 1600, 919 North Market Street, Wilmington, Delaware 19801 (Attn: Jeffrey M. Schlerf, Esq.), proposed co-counsel to the Debtors; and (ii) the Office of the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attn: David L. Buchbinder, Esq.).

## Approval of Form, Manner and Sufficiency of Notice of the
## Commencement of the Cases and the Combined Hearing

177.    The Debtors respectfully submit that the proposed procedures for transmitting the notice of the Combined Hearing (the "Combined Hearing Notice") to parties in interest are adequate under the circumstances and should be approved.

178.    Combined Hearing Notice. Within four (4) days after the entry of the Combined Hearing Order, the Debtors propose to transmit by first-class mail or any other method approved by the Court[25] a copy of the Combined Hearing Notice, substantially in the form attached to the Combined Hearing Motion as Exhibit "B", to all of the Debtors' known creditors and equity interest holders (as of January 12, 2010) entitled to vote on the Plan, and all other entities required to be served under Bankruptcy Rules 2002 and 3017. Among other

---

[25]    As described above, the Debtors are seeking authority through the AIC Notice Motion to serve active and former AICs by electronic mail.

things, the Combined Hearing Notice sets forth: (a) the date of the commencement of these chapter 11 cases, (b) notice of implementation of the automatic stay pursuant to section 362 of the Bankruptcy Code, (c) the date of the Combined Hearing, (d) the procedures for obtaining a copy of the Disclosure Statement and prepackaged Plan, and (e) deadlines and procedures for filing Objections to the Disclosure Statement, the Solicitation Procedures, and confirmation of the prepackaged Plan, and opting out of the releases by creditors and equity security holders contained therein.

179.    Because of the sensitive relationship between the Debtors and their AICs, the Debtors further propose to provide a letter from the Chief Executive Officer of Arbonne, substantially in the form attached to the Combined Hearing Motion as Exhibit "C", with the Confirmation Notice to be sent to the active and inactive AICs.[26] The Debtors believe that such a letter will provide comfort to the AICs at de minimis cost and prevent the potential attrition that might otherwise result if the AICs receive the Confirmation Notice without any personal reassurance in a manner familiar to them that normal business operations are expected to continue through the chapter 11 cases.

180.    Notice of Non-Voting Status. In addition, the Debtors propose to mail or cause to be mailed by first-class mail or any other method approved by the Court a notice of non-voting status to holders of classes deemed to accept or reject the prepackaged Plan. Specifically, the Debtors propose to send (a) to holders of Class 1 – Priority Claims, Class 4 – Secured Claims, Class 5 – Unsecured Claims and Class 7 – Other Equity Interests a notice of non-voting status, substantially in the form attached to the Combined Hearing Motion as Exhibit "D-1" (the . "Notice of Non-Voting Status – Unimpaired Classes"), which identifies the classes designated as

---

[26]    "Inactive AICs" does not include independent consultants for which Arbonne has terminated the independent consultant contract prior to the Petition Date.

being unimpaired and deemed to have accepted the prepackaged Plan; and (b) to holders of Class 6 – NPG Equity Interests a notice of non-voting status, substantially in the form attached to the Combined Hearing Motion as Exhibit "D-2" (the "Notice of Non-Voting Status – Deemed Rejected Class" and, collectively with the Notice of Non-Voting Status – Unimpaired Classes, the "Non-Voting Notice"), which identifies the class designated as being deemed to have rejected the Plan. Among other things, the Non-Voting Notice also sets forth: (a) the date of the commencement of these chapter 11 cases, (b) notice of implementation of the automatic stay pursuant to section 362 of the Bankruptcy Code, (c) the date of the Combined Hearing, (d) the procedures for obtaining a copy of the Disclosure Statement and prepackaged Plan, (e) the deadlines and procedures for filing Objections to the Disclosure Statement, the Solicitation Procedures, and opting out of the releases by creditors and equity security holders contained therein, and (f) the treatment to be received by the non-voting classes under the prepackaged Plan.

181.    Publication Notice.  Bankruptcy Rule 2002(l) permits the Court to "order notice by publication if it finds that notice by mail is impracticable or that it is desirable to supplement notice." Fed. R. Bankr. P. 2002(l).  At least seven (7) days prior to the Objection Deadline, the Debtors propose to publish the Combined Hearing Notice (substantially in the form attached to the Combined Hearing Notice as Exhibit "B") in the national edition of The Wall Street Journal.  The Debtors believe that publication of the Combined Hearing Notice will provide sufficient notice to persons who may not otherwise receive notice by mail or other methods of service approved by the Court.

182.    Online Notice.  In addition, the Debtors propose to post various chapter 11 related documents to the website for the Solicitation Agent, including the following: (a) the

prepackaged Plan, (b) the Disclosure Statement, (c) this Motion and any orders entered in connection with this Motion, (d) the Combined Hearing Notice, and (e) the Notice of Non-Voting Status. The Solicitation Agent's website address is: http://www.npginfo.com.

183.     The Debtors believe that (a) service and publication of the Combined Hearing Notice, (b) service of the Non-Voting Notice, and (c) online posting of the Combined Hearing Notice and the Non-Voting Notice (together, the "Confirmation Notices") will provide all parties in interest in the Debtors' chapter 11 cases ample and sufficient notice of the Combined Hearing, the Objection Deadline and the procedures for objecting to the adequacy of the Disclosure Statement, the Solicitation Procedures, and confirmation of the prepackaged Plan. Accordingly, the Debtors seek the waiver of any provision of Bankruptcy Rule 3017(d) requiring the Debtors to distribute the Solicitation Package to unimpaired creditors or to other parties-in-interest, other than as prescribed by the Combined Hearing Order.

## No Requirement to Convene a Section 341 Meeting of Creditors and No Reason to Appoint a Statutory Committee

184.     As set forth above, the Debtors solicited voting and obtained the requisite amount of acceptances of the prepackaged Plan prior to the Petition Date. Because the prepackaged Plan has already been accepted by those classes of creditors that are impaired and entitled to vote on the prepackaged Plan, the Debtors anticipate a brief stay and prompt emergence from these chapter 11 cases. Furthermore, the prepackaged Plan provides that general unsecured creditors are unimpaired and shall be paid in full, and the HoldCo Lenders, whose claims are unsecured, have voted overwhelmingly in favor of the Plan. Accordingly, the Debtors submit that ample cause exists for this Court to direct the United States Trustee not to convene a meeting of creditors or equity security holders and not to appoint any statutory

committee in these cases unless the prepackaged Plan has not been confirmed within ninety (90) days after the Petition Date.

**Approval of Solicitation Procedures**

185. <u>Voting Record Date</u>. Bankruptcy Rule 3017(d) provides that the "date the order approving the disclosure statement is entered" shall be the record date for determining the "holders of stock, bonds, debentures, notes, and other securities" entitled to receive the materials specified in Bankruptcy Rule 3017(d), unless another date is fixed by the court. Because solicitation in these cases began before the Petition Date, the Debtors seek that the Court establish January 12, 2010, as the record date (the "Voting Record Date") for determining the identities of the holders of Class 2 – OpCo Lender Claims and Class 3 – HoldCo Lender Claims who were entitled to receive Solicitation Packages and are entitled to receive the Combined Hearing Notice.

186. <u>Approval of the Ballots</u>. Under the prepackaged Plan, holders of Class 2 – OpCo Lender Claims and Class 3 – HoldCo Lender Claims were entitled to vote on the prepackaged Plan.

187. The forms of Ballots were customized for each impaired class, and are attached to the Combined Hearing Motion as Exhibit "E-1" (holders of Class 2 – OpCo Lender Claims) and Exhibit "E-2" (holders of Class 3 – HoldCo Lender Claims).

188. The Ballots are consistent with the appropriate Official Form and thus satisfy the requirements of Bankruptcy Rule 3017(d). Among other things, the Ballots give notice of the time within which acceptances and rejections of the prepackaged Plan had to be received and the methods for transmitting the Ballot to the Solicitation Agent. Accordingly, the

70

Debtors seek that, at the Combined Hearing, the Court approve the Ballots in the forms attached to the Combined Hearing Motion as Exhibits "E-1" and "E-2".

189. <u>Prepetition Transmittal of Solicitation Package</u>. Bankruptcy Rule 3017(d) specifies the materials to be distributed to all impaired creditors and equity security holders for the purpose of soliciting their votes of acceptance or rejection of a plan of reorganization. As discussed above, in accordance with Bankruptcy Rule 3017(d), on January 13, 2010, the Debtors caused the Solicitation Agent to transmit by overnight delivery the Solicitation Package to the Prepetition Lenders. The Debtors believe that the method of solicitation employed to transmit the Solicitation Packages was sufficient under the circumstances and should be approved at the Combined Hearing.

190. Classes 1, 4, 5 and 7 are unimpaired under the prepackaged Plan and, therefore, pursuant to section 1126(f) of the Bankruptcy Code, are conclusively presumed to have accepted the prepackaged Plan and are not entitled to vote on the prepackaged Plan. Class 6 is not entitled to any distribution under the prepackaged Plan and, therefore, pursuant to section 1126(f) of the Bankruptcy Code, is conclusively presumed to have rejected the prepackaged Plan and is not entitled to vote on the prepackaged Plan. Accordingly, Classes 1, 4, 5, 6, and 7 did not receive Solicitation Packages.

191. <u>Approval of Voting Deadline</u>. The Debtors began solicitation of votes for approval of the prepackaged Plan on January 13, 2010. The Ballots clearly provided that, in order to be counted, such Ballots must be received by the Solicitation Agent no later than 12:00 p.m. (Prevailing Eastern Time) on the Voting Deadline of January 27, 2010.

192. The Debtors believe that this solicitation period provided the holders of Class 2 – OpCo Lender Claims and Class 3 – HoldCo Lender Claims ample time to make an

71

informed decision to accept or reject the Restructuring and the prepackaged Plan. As discussed above, the prepackaged Plan represents the culmination of a lengthy negotiation process between and among the Debtors, the OpCo Lenders and the HoldCo Lenders. Certain of the Prepetition Lenders and the Prepetition Agents retained sophisticated counsel to represent their respective interests in the negotiations with the Debtors, including with respect to the formulation of the terms of the Restructuring, the prepackaged Plan and the Disclosure Statement. Such parties received drafts of the documents comprising the Solicitation Package in advance of the solicitation period. Such negotiations resulted in the Debtors executing a plan support agreement with a substantial majority of the OpCo Lenders and plan support agreements with a substantial majority of the HoldCo Lenders before the solicitation period commenced. Accordingly, the Debtors submit that, given the lengthy negotiation process and the involvement of sophisticated counsel, the fourteen-day solicitation period is sufficient under the circumstances and should be approved.

193. <u>Approval of Procedures for Vote Tabulation.</u> The Debtors required that claim holders voting on the prepackaged Plan vote all of their claims either to accept or reject the prepackaged Plan. In accordance with Bankruptcy Rule 3018(a), the Debtors propose that whenever two or more Ballots are cast voting the same claim prior to the Voting Deadline, the first Ballot received prior to the Voting Deadline will be deemed to reflect the voter's intent, without prejudice to the Debtors' right to count any later-cast Ballot for all purposes. This procedure of counting the first Ballot received is consistent with Bankruptcy Rule 3018(a), which requires a creditor to show cause, after notice and a hearing, why such creditor should be permitted to change or withdraw its acceptance or rejection of the prepackaged Plan by the casting of a later Ballot.

## Adequacy of the Disclosure Statement

194.     The Debtors seek that, at the Combined Hearing, the Court approve the Disclosure Statement as providing adequate information within the meaning of section 1125(a)(1) of the Bankruptcy Code.

195.     The Disclosure Statement is extensive and comprehensive and contains descriptions and summaries of, among other things, (a) the Out-of-Court Transaction, (b) the prepackaged Plan, (c) certain events preceding the commencement of the Debtors' chapter 11 cases, (d) securities to be issued under the prepackaged Plan, (e) risk factors affecting the prepackaged Plan, (f) a liquidation analysis setting forth the estimated return that creditors would receive in a hypothetical chapter 7 liquidation, (g) financial information and projections that would be relevant to creditors' determinations of whether to accept or reject the prepackaged Plan, and (h) federal tax law consequences of the prepackaged Plan.

196.     In addition, the Disclosure Statement is the product of a collaborative effort among the Debtors and the majority of the Prepetition Lenders, and reflects comments received from the members of each group and counsel thereto.

197.     Accordingly, the Debtors submit that the Disclosure Statement contains adequate information within the meaning of section 1125 of the Bankruptcy Code, and should be approved at the Combined Hearing.

## Confirmation of the Prepackaged Plan

198.     The Debtors believe that the prepackaged Plan satisfies all of the requirements for confirmation under the Bankruptcy Code and seek an order confirming the prepackaged Plan to be entered at the Combined Hearing. Prior to the Combined Hearing, the Debtors intend to file a memorandum of law in support of confirmation of the prepackaged Plan

MIAMI 820996 (2K)

demonstrating that it satisfies each requirement for confirmation and responding to objections to confirmation, if any. Also prior to the Combined Hearing, the Debtors will submit to the Court the proposed form of order approving the Disclosure Statement and Solicitation Procedures, and confirming the prepackaged Plan.

199.    For all the foregoing reasons, the Debtors believe that the relief requested in the Combined Hearing Motion is in the best interest of the Debtors, their estates and all parties in interest.

## Conclusion

200.    The Debtors hope to confirm a plan of reorganization and emerge from chapter 11 in as short a time as is necessary. The Debtors believe that the protections afforded by chapter 11 will enable them to develop, implement and consummate a financial restructuring that will provide for the equitable treatment of all claims and interests, and preserve the value of their assets for the benefit of creditors and equity security holders alike.

74

NATURAL PRODUCTS GROUP, LLC,
(for itself and on behalf of each of its affiliated
debtors as debtors and debtors in possession)

By: _____

Mark I. Lehman
Chief Financial Officer and Secretary

Subscribed and sworn to (or affirmed) before me on this 27th day of January , 2010, by
Mark I. Lehman , proved to me on the basis of satisfactory evidence to be the person who
appeared before me.

_____
Notary Public

KIMBERLY ANNE HOLLAND
Commission # 1794430
Notary Public - California
Orange County
My Comm. Expires Mar 28, 2012

## Bankruptcy Cases Concurrently Filed By
## Any Partner or Affiliate of the Debtor

**The Debtor and each of the affiliated entities listed below filed in this Court a voluntary petition for relief under chapter 11 of title 11 of the United States Code:**

Natural Products Group, LLC

Arbonne Intermediate Holdco, Inc.

Levlad Intermediate Holdco, Inc.

Arbonne International, LLC

Levlad, LLC

Arbonne Institute of Research and Development, LLC

Arbonne International Holdings, Inc.

Arbonne International Distribution, Inc.